**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC,

       Plaintiff,

v.

ARKOWL, LLC and
ARKOWL CORPORATION,

       Defendants.

---

**PLAINTIFF DARKOWL, LLC'S MOTION TO EXCLUDE EVIDENCE AND
TESTIMONY FROM MARK KEEGAN**

Plaintiff DarkOwl, LLC ("DarkOwl") moves the Court for an order precluding Defendants' expert witness, Mark Keegan ("Keegan"), from testifying at trial or presenting evidence on the issue of the likelihood of confusion between the disputed marks because his report and intended testimony do not meet the threshold of reliability required under *Daubert* and Federal Rules of Evidence 702 and 403. Keegan's report would confuse, rather than help, the trier of fact, and result in prejudice to DarkOwl. His testimony and report should therefore be excluded.

**I.**    **INTRODUCTION**

Defendant ArkOwl retained Keegan as an expert witness to "determine the extent to which, if at all, there is a likelihood of confusion among relevant consumers between cybersecurity software services sold under the contested DarkOwl mark (as marketed by the plaintiff) and services sold under the defendant's ArkOwl mark." Keegan Survey, ¶3, attached as *Exhibit A*. To that end, Keegan "designed and executed a national consumer study of 207 likely purchasers of the parties' services – i.e. cybersecurity software services… to test for the presence of likelihood of confusion… among these relevant consumers." *Id.*, ¶4. As a result of the survey, Keegan

concluded that there is a likelihood of confusion among consumers between services sold under the plaintiff's DARKOWL mark and services sold under the defendant's ARKOWL mark.

However, Keegan's survey is fatally flawed because it failed to test the appropriate population—consumers who have purchased or who are likely to purchase services similar to those offered by alleged infringer DarkOwl. The survey was instead designed to select consumers whose position involved "data services" and who are prospective purchasers of ArkOwl's "data verification services" or "fraud prevention services." This fatal flaw is no surprise, as this is the same type of error that led to two prior surveys conducted by Keegan being excluded by other federal courts. The reliability of the survey here is further undermined as a result of Keegan's erroneous assumption that the parties are "direct competitors" and for failing to reasonably replicate marketplace conditions. Keegan also failed to use a proper control to reliably account for the suggestive survey design.

As discussed in detail below, Keegan's survey is legally and factually flawed and will mislead a factfinder and should therefore be excluded.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), provide the framework governing the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Acting as a "gatekeeper," the Court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597; *see also U.S. v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012).

Performing the "gatekeeper" analysis requires two steps.  First, the "District Court must [] determine whether the expert is qualified 'by knowledge, skill, experience, training, or education to render an opinion.'"  *Avitia-Guillen*, 680 F.3d at 1256 (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009)).  Assuming "the expert is sufficiently qualified, the court must determine whether the expert's opinion is **reliable** by assessing the underlying **reasoning and methodology**."  *Nacchio*, 555 F.3d at 1241 (emphasis added).  "Reliability questions may concern the expert's data, method, or his application of the method to the data."  *Id.*  "Under *Daubert*, any step that renders the expert's analysis unreliable ... renders the expert's testimony inadmissible."  *Nacchio*, 555 F.3d at 1241 (quoted reference omitted); *see also Wells v. Kawasaki Motors Corp.*, 854 F. App'x 242, 246 (10th Cir. 2021).

The proponent of expert testimony bears the burden of showing that the testimony is admissible.  *Nacchio*, 555 F.3d at 1238, 1241.  Guided by these principles, a court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible.  *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004).  "The 'touchstone' of admissibility of expert testimony is its helpfulness to the trier of fact."  *Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002); *see also Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2004) (The fundamental issue is whether the proffered testimony "advances the purpose of aiding the trier of fact.").  Because of the "special dangers to the fact-finding process" posed by expert testimony, district courts must exclude such testimony "unless they are

convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1223 (D. Colo. 1998).

### III. ARGUMENT

#### A. Keegan's Opinions and Report Should Be Excluded Because He Failed To Survey The Appropriate Population

If the survey universe consists of individuals whose state of mind is not relevant to the legal issue being tested, the survey is likely to be excluded from evidence or given no weight by the court. Trademark and Deceptive Advertising Surveys: Law, Science, and Design 28 (Shari C. Diamond & Jerre Bailey Swann, eds., ABA Book Publishing, 1st ed. 2012). A misstep in the survey design process, including the universe, can potentially render all future work on the survey meaningless, as courts frequently discount, or even exclude, surveys with flawed universes. *Id*. at p. 49. In fact, courts have held that the selection of the proper universe is one of the most important factors in assessing the validity of a survey as well as the weight that it should receive. *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980) (stating that "one of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe' that is the person interviewed must adequately represent the opinions which are relevant to the litigation"); *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp.2d 734, 767 (E.D. Mich. 2003) ("Selection of a proper universe is so critical that even if the proper questions are asked, the results are likely to be irrelevant.").

"To test forward (direct) confusion, 'the proper universe to survey is composed of the potential buyers of the junior user's goods or services.'" *Kodiak Cakes, LLC v. JRM Nutrasciences, LLC*, No. 220CV00581DBBJCB, 2022 WL 17340660, at *12 (D. Utah Nov. 30, 2022); *OraLabs, Inc. v. Kind Grp. LLC*, No. 13-CV-00170-PAB-KLM, 2015 WL 4538442, at *5 (D. Colo. July 28, 2015).

### 1. Keegan Failed to Identify DarkOwl's Prospective Purchasers

Although Keegan recognizes that the appropriate universe for his survey in this case should have been prospective purchasers of DarkOwl's offerings, he designed a survey that did not properly identify this universe. *See* Keegan Survey, ¶19. Specifically, Keegan's survey states:

> In a typical case alleging forward confusion, such as the current matter, the appropriate population from which to sample is likely purchasers of services or **services bearing the "junior" user's mark**. "Junior" mark refers to the mark at issue in the case that is a later entrant to the marketplace – in this case, DarkOwl.

*Id.* (emphasis added),

However, Keegan's own sworn testimony admits that he did not have information about DarkOwl's current customers and did nothing to investigate them. Keegan testified that he reviewed only information regarding ArkOwl's customers in order to prepare the survey:

> Q. So taking a step back, what investigation did you conduct to understand the job titles for potential customers for DarkOwl's services?
>
> A. Oh. Well, I reviewed a number of job titles for ArkOwl for customers and potential customers for ArkOwl and that informed me to some degree as to the job titles for DarkOwl. In addition many of the job titles of the respondents in my survey referenced things like, you know, cybersecurity and so on, things that using similar terminology that DarkOwl uses in describing its services.
>
> Q. So you don't have any information about DarkOwl's current customers, do you?
>
> A. I do not.
>
> Q. And you don't have any information about the – job titles of potential customers that DarkOwl is specifically targeting, do you?
>
> A. No.
>
> Q. Did you attempt to research the job titles for DarkOwl's customers specifically?
>
> A. No.
>
> \* \* \*
>
> Q. Did you talk through which of in particular these six services are relevant to –would identify potential DarkOwl customers?

> A. I don't recall.
>
> Q. Do you recall speaking with anyone else about which of these six services are relevant – would identify a potential DarkOwl customer?
>
> A. I don't.

Keegan Depo. 183:11-184:8; 189:8-15, attached as *Exhibit B*.

Keegan also revealed a lack of understanding of DarkOwl's customers, despite claiming to have reviewed DarkOwl's website, which discusses specific "use cases" for its services.

> Q. And do you understand that DarkOwl' service are directed towards intelligence agencies?
>
> A. I don't have that understanding.
>
> \* \* \*
>
> Q. Do you understand that DarkOwl potential customers include law enforcement agencies?
>
> A. Again, I think they have wide scope of industries and I don't have that particular understanding. I've seen nothing to say that they target, for example, law enforcement agencies, but I'm sure they wouldn't say no.

Keegan Depo. 197:12-14; 197:22-198:5; *See also* excerpts from DarkOwl's public marketing documents, attached as *Exhibit C*.

Although Keegan reviewed confidential documents from ArkOwl specifically discussing and identifying ***its*** services and potential customers, he did not identify or review ***any*** documents discussing DarkOwl's potential customers, except for DarkOwl's publicly available website.[1] Keegan Survey, Ex. 2. Had he, or had he at least reviewed the publicly available website in detail, Keegan would have had, at a minimum, a working understanding of DarkOwl's services and target customers and been able to design a survey to test the correct consumer group.

---

[1] Nor did ArkOwl's counsel disclose Keegan as an expert who may receive designated Confidential and Highly Confidential – Attorney Eyes Only protected information in this matter pursuant to Paragraph 8(a) of the Stipulated Protective Order prior to Keegan's development of the survey.

Because Keegan failed to even identify DarkOwl's universe of prospective customers, his survey cannot be deemed reliable.

### 2. The Universe Keegan Tested Did Not Represent DarkOwl's Prospective Customers

The universe of respondents Keegan tested through his survey did not represent prospective customers of DarkOwl's highly specialized darkweb services. Rather, Keegan designed the survey to be administered to prospective purchasers of *ArkOwl's* offering – "user or customer identification or data verification services" and "fraud prevention services," which differ in significant ways from DarkOwl's offerings.

After a series of introductory screening questions, Keegan screened respondents based on whether they personally used "data services" as part of their job responsibilities. If they responded in the affirmative, Keegan's following screening question specifically asked whether respondents used "user or customer identification or data verification services" or "fraud prevention services."

> 54. Respondents were next asked a question to determine whether they use the specific types of data services provided by the parties as part of their job responsibilities:
>
> Which, if any, of the following types of vendor-provided services do you personally use as part of your job responsibilities? Please select all that apply.
> ☐ User or customer identification or data verification services
> ☐ Web hosting or website maintenance or website usability services
> ☐ Search engine optimization (SEO) services
> ☐ Merchant account or commercial banking services
> ☐ E-commerce / Online shopping cart services
> ☐ Social media / digital marketing services
> ☐ Fraud prevention services
> ☐ None of these

Keegan Survey ¶54. Respondents had to select one of these two sets of services to qualify for the survey. Yet, these are the precise offerings that ArkOwl provides through its email and phone number verification services for fraud prevention. ArkOwl Customer Agreement, 1.1, attached as

*Exhibit D.*  Noticeably absent from the list of potentially relevant "data services" are DarkOwl's services -- dark web data collection and a searchable database of content gathered from the dark web.  Excerpts from DarkOwl's website, attached as *Exhibit E.*  Indeed, the terms "dark web" or "dark net" do not appear in Keegan's survey until after the survey confirmed respondents were part of ArkOwl's potential purchaser universe, and even then, respondents were asked only to "imagine" that respondents' organization needed a vendor to supply certain cybersecurity offerings, including "darknet intelligence services" or "darknet content index services," with the response only used to determine respondents' involvement in decision making.

> 56. The next question sought to identify decision-makers that, on behalf of their company, would be involved in the decision to purchase the types of services that are sold by the parties—i.e., cybersecurity software services. Respondents were asked:
>
>> Imagine that your company/organization is in need of a vendor or vendors to supply any of the following:
>> - Data for customer verification
>> - Data and cybersecurity software and services
>> - Darknet intelligence services
>> - Darknet content index services

> How would you describe your involvement in the process of identifying, vetting, and hiring such a vendor or vendors?
> ○ I would engage in the vetting process and make the hiring decision on my own
> ○ In combination with others, I would engage in the vetting process and make the hiring decision
> ○ I would influence the vetting process and hiring decision
> ○ I would not be involved in the vetting process or making hiring decision
> ○ Other
> ○ I am not sure

Keegan Survey ¶56.

As a result of his flawed screening, Keegan tested the perceptions of ArkOwl's prospective purchasers, not DarkOwl's, making his study irrelevant to the likelihood of confusion in this case. Any attempt to rehabilitate this fatal flaw by speculating that ArkOwl's prospective customers are also in fact DarkOwl's prospective customers simply because ArkOwl and Keegan unilaterally assert that the parties are direct competitors ignores the stark differences between the parties' respective offerings and target consumers.  And indeed, Keegan admitted that not only did he rely on ArkOwl's assertion that the parties are competitors, but that if DarkOwl and ArkOwl were not competitors, that fact would impact his evaluation of his work:

> Q. Would your opinions in this matter change if DarkOwl does not provide email or telephone number verification services?
>
> A. It's hard to say.  My understanding broadly is that these companies are competitors and hence the basis for the type of survey that I conducted.  If somehow these companies are not competitors, that would certainly be news to me and would – would impact my evaluation of – of the work that I've done in this case.
>
> \* \* \*
>
> Q. So I understand from your discussion today but please let me know if I have this incorrect, that you relied at least in part on your discussions with Mr. Daline for your understanding that ArkOwl and DarkOwl are competitors is that correct?
>
> A. Yes.

Keegan Depo. 36:21-37:5; 38:19-25.

Regardless of the parties' competitor status, Keegan should have examined a universe composed of potential purchasers of DarkOwl's offerings, but he did not.  Instead, he chose to disregard DarkOwl's customer and service offering nuances, and questioned survey respondents that are potential customers of ArkOwl's offering.  This is a critical mistake.  "When surveys do not appropriately target the junior user's goods and services … they have been routinely excluded as unhelpful to a jury."  *Hain Blueprint, Inc. v. Blueprint Coffee, LLC*, 2018 U.S. Dis. LEXIS

- 9 -

201886 at *6-7 (E.D. Mo. Nov. 29, 2018) citing Leelanau *Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007). And in fact, multiple courts have excluded Keegan's studies for a similarly flawed universe selection. *See von Rosenberg v. Lawrence*, 413 F. Supp. 3d 437 (D. S.C. 2019) (excluding Keegan's survey noting he "improperly limited respondents… thus surveying the wrong universe of respondents"); *see also Kudos Inc. v. Kudoboard LLC*, 2021 U.S. Dist. LEXIS 224311 (N.D. Ca. Nov. 20, 2021) (excluding Keegan's survey noting that "Keegan's sample selection does not capture a representative sample of the customers 'most likely to purchase' [junior user's] products").

ArkOwl cannot carry its burden to show the reliability and relevance of Keegan's survey given the fatally flawed universe selection. As such, Keegan's study should be excluded by this Court just as other courts have excluded Keegan (and others') studies suffering from similar flaws.

### 3. The general consumer panel Keegan used did not draw a representative sample from the appropriate universe.

The reliability of Keegan's survey is also undermined by the fact that Keegan chose to utilize "general consumer panels" rather than "specialty panels," despite the nuanced and sophisticated nature of DarkOwl's services and its customers. A bedrock principle in trademark litigation is that survey evidence may be evidence of "actual" confusion but only to the extent that the survey mirrors the real world setting which can create an instance of actual confusion. 4 McCarthy on Trademarks and Unfair Competition § 23.2.50 (5th ed. 2022). A court should exclude a survey if the "sample of respondents clearly does not represent the universe it is intended to reflect." *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F.Supp.2d 1312, 1334 (D. Kan. 2005). Further, a party introducing a consumer survey bears the burden of establishing that not only was a proper universe examined, which as explained above, in this case it was not, and a representative sample was drawn from that universe. *See Kudos*, 2021 U.S. Dist. LEXIS 224311

at 38 (N.D. Cal 2021); *see also Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F.Supp.3d 270, 285 (W.D.N.Y. 2019); *see also NFL Props. v. N.J. Giants, Inc.*, 637 F.Supp. 507, 513-14 (D.N.J. 1986) *citing* Federal Judicial Center, *Manual For Complex Litigation*, 116 (5th ed. 1981).  If a survey suffers from substantial methodological flaws, it will be excluded under both Rule 403 and Rule 702.  *Saxon Glass*, 393 F.Supp.3d at 285.

Here, Keegan did not design the survey to obtain a sample that is representative of the target population -- prospective purchasers of DarkOwl's services.  *Water Pik, Inc. v. Med-Systems, Inc.*, 2012 U.S. Dis. LEXIS 81592 at *11, 16 (Colo. 2012).  Keegan seemingly admitted in his deposition that he was unaware of DarkOwl's customers' unique characteristics and use cases, including for example that he did not understand that DarkOwl offers its services to intelligence agencies, law enforcement agencies, and national security:

> Q. And do you understand that DarkOwl's services are directed towards intelligence agencies?
>
> A. I don't have that understanding.
>
> \* \* \*
>
> Q. Do you understand that DarkOwl potential customers include law enforcement agencies?
>
> A. Again, I think they have a wide scope of industries, and I don't have that particular understanding.  I've seen nothing to say that they target, for example, law enforcement agencies or they have a specialty in law enforcement agencies, but I'm sure they wouldn't say no.
>
> \* \* \*
>
> Q. Do you have any reason to disagree that DarkOwl's services are directed to governmental agencies?
>
> A. Well, I've reviewed DarkOwl's site, obviously.  I don't recall seeing anything that showed a particular focus of government agencies.  So, again, I think it's – you know, a government agency, you called them up and wanted to use their services, they're not going to hang up the phone.  But I didn't recognize that as a particular focus in terms of an industry of their software.

> Q. Do you recall DarkOwl discussing national security as one of the use cases for its services?
>
> A. I don't.
>
> Q. Do you recall the DarkOwl website discussing law enforcement as one of the use case for its services?
>
> A. I don't.

Keegan Depo., 197:12-14; 197:22; 198:5; 198:15-199:10.

DarkOwl prominently identifies intelligence agencies, law enforcement, and national security as one of its major use cases for its services on its website and a key target demographic for DarkOwl. *Exhibit C*. Had Keegan attempted to target DarkOwl's prospective customers, rather than improperly relying on ArkOwl's target customers to design his survey, he would not have utilized the "general consumer panels" for the survey. Keegan Depo., 156:10-11; 157:13-14. These "general consumer panels" do not accurately represent DarkOwl's unique and sophisticated prospective purchasers. DarkOwl, the world's largest database of dark web content, simply does not advertise to or target the general population, and as such, the general consumer panel respondents could not create a representative sample of DarkOwl's target consumer. *Exhibit E*. Indeed, this point is illustrated by Keegan's conclusion that, based on his own survey results, it must be the case that 15% of the general consuming public are customers or potential customers of DarkOwl. Keegan Depo., 162:11-18. Given DarkOwl's highly specialized services and uniquely targeted consumer population, this conclusion is implausible. The general consumer panels were inappropriate for this case.

To properly design the survey with DarkOwl's services and target customers as the focus, Keegan should have utilized specialty panels. And indeed, Keegan has used these specialty panels in the past when he determined that the target population at issue was unique and had specific characteristics and needs that should be factored into the survey assessment. Keegan Depo. 156:5-

18. As an example, Keegan used a specialty panel to assess potential confusion related to red bean paste products.[2] *Id.* However, in order to manufacture the necessary confusion in this case, Keegan oversimplified DarkOwl's services and target population, and then utilized the same general consumer panel he used, for example, in a survey (in a different case) directed toward assessing the target consumers for bread products. Keegan Depo. 156:19-22.

By using general consumer panels where DarkOwl's target consumers are highly specialized, Keegan's survey failed to obtain a sample that is representative of the target population and is therefore irrelevant to the issues at hand.

**B.     Keegan's Opinions and Report Should Be Excluded Because Keegan Created an Artificial Marketplace and Employed a Leading Design**

Violating a golden rule of sound consumer survey design, Keegan failed to craft a study that would simulate how consumers might actually encounter the DARKOWL and ARKOWL marks under marketplace conditions. See *Kwan Software Eng'g*, 2014 WL 572290, at *4 (quoting *Medisim Ltd. v. BestMed LLC*, 861 F.Supp.2d 158, 166 (S.D.N.Y. 2012) ("The failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility.").

After beginning his study by familiarizing respondents with ArkOwl's webpage and stating "on the next page you will be shown the webpage of a vendor that provides data services[,]" Keegan sought to familiarize respondents with an array of other companies, including DarkOwl, by showing websites for these companies. Keegan Survey, Ex. 3. But, the survey did not show just the webpages and allow respondents to draw their own conclusions about them. Instead, it characterized the companies and their services for respondents. The first time DarkOwl's webpage appeared with the other companies, Keegan described the stimuli as "Shown below, in random

---

[2] DarkOwl's target consumer is at least as sophisticated and unique as the purchasers of red bean paste.

- 13 -

order, are additional webpages of ***vendors that provide data services***." *Id. (emphasis added)*. And this was after Keegan had already communicated to survey respondents that ArkOwl provides data services. *Id*. This improper lead-in characterized the stimuli instead of allowing respondents to draw their own conclusions about the connection, if any, between the companies and goods and services shown. *See Kudos*, 2021 WL 5415258 at *12. Additionally, Keegan provided only partial snapshots of the companies' webpages upfront and allowed, but did not require, respondents to expand the viewable section of the webpages with more detailed information on each companies' unique offerings. Respondents also were allowed to move on in the survey after only ten seconds of viewing the partial screenshots of each company's webpage.

Keegan's survey should be excluded given the leading nature of its design. *See Universal City Studies, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey based on, among other things, its leading design; explaining that the "inquiry was an obvious leading question in that it suggested its own answer. The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations."). The court in *Kudos* excluded Keegan's survey for use of the nearly exact lead-in statement Keegan used in the subject survey. *Kudos*, 2021 WL 5415258 at *12. The court held that "the statement '[s]hown below, in random order, are additional pages for ***companies offering employee recognition and engagement software***,'" constituted a lead-in that departs from simulated market conditions by substantively describing the products that followed, and excluded Keegan's report on that basis alone. *Id. (emphasis added)*. It appears Keegan copied-and-pasted this flawed survey construction for the subject survey, changing only the leading characterization of the party services in an attempt to fit the facts of the instant case. The Court here should likewise exclude Keegan's survey because of its inappropriate construction.

### C. Keegan's Survey Failed To Use An Appropriate Control

Keegan's survey suffers from yet another major flaw and to such a degree as to render the survey unreliable and ultimately inadmissible. "A survey designed to estimate likelihood of confusion must include a proper control." *THOIP v. Walt Disney Co.*, 690 F.Supp.2d 218, 240 (N.Y.S.D. 2010). A control is designed to estimate the degree of background "noise" or "error" in the survey and without a proper control, there is no benchmark for measuring whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology. *Id.; see also* 6 McCarthy on Trademarks § 32:187 (5th ed. 2022). "To fulfil its function, a control should 'share [] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'" *Id. citing* Shari Seidman Diamond, Reference Guide on Survey Research, *in* Reference Manual on Scientific Evidence, 258 (Federal Judicial Center 2d ed. 2000). Put another way, "to isolate confusion arising specifically from the contested mark, survey designers will substitute for the contested mark a control that shares as many characteristics with the contested mark as possible." *Longoria v. Million Dollar Corp.*, 2021 U.S. Dist. LEXIS 38478 at *28 (Colo. March 2, 2021). Without using a proper control, Keegan cannot demonstrate that the "survey responses in fact reflect the thing the survey is designed to prove," that there is a likelihood of confusion between the DARKOWL and ARKOWL trademarks. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed. 2022).

First, Keegan failed to use a control group at all in that he did not utilize two separate groups of survey respondents, but instead used only one set of survey respondents shown and questioned about ArkOwl's website along with four other company websites, including DarkOwl's

website.³ The proper methodology would have included Keegan showing and questioning one group of respondents with regard to the five company websites. Then, Keegan should have shown and questioned a second, entirely separate group of respondents on the five websites, but this time substituting the DarkOwl website for a control stimulus. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed. 2022) ("A properly constructed survey has at least two groups of respondents: one group (the 'test cell') is shown the allegedly infringing mark; the second group (the 'control cell') is shown a mark similar in appearance to the test cell, except for the designation whose influence is being tested." Keegan did not use the commonly accepted methodology for confusion surveys, instead choosing a subpar methodology, which did not properly account for "noise" by utilizing a proper control.

Second, even if, *arguendo*, we accept Keegan's survey construction, the array of three purported "controls" was improper. As noted above and in Keegan's own referenced materials, a proper control is one that changes the allegedly infringing mark as little as possible and rather shares as many characteristics with the contested mark as possible.⁴ *See* Mike Rappeport, Design Issues in Controls, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design 225 (Shari C. Diamond & Jerre Bailey Swann, eds., ABA Book Publishing, 1st ed. 2012), p. 225 ("the best control is one that comes *as close as possible* to the test stimulus without itself being subject to a claim that it is infringing or misleading."). Keegan's purported controls, however, were simply three of *ArkOwl's* known competitors: Ekata, Gemini Advisory, and SpyCloud, none of which shared the attributes of a proper control. Keegan Survey ¶64; *see also* About Fraud's

---

³ Keegan falsely claims in Paragraph 22 of the survey to have used the proper "rigorous" "test v. control format" for his survey.

⁴ In his deposition, Keegan agreed that the goal of a control is to be as close as possible without being subject to an infringement claim. *See* Keegan Depo. 107:16-21; 108:10-14; 120:11-16.

solution providers in the Identity and Verification industries showing ArkOwl and the purported control companies, attached as *Exhibit F*. These "controls" did not mirror the DARKOWL trademark, nor share any characteristics with the DARKOWL trademark, making it highly unlikely that someone would select them. Indeed, beyond the purported control and DarkOwl websites all showing the company trademark and logo in the upper left-hand corner of the screenshots presented to the respondents, the purported controls share no similarities to the DARKOWL trademark. Each website features a different color scheme, a different company name or trademark which does not incorporate any elements of the others, different logos with no overlapping design elements, and each website and company advertises markedly different services. Keegan Survey ¶64. Moreover, the screenshots shown to survey respondents for Ekata and Gemini Advisory also clearly identify a parent or affiliated company—Ekata is a Mastercard company while Gemini Advisory is a Recorded Future company—likely leading respondents away from believing the companies are related to ArkOwl. The purported controls simply do not share any characteristics with the DARKOWL trademark and therefore cannot isolate potential confusion as intended or fulfill the basic function of accurately estimating the degree of background "noise" or "error" in the survey. As such, the purported controls are improper.

Further evidencing these methodology flaws, Keegan testified that he was not controlling for the contested marks, but rather was "controlling for companies in this space." Keegan Depo. 114:4-5. Keegan admitted to looking for companies that have a web presence and are offering cybersecurity companies. *Id.* at 114:10-12. He did not choose controls that were intended to filter out noise and prove likelihood of confusion between the marks at issue, as proffered, but rather, the controls were chosen to determine whether "consumers believe that any old cybersecurity company is related to any other cybersecurity company." Keegan Depo. 114:6-8. That proposition

is wholly irrelevant to this case and was an improper foundation for choosing the correct control group. As a result, the controls chosen did not, and could not, fulfill their required functions.

Keegan should have included a test stimulus that included at least some characteristics of the DARKOWL trademark. *See THOIP*, 690 F.Supp.2d at 240; *Longoria*, 2021 U.S. Dist. LEXIS 38478 at *28; 6 McCarthy on Trademarks § 32:187 (5th ed. 2022); Diamond on Survey Research at 258. A more appropriate control would have been, for example, an OWL-formative mark, such as REDOWL or OWL CYBER DEFENSE, a DARK-formative mark, such as DARKTRACE, and/or a logo with owl or bird imagery. Alternatively, Keegan could have modified the contested mark and created a control for this survey that appropriately shared allegedly non-infringing characteristics with the marks at issue, an exercise he admits he has done for past surveys. Keegan Depo., 121:3-9. Keegan could have even chosen controls that share *some* characteristics with either of the marks at issue in this case.

Keegan chose entirely inappropriate controls and employed a flawed methodology that all but ensured his controls would not impact his manufactured survey results. The lack of a control group entirely and inadequate control stimulus are egregious methodology flaws and in and of themselves sufficient grounds to exclude Keegan's survey. Combined with the other flaws identified above, these methodology errors render Keegan's survey and analysis and testimony unreliable. *Nacchio*, 555 F.3d at 1241. As a result, they simply cannot advance the purpose of expert testimony and aid the tier of fact. *See Bitler,* 400 F.3d at 1234. Indeed, allowing Keegan's Survey will do nothing more than mislead the jury in this case, leaving its probative value substantially outweighed by its prejudicial effect. *Breast Implant Litig.*, 11 F. Supp. 2d at 1223; *Trouble v. Wet Seal, Inc.*, 179 F.Supp. 2d 291, 308 (S.D.N.Y. 2001).

## IV. CONCLUSION

Based on the foregoing, DarkOwl respectfully requests that the Court exclude the testimony, opinions, and report of Keegan pursuant to Fed. R. Civ. P. 702 and 403.

## CERTIFICATE OF COMPLIANCE

Pursuant to D.C.COLO.LCivR 7.1(a), DarkOwl's counsel communicated with ArkOwl's counsel regarding the parties' respective positions on this motion, but the parties were not able to resolve the issues raised in the motion.

DATED January 11, 2023

Respectfully submitted,

**PERKINS COIE LLP**

By: _s/ Jeremy L. Buxbaum_

Kourtney Mueller Merrill, CO Bar #36,662
1900 Sixteenth Street, Suite 1400
Denver, CO  80202
P: (303) 291-2300
F: (303) 291-2400
KMerrill@perkinscoie.com

Thomas L. Holt, PHV Admission
Jeremy L. Buxbaum, PHV Admission
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
P: (312) 324-8646
F: (312) 324-9646
Tholt@perkinscoie.com
JBuxbaum@perkinscoie.com

**HOLLAND & HART LLP**

Sabrina J. Danielson, CO Bar #49,279
555 17th Street, Suite 3200
Denver, CO 80202
P: (303) 295-8565
F: (303 265-9255
SJDanielson@hollandhart.com

- 20 -

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2023, I served a true and complete copy of the foregoing **PLAINTIFF DARKOWL, LLC'S MOTION TO EXCLUDE EVIDENCE AND TESTIMONY OF MARK KEEGAN** on the attorney of record for ArkOwl LLC and ArkOwl Corporation via email to Michael H. Frasier at the email address listed below:

Michael H. Frasier
Rubric Legal LLC
111 Third Avenue South
Suite 110
Minneapolis, MN 55401
612-465-0074
Email: michael@rubriclegal.com

DATED:  January 11, 2023                    *s/*Jeremy L. Buxbaum
                                            Attorney for Plaintiff