# EXHIBIT

# A



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO

| | |
|---|---|
| DarkOwl, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Case No.: 21-cv-02163** |
| ) | |
| ArkOwl LLC and ArkOwl Corporation ) | |
| ) | |
| Defendant. ) | |

**Expert Report of Mark Keegan**

**Keegan & Donato Consulting, LLC**
**July 20, 2022**



**Exhibit**

**Keegan - 1**

8-26-2022 - JS



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## TABLE OF CONTENTS

Summary of Assignment and Opinions ................................................................................ 1

Firm Overview ................................................................................................................... 3

Methodology ..................................................................................................................... 4

    Study Integrity ............................................................................................................ 4

    Study Objective .......................................................................................................... 5

    Study Population ......................................................................................................... 5

    Study Design .............................................................................................................. 6

    Data Collection .......................................................................................................... 9

    Accuracy of Estimate ................................................................................................ 10

    Bias Management ...................................................................................................... 10

    Questionnaire ........................................................................................................... 12

        Screener ............................................................................................................. 12

        Main Questionnaire ............................................................................................. 15

Sample Characteristics ..................................................................................................... 21

Results & Analysis ............................................................................................................ 22

Conclusions ..................................................................................................................... 26

**Exhibits**

Exhibit 1—About Keegan & Donato Consulting, LLC

Exhibit 2—Documents Considered

Exhibit 3—Questionnaire (Screen Shots)

Exhibit 4—Questionnaire (Editor Export)

Exhibit 5—Tabulated Data & Open-Ends

Exhibit 6—Untabulated Data

Exhibit 7—Disposition of Contacts



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Summary of Assignment and Opinions

1.  Keegan & Donato Consulting, LLC ("Keegan & Donato Consulting") was engaged by defendants ArkOwl, LLC and ArkOwl Corporation (hereafter collectively "ArkOwl" or "defendant"). ArkOwl is a leading software as a service ("SAAS") provider of cybersecurity services (e.g., user or customer identification or data verification services) and fraud prevention data and search services (hereafter collectively "cybersecurity software services"), including data from the dark web.[1] Plaintiff DarkOwl, LLC (hereafter "DarkOwl" or "plaintiff") is also a SAAS provider of cybersecurity software services, including dark web investigations and monitoring.[2]

2.  The defendant has asserted trademark rights in the trademark "ArkOwl" for use in promoting its cybersecurity software services. The defendant currently alleges, among other things, that the name under which the plaintiff sells its cybersecurity software services—"DarkOwl"—is confusingly similar to the defendant's ArkOwl mark and is likely to cause consumer confusion in the marketplace.[3]

3.  I have been asked to determine the extent to which, if at all, there is a likelihood of confusion among relevant consumers between cybersecurity software services sold under the contested DarkOwl mark (as marketed by the plaintiff) and services sold under the defendant's ArkOwl mark. The parties' respective marks appear in Figure 1 below.

---

[1] Counterclaims, ¶¶ 3-4.

[2] Complaint, ¶¶ 2, 16.

[3] Counterclaims, ¶ 37.

*Figure 1. Defendant's and Plaintiff' Marks*

| Plaintiff's Mark | Defendant's Mark |
|---|---|



4.   To determine the potential for consumer confusion in this matter, I designed and executed a national consumer study of 207 likely purchasers of the parties' services—i.e., cybersecurity software services. The study was designed to test for the presence of likelihood of confusion between the plaintiff's DarkOwl mark and the defendant's ArkOwl mark among these relevant consumers. An explanation of the methodology, execution, and results of my consumer survey are presented in the sections that follow.

5.   The study I conducted in this case confirms that there <u>is a likelihood of confusion</u> among relevant consumers between the DarkOwl and ArkOwl marks. Specifically, well over half of study respondents—61.4 percent—indicated a belief that DarkOwl and ArkOwl are the same company or are somehow affiliated. Accounting for the study controls yields an average net confusion level of 25.6 percent among relevant respondents. This net confusion finding exceeds the minimum threshold that is typically viewed as evidence of a likelihood of confusion among relevant consumers.[4]

6.   Based on this study methodology and the resulting findings, I conclude that there is a likelihood of confusion among relevant consumers between the plaintiff's DarkOwl mark and the defendant's ArkOwl mark among relevant consumers within the cybersecurity software services market.

7.   The methodology and results of this study are presented in detail in the sections that follow.

---

[4] A minimum threshold for the determination of likelihood of confusion has been cited at approximately 15 percent. See Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, pp. 392, 911.

## Firm Overview

8.    I am a principal at Keegan & Donato Consulting, a consulting firm serving litigators and their clients. Our areas of expertise include marketing analysis, intellectual property, consumer survey research, damages analysis, forensic economic analysis, and related disciplines. Our firm designs and executes methodologically sound consumer survey research studies and conducts objective evaluation of existing survey research as well as collaborates on a wide range of marketing and complex commercial litigation issues. We are also regularly engaged by clients for non-litigation consulting assignments related to marketing research and strategy.

9.    Over the course of my career, I have personally conducted over 1,000 consumer surveys reaching more than 250,000 consumers. Many of these surveys have been admitted into evidence in federal courts, state courts, at arbitration, to the Trademark Trial and Appeal Board, the National Advertising Division of the Council of Better Business Bureaus, and the United States International Trade Commission. I have also served as a rebuttal witness. In the past four years, I have been deposed or testified at trial in conjunction with my involvement in litigation matters 32 times.

10.    I am a graduate of the University of Georgia's *Principles of Market Research Program*. This comprehensive course of study, developed in concert with the Market Research Institute International (MRII), is a post-graduate program for marketing industry professionals covering all aspects of the market research process. Coursework is based on the MRII's Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process. Certification is conferred only upon participants who demonstrate mastery of concepts presented in 284 detailed module studies across 13 core areas of market research, as determined via rigorous proctored examinations. The University of Georgia's *Principles of Market Research Program* is endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association.

11.    I am a member of the American Marketing Association (AMA), the preeminent professional association for marketing practitioners and scholars. From the AMA I have earned the designation of Professional Certified Marketer (PCM). The AMA confers the PCM certification upon individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles. PCM certification requires rigorous testing, ongoing

professional development, and a commitment to upholding the highest standards in the marketing field. The AMA only accepts into the PCM certification program plaintiffs with demonstrated professional experience in the field of marketing.

12.  My educational background additionally includes a J.D. from Brooklyn Law School and a B.A. in History from Pace University. I have completed coursework in the MBA program at the Lubin School of Business at Pace University and in Harvard University's Corporate Finance Certificate program. I have also served as a Registered Representative, National Association of Securities Dealers (Series 7, expired).

13.  Keegan & Donato Consulting is a member of ESOMAR, the leading global association for market, social, and opinion research, the American Association for Public Opinion Research (AAPOR), a professional organization of more than 2,000 public opinion and survey research professionals in the United States and from around the world, the International Trademark Association (INTA), and the Association for Consumer Research (ACR). I have published in an ESOMAR compendium on the benefits of methodologically sound marketing research. I have taught CLE-accredited courses on survey research for litigation at the Florida Bar's Annual IP Symposium and have addressed the Pennsylvania Bar Association's Intellectual Property Law group with a presentation on the building blocks of survey research for litigation, consumer research best practices, and current trends in the industry.

14.  Additional information about my credentials is provided at Exhibit 1 to this report. Exhibit 1 also lists the matters in which I have provided testimony over the last four years. A listing of the documents I considered in formulating my opinions appears as Exhibit 2.

15.  I am being compensated for my work on this assignment at the hourly rate of $600. This rate applies to both consulting services and any testimony that may be required. Keegan & Donato Consulting's compensation is not dependent on the outcome of this case.

## Methodology

### Study Integrity

16. I designed and executed this study of 207 likely purchasers of the plaintiff's services—i.e., cybersecurity software services—in accordance with accepted standards of survey research. For example, this survey follows the guiding principles for survey research for the purpose of

litigation as outlined by Shari Diamond,[5] including but not limited to:

- · Appropriate universe selection and sampling frame;

- · Rigorous and valid survey design that is probative of the relevant issues in the case;

- · Inclusion of representative, qualified respondents;

- · Use of procedures to minimize potential biases in data collection;

- · Use of objective, non-leading questions;

- · Use of procedures to reduce guessing among respondents; and

- · Full analysis and reporting of survey data.

17. This research was also guided by the provisions of the Lanham Act[6] and recognized treatises in the area of trademark research.[7]

**Study Objective**

18. The objective of the study that I designed and conducted in this case was to determine the extent to which, if at all, there is a likelihood of confusion among relevant consumers—i.e., likely purchasers of cybersecurity software services—between the parties' marks in this case. The remaining sections of this report describe the methodology, findings, and conclusions of my study.

**Study Population**

19. Surveys are conducted by collecting data from a sample, or subset, of the population of interest, i.e., the larger group to which the study results may be projected. In a typical case alleging forward confusion, such as the current matter, the appropriate population from which to sample is likely purchasers of services or services bearing the "junior" user's mark. "Junior" mark refers to the mark at issue in the case that is a later entrant to the

---

[5] Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, pp. 359-423.

[6] 15 USC §1125.

[7] See, for example, McCarthy, J.T. (2020). *McCarthy on Trademarks and Unfair Competition, 5th Ed.*; Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys.*

marketplace—in this case, DarkOwl. Correspondingly, the "senior" mark in this context refers to the mark that is the first entrant in the marketplace with asserted trademark rights, i.e., ArkOwl. In the current matter, the parties are direct competitors. In such cases, the appropriate survey universe is likely purchasers within the relevant market[8]—i.e., cybersecurity software services.

20. Consistent with standard marketing research practice, only respondents aged 18 and older were permitted to participate in the study.

21. Respondents who met the study population definition were identified through the use of questions that screened respondents on the above criteria (see Questionnaire discussion below; the full questionnaire is available at Exhibit 3).

**Study Design**

22. This study employed a rigorous design using a test vs. control format. The test vs. control study design is used to determine the impact of a variable of interest above and beyond the baseline level of impact of extraneous variables in the marketplace.[9]

23. The specific survey design employed in this study is a standard variation of the *Squirt* survey, known as a sequential (or two-room) lineup study. Taking its name from the case in which it was first used,[10] the *Squirt* format places respondents into a marketplace scenario by exposing respondents to stimuli showing the contested marks (often, and in this case, through sequential presentation), and measuring the extent to which consumers believe the services or services using the contested marks originate from the same, affiliated, or otherwise connected companies, thereby gauging consumer confusion.

24. All respondents were first exposed to representative use of the defendant's ArkOwl mark on its website homepage. Next, respondents were exposed to a range of marks presented in an array, including the plaintiff's DarkOwl mark, as they appear on their respective owners' website homepages. After this exposure, respondents were presented with a variety of

---

[8] Barber, William G. (2012). "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S.S. and Swann, J.B., eds., American Bar Association, p. 29.

[9] "By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus." See Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 398.

[10] *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1089 n.4, 1091 (8th Cir. 1980).

questions to determine whether they mistakenly believe the company using the DarkOwl mark to be the same company or associated with the company that uses the ArkOwl mark (discussed in detail in Questionnaire section below).

25. A sequential lineup survey is appropriate in this case. The sequential lineup presentation simulates the non-side-by-side consumer experience that a likely purchaser of cybersecurity software services would experience when researching, considering, and ultimately purchasing, the types of services that are sold by the plaintiff and defendant. The sequential lineup format is therefore a reasonable approximation of the market environment in which the parties operate.

26. The three third-party, competing marks serve as controls designed to measure the baseline level of consumer confusion within the marketplace that is not associated with trademark confusion. Such baseline confusion is sometimes referred to by marketing researchers as "noise." In this study, the noise level represents the extent to which consumers mistakenly believe that the non-infringing, third-party marks emanate from the same company or are somehow affiliated with ArkOwl for reasons other than trademark similarity.

27. The specific type of controls used in this study are known as internal (or "within group") controls. Rather than employing a separate control group or cell (i.e., "between-group" controls), studies that employ internal controls expose all respondents to the junior user's mark of interest (in this case, DarkOwl) along with all of the study control stimuli.[11] With respect to likelihood of confusion research, use of internal control stimuli is common and acceptable when using the two-room line-up survey methodology:

> [In a two-room line-up study], the respondent is shown the [senior user's] mark in the first room.[12] In the second room, the respondent is shown the [junior user's] mark, and each of the control marks. Respondents are asked the same one or

---

[11] For a discussion of internal controls of the type employed in this study, see Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 249: "Questions are not the only survey elements that can serve a within-group or internal control function. Think of trademark surveys that involve product arrays where the test stimulus is shown within the array along with noninfringing control products or packages."

[12] In this context, "room" does not necessarily refer to two physical rooms, but a methodological design wherein one study stimulus is displayed to respondents (commonly, and in this study, in the online environment; first "room") and is then removed from view before respondents are exposed to additional study stimuli (second "room").

more questions about each of the second-room stimuli to ascertain which, if any, of the second-room stimuli the respondent thinks come from the same source as the first room stimulus. A follow-up such as, 'Why did you say that?' may be used to provide some explanation of the reason for any linkages.[13]

28. This type of control treatment was employed in my study. Presentation of the internal controls within the array (along with the plaintiff's mark) and the likelihood of confusion questions conveys to the respondent that a range of products are available within the relevant market of cybersecurity software services and reduces pressure on participants to assume that there is a source relationship between the plaintiff and defendant.[14]

29. The internal controls also serve as distracter stimuli. As noted by trademark commentator Jacob Jacoby, distracter stimuli "are stimuli used either for diluting the respondents' attention with the expectation that this will lessen the chances they will be able to discern (or prematurely discern) the test stimulus that is the focus of the investigation, [and/or] for generating a level of distraction more comparable to the marketplace experience."[15] Thus, the use of distracter stimuli help to ensure a realistic replication of the marketplace within the survey environment.

30. The marks that I selected as controls—Ekata, Gemini Advisory, and SpyCloud—are all in current use by competing cybersecurity software service providers; however, none of the control marks incorporate elements that could be considered infringing upon the defendant's ArkOwl mark.

31. The control marks used in this study properly shared a variety of characteristics with the plaintiff's mark but cannot be considered infringing upon the defendant's asserted trademark rights. Thus, the control marks isolate the trademark components that are at issue in this case and act as appropriate control measures. The survey stimuli as viewed by respondents are available at Exhibit 3.

---

[13] Rappeport, M. (2012). "Design Issues for Controls." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S.S. and Swann, J.B., eds., American Bar Association, pp. 236-237.

[14] Ibid, p. 238.

[15] Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, p. 500.

**Data Collection**

32. This survey was completed through online interviewing via the Internet. Online interviewing is the dominant data collection method used in marketing research today.[16] Data collection for this study took place in June and July 2022.

33. The respondent sample for this project was provided by two consumer panels: Dynata[17] and CatalystMR.[18] Dynata is a leading provider of online sample for research projects in the U.S. and across the globe. Dynata maintains an actively managed online panel of millions of consumers. Membership in the panel is by invitation only, and Dynata employs and enforces a range of policies and procedures to ensure "panel health"—i.e., that the panel is nationally representative and that respondents provide honest and accurate answers to questions. Additional panel health checks include participation limits, screening questions, digital fingerprinting, IP verification, anti-automation filtering, identification of random and illogical responding checks, capturing and removing flatliners and speeders, among others. Dynata utilizes a "double opt-in" procedure in its recruitment process, which helps to verify the respondent's identity and ensure the panel is populated by quality participants.[19]

34. CatalystMR is also a leading provider of online sample for research projects. CatalystMR's panel health protocols include geo-location checks, IP verification, bot and bad actor identification, participation limits, screening questions, digital fingerprinting, random and illogical responding checks, capturing and removing flatliners and speeders, among others.[20] Like Dynata, CatalystMR utilizes a "double opt-in" procedure to verify each respondent's identity.[21]

35. I have personally used Dynata and CatalystMR as sample providers for many consumer research studies, am familiar with their panel health procedures, and am satisfied that they

---

[16] *Global Market Research 2021: An ESOMAR Industry Report,* pp. 58-61.

[17] www.dynata.com.

[18] https://catalystmr.com.

[19] *Dynata Panel Book.* Available at www.dynata.com/panel-book-form.

[20] https://catalystmr.com/new/about/quality-control/index.htm.

[21] *CatalystMR 2021 Online Sample Panel Book & ESOMAR 28*, p. 8.

provide high quality, representative respondents. The Dynata and CatalystMR consumer panels constituted the sampling frame of the study.

36. The survey was programmed using an industry-leading online survey software platform with custom code integration. All survey programming was performed by Keegan & Donato Consulting. The survey software facilitates the programming and execution of advanced survey designs, custom coding, complex skip logic, and advanced rotation and randomization of questions, answer options, and stimuli. All such options were employed wherever appropriate.

**Accuracy of Estimate**

37. Surveys typically, and in this case, are designed such that the results are reliable at the 95 percent confidence level. A total of 207 respondents qualified for and completed the questionnaire (see full disposition of contacts at Exhibit 7). Samples of this size are associated with a maximum margin of error of ±6.8 percentage points at 95 percent confidence.[22]

**Bias Management**

38. All efforts were made to present the survey questions in an objective, unbiased, and non-leading format. Respondents were presented with a "don't know," "no opinion," or equivalent answer option wherever appropriate throughout the survey to minimize guessing.

39. It is common in consumer survey research, both for litigation and more broadly, for the researcher to employ various types of randomization of questions and answer options across respondents. Randomization is an important tool that researchers use to minimize the potential for order bias (i.e., order effects) to impact the study's results. Order bias refers to a respondent's tendency to select the first answer in a given list of answer options regardless of the question content[23] or answer the first question in a series of questions differently than

---

[22] "Traditionally, scientists adopt the 95% level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value." See Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 381.

[23] Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), *Handbook of Research Methods in Social and Personality Psychology*. Cambridge University Press, p. 240.

later questions.[24] In this study, randomization was used wherever possible to minimize the potential for order bias.

40. The final data was examined to ensure data integrity. First, I examined the data to identify "speeders." Respondents who complete the survey too quickly may introduce respondent-related error into the survey data. Respondents were to be flagged if they completed the survey in less than one-third of the median completion time across all respondents in the sample. No respondents were removed from the sample based on this criterion.

41. I also reviewed the data for low-quality and nonsense responses. Low-quality responses are not reflective of actual consumer opinions and therefore introduce biases into the data. Based on this criterion, 50 respondents were removed from the sample.

42. Finally, respondents were required to provide, in their own words, their job titles in their primary employment. I reviewed all job titles for appropriateness as to likely participation in the parties' market. One respondent was removed for providing an inappropriate job title (all low-quality responses provided at Exhibit 6).

43. To reduce the potential for undesirable respondents to participate in the study, the screening portion of the questionnaire employed security questions, including a CAPTCHA question to prevent bots and other automated respondents from participating in the study. Respondents who did not pass the security measures were not permitted to complete the survey.

44. The study was conducted under "double blind" conditions—neither the panel providers nor the survey participants knew the purpose of the study or the sponsoring party. Double blind research is designed to prevent external or circumstantial bias from impacting the survey process and results.

---

[24] See Diamond, S. (2011). "Reference Guide On Survey Research," in *Reference Manual on Scientific Evidence*. Federal Judicial Center/National Academy of Sciences, p. 396: "To control for order effects, the order of the questions and the order of the response choices in a survey should be rotated, so that, for example, one-third of the respondents have Product A listed first, one-third of the respondents have Product B listed first, and one-third of the respondents have Product C listed first. If the three different orders are distributed randomly among respondents, no response alternative will have an inflated chance of being selected because of its position, and the average of the three will provide a reasonable estimate of response level."

**Questionnaire**

45.  In consumer surveys, data are collected by means of a questionnaire. In this case, the
     questionnaire was divided into two parts: a screener portion and the main questionnaire. The
     language and mechanics of the screener and main questionnaire are provided in summary
     below; screenshots of the questionnaire as it was viewed by respondents are provided at
     Exhibit 3.

### *Screener*

46.  The screener opened with a standard survey research statement that conveyed relevant
     information about duration, privacy issues, etc., and instructed respondents not to guess if
     they did not know the answer to a question but, instead, to use the "Don't know" option that
     was provided when appropriate. Only respondents who indicated that they understood the
     instructions were allowed to continue with the survey.

47.  Respondents were next asked to provide their age. In addition to soliciting standard
     demographic information about the respondent, the age question was used to identify and
     terminate potential participants under age 18. Only respondents who met this minimum age
     requirement were permitted to continue with the survey. All other respondents were
     terminated.

48.  On the next screen, respondents were asked to indicate the state in which they reside. Only
     respondents who indicated that they reside in the United States (or Washington, D.C.) were
     permitted to continue with the survey. All other respondents were terminated.

49.  The next screening question was a CAPTCHA-type security measure; it was included to
     confirm that respondents were devoting appropriate attention to their responses and to
     prevent bots and other automated respondents from participating in the study. Only
     respondents who answered the question correctly were permitted to continue with the survey.

50.  The next series of questions was designed to identify and qualify members of the target
     audience for this study: likely purchasers of cybersecurity software services. First, because
     the parties provide services that are targeted toward business customers, respondents were
     asked a question to determine whether they were employed. A variety of masking items[25]

---

[25] Masking is used in surveys to obscure the intended purpose of a question from the respondent, thereby
reducing biases in the data. For example, in this case, masking takes the form of neutral answer options that

were included in the answer options to obscure the purpose of this question from respondents and prevent the sample from being tainted unnecessarily. Randomization of the answer options was employed to eliminate the potential for order bias:[26]

> Which of the following best describes your current occupational status?
>
> ☐ Retired                                        ☐ Business owner / Principal
>
> ☐ Full-time student                        ☐ Stay-at-home home-maker
>
> ☐ Self-employed                            ☐ Other
>
> ☐ Work for a company or organization    ☐ Prefer not to answer

51. Only respondents who indicated that they are employed (selected "self-employed," "business owner/principal," or "work for a company or organization") were permitted to continue with the survey. All other respondents were terminated.

52. Next, because the parties' services generally fall into the category of "data services," respondents were asked to indicate whether they used such services as part of their job responsibilities:

> Which, if any, of the following types of services do you personally use as part of your job responsibilities? Please select all that apply.
>
> ○ Payroll services
>
> ○ Data services
>
> ○ Maintenance services
>
> ○ Information technology (IT) services
>
> ○ Inventory services
>
> ○ None of these

53. Only respondents who indicated that they use "Data services" as part of their job responsibilities were allowed to continue with the survey. All other respondents were terminated.

---

conceal the item of interest. Masking was employed for all questions in the screener and main questionnaire where applicable.

[26] This type of randomization was employed for all questions in the screener and main questionnaire where applicable.

54. Respondents were next asked a question to determine whether they use the specific types of data services provided by the parties as part of their job responsibilities:

> Which, if any, of the following types of vendor-provided services do you personally use as part of your job responsibilities? Please select all that apply.
>
> ○ User or customer identification or data verification services
>
> ○ Web hosting or website maintenance or website usability services
>
> ○ Search engine optimization (SEO) services
>
> ○ Merchant account or commercial banking services
>
> ○ E-commerce / Online shopping cart services
>
> ○ Social media / digital marketing services
>
> ○ Fraud prevention services
>
> ○ None of these

55. Only respondents who indicated that they use "User or customer identification or data verification services" and/or "Fraud prevention services" as part of their job responsibilities were allowed to continue with the survey. All other respondents were terminated.

56. The next question sought to identify decision-makers that, on behalf of their company, would be involved in the decision to purchase the types of services that are sold by the parties—i.e., cybersecurity software services. Respondents were asked:

> Imagine that your company/organization is in need of a vendor or vendors to supply any of the following:
>
> • Data for customer verification
>
> • Data and cybersecurity software and services
>
> • Darknet intelligence services
>
> • Darknet content index services

How would you describe your involvement in the process of identifying, vetting, and hiring such a vendor or vendors?

m I would engage in the vetting process and make the hiring decision on my own

m In combination with others, I would engage in the vetting process and make the hiring decision

m I would influence the vetting process and hiring decision

m I would not be involved in the vetting process or making hiring decision

m Other

m I am not sure

57. Because the survey sought to include likely purchasers of the parties' services, only those respondents who selected "I would engage in the vetting process and make the hiring decision on my own," "In combination with others, I would engage in the vetting process and make the hiring decision," or "I would influence the vetting process and hiring decision" were permitted to continue with the survey. All other respondents were terminated.

58. The final question of the screener portion of the questionnaire asked respondents to provide their job title at their primary occupation. This question was for informational purposes to ensure that the survey respondents were in relevant occupational roles of the types that would be likely to purchase the parties' services.

### Main Questionnaire

59. Respondents who passed the screening portion of the questionnaire were considered "qualified" (i.e., a likely purchaser within the relevant market) and proceeded to the main portion of the questionnaire.

60. The main questionnaire began with the following set of instructions and representative marketplace exposure to the defendant's ArkOwl mark as it is used on the ArkOwl website:

For the remainder of this survey, if you do not know or do not have an opinion about any of the questions, please select the "don't know / no opinion" answer option. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.

[Next page]

On the next page you will be shown the webpage of a vendor that provides data services. Please consider the webpage as you would if you were considering hiring the vendor to provide these services for your company/organization.

Keegan & Donato Consulting, LLC                                          Page 16

Please take as much time to consider the webpage as you would like; you will be asked your opinions when you are finished. For the remainder of the survey, the webpage that you will be shown will be referred to as "**PAGE A.**"

[Next page]

Please consider the webpage shown below as you would if you were considering hiring the vendor to provide services for your company/organization. You can click on the image for an expanded view.

**<span style="color:red">PAGE A</span>**

**<span style="color:red">PAGE A</span>**

*You will be able to advance after 10 seconds have passed.*

61. Respondents were permitted to view an expanded (full page length) version of PAGE A via a popup (i.e., "lightbox") image if they chose to do so.

62. On the next page, the ArkOwl mark was removed from the respondent's view. Respondents were asked a question to ensure that they were able to see PAGE A clearly:

Were you able to see **PAGE A** clearly?

m **Yes**

m **No**

m **Don't know**

63. Only respondents who indicated they were able to view PAGE A clearly were permitted to continue with the survey. All other respondents were terminated.

64. On the next page, respondents were shown an array of webpages of other cybersecurity software service providers, which included the plaintiff's DarkOwl webpage and the three third-party controls: Ekata, Gemini Advisory, and SpyCloud. The position of the webpages in the array was randomized for each respondent. Respondents were provided with the following instruction:

> Shown below, in random order, are additional webpages of vendors that provide data services. Again, please consider the webpages as you would if you were considering hiring the vendors to provide these services for your company/ organization. Please take as much time as you would like to look at the webpages. You can click on each image for an expanded view.



Keegan & Donato Consulting, LLC                                    Page 18







65. For all webpages presented in the array, respondents were permitted to view an expanded (full page length) version of the webpage via a lightbox image if they chose to do so.

66. On the next page, respondents were given another opportunity to view PAGE A (i.e., ArkOwl). All webpages were then removed from view, and respondents were provided with the following instruction:

> We are now going to ask you some questions about the webpages you just reviewed. Click the "Next" button below to continue.

67. Respondents were next shown each of the four webpages, one at a time, that appeared in the array. The webpages were presented in random order for each respondent. For each webpage, respondents were asked a series of questions to determine the extent to which, if at all, they believed that webpage to be the same company or affiliated with the defendant's ArkOwl webpage (i.e., "PAGE A") which they initially considered.

68. With the webpage in view, respondents were first asked:

Thinking of the first webpage that you saw earlier in this survey, PAGE A, do you believe:

m The webpage above is put out by the same company as **PAGE A**, the first webpage you saw

m The webpage above is not put out by the same company as **PAGE A**, the first webpage you saw

m Don't know / No opinion

69. Respondents who selected "The webpage above is put out by the same company as PAGE A, the first webpage you saw" were asked an open-ended follow-up question to elicit additional information about their beliefs:

What makes you say that the webpage shown above is put out by the same company as **PAGE A**? Please be as specific as possible.

70. To answer this question, respondents were provided with a text box to type in a response in their own words. A "don't know/no opinion" answer option also was provided.

71. Respondents who selected "The webpage above is not put out by the same company as PAGE A, the first webpage you saw" or "Don't know / No opinion" were asked a follow-up question to determine whether they believed the webpage was affiliated, connected, or associated with the first webpage that they viewed:

Do you believe that the webpage shown above:

m Is affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw

m Is not affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw

m Don't know / No opinion

72. Respondents who selected "Is affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw" were asked an open-ended follow-up question to elicit additional information about their beliefs:

What makes you say that the webpage shown above is affiliated, connected, or associated with the company that puts out **PAGE A**? Please be as specific as possible.

73. To answer this question, respondents were provided with a text box to type in a response in their own words. A "don't know/no opinion" answer option also was provided.

74. Respondents who selected "Is not affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw" were asked a follow-up question to determine whether they believed the webpage was sponsored or approved by the company that puts out the first webpage they viewed:

> Do you believe that the webpage shown above:
> m Is sponsored or approved by the company that puts out PAGE A, the first webpage you saw
> m Is not sponsored or approved by the company that puts out PAGE A, the first webpage you saw
> m Don't know / No opinion

75. Respondents who selected "Is sponsored or approved by the company that puts out PAGE A, the first webpage you saw" were asked an open-ended follow-up question to elicit additional information about their beliefs:

> What makes you say that the webpage shown above is sponsored or approved by the company that puts out **PAGE A**? Please be as specific as possible.

76. To answer this question, respondents were provided with a text box to type in a response in their own words. A "don't know/no opinion" answer option also was provided.

77. For each of the main questions of interest, respondents were provided a link to review the ArkOwl webpage (PAGE A) via a lightbox image if they chose to do so.

78. This series of questions was repeated until respondents had viewed and answered questions about all four webpages (DarkOwl, Ekata, Gemini Advisory, and SpyCloud).

79. The responses to these questions constitute the likelihood of confusion measurement. The main questionnaire concluded with several standard demographic questions regarding education level, gender, and household income, as well as a final attention filter question. The full questionnaire is provided at Exhibit 3.

## Sample Characteristics

80. The sample for this study is nationally representative, providing a robust, projectable overview of the opinions of likely purchasers of ice cream pint products. Demographic characteristics for the study participants are shown in Table 1 below.

*Table 1. Sample characteristics - demographics*

|                                      | % Respondents (n=207) |
| ------------------------------------ | --------------------: |
| **Age**                              |                       |
| 18 - 30                              |                   9.7 |
| 31 - 40                              |                  49.8 |
| 41 - 50                              |                  29.0 |
| 51 - 60                              |                   6.8 |
| 61 - 70                              |                   4.3 |
| 71 or older                          |                   0.5 |
| **Education**                        |                       |
| Less than high school                |                   0.0 |
| High school graduate                 |                   4.8 |
| Some college                         |                   5.3 |
| 2 year degree                        |                   5.3 |
| 4 year degree                        |                  38.6 |
| Master's / Professional degree       |                  43.5 |
| Doctorate                            |                   2.4 |
| **Household income**                 |                       |
| Under $35,000                        |                   1.0 |
| $35,000 - $49,999                    |                   4.8 |
| $50,000 - $74,999                    |                  13.0 |
| $75,000 - $99,999                    |                  15.5 |
| $100,000 - $124,999                  |                  17.4 |
| $125,000 - $149,999                  |                  21.3 |
| $150,000 or more                     |                  27.1 |
| Prefer not to answer                 |                   0.0 |
| **Gender**                           |                       |
| Male                                 |                  69.6 |
| Female                               |                  30.4 |
| Prefer to self-identify              |                   0.0 |
| Prefer not to answer                 |                   0.0 |
| **Region**                           |                       |
| Northeast                            |                  26.1 |
| South                                |                  35.7 |
| West                                 |                  15.5 |
| Midwest                              |                  22.7 |

## Results & Analysis

81. The findings of this study confirm that there <u>is a likelihood of confusion</u> among relevant consumers between DarkOwl and ArkOwl: well over half of study respondents—61.4 percent—indicated a belief that DarkOwl and ArkOwl are the same company or are somehow affiliated.

82. Specifically, as shown in Table 2 below, the study findings confirm that 52.2 percent of respondents believed that DarkOwl and ArkOwl are the same company. An additional 7.2

percent believed that DarkOwl and ArkOwl are affiliated, connected, or associated with each other, and an additional 1.9 percent indicated a belief that ArkOwl sponsored or approved DarkOwl. Summing these results yields a composite gross likelihood of confusion measurement of 61.4 percent between DarkOwl and ArkOwl.

*Table 2. Likelihood of confusion measurement[27]*

|  | DarkOwl | Ekata | Gemini Advisory | SpyCloud |
|---|---|---|---|---|
| (Base: All Respondents) | (207) | (207) | (207) | (207) |
|  | % | % | % | % |
| Webpage is from same company that puts out PAGE A | 52.2 | 19.8 | 25.6 | 25.1 |
| Product is affiliated, connected, or associated with the company that puts out PAGE A | 7.2 | 10.1 | 8.2 | 7.2 |
| Product is sponsored or approved by the company that puts out PAGE A | 1.9 | 5.3 | 3.4 | 2.4 |
| **Total: same source or affiliated / approved** | **61.4** | **35.3** | **37.2** | **34.8** |
| Not same / affiliated / approved | 27.1 | 52.7 | 52.2 | 52.2 |
| Don't know / No opinion | 11.6 | 12.1 | 10.6 | 13.0 |

83. The control marks consistently generated lower levels of consumer confusion. As shown in Table 2, the composite likelihood of confusion measures between ArkOwl and the controls are as follows: Ekata, 35.3 percent; Gemini Advisory, 37.2 percent; and SpyCloud, 34.8 percent. The consistency of the control findings is evidence of the internal validity of the control choices and confirms their appropriateness with regard to the study design. Together, the three controls yielded an average confusion measurement of 35.7 percent.

84. It is standard practice in a survey design of this type to deduct or "net" the control findings from the test findings. As shown in Table 3 below, deducting the control measurements from the test finding of 61.4 percent (ArkOwl vs. DarkOwl) yields net confusion measurements of 26.1 percent (Control 1, Ekata), 24.2 percent (Control 2, Gemini Advisory), and 26.6 percent (Control 3, SpyCloud). Deducting the average control measurement—35.7 percent—from the test finding of 61.4 percent yields an average net confusion measurement of 25.6 percent. Thus, regardless of whether they are viewed individually or as an average, the three controls

---

[27] Percentages may not add to 100 due to rounding.

yield net findings that exceed the minimum threshold that is typically viewed as evidence of a likelihood of confusion among relevant consumers.[28]

*Table 3. Net likelihood of confusion findings - webpages[29]*

|  | % |
|---|---|
| **Control 1 (Ekata)** | |
| Total confusion, test (ArkOwl vs. DarkOwl) | 61.4 |
| Less: Total confusion, control (ArkOwl vs. Control 1, Ekata) | 35.3 |
| **Net confusion** | **26.1** |
| | |
| **Control 2 (Gemini Advisory)** | |
| Total confusion, test (ArkOwl vs. DarkOwl) | 61.4 |
| Less: Total confusion, control (ArkOwl vs. Control 2, Gemini Advisory) | 37.2 |
| **Net confusion** | **24.2** |
| | |
| **Control 3 (SpyCloud)** | |
| Total confusion, test (ArkOwl vs. DarkOwl) | 61.4 |
| Less: Total confusion, control (ArkOwl vs. Control 3, SpyCloud) | 34.8 |
| **Net confusion** | **26.6** |
| | |
| **Average Net Confusion** | **25.6** |

85. A review of the open-ended responses provided by study participants provide empirical evidence that the consumer confusion observed between DarkOwl and ArkOwl is materially driven by the contested trademark issue being litigated in this matter—namely, the similarity of the DarkOwl mark to the ArkOwl mark. The exemplar verbatim responses provided in Table 4 below support this finding.[30]

*Table 4. Exemplar open-ends – "Same company" – DarkOwl vs. ArkOwl*

| **Respondent ID** | **"What makes you say that?" (Verbatim Response)** |
|---|---|
| R_01bGwyikdVJBlCN | I think due that they have similar names |
| R_09eE072T4Iq9cpb | Very similar arkowl/darkowl name and drsign |
| R_1guLK71qeVhE6ZO | Same name |

---

[28] A leading treatise on trademark surveys indicates that a minimum threshold for the determination of likelihood of confusion is approximately 15 percent. Jacoby, J. (2013). *Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys*, pp. 392, 911.

[29] Percentages may not add to 100 due to rounding.

[30] See Exhibit 4 for a full listing of open-ended responses.

| | |
|---|---|
| R_1hQG7HZxk8ZfPAl | design and company name |
| R_1LimFs6ufh2EVPD | I think it might be, because the names are kind of the same. |
| R_1LRSzJi8phOdMoy | Both have dark owl as headliners |
| R_28Y9ORorsxE20nf | Same company I remember the name of it very clearly I am positive this is it |
| R_2aDmtvlBTa4sOpX | The name of the company |
| R_2f8u7dhrr7nl1p8 | The name of the company Darkowl |
| R_2PccPX9HocF5LVb | The company name in the corner |
| R_2QR05yLkq0bL3pa | the logp and the name of this webpage is similar to the PAGE A |
| R_2S7hOsRJe3jiIb9 | They use the same brand name |
| R_2TFRPyKfIb4LVMT | Ark Owl and Dark Owl its simple |
| R_2ttGJxmk9EqJbEJ | the logos are almost similar |
| R_2TWP4bHjoejlMcK | use of the word "owl" |
| R_2TYTRcr7kUXr0VX | Darkowl is mentioned in website A several times |
| R_2VlPfgSLQk2jEEK | Both names are extremely similar so they're pretty much under the same company |
| R_2vZCvv58BJhBDkH | The icon in the top left corner |
| R_2zowV8AXJGCQ5Vl | DarkOwl in top corner |
| R_3F27JLL1MfWVFlg | Same logo |
| R_3fHjSdxLdqZOOiW | The brand logo is same . That's mean this is something same . |
| R_3hyZSVG4CnbEwKN | it literally says "dark owl", by company name. |
| R_3lcPt2FnYJu4kdO | The same company, dark owl |
| R_3J3p1qaGiT2oU2C | both have the dark owl logo |
| R_3m3RosLCNLVJMeV | Same company name. Darkowl. |
| R_3ml5CKgP1anDyiU | Same brand name |
| R_3ol6GNRFsGP3OUs | i think , it is the same name |
| R_3po2fWMRYUxYZmC | because it has the same name its just missing the letter d . |
| R_3QKq18E02DTYvdz | The company name is the same. |
| R_77om2kK7CXblN8B | the logo on the left |
| R_AFgD0mTbeK7cOe5 | Both brands are Dark Owl |

| R_ApV5Samx4jlslUd | They both have similar names and setups |
| R_enQaENCo7wl5v8J | The same name of the company. |
| R_p64r4QekbG9uMnf | Darkowl is on both pages |
| R_UtDovheLR4k8ro5 | The messaging and the logo are similar to Page A |
| R_z1oyepzXjqyemqJ | Same owl brand or company |

86. As evidenced by the findings presented above, respondents who exhibited a likelihood of confusion between DarkOwl and ArkOwl materially attributed their beliefs to the considerable similarity of the DarkOwl and ArkOwl marks. Because this study design employed rigorous controls which held exogenous variables constant, the net confusion exhibited between the parties is directly attributable to the contested trademark issues in this case.

## Conclusions

87. The results of this study of 207 likely purchasers of cybersecurity software services shows that there <u>is a likelihood of confusion</u> among consumers between services sold under the plaintiff's DarkOwl mark and services sold under the defendant's ArkOwl mark.

88. The specific study findings show that:

· Over half of study respondents—61.4 percent—indicated a belief that DarkOwl and ArkOwl are the same company or are somehow affiliated;

· When taking the study controls into account, the average net confusion finding of 25.6 percent exceeds the minimum threshold that is typically viewed as evidence of a likelihood of confusion among relevant consumers; and

· Verbatim open-ended responses provided by study participants contain repeated references to the similarity of the DarkOwl and ArkOwl marks, thereby confirming that the consumer confusion observed between DarkOwl and ArkOwl is materially driven by the contested trademark issues being litigated in this matter.

89. Overall, the findings of this study demonstrate that relevant consumers materially confuse the source origin of services using the plaintiff's DarkOwl mark and the defendant's ArkOwl mark. Because the survey design employed appropriate controls, the likelihood of confusion findings are directly attributable to the contested trademark issues.

90. The survey conducted in this case was designed and executed in accordance with accepted standards of survey research. All findings and conclusions are presented with a reasonable degree of certainty.

Keegan & Donato Consulting, LLC reserves the right to supplement and revise this report and the opinions expressed herein based on the availability of new information.

For Keegan & Donato Consulting, LLC:

Mark Keegan

July 20, 2022

Date

**Exhibit 1—About Keegan & Donato Consulting, LLC**



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Mark T. Keegan, Esq.

**Partner, Keegan & Donato Consulting, LLC**

**Education**

§   Principles of Market Research Program, University of Georgia (graduated 2021)

- Post-graduate program for industry professionals covering all aspects of the market research process

- Coursework based on the Market Research Core Body of Knowledge (MRCBOK), a compilation of the underlying principles and essential skills that comprise the market research process developed by Market Research Institute International (MRII)

- Certification conferred upon participants who demonstrate mastery of concepts presented in 284 detailed module studies across 13 core areas of market research

- Endorsed by all major market research and insights industry associations, including ESOMAR and the Insights Association

§   Professional Certified Marketer (PCM), American Marketing Association (2015 – present)

- AMA certification for individuals who have demonstrated a mastery of comprehensive and core marketing knowledge and principles

- Designation conferred only upon successful completion of rigorous testing spanning full range of marketing principles and concepts

- Ongoing professional development and education credits required on annual basis

- PCM recipients must have demonstrated professional experience in the field of marketing

§   Juris Doctor, Brooklyn Law School (graduated 1995)

§   Bachelor of Arts, History, Pace University (graduated 1990)

§   MBA Coursework, Pace University, Lubin School of Business (1990 – 1991)

§   Corporate Finance Program, Harvard University (coursework)

**Professional Memberships**

§   Admitted to the Bar in the states of New York and Connecticut

§   Member, ESOMAR (World Association of Opinion and Marketing Research Professionals)

§   Member, International Trademark Association (INTA)

§   Member, American Marketing Association (AMA)

§   Member, American Association for Public Opinion Research (AAPOR)

§   Member, Association for Consumer Research (ACR)

§   Registered Representative, National Association of Securities Dealers (Series 7, expired)

**Current Employment**

§   Keegan & Donato Consulting, LLC, Litigation Consultant, Founding Partner (7/2011 – present)

**Consumer Research Experience**

§   Designed and executed over 1,000 consumer research studies reaching more than 250,000 respondents for corporate and litigation clients over the course of two-decade career

§   Focus on trademark and marketing research with principal areas of study including consumer confusion, trade dress, dilution, secondary meaning, genericness, false advertising, consumer perception, consumer understanding, and other consumer research issues

§   Represented a mix of both plaintiffs and defendants in litigation matters spanning a broad range of products, services, and industries

§   Submitted survey research expert reports in relevant venues including federal courts, state courts, at arbitration, to the National Advertising Division of the Council of Better Business Bureaus, and to the Trademark Trial and Appeal Board

§   Founder and owner of two successful marketing and consumer research consulting firms

§   Regularly testify to consumer behavior research, findings, and related issues at trials, depositions, hearings, and other proceedings

KEEGAN_EXHIBITS_3

§   Qualified to testify as an expert in the field of consumer survey research at federal court trials:

- *BuzzBallz, LLC v. Jem Beverage Co.*, U.S. District Court (Central District of California), the Honorable William D. Keller presiding

- *Christopher Lewert v. Boiron, Inc.*, U.S. District Court (Central District of California), the Honorable André Birotte, Jr. presiding

- *Coty Inc., et al. v. Excell Brands LLC*, U.S. District Court (Southern District of New York), the Honorable Jesse M. Furman presiding

- *Bodum U.S.A., Inc. v. A Top New Casting, Inc.*, U.S. District Court, Northern District of Illinois, the Honorable Matthew F. Kennelly presiding

§   Qualified as a survey expert by numerous federal court judges (pre-trial)

§   Develop and execute consumer research studies using industry-accepted methodologies, cutting-edge technologies, and industry-leading consumer panel partners

**Marketing and Other Relevant Experience**

§   Served as a marketing consultant to private clients and have advised on a wide range of issues including product development and rollout, advertising, consumer feedback and intelligence, the product life-cycle, and other issues concerning marketing and marketing research

§   Formulated winning brand positioning strategies as a branding expert for some of the best-known consumer brands and services including General Electric (GE), Nike, Pepsi, Subaru, AOL, Excite, NBC, and others

§   Analyzed and evaluated comprehensive marketing campaigns for a broad range of corporate clients to determine their impact on consumers

§   Evaluated all components of integrated marketing communications including advertising, public relations, packaging, sales promotions, and point of sale materials, among others

§   Developed testimony on marketing messages and their intended influence on consumer understanding and behavior

**Previous Employment**

§   Keegan & Company LLC, Founding Partner (9/2001 – 12/2015)

Designed and executed consumer research studies, conducted complex litigation consulting, and developed marketing and economic analyses for clients across a range of industries

§   Information Markets Corp, Program Manager (2000 – 2001)

Managed enterprise-wide marketing and product development. Developed use cases and conducted consumer market research. Coordinated with multiple partners including AOL, Excite, and NBC.

§   Affiliation Networks, Inc., Project Manager (1999 – 2000)

Produced online advertising solutions for Fortune 500 clients. Coordinated creative team of account managers, designers, programmers and copywriters.

§   UpTick Technologies, Marketing Consultant (1999)

Managed the creation of innovative marketing products for large brokerage software provider

§   Cosmos Internet Solutions, Marketing Consultant (1998 – 1999)

Developed marketing strategy for business ISP and hosting provider as well as Web site marketing and development for clients

§   FactSet Research Systems, Product Development (1996 – 1998)

Formulated product and communications strategies for leading integrated financial and economic database provider

§   Warren Keegan Associates, Inc., Marketing Consultant (1992 – 1996)

Marketing consultant to clients across a range of industries. Edited and contributed content to marketing textbooks and other academic marketing publications.

§   BMW of North America, Inc., Graduate Appointment (1991)

Reviewed, analyzed, and cataloged broad-based market research on consumer preferences and attitudes in the automobile industry

**Submitted Surveys Excluded by Courts**[*]

§   *Kudos, Inc. v. Kudoboard, LLC, et al.* (2021). This Squirt-style survey was designed to test for a likelihood of confusion between two competing brands of employee recognition software among users and likely purchasers of this type of software. The Court disagreed with the survey universe, opining that a narrower population definition should have been employed. A rebuttal report that I submitted in this matter was accepted by the Court.

§   *The Episcopal Church, et al. v. The Right Reverend Mark J. Lawrence, et al.* (2019). In this Teflon-style survey, I interviewed Episcopalians regarding the potential genericness of the mark THE EPISCOPAL CHURCH. The Court disagreed with the survey universe, opining that the population definition should have included non-Episcopalians.

§   *Warner Brothers Entertainment, Inc., et al. v. The Global Asylum, Inc.* (2012). A deficiency in the pleadings (the client's failure to submit my resume among other credentials) led to the court excluding this survey at a preliminary injunction hearing. I did not testify in this matter.

**Lectures, Presentations & Publications**

§   *Squirt vs. Eveready: Battle of the Titans*, 9th Annual Intellectual Property Law Symposium, hosted by The Florida Bar Continuing Legal Education Committee and Business Law Section, April 12-13, 2018. CLE-accredited presentation.

§   *Panel Power: Online Panel Sampling for Litigation Surveys*, 8th Annual Intellectual Property Law Symposium, hosted by The Florida Bar Continuing Legal Education Committee and Business Law Section, March 30-31, 2017. CLE-accredited presentation.

§   *Evaluating a Brand's Equity in a Nascent Market*, ESOMAR World Research, The EUREKA's Project - Success Stories of Market Research, 2016.

§   *Consumer Survey Research for Litigation: With Great Data Comes Great Power.* Presentation before the Pennsylvania Bar Association, Intellectual Property Law Group, 12/8/2014.

---

[*] Lifetime. Court opinions available upon request.

**Continuing Education**

§   *Online Sample Fraud: Causes, Costs & Cures*, Insights Association Webinar, 2/11/2022.

§   *Quantifying Unjust Enrichment*, Fox Forensic Accounting, 10/6/2021.

§   *Questionnaire Design Best Practices*, ESOMAR/University of Georgia Webinar, 5/19/2021.

§   *Making Online Samples More Representative*, ESOMAR Webinar, 3/17/2021.

§   *Intelligence 360: Solicited + Unsolicited Customer Opinion*, ESOMAR Webinar, 2/17/2021.

§   *The Future of Online Polling After 2020*, ESOMAR Webinar, 12/16/2020.

§   *The Opportunity for UX Research*, ESOMAR/University of Georgia Webinar, 12/8/2020.

§   *BigSurv20: Big Data Meets Survey Science*, Online Conference, November/December 2020.

§   *International Trademark Association (INTA), 141st Annual Meeting (2019)*, Attendee, May 2019.

**Contact Information**

Keegan & Donato Consulting, LLC
31 Purchase Street, Ste. 3-4
Rye, NY 10580
(914) 967-9421
mark@keegandonato.com

KEEGAN_EXHIBITS_7



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## Mark Keegan Testimony List (Past Four Years)

### Depositions

| Case Caption | Court | Client |
|---|---|---|
| Chasom Brown, et al. v. Google LLC | United States District Court, Northern District of California | Plaintiffs |
| BillFloat Inc., d/b/a SmartBiz Loans v. Collins Cash Inc., d/b/a Smart Business Funding, et at. | United States District Court, Northern District of California | Defendants |
| Kenco Bucket Trucks LLC v. Versabucket LLC, et al. | District Court, Harris County, Texas, 113th Judicial District | Defendants |
| EBIN New York, Inc. v. SIC Enterprise, Inc., et al. | United States District Court, Eastern District of New York | Plaintiff |
| Kudos, Inc. v. Kudoboard, LLC, et al. | United States District Court, Northern District of California | Plaintiff |
| Master Inspector Certification Board, Inc. v. Examination Board of Professional Home Inspectors, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Solid 21 Inc. v. Richemont North America, Inc. et al. | United States District Court, Southern District of New York | Defendants |
| Watching Time, LLC v. International Watchman, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Plaintiff (Petitioner) |
| Diamond Resorts U.S. Collection Development, LLC, et al. v. Newton Group Transfers, LLC, et al. | United States District Court, Southern District of Florida, West Palm Beach Division | Defendants |
| Fair Isaac Corporation v. Fido Alliance, Inc. | United States Patent and Trademark Office, Trademark Trial and Appeal Board | Defendant (Applicant) |
| Solid 21, Inc. v. Breitling U.S.A. Inc., et al. | United States District Court, District of Connecticut | Defendants |
| Juul Labs, Inc. v. Eonsmoke, LLC d/b/a 4X PODS, et al. | United States District Court, District of New Jersey | Defendants |

KEEGAN_EXHIBITS_8



**KEEGAN & DONATO**
CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

| Case Caption | Court | Client |
|---|---|---|
| Restoration Hardware, Inc., et al., v. Bungalow Home, LLC | United States District Court, Southern District of Ohio, Western Division | Plaintiffs |
| United States of America ex. rel., Yoash Gohil v. Sanofi U.S. Services Inc., et al. | U.S. District Court, Eastern District of Pennsylvania | Defendants |
| Alo, LLC v. Acadia Malibu, Inc., d/b/a Alo House Recovery Centers, et al. | U.S. District Court, Central District of California | Plaintiff |
| Farjad Fani, et al. v. Shartsis Friese LLP, et al. | JAMS Arbitration, JAMS Reference No. 1100104777 | Claimants |
| Solid 21, Inc. v. Ulysse Nardin USA Inc., et al. | U.S. District Court, Southern District of Florida | Defendants |
| The Shoppes at River Station, LLC v. College Park Retail Investors, LLC | Superior Court of Fulton County, State of Georgia | Plaintiff |
| Spartan Chemical Company, Inc. v. Ecolab, Inc. | U.S. District Court, Northern District of Ohio, Western Division | Plaintiff |
| Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc. | U.S. District Court, Central District of California, Southern Division | Defendant |
| The Episcopal Church, et al. v. The Right Reverend Mark J. Lawrence, et al. | U.S. District Court, District of South Carolina, Charleston Division | Plaintiffs |
| Spangler Candy Company v. Tootsie Roll Industries, LLC | U.S. District Court, Northern District of Ohio, Western Division – Toledo | Plaintiff |
| FCOA LLC v. Foremost Title & Escrow Services, LLC | U.S. District Court, Southern District of Florida | Defendant |
| Dentsply International Inc. v. Dental Brands for Less LLC d/b/a Dental Wholesale Direct | U.S. District Court, Southern District of New York | Plaintiff |
| eMove, Inc. and u-Haul International, Inc. v. Hire A Helper, LLC, et al. | U.S. District Court, Southern District of California | Defendants |
| J-B Weld Company, LLC v. The Gorilla Glue Company | U.S. District Court, Northern District of Georgia | Defendant |
| Gulfstream Aerospace Corp. v. Gulfstream Unsinkable Boats, LLC | U.S.P.T.O. Trademark Trial and Appeal Board | Defendant |
| Lokai Holdings, LLC v. Twin Tiger USA LLC | U.S. District Court, Southern District of New York | Plaintiff |

KEEGAN_EXHIBITS_9



31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

Trials

| Case Caption | Court | Client |
|---|---|---|
| Bodum U.S.A., Inc. v. A Top New Casting, Inc. | U.S. District Court, Northern District of Illinois, Eastern Division | Defendant |
| Coty Inc., et al. v. Excell Brands, LLC | U.S. District Court, Southern District of New York | Defendant |
| Christopher Lewert, et al., v. Boiron, Inc., et al. | U.S. District Court, Central District of California | Plaintiffs |
| BuzzBallz, LLC v. BuzzBox Beverages, Inc., et al. | U.S. District Court, Central District of California | Plaintiff |

KEEGAN_EXHIBITS_10



# KEEGAN & DONATO
## CONSULTING, LLC

31 Purchase Street, Ste. 3-4
Rye, New York 10580
914.967.9421
www.keegandonato.com

## About Us



Mark Keegan brings a wide breadth of experience to Keegan & Donato Consulting, having spent over a decade formulating case strategies in complex litigation. As a founding partner of Keegan & Donato Consulting, Mr. Keegan has actively consulted on a variety of litigation issues ranging from marketing and international business to consumer research for Lanham Act claims.

Prior to his work with Keegan & Donato Consulting, Mr. Keegan assisted a diverse range of companies as a marketing strategist and operations manager. From working with top brands to create innovative online advertising solutions to positioning and communicating a company's competitive advantage, Mr. Keegan's practical execution of successful marketing strategies has benefited several organizations.

Mr. Keegan received his law degree from Brooklyn Law School (1995) and is licensed to practice in New York and Connecticut. His undergraduate work was completed at Pace University where he received a Bachelor of Arts in history.



Tony Donato has served as a consultant in complex litigation matters since 2004. He has a broad range of experience in research, strategy, survey design & execution, data analysis and case management. Mr. Donato has consulted on a wide variety of marketing, intellectual property, and consumer behavior cases covering trademark, copyright, patent, best efforts, advertising, business damages, consumer surveys, business ethics, and other issues.

Mr. Donato has a strong analytical background which he developed in his prior employment as a member of the research team at Harvard Medical School's Division on Addictions. He is the co-author of several peer-reviewed journal articles.

Mr. Donato received a Master of Public Policy from Georgetown University (2002) and a Bachelor of Arts in politics from Ursinus College (2000).

KEEGAN_EXHIBITS_11

**Exhibit 2—Documents Considered**

KEEGAN_EXHIBITS_12



| Documents Considered - DarkOwl, LLC v. ArkOwl LLC and ArkOwl Corporation |
|---|
| Complaint |
| Answer & Counterclaims |
| 15 USC §1125 |
| Barber, William G. (2012). "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* , Diamond, S.S. and Swann, J.B., eds., American Bar Association |
| Rappeport, Mike. (2012). "Design Issues for Controls," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* , Diamond, S.S. and Swann, J.B., eds., American Bar Association |
| Diamond, S. (2011). "Reference Guide On Survey Research," in Reference Manual on Scientific Evidence. Federal Judicial Center/National Academy of Sciences, p. 359-423 |
| Global Market Research 2021: An ESOMAR Industry Report, p. 58-61 |
| Jacoby, J. (2013). Trademark Surveys, Volume 1: Designing, Implementing, and Evaluating Surveys, American Bar Association |
| McCarthy, J.T. (2020). McCarthy on Trademarks and Unfair Competition, 5th Ed. |
| Squirtco v. Seven-Up Co., 628 F.2d 1086, 1089 n.4, 1091 (8th Cir. 1980) |
| Visser, P. S., Krosnick, J. A., & Lavrakas, P. J. (2000). Survey research. In H. T. Reis & C. M. Judd (Eds.), Handbook of Research Methods in Social and Personality Psychology. Cambridge University Press |
| https://www.dynata.com |
| https://catalystmr.com |
| Dynata Panel Book |
| CatalystMR 2021 Online Sample Panel Book & ESOMAR 28 |
| 2012-2021-AccountRequests_AllTime(cleaned).xlsx |
| 2020 Paladin Vendor Report |
| About-Fraud Q4 2021 Solution Providers sheet |
| ArkOwl Booth.jpg |
| Raffle entry list |
| MRC attendee list |
| Evan McNiff email, 8/12/2021 |
| https://arkowl.com/ |
| https://www.darkowl.com/ |
| https://geminiadvisory.io/ |
| https://spycloud.com/ |
| https://ekata.com/ |

**Exhibit 3—Questionnaire (Screen Shots)**

Thank you for agreeing to participate in this anonymous survey. The survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything.

The survey will take just a few minutes of your time. Before we begin, please read the following instructions:

• This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please feel free to select that answer when provided. We do not want you to guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding your survey answers.

• Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.

Do you understand and agree to follow the instructions provided above?

| No |
| --- |
| Yes |
| Don't know |

**Next >>**

KEEGAN_EXHIBITS_15



Which of the following age brackets contains your age on your last birthday?

Under 18

18 - 30

31 - 40

41 - 50

51 - 60

61 - 70

71 or older

Next >>

KEEGAN_EXHIBITS_16

In which U.S. state do you currently reside?

Next >>

KEEGAN_EXHIBITS_17

Please complete the CAPTCHA below.

I'm not a robot

reCAPTCHA
Privacy - Terms

Next >>

KEEGAN_EXHIBITS_18

Which of the following best describes your current employment status?

Stay-at-home home-maker

Self-employed

Retired

Work for a company or organization

Full-time student

Business owner / Principal

Other

Prefer not to answer

Next >>

Which, if any, of the following types of services do you personally use as part of your job responsibilities? Please select all that apply.

| | |
|---|---|
| Payroll services | Maintenance services |
| Inventory services | Data services |
| Information technology (IT) services | None of these |

Next >>

Which, if any, of the following types of vendor-provided services do you personally use as part of your job responsibilities? Please select all that apply.

| | |
|---|---|
| Fraud prevention services | Social media / digital marketing services |
| Merchant account or commercial banking services | E-commerce / Online shopping cart services |
| Search engine optimization (SEO) services | User or customer identification or data verification services |
| Web hosting or website maintenance or website usability services | None of these |

Next >>

KEEGAN_EXHIBITS_21

Imagine that your company/organization is in need of a vendor or vendors to supply any of the following:

- Data for customer verification
- Data and cybersecurity software and services
- Darknet intelligence services
- Darknet content index services

How would you describe your involvement in the process of identifying, vetting, and hiring such a vendor or vendors?

I would not be involved in the vetting process or making hiring decision

I would influence the vetting process and hiring decision

In combination with others, I would engage in the vetting process and make the hiring decision

I would engage in the vetting process and make the hiring decision on my own

Other

I am not sure

Next >>

KEEGAN_EXHIBITS_22

What is your current job title in your primary occupation?

Next >>

KEEGAN_EXHIBITS_23

For the remainder of this survey, if you do not know or do not have an opinion about any of the questions, please select the "don't know / no opinion" answer option. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.

Click the "Next" button below to continue.

Next >>

KEEGAN_EXHIBITS_24

On the next page you will be shown the webpage of a vendor that provides data services. Please consider the webpage as you would if you were considering hiring the vendor to provide these services for your company/organization.

Please take as much time to consider the webpage as you would like; you will be asked your opinions when you are finished. For the remainder of the survey, the webpage that you will be shown will be referred to as "**PAGE A**."

Click the "Next" button below to continue.

Next >>

KEEGAN_EXHIBITS_25

Please consider the webpage shown below as you would if you were considering hiring the vendor to provide services for your company/organization. You can click on the image for an expanded view.

**PAGE A**



**PAGE A**

*You will be able to advance after 10 seconds have passed.*

Next >>

KEEGAN_EXHIBITS_26

Were you able to see **PAGE A** clearly?

No

Yes

Don't know

Next >>

KEEGAN_EXHIBITS_27

Shown below, in random order, are additional webpages of vendors that provide data services. Again, please consider the webpages as you would if you were considering hiring the vendors to provide these services for your company/organization. Please take as much time as you would like to look at the webpages. You can click on each image for an expanded view.





KEEGAN_EXHIBITS_28





Click the "Next" button below to continue.

KEEGAN_EXHIBITS_29

Next >>

KEEGAN_EXHIBITS_30

Please consider again **PAGE A**, the first webpage you saw earlier in this survey:

**PAGE A**

**PAGE A**

Click the "Next" button below to continue.

Next >>

KEEGAN_EXHIBITS_31

We are now going to ask you some questions about the webpages you just reviewed. Click the "Next" button below to continue.

Next >>

KEEGAN_EXHIBITS_32

Please consider this webpage and answer the questions below the image:



Thinking of the first webpage that you saw earlier in this survey, **PAGE A**, do you believe:

The webpage above is not put out by the same company as **PAGE A**, the first webpage you saw

The webpage above is put out by the same company as **PAGE A**, the first webpage you saw

Don't know / No opinion

Click here to view **PAGE A**

What makes you say that the webpage shown above is put out by the same company as **PAGE A**? Please be as specific as possible.

KEEGAN_EXHIBITS_33



Don't know / No opinion

Next >>

KEEGAN_EXHIBITS_34

Please consider this webpage and answer the questions below the image:



Thinking of the first webpage that you saw earlier in this survey, **PAGE A**, do you believe:

> The webpage above <u>is not</u> put out by the same company as **PAGE A**, the first webpage you saw

> The webpage above <u>is</u> put out by the same company as **PAGE A**, the first webpage you saw

> Don't know / No opinion

Click here to view **PAGE A**

Do you believe that the webpage shown above:

> <u>Is not</u> affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw

> <u>Is</u> affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw

> Don't know / No opinion

KEEGAN_EXHIBITS_35

What makes you say that the webpage shown above is affiliated, connected, or associated with the company that puts out **PAGE A**? Please be as specific as possible.

Don't know / No opinion

Next >>

Please consider this webpage and answer the questions below the image:



Thinking of the first webpage that you saw earlier in this survey, **PAGE A**, do you believe:

The webpage above is not put out by the same company as **PAGE A**, the first webpage you saw

The webpage above is put out by the same company as **PAGE A**, the first webpage you saw

Don't know / No opinion

[Click here to view **PAGE A**](#)

Do you believe that the webpage shown above:

Is not affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw

Is affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw

Don't know / No opinion

KEEGAN_EXHIBITS_37

Do you believe that the webpage shown above:

Is not sponsored or approved by the company that puts out **PAGE A**, the first webpage you saw

Is sponsored or approved by the company that puts out **PAGE A**, the first webpage you saw

Don't know / No opinion

What makes you say that the webpage shown above is sponsored or approved by the company that puts out **PAGE A**? Please be as specific as possible.

Don't know / No opinion

Next >>

KEEGAN_EXHIBITS_38

Please consider this webpage and answer the questions below the image:



Thinking of the first webpage that you saw earlier in this survey, **PAGE A**, do you believe:

The webpage above is not put out by the same company as **PAGE A**, the first webpage you saw

The webpage above is put out by the same company as **PAGE A**, the first webpage you saw

Don't know / No opinion

Click here to view **PAGE A**

Do you believe that the webpage shown above:

Is not affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw

Is affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw

Don't know / No opinion

KEEGAN_EXHIBITS_39

Do you believe that the webpage shown above:

Is not sponsored or approved by the company that puts out **PAGE A**, the first webpage you saw

Is sponsored or approved by the company that puts out **PAGE A**, the first webpage you saw

Don't know / No opinion

Next >>

KEEGAN_EXHIBITS_40

Please select "Green" from the list below.

Red

Blue

Yellow

Green

Next >>

KEEGAN_EXHIBITS_41

Now, a few more questions for classification purposes only. Which of the following best describes your educational background?

Less than high school

High school graduate

Some college

2-year degree

4-year degree

Master's / Professional degree

Doctorate

Next >>

KEEGAN_EXHIBITS_42

What is your gender?

Male

Female

Prefer to self-identify:

Prefer not to answer

Next >>

KEEGAN_EXHIBITS_43



Which of the following includes your household's approximate annual income in 2021?

Under $35,000

$35,000 - $49,999

$50,000 - $74,999

$75,000 - $99,999

$100,000 - $124,999

$125,000 - $149,999

$150,000 or more

I prefer not to answer

Next >>

KEEGAN_EXHIBITS_44

We thank you for your time spent taking this survey.
Your response has been recorded.

KEEGAN_EXHIBITS_45

**Exhibit 4—Questionnaire (Editor Export)**

KEEGAN_EXHIBITS_46

**Start of Block: Intro**



Q1 Thank you for agreeing to participate in this anonymous survey. The survey is for research purposes only. Your responses will be held confidential and we are not trying to sell you anything.

 The survey will take just a few minutes of your time. Before we begin, please read the following instructions:

 • This survey makes use of images. If you are currently using a device that does not have image capabilities, please stop now and resume this survey when you have access to a compatible device.

• If you typically wear eyeglasses when reading information or looking at pictures or videos on your electronic device, please put them on now and wear them through the remainder of this survey.

• If you don't know the answer, don't recall, or don't have an opinion on any of the questions that follow, please feel free to select that answer when provided. We do not want you to guess at any of your answers.

• Please do not look up answers to any of the survey questions on the Internet or consult with any other persons regarding your survey answers.

 • Your browser's back button will be disabled during the survey. Please use the "Next" button within the survey to advance through the questionnaire.


 Do you understand and agree to follow the instructions provided above?

○ Yes  (1)

○ No  (2)

○ Don't know  (3)

**End of Block: Intro**

**Start of Block: Age**



KEEGAN_EXHIBITS_47

Q2 Which of the following age brackets contains your age on your last birthday?

○ Under 18  (1)

○ 18 - 30  (2)

○ 31 - 40  (3)

○ 41 - 50  (4)

○ 51 - 60  (5)

○ 61 - 70  (6)

○ 71 or older  (7)

**End of Block: Age**

**Start of Block: State**

Q3 In which U.S. state do you currently reside?

▼ Alabama (1) ... None of these (53)

**End of Block: State**

**Start of Block: CAPTCHA**

Q4 Please complete the CAPTCHA below.

**End of Block: CAPTCHA**

**Start of Block: Industry**

Q5 Which of the following best describes your current employment status?

○ Stay-at-home home-maker  (1)

○ Retired  (2)

○ Full-time student  (3)

○ Self-employed  (4)

○ Business owner / Principal  (5)

○ Work for a company or organization  (6)

○ Other  (7)

○ Prefer not to answer  (8)

Page Break

*Display This Question:*

> *If Q5 = 4*
>
> *Or Q5 = 5*
>
> *Or Q5 = 6*

Q6 Which, if any, of the following types of services do you personally use as part of your job responsibilities? Please select all that apply.

☐　　Payroll services  (1)

☐　　Data services  (2)

☐　　Maintenance services  (3)

☐　　Information technology (IT) services  (4)

☐　　Inventory services  (5)

☐　⊗None of these  (6)

*Skip To: End of Block If Q6 != 2*

Page Break

> *Display This Question:*
>
>   *If Q6 , 2 Is Displayed*
>
>   *Or Q6 = 2*

Q7 Which, if any, of the following types of vendor-provided services do you personally use as part of your job responsibilities? Please select all that apply.

☐ User or customer identification or data verification services  (1)

☐ Web hosting or website maintenance or website usability services  (2)

☐ Search engine optimization (SEO) services  (3)

☐ Merchant account or commercial banking services  (4)

☐ E-commerce / Online shopping cart services  (5)

☐ Social media / digital marketing services  (6)

☐ Fraud prevention services  (7)

☐ None of these  (8)

**End of Block: Industry**

**Start of Block: Decision maker**

Q8
Imagine that your company/organization is in need of a vendor or vendors to supply any of the following:

· Data for customer verification
· Data and cybersecurity software and services
· Darknet intelligence services
· Darknet content index services

How would you describe your involvement in the process of identifying, vetting, and hiring such a vendor or vendors?

○ I would engage in the vetting process and make the hiring decision on my own  (1)

○ In combination with others, I would engage in the vetting process and make the hiring decision  (2)

○ I would influence the vetting process and hiring decision  (3)

○ I would not be involved in the vetting process or making hiring decision  (4)

○ Other  (5)

○ I am not sure  (6)

**End of Block: Decision maker**

**Start of Block: Job title**

Q9 What is your current job title in your primary occupation?

_____

**End of Block: Job title**

**Start of Block: Instruction**

Q10 For the remainder of this survey, if you do not know or do not have an opinion about any of the questions, please select the "don't know / no opinion" answer option. Please do not guess at any of your answers and please do not use the Internet or any other sources to inform your answers.

 Click the "Next" button below to continue.

**End of Block: Instruction**

**Start of Block: First Stimulus**

Q11
On the next page you will be shown the webpage of a vendor that provides data services.
Please consider the webpage as you would if you were considering hiring the vendor to provide

KEEGAN_EXHIBITS_52

these services for your company/organization.

Please take as much time to consider the webpage as you would like; you will be asked your opinions when you are finished. For the remainder of the survey, the webpage that you will be shown will be referred to as "**PAGE A**."

Click the "Next" button below to continue.

---

Page Break ─────────────────────────────────

JS

Q12 Please consider the webpage shown below as you would if you were considering hiring the vendor to provide services for your company/organization. You can click on the image for an expanded view.

**PAGE A**

${e://Field/PAGE%20A}

**PAGE A**

*You will be able to advance after 10 seconds have passed.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q13 Timing
First Click  (1)
Last Click  (2)
Page Submit  (3)
Click Count  (4)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ──────────────────────────────────────

KEEGAN_EXHIBITS_54

Q14 Were you able to see **PAGE A** clearly?

○ Yes  (1)

○ No  (2)

○ Don't know  (3)

**End of Block: First Stimulus**

**Start of Block: Product Review**

Q15
${e://Field/ARRAY}

Click the "Next" button below to continue.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q16 Timing
First Click  (1)
Last Click  (2)
Page Submit  (3)
Click Count  (4)

**End of Block: Product Review**

**Start of Block: Review A**

Q17 Please consider again **PAGE A**, the first webpage you saw earlier in this survey:

## **PAGE A**

${e://Field/PAGE%20A2}

## **PAGE A**

Click the "Next" button below to continue.

End of Block: Review A

Start of Block: LOC

*Display This Question:*
   *If Loop all: Q19 , 1 Is Not Displayed*

Q18 We are now going to ask you some questions about the webpages you just reviewed. Click the "Next" button below to continue.

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — —

Page Break  ——————————————————————————————

JS ⤨

Q19

Please consider this webpage and answer the questions below the image:

${lm://Field/1}

Thinking of the first webpage that you saw earlier in this survey, **PAGE A**, do you believe:

○ The webpage above <u>is</u> put out by the same company as **PAGE A**, the first webpage you saw  (1)

○ The webpage above <u>is not</u> put out by the same company as **PAGE A**, the first webpage you saw  (2)

○ Don't know / No opinion  (3)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Display This Question:*

   *If  Loop 1: ${e://Field/stim1}, stim1,  Current Loop*

JS

Q20

Click here to viewPAGE A

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

*Display This Question:*

   *If  Loop 2: ${e://Field/stim2}, stim2,  Current Loop*

JS

Q21

Click here to viewPAGE A

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KEEGAN_EXHIBITS_57

*Display This Question:*

    *If  Loop 3: ${e://Field/stim3}, stim3,  Current Loop*

**JS**

Q22

Click here to viewPAGE A

---

*Display This Question:*

    *If  Loop 4: ${e://Field/stim4}, stim4,  Current Loop*

**JS**

Q23

Click here to viewPAGE A

---

*Display This Question:*

    *If Loop current: Q19 , 1 Is Displayed*

    *And Loop current: Q19 = 1*

Q24

What makes you say that the webpage shown above is put out by the same company as **PAGE A**? Please be as specific as possible.

_____

_____

_____

_____

_____

---

Display This Question:

If If Same OE Text Response Is Displayed

Q25 .

☐　　　　Don't know / No opinion  (1)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Display This Question:

If Loop current: Q19 , 2 Is Displayed

And If

Loop current: Q19 = 2

Or Loop current: Q19 = 3

Q26 Do you believe that the webpage shown above:

○ <u>Is</u> affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw  (1)

○ <u>Is not</u> affiliated, connected, or associated with the company that puts out **PAGE A**, the first webpage you saw  (2)

○ Don't know / No opinion  (3)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Display This Question:

If Loop current: Q26 , 1 Is Displayed

And Loop current: Q26 = 1

Q27 What makes you say that the webpage shown above <u>is</u> affiliated, connected, or associated with the company that puts out **PAGE A**? Please be as specific as possible.

_____

_____

_____

_____

KEEGAN_EXHIBITS_59

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Display This Question:

   If If Affil OE Text Response Is Displayed

✳

Q28 .

☐          Don't know / No opinion  (1)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Display This Question:

   If Loop current: Q26 , 1 Is Displayed

And If

   Loop current: Q26 = 2

   Or Loop current: Q26 = 3

🔀

Q29 Do you believe that the webpage shown above:

○ <u>Is</u> sponsored or approved by the company that puts out **PAGE A**, the first webpage  you saw  (1)

○ <u>Is not</u> sponsored or approved by the company that puts out **PAGE A**, the first webpage you saw  (2)

○ Don't know / No opinion  (3)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Display This Question:

   If Loop current: Q29 , 1 Is Displayed

   And Loop current: Q29 = 1

Q30 What makes you say that the webpage shown above <u>is</u> sponsored or approved by the company that puts out **PAGE A**? Please be as specific as possible.

_____

_____

_____

_____

_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| Display This Question: |
| :--- |
| *If If Sponsored OE Text Response Is Displayed* |

✱

Q31 .

☐         Don't know / No opinion  (1)

**End of Block: LOC**

**Start of Block: Data integrity - Green**

⤬

Q32 Please select "Green" from the list below.

○ Red  (1)

○ Green  (2)

○ Blue  (3)

○ Yellow  (4)

**End of Block: Data integrity - Green**

**Start of Block: Demographics**

Q33 Now, a few more questions for classification purposes only. Which of the following best describes your educational background?

○ Less than high school  (1)

○ High school graduate  (2)

○ Some college  (3)

○ 2-year degree  (4)

○ 4-year degree  (5)

○ Master's / Professional degree  (6)

○ Doctorate  (7)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break ─────────────────────────────────────

Q34 What is your gender?

○ Male  (1)

○ Female  (2)

○ Prefer to self-identify:  (3) _____

○ Prefer not to answer  (4)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Page Break _____

KEEGAN_EXHIBITS_63



Q35 Which of the following includes your household's approximate annual income in 2021?

○ Under $35,000  (1)

○ $35,000 - $49,999  (2)

○ $50,000 - $74,999  (3)

○ $75,000 - $99,999  (4)

○ $100,000 - $124,999  (5)

○ $125,000 - $149,999  (6)

○ $150,000 or more  (7)

○ I prefer not to answer  (8)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q36 Click to write the question text
Browser  (1)
Version  (2)
Operating System  (3)
Screen Resolution  (4)
Flash Version  (5)
Java Support  (6)
User Agent  (7)

**End of Block: Demographics**

KEEGAN_EXHIBITS_64

**Exhibit 5—Tabulated Data & Open-Ends**

KEEGAN_EXHIBITS_65

# Tabulated Data

## Q1 - Beginning instruction



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Yes | 100.0% | 207 |
| 2 | No | 0.0% | 0 |
| 3 | Don't know | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_66

## Q2 - Age



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Under 18 | 0.0% | 0 |
| 2 | 18 - 30 | 9.7% | 20 |
| 3 | 31 - 40 | 49.8% | 103 |
| 4 | 41 - 50 | 29.0% | 60 |
| 5 | 51 - 60 | 6.8% | 14 |
| 6 | 61 - 70 | 4.3% | 9 |
| 7 | 71 or older | 0.5% | 1 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_67

Q3 - State



| # | | Answer | % | Count |
|---|---|--------|---|-------|
| 1 | | Alabama | 1.4% | 3 |
| 2 | | Alaska | 0.0% | 0 |
| 3 | | Arizona | 0.5% | 1 |
| 4 | | Arkansas | 2.9% | 6 |
| 5 | | California | 8.2% | 17 |

KEEGAN_EXHIBITS_68

| 6 | Colorado | 1.4% | 3 |
| 7 | Connecticut | 1.4% | 3 |
| 8 | Delaware | 0.5% | 1 |
| 9 | District of Columbia | 1.9% | 4 |
| 10 | Florida | 7.2% | 15 |
| 11 | Georgia | 4.3% | 9 |
| 12 | Hawaii | 0.5% | 1 |
| 13 | Idaho | 0.0% | 0 |
| 14 | Illinois | 7.7% | 16 |
| 15 | Indiana | 1.4% | 3 |
| 16 | Iowa | 1.0% | 2 |
| 17 | Kansas | 1.4% | 3 |
| 18 | Kentucky | 1.9% | 4 |
| 19 | Louisiana | 1.4% | 3 |
| 20 | Maine | 0.0% | 0 |
| 21 | Maryland | 0.5% | 1 |
| 22 | Massachusetts | 1.0% | 2 |
| 23 | Michigan | 2.9% | 6 |
| 24 | Minnesota | 0.0% | 0 |
| 25 | Mississippi | 0.5% | 1 |
| 26 | Missouri | 1.9% | 4 |
| 27 | Montana | 0.0% | 0 |
| 28 | Nebraska | 0.0% | 0 |
| 29 | Nevada | 0.0% | 0 |
| 30 | New Hampshire | 0.0% | 0 |
| 31 | New Jersey | 3.4% | 7 |
| 32 | New Mexico | 0.5% | 1 |
| 33 | New York | 13.5% | 28 |
| 34 | North Carolina | 2.4% | 5 |
| 35 | North Dakota | 0.5% | 1 |

KEEGAN_EXHIBITS_69

| 36 | Ohio | 4.3% | 9 |
| 37 | Oklahoma | 1.0% | 2 |
| 38 | Oregon | 1.4% | 3 |
| 39 | Pennsylvania | 4.3% | 9 |
| 40 | Rhode Island | 0.5% | 1 |
| 41 | South Carolina | 0.5% | 1 |
| 42 | South Dakota | 0.0% | 0 |
| 43 | Tennessee | 0.5% | 1 |
| 44 | Texas | 8.2% | 17 |
| 45 | Utah | 0.0% | 0 |
| 46 | Vermont | 0.0% | 0 |
| 47 | Virginia | 2.4% | 5 |
| 48 | Washington | 2.9% | 6 |
| 49 | West Virginia | 0.0% | 0 |
| 50 | Wisconsin | 1.4% | 3 |
| 51 | Wyoming | 0.0% | 0 |
| 52 | Other | 0.0% | 0 |
| 53 | None of these | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_70

## Q5 - Employment status



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Stay-at-home home-maker | 0.0% | 0 |
| 2 | Retired | 0.0% | 0 |
| 3 | Full-time student | 0.0% | 0 |
| 4 | Self-employed | 4.3% | 9 |
| 5 | Business owner / Principal | 17.4% | 36 |
| 6 | Work for a company or organization | 78.3% | 162 |
| 7 | Other | 0.0% | 0 |
| 8 | Prefer not to answer | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_71

## Q6 - Services - broad



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Payroll services | 16.7% | 119 |
| 2 | Data services | 29.1% | 207 |
| 3 | Maintenance services | 13.1% | 93 |
| 4 | Information technology (IT) services | 28.1% | 200 |
| 5 | Inventory services | 12.9% | 92 |
| 6 | None of these | 0.0% | 0 |
| | Total | 100% | 711 |

KEEGAN_EXHIBITS_72

## Q7 - Services - narrow



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | User or customer identification or data verification services | 17.6% | 183 |
| 2 | Web hosting or website maintenance or website usability services | 16.8% | 175 |
| 3 | Search engine optimization (SEO) services | 14.4% | 150 |
| 4 | Merchant account or commercial banking services | 11.3% | 118 |
| 5 | E-commerce / Online shopping cart services | 13.4% | 140 |
| 6 | Social media / digital marketing services | 12.2% | 127 |

KEEGAN_EXHIBITS_73

| 7 | | Fraud prevention services | 14.2% | 148 |
|---|---|---|---|---|
| 8 | | None of these | 0.0% | 0 |
| | | Total | 100% | 1041 |

KEEGAN_EXHIBITS_74

## Q8 - Decision makers



| # | Answer | % | Count |
|---|---|---|---|
| 1 | I would engage in the vetting process and make the hiring decision on my own | 58.5% | 121 |
| 2 | In combination with others, I would engage in the vetting process and make the hiring decision | 34.3% | 71 |
| 3 | I would influence the vetting process and hiring decision | 7.2% | 15 |
| 4 | I would not be involved in the vetting process or making hiring decision | 0.0% | 0 |
| 5 | Other | 0.0% | 0 |
| 6 | I am not sure | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_75

Q14 - See stimulus clearly



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Yes | 100.0% | 207 |
| 2 | No | 0.0% | 0 |
| 3 | Don't know | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_76

## 1_Q19 - Same - DARKOWL



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | The webpage above is put out by the same company as PAGE A, the first webpage you saw | 52.2% | 108 |
| 2 | The webpage above is not put out by the same company as PAGE A, the first webpage you saw | 39.6% | 82 |
| 3 | Don't know / No opinion | 8.2% | 17 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_77

1_Q24 - Same OE - DARKOWL

${e://Field/stim1} - Same OE

| |
|---|
| the logp and the name of this webpage is similar to the PAGE A |
| The webpage has a similar name and design |
| because the name is really similar to the PAGE A |
| Same owl brand or company |
| Both brands are Dark Owl |
| Services provided in the same field |
| There's a correlation in the name of the provider |
| Already on the page |
| design and company name |
| Both have the same web address/URL i.e. darkowl.com |
| All I saw |
| Same URL, anyway |
| the logos are almost similar |
| has new system |
| The name of the company Darkowl |
| The brands features similar companies |
| The same company, dark owl |
| The title plus the webpage addresses as well as the user interface are similar to one another. |
| Because I saw it. |
| They design in the same style |
| DarkOwl in top corner |
| both have the dark owl logo |
| The icon in the top left corner |
| It looks similar and original. |
| They're both associated with the name 'D'ARKOWL |
| this name is secure  and trust |
| i think , it is the same name |

KEEGAN_EXHIBITS_78

Darkowl is on both pages

Information of the pages

The name of the company

it looks like it -- darkwl

It can be from the same company

same company

Same brand name

Because it has us

Dark owl is the same company because it had the same web address.

because it is from the same company ,Dark Owl .

It gives great performance value

for better quality

SHOWS ME WHAT I WANT TO KNOW ABOUT SIGNING UP AND WHAT IT DOES FOR MY COMPANY OR ANYONE THAT BUYS THE PROGRAM

Maybe

By analyzing the information and data of the site. It provides data protection and information security services.

I think it might be, because the names are kind of the same.

IT IS THE SAME FORM

This is the type of security that this company does including the /darknet where the unscrupulous businesses dwell to prey on other businesses.

They both have similar names and setups

Same name

They use the same brand name

Because they deserve it.

it looks like the page A, the colors

because it has the same sides and frontline

I think due that they have similar names

Compatible services

Same company name. Darkowl.

innovative presenting

Darkowl is mentioned in website A several times

Because it useful.

KEEGAN_EXHIBITS_79

The webpage interface seems to align

Very trusted

the name is kind of same

Ark Owl and Dark Owl its simple

Because they have similar logos

The same name of the company.

Overall provide some of good facilities like page a

Both pages has similar features

it literally says "dark owl", by company name.

The topic is this same

Both have dark owl as headliners

Very similar arkowl/darkowl name and drsign

The company name in the corner

It has some content that are similar

use of the word "owl"

Both names are extremely similar so they're pretty much under the same company

The tag lines.

Good review from this page

The brand logo is same . That's mean this is something same .

The features were same.

Same logo

Easy to use app and speed Services

Dark owl

Same company I remember the name of it very clearly I am positive this is it

Because it appears to be a webpage of the original solution provider.

They look to be from the same source

The company name is the same.

The messaging and the logo are similar to Page A

darknet data is  better database

They provide same type product. So I think so.

KEEGAN_EXHIBITS_80

It's all about technology

The name of the sponsors is quite visible here

They have the same specific. Information

the logo on the left

Page A was put out by company ARKOWL and this page is put out by company called DARKOWL. So it is related.

because it has the same name its just missing the letter d .

It has the same kind of layout

KEEGAN_EXHIBITS_81

1_Q25 - Same OE DK - DARKOWL



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 14 |
| | Total | 100% | 14 |

KEEGAN_EXHIBITS_82

## 1_Q26 - Affil - DARKOWL



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Is affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 15.2% | 15 |
| 2 | Is not affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 63.6% | 63 |
| 3 | Don't know / No opinion | 21.2% | 21 |
| | Total | 100% | 99 |

KEEGAN_EXHIBITS_83

## 1_Q27 - Affil OE - DARKOWL

${e://Field/stim1} - Affil OE

The use of the brand name-Darkowl.

It seems like a subsidiary of Page A. The names are similar.

Similar design

Their similarities in the logos and brand promises. It would make sense if these companies are aligned.

This page makes me.

ArkOwl and DarkOwl seem to be very close in name, with the latter focusing on dark web data.

It is connected with cyber use and a database

They provide same type of product. They provide same product I think.

They are the same brand.

It has almost the same name so it gives off the impression that it's either a parent or sister company

empowers organizations to continually improve their cybersecurity defenses using DRKNET intelligence

KEEGAN_EXHIBITS_84

1_Q28 - Affil OE DK - DARKOWL



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 4 |
| | Total | 100% | 4 |

KEEGAN_EXHIBITS_85

## 1_Q29 - Sponsored - DARKOWL



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Is sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 4.8% | 4 |
| 2 | Is not sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 66.7% | 56 |
| 3 | Don't know / No opinion | 28.6% | 24 |
| | Total | 100% | 84 |

KEEGAN_EXHIBITS_86

1_Q30 - Sponsored OE - DARKOWL

${e://Field/stim1} - Sponsored OE

Its design and their theory that they told past pictures that really asusual same and intelligence category based.

Darkowl is a similar sounding name to arkowl as though they're an umbrella company and slogan is similar.

KEEGAN_EXHIBITS_87

## 1_Q31 - Sponsored OE DK - DARKOWL



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 2 |
| | Total | 100% | 2 |

KEEGAN_EXHIBITS_88

## 2_Q19 - Same - EKATA



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | The webpage above is put out by the same company as PAGE A, the first webpage you saw | 19.8% | 41 |
| 2 | The webpage above is not put out by the same company as PAGE A, the first webpage you saw | 69.6% | 144 |
| 3 | Don't know / No opinion | 10.6% | 22 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_89

## 2_Q24 - Same OE - EKATA

${e://Field/stim2} - Same OE

replica services

Understand

I can think of that it's a right picture.

The webpage covers information which is very important for consideration

Because I saw it.

They design in the same style

The style is similar. Looks like it's a Wordpress template

they have the same purpose.

IT SHOWS WHAT I NEED TO KNOW AND GIVE A LOT OF INFORMATION

because they to have similar style, and this last page to have information additional  that can to help to the people, so I can see a good security package

This is what they do, it's the type of business that is in their catalog.

It looks very similar to the first page.

the company relies on profit merchandising and technology

this is very secure and trust

Compatible services

it seems like a first draft of page a

Because it useful

This webpage has some similar features a the webpage A

fastest service

because the sitewebs looks similar

The topic is this same

The headline is very bold

Because they both deal with cyber security

The tag lines.

It was some same about our company.

The benefits were same with first one.

KEEGAN_EXHIBITS_90

Easy to understand and Strong Discover.

To  verify email address and phone number in a real  time.

It's okay I'm my view

They both offer the same or similar services

The design and arrangements of words

just feel that it has the same kind of feel

KEEGAN_EXHIBITS_91

## 2_Q25 - Same OE DK - EKATA



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 9 |
| | Total | 100% | 9 |

KEEGAN_EXHIBITS_92

## 2_Q26 - Affil - EKATA



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Is affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 12.7% | 21 |
| 2 | Is not affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 71.7% | 119 |
| 3 | Don't know / No opinion | 15.7% | 26 |
| | Total | 100% | 166 |

## 2_Q27 - Affil OE - EKATA

| ${e://Field/stim2} - Affil OE |
| --- |
| Similar Services |
| The page above provides more details about the steps a company can take to protect their client's data than the original Page A. |
| Overlapping themes but that could just be a coincidence |
| They both work on data security |
| Noticed the same company name and type content. |
| same topics |
| Because it has Sam projected |
| This page makes me |
| i think so |
| They are same type of page. They provide same type product. |
| Both pages connects with identity |
| They provide same type of product. I think this are same type but different brand. |
| Same kind of design |
| They provide same type of product. So I think they both are associate. |
| I just think that way about them |

KEEGAN_EXHIBITS_94

2_Q28 - Affil OE DK - EKATA



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 6 |
| | Total | 100% | 6 |

KEEGAN_EXHIBITS_95

## 2_Q29 - Sponsored - EKATA



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Is sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 7.6% | 11 |
| 2 | Is not sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 75.2% | 109 |
| 3 | Don't know / No opinion | 17.2% | 25 |
| | Total | 100% | 145 |

KEEGAN_EXHIBITS_96

## 2_Q30 - Sponsored OE - EKATA

| ${e://Field/stim2} - Sponsored OE |
| --- |
| its clear and specific |
| Maybe |
| some marketing words seemed similar |
| Aekowl |
| clearly saw the description and brand name |
| Overall provide good quality facilities with value for money |
| The language and the message of the ad immediately caught my attention |
| the ads quality and clearity |
| because of  the look of the logo |

KEEGAN_EXHIBITS_97

## 2_Q31 - Sponsored OE DK - EKATA



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 2 |
| | Total | 100% | 2 |

KEEGAN_EXHIBITS_98

## 3_Q19 - Same - GEMINI ADVISORY



| # | Answer | % | Count |
|---|---|---|---|
| 1 | The webpage above is put out by the same company as PAGE A, the first webpage you saw | 25.6% | 53 |
| 2 | The webpage above is not put out by the same company as PAGE A, the first webpage you saw | 63.3% | 131 |
| 3 | Don't know / No opinion | 11.1% | 23 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_99

## 3_Q24 - Same OE - GEMINI ADVISORY

| ${e://Field/stim3} - Same OE |
| --- |
| Affiliated with the same fraud protection services as page A |
| The webpage features some brands |
| They design in the same style |
| Looks identical.  Same company and same page. |
| Again, looks pretty similar |
| Similar design |
| because they have the same purpose. |
| SHOWS ME WHAT I WANT TO KNOW ABOUT SIGNING UP AND WHAT IT DOES FOR MY COMPANY OR ANYONE THAT BUYS THE PROGRAM THIS WOULD COME IN HANDY |
| same progam |
| because they have a similar design and style, also they have a relevant information about how I can stop of fraud and verification a number and email address, that it looks as a package of services |
| This is basically what they do, it's in their line of business. |
| Because they deserve it. |
| very creative and credible idea. |
| Compatible services |
| clean lines and no unnecessary links |
| i think so |
| Because it interesting. |
| The background has some similarities |
| It has the same tone & manner, the same dark visuals and the same scare tactics in headlines. |
| unique service |
| because the sitewebs looks similar |
| Both webpage have the same goal. |
| They are same type page. I think they both are same type of product and service. |
| They have similarities, I think the fonts and layout looks the same |
| It's included with web protection of identity |
| The design |

KEEGAN_EXHIBITS_100

The layout is good and it's easy to read

Same info

They have the same content

They look and sound similar

The similar tag lines.

Also has a very similar design.

It is very relevant as Page A.

Saves to me and Quality Services.

It is financial service.

The design is similar

I remind it this ads quality

It is totally different from each other

They have similarities in terms of features

It looks a little the same

KEEGAN_EXHIBITS_101

3_Q25 - Same OE DK - GEMINI ADVISORY



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Don't know / No opinion | 100.0% | 13 |
| | Total | 100% | 13 |

KEEGAN_EXHIBITS_102

## 3_Q26 - Affil - GEMINI ADVISORY



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Is affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 11.0% | 17 |
| 2 | Is not affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 74.0% | 114 |
| 3 | Don't know / No opinion | 14.9% | 23 |
| | Total | 100% | 154 |

KEEGAN_EXHIBITS_103

## 3_Q27 - Affil OE - GEMINI ADVISORY

${e://Field/stim3} - Affil OE

| |
|---|
| Similar layout / brand feel |
| offers new services |
| They both work on the security of data |
| color scheme |
| Because it has same effect |
| This photo makes me. |
| Looks similar in design. |
| Overall provide unique quality products with value for money services |
| They provide same type of product. So I say that. |
| The messaging of both are the same on the issue |
| I think they are same type type of product. |

KEEGAN_EXHIBITS_104

3_Q28 - Affil OE DK - GEMINI ADVISORY



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 6 |
| | Total | 100% | 6 |

KEEGAN_EXHIBITS_105

## 3_Q29 - Sponsored - GEMINI ADVISORY



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Is sponsored or approved by the company that puts out PAGE A, the first webpage  you saw | 5.1% | 7 |
| 2 | Is not sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 78.8% | 108 |
| 3 | Don't know / No opinion | 16.1% | 22 |
| | Total | 100% | 137 |

KEEGAN_EXHIBITS_106

3_Q30 - Sponsored OE - GEMINI ADVISORY

${e://Field/stim3} - Sponsored OE

Services provided

The user interface of both these pages are similar and both pages looks connected in some way and legit.

They both address consumer security and educating their clients on fraudulent activities. They don't look the same as far as style, but some of the message is the same.

Company sponsored

It was about  same facility .

Both are cool

Both are  reduce  digital  crime

KEEGAN_EXHIBITS_107

## 3_Q31 - Sponsored OE DK - GEMINI ADVISORY



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 0.0% | 0 |
|   | Total |  | 0 |

## 4_Q19 - Same - SPYCLOUD



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | The webpage above is put out by the same company as PAGE A, the first webpage you saw | 25.1% | 52 |
| 2 | The webpage above is not put out by the same company as PAGE A, the first webpage you saw | 66.2% | 137 |
| 3 | Don't know / No opinion | 8.7% | 18 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_109

4_Q24 - Same OE - SPYCLOUD

${e://Field/stim4} - Same OE

Services provided

Design seems very like page a

just right

fpmtomg

I can think of that for that reason.

Because I saw it.

They design in the same style

color scheme and wordiung

Look like her

The whole concept for page A is very streamlined, not cluttered, and presents the information in a clear and concise way. This information page achieves all of this as well as the earlier information pages.

This one is a bit more simple, but still can be from the same company.

Similar design

because they have the same purpose .

SHOWS ME WHAT I WANT TO KNOW ABOUT SIGNING UP AND WHAT IT DOES FOR MY COMPANY OR ANYONE THAT BUYS THE PROGRAM

same similar methods

IT IS THE SAME FORM

It is good management

One is about security and the other is about the criminal underground. A security company knows all about both entities and knows the ins and outs of them all.

Because they deserve it.

Compatible services

their presenting way

Because it interesting

live support

instant access and connected with profile

They both are same type of product.

the style, tone, color and font are very similar.

KEEGAN_EXHIBITS_110

It just goes together. The same info and even the same colors in add

The simalar tag lines.

That page review so easy

Similar design in my opinion but i could be very wrong on this lmao.

It was helpful like the first one.

Same type of design

They look to share a common source.

To prevent malware infected devices

KEEGAN_EXHIBITS_111

4_Q25 - Same OE DK - SPYCLOUD



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 18 |
| | Total | 100% | 18 |

KEEGAN_EXHIBITS_112

## 4_Q26 - Affil - SPYCLOUD



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Is affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 9.7% | 15 |
| 2 | Is not affiliated, connected, or associated with the company that puts out PAGE A, the first webpage you saw | 76.1% | 118 |
| 3 | Don't know / No opinion | 14.2% | 22 |
| | Total | 100% | 155 |

KEEGAN_EXHIBITS_113

## 4_Q27 - Affil OE - SPYCLOUD

${e://Field/stim4} - Affil OE

There is a lot of similarity between the two pages

That both have the same goal protecting the data security and privacy of one's clients.

has great system

The services offered by both seems connected.

Same name and similar content.

The information inside

This web site photo makes me.

Their providing service and their thoughts that all about as same.

Just as is

It was almost same to technology think.

The content and design is relevant

It is using the same language as those in the Page A ad

It is having always same pattern

KEEGAN_EXHIBITS_114

## 4_Q28 - Affil OE DK - SPYCLOUD



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 2 |
| | Total | 100% | 2 |

KEEGAN_EXHIBITS_115

## 4_Q29 - Sponsored - SPYCLOUD



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Is sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 3.6% | 5 |
| 2 | Is not sponsored or approved by the company that puts out PAGE A, the first webpage you saw | 77.1% | 108 |
| 3 | Don't know / No opinion | 19.3% | 27 |
| | Total | 100% | 140 |

4_Q30 - Sponsored OE - SPYCLOUD

${e://Field/stim4} - Sponsored OE

The benefits of the brand seems likely

it looks like it

its clear and specific

They are offering similar services

KEEGAN_EXHIBITS_117

4_Q31 - Sponsored OE DK - SPYCLOUD



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Don't know / No opinion | 100.0% | 1 |
| | Total | 100% | 1 |

KEEGAN_EXHIBITS_118

## Q32 - Green



| # | Answer | % | Count |
|---|--------|----|-------|
| 1 | Red | 0.0% | 0 |
| 2 | Green | 100.0% | 207 |
| 3 | Blue | 0.0% | 0 |
| 4 | Yellow | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_119

## Q33 - Education



| # | Answer | % | Count |
|---|--------|---|-------|
| 1 | Less than high school | 0.0% | 0 |
| 2 | High school graduate | 4.8% | 10 |
| 3 | Some college | 5.3% | 11 |
| 4 | 2-year degree | 5.3% | 11 |
| 5 | 4-year degree | 38.6% | 80 |
| 6 | Master's / Professional degree | 43.5% | 90 |
| 7 | Doctorate | 2.4% | 5 |
|   | Total | 100% | 207 |

KEEGAN_EXHIBITS_120

## Q34 - Gender



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Male | 69.6% | 144 |
| 2 | Female | 30.4% | 63 |
| 3 | Prefer to self-identify: | 0.0% | 0 |
| 4 | Prefer not to answer | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_121

## Q35 - Income



| # | Answer | % | Count |
|---|---|---|---|
| 1 | Under $35,000 | 1.0% | 2 |
| 2 | $35,000 - $49,999 | 4.8% | 10 |
| 3 | $50,000 - $74,999 | 13.0% | 27 |
| 4 | $75,000 - $99,999 | 15.5% | 32 |
| 5 | $100,000 - $124,999 | 17.4% | 36 |
| 6 | $125,000 - $149,999 | 21.3% | 44 |
| 7 | $150,000 or more | 27.1% | 56 |
| 8 | I prefer not to answer | 0.0% | 0 |
| | Total | 100% | 207 |

KEEGAN_EXHIBITS_122

## Exhibit 6—Untabulated Data

**Produced electronically.**

KEEGAN_EXHIBITS_123

**Exhibit 7—Disposition of Contacts**

KEEGAN_EXHIBITS_124



**KEEGAN & DONATO**
CONSULTING, LLC

**Disposition of Contacts - DarkOwl, LLC v. ArkOwl LLC and ArkOwl Corporation**

|  | n | % |
|---|---|---|
| Responded to invitation | 1,383 | 100.0% |
|  |  |  |
| Rejected - failed instruction acknowledgement question | 124 | 9.0% |
| Rejected - failed age question (under 18) | 30 | 2.2% |
| Rejected - failed - did not select a state | 1 | 0.1% |
| Rejected - failed - not employed | 104 | 7.5% |
| Rejected - failed - no data services | 773 | 55.9% |
| Rejected - failed - no customer identification or data verification services or fraud prevention services | 76 | 5.5% |
| Rejected - failed - not a decision maker | 9 | 0.7% |
| Rejected - failed - could not see stimulus | 4 | 0.3% |
| Rejected - failed security question ("Green") | 0 | 0.0% |
| Rejected - speeder | 0 | 0.0% |
| Rejected - low quality response | 51 | 3.7% |
| Rejected - over quota | 4 | 0.3% |
| Total qualified respondents | 207 | 15.0% |