**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

DARKOWL, LLC,

        Plaintiff,

v.

ARKOWL LLC and ARKOWL
CORPORATION,

        Defendants.

Court File No. 21 cv 02163

**DEFENDANT'S MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S
MOTION TO EXCLUDE EVIDENCE
AND TESTIMONY FROM MARK
KEEGAN**

**INTRODUCTION**

Whether ArkOwl and DarkOwl are competitors is a key material question that remains in dispute. ArkOwl says they are, DarkOwl disagrees. Both parties have evidence they believe proves their point. In moving to exclude Mark Keegan's expert testimony, DarkOwl asks the Court to blow right past that material factual dispute; to implicitly decide the parties aren't competitors, and that because they aren't competitors Keegan's report is unreliable and inadmissible.

That placement of cart before horse isn't the only flaw in DarkOwl's motion, but it is the most significant. Though cast as an attack on Keegan's methodology, the motion in reality offers reasons DarkOwl believes his report shouldn't be afforded any substantial weight and credibility. Even if those attacks on the credibility of Keegan's report were valid   a point ArkOwl unsurprisingly disputes   they would not justify the

1

exclusion of his testimony. Questions of credibility go to the weight a factfinder gives an expert's opinions; they do not justify keeping the factfinder from hearing those opinions in the first place.

Keegan formed his opinions based on a survey he crafted and conducted in accordance with accepted methodology. DarkOwl's motion to exclude his testimony because it believes he could or should have used different methodologies should be denied.

## ARGUMENT

### I. KEEGAN'S SURVEY UNIVERSE EMBRACES POTENTIAL DARKOWL CUSTOMERS

Based on information provided by ArkOwl and his own review of DarkOwl's website, Keegan concluded the two companies compete for clients seeking cybersecurity services addressing customer verification, data verification and fraud prevention. His survey universe was crafted from that conclusion. (Keegan Report[1] p. 17, ¶¶ 54, 55).

DarkOwl insists that universe is not representative of its potential clients because 1) Keegan did not recall during his deposition that in addition to businesses, DarkOwl markets to law enforcement and intelligence agencies; and 2) DarkOwl argues that its services and customers "differ in significant ways" from ArkOwl's. But most of

---

[1] The Expert Report of Mark Keegan is attached to Plaintiff's Motion to Exclude as Exhibit A and will be referred to as the "Keegan Report."

DarkOwl's target market is commercial, not governmental, and the extent and significance of the differences between the companies' target markets are very much in dispute.[2]

Constructing a universe of clients using data services focused on their cybersecurity needs to address customer and data verification and fraud prevention was appropriate because it reflects DarkOwl's clients as well as ArkOwl's. DarkOwl's internal marketing documents describe its potential customers as "███████████████." (Ex 1,[3] p. 5) They include companies in the "██████ Industry" using data for commercial purposes, as well "███████████████████████ ██████." (Ex. 1, p. 5) While its customers did include governmental agencies    as DarkOwl's brief emphasizes    that is not most of its client base. As of June 2021, according to DarkOwl documents, the company had ██ clients. Only ██ were governmental. (Ex. 1, p. 5) Another DarkOwl document acknowledges that "████████████████████ ████" and that the "████████████████████████." (Ex. 2,[4] p. 10)

---

[2] Though DarkOwl asserts throughout its brief that it and ArkOwl differ significantly in their offerings and marketing, the assertions are purely argument with no substantiation in the record. ArkOwl is providing evidence of the parties' competition and the overlap in their markets in opposition to this motion to demonstrate that the issue remains in dispute.

[3] Deposition Exhibit 17, marked Attorneys Eyes Only.

[4] Deposition Exhibit 10, marked Attorneys Eyes Only.

The company markets access to data such as names, social security numbers, emails and passwords and much more, used by credit monitoring bureaus, businesses engaged in identify theft monitoring, "Companies & Organizations," and, yes, law enforcement. (Ex. 2, p. 10)

DarkOwl's internal documents demonstrate the parties' competitive overlap. DarkOwl's head of sales created documents intended to identify DarkOwl's "addressable market," or what he considered to be potential customers. (Ex. 3[5], Dep. pp. 107 108, 115 118) He identified at least two of ArkOwl's existing customers, ███████████, as part of DarkOwl's target market. (Ex. 4,[6] p. 18; Ex. 5,[7] Ex. 6[8]) And on at least one occasion, DarkOwl directly solicited █████, an existing customer of ArkOwl. (Ex. 7[9])

Keegan's survey universe encompasses the kinds of individuals likely to work at such companies. To define the universe, he first limited the potential participants to those whose job responsibilities include "data services,"[10] and then further narrowed the pool

---

[5] Excerpts from the 30(b)(6) Deposition of DarkOwl, given by Mark Turnage, and designated Attorneys Eyes Only.

[6] Deposition Exhibit 11, marked Attorneys Eyes Only.

[7] A PDF print out of the third tab of Deposition Exhibit 12, marked Attorneys Eyes Only.

[8] A representative list of ArkOwl's current invoiced clients, marked Attorneys Eyes Only.

[9] Deposition Exhibit 18.

[10] In his deposition, DarkOwl CEO Mark Turnage confirmed more than once that DarkOwl is "██████████." (Ex. 3, dep. p. 88); see also Ex. 3, dep. p. 95 ("███████████ ████████████████████████.") Reviewing a chart (created by a third party) showing "████████████████████████████

to those whose particular data services work included "user or customer identification or data verification services" or "fraud prevention." (Keegan Report, pp. 16 17, ¶¶ 52 55) Within that dataset, only those who had some level of involvement in purchasing the relevant services were allowed to proceed to the substance of the survey. (Keegan Report, p. 18, ¶ 57) Keegan further screened by reviewing respondents' job titles "for appropriateness as to likely participation in the parties' market." (Keegan report pp. 14, 18, ¶ 42, 58)

DarkOwl argues the Keegan report should be excluded because it believes a different or better survey universe should have been constructed. But even if that argument were valid, "[t]echnical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996).[11]  And courts have rejected arguments much like the one DarkOwl relies on here.

---

," Turnage testified DarkOwl would fall in "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓," but the "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." (Ex. 3, dep. pp. 112 113; Ex. 4, p. 7)

[11] "'In most cases, the selection of an inappropriate universe will lessen the weight of the resulting survey data, not result in its inadmissibility.'" *Kodiak Cakes, LLC v. JRM Nutrasciences, LLC*, 2022 U.S. Dist. LEXIS 217175, at *35 (D. Utah Nov. 30, 2022) (quoting McCarthy § 32:162)

In *OraLabs, Inc. v. Kind Grp. Ltd. Liab. Co.*, 2015 U.S. Dist. LEXIS 98306, at *12 (D. Colo. July 28, 2015), both parties sold lip balm in a similar egg shaped container in similar retailers. The defendant — the senior user of the mark at issue — identified its market as 18 34 year old women, and based largely on that its expert surveyed 18 38 year old women. Id. at *12. The parties agreed the junior user's market was the relevant universe, but the court rejected the motion to exclude the expert because — as in this case — there was no clear evidence that the markets weren't similar or overlapping. *Id.* at *15.

The parties in *Kodiak Cakes, LLC v. JRM Nutrasciences, LLC*, 2022 U.S. Dist. LEXIS 217175, at *3 (D. Utah Nov. 30, 2022) sold different products in similar markets. The plaintiff sold pancake and waffle mixes, snacks, and "ready eat breakfast items" with added protein. *Id.* at *2. The defendant's products were nutritional supplements like protein powder. *Id.* at *3. The plaintiff's expert conducted *Squirt* surveys that "defined the interested universe broad as 'past or future purchasers of protein products.'" *Id.* at *7. Like Keegan, he determined that universe by considering information from his client and from the parties' websites. *Id.* at 35. The defendant sought to exclude the expert's report "as inappropriately overbroad" because it wasn't limited to the products it (the junior user) sold or to its "target market" of 18 35 year olds. *Id.* at *36.

The *Kodiak* court acknowledged that the defendant's argument "seems logical," and then rejected it because:

6

> Whether the screening question accurately describes the Defendant's product is not the issue. The issue is whether the 'survey is composed of the potential buyers of the junior user's goods or services.' Therefore, Mr. Franklyn's survey is only surveying the improper universe if consumers of foods with added protein are not potential buyers of Defendants' goods.

*Id.* (quoting 6 McCarthy on Trademarks and Unfair Competition § 32:159 (4th ed. 2003)). The court recognized the possibility that the survey might have captured results largely from the plaintiff's core market, but that did not justify its exclusion. "Here, even if the survey includes only past and potential purchasers of 'foods with added protein'     the senior user's goods     there is a significant likelihood that that same market will be interested in the junior user's goods: also protein focused." *Id.* at *42.

Here there is also a "significant likelihood" that the market reflected in Keegan's survey universe is interested in DarkOwl's services. The fact that the universe also encompasses respondents who could be interested ArkOwl's services doesn't undermine that. If anything, it helps reinforce the propriety of the survey universe because there is evidence that the two companies target not only overlapping markets, but some of the same companies within those markets. DarkOwl has not shown that Keegan's methodology in selecting the universe of survey respondents was flawed   let alone that it was so fundamentally flawed that exclusion is warranted    and its motion to exclude on that basis should be denied.

7

## II. KEEGAN'S SURVEY USED APPROPRIATE QUESTIONS TO APPROXIMATE THE RELEVANT MARKETPLACE

No survey can perfectly replicate an actual marketplace. But Keegan's appropriately approximated the marketplace for cybersecurity related data services. On this motion, the relevant question is whether Keegan's methodology was flawed. DarkOwl makes arguments revealing that it questions his methodology but does not point to any authority (academic or legal) that calls that method into question.

DarkOwl's principal claim here is that Keegan's survey has a leading design. It bases that claim on the fact that, before showing respondents website pages from DarkOwl and three other cybersecurity companies, the survey stated that the websites were from "vendors that provide data services." (DarkOwl Brief p. 13 14) DarkOwl never explains what about that statement makes it leading. A leading stimulus would suggest to respondents the answer they should give to the questions that followed. But the observation of the undisputed fact that companies "provide data services" does not point the respondent toward any answer or conclusion about anything at issue in this case. "Data services" is a broad term that encompasses the parties' services, but also data storage (like Dropbox or Amazon Web Services), legal research services like Lexis Nexis and Westlaw, and general search services like Google, Bing, or ChatGPT.

Contrasting this case with the two DarkOwl relies on helps make this point. In *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112 (2nd Cir. 1984), the plaintiff movie

studio tried to prove consumer confusion between "King Kong" and the "Donkey Kong" video game with a telephone survey that asked: "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" *Id.* at 118. The survey was inadmissible because the very question suggested the connection the plaintiff was trying to prove. *Id.* The survey in *Kudos Inc. v. Kudoboard LLC*, 2021 U.S. Dist. LEXIS 224311, at *38 (N.D. Cal. Nov. 20, 2021) posed a similar (if less blatant) problem. The plaintiff provided "employer recognition and engagement software" that employers could use to "encourage positive interactions." *Id.* at *3. The defendant was an online greeting card company. The survey told respondents they would be viewing websites "for companies offering employee recognition and engagement software." *Id.* at 38. That statement strongly suggested to respondents that the defendant was providing a service    employee recognition and engagement    that it did not. The report was excluded because it "substantively describ[ed] the product" the surveyed respondents were considering. *Id.* at *39.

"Data services" carries no such implication, nor is it misleading. All of the companies shown in Keegan's survey were in the "data services" industry    but nothing in the survey suggests what kind of data services any of them provide, or that any of their services are similar to ArkOwl's. The term is generic and there is no reason to believe its use led any respondent to any particular conclusion.

DarkOwl's other two reasons for calling the survey marketplace "artificial" are no stronger. The first is that the respondents were initially shown a portion of each website's landing page. When a page popped up on their screen they could see most, but not all of it; they could, however, click on it to see more. DarkOwl's motion does not explain why this makes the experience "artificial" (it is often necessary, after all, to scroll through a web page to see the whole thing) or how it rendered the survey methodologically unsound. The final argument here is that the survey allowed respondents to move on to the next page after 10 seconds. Again, there is no argument or explanation of how that fact undermines the soundness of the survey methodology.[12]

None of these arguments show that the survey marketplace was artificial, and none justify exclusion of Keegan's report.

## III.    KEEGAN'S SURVEY USED A RECOGNIZED CONTROL

Finally, DarkOwl seeks to exclude Keegan's report because it would have used a different control than it did. That argument, though, is one DarkOwl should make on cross examination in an attempt to undermine the credibility of Keegan's opinion rather than in an attempt to avoid having to confront his opinion at all.

---

[12] Keegan did account for the possibility of "speeders" in the survey. "Respondents were to be flagged if they completed the survey in less than one third of the median completion time across all respondents in the sample." (Keegan Report, p. 14, ¶ 40). No one did.

First, DarkOwl notes that Keegan did not use a control group in his survey. That is an accurate statement, but it does not mean the survey did not incorporate a proper and valid control at all. While use of a control group is a common method of setting a control, it is not the exclusive method. Keegan instead used the method he details in his report. This method known as an "internal control" made use of three control stimuli. (Keegan Report, pp. 10 11, ¶ 27) As Keegan explains, "With respect to likelihood of confusion research, use of internal control stimuli is common and acceptable when using the two room line up survey methodology:

> [In a two room line up study], the respondent is shown the [senior user's] mark in the first room. In the second room, the respondent is shown the [junior user's] mark, and each of the control marks. Respondents are asked the same one or more questions about each of the second room stimuli to ascertain which, if any, of the second room stimuli the respondent thinks come from the same source as the first room stimulus. A follow up such as, 'Why did you say that?' may be used to provide some explanation of the reason for any linkages.

(Keegan Report, pp. 10 11, ¶ 27 (quoting Rappeport, M. (2012) "Design Issues for Controls." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S.S. and Swann, J.B., eds., American Bar Association, pp. 236 237)). As Keegan explains, use of this internal control method "conveys to the respondent that a range of products are available within the relevant market of cybersecurity software services and

reduces pressure on participants to assume that there is a source relationship between the plaintiff and defendant." (Keegan Report, p. 11, ¶ 28 (citing Rappeport p. 238)).

Control stimuli should share characteristics with the original mark (in this case ArkOwl's), but care must be taken not "incorporate elements that could be considered infringing" on that mark. (Keegan Report, p. 11, ¶ 30) The controls should be "as close as possible to the test stimulus without itself being subject to a claim that it is infringing or misleading." (Ex. 8[13] dep. p. 108:10 14) Keegan selected his controls with that requirement in mind. (Ex. 8 dep. p. 108:15:21). DarkOwl argues that his selections did not satisfy that criterion, but as Keegan testified during his deposition, "this is subjective." (Ex. 8 dep. p. 110:4) When, for example, DarkOwl's counsel asked why he hadn't included a company called ClearSale that had a bird logo, Keegan explained that the ClearSale logo was too "distinctive" and "prominent." (Ex. 8 dep. p. 110:1 9) "I'm not looking for something to stand out." (Ex. 8 dep. p. 113:17 18) As one court put it, finding an "adequate control" requires the selection an "average, non infringing" image or item. *Apple, Inc. v. Samsung Elecs. Co.*, 2012 U.S. Dist. LEXIS 90877 (N.D. Cal. June 29, 2012).

Keegan's caution about selecting a prominent bird element is consistent with proper methodology, as courts have recognized. "To fulfill its function, a control should

---

[13] Excerpts from the deposition of Mark Keegan.

'share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'" *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010) (emphasis added) (quoting Diamond on Survey Research at 258) Because the selection of a control is, as Keegan noted, "subjective," there is often room for disagreement between parties and their respective experts. Those disagreements, courts frequently hold, should be resolved by the factfinder at trial. *Ferring Pharm., Inc. v. Braintree Labs., Inc.*, 210 F. Supp. 3d 252, 257 (D. Mass. 2016) ("Any issues with the lack of a control group go to the weight, not the admissibility"); *AirWair Int'l Ltd. v. Pull & Bear Espana SA*, 2021 U.S. Dist. LEXIS 129674, *3 (N.D. Cal. July 12, 2021) ("adequacy of the control image" went to weight of expert evidence not admissibility); *LG Electronics. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 956 (N.D. Ill. 2009) (challenge to quality of "the test and the control" affected weight jury would give survey, did not render it inadmissible);[14] *Rice v. Brand Imps.*, 2011 U.S. Dist. LEXIS 169679, at *8 (N.D. Ga. Mar. 4, 2011) ("Whether the internal controls" were adequate was a question for trial).

---

[14] Explaining the caution to be taken, the *LG Electronics* court quoted McCarthy's observation that "The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out of hand." *Id.* (quoting 6 McCarthy on Trademarks and Unfair Competition § 32:178 (4th ed. Supp. Sept. 2009)).

DarkOwl will be free at trial to argue that Keegan should have used different controls. It should not be able to avoid that argument with this motion.

## CONCLUSION

The jury should be permitted to hear from ArkOwl's expert and determine how much weight to give to his survey and opinions in this case. DarkOwl will have the opportunity to challenge Mr. Keegan's methodology and credibility. But it is for the jury to decide whether to credit his opinion and how much weight it should be given. DarkOwl's attempt to exclude Mr. Keegan's testimony usurps the jury's role and should be denied.

Dated: February 1, 2023

By:  /s/ Michael Frasier
Michael Frasier, MN Bar #387704
**RUBRIC LEGAL LLC**
111 Third Avenue South, Suite 110
Minneapolis, MN 55401
P: (612) 465.0074
F: (612) 605.1986
Michael@rubriclegal.com

*Attorney for Defendants ArkOwl LLC*
*and ArkOwl Corporation*