## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC,

      Plaintiff,

v.

ARKOWL, LLC and
ARKOWL CORPORATION,

      Defendants.

---

### PLAINTIFF DARKOWL, LLC'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE EVIDENCE AND TESTIMONY FROM MARK KEEGAN

---

Plaintiff DarkOwl, LLC ("DarkOwl"), for its Reply in support of its motion to preclude Defendants' expert witness, Mark Keegan ("Keegan"), from testifying at trial or presenting evidence on the issue of the likelihood of confusion between the disputed marks ("Motion"), states as follows:

### INTRODUCTION

DarkOwl argued in its Motion that Keegan's testimony and expert report should be excluded because his survey suffers from several fatal flaws that make it unreliable and likely to confuse the trier of fact, including using the wrong universe of survey respondents, failing to implement a proper control, and using a leading question to introduce survey stimuli. In its Opposition ("Opposition"), ArkOwl contends that Keegan utilized an acceptable form of control in his survey, Keegan utilized a proper universe because the parties are purported competitors, Keegan's introduction of stimuli was not improperly leading, and, in any event, the issues raised by DarkOwl should go to the *weight* of Keegan's testimony and report and are not bases for *exclusion*. But the relevant facts and authorities do not support any of these contentions.

First, Keegan's purported use of an "internal control" method is not an acceptable control mechanism for the likelihood of confusion survey at issue here.  Second, Keegan's use of a leading characterization of the stimuli is equally improper and parallel's the survey design that another district court found to warrant exclusion of his survey in its entirety.  Additionally, while DarkOwl disagrees that there is any factual dispute about whether the parties are competitors (they are not), that issue is of no moment.  Even if it is assumed for the sake of argument that there is some overlap in the parties' potential customers, Keegan made no effort to (and did not) isolate potential DarkOwl customers, as is required to obtain the proper universe of respondents.  Finally, numerous authorities counsel that the flaws in Keegan's methodology warrant *exclusion* of the report and testimony.  The cases ArkOwl points to against exclusion are simply one-off examples where individual courts have determined that specific concerns about an expert report or survey design should go to the *weight* of that report, and do not establish any general rule against full *exclusion* in the circumstances presented here.

## A.    Keegan Failed to Use A Proper Control

DarkOwl argued in its Motion that Keegan failed to use a proper control in his survey, causing the survey results to be unreliable.  *See* Motion at 15-18.  In response, ArkOwl admits that Keegan did not use a control group in his survey but contends that he nonetheless used an "internal control" that is a "recognized" form of control.  Opp. at 10-13.  Importantly, however, ArkOwl provides no support for this contention, which squarely contradicts well-established authority that likelihood of confusion surveys must utilize separate control groups.

"A survey designed to estimate likelihood of confusion must include a proper control." *THOIP v. Walt Disney Co.*, 690 F.Supp.2d 218, 240 (N.Y.S.D. 2010).  A control is designed to estimate the degree of background "noise" or "error" in the survey, and without a proper control,

there is no benchmark for measuring whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology. *Id.; see also* 6 McCarthy on Trademarks § 32:187 (5th ed. 2022). "To fulfil its function, a control should 'share [] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'" *Id.* (*citing* Shari Seidman Diamond, Reference Guide on Survey Research, *in* Reference Manual on Scientific Evidence, 258 (Federal Judicial Center 2d ed. 2000)).

ArkOwl provides no support for its contention that an "internal control" method is acceptable and proper in this case, if ever. ArkOwl's reference to and quotations from pages 10-11 in the Keegan report simply explain one way of setting up a survey for an initial test group, i.e., a "two-room line-up" study, where the respondent is shown the senior user's mark in a first room, and then the respondent is shown the junior user's mark and several other marks in a second room. Opp. at 11. However, ArkOwl does not demonstrate or even contend that this style of survey eliminates the well-established need for a separate control group. The quotation from the article that Keegan quotes in his report, and that ArkOwl quotes in its Opposition on page 11 (from a prior version of *Trademark and deceptive advertising surveys: law, science, and design*, (Diamond & J. B. Swann, Eds., 2nd ed. 2022)), does not even support ArkOwl's assertion that the "internal control" method is common and acceptable, let alone that it is appropriate here—the article actually never even mentions the phrase "internal control." In fact, a different article by leading expert Shari Diamond contained in both the prior and current versions of this industry-leading authority, and which expressly discusses control group designs and "within-group" control designs, supports the use of traditional control groups, stating:

> 'Between-group designs,' i.e. traditional control groups 'that compare the responses of one set of survey participants with responses from another set… are the strongest designs for causal interference… In contrast… within-group designs are not suitable in some situations

(e.g., false advertising surveys), but are appropriate and standard fare in surveys assessing whether a mark is generic.

Diamond, S. (2022) "Control Foundations: Rationales and Approaches " in *Trademark and deceptive advertising surveys: law, science, and design*, (Diamond & J. B. Swann, Eds., 2nd ed. 2022, p. 254).  Thus, even if an "internal control" method is appropriate in certain settings (a presumption that ArkOwl fails to establish), ArkOwl provides no explanation as to why Keegan chose to use it here instead of traditional control groups, which is considered the strongest control methodology.  *See* 6 McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed. 2022) ("A properly constructed survey has at least two groups of respondents: one group (the 'test cell') is shown the allegedly infringing mark; the second group (the 'control cell') is shown a mark similar in appearance to the test cell, except for the designation whose influence is being tested."

ArkOwl spent two pages of its Opposition attempting to explain why Keegan chose not to use a stimulus that includes a bird element (like one of the DarkOwl marks at issue) (Opp. at 12-13).  Despite its attempt to obfuscate the issues, ArkOwl ultimately failed to justify (nor could it) why Keegan chose to use an "internal control" method rather than the industry accepted practice of using a separate control group and control stimuli that share as many characteristics as possible with the mark at issue other than the allegedly infringing element(s).  *See* Opp. at 12-13.  As DarkOwl noted in its Motion, Keegan's purported "internal controls" had virtually nothing in common with the DARKOWL marks at issue.  Motion at 16-18.  It appears that Keegan was more focused on the nature of the companies and their goods and services than the actual trademarks, and he admitted as much in his deposition when he stated that he was not controlling for the contested marks, but rather was "controlling for companies in this space."  Keegan Depo. 114:4-5.  ArkOwl provides no support for Keegan using this approach and effectively punts on the issue, stating repeatedly that control selection is "subjective" and that any disagreements on the issue

should go to the weight of the survey.  *See* Opp. at 12-13.  This purported catch-all explanation does not save Keegan's fatally flawed survey design, however.  Keegan's failure to use a proper control (or any control at all) is dispositive and warrants exclusion of the survey.

**B.     Keegan Improperly Characterized Stimuli**

In its Motion, DarkOwl argued that Keegan's survey should be excluded because it employed an improper lead-in when introducing test stimuli to respondents.  Motion at 13-14.  DarkOwl noted that the first time DarkOwl's mark appeared with the other stimuli, the page was introduced by Keegan as follows: "Shown below, in random order, are additional webpages of ***vendors that provide data services***."  Keegan Survey, Ex. 3. (emphasis added).  This improper lead-in characterized the stimuli for respondents instead of allowing them to draw their own conclusions about the connection, if any, between the displayed companies and their goods and services.

ArkOwl contends that the lead-in characterization was simply an "observation of the undisputed fact" that the companies shown as stimuli provide data services, and that this characterization does not point the respondent toward any particular conclusion because "data services" is such a broad concept.  Opp. at 8.  ArkOwl misses the point.  The concern with the lead-in characterization of stimuli is not that the statement was necessarily untrue, but rather that it characterized the stimuli at all, and did so in a way, however general, that suggested a potential relationship between the companies and their goods and services.

ArkOwl attempts to side-step the holding in *Kudos Inc. v. Kudoboard LLC*, 2021 WL 5415258 (N.D. Ca. Nov. 20, 2021), which is directly on point.  The court in *Kudos* excluded Keegan's survey for use of the nearly exact lead-in statement Keegan used in his survey here.  *Kudos*, 2021 WL 5415258 at *12.  The court held that "the statement '[s]hown below, in random

order, are additional pages for **companies offering employee recognition and engagement software**,'" constituted a lead-in that departs from simulated market conditions by substantively describing the products that followed. *Id.* (emphasis added). The court excluded Keegan's report on this basis alone. *Id.* ArkOwl suggests that the court excluded the survey because the lead-in at issue suggested to respondents that the defendant was providing a service that it did not. Opp. at 9. But that fact (even if true) is not a part of the Court's analysis. *Kudos*, 2021 WL 5415258 at *12. To be clear, the *Kudos* Court took issue with the fact that there was *any* lead-in at all that characterized the stimuli (as opposed to, say, an instructional statement) regardless of whether it was false or misleading. *Id.* This is directly analogous to the survey at issue here, and this Court should reach the same result and exclude Keegan's survey on this basis alone.

## C.     Keegan Failed to Survey a Universe Consisting of Potential DarkOwl Customers

Another fatal flaw with Keegan's survey is its failure to test the appropriate population, namely, prospective purchasers of services offered by alleged infringer, DarkOwl. The survey was instead designed to select respondents whose position involved "data services" and who are prospective purchasers of ArkOwl's "data verification services" or "fraud prevention services." ArkOwl contends that Keegan tested an appropriate universe because the parties are indeed competitors, and thus, presumably, their customer bases overlap. Opp. at 2-7. Therefore, the argument would go (although ArkOwl did not quite put it this way), by focusing on potential ArkOwl customers for his universe, Keegan automatically included potential DarkOwl customers as well, even if Keegan knew very little about DarkOwl customers, as he admitted. *See* Motion at 5-6, 9, 11-12. DarkOwl firmly disagrees that the parties are competitors, and it provided evidence to support its position that they are not. *See* Motion at 6.

But whether the parties are "competitors" is beside the point.  The key issue here is whether Keegan's survey tested the prospective customers of DarkOwl's specialized dark net services.  Recognizing its inability to address this issue directly, ArkOwl attempts an end around by arguing that the parties are competitors and thus the universe of consumers for DarkOwl is the same as that of ArkOwl.  However, ArkOwl uses the term "competitor" loosely and broadly and does not offer facts that support that the parties are competitors in any relevant sense, e.g., that there is a significant overlap in their respective customer bases.  Even if one were to grant ArkOwl certain factual assumptions (that DarkOwl nonetheless denies), at best it might establish that there is some narrow overlap in the parties' potential customers.  But in focusing on users of "data services" and then users of "data verification services" and/or "fraud prevention services," Keegan made no effort to isolate those respondents that would fall into that hypothetical overlap category within the broader group.  "Data services" is such a broad category that isolating users of those services does little to hone in on a relevant survey universe.  Perhaps recognizing this, Keegan narrowed his universe by focusing on users of "data verification services" and/or "fraud prevention services."  But this attempt to narrow the universe still leaves an unwieldy and diverse group of respondents that is entirely too broad to ensure that it represents potential DarkOwl customers, i.e., those looking for dark web data collection and a searchable database of content gathered from the dark web -- services that are quite distant from those that ArkOwl provides.  ArkOwl does not contend otherwise.

Ultimately, Keegan (1) did not take any steps to arrive at or substantiate the conclusion that the parties are competitors (*see* Motion at 5-6, 9) and (2) assumed that by considering the parties "competitors," regardless of how much he or ArkOwl stretched that concept, he would end up with the proper survey universe simply by isolating potential ArkOwl customers.  These are fatal flaws.

To make matters worse, as noted in DarkOwl's Motion, Keegan, improperly utilized general consumer panels rather than specialty panels that would allow him to draw from a more representative pool of DarkOwl's target consumers.  *See* Motion at 10-13.  ArkOwl does not address this argument in its Opposition and thus concedes the point.  Because Keegan did not survey the proper universe, the results of his survey are unreliable and should be excluded.

**D.     The Flaws in Keegan's Survey Warrant *Exclusion* of His Report and Testimony**

Each of the flaws in Keegan's survey noted above and in DarkOwl's Motion warrant exclusion of the survey and any related testimony.  ArkOwl contends that any concerns with the survey's methodology should go to the weight the survey is afforded and do not warrant full exclusion.  But none of the cases cited by ArkOwl establish a bright-line rule precluding exclusion of expert evidence in the face of significant methodological flaws that render the survey unreliable. In fact, numerous authorities support exclusion of Keegan's report and testimony for the same types of flaws Keegan's survey suffers from here.

For example, ArkOwl cites *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir. 1996) to suggest that "[t]echnical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility."  *See* Opp. at 5.  But the issue in *Harolds Stores* was copyright infringement damages, not trademark confusion, and the challenged survey was fundamentally different from the one at issue here.  *Harolds Stores*, 82 F.3d at 1545.  There is no principled way to apply the ruling in that case to the issues raised here.

*Kodiak Cakes, LLC v. JRM Nutrasciences, LLC*, 2022 WL 17340660, at *14 (D. Utah Nov. 30, 2022), likewise fails to support ArkOwl's efforts to avoid exclusion of Keegan's report and testimony.  Opp. at 6-7.  There, the court did not exclude the expert survey *or* attribute it less

weight because the court found that the survey universe "was properly chosen and defined." *Kodiak Cakes*, 2022 WL 17340660, at *11. The language that ArkOwl quotes in footnote 11 in its Opposition regarding selection of an inappropriate universe going to the weight of the survey is therefore dicta and has no bearing on the issues presented here.

Similarly, none of the cases cited by ArkOwl stand for the proposition that surveys with inadequate controls cannot or should not be excluded in their entirety. *See* Opp. at 13. For example, ArkOwl held out *Ferring Pharm., Inc. v. Braintree Labs., Inc.*, 210 F. Supp. 3d 252, 257 (D. Mass. 2016) as establishing a general rule that "issues with the lack of a control group go to the weight, not the admissibility" but left out the fact that this was in the context of an expert who was offering *rebuttal* testimony in connection with a *false advertising* survey. *Id.* at 257 (emphasis added). Other cases cited by ArkOwl are similarly fact and case-specific. *See* Opp. at 13; *AirWair Int'l Ltd. v. Pull & Bear Espana SA*, 2021 WL 2914082, at *7 (N.D. Cal. July 12, 2021) (stating that the particular challenge—to a "control image" used in an "Eveready" survey (fundamentally different than Keegan's survey) was a "technical inadequacy" that went to the weight of the particular survey); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 940, 956 (N.D. Ill. 2009) (evaluating a survey where a separate control group *was* used and limiting the holding to the particular study).

In contrast, courts and other authorities recognize that fundamental survey errors—of the type present in Keegan's report here—warrant full exclusion. *See, e.g.*, 6 McCarthy on Trademarks and Unfair Competition, *Introduction to survey evidence* § 32:158 (5th ed.) ("There is no doubt that a trial court" can "exclude a flawed survey report from being received into evidence."). This is true for each of the deficiencies present in Keegan's survey. Surveys that poll the improper group can and should be excluded. *See, e.g.*, *Kodiak Cakes*, 2022 WL 17340660, at

*12 ("A survey that provides information about a wholly irrelevant population is itself irrelevant"); *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) (excluding survey that "focused on potential users of the software rather [than] potential purchasers"); McCarthy § 32:159 ("[I]f the universe selected is significantly skewed away from the proper group of people whose perception is at issue, it may be excluded from evidence altogether.").

Similarly, surveys that lead participants to particular conclusions or that use inadequate controls may be excluded. *See, e.g.*, *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004); Diamond, & Swann, J. B., *Trademark and deceptive advertising surveys: law, science, and design*, 382 ("Surveys are still offered without a control cell or with fundamentally inadequate control stimulus, and such surveys should be excluded or… wholly discounted."). Given the significant flaws with Keegan's survey discussed above and in the Motion, his report and any related testimony should be excluded in its entirety.

## **CONCLUSION**

At numerous inflection points throughout the survey process, Keegan could have easily utilized a methodology that would have designed his survey to be fair, less biased, and more consistent with accepted best practices, and each time he made choices that were instead geared toward obtaining ArkOwl's desired result. ArkOwl provides no plausible explanation for these missteps in its Opposition. For these reasons, Keegan should be excluded from testifying at trial or presenting evidence on the issue of the likelihood of confusion.

DATED: February 15, 2023

Respectfully submitted,

**PERKINS COIE LLP**

By: _s/ Jeremy L. Buxbaum_____

Thomas L. Holt, IL Bar #6243134
Jeremy L. Buxbaum, IL Bar #6296010
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
P: (312) 324-8400
F: (312) 324-9400
Tholt@perkinscoie.com
JBuxbaum@perkinscoie.com

Kourtney Mueller Merrill, CO Bar #36,662
1900 Sixteenth Street, Suite 1400
Denver, CO  80202
P: (303) 291-2300
F: (303) 291-2400
KMerrill@perkinscoie.com

**HOLLAND & HART LLP**

Sabrina J. Danielson, CO Bar #49,279
555 17th Street, Suite 3200
Denver, CO 80202
P: (303) 295-8565
F: (303 265-9255
SJDanielson@hollandhart.com