1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
     Case No. 21-cv-02163-KLM
 3   _____

 4   DARKOWL, LLC,

 5        Plaintiff,

 6   vs.

 7   ARKOWL, LLC, et al.

 8        Defendants.
     _____
 9

10          Proceedings before KRISTEN L. MIX, United States

11   Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 1:27 p.m., May 15, 2023,

13   in the United States Courthouse, Denver, Colorado.

14   _____

15          WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                        APPEARANCES

19          JEREMY BUXBAUM, THOMAS HOLT, JR., and SABRINA

20   DANIELSON, Attorneys at Law, appearing for the Plaintiff.

21          MICHAEL FRASIER, Attorney at Law, appearing for

22   the Defendant.

23   _____

24                     EVIDENTIARY HEARING

25
```

2

1                         I N D E X

2    WITNESS                          PAGE

3    Plaintiff:

4      Robert Daline
           Examination by Mr. Holt        21,70
5          Examination by Mr. Frasier     44

6      Mark Turnage
           Examination by Mr. Buxbaum     76
7          Examination by Mr. Frasier     107

8      Hal Poret
           Examination by Mr. Buxbaum     152
9          Examination by Mr. Frasier     168

10   Defendant:

11     Russell Cohen
           Examination by Mr. Frasier     149
12

13

14   EXHIBITS                         ADMITTED

15   1                                70

16   2                                57

17   3                                58

18   4                                62

19   5                                66

20   6                                67

21   7                                79

22   8                                84

23   9                                84

24   10                               86

25   11                               87

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

3

```
 1    EXHIBITS (continued)              ADMITTED

 2    12                                   89

 3    13                                   91

 4    14                                   93

 5    15                                   95

 6    16                                  121

 7    17                                  125

 8    18                                  133

 9    19                                  139

10    20                                  143

11    21                                  155

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1              P R O C E E D I N G S

2              (Whereupon, the within electronically recorded

3  proceedings are herein transcribed, pursuant to order of

4  counsel.)

5              THE COURT:  Good afternoon.  This is 21-cv-02163

6  DarkOwl, LLC, vs. ArkOwl, LLC.  Let's have counsel enter

7  appearances, please, starting with counsel for the

8  plaintiff.

9              MR. HOLT:  Yeah.  Thomas Holt of Perkins Coie,

10  Jeremy Buxbaum of Perkins Coie and Sabrina Danielson of

11  Holland & Hart.

12             THE COURT:  Good afternoon.

13             MR. HOLT:  Good afternoon.

14             MR. FRASIER:  Thank you, Your Honor.  It's Michael

15  Frasier from Rubric Legal on behalf of the defendant ArkOwl.

16             THE COURT:  Good afternoon.

17             MR. FRASIER:  Good afternoon.

18             THE COURT:  And who is this gentleman sitting with

19  you?

20             MR. FRASIER:  This is Mr. Rob Daline, the owner of

21  ArkOwl.

22             THE COURT:  All right, thank you.

23             All right, we're here for a hearing on plaintiff's

24  motion to exclude evidence and testimony under Rule 702.

25             Counsel prepared to proceed for the plaintiff?

1          MR. HOLT:  We are, Your Honor.  We were hoping to

2     address a few preliminary matters if we could.

3          THE COURT:  You may.  Just let me ask defense

4     counsel if defendant is also prepared to proceed?

5          MR. FRASIER:  Yes, Your Honor.

6          THE COURT:  All right, thank you.

7          Go ahead with your preliminary matters, Mr. Holt.

8          MR. HOLT:  Yes, Your Honor.

9          We want to be respectful of the Court's time.

10    We've brought in a number of witnesses for the hearing and I

11    just want to have an idea of how much time we're permitted

12    to present the evidence.  We're trying to work with opposing

13    counsel to make sure that, you know, each party has roughly

14    the same amount of time.  I'm just trying to figure out how

15    that would --

16         THE COURT:  Well, I have to get you out of here by

17    6:00 p.m.  I do not have this matter set for any further

18    time, besides this afternoon.  So that gives you, what, four

19    and a half hours to work with.

20         We are going to need to take at least one

21    midafternoon break.  Nobody should sit for four and a half

22    hours straight.

23         So, you know, do the best you can to get through

24    the witnesses that you can.  I mean, I encourage you to not

25    be repetitive, I think that's very important.  If we don't

1  finish by 5:45 p.m., we're simply going to have to reconvene

2  the hearing at another time.

3  　　　　　I mean, I'm certainly -- unless I am satisfied

4  that I've heard what I need to hear, and I can't make that

5  judgment at this point, of course.

6  　　　　　So I think we have to play it by ear, but I am

7  very hopeful that we'll be able to wrap this up by 6:00 and

8  I encourage you to do what you can to streamline.

9  　　　　　MR. HOLT:  Yeah.  We're hopeful of that, as well,

10  and I think we should be able to work within those

11  parameters.

12  　　　　　THE COURT:  Remember, also, you've got to speak

13  into a microphone.

14  　　　　　MR. HOLT:  Yeah.  You want me standing up --

15  　　　　　THE COURT:  I'm already going deaf and I'll be

16  deafer by the end of this hearing.

17  　　　　　MR. HOLT:  Is it okay if I sit down so I'm closer

18  to the microphone?

19  　　　　　THE COURT:  Sitting down is fine or standing at

20  the podium is fine, either, as long as you're speaking into

21  a microphone.

22  　　　　　MR. HOLT:  Yeah.

23  　　　　　With respect to exhibits, we understand that Your

24  Honor would like a hard copy as they're introduced.

25  　　　　　THE COURT:  I would.

7

1          MR. HOLT:  Are you okay with the witnesses and

2    opposing counsel just using electronic copies?

3          THE COURT:  Absolutely okay with that.  The reason

4    why I request a hard copy is I frequently make notes on

5    exhibits and it's easier for me to do that with my pen in my

6    hand.

7          MR. HOLT:  Okay.  With respect to impeachment, you

8    know, would you like the actual deposition transcript

9    introduced as an exhibit?  Or is it okay if we just read it

10   into the record?

11         THE COURT:  It's fine to read it into the record.

12         If there are disputes about what the deposition

13   transcript says -- and I know that sounds incredible, but

14   trust me, it occurs -- then I may ask for the transcript;

15   but, otherwise, it's not necessary.

16         MR. HOLT:  Okay.  And then with respect to just

17   opening remarks, we were hoping for just a couple of minutes

18   to kind of frame out for the Court what will be presented

19   today.

20         THE COURT:  I think that's fine.  I intended to

21   give both sides a few minutes for opening remarks.

22         MR. HOLT:  Okay.

23         THE COURT:  Anything further from plaintiff or

24   preliminary matters?

25         MR. HOLT:  With respect to confidentiality, Your

1   Honor, there are some documents that will be introduced

2   today that are AEO.  We're, obviously, willing to take

3   guidance from the Court on how you, you know, like to handle

4   that, but we were thinking that, you know, we could have the

5   principals for each party step out when AEO documents from

6   the other side are presented.

7            THE COURT:  Any objection to that from defense

8   counsel?

9            MR. FRASIER:  No, Your Honor.

10           THE COURT:  All right, then that will be fine.

11           MR. BUXBAUM:  Restriction of (indiscernible - away

12   from mic) from the public record.

13           THE COURT:  Well, yeah, I mean, if exhibits are

14   admitted into evidence, there is a notation of that on the

15   electronic record, but there is no copy of the exhibit

16   that's necessarily a part of the record, so you don't need

17   to be concerned about that.  I'll make sure that copies of

18   the exhibits that are admitted are maintained in confidence.

19           MR. BUXBAUM:  Is there a transcript (indiscernible

20   - away from mic)?

21           THE COURT:  You have to request a transcript of

22   the hearing.  This is not a hearing before our Article III

23   judges, who always have a court reporter present in the

24   courtroom.  This is a hearing before a magistrate judge.  So

25   bear in mind that if any side wants a transcript, you have

9

1   to request a transcript.  It will usually take at least a

2   week to obtain the transcript.

3          Also bear in mind, that I do not have realtime,

4   which is the methodology used in -- by the Article III

5   judges to see the questions and the answers as they are

6   being transcribed by the court reporter while the trial is

7   underway -- hearing is underway.  So I may need you to

8   repeat questions for purposes of objections, et cetera.

9          MR. HOLT:  Sounds good, Your Honor.

10          THE COURT:  Is that it?

11          MR. HOLT:  That's all from plaintiff's counsel.

12          THE COURT:  Anything further in a preliminary

13   matter from defense counsel?

14          MR. FRASIER:  Will there be any -- any sort of

15   opportunity to provide a brief closing argument at the end

16   of the hearing?

17          THE COURT:  I hope so.  It depends on time.

18          MR. FRASIER:  Sure.

19          THE COURT:  And we can revisit that at the

20   conclusion of the day.  If we've done everything but

21   closings and you still want to give a closing, we can talk

22   about maybe a possibility of submitting a closing in

23   writing, for example.  So let's hold that thought and talk

24   about it later.

25          MR. FRASIER:  Okay, thank you.

1           THE COURT:  You're welcome.

2           MR. FRASIER:  That's all I have.

3           THE COURT:  All right, fair enough.

4           I've already, of course, received a signal from

5    one of my hearing aids that battery has gone out because

6    that's what always happens the moment that I step on the

7    bench, so give me a moment to take care of that and then

8    we'll get started.

9           MR. HOLT:  Thank you.

10          (Pause in proceedings.)

11          THE COURT:  In ten minutes the next one -- the

12   other one will go.  All right, thank you.

13          Plaintiff's counsel, you may begin.

14          MR. HOLT:  Good afternoon, Your Honor.

15          We appreciate your time today and the opportunity

16   to present additional evidence on DarkOwl's pending motion

17   to exclude Mr. Kegan's (ph) survey.

18          Your order requests that the parties present

19   evidence on two key issues.  One, whether the parties are

20   competitors; and, two, whether Mr. Kegan's survey captured

21   the proper universe of respondents.

22          DarkOwl intends to call first Robert Daline, the

23   CEO and founder of ArkOwl as a fact witness, as well as Mark

24   Turnage, who is the CEO and co-founder of DarkOwl, as well

25   as two experts:  Mr. Kegan and then our rebuttal expert Hal

1   Poret.

2           On the first key issue the evidence will show that

3   the parties are not direct competitors.  In fact, they offer

4   vastly different services for radically different use cases.

5           DarkOwl, as you will hear, provides its customers

6   access to a massive database of dark web data.  The data is

7   not accessible through ordinary Internet search tools like

8   Google.  This data is mainly used for criminal activity,

9   that might include such things as credentials circulated on

10  the dark web.

11          DarkOwl provides this data to sophisticated cyber

12  security professionals, including to national intelligence

13  and law enforcement agencies and select organizations that

14  go through a stringent vetting process.  This data is used

15  by DarkOwl's customers for purposes of assessing cyber

16  security risk, enhancing data protection systems, and

17  protecting national security.

18          THE COURT:  Are you saying, Counsel, that the

19  customers of DarkOwl are essentially entirely law

20  enforcement related?

21          MR. HOLT:  No, not entirely.  We have a set of

22  customers that have to go through the stringent vetting

23  process before they have access to the dark web data that

24  our client offers.

25          THE COURT:  And what do are those nonlaw

12

1    enforcement customers who go through the stringent vetting

2    process do?

3             MR. HOLT:  They're --

4             THE COURT:  They're criminals?

5             MR. HOLT:  No.  They're all involved in the cyber

6    security industry.

7             THE COURT:  Okay, thank you.

8             MR. HOLT:  ArkOwl, on the other hand, offers what

9    it advertises as an email and phone verification service.

10   When an online purchase takes place, analysts at the seller

11   will input the customer email and phone number into ArkOwl's

12   search tool and then will receive back in realtime certain

13   data that ArkOwl provides that may assist in determining

14   whether the transaction is fraudulent and should be

15   declined.

16            ArkOwl generally provides its services to fraud

17   analysts that monitor purchases for their companies.  So the

18   parties' services and their target consumers are quite

19   distinct, yet Mr. Kegan's survey was based on the assumption

20   that the parties are direct competitors; i.e., they compete

21   for the same business.

22            This false assumption resulted in the survey

23   universe, the second key issue today, that is not

24   representative of the purchasers of DarkOwl's services,

25   which both parties agree is the proper universe here.

1          Mr. Kegan has acknowledged that he did very little

2     to learn about DarkOwl or its services in designing his

3     survey.  Again, he believed the parties were direct

4     competitors.

5          As a result, his screening questions to select the

6     survey universe improperly focused on, first, potential

7     customers of ArkOwl's services; namely, email and phone

8     verification services, services that DarkOwl doesn't

9     provide; or second, fraud prevention services, which is a

10    term so broad and vague that it doesn't assist in targeting

11    potential consumers of DarkOwl's niche services.

12          ArkOwl contends, nonetheless, that the correct

13    universe was surveyed because ArkOwl and DarkOwl are

14    competitors and thus, the potential customer bases overlap.

15          While the evidence is clear that the parties

16    aren't competitors, even if there was some overlap, the

17    survey is still fatally flawed because the screening

18    questions did not ensure that the proper universe was

19    actually surveyed, as DarkOwl's expert Mr. Poret will

20    testify.

21          THE COURT:  So let me ask you this, Counsel.

22          Is it your contention that the determination of

23    whether the parties to the case are direct competitors or

24    not is a determination for the Court or for a jury?

25          MR. HOLT:  Well, this case is no longer before a

14

1  jury; but it's a fact determination that goes to the

2  reliability of the survey, which we think is, you know,

3  appropriate before the Court.

4         THE COURT:  So if it's a fact determination for

5  the Court because the case is no longer before a jury, is it

6  the type of fact determination that should be made prior to

7  the hearing of the entirety of the evidence on the claims?

8         MR. HOLT:  We believe it is, Your Honor.

9         THE COURT:  Why?

10        MR. HOLT:  Well, it will, I think, significantly

11 impact the presentation of evidence at trial and we don't

12 believe that, you know, the Court -- the fact-finder should

13 see a survey that we firmly believe is unreliable and we

14 think it's prejudicial to DarkOwl to have that survey and

15 that related testimony.

16        THE COURT:  Why can't your objections to the

17 survey be better handled simply on cross-examination of the

18 surveyor?

19        MR. HOLT:  Well, I mean, that's certainly one way

20 to handle it; but, again, we believe the survey is so

21 fundamentally flawed, that it shouldn't be presented to the

22 Court.

23        THE COURT:  So your concern is really about

24 whether the Court sees the survey and what the Court makes

25 of the survey?  You're not even really worried about a jury

1    here?  You're not worried about, you know, potentially not

2    well educated in the areas of law, lay people

3    misunderstanding what the survey is about?  You want to keep

4    it from the Court in its entirety?

5           MR. HOLT:  We do, Your Honor.  We believe that

6    it's confusing and misleading for that evidence to be

7    presented to the Court as a part of a trial.  We believe it

8    should be excluded in its entirety and, you know, the fact

9    that it would be admitted and there is testimony, whether

10   it's direct or cross, you know, presenting the survey or

11   criticizing it is just -- it's prejudicial to us and we

12   would like to exclude it at this stage so that we can

13   streamline the issues for trial.

14          THE COURT:  You, nevertheless, have a rebuttal

15   expert, right?

16          MR. HOLT:  We do.

17          THE COURT:  And is the rebuttal expert, I presume

18   because he's here today and going to testify, will talk

19   about the propriety of the survey?

20          MR. HOLT:  That is correct, Your Honor.

21          THE COURT:  But your rebuttal expert did not

22   prepare his own survey?

23          MR. HOLT:  He did not.

24          THE COURT:  So you're not prepared to offer an

25   alternate survey to the survey that's been prepared by the

1   defendant?

2            MR. HOLT:  That is right.  And we will explain why

3   that is the case throughout the day.

4            THE COURT:  All right, thank you.

5            MR. HOLT:  So based on the evidence and the

6   parties' briefing, we believe that it's only appropriate for

7   the Court to exclude Mr. Kegan's survey in its entirety.

8            Thank you, Your Honor.

9            THE COURT:  Thank you.

10           Opening statement from defense counsel, if any?

11           MR. FRASIER:  I'm sorry?

12           THE COURT:  Opening statement from defense

13   counsel, if any?

14           MR. FRASIER:  Yes, Your Honor.

15           It occurred to me, though, with one other

16   procedural matter that I don't think we addressed.  To

17   streamline matters, I believe we've agreed to only call

18   witnesses once, so they're calling Mr. Daline and then I

19   will just do my direct immediately after that.

20           THE COURT:  Perfectly appropriate.  I'm

21   appreciated that you agreed to that.  That's fine with the

22   Court.

23           MR. FRASIER:  Thank you, Your Honor.

24           THE COURT:  You're welcome.  Whenever you're

25   ready.

1          MR. FRASIER:  Yes.

2          Mr. Kegan should be allowed to testify at trial

3     and present his findings from the survey that he conducted,

4     because expert style survey is appropriate for the parties

5     in this particular circumstance, and Mr. Kegan's screening

6     questions appropriately captured a representative sample of

7     the relevant universe.

8          DarkOwl, the plaintiff, would have the Court

9     believe that the question on whether escort survey at all is

10    reliable is if the parties have the exact same type of

11    services, and that's not the law.

12         The question is whether or not the parties'

13    services are the type of services that are similar and seen

14    by the same types of customers in the same types of places,

15    and there has to be some sort of competitive proximity and

16    overlap.

17         And you will hear today that there is significant

18    competitive proximity and overlap.

19         THE COURT:  So let me just ask you:  Does your

20    client have, as a customer base, law enforcement-related

21    officials?

22         MR. FRASIER:  No, Your Honor.  And what you will

23    hear at trial today is that law enforcement -- law

24    enforcement is not DarkOwl's primary focus and it hasn't

25    been since at least 2017.  Both parties for the last several

1   years have focused all of their marketing efforts at cyber

2   security companies, companies that aggregate data from

3   multiple sources and create their own product to serve

4   people like retail establishments, banks, cryptocurrency or

5   law enforcement.

6           So the primary focus of both entities is to sell

7   data -- relevant data to cyber security companies for those

8   companies to aggregate with other data and then use it in

9   their products or resell it as a part of a more integrated

10  package.

11          THE COURT:  Thank you.

12          MR. FRASIER:  The competitive overlap will also

13  become more evident at trial when we -- when you hear from

14  the witnesses, not only that both parties are focusing the

15  same type of industry, but that both parties are providing

16  email information -- relevant information about email

17  addresses, about domains, about IP addresses that could all

18  be used for the same purposes by the end-users, those users

19  of the cyber security companies.

20          Moreover, it's not -- the dark net is not as black

21  and white as DarkOwl would have you believe.  Both parties

22  are providing data that is breached data, meaning data that

23  where there was some sort of security attack and the data

24  was leaked, probably, on the dark net and then resold.  Both

25  parties have that data as part of their products.

1             THE COURT:  Is that all that your client provides,

2       is breached data?

3             MR. FRASIER:  From the dark net?

4             THE COURT:  Any breached data, whether it comes

5       from the dark net or otherwise.

6             MR. FRASIER:  No.  The -- no.  My client

7       provides -- and you'll hear in his testimony that he

8       provides a myriad -- significant different types of

9       information about email addresses, including like the

10      creation date, the number of times it's appeared in the

11      ArkOwl database, associations with things, like domains that

12      are also in the database or with social media accounts.  And

13      it provides information about IP addresses and social media

14      accounts and domains, as I said.

15            DarkOwl doesn't only provide data from the dark

16      net as well.  There is no one accepted definition of the

17      dark net.  And you will hear today that although DarkOwl

18      focuses on the dark net, what it describes as the dark net,

19      it also has multiple other sources that is definitely not

20      categorized as the dark net.

21            But the question isn't where -- where the data

22      comes from.  It's what are they doing with it?  Who they are

23      selling it to and for what?

24            And what you'll hear today is that they're doing

25      the same types of things with it.  They're marketing it in

1   the same way.  They're marketing personally identifiable

2   information to be sold to cyber security companies for them

3   to use in things like fraud prevention.

4         You'll also hear that DarkOwl has targeted -- has

5   identified, targeted, and directly solicited multiple of

6   ArkOwl customers offering this PII data service.  So there

7   is -- this is more than just speculation.  There is actual

8   evidence that they have targeted these companies to sell to

9   these companies the same type of information that ArkOwl

10  sells.

11        The second question, on whether or not the -- the

12  survey appropriately captured the relevant universe, you

13  will hear evidence and testimony today that, in fact, the

14  screening questions did use a funnel approach, to start

15  broad and get narrowed to effectively capture those people

16  who are making decisions about whether or not to hire

17  vendors like ArkOwl and DarkOwl.

18        You will hear that the -- the sample that was

19  captured has other data, other than the screening questions,

20  including things like the job title, that further cement the

21  question of:  Does this sample contain a sufficient number

22  of potential DarkOwl customers?

23        At the end of the day, this hearing should be --

24  should be taking place at a trial.  This is questions of

25  fact and I think both parties have struggled to figure out

1    how to fit it into a half a day because the significant

2    amount of trial is over the question of to what extent is

3    there competitive overlap between these two parties.

4              So the Court should deny this motion and let the

5    parties proceed to trial on these issues.

6              THE COURT:  All right, thank you.

7              All right, let me ask plaintiff to call their

8    first witness, please.

9              MR. HOLT:  Plaintiff calls Robert Daline.

10             THE COURT:  All right, Mr. Daline, if you come

11   forward and stand in front of the witness box and raise your

12   right hand.

13                          ROBERT DALINE,

14   having been first duly sworn, was examined and testified as

15   follows:

16             THE WITNESS:  Yes.

17             THE COURT:  Please be seated and speak into the

18   microphone.

19             THE WITNESS:  Okay.

20                       DIRECT EXAMINATION

21   BY MR. HOLT:  :

22        Q.   Good afternoon, Mr. Daline.

23        A.   Good afternoon.

24        Q.   Would you please state and spell your full name

25   for the record.

22

 1       A.   Yes.  Robert D. Daline -- Robert David Daline.

 2       Q.   And are you currently employed, Mr. Daline?

 3       A.   Yes.

 4       Q.   By whom?

 5       A.   By ArkOwl.

 6       Q.   And what is your role there?

 7       A.   I am the chief executive officer and co-founder.

 8       Q.   And when did you found ArkOwl?

 9       A.   With the state of Minnesota, I founded it in 2012.

10       Q.   Okay.  Would it be fair to characterize ArkOwl as

11  an identity and verification service provider?

12       A.   Yes.

13       Q.   And is personal identifiable information

14  verification ArkOwl's main focus?

15       A.   And validation, yes.

16       Q.   I understand that the term "PII" is used as an

17  acronym in the industry for the term "personal identifiable

18  information."  Are you okay with me using PII throughout

19  today's hearing?

20       A.   As an acronym, yes.

21       Q.   What type of PII does ArkOwl help its customers

22  verify?

23       A.   The email address, the phone number, a user's IP

24  address, or even their physical address.

25       Q.   Anything else?

23

1        A.   We added a name match recently, so a name.  And

2   that's -- that's only the inputs.

3        Q.   Right, right, right.

4             When you say "name match," can you explain to me

5   what you're referring to there?

6        A.   If a company inputs a full name, like Robert

7   Daline, we'll say whether there was a match in our database

8   or the databases that we check.

9        Q.   Okay.  And up until last year, was ArkOwl's focus

10  on providing email and phone verification?

11       A.   Up until last year, the only inputs were email,

12  address, and phone number.

13       Q.   Okay.

14            MR. HOLT:  I would like to introduce into evidence

15  as Exhibit 1 a printout from ArkOwl's website.  Your Honor,

16  may I approach the bench?

17            THE COURT:  You may.

18       Q.   (By Mr. Holt) Can you see the exhibit on your

19  screen, Mr. Daline?

20       A.   I can, yes.

21       Q.   Do you recognize?

22       A.   Yes.

23       Q.   And what is this?

24       A.   This is our -- our home page for our company

25  website.

24

1      Q.   And is this what it looks like today?

2      A.   I believe so.

3      Q.   I would draw your attention to the time-stamp at

4  the bottom left corner that reflects it was captured today.

5           Do you see that?

6      A.   Yes.

7      Q.   And do you have any reason to believe that this is

8  not what your home page currently looks like?

9      A.   I do not have any reason to doubt that.

10      Q.   And what is the first most prominent description

11  of ArkOwl's services on its site?

12      A.   Verify email addresses and phone numbers in

13  realtime.  I'm assuming you just wanted me to read it out

14  loud, right?

15      Q.   Yeah, that's great.  Thank you.

16      A.   Do you want me to keep reading?

17      Q.   No, that's fine.  Thank you.

18      A.   No.  Okay.

19      Q.   It's my understanding that last year ArkOwl added

20  IP address and physical address verification to its

21  capabilities?

22      A.   Yes.

23      Q.   So is it fair to say that ArkOwl provides a

24  platform that allows its users to use various PII as search

25  inputs?

25

1       A.   Yes.

2       Q.   And in general terms, what outputs does an ArkOwl

3   customer receive when inputting this information into

4   ArkOwl's platform?

5       A.   Oh, I mean, 81-plus on the website, but I think

6   we're up to maybe -- maybe 150, including if you input a

7   name or an email address, you might get a name back,

8   potentially a location.  You might get pictures.  You'll

9   also get breached data, whether the -- some of that breached

10  data includes whether it was seen in the dark web.  You'll

11  get first and last seen date.  You'll get domain data.  And

12  that's just for the email address.

13          For the phone number, you'll get the data breach

14  information there too.  You'll get the first seen, you'll

15  get some social checks, you'll get first and last seen.  For

16  the IP address, you'll see the same where there is location

17  associated with the IP.  You'll also get the ISP network

18  that the IP was on.

19          Do you want me to keep going, because there is a

20  bunch of these, so . . .

21      Q.   I think that's fine for now.

22      A.   Okay.

23      Q.   I appreciate the comprehensiveness of your

24  response.

25          As part of the output, does ArkOwl ever provide

1   any password information to its customers?

2       A.   We provide whether a password was in a breach,

3   like a yes or no, like this data breach included passwords,

4   but we do not include the passwords.

5       Q.   How is that possible, if the search input doesn't

6   include password field?

7       A.   The search input includes the email address or the

8   phone number.  And with that, we'll say this email address

9   was found in this data breach, along in this data breach

10  included breaches of passwords, phone numbers, all of those

11  PII data was leaked in the same breach and this email

12  address was found in the breach.

13          So a user could assume that potentially, the

14  password that they put into, you know, let's say Adobe.com,

15  which was breached, the user name and password for their

16  Adobe account was leaked.  So it's just more of a yes-or-no

17  check.

18      Q.   Right.  You're not actually providing password

19  information to your customer?

20      A.   No.

21      Q.   And any sort of login credentials being provided

22  by ArkOwl to its customers?

23      A.   From the end-user, the customer, the output of the

24  email address?

25      Q.   Yes.

27

1        A.   No.

2        Q.   How is ArkOwl's data output then used by ArkOwl's

3   customer.

4        A.   The output is used to help verify as to whether

5   the -- the customer that they're looking at, the entity is

6   looking at, to verify legitimacy or not.  So they're

7   looking:  Is this a potential fraud threat, or is this a

8   potentially good -- good customer?

9        Q.   And just so I'm clear, the verification itself, is

10  that provided by ArkOwl, or is that provided by ArkOwl's

11  customer?

12       A.   It's provided by the customer.  ArkOwl provides

13  the data.

14       Q.   Okay.  And these data outputs that ArkOwl provides

15  for these queries, are those essentially realtime?

16       A.   Yes, except for the ArkOwl's database, which -- I

17  mean, that's realtime.  We store it, right?

18       Q.   Can you explain that.

19       A.   So ArkOwl stores a log of queries purchased, or a

20  log of queries made by a particular -- by all of our clients

21  collectively, so that we could provide the first seen date.

22  So that's not a realtime check --

23       Q.   Okay.

24       A.   -- out to the Internet; that's a realtime check of

25  our own database.

1      Q.   But with respect to the input and the output that

2   the customer receives, it's essentially realtime; it happens

3   instantly?

4      A.   Correct.

5      Q.   Okay.  So let me just set up a short hypothetical

6   here to make sure I understand how the business works and to

7   potentially frame it up cleanly for the Court.

8           Let's say --

9      A.   I said I would be perfectly honest.

10          We do have a batch query, that if you query -- if

11   you query like a thousand queries, it will tell you how much

12   time is left until the result.  So I'm -- you know, based on

13   your question of realtime, they may have to wait for the

14   batch.

15     Q.   Okay, understood, thanks.  So let's get back to

16   that hypothetical.

17          Let's say that Nike is an ArkOwl customer.  I go

18   to buy a pair of shoes on Nike.com and as a part of that

19   process, Nike has me provide my email address, my phone

20   number, credit card information, the usual information that

21   you would be required to provide in a commercial

22   transaction.

23          Nike could then use ArkOwl's service to obtain

24   information to determine if my email address and phone

25   number that I provided can be verified.  And then based on

1   that information, Nike can then approve or decline my

2   transaction.  Is that a fair capture of it?

3       A.   Yes.  We would provide the extra data that the

4   customer didn't -- didn't give you.

5       Q.   Okay.  And all of this happens within a matter

6   seconds or less?

7       A.   Yes.

8       Q.   Could you give me a rough idea of how many paying

9   customers ArkOwl currently has.

10      A.   Wow.

11      Q.   I don't need specifics, I'm just ballparking it.

12      A.   Yeah, we have -- we have a pay-as-you-go model for

13  some customers, so it's a little harder to keep track of if

14  we made a sale like two years ago.  You know, they're still

15  a paying customer, they're using ArkOwl today.  So there is

16  a lot of those.

17           I would say there is --

18      Q.   Are we talking hundreds, thousands?

19      A.   I think hundreds.

20      Q.   Hundreds?

21      A.   Hundreds, yeah.

22      Q.   And of these paying customers, what percentage use

23  ArkOwl's service to assess fraud in connection with online

24  purchase transactions?

25      A.   We -- ArkOwl provides the data.  We don't

30

1    necessarily -- we're not necessarily sure to what extent the

2    end-user is using the data for.  I would assume, you know,

3    if it's -- if it's a retail fraud department, that they

4    would be using it the way I used it when I was in the retail

5    fraud.

6         Q.   But sitting here today, you're not aware of any

7    other uses of ArkOwl's data, apart from -- in connection

8    with an online transaction for paying customers?

9         A.   Yes, I'm not aware.

10        Q.   Okay.

11        A.   Oh, wait.

12        Q.   Yes.

13        A.   We said retailer.  We do have banks, cyber

14   security companies, and we do have law enforcement in Europe

15   using ArkOwl.

16        Q.   The law enforcement officers in Europe, or law

17   enforcement agencies in Europe, those are current customers?

18        A.   Correct.

19        Q.   And they're paying customers?

20        A.   Correct.

21        Q.   And you also mentioned a couple of other

22   categories.  Could you run through those for me.

23        A.   Cyber security, so like whole fraud platforms.

24             THE COURT:  I'm sorry, say that again.  Whole?

25             THE WITNESS:  -- fraud platform.

1           THE COURT:  Oh, okay.

2       A.   So there is -- when it comes to -- you know, when

3   I was in -- I'll relate it to my experience.

4           When I was in online fraud, we would use a fraud

5   platform to aggregate all the data that we were looking at,

6   to help us review the order to see if it was fraud or if the

7   customer was somebody trying to commit fraud or if they were

8   legitimate, and it would take in all the data.

9           We used the Accertified platform when I was there,

10  and Accertify would collect all of the orders, collect all

11  of the data, and sometimes just the program itself would

12  make a decision fraud or not.  I was an analyst, I was

13  required to look at orders and make the determination fraud

14  or not, given the data that we were looking at, plus the

15  data from any third-party tools.

16      Q.   And this whole fraud platform that you refer to,

17  is that being used in connection with online purchases?

18      A.   Probably.  I don't -- I don't know all of their

19  customers.

20      Q.   But you're not specifically aware of any other

21  use?

22      A.   I'm not specifically aware of any other use they

23  would be using it for.

24      Q.   Okay.  You mentioned three, I think, when you

25  provided your supplemental response.  Could you run through

1    those again?  I just want to make sure I have them

2    correctly.

3           You mentioned an officer or law enforcement agency

4    in the UK; is that right?

5        A.   Yes.

6        Q.   And can you tell me a little bit about that

7    particular customer.

8        A.   There are several.  There are police departments

9    and I'm not -- I'll confess, I've never been to the UK, so

10   I've only seen the accounts come in, gone on the website.

11   The website says, you know, Department of this London, or

12   whatnot, you know, police, and then in their -- in their

13   email footers, they say that they're police too.

14          I think, you know, there are several of those, but

15   I'm not -- I'm not totally sure -- like, I haven't

16   researched them a whole lot, outside of knowing that they're

17   not -- they're not retail.

18       Q.   Okay.  And again, you said that those are paying

19   customers?

20       A.   Correct.

21       Q.   Okay.  And do you have any law enforcement

22   customers that are within the U.S.?

23       A.   I do not believe so.

24       Q.   So we have law enforcement in the UK, you

25   mentioned whole fraud platform.  What was the third?

1          A.   There was cyber security, banking, so like Thin

2     Tech.  Any -- anywhere online where you would take in an

3     email address and need to research that was -- has been kind

4     of more of the base of customers we've been building.

5          Q.   Okay.  And in that context, is it your

6     understanding that the data that ArkOwl is providing to its

7     customers is used in connection with the approval or

8     verification on an online purchase transaction?

9          A.   Correct.  I believe our service is being used for

10    fraud prevention and cyber security.

11         Q.   In connection with online purchase transactions?

12         A.   In -- in connection with -- with that, or cyber

13    security or the -- the law enforcement in Europe.  I don't

14    know how they're using it in that.  Maybe they are using it

15    in Europe for online transactions too, I have no clue,

16    because I just see the number of crews that come in.

17         Q.   Understood.

18              But sitting here today, you're not aware of any

19    customer using ArkOwl's information for anything other than

20    supporting online purchase transactions?

21         A.   I am not aware.

22         Q.   Okay, thank you.

23              To your knowledge, are any of ArkOwl's paying

24    customers using ArkOwl to assess cyber security risk in

25    connection with insurance underwriting?

1        A.    I am not aware.

2        Q.    Okay.  To your knowledge, are any of ArkOwl's

3   paying customers using ArkOwl to assess the risk of a cyber

4   attack?

5        A.    I am not aware.

6        Q.    To your knowledge, are you -- are any of ArkOwl's

7   paying customers using ArkOwl to assess cyber security risk

8   by monitoring ransom ware sites?

9        A.    I am not aware.

10       Q.    To your knowledge, are there any of ArkOwl's

11   paying customers using ArkOwl in connection with national

12   security threats or investigations?

13       A.    I am also not aware.

14       Q.    Roughly speaking, how many queries were run

15   through ArkOwl's platform in 2022?

16       A.    19 million, roughly.

17       Q.    So thousands of inquiries each day?

18       A.    Yes.

19       Q.    This is a high volume verification business?

20       A.    Yes.

21       Q.    Does ArkOwl use a variety of resources to generate

22   outputs for its customer's inquiries?

23       A.    Like data sources?

24       Q.    Yes.

25       A.    Yes.

1        Q.   Okay.  And are these all publicly available

2   sources?

3        A.   Some of them, no.

4        Q.   Could you list for me the ones that are not.

5        A.   The ones that were purchased partners with would

6   be Whois.  We use a company for Caller ID.  That one is

7   Telnyx.  We used Have I Been Pwnd for breach data.

8        Q.   Are these not all publicly available?

9        A.   You need to purchase an account or --

10        Q.   For Whois?

11        A.   For use, yes.

12        Q.   For Whois?  You mentioned Whois?

13        A.   For Whois, yes.

14             I think the information itself is publicly

15   available, but the kind of bringing the data altogether and

16   cleaning it up is what we use Whois for.

17        Q.   So the way ArkOwl provides the data to its

18   customers, you need some sort of account set up with some of

19   these resources, but the information is all publicly

20   available?  I could go into Whois, Caller ID or Have I Been

21   Pwnd and --

22        A.   Yes.

23        Q.   -- obtain information?  Okay.

24             Does the --

25        A.   Sorry.  Our first and last seen isn't publicly

36

1    available, that's only through ArkOwl.

2        Q.   Have I been seen?

3        A.   No.  First seen, so it's when ArkOwl first saw it

4    in our -- in our own database.

5        Q.   Okay.  And that's simply an indication of when

6    that particular PII first hit ArkOwl's database?

7        A.   Correct.

8        Q.   Okay.  Does the output that ArkOwl provides to its

9    customers contain data from the publicly accessible or

10   surface web?

11       A.   Yes.

12       Q.   Are you familiar with the dark web?

13       A.   I'm familiar with the term, but not familiar with

14   using it.

15       Q.   Okay.  And in your own terms, like how would you

16   describe the dark web?

17       A.   The dark web is not the -- the Google and kind of

18   the stuff that's -- you could readily go to maybe on your

19   phone with a browser, I suppose.  You know, an expert on

20   dark web probably could go with their browser on their

21   phone, but I'm not an expert in the dark web.

22       Q.   Okay, but when I refer to the "dark web," you know

23   generally what I'm referring to?

24       A.   I know it's a place where you have companies --

25   you know, if you hear of breaches in the news, you also hear

37

1    it was leaked in the dark web or this was purchased off the

2    dark web.  You know, X amount of drugs were sold -- it seems

3    like dark stuff happens in the dark web.

4         Q.   Indeed, indeed.

5              Over the course of your career -- I think you

6    answered this question, but I'm going to ask it anyway.

7              Over the course of your career, have you

8    personally run a search on the dark web?

9         A.   I have not.

10        Q.   Do you know what a dark web search result would

11   look like?

12        A.   Is it something you can just do a search of?  I

13   don't --

14        Q.   You're not familiar?

15        A.   I'm not familiar.

16        Q.   And to your knowledge, has anyone at ArkOwl ever

17   searched the dark web?

18        A.   To my knowledge, no.

19        Q.   Does ArkOwl promote any dark web-specific

20   services?

21        A.   Yes, the breach data from Have I Been Pwnd.

22        Q.   So it's your position that breach data and dark

23   web data are synonymous?

24        A.   No.  But some of the breaches where it says, You

25   know, this breach contained passwords and all of those PII

1    data, it will also say where the data -- data breach was

2    leaked.

3         Q.   Okay.

4         A.   And so in the information of it, it will say:

5    This was leaked on the dark web.  These are the things that

6    were leaked:  Passwords, user names, email addresses, phone

7    numbers.

8         Q.   Okay, understood.

9              Just so I'm clear, you agree, though, that the

10   dark web and breached data are distinguishable terms?

11   They're not synonymous?

12        A.   That's something that -- yes.

13        Q.   So getting back to my question:  Does ArkOwl

14   promote any dark web-specific services?  Can you provide --

15        A.   We do not search the dark web.

16        Q.   Okay.  Are there any ArkOwl materials -- marketing

17   materials that reference the dark web specifically?

18        A.   If there are, I've forgotten about them.

19        Q.   So let's go back to the breached data that you're

20   referring to.

21             Does ArkOwl access the dark web to pull

22   information that it provides to customers?

23        A.   No.  Like the Whois service, we access another

24   service that does the breach data.

25        Q.   And what is the name of that service?

39

1          A.    That's Have I Been Pwnd, or Have I Been Pwnd.com.

2          Q.    And what information is Have I Been Pwnd providing

3     to ArkOwl?

4          A.    They provide a reverse email address and a reverse

5     phone number lookup.  So where we input an email address or

6     a phone number, and they provide which data breaches that

7     email address has been in, or if the email address has even

8     been in a data breach.

9          Q.    Do you have firsthand knowledge of whether the

10    data ArkOwl obtained from Have I Been Pwnd is actually

11    coming from the dark web?

12         A.    I do not.  I -- I wasn't there when they put that

13    data in their database.

14         Q.    But it's your understanding that it's providing

15    information regarding breach data, but you're not sure if it

16    came from the dark web or the surface web or somewhere else?

17         A.    Yeah, it claims it did.  But like I said, we use

18    their service because we've never been in the data -- in the

19    dark web.

20         Q.    You mentioned that Have I Been Pwnd represents

21    that it's pulling information from the dark web.  Where does

22    it represent that?

23         A.    It represents the -- when you search an email

24    address in their service, some of the breaches that come up,

25    their individual breaches -- and I'm using this as an

1   example, because I don't remember which breaches will say

2   that.  But let's say like the Adobe.com or the LinkedIn.com

3   breach, it will say, you know, 220 million users were

4   compromised in this breach by LinkedIn and this data was

5   found to be leaked on the dark web and that's how we found

6   out about it, and --

7        Q.   So it's breached data certainly?  That's what Have

8   I Been Pwnd is providing, correct?  Breached data?

9        A.   Correct.

10       Q.   But the data could be coming from the surface web?

11       A.   If they say it's coming from the dark web, I just

12   trust them.  It could come from the surface web.  I'm not --

13   you know, I wasn't there.  They could be lying to us.

14       Q.   So when you provide data from Have I Been Pwnd to

15   your customers, is it giving an indication of whether the

16   information was pulled from the dark web?

17       A.   We pass along exactly what Have I Been Pwnd's API

18   passes through to us, and sometimes Have I Been Pwnd's API

19   will say this came from the dark web, so our customers would

20   see that coming from ArkOwl.

21       Q.   Do you recall testifying at your deposition that

22   you don't know if Have I Been Pwnd gets its data from the

23   dark web?

24       A.   I remember that, because it was when I was

25   searching ArkOwl one time after the deposition, I was like,

1    Oh, they do say it, they say it right here.

2            So I do remember that's inconsequent with my

3    deposition, because I saw it after.

4        Q.   And again, your subsequent review was going into

5    the Have I Been Pwnd website and analyzing the information

6    that it's providing to ArkOwl?

7        A.   Yeah, we -- when I saw it coming through the API

8    into ArkOwl.

9        Q.   Okay.

10       A.   That was -- that was the only review of saying,

11   Oh, it says it's from the dark web.

12       Q.   Just so I understand, you access Have I Been Pwnd,

13   they generally are providing breached data, some of that

14   breached data is on the surface web.  It's your

15   understanding that at least a portion of that data is coming

16   from the dark web, as well?

17       A.   That's what they claim.

18       Q.   Okay.  But again, just so I'm clear, ArkOwl itself

19   is not searching the dark web?

20       A.   ArkOwl itself is not searching the dark web.

21       Q.   What companies has ArkOwl gone head-to-head with

22   when selling its PII verification services?

23       A.   We've gone head-to-head with any company that has

24   advertised fraud data solutions.  You know, typically, we go

25   head-to-head with those that are providing email address

1    inputs and outputs for the email address --

2         Q.    Sure.

3         A.    -- in the form of data.

4         Q.    And are those typically PII verification services?

5         A.    Typically, yes.

6         Q.    Okay.  Do you recall during your deposition you

7    had testified with regard to a few specific direct

8    competitors?

9         A.    Yes.  There are those that we hear about more

10   often when talking with clients.

11        Q.    So Ekata, PIPL, LexisNexis and SEON, would you

12   agree that those --

13        A.    Yep.

14        Q.    -- are those competitors?

15        A.    Yep, those are competitors.

16        Q.    And what about Email Hippo?

17        A.    Email Hippo?  I -- I haven't heard of them from a

18   customer, but I've looked at their service and I've thought

19   they look like a competitor.

20        Q.    Okay.  And all of these companies that we just ran

21   through, they all provide PII verification services?

22        A.    I haven't tried Email Hippo.  I would assume so,

23   based on their website.

24        Q.    To your knowledge, do any of these particular

25   competitors provide dark web database services?

43

1          A.   SEON might.  I don't -- I don't know -- I don't

2     use -- I haven't looked at them, so --

3          Q.   That's fair.

4               Sitting here today, you're not aware?

5          A.   Yeah, I'm not aware today.

6          Q.   Sitting here today, are you aware of any instances

7     where ArkOwl has lost business to DarkOwl?

8          A.   I'm not aware.

9          Q.   Are you aware of any instances in which DarkOwl

10    has lost business to ArkOwl?

11         A.   Not aware.

12         Q.   Are you aware of any instances in which a

13    customer, or potential customer was deciding between DarkOwl

14    services, on the one hand, and ArkOwl services, on the

15    other?

16         A.   Not that they would tell me, no.  I'm not aware.

17         Q.   To your knowledge, have you ever encountered

18    DarkOwl at any industry events?

19         A.   No.

20         Q.   Are you aware of any companies who use DarkOwl

21    services for any type of PII verification?

22         A.   I have an assumption, but --

23         Q.   No firsthand knowledge?

24         A.   I mean, United States Postal Service, when we ran

25    into them at the industry conference, I would assume they

44

1   use DarkOwl because they came up to us.

2       Q.   For PII verification?

3       A.   I assumed -- I assumed that, but --

4       Q.   Don't pretend knowledge.

5       A.   It's an assumption, right.

6       Q.   Fair enough.  We don't want you speculating.

7       A.   Yep.

8       Q.   Sitting here today, are you aware any of customer

9   or potential customer deciding between these services of

10  ArkOwl and a provider of dark web database services?

11      A.   No, I'm not aware.

12          MR. HOLT:  I have no further questions at this

13  time, Your Honor.

14          THE COURT:  Thank you.

15          Is there cross-examination, which is really direct

16  examination?

17          MR. FRASIER:  Thank you, Your Honor.

18          THE COURT:  You're welcome.

19          THE WITNESS:  Can you hear me okay?

20          THE COURT:  Yeah, I'm doing just fine.  Thank you

21  very much.

22          THE WITNESS:  I was expecting this chair to have

23  wheels and when I got here it --

24          THE COURT:  You're not the first to be fooled by

25  that.

1          THE WITNESS:  Because those had wheels and I get

2    up and I'm like, Oh.

3                    CROSS-EXAMINATION

4    BY MR. FRASIER:

5          Q.    Good afternoon, Mr. Daline.

6          A.    Good afternoon.

7          Q.    You testified a minute ago that you were working

8    in fraud prevention departments before forming ArkOwl; is

9    that right?

10         A.    That's correct.

11         Q.    Approximately when was that?

12         A.    That was back in 20 -- 2010 and 2011, so a while

13   ago.

14         Q.    What did you do when you were working as a fraud

15   prevention specialist in 2010 and 2011?

16         A.    I would be reviewing online orders.  And that was

17   my daily job, was to look at online orders, to look at the

18   data as it came in.  It was like a queue and I just take the

19   next one in the queue.

20               So what happens when you order something online, a

21   lot of times it goes right through because, typically,

22   information verifies or the orders lower dollar, and so the

23   decision for fraud are not is made pretty quickly.

24               But for bestbuy.com, where I worked first with

25   high dollar Mac Book Pros or tiny technologies that were

1    high in fraud, a lot of orders made it before physical

2    analysts who would sit down and review whether to let that

3    go out the door or --

4        Q.    What type of information were you looking for to

5    make the determination?

6        A.    The -- the whole thing was whether to -- we were

7    looking for excuses to approve the order.  So we're looking

8    for something to tell me that the order is legitimate.  You

9    know, do they -- is the billing and shipping address, do

10   they have the same name and do those names verify, and third

11   parties, could they be relatives?  You know, is this email

12   address 12 years old?  You know, does that -- could that

13   look like legitimate behavior?  If it's three seconds old,

14   that really doesn't look like it's legitimate behavior.

15           But we are -- we are looking for any excuse to

16   make a profit there and to make sure the good customer gets

17   their order.

18       Q.    Approximately how much time did you have to

19   conduct these manual reviews?

20       A.    I believe it was like five to eight minutes.

21       Q.    Per review?

22       A.    Per review.

23       Q.    And how did your work as a fraud prevention

24   specialist lead to ArkOwl?

25       A.    Well, I kept seeing that there was -- we would

1    have third-party tools for address, we would have

2    third-party tools for, like, a billing name with an address.

3    We had a third-party tool to review the IP address or the

4    device ID.

5            But when it came to email addresses, a Google

6    search -- and we had like maybe five or eight different tabs

7    open all the time with things that we would just throw email

8    addresses into to say, Give me an excuse that this is a real

9    person at the end of this.  You know, is -- is this account

10   registered somewhere?  Or is this email address registered

11   somewhere?

12        Q.   So how did that turn into ArkOwl?

13        A.   Well, it turned into ArkOwl because we -- we made

14   ArkOwl as an email input, or we had the idea to have an

15   email input that would just check all of these things that I

16   was already doing as an analyst.

17        Q.   You testified that you launched ArkOwl in

18   approximately 2012; is that right?

19        A.   We launched the website in 2011.

20        Q.   All right.

21        A.   But we launched the company in 2012.

22        Q.   What did the ArkOwl website -- or what did the

23   ArkOwl service look like in 2012?

24        A.   In 2012 the -- we only had one data provider.  We

25   only had one data check, which was Yahoo Pulse.  So -- and

1    basically what you do is, you would put in an email address

2    and it had to be -- it had to be a Yahoo.com -- @Yahoo.com.

3    You would plug it in and the output would be name, birthday,

4    email creation, location and gender.  And that's -- that was

5    our only feature for, maybe, several months until we added

6    Whois.

7          Q.   And so it was a user interface?

8          A.   A user interface, correct.

9          Q.   Okay.

10         A.   So much like Google, where you just go there and

11   type -- type something in, you would go to ArkOwl and type

12   in an email address.

13         Q.   What types of businesses were ArkOwl's first

14   customers?

15         A.   Well, the very first one was Target, because I was

16   working at Target at the time.  And then it was bestbuy.com.

17   And then bestbuy.com, the manager had shared us with the --

18   the MRC at the time, the Merchant Risk Council.  And from

19   that time on, we had a lot -- a lot more users, Apple,

20   Amazon, Orbits.  Online retailers were our early -- early

21   days.

22         Q.   Online retailers were your primary customers at

23   the beginning?

24         A.   Correct.

25         Q.   Now, you mentioned somebody sending an email to

1   MRC?

2         A.   Correct.

3         Q.   When did that happen?

4         A.   Jason Taylor, who was my manager at Best Buy, and

5   then when I went to Target, he shared that around the time

6   when we first started ArkOwl.  We first started it in

7   February.  Jason had shared this in March.

8         Q.   Of 2012?

9         A.   Of 2012, yes.

10        Q.   Right.  And you said MRC is Merchant Risk Council;

11   is that right?

12        A.   Correct.

13        Q.   What kind of companies comprise the Merchant Risk

14   Council members?

15        A.   Online retailers, fraud platforms, fraud software

16   platforms, online banks, the vendors, the data solutions for

17   those online retailers and banks, and fraud platforms.

18        Q.   Are Merchant Risk Council members likely ArkOwl

19   competitors or customers or vendors or what?

20        A.   They could be all of the above.  They could be

21   customers, they could be competitors, or they could be

22   vendors.

23        Q.   What unites that Merchant Risk Council members?

24        A.   They probably talk that, you know, there is no

25   competitors in the field.  It's just one big fight against

1    fraud.

2        Q.   Okay.  So ArkOwl's first customers were in retail.

3    Did ArkOwl start acquiring customers that were not in

4    retail?

5        A.   Yes.  Through -- through this, we started

6    acquiring the -- you know, some fraud platforms:  Cyber

7    Source, Signifyd, Cell Secure (ph).

8        Q.   Do you recall approximately when ArkOwl had the

9    three customers you just mentioned?

10       A.   Cyber Source was early on.  I don't think Signifyd

11   started until 2014, so I think Signifyd was 2014.

12       Q.   And Cell Secure?

13       A.   Cell Secure was pretty early on too.  I think they

14   might have been 2014, 2015.

15       Q.   What is Cyber Source?

16       A.   Cyber Source is an all-around cyber security fraud

17   prevention platform.  They take in, much like when we were

18   using Accertified to review the manual, do things manual

19   review, you could use Cyber Source for the same thing.  They

20   would take in all the orders, all the data.  Cyber Source

21   even can manage whole fraud departments.  Instead of having

22   your own fraud department, they can say, Hey, we'll take

23   that under our roof so that you don't even need a fraud

24   department.

25       Q.   What is Signifyd?

1        A.   I believe they do the same thing; they're a fraud

2   platform that will take on the whole -- the whole fraud

3   department or part of it.  Whatever part that they need help

4   with, a fraud department might need help with, Signifyd is

5   there to say, We can help with that piece.

6        Q.   So this was about a decade ago that you first

7   acquired these customers.  Does ArkOwl still have cyber

8   security companies as customers?

9        A.   Those are our main customers today.

10       Q.   As of today, they're your main customers?

11       A.   Correct.

12       Q.   As of last year, roughly what percentage of

13  ArkOwl's revenue came from the cyber security companies?

14       A.   I believe it was upwards of 80 to 85 percent.

15       Q.   Other than the three you've identified, what other

16  cyber security customers does ArkOwl currently have?

17       A.   We have Apruvd, a company called Getmelo (ph).

18  Those are also fraud prevention platforms.  I'm sure there

19  are many, many others there.

20       Q.   How do -- how do these security companies use

21  ArkOwl's data?

22       A.   I believe it's to help them stop fraud on some

23  level.  I'm -- I'm not totally -- I'm not totally sure.  We

24  just provide the data.

25       Q.   What insight does ArkOwl have as to how its

1    customers are using ArkOwl's data?

2        A.   We pretty much only have the volume, so the amount

3    of queries performed in a particular day by a cyber security

4    platform.

5        Q.   Did ArkOwl ever make a conscious decision to focus

6    marketing on cyber security companies?

7        A.   Yes.  In 2019 -- whenever the first time I went to

8    the MRC was that -- when I went -- when I physically went

9    there -- I think it was 2019 -- I found myself talking more

10    with the other fraud prevention platforms and the other

11    vendors in the space more than I was the retailers.

12        Q.   All right.  Let's -- let's jump back to ArkOwl

13    services.

14        On your direct you described what ArkOwl services

15    look like now, which is very different from what you

16    described in 2012.

17        At what point did ArkOwl's service change from

18    what you described as -- in 2012?

19        A.   Yeah.  I think sometime between 2012 and 2015 or

20    '16, we added a few more social checks, social registrations

21    where you could put in the email address and it would say

22    yes or no to a Facebook, or yes and no to Twitter.  We added

23    the Whois domain information at that time.

24        So Whois is kind of that -- so at ArkOwl.com is

25    the Whois part of the email address, the domain.  So that

1    the Whois researches that to say was this domain created,

2    like two days ago.

3           And then in 20 -- 2015 or 2016, we -- we massively

4    increased our social checks.  We added the breached data,

5    we -- and kind of the main -- the main thing with that was

6    also to launch the API.

7           Q.   What's an API?

8           A.   API is an applications programmable interface.  It

9    basically allows systems to connect to each other so that a

10   system could connect to our data -- an analytic system could

11   connect to our data and do machine learning, given our extra

12   data.

13          Q.   In your direct, you talked a little bit about Have

14   I Been Pwnd.com.  What -- I believe you testified that it

15   contains both email addresses and phone numbers; is that

16   right?

17          A.   Correct.

18          Q.   Has it always contained both email addresses and

19   phone numbers?

20          A.   No.  I believe they added phone numbers last year

21   or this year.  It's recent.

22          Q.   All right.  And what information does Have I Been

23   Pwnd give ArkOwl?

24          A.   The output is to describe whether an email was in

25   a data breach.  So it might -- so if I plugged in my email,

54

1    it would say, RDaline@Gmail -- this is stricken from the

2    record, right?  No one will have RDaline@Gmail, but RDaline

3    @Gmail has 20 breaches associated with it.  And if you click

4    on that in the ArkOwl interface, it will show exactly which

5    breaches those are and we do display that in the API, as

6    well.

7          So maybe I'm in the Adobe breached or the LinkedIn

8    breached.

9    Q.   How is the information you just described useful

10   to your clients?

11   A.   It's very useful in determining account takeover,

12   whether there is an account takeover.

13         So the -- kind of the -- the really, like, Holy

14   Grail of email verification is to see if something was

15   created within the last few seconds, while on the flip side,

16   the Holy Grail for the fraudster is getting a highly

17   verified email to place your order with.  And the best type

18   of verified email you can get is the one that a customer has

19   already used.

20         So if you can take a login and a password and sign

21   in to somebody's, you know, Groupon account and place an

22   order with a credit card that's saved in there, that looks

23   really legit.  And so you use the breached data to be like,

24   Was this email address seen in any of these breaches?  Could

25   the order that I'm looking at be in a possible account

1    takeover?

2        Q.   You briefly described the Merchant Risk Council.

3    Are you aware of whether any Merchant Risk Council members

4    utilize data from the dark web?

5        A.   I -- I am not.  I am not aware.

6        Q.   Are you aware of whether any of the Merchant Risk

7    Council members advertise using dark web data?

8        A.   Oh, the vendors.  Yes.  SpyCloud is a -- is a

9    member that's using -- or that advertise dark web

10   monitoring.  A company called Flashpoint.  I saw that they

11   had a dark web in their description.  IPQualityScore, which

12   also provides inputs of email address, phone number, IP

13   address, they advertise dark web data.

14       Q.   Do you know what IPQualityScore does?

15       A.   They -- they provide data, as well as fraud

16   scoring, for reverse lookups of IP address, email address

17   and phone number.  And I believe they also advertise the

18   Vice ID.

19       Q.   Is IPQualityScore a competitor of ArkOwl?

20       A.   Yes.

21       Q.   How do you know that?

22       A.   Because I've actually demoed their data and I can

23   see that it has an email input.  I can put in an email and

24   they advertise that they provide data in return for that

25   email to help with fraud protection, which is what we do.

1            MR. FRASIER:  I would like to offer an exhibit.

2   Should I just resume numbering, Your Honor, so Exhibit 2?

3            UNIDENTIFIED SPEAKER:  Counsel, is your computer

4   plugged into the lectern?

5            MR. FRASIER:  It should -- it says it is.

6            UNIDENTIFIED SPEAKER:  It takes just a second.

7            MR. FRASIER:  May I approach, Your Honor?

8            THE COURT:  You may.  Thank you.

9            MR. FRASIER:  Apologies.  This was working a

10  minute ago.

11           Success.

12       Q.   (By Mr. Frasier) Mr. Daline, I am showing you what

13  has been marked as Exhibit 2.  Do you recognize it?

14       A.   Yes.

15           THE COURT:  Let me make sure the record reflects

16  counsel can see that on your screen, on your --

17           MR. HOLT:  I can, Your Honor.  Thank you.

18           THE COURT:  All right, go ahead.

19       A.   Yes.

20       Q.   (By Mr. Frasier) What is Exhibit 2?

21       A.   This looks like IPQualityScore's description of

22  their features and plans, purchase plans.

23       Q.   Where did this document come from?

24       A.   IPQualityScore's website.

25       Q.   Did you go to IPQualityScore's website?

1        A.   I've been there, yes.

2        Q.   Is that -- did you create this image?

3        A.   I thought you might have.  But, yeah, those tabs

4   are all mine, yep.

5             MR. FRASIER:  I offer Exhibit 2.

6             THE COURT:  Any objection to 2?

7             MR. HOLT:  No objection, Your Honor.

8             THE COURT:  All right, Exhibit 2 is received.

9             (Exhibit 2 admitted.)

10            MR. FRASIER:  I would like to offer one more.  May

11  I approach?

12            THE COURT:  You may.

13       Q.   (By Mr. Frasier) I'm showing you what's been

14  marked is Exhibit 3.  Do you recognize it?

15       A.   Yes.

16       Q.   What is Exhibit 3?

17       A.   This is -- zoomed in on the page we were just

18  looking at, if you click on the dark data question mark

19  under one of IPQualityScore's plans.

20       Q.   Where did this image come from?

21       A.   IPQualityScore's website.

22       Q.   Did you create this document?

23       A.   I might have taken the screenshot, but I did not

24  create the IPQualityScore's website.

25       Q.   Thank you for that clarification.

1             MR. FRASIER:  I offer Exhibit 3.

2             THE COURT:  Any objection to 3?

3             MR. HOLT:  No objection, Your Honor.

4             THE COURT:  Thank you.  3 is received.

5             (Exhibit 3 admitted.)

6        Q.   (By Mr. Frasier) And you said IPQualityScore.  Do

7   you compete with IPQualityScore?

8        A.   Yes.

9        Q.   What is ArkOwl's relationship with the company

10   Socure?

11        A.   Socure is a client of ArkOwl's.

12        Q.   What does Socure do?

13        A.   Socure advertises identity verification, but I

14   have -- I have never used it.

15        Q.   Is it a retail company?

16        A.   No.

17        Q.   What kind of company is it?

18        A.   I believe it's a fraud protection identity

19   company.

20        Q.   What is ArkOwl's relationship with Apruvd?

21        A.   Apruvd is a client.

22        Q.   What is Apruvd?

23        A.   Apruvd is a fraud prevention platform and they

24   advertise -- they advertise their retailers, saying that

25   they would like to see their canceled orders, because they

1    think they can approve a few, and Apruvd gets a cut of what

2    they approved of the canceled orders.

3         Q.    How long has Apruvd been an ArkOwl customer?

4         A.    I believe so since 2017 or 2018.

5         Q.    What is ArkOwl's relationship with Accertify?

6         A.    Accertify is like a gateway to potential retailers

7    and banks to provide data through them.  They are a fraud

8    platform.

9         Q.    And what's ArkOwl's relationship?

10        A.    We can provide data through them to whatever --

11   whoever their customers are.

12        Q.    What is the company NICE Actimize?

13        A.    It is similar to Accertify where it's a fraud

14   platform and their focus is more on banks and -- and tech

15   companies.

16        Q.    And what's ArkOwl's relationship with NICE

17   Actimize?

18        A.    It's similar to Accertify in the fact that we

19   would provide data to their customers through them.

20        Q.    You testified that ArkOwl added phone number, IP

21   and postal data; is that -- is that right?

22        A.    That's correct.

23        Q.    What phone number data does ArkOwl offer?

24        A.    ArkOwl offers the breached data for phone numbers,

25   caller ID, the phone carrier, whether it's like T-Mobile or

60

1  AT&T, information about the area code, saying, This area

2  code is connected to this region.  We also provide social

3  checks, which provide back -- in some cases, names and

4  pictures and birthdays.

5      Q.   What IP data does ArkOwl provide?

6      A.   ArkOwl provides location, geo location of an IP

7  address, the ISP, which is kind of like the carrier for a

8  phone number.  And we also provide first seen/last seen from

9  our own database for all of those data points -- or those

10  data inputs, sorry.

11      Q.   Are you familiar with the website about-fraud.com?

12      A.   Yes.

13      Q.   What is about-fraud.com?

14      A.   About-fraud.com is a compilation and a collection

15  of vendors in the fraud industry.

16          MR. FRASIER:  May I approach, Your Honor?

17          THE COURT:  You may.

18          MR. FRASIER:  There we go, all right.

19      Q.   (By Mr. Frasier) I am now showing you what's been

20  marked as Exhibit 4.  Is it in front of you, Mr. Daline?

21      A.   Yes, I can see it.

22      Q.   What is Exhibit 4?

23      A.   This is the About-Fraud info graphic where they

24  compile the -- all the vendors in the industry that have

25  approached them.

1          Q.   Where did this image come from?

2          A.   The About-Fraud website, but it was potentially

3    emailed to me.

4          Q.   For Exhibit 4?

5          A.   By -- it was -- I think it might have been emailed

6    to me by About-Fraud or it was on their website, one -- one

7    or the other.

8               MR. FRASIER:  I offer Exhibit 4.

9               THE COURT:  Well, first thing is, my version of it

10   is different from what's on the screen.

11              MR. FRASIER:  Oh, that is interesting.

12              THE COURT:  Maybe they've updated it since you've

13   printed this.

14              MR. FRASIER:  Let me find the one that you have.

15              THE COURT:  Mine says July 2020, so it might be a

16   little old.

17              MR. FRASIER:  May I just use paper copies for this

18   exhibit, Your Honor?

19              THE COURT:  Yeah, that would be fine.  Any

20   objection?  Do you want to offer paper copy of Exhibit 4?

21              MR. FRASIER:  Yes.  I offer the Exhibit 4 that I

22   just handed to you.

23              THE COURT:  All right.  Any objection to 4?

24              MR. HOLT:  No objection, Your Honor.

25              THE COURT:  4 is received.

62

1          (Exhibit 4 admitted.)

2      Q.   (By Mr. Frasier) Thank you for your patience

3  through that.

4          Is what we're looking at an exhaustive list of

5  fraud prevention service companies?

6      A.   No, definitely not.

7      Q.   Okay.  Where does ArkOwl appear on this graphic?

8      A.   ArkOwl appears under Data Consortium and

9  Verification.

10     Q.   Do you agree with that characterization?

11     A.   I do.

12     Q.   Are the other companies identified in the Data

13  Consortium and Verification box ArkOwl competitors?

14     A.   I would believe so, yes, the ones that I know and

15  have researched and heard of.

16     Q.   Which ones can you identify on the graphic that

17  are your competitors?

18     A.   Email Age, Ekata, potentially Whois XML, Email

19  Hippo, IPQualityScore, People, MaxMind, Telesign, Digital

20  Element.

21     Q.   Are any of the companies in the Data Consortium

22  and Verification box potential customers of ArkOwl?

23     A.   Yes.

24     Q.   Which ones?

25     A.   We've explored Ekata.  Email Age has come up to us

1   before inviting us to try their data and have us provide

2   them with our data.  IPQualityScore, potentially.

3        Q.   In your experience in the industry, is it unusual

4   to have companies that are both competitors and potential

5   customers?

6        A.   It's not unusual.

7        Q.   Why not?

8        A.   Because a lot of -- a lot of data softwares and

9   solutions provide different data, and so our data is

10  different than Ekata's data and it's different than Email

11  Age's data.  Even though the input of the email is the same,

12  the data -- the data output is different, how we get the

13  data is different.

14       Q.   So you end up competing with them in some context,

15  but potentially selling to them in other context?

16       A.   Yes.

17       Q.   Other than the ones that we just discussed, does

18  ArkOwl have any existing customers on the broader graphic?

19       A.   Yes.

20       Q.   Which ones?

21       A.   Let's see here.  Socure, Signifyd, Cyber Source,

22  and then conversations with more than several other

23  entities.

24       Q.   What do you mean, conversations with?

25       A.   Well, they're potential customers, like potential

64

1    future -- they're in the pipeline.

2         Q.   Which -- which companies have you specifically had

3    a conversation with in the -- in the graphic you're looking

4    at about becoming a customer of ArkOwl?

5         A.   Ravelin, Frogstreet, Radial -- Radial, IDinsight.

6              Are we talking companies that we've had

7    discussions with in the past as well?

8         Q.   I'm talking about companies on this graphic that

9    you have specifically discussed selling data to.

10        A.   LexisNexis, Experian, RISK IDENT, TransUnion.

11   They all just kind of blur together after a while.

12        Q.   That's fine.  Let's change topics for a minute.  I

13   would like to briefly discuss DarkOwl.

14             When did you first discover DarkOwl?

15        A.   We first discovered DarkOwl in 2019.

16        Q.   Did you ask DarkOwl to change its name in 2019?

17        A.   I did not.

18        Q.   Why?

19        A.   Because I briefly skimmed over their website and

20   thought that they potentially weren't in the same industry

21   or a competitor.

22        Q.   What made you think that they weren't in the same

23   industry or a competitor?

24        A.   Because I didn't see a whole lot on email data.  I

25   didn't see the word "email," I didn't see a whole lot of the

 1    word "fraud," "data solution."  I hadn't heard about it from

 2    any of our customers.  I was the one to discover it.

 3            I didn't -- you know, I think I saw kind of more

 4    of a, you know, words like "penetration test" or, you know,

 5    stuff that was more for -- more for something that was

 6    different.

 7        Q.   What changed?

 8        A.   Apruvd -- Corwin from Apruvd, one of our

 9    customers, sent me an email asking if we were affiliated

10    with a company called DarkOwl and was saying -- asking if it

11    was one of our projects and saying that they have been

12    receiving sales emails from them.

13            MR. FRASIER:  Your Honor, may I approach?

14            THE COURT:  You may.

15            MR. FRASIER:  I believe an electronic copy will

16    work this time.

17        Q.   (By Mr. Frasier) You're viewing what's been marked

18    as Exhibit 5.  Do you recognize it?

19        A.   Yes.

20        Q.   What is Exhibit 5?

21        A.   This is the email from Corwin that I received.

22            MR. FRASIER:  I would offer Exhibit 5.

23            THE COURT:  Objection to 5?

24            MR. HOLT:  No objection, Your Honor.

25        Q.   (By Mr. Frasier) Who is Corwin Cole?

```
 1              THE COURT:  I'm sorry, 5 is admitted.  Go ahead.

 2              (Exhibit 5 admitted.)

 3              MR. FRASIER:  Thank you, Your Honor.

 4         Q.   (By Mr. Frasier) Who is Corwin Cole?

 5         A.   Corwin Cole is a CTO and co-founder of Apruvd.

 6         Q.   Okay.  What was ArkOwl's relationship with Apruvd

 7    when you received this email?

 8         A.   They were a client.  They were a client that I met

 9    with face-to-face already, both Corwin and the CEO.

10         Q.   Is this the email you were referring to that

11    changed your attitude?

12         A.   Yes.

13              MR. FRASIER:  Your Honor, may I approach?

14              THE COURT:  You may.

15         Q.   (By Mr. Frasier) You're now viewing what's been

16    marked as Exhibit 6.  Do you recognize Exhibit 6?

17         A.   Yes.

18         Q.   What is Exhibit 6?

19         A.   This was a forward -- forward from Corwin of the

20    sales email that it looks like Evan from Apruvd had received

21    from Taylor Sharp of DarkOwl.

22         Q.   When was this email sent in relation to the

23    Exhibit 5 we were just looking at?

24         A.   I believe it was shortly after.

25              MR. FRASIER:  I would offer Exhibit 6.
```

1            THE COURT:  Objection to 6?

2            MR. HOLT:  I'm having a hard time seeing it.

3            MR. FRASIER:  I can hand you a paper copy as well.

4            MR. HOLT:  That would be great.

5            MR. FRASIER:  I killed all these trees anyway, I

6    might as well.

7            MR. HOLT:  No objection, Your Honor.

8            THE COURT:  All right, thank you.  6 is received.

9            (Exhibit 6 admitted.)

10       Q.   (By Mr. Frasier) So you testified that Apruvd was

11   a customer of ArkOwl's at this point; is that right?

12       A.   Yes.

13       Q.   What was ArkOwl providing Apruvd?

14       A.   ArkOwl was providing Apruvd with data output for

15   email addresses and phone numbers.

16       Q.   Okay.  Now, I'm going to flip down to the second

17   page of Exhibit 6.

18            MR. BUXBAUM:  Counsel, how much time more time do

19   you have?  You're well over your time.

20            MR. FRASIER:  Sorry, this --

21            THE COURT:  Wait a minute.

22            First of all, it's not your place to just, in the

23   middle of an examination, ask that question.  If you want to

24   speak, you speak to the Court.

25            MR. BUXBAUM:  Sorry.

1          THE COURT:  Do you have an estimate for how long

2   you might have?

3          MR. FRASIER:  Maybe five more minutes, Your Honor.

4          THE COURT:  Thank you.  And I'm sorry, ask the

5   beginning of the last question again, because I didn't hear

6   it.

7          MR. FRASIER:  Sure.  I was just --

8          THE COURT:  You were just getting to --

9          MR. FRASIER:  -- flipping to the second page, yes.

10          THE COURT:  Thank you.

11     Q.   (By Mr. Frasier) Now, is the second -- is the

12   second page of Exhibit 2 the same email chain that we were

13   looking at?

14     A.   I believe so, yes.

15     Q.   From -- from the text of the second page of

16   Exhibit 6, does it appear to be the first contact that

17   DarkOwl had made to Apruvd?

18     A.   Since -- in context, it's saying, "Reaching out to

19   again," I would say no, but that's -- that's an assumption

20   based on -- on the email.

21     Q.   On the third paragraph of the second page of

22   Exhibit 6, the person wrote, quote, DarkOwl provides a

23   comprehensive data environment to monitor when personal

24   identification info, (PII), is posted on behalf of your

25   clients, end quote.

69

1              With your experience with Apruvd, are those data

2       services useful to Apruvd?

3          A.   Absolutely.

4          Q.   How?

5          A.   Apruvd only provides services for their clients.

6       They provide fraud prevention services where they need to

7       verify PII information, such as the output of an email

8       address.

9          Q.   In your opinion, could Apruvd have used DarkOwl's

10      data services they're offering in this email for the same

11      purpose as it was using ArkOwl's?

12         A.   The same -- same purpose, yes.

13         Q.   Why do you say that?

14         A.   It may not be to the same effect, because our data

15      is amazing, but for the same purpose, yes.  If Apruvd was

16      looking for an email address input to have output to verify

17      whether there was an account takeover or whether the person

18      is a legitimate -- has legitimate information online,

19      whether leaked or on surface web, that is something that

20      Apruvd could have used DarkOwl for that.

21         Q.   In your opinion, do -- does ArkOwl compete with

22      DarkOwl?

23         A.   Yes.

24         Q.   And why?

25         A.   Because of that.  Because there is an ability to

1   input an email address and give output to verify a customer

2   for, whether it's -- whether the customer or client is

3   legitimate or fraudulent.

4           MR. FRASIER:  Thank you.  I have no further

5   questions.

6           THE COURT:  Thank you.

7           Any recross?  Recross, redirect?

8           MR. HOLT:  Just a couple of minutes, Your Honor,

9   if I may.

10          THE COURT:  Yeah.

11          MR. HOLT:  Thank you.

12          THE COURT:  And also, Mr. Holt, did you intend to

13   offer Exhibit 1 into evidence?

14          MR. HOLT:  Yes.

15          THE COURT:  I don't think you did.  Is there any

16   objection to 1?

17          MR. FRASIER:  No, Your Honor.

18          THE COURT:  All right, 1 is received.

19          (Exhibit 1 admitted.)

20                      REDIRECT EXAMINATION

21   BY MR. HOLT:

22      Q.   Mr. Daline, throughout your examination by

23   Mr. Frasier, you repeatedly used the term "cyber security,"

24   and I think you said that the vast majority of your clients,

25   I think you said maybe upwards of 85 percent, are in the

1    cyber security industry?

2         A.   Correct.

3         Q.   Is that right?  How would you define the term

4    "cyber security"?

5         A.   I would define cyber security as being a broad

6    umbrella.

7         Q.   Do you believe that every company within the cyber

8    security industry is a competitor of ArkOwl?

9         A.   No.

10        Q.   And did you not testify during my direct

11   examination earlier that you're not personally aware of any

12   of ArkOwl's customers using ArkOwl data for anything other

13   than support in connection with online purchase

14   transactions?

15        A.   Online purchase transactions could be under that

16   cyber security umbrella.

17        Q.   And sitting here today, you're not aware of any

18   other uses of DarkOwl's data by customers within the U.S.?

19        A.   DarkOwl's?  No.

20        Q.   ArkOwl's?

21        A.   ArkOwl's?  No, not aware.

22        Q.   So no other use cases within the U.S. that you're

23   aware of, other than in support of verifying consumer

24   transactions?

25        A.   Within the U.S., I am not aware.

1          Q.    You repeatedly used the term "fraud prevention"

2     throughout your examination by Mr. Frasier as well.  Do you

3     believe that every single company that's involved in fraud

4     prevention is a competitor of ArkOwl?

5          A.    I do not.

6          Q.    And, in fact, as you were going through Exhibit 4,

7     you acknowledged that there are many companies on that

8     exhibit, correct, that are not competitors?

9          A.    Correct.

10         Q.    Is it your position that every company that

11    generates an output to the search of an email address for

12    purposes of verifying the legitimacy of that email is in the

13    cyber security industry?

14         A.    No.

15         Q.    So you discussed a couple of emails that were

16    introduced as exhibits that were sent by Apruvd.  Do you

17    recall that?

18         A.    Yes.

19         Q.    And I believe you said that Apruvd is an ArkOwl

20    customer, correct?

21         A.    Yes.

22         Q.    And Mr. Cole -- Corwin Cole, he sent you that

23    email?

24         A.    Correct.

25         Q.    And is Mr. Cole a friend of yours?

1         A.   He's a client, and I consider clients friends.

2         Q.   And to your knowledge, is Apruvd a DarkOwl

3    customer?

4         A.   To my knowledge, I do not believe they are.

5         Q.   And do you have any knowledge that Mr. Cole was

6    confused between DarkOwl and ArkOwl?

7         A.   Outside of that email that we looked at, no.

8         Q.   Have you ever talked to Mr. Cole about being

9    confused between ArkOwl and DarkOwl?

10        A.   Potentially.  We had a phone call after that email

11   and I don't really remember how it went.

12        Q.   Okay.  And in fact, Apruvd has increased its sales

13   volume with ArkOwl since you received Mr. Cole's email;

14   isn't that true?

15        A.   That's true.

16             MR. HOLT:  Okay.  I have no further questions,

17   Your Honor.

18             THE COURT:  All right, thank you.  Is there going

19   to be any redirect, re-redirect?

20             MR. FRASIER:  No, Your Honor.

21             THE COURT:  All right, let me follow up with a

22   couple of questions and then counsel, of course, will be

23   permitted to follow up on my questions.

24             So, Mr. Daline, I'm a little confused about your

25   definition of cyber security and you refer to it as a "broad

1  umbrella" and I understand from your testimony that you

2  believe that online purchase transactions are under the

3  cyber security umbrella.  Is that correct from?

4          THE WITNESS:  Yes.

5          THE COURT:  What else is under the cyber security

6  umbrella, in your view?

7          THE WITNESS:  Well, on- -- online transactions,

8  the piece of it that I worked on, which was for fraud

9  review, was under cyber security.  Any online transaction --

10 just because it's an online transaction doesn't necessarily

11 mean that there is a potential fraud threat or even a fraud

12 review, but when it becomes the fraud department, that's

13 under cyber security umbrella.

14         THE COURT:  What else is under cyber security

15 umbrella, in your definition?

16         THE WITNESS:  In my definition, I believe

17 DarkOwl -- when we first discovered them in 2019, I believed

18 them to also be under cyber security umbrella, like pen

19 testing -- penetration test to make sure, you know, website

20 can't get breached.  I believe that is also under cyber

21 security.

22         I believe any threat that's technology-related

23 could come under that "cyber security" term.

24         THE COURT:  And are services related to

25 penetration testing offered by ArkOwl?

75

1            THE WITNESS:  No.

2            THE COURT:  Are services related to testing of

3    threats -- technology-related threats offered by ArkOwl?

4            THE WITNESS:  The data to stop threats, yes.  So

5    the data to stop the threat of a fraudulent purchase online,

6    yes.

7            THE COURT:  But once a threat is made, further

8    services are not offered by ArkOwl?

9            THE WITNESS:  We do not provide any analytical

10   services or anything past the raw data currently.

11           THE COURT:  Thank you.  Those are my questions.

12           Plaintiff's counsel, do you want to follow up on

13   those at all?

14           MR. HOLT:  No, Your Honor.

15           THE COURT:  Defense counsel?

16           MR. FRASIER:  No, Your Honor.

17           THE COURT:  All right, thank you.  Thank you.

18           Mr. Daline, you may step down.

19           THE WITNESS:  Thank you.

20           THE COURT:  All right, let's go a little bit

21   further before we have a little break here.

22           Does plaintiff have another witness?

23           MR. BUXBAUM:  We do, Your Honor.  Plaintiff would

24   like to call Mr. Mark Turnage, please.

25           THE COURT:  And, Mr. Mark Turnage, I don't think

1    I've got your name right, but you can tell me what it is

2    when you come up here.

3              Raise your right hand.  What is your name?

4              THE WITNESS:  I'm sorry?

5              THE COURT:  What is your name?

6              THE WITNESS:  Mark -- Mark Turnage.

7                        MARK TURNAGE,

8    having been first duly sworn, was examined and testified as

9    follows:

10             THE COURT:  And speak into the microphone.

11             Whenever you're ready, Counsel

12                   DIRECT EXAMINATION

13   BY MR. BUXBAUM:

14      Q.   Good afternoon, Mr. Turnage.  Thank you for your

15   time today.

16             Would you please provide your full name for the

17   Court.

18      A.   Mark Turnage.

19      Q.   Thank you.

20             Are you currently employed, Mr. Turnage?

21      A.   I am.  I'm the CEO and co-founder of DarkOwl.

22      Q.   And could you give the Court a brief background of

23   your education, starting with college.

24      A.   Yes.  I attended the University of Colorado

25   Boulder, studied Arabic at the American University in Cairo,

1   did a graduate degree in Oxford and graduated from Yale Law

2   School.

3        Q.   Did you found DarkOwl?

4        A.   Yes, I did, with my co-founder.

5        Q.   Who is your co-founder?

6        A.   Russ Cohen, who is sitting in the courtroom today.

7        Q.   Could you please briefly explain the circumstances

8   around the founding of DarkOwl.

9        A.   Yes.  In late 2015, early 2016, my co-founder Russ

10  and I bought some software assets out of the bankruptcy of a

11  cyber security services firm here in Denver.  We took those

12  assets, which we bought out of the bankruptcy, and formed

13  DarkOwl.

14       Q.   In general -- and we'll get into more detail in a

15  moment.  In general, what does DarkOwl do?

16       A.   We monitor the dark net for threats that emerge,

17  you know, from the dark net, and we built a platform that --

18  that does that.

19            MR. BUXBAUM:  May I approach, Your Honor.

20            THE COURT:  You may.

21            MR. BUXBAUM:  This is an AEO document.  I don't

22  think we've dealt with this issue yet, but I do think that

23  we agreed that (indiscernible - away from mic).

24            THE COURT:  All right.  So I presume this is an

25  AEO document to which your client, who is on the stand, has

78

1    already had access?

2            MR. BUXBAUM:  Yes.

3            THE COURT:  All right.  And so you're asking that

4    Mr. Daline step out?

5            MR. BUXBAUM:  Yes.

6            THE COURT:  All right.  Mr. Daline, if you would

7    step outside, I'm going to send your counsel out to get you

8    when we're done dealing with this document.  Thank you.

9            MR. BUXBAUM:  I can't see it anywhere.

10       Q.  (By Mr. Buxbaum) Mr. Turnage, do you recognize

11   this document?

12       A.  Not -- I can't see what you're looking at, I'm

13   sorry.

14       Q.  Oh, you don't have one either?  Is it --

15           THE COURT:  Can we put it on the screens for

16   display or not?

17           MS. DANIELSON:  I'm trying, Your Honor.

18           THE COURT:  You're having trouble?

19           MS. DANIELSON:  I think it's frozen now.

20           MR. BUXBAUM:  If I can approach, I can

21   (indiscernible) from the bench.

22           THE COURT:  Sure.  Do you want to sit?

23           THE WITNESS:  I can see it now.

24       Q.  (By Mr. Buxbaum) Would you like a hard copy as

25   well?

1       A.   No.  I'm fine, as long as I can see it on the

2   screen.

3       Q.   Do you recognize this document?

4       A.   I do.

5       Q.   And what is it?

6       A.   I'm sorry?

7       Q.   What is it?

8       A.   It's a company deck that we used in 2018.

9            MR. BUXBAUM:  I would like to offer this as

10   exhibit -- where are we?

11           THE COURT:  As Exhibit --

12           MR. BUXBAUM:  7.

13           THE COURT:  -- 7.  Any objection to 7?

14           MR. FRASIER:  No objection.

15           THE COURT:  7 is received.

16           (Exhibit 7 admitted.)

17           MR. BUXBAUM:  Thank you, Your Honor.

18           THE COURT:  And I'm sorry, I didn't hear what the

19   witness said.  It's a company?

20           THE WITNESS:  Deck

21           THE COURT:  Deck.

22           THE WITNESS:  It's a description of the company.

23           THE COURT:  Flag deck, yeah.  Got it.

24       Q.   (By Mr. Buxbaum) If you could please turn to page

25   2.  And just looking over page 2, is it -- is this a fair

1    overview of what the dark web is?

2        A.   Yes.  And in brief, the Internet is described on

3    this slide as that iceberg.  And the top of it, which is the

4    surface web is where we all spend our time.

5            If you look for something on Google and it returns

6    results, it's coming from the surface web.  The middle part

7    of the iceberg is the deep web.  That's where the bulk of

8    data that's found on Internet is actually stored.  To get to

9    that data, you have to have a password.  So that would be a

10   bank account, details of company network.  This courthouse's

11   own network would be considered part of the deep web because

12   it's -- I cannot access that from my Google search bar.

13           Below that is the dark net and the dark net is

14   where we focus our efforts.  The dark net is considered dark

15   because it requires -- usually requires proprietary browser

16   to get access to.  And once you're in the dark net, user

17   identity is obfuscated and traffic is obscured, so it's

18   become a haven for cyber criminals.

19           MR. BUXBAUM:  Your Honor, I'm sorry, just one -- I

20   don't know who these attendees are, but I think it would be

21   appropriate for them to leave as well.

22           THE COURT:  Yeah.  So gentlemen, I need to ask who

23   you are, because we're talking about some confidential

24   information.  So could you tell us who you are, please.

25           UNIDENTIFIED SPEAKER:  Yes.  He is my dad.  I'm

1    just watching him testify (indiscernible).

2              THE COURT:  Okay.  Any problem with having your

3    son and his friend here?

4              THE WITNESS:  No problems.

5              THE COURT:  All right, fair enough, thank you.

6    Appreciate that.

7              MR. BUXBAUM:  No problem.  Sorry about that.

8         Q.   (By Mr. Buxbaum) Mr. Turnage, just so -- so

9    everyone is clear on terminology, is the dark web and the

10   dark net the same thing?

11        A.   Yes, we use them interchangeably.

12        Q.   We've heard testimony today that the concept of

13   cyber security services is a broad -- a broad concept that

14   encompasses a number of different things.

15             Would you consider DarkOwl to be in the cyber

16   security industry?

17        A.   Yes.

18        Q.   And just broadly, can you tell us what different

19   types of businesses would be in the cyber security industry.

20        A.   Yeah.  It's an incredibly broad term, "the cyber

21   security industry."

22             I mean, the cyber security industry incorporates

23   everything from protecting the data that's on your cell

24   phone to protecting the data that's on your company network,

25   the courthouse.  And it can include the LED lights in room

1   can have cameras in them.  Monitoring those for abuse as

2   part of the cyber security industry.

3           Monitoring threats among hackers is part of the

4   cyber security industry.  Performing tests and services on

5   companies to see if they have exposure is part of the

6   services industry.

7           My -- I believe there are something like 10,000 to

8   14,000 cyber security companies around the world and the

9   diversity of services and technologies they offer is

10  immense.

11      Q.   Is it fair to say that some of those companies

12  compete with each other and some do not?

13      A.   I think that's fair.

14           MR. BUXBAUM:  We can take that exhibit down now

15  and bring Mr. Daline back in.

16           THE COURT:  Thank you.  And would you mind,

17  Counsel, getting Mr. Daline?  Thank you.  You're closer to

18  the door, so . . .

19           MS. DANIELSON:  Yes.

20           THE COURT:  You may.  All right, go ahead.

21           MR. BUXBAUM:  May I approach?

22           THE COURT:  You may.

23      Q.   (By Mr. Buxbaum) Show you a document that

24  hopefully will be marked as Exhibit 8.

25           Go ahead and put that up, if you can.  Is it

1   frozen again?

2          MS. DANIELSON:  I apologize, Your Honor.

3   Plaintiff (indiscernible).

4          THE COURT:  Are you seeing it?

5          MR. BUXBAUM:  I see it.

6          THE WITNESS:  I can see it on my screen.

7          MS. DANIELSON:  And then, Your Honor, on the right

8   it, should say (indiscernible - away from mic).

9          THE COURT:  I'm educable, amazing.  All right, I

10  think we've got it.

11         Thank you.

12     Q.   (By Mr. Buxbaum) This is a document that was

13  marked in discovery as DarkOwl 004368.  Do you recognize

14  this document, Mr. Turnage?

15     A.   I do.

16     Q.   What is it?

17     A.   It's a page from our website talking about the use

18  cases for the dark net data that we collect.

19     Q.   And where it lists seven use cases, is that a fair

20  representation of the core ways in which customers utilize

21  DarkOwl's services?

22     A.   It is.

23     Q.   Let's walk through each of these use cases

24  briefly.

25         MR. BUXBAUM:  Can I offer that as Exhibit 8, Your

1   Honor?

2         THE COURT:  Any objection to 8?

3         MR. FRASIER:  No, Your Honor.

4         THE COURT:  8 is received.

5         (Exhibit 8 admitted.)

6         MR. BUXBAUM:  May I approach?

7         THE COURT:  You may.

8         MR. BUXBAUM:  You can put that up.

9         MS. DANIELSON:  You can just leave it here.

10        THE COURT:  Thank you.

11    Q.   (By Mr. Buxbaum) I am showing you a document that

12   has been marked in discovery as DarkOwl 004376.  Do you

13   recognize this document, Mr. Turnage?

14    A.   I do.

15    Q.   And what is it?

16    A.   It's a part of our website discussing the use case

17   of threat intelligence.

18        MR. BUXBAUM:  Okay.  I would like to offer this

19   into evidence as Exhibit 9, Your Honor.

20        THE COURT:  Any objection to 9?

21        MR. FRASIER:  No, Your Honor.

22        THE COURT:  Thanks.  9 is received.

23        (Exhibit 9 admitted.)

24    Q.   (By Mr. Buxbaum) Mr. Turnage, can you please

25   explain what is meant by "threat intelligence" as a use case

1   for DarkOwl?

2       A.   Yes.  A lot of money has been spent in the cyber

3   security industry protecting networks, protecting devices,

4   protecting phones.

5           Threat intelligence refers to the intelligence of

6   looking outside your company or your organization or your

7   network for threats that are emerging to your organization.

8           So that can include hacker chatter, talking about

9   attacking company's network.  It can incorporate discussions

10  about software vulnerabilities, it can be used to attack a

11  company or an organization to get access to their data.

12  There is a broad variety of uses, but you're looking outside

13  the network for threat data.

14      Q.   And what categories of customers is DarkOwl

15  targeting or used by DarkOwl through this use case?

16      A.   Other threat intelligence providers who would add

17  dark net data to their platform as an enrichment source.

18      Q.   And does this use have any connection to approving

19  a commercial transaction in realtime?

20      A.   No.

21           MR. BUXBAUM:  May I approach, Your Honor.

22           THE COURT:  You may.

23      Q.   (By Mr. Buxbaum) Showing you a -- is it up yet?

24  All right -- a document that was marked in discovery as

25  DarkOwl 004373, do you recognize this document?

```
 1        A.   Yes.

 2        Q.   And what is it?

 3        A.   It's a page from our website.

 4             MR. BUXBAUM:  I would like to offer this into

 5   evidence as Exhibit 10, Your Honor.

 6             THE COURT:  Any objection to 10?

 7             MR. FRASIER:  No, Your Honor.

 8             THE COURT:  10 is received.

 9             (Exhibit 10 admitted.)

10        Q.   (By Mr. Buxbaum) Mr. Turnage, could you please

11   explain what is meant by "third-party risk" as a use case

12   for DarkOwl?

13        A.   Yes.  Third-party risk is the means by which a

14   large organization that has many vendors or many contractors

15   assess the risk of those contractors.

16             And that's important because cyber criminals

17   oftentimes gain access to large organizations, networks,

18   through vendors.  I mean, everybody remembers the case of

19   Target that was breached six or seven years ago, the hackers

20   that got into Target and stole tens of millions of credit

21   cards came through their air-conditioning vendor and it

22   wasn't even a main air-conditioner vendor.  It was an

23   air-conditioning vendor in a small city that they had one or

24   two stores in, but they had access through to the Target

25   accounting network.
```

1          So this is -- there is an entire cyber security

2     industry that's built up to provide companies, like Target,

3     with a cyber risk assessment of all of their contractors and

4     all of their vendors.

5          Q.   What categories of customer is DarkOwl targeting

6     through this use case?

7          A.   The third -- it's called vendor risk or

8     third-party risk companies that provide those risk services.

9          Q.   Does this use have any connection to approving a

10    commercial transaction in realtime?

11         A.   It does not.

12              MR. BUXBAUM:  May I approach, Your Honor.

13              THE COURT:  You may.

14              MR. BUXBAUM:  Put that one up.

15         Q.   (By Mr. Buxbaum) I'm showing you a document that

16    was marked in in discovery as DarkOwl 004361.  Do you

17    recognize this document, Mr. Turnage?

18         A.   I do.  It's another page from our website.

19         Q.   Okay.

20              MR. BUXBAUM:  I would like to offer this into

21    evidence as Exhibit 11.

22              THE COURT:  Any objection to 11?

23              MR. FRASIER:  No, Your Honor.

24              THE COURT:  11 is received.

25              (Exhibit 11 admitted.)

88

1        Q.   (By Mr. Buxbaum) Mr. Turnage, can you please

2   explain to the Court what is meant by "cyber insurance

3   underwriting" as a use case for DarkOwl?

4        A.   Yes.  In -- in the last five to seven years cyber

5   attacks have become so prevalent that most companies today

6   buy cyber insurance policies to cover the costs if they are,

7   in fact, attacked.  The problem that the insurance companies

8   have in underwriting those cyber policies is making an

9   assessment of the risk of the actual companies that they're

10  underwriting.

11        So if two similarly sized banks come in the door,

12  one has spent millions and millions of dollars on hardening

13  their cyber defenses, the other one has not, the cyber

14  companies -- the insurance companies are unable to assess

15  the level of risk.

16        So an entire sector of the cyber security industry

17  has built up, really, in the last five to seven years where

18  these companies assess cyber risk and then -- and then give

19  that data to the underwriter so they can write the insurance

20  policies.

21        Q.   And what categories of customers is DarkOwl

22  targeting through this case?

23        A.   We supply data to the cyber risk company -- the

24  cyber-insured tech companies that are looking in assessing

25  the risk of the companies for underwriting purposes.

1     Q.   And is there any way you can conceive of a

2  connection between this use and approving a commercial

3  transaction in realtime?

4     A.   No.

5          MR. BUXBAUM:  May I approach, Your Honor?

6          THE COURT:  You may.

7     Q.   (By Mr. Buxbaum) I am now showing you a document

8  that was marked as DarkOwl 004363 in discovery.  Do you

9  recognize this document?

10    A.   I do.  It's another page from our website.

11         MR. BUXBAUM:  I would like to offer this into

12  evidence as Exhibit 12, Your Honor.

13         THE COURT:  Any objection to 12?

14         MR. FRASIER:  No, Your Honor.

15         THE COURT:  12 is received.

16         (Exhibit 12 admitted.)

17    Q.   (By Mr. Buxbaum) Mr. Turnage, can you please

18  explain what is meant by "digital identity protection" as a

19  use case for DarkOwl?

20    A.   Yes.  Digital identity refers to your identity, or

21  our identities online and how those can be assessed and

22  whether they can be risk-rated is the use case here.

23    Q.   I notice on the first -- I noticed that the

24  document references PII data.  And specifically, it

25  references 8 billion email addresses?

90

1          A.    That's correct.

2          Q.    Do you see that?

3          A.    That's correct.

4          Q.    Okay.  Can you please explain how email addresses

5    are -- for example, are used within this use case.

6          A.    Yes.  Email addresses by themselves are

7    uninteresting.  And in fact, many email addresses show up in

8    the dark net, for example, on spam lists.  Our clients are

9    interested only in email addresses where they have live

10   active passwords associated with them.

11         Q.    And just to be clear, are any of your customers

12   interested in finding out merely the presence or absence of

13   an email address in the dark net?

14         A.    The presence or absence?

15         Q.    Or absence.

16         A.    No.  In fact, our system is not built to give them

17   that information.

18         Q.    Are you aware of any customers that are using

19   DarkOwl data under this use case, digital identity

20   protection, for PII verification purposes?

21         A.    For PII verification, no.

22         Q.    What categories of customers is DarkOwl targeting

23   through this use case?

24         A.    This is -- actually, almost all of our customers

25   use -- at some level, use digital identity verification to

1   control their environment and their network and access to

2   their network.  But the only way that you can get access to

3   a network is if you have an email that is associated to an

4   actual password.  I can't get -- I cannot get access to your

5   law firm -- law firm's data because I have your email.

6   That's a -- that's a -- it's not a vector for cyber risk.

7        Q.   Does this use have any connection to approving a

8   commercial transaction in realtime?

9        A.   No.  And in fact, we can't actually give this data

10  in realtime.

11            MR. BUXBAUM:  May I approach, Your Honor?

12            THE COURT:  You may.

13       Q.   (By Mr. Buxbaum) I'm going to show you a document

14  that was previously marked in discovery as DarkOwl 004366.

15            Do you recognize this document?

16       A.   I do.  It's another page from our website.

17            MR. BUXBAUM:  I would like to offer this into

18  evidence as Exhibit 13.

19            THE COURT:  Any objection to 13?

20            MR. FRASIER:  No, Your Honor.

21            THE COURT:  13 is received.

22            (Exhibit 13 admitted.)

23       Q.   (By Mr. Buxbaum) Mr. Turnage, can you please

24  explain what is meant by "fraud protection" as a use case

25  for DarkOwl.

1    A.   Yes.  I mean, "fraud" is an enormously broad term,

2  but in the context of the use case for DarkOwl, it's

3  primarily focused on financial fraud.

4         So account -- bank account information that's

5  present and traded, bought and sold in the dark net, credit

6  card information that is bought and sold in the dark net,

7  other types of information.  Increasingly crypto is a major

8  vector of fraud in the dark net.

9    Q.   I notice on this page there is a reference to

10  email addresses, passwords and credit cards, for example.

11         Can you explain how email addresses and passwords

12  are used within this use case.

13    A.   Well, actually, the more important part of this

14  exhibit is the plain text passwords.  That's what our

15  customers are interested in.

16         So what they want to know is, does -- is Mark

17  Turnage's email alongside a plain text password that is live

18  today and can give somebody access to my bank account at

19  U.S. Bank.  That's -- that's the use case here.

20    Q.   Are you aware of any customers that use DarkOwl's

21  fraud protection services as a -- for PII verification

22  purposes for online transactions?

23    A.   No.  And it's not set up -- and our system is not

24  set up to do that.

25    Q.   What categories of customers is DarkOwl targeting

1   through this use case?

2       A.    Other cyber security companies that provide

3   services to financial institutions.

4             MR. BUXBAUM:  May I approach, Your Honor.

5             THE COURT:  You may.

6       Q.    (By Mr. Buxbaum) I am showing you what has been

7   previously marked in discovery as DarkOwl 004030.  Do you

8   recognize this document?

9       A.    I do.  It's another page from our website.

10            MR. BUXBAUM:  I would like to offer this into

11  evidence as Exhibit 14, Your Honor.

12            THE COURT:  Any objection?

13            MR. FRASIER:  No, Your Honor.

14            THE COURT:  14 is received.

15            (Exhibit 14 admitted.)

16      Q.    (By Mr. Buxbaum) Mr. Turnage, can you please

17  explain what is meant by "critical infrastructure" as a use

18  case for DarkOwl.

19      A.    Yes.  So critical infrastructure is one of the

20  prime targets for both cyber criminals and for nation-states

21  that are active in the dark net.

22            In the recent -- in the current run -- Russian

23  Ukraine war, the Russians have targeted, both Ukrainian and

24  western European critical infrastructure with cyber attacks.

25  And so we're talking about power plants, water treatment

1   systems, lighting systems, street grids, stoplight systems,

2   anything that runs -- any infrastructure that could be

3   attacked by a cyber.

4         Q.   What categories of customers is DarkOwl targeting

5   through this use case?

6         A.   This is governments.

7              THE COURT:  I'm sorry, I missed that.  This is --

8              THE WITNESS:  Governments.

9         Q.   (By Mr. Buxbaum) And do you have examples of the

10  types of government agencies that would be a customer or use

11  this as a use case?

12        A.   Yes.  Intelligence agencies are the primary

13  customers for this use case, who are trying to monitor what

14  cyber criminals are targeting, how they're targeting it,

15  what software vulnerabilities they're using.  Is there

16  chatter among those criminals about the -- and those cyber

17  actors?

18             And oftentimes, these are private cyber actors

19  acting on behalf of nation-states.  The Russians are

20  particularly known for that.

21        Q.   Does this use have any connection to approving a

22  commercial transaction in realtime?

23        A.   I don't believe so, no.

24             MR. BUXBAUM:  May I approach, Your Honor.

25             THE COURT:  You may.

1        Q.    (By Mr. Buxbaum) All right.  I am showing you what

2   was marked in discovery as DarkOwl 004370.  Do you recognize

3   this document?

4        A.    I do.  It's another page from our website.

5        Q.    Okay.  And can you please explain what is meant by

6   "national security" as a use case for DarkOwl.

7        A.    Yes.  Increasingly, cyber actors and other

8   nation-state adversaries of the United States are active in

9   the dark net.  I mentioned it in the context of the critical

10  infrastructural deal -- but critical infrastructure use

11  case.  But increasingly, we find national security secrets,

12  discussions that are of import to national security in the

13  dark net.

14            So last year, we were approached by ███████,

15  which is ██████████████████████████  They invested in

16  our company because ████████has a direct need for dark net

17  data for their analyst teams.  So that would be a use case

18  here.

19        Q.    Does this use case have any connection to

20  approving a commercial transaction in realtime?

21        A.    No.

22            MR. BUXBAUM:  Your Honor, I would like to offer

23  this into evidence as Exhibit 15.

24            THE COURT:  Any objection to 15?

25            MR. FRASIER:  No, Your Honor.

1          THE COURT:  15 is received.

2          (Exhibit 15 admitted.)

3     Q.    (By Mr. Buxbaum) Mr. Turnage, other than the seven

4     use cases that we've looked at that are featured on your

5     website -- or on DarkOwl's website, are there any other core

6     use cases for DarkOwl not included in the seven we just

7     discussed?

8     A.    Well, there is a growing use of cryptocurrency in

9     the dark net.  I said that it's a haven for criminal

10    activity.  It's the primary means by which criminals conduct

11    business with each other.

12          So we -- we see a growing use case for monitoring

13    crypto -- use of cryptocurrency in the dark net.  So some of

14    our crypto customers, for example, would want to know

15    whether a bitcoin wallet has been used on a child

16    pornography site and is it used to buy or sell.  And if it

17    has, then they will not reimburse -- they won't convert any

18    of the crypto in that wallet to dollars, or whatever

19    currency they're trying to concert it for.  That's a growing

20    use case that's not outlined on this website.

21    Q.    Okay.  For the categories of customers that

22    DarkOwl targets, what industry sectors are they typically

23    from?

24    A.    Sorry, our customers you're referring to?

25    Q.    Yes.

1        A.   Yeah, sorry.  80 percent of our customers come

2    from that broad category called cyber security industries.

3    We don't generally target end-users: banks, retail, health

4    care.  Those companies generally are not our customers.  We

5    generally target just cyber security -- very sophisticated

6    cyber security customers.

7        Q.   And do you also target customers in sectors of

8    thin tech, though, insurance tech?

9        A.   Yeah.  And I consider the insured tech and thin

10   tech companies to fall under that very broad umbrella of

11   cyber security, because the customers we're targeting in

12   those areas are dealing with cyber risks.

13       Q.   And what portion of your customers would make up

14   government or national intelligence agencies?

15       A.   Directly about 20 percent of our customers are

16   government international intelligence and that number is

17   growing.  And then indirectly, because the number of the

18   cyber security companies that we provide data to have as

19   customers themselves government.  That probably is another

20   20 to 25 percent of our customers.  So overall, 45, 40, 45

21   percent of our customers.

22       Q.   And at these customers, or prospective specific

23   customers, who at those companies is making purchasing

24   decisions?

25       A.   Almost entirely we deal with the C suite.  So

1    either the CEO, the CFO, the CTO or the chief information

2    security officer.  And the reason for that is, the nature of

3    the data that we supply them is so sensitive that we have to

4    be ensured -- we have to be sure that they understand the

5    obligations of dealing with that data.  So almost all of our

6    customers are at the C suite level.

7          Q.   And it probably goes without saying, but are

8    DarkOwl purchasers sophisticated?

9          A.   They have to be to use our data.

10         Q.   Are DarkOwl users sophisticated?

11         A.   They have to be to use our data.

12         Q.   Do you consider DarkOwl's business as niche?

13         A.   It's a very small niche under the large cyber

14   security umbrella, yes.

15         Q.   Okay.  And how many other companies do you think

16   are out there that do roughly what you do?

17         A.   I can probably name them on one hand.

18         Q.   Okay.  We'll come back to that.

19              Mr. Turnage, is there a vetting process for the

20   customers that DarkOwl takes on?

21         A.   Yes.  It's the most painful part of our sales

22   process.  We -- we require that all our customers who get

23   access to our data sign quite comprehensive legal documents

24   that prevent the misuse of that data by them or by their

25   staff.  So my sales team hates it.  They actually get to a

1  point in the process where then the lawyers get involved and

2  they have to go through that.

3          We also turn down probably 30 percent of the

4  inbounds that we get from customers.  We regularly get

5  inbounds from nation-states that are adversarial to the

6  United States.  We don't sell to China, we don't sell to

7  Russia, we don't sell to Iran, we don't sell to North Korea.

8  They either approach us directly or they approach us through

9  shell companies.

10     Q.   And just to be clear, when you talk about being

11  approached by foreign nation-states that may be adversaries

12  of the United States, you're not talking about countries in

13  those companies?  You're talking about representatives of

14  the nation-states themselves?

15     A.   Representatives of the nation-states themselves or

16  private actors acting on behalf of those nation-states that

17  we are able to determine.

18     Q.   Mr. Turnage, when did you first hear of ArkOwl?

19     A.   When I received a letter from ArkOwl demanding

20  that we stop using the DarkOwl brand.

21     Q.   When I say the phrase "PII verification services,"

22  do you know what that means?

23     A.   Broadly, just from looking at the website of

24  ArkOwl.

25     Q.   And so what is your understanding of PII

100

1    verification services?

2        A.   My understanding is that PII verification services

3    in the context of, say, a commercial transaction, looks at a

4    number of data points to allow the merchant to make an

5    assessment of whether or not that's a legitimate transaction

6    or not.

7        Q.   And is it your understanding that ArkOwl performs

8    PII verification services?

9        A.   That's my understanding, yes.

10       Q.   Does DarkOwl consider PII verification a use case?

11       A.   No, and our platform is not built for that.

12       Q.   Why not?

13       A.   I think the prior witness CEO, Mr. Daline,

14   testified that he provides 80 or 100 data points, including

15   things like:  When was this email set up?  Was it set up

16   five minutes ago?  What IP address is this person coming

17   from and so on.  We don't have any of that data.  That's not

18   our -- we don't have any of that data in our system.

19       Q.   Have you encountered ArkOwl in the marketplace?

20       A.   Never.

21       Q.   Has a customer or potential customer ever

22   suggested and wanted to or intended to use DarkOwl for PII

23   verification services?

24       A.   No.  And in fact, I've never had a conversation

25   outside the context of this litigation with anyone else

1    about ArkOwl.  Never heard them mentioned in any context

2    whatsoever by a customer, by a prospect.  I've never seen

3    them at a trade show, I've never seen them at a conference.

4    I've never heard at all any publications or speeches or

5    anything that they've done.

6         Q.   Are you aware of any customer of DarkOwl's using

7    DarkOwl data to perform PII verification services?

8         A.   No.

9         Q.   As CEO, are you familiar with DarkOwl's

10   competitors?

11        A.   I'm sorry, say that again.

12        Q.   Are you familiar with DarkOwl's competitors?

13        A.   Yes, I am.

14        Q.   And who do you consider to be DarkOwl's

15   competitors?

16        A.   Our primary competitors are two companies out of

17   the Israel.  One is called Cyber 6 Skill, one is called

18   Webbs.  Both of them were founded by former Musaad cyber

19   intelligence operative -- officers in Israel; that we

20   compete against a company called Searchlight Cyber based out

21   of the UK.  And here in the U.S. we compete against a

22   company called Bluestone Analytics, which is a subsidiary of

23   a very large defense contractor.

24        Q.   And what is the business focus of those companies

25   that you just listed?

1     A.   It's very similar to ours.  They provide data to

2  cyber security industry and national intelligence agencies.

3     Q.   And do you believe that any of those companies

4  provide PII verification services to support verification of

5  online commercial transactions?

6     A.   Not all, to my knowledge.

7     Q.   Do you consider ArkOwl to be a correct competitor

8  of DarkOwl?

9     A.   No.

10     Q.   Why not?

11     A.   Not a single DarkOwl customer could get from

12  ArkOwl what they get from us, and not a single ArkOwl

13  customer, as I understand from Mr. Daline's explanation, can

14  get from DarkOwl what they get from ArkOwl.

15     Q.   Okay.  Can you explain why you believe that in a

16  little bit more detail?

17     A.   Again, in the case of ArkOwl, ArkOwl has --

18  apparently has access to a wide range of surface web and

19  other datasets that we don't have access to and don't

20  provide our clients.  And in the case of DarkOwl clients are

21  coming -- DarkOwl's clients come to us to get intelligence

22  from the dark net of a wide variety of sorts: hacker

23  chatter, software vulnerabilities that are being sought,

24  bought and sold on the dark net, vulnerabilities that are

25  being discussed amongst hackers as a means to attack the

1   federal courthouse here in Denver and so on.  That is not

2   available, is I understand it, from Mr. Daline's explanation

3   from ArkOwl.

4        Q.   Earlier you heard Mr. Daline testify that some of

5   ArkOwl's direct competitors are Ekata, PIPL, LexisNexis,

6   SEON, Email Hippo and IPQualityScore.  Do you consider any

7   of those companies to be competitors of DarkOwl?

8        A.   No.  In fact, with the exception much LexisNexis,

9   which I know from my days as a lawyer, as a case -- as a way

10  to pull cases, I haven't really heard of many of those

11  companies, or certainly run into them in the marketplace.

12       Q.   Have you heard of a company called Apruvd?

13       A.   No.

14       Q.   Mr. Turnage, was there a time when DarkOwl

15  utilized a third-party marketing service to send out

16  marketing blasts?

17       A.   Yes.  Starting around 2020 we employed -- we

18  wanted to expand the reach of our marketing, so we employed

19  a company that had a team based in the Philippines that did

20  email blasts in an attempt to draw out meetings.

21       Q.   And did DarkOwl approve lists of businesses that

22  the marketing blasts would be sent out to from that

23  third-party agency?

24       A.   No.

25       Q.   Can we please look at the exhibit -- I believe it

1   was Exhibit 6 that was the email from Mr. Cole to

2   Mr. Daline?  How do we -- is it -- Michael, do we have a

3   hard copy?

4          THE COURT:  Yeah, if you need to get that from

5   defense counsel to put it on the screen.

6          MR. FRASIER:  Sure, I can put it on the screen.

7          THE COURT:  That would be great, thank you.

8          MR. BUXBAUM:  I just have a few questions about

9   it.

10          MS. DANIELSON:  Your Honor, may I approach?

11          THE COURT:  You may.

12      Q.   (By Mr. Buxbaum) Do you see that, Mr. Turnage?

13      A.   Yes.

14      Q.   If I could direct your attention to the email

15   toward the bottom part of the page -- I know the print is

16   small, but it says it's from Taylor Sharp to Evan McNiff

17   (ph).  Do you see that?

18      A.   Yes, I see it.

19      Q.   Okay.  Do you see Taylor Sharp's email address, it

20   says Taylor.Sharp@BD.DarkOwl.com?

21      A.   Yes.

22      Q.   Is that -- is that an email from DarkOwl?

23      A.   It is not.  It's from the third-party company that

24   we hired to do marketing at.  The BD stands for business

25   development.

1        Q.  Okay.  And you were not aware of this email being

2  sent to Apruvd; is that correct?

3        A.  That's correct, and Taylor Sharp was not an

4  employee of ours.

5        Q.  Okay.  And you've never heard of Apruvd before?

6        A.  I'm sorry.

7        Q.  And you've never heard of Apruvd before?

8        A.  I've never heard of Apruvd.

9        Q.  And you don't consider Apruvd to be a targeted

10  customer?

11        A.  I don't know enough about them to know whether

12  they would be a targeted customer.

13        Q.  Do you know how many of these types of blast

14  emails would have been sent out through your third-party

15  agent?

16        A.  Many thousands.

17        Q.  Did those generate any business?

18        A.  They did not and we ended up terminating the

19  agency as a result.

20        MR. BUXBAUM:  You can take that down.  Thank you,

21  Counsel.

22        Q.  (By Mr. Buxbaum) Mr. Turnage, DarkOwl uses emails

23  as a search input; is that correct?

24        A.  That's correct.

25        Q.  And how long has it been doing that for?

1  A. Since its inception.

2  Q. Which was when?

3  A. I'm sorry?

4  Q. Which was when?

5  A. 2016.

6  Q. Okay.  And do you believe there was outward facing

7 marketing regarding that?

8  A. There was no question, yes.

9  Q. Okay.  What about the fraud protection use case

10 that we talked about a little bit ago; how long has that

11 been something that DarkOwl has utilized and marketed?

12  A. Since inception.

13  Q. Which is in 2015?

14  A. 2015 -- late 2015 or early 2016.

15  Q. Okay.  And would there have been publicly facing

16 marketing regarding that use case?

17  A. Yes.

18  MR. BUXBAUM:  Thank you, Mr. Turnage.  I have no

19 further questions at this time.

20  THE COURT:  Thank you.  Counsel, it's quarter to

21 4:00.  Let's take a short break now and you may step down,

22 Mr. Turnage.

23  And let's reconvene around 4:00 p.m. and see how

24 much progress we can make at that time.  We'll begin with

25 cross-examination.  Thank you.

107

 1              (Recess taken from 3:44 p.m. to 4:05 p.m.)

 2              THE COURT:  All right.  Ready for

 3    cross-examination, and -- yes, Mr. -- I hope I don't get

 4    your name wrong again.  I should probably remember this.

 5              MR. FRASIER:  Mr. Daline, we're going to be

 6    talking about AEO documents at first, so I'll have you step

 7    out.

 8              THE COURT:  Mr. Turnage.  Mr. Turnage, you may

 9    resume the stand.  We'll have Mr. Daline leave, because

10    we're going to use a confidential document, and whenever

11    you're ready Mr. Frazier.

12              MR. FRASIER:  Thank you, Your Honor.

13                       CROSS-EXAMINATION

14    BY MR. FRASIER:  :

15         Q.   Good afternoon, Mr. Turnage.

16         A.   Good afternoon.

17         Q.   We're going to start broad.  DarkOwl is a SAS

18    company, right?

19         A.   Yes.

20         Q.   Software as a service?

21         A.   That's correct.

22         Q.   DarkOwl is a data company?

23         A.   That's correct.

24         Q.   DarkOwl has a database that it has accumulated

25    from the dark net, right?

1       A.   Correct, primarily from the dark net.

2       Q.   DarkOwl's products allow its customers to search

3  the database that DarkOwl has accumulated, right?

4       A.   Yes.  They can either search the database or they

5  can access to curated data feeds, or structured data feeds

6  of certain types of data.

7            MR. FRASIER:  May I approach, Your Honor?

8            THE COURT:  You may.  Thank you.

9       Q.   (By Mr. Frasier) Showing you what has been marked

10 Exhibit 16.  This is a -- sorry, I'm going to -- I'm showing

11 you what's been marked Exhibit 16.  This is a product

12 training manual; is that right?

13      A.   It looks -- yes, it appears to be so, yes.

14      Q.   I'm going to turn to page 6 of Exhibit 16.  Page 6

15 that I'm showing you right now is a graphic reflecting

16 DarkOwl's existing products and services; is that right?

17      A.   That's correct.  There has been one addition since

18 this chart was put together.

19      Q.   So this -- this chart was accurate as of last

20 year?

21      A.   It was accurate as of last year, correct.

22 Accurate as of about two months ago.

23      Q.   So in the graphic, the black cylinder called

24 DarkOwl Collection represents the data that DarkOwl has

25 aggregated?

1        A.   That's correct.

2        Q.   DarkOwl indexes certain data that it collects,

3   right.

4        A.   That's correct.

5        Q.   DarkOwl indexes email addresses?

6        A.   Among other things, yes.

7        Q.   IP addresses?

8        A.   Yes.

9        Q.   Now, in the middle of the graphic on page 6 there

10   is a box with the writing, Extracted IOCs/Structured Data.

11   Do you see that?

12        A.   That's correct, yes.

13        Q.   IOC stands for indicators of compromise?

14        A.   That's correct.

15        Q.   And the data -- excuse me.  The box that I just

16   referenced is referencing a subdatabase that DarkOwl

17   maintains?

18        A.   Effectively, yes.

19        Q.   And all the data in the Extracted IOC/Structured

20   Database is data that has been indexed?

21        A.   Has been indexed, yes.

22        Q.   The -- this database, the extracted IOC's

23   database, is available to your customers via API, right?

24        A.   That's correct.

25        Q.   The reason DarkOwl created the separate database

110

1    for extracted IOCs is to minimize the amount of noise your

2    customers encounter when running searches; is that right?

3         A.   That's correct.  They can get access to the same

4    data through the far left blue box called Vision API Search,

5    but the structured database gives it to them in a more

6    refined structured format.

7         Q.   The structured data set allows users to get

8    relevant information much more quickly, right?

9         A.   Yes.

10        Q.   The blue box underneath the Extracted IOC's

11   Database called Vision API Entity --

12        A.   Yes.

13        Q.   -- do you see that?

14        A.   Yes, I do.

15        Q.   That represents a product of DarkOwl's?

16        A.   Yes.  The four -- the four lines under that are

17   four separate products.

18        Q.   Okay.  And each of those products allows a DarkOwl

19   customer to search the structure database for the specific

20   item mentioned under vision API entity?

21        A.   Yes, yes.  Effectively, yes.

22        Q.   And then the blue box immediately to its right

23   called Vision API Entity Set allows DarkOwl users to search

24   the same structure database for sets of data --

25        A.   Right.

1      Q.   -- as opposed to just one type?

2      A.   Correct.

3      Q.   For example, the DarkOwl user could use the entity

4  Set API Product to search for every email in your database

5  associated with a given domain?

6      A.   Every email and password.  It doesn't return just

7  emails.

8      Q.   You can't -- a customer couldn't search a

9  password, right?  They could certificate they would search

10 an email?

11     A.   They could search for password as well.  We don't

12 return just emails.  We don't return a red light or a green

13 light present or absent.  We return an email and a password.

14     Q.   I'm asking about input.  So in the --

15     A.   Excuse me?

16     Q.   I'm asking about inputs.

17     A.   Inputs.

18     Q.   So a customer using the Vision API Entity Set

19 would input an email domain and an email --

20     A.   Or an email, yes.

21     Q.   And with an entity set it could search both; is

22 that right?

23     A.   No.  Well, yes, effectively -- so the difference

24 is, if you search for JohnSmith@gmail, you would search in

25 the left-hand box, just so you're looking for one email.  If

1    you were looking for all gmail accounts, you would search in

2    the right box.  That's the input, that's right.

3         Q.   It's your opinion that DarkOwl and ArkOwl are not

4    competitors; is that right?

5         A.   Yes.

6         Q.   Do you believe there is any competitive overlap

7    between DarkOwl and ArkOwl?

8         A.   No.

9         Q.   Now, this document we're looking at is designated

10   as Attorney's Eyes Only.  Is there any reason why ArkOwl

11   would receive a competitive advantage from reviewing this

12   document?

13        A.   I'm not sure and I'm not sure how it -- how at

14   what point in the process it got designated as Attorney's

15   Eyes Only.

16        Q.   Do you care if Mr. Daline hears your testimony

17   regarding this exhibit?

18        A.   I don't actually mind if he hears that testimony.

19             MR. BUXBAUM:  No objection here.

20             THE COURT:  You can go get him.

21             MR. FRASIER:  May I.

22             THE COURT:  Sure.

23             MR. FRASIER:  Thank you, Mr. Turnage.

24        Q.   (By Mr. Frasier) Now, when DarkOwl customers use

25   the vision API entity product to run a search for an email

113

1    address, that user would get back all the surrounding

2    contextual information in the metadata, right

3         A.   No.  It would just get the metadata, the email

4    address and the passwords.  It wouldn't get the contextual

5    information.

6         Q.   It would get when DarkOwl -- when that email

7    address was scraped by DarkOwl?

8         A.   I'm sorry, say that again.

9         Q.   It would -- the user would see when the email

10   address was scraped by DarkOwl?

11        A.   Yes, too.

12        Q.   Where it was found on the dark net?

13        A.   Yes.

14        Q.   Whether it was associated with a data breach?

15        A.   In some cases, yes.  Not in all cases.

16        Q.   It would identify the specific data breach that

17   that email address was --

18        A.   Not currently.

19        Q.   DarkOwl collects data leaks; is that right?

20        A.   I'm sorry.  DarkOwl collects?

21        Q.   Data leaks.

22             THE COURT:  Data links, I think.

23        Q.   (By Mr. Frasier) Data leaks, L-E-A-K-S.

24        A.   Data leaks.  Yes, we do collect data leaks.

25        Q.   And a data leak refers to data that a hacker has

114

1    extracted from inside a computer network?

2         A.    That's correct.

3         Q.    And then reposted or sold; is that right?

4         A.    Reposted or sold, that's correct.

5         Q.    Primarily on the dark net?

6         A.    Well, our focus is primarily on the dark net, but

7    many data leaks are posted on the surface web as well.

8         Q.    DarkOwl has a specific API that monitors surface

9    websites and dark net sites where ransom ware operators

10   breached data?

11        A.    That's correct.  They're called --

12        Q.    We've been using the term "dark net" a lot or

13   "dark web," but there is no one accepted definition of the

14   dark net?

15        A.    Probably not.  There is probably not -- no, I've

16   never heard everybody agreeing to a single definition of the

17   dark net.

18        Q.    Some people would consider peer-to-peer networks

19   as part of the dark net?

20        A.    That's correct.

21        Q.    Do you consider peer-to-peer --

22        A.    I do.  They require proprietary browser to get to

23   and oftentimes user identities are obfuscated, but it also

24   depends on which peer-to-peer networks you're talking about.

25   So, for example, and I can talk on Apple Messenger.  That's

115

1    a peer-to-peer network.  That's not a dark net.

2        Q.   Now, some people would include any password

3    protected website in their definition of the dark net?

4        A.   No, I've never heard that once in my career.

5        Q.   Now, I asked you about your definition of the dark

6    net in your deposition?

7        A.   Correct.

8        Q.   Would you -- would you consider any website that

9    is password protected as part of the deep net?

10       A.   Generally, yes, it's part of the deep net.

11       Q.   But not --

12       A.   Deep net, but not the dark net.

13       Q.   Okay.

14       A.   So the example I gave earlier I think when there

15   was a slide up here, was my bank account information is

16   password protected.  That's part of the deep web, in my

17   definition.  It's not part of the dark net.

18       Q.   Does DarkOwl collect data from the deep net?

19       A.   Very rarely.  The only data we collect from the

20   deep web would be criminal forums that are password

21   protected.

22       Q.   Now, DarkOwl is focused on selling to companies in

23   the cyber security industry?

24       A.   Broadly, yes.

25       Q.   That's your core target market?

```
 1        A.   Broadly yes, yes.

 2        Q.   Many of your customers' aggregate data from a

 3   broad variety of services, including the surface web, deep

 4   web and dark web?

 5        A.   Yes.

 6        Q.   They use DarkOwl's data to enrich other data from

 7   those other sources?

 8        A.   That's correct.

 9        Q.   They then aggregate all the data they acquired for

10   their own customer's use?

11        A.   That's correct.

12        Q.   You mentioned --

13        A.   Sorry, not in every case, but many of them do.

14        Q.   Right.  You mentioned that your customers have to

15   sign a legal document.  That's their end user license?

16        A.   That's correct.

17        Q.   Other than the end user license agreement, DarkOwl

18   has no control over how its customers use the data you

19   provide?

20        A.   Just so we're clear, when you say "control," what

21   do you mean by that?

22        Q.   I would mean, for example, physical control via

23   software that they can search something -- they can use it

24   in one way, but not another way.

25        A.   No.  We have some control -- if that's your
```

117

1    definition, we have some control over how they use the data.

2         Q.   What control do you have?

3         A.   If they're using the user interface, we can

4    monitor all their searches, and if -- for example, if I have

5    Citibank and J.P. Morgan as a client and I see J.P. Morgan

6    searching for Citibank data, we cut them off.  That's a

7    violation of the EULA.  So we have control over that -- in

8    that context.

9              We also have control by the EULA over whether they

10   use the data that we give them to compete with us directly.

11   So I don't want to find one of my clients showing up at a

12   U.S. government agency and competing for my business.

13        Q.   So you have a noncompete in the EULA --

14        A.   It's not a noncompete.  It's a use of data

15   prescription.

16        Q.   And you said EULA, you're referring to the end

17   user license --

18        A.   End user license agreement, excuse me, yes.

19        Q.   I want to make sure we're not talking over each

20   other so that --

21        A.   Yeah, yeah, sorry.

22        Q.   No problem.

23             You referenced a technical control or a physical

24   control via the user interface.  DarkOwl has no way of

25   tracking what your customers are doing via your API

1    products, though?

2        A.   We do not.  We can track volume, what they do, but

3    all of our -- we know what the use cases are, we know what

4    they're using the data for.

5        Q.   Now, DarkOwl has numerous potential use cases for

6    its service?

7        A.   That's correct.

8        Q.   More than just what we looked at earlier this

9    afternoon?

10       A.   Well, I mean, those -- I would say that's a pretty

11   accurate description and that's where we're putting our

12   marketing dollars in terms of use cases.

13       Q.   Those are use cases that you are specifically

14   targeting?

15       A.   Correct.

16       Q.   Now, DarkOwl in the past has had customer

17   prospects ask for things that no other customers of yours

18   were doing?

19       A.   Yes.  I mean, some of these use cases came from

20   customers approaching us, including ███████████ use case

21   when ███████████████ approached us.

22       Q.   Sure.  And there are potential use cases for

23   DarkOwl services that are not currently being utilized by

24   your customers?

25       A.   If there are, would you let me know.  I would love

1    to actually try and monetize those.

2        Q.   In fact, you testified that if you knew about a

3    use case, DarkOwl would be selling or trying to sell into

4    that space?

5        A.   It depends.  It depends on whether we have a

6    competitive advantage in that particular use -- you know, if

7    somebody comes in the door and says, Hey, here is a use

8    case, we would love to buy your data for this use case, it's

9    not that simple.  It's a question of whether we're

10   competitive in that market, whether it makes sense in that

11   market.

12       Q.   What would you do to determine if it made sense in

13   that market?

14       A.   Well, for example, the supplier that Mr. Daline

15   cited earlier today, Have I Been Pwnd, gives away their data

16   for free.  My investors would be quite upset with me if I

17   decided to compete against Have I Been Pwnd?  They give

18   their data away for free.  They give that information away

19   for free.  I don't compete against companies who do that.

20            And by the way, there are a range of other

21   companies in the industry, including Google, Apple and

22   others, who actually monitor for the presence or absence of

23   an email address in the dark net for free.  I don't compete

24   against those companies.

25            So if somebody comes in and says, I'll give you

120

1    $100,000 to buy your data to monitor the presence or absence

2    of an email address in the dark net, ultimately that's not

3    going to be a sustainable client.  They're going to figure

4    out pretty quickly they can get that data for free.

5         Q.   But if there were a use case out there that you

6    discovered, you would be trying to sell to it?

7         A.   I would certainly consider if there was a use case

8    out there that I didn't know about.

9         Q.   Now, I asked you about use cases in your

10   deposition.  Do you recall that?

11        A.   I do.

12        Q.   I asked you:

13             "Do you think there are potential use cases for

14   dark web data -- for DarkOwl customers that are not

15   currently being utilized by your customers?"

16        A.   That's correct, I remember that question.

17        Q.   And you answered:

18             "There may be.  I mean, we have had -- in the past

19   we have had customers, prospects walk in the door, and, you

20   know, ask for things that no other customers are using"?

21        A.   Yeah.  And the example I give today in the court

22   is ███████████████████████████ approached us and they

23   weren't a use case that we were doing.

24        Q.   And then you went on and said:

25             "But I -- it's hard for me to know what those are

1    today because if -- if we -- if I knew about them, we would

2    be serving -- we would be selling or trying to sell into

3    those spaces"?

4         A.    Yeah.  And my definition of a use case is

5    something that's sustainably compatible -- competitive for

6    us.

7              MR. FRASIER:  Your Honor, may I approach?

8              THE COURT:  You may.  Mr. Frazier, did you intend

9    to offer Defendant 16?

10             MR. FRASIER:  Thank you, Your Honor.  I offer

11   Exhibit 16.

12             THE COURT:  All right.  Any objection to 16,

13   Defendant 16?

14             MR. BUXBAUM:  No objection, Your Honor, sorry.

15             THE COURT:  Thank you.  It is received.

16             (Exhibit 16 admitted.)

17        Q.    (By Mr. Frasier) Mr. Turnage, I am not yet showing

18   you the document because it's currently marked as Attorney's

19   Eyes Only.

20        A.    Okay, sorry.  So I'm not supposed to look at this?

21        Q.    No, it's -- you can look at, my client cannot.

22        A.    Oh, sorry.  I thought it was -- okay, sorry.

23        Q.    I will not show you documents that you cannot look

24   at, I promise.

25             MR. FRASIER:  Why don't you step out.

122

1           MR. DALINE:  Can I go to a side where I can't see

2    it or do you want me out?

3           MR. FRASIER:  Why don't you just step out for a

4    minute and we'll see if -- all right.

5           There we go.  We can publish it to the witness.

6      Q.    (By Mr. Frasier) I'm showing you what has been

7    marked Exhibit 17.  Do you recognize this document?

8      A.    I do, I do.

9      Q.    This is a document that DarkOwl uses to onboard

10   new employees?

11     A.    We have in the past.  I haven't seen this document

12   used in awhile to onboard new employees.

13     Q.    This document is also designated Attorney's Eyes

14   Only.  Is this a document that you believe ArkOwl would gain

15   a competitive advantage from?

16     A.    Perhaps.  I would like to see what specific and

17   then we can ask Mr. Daline to step back in.  I just don't

18   know what specifically you're going to question me about in

19   the document.

20     Q.    Okay.  In flipping through this document, the page

21   2 that I'm showing you now is what DarkOwl will look like in

22   2015?

23     A.    Correct.

24     Q.    And then the second -- or the third page, rather,

25   is a description of the product, the features and the data

1    sources that were added in that year?

2         A.    That's correct.

3         Q.    And in each subsequent year DarkOwl added fonts?

4         A.    That's correct.

5         Q.    And each year it added five features as well?

6         A.    Correct.

7         Q.    And it added new data sources?

8         A.    Correct.

9         Q.    And I'm allowed to ask you about each of these.

10        A.    Sure.

11        Q.    On page 16 of 18, this is the same image that we

12   were looking at in the Product Training Manual, right?

13        A.    That's correct.

14        Q.    And you already testified that this graphic

15   doesn't actually represent DarkOwl as of now because you

16   have a new product?

17        A.    We have added one more:  Blue box.

18        Q.    It's called Dark Sonar?

19        A.    That's correct.

20        Q.    And the ransom ware API was added just last year

21   as well?

22        A.    That's correct.

23        Q.    In the last year DarkOwl has also added 14 new

24   search templates?

25        A.    A variety.  I don't know if the exact number is

124

1    14.

2         Q.   They've added several new search blocks this year?

3         A.   That's correct.

4         Q.   In the last year DarkOwl has added hundreds of new

5    channels and servers?

6         A.   That's correct.

7         Q.   Do you know was DarkOwl, this graphic will look

8    for 2024?

9         A.   Broadly similar with some more additions.

10        Q.   Do you know what additions will be in there for

11   2024?

12        A.   I'm just trying to think what will be in 2024 that

13   you would see.  Well, what you would see is a box at the top

14   of the UI, the user interface, which would be a

15   collaboration platform for teams of analysts working

16   together.  And that's at the request of ███████, to build to

17   that collaboration platform so that their analysts can share

18   data among themselves without us being able to see it.

19        Q.   It will also include other data sources that

20   DarkOwl might start using in the next year?

21        A.   Yeah.  If we start collecting from new data

22   sources, it would include those as well.

23             MR. FRASIER:  I offer Exhibit 17 --

24        A.   But that's not shown on this -- data sources

25   aren't shown on this slide.  It would just go into that

125

1   black box at the top.

2       Q.   (By Mr. Frasier) It would show up on -- in the

3   parallel version of what's on --

4       A.   Yeah, if this is updated and used in on boarding,

5   it would show.

6            MR. FRASIER:  I offer Exhibit 17.

7            THE COURT:  Any objection to 17?

8            MR. HOLT:  No objection, Your Honor.

9            THE COURT:  Thank you.  17 is received.

10           (Exhibit 17 admitted.)

11      Q.   (By Mr. Frasier) Now, DarkOwl did not initially

12  target cyber companies?

13      A.   Originally, when we started the business, we

14  targeted for the first year of our operations, we

15  targeted -- we generally targeted Fortune 500 companies.

16      Q.   Prior to 2017 its go-to market strategy was to

17  sell to banks, retail companies and health care companies?

18      A.   Yeah, for about nine months, up until early 2017.

19      Q.   And then what happened in 2017 was that DarkOwl

20  got approached by a cyber security company asking you to --

21  to sell to them, right?

22      A.   Yeah.  What we found was that the Fortune 500

23  companies were not sophisticated enough to use our platform

24  and we were approached by a cyber security company, a threat

25  int- -- an ▮▮▮▮▮▮ threat intelligence company asking if we

126

1    would license our database to their platform, sell them

2    data.

3         Q.    And so this was a potential customer coming to

4    DarkOwl saying, Hey, we want to use your data?

5         A.    Yes.

6         Q.    And then did that cause DarkOwl to pivot -- to

7    focus to selling to cyber security companies?

8         A.    That's -- well, we pivoted because we recognized

9    that if that cyber security company was coming to us and we

10   were struggling in the marketplace with respect to the

11   sophistication of the end-user, if there was an end-user

12   group out there that was sophisticated enough to use our

13   platform, it was other cyber security companies.

14        Q.    Sure.

15        A.    So we pivoted.

16        Q.    You mentioned this in your direct a little bit.

17              But it was late 2020 that DarkOwl hired the

18   third-party vendor to outbound sales generation?

19        A.    I believe -- I believe it was 2020.  I don't know

20   if it was mid, late, early 2020 timeframe.

21        Q.    Okay.  And it was a company called Cieence spelled

22   with a C?

23        A.    C-I-E-E-N-C-E, that's correct.

24        Q.    And you testified that that company sent out

25   thousands of emails per week?

127

1        A.   It did.

2        Q.   Did DarkOwl receive regular reports from Cieence

3   on their sales efforts?

4        A.   Yeah.  What they would send us -- the primary

5   report we received from Cieence was meetings they had set up

6   effectively.  They were compensated not for sending out

7   emails, not for doing any of that, they were compensated if

8   they actually set up a meeting with a prospective client.

9        Q.   Okay.  And you had no visibility on who they were

10   sending their emails to?

11        A.   No.

12        Q.   You had no --

13        A.    In fact, it was a disaster because they sent

14   emails to our customers asking for meetings, which was a

15   complete disaster.

16        Q.   Now, DarkOwl -- you testified that DarkOwl

17   terminated that contract?

18        A.   We did.

19        Q.   But that wasn't until the fall of 2021, correct?

20        A.   That's right.  My -- the woman who was running

21   business development for me went out on maternity leave for

22   a period of six months and we allowed Cieence to continue

23   their efforts; they had minimal success.  And then I -- then

24   there was an uproar from our clients were being approached

25   by this third party, so we terminated them when she came

128

1    back from maternity leave.

2         Q.    Okay.  So you allowed DarkOwl to have this company

3    sending out emails --

4         A.    That's correct.

5         Q.    -- for almost a year?

6         A.    We hired them to do so, yes.

7               Our belief was that they would get better over

8    time, that they would get more focused on understanding our

9    core markets and our target markets, and they did not.

10        Q.    DarkOwl didn't produce emails from Cieence in this

11   case, did it?

12        A.    Produce?  Sorry.

13        Q.    Produce them in the litigation, produce them as

14   evidence in the case.

15        A.    I don't even think we have those emails, actually.

16   We never -- they were a separate stand-alone company.  Like

17   the first time that email that you showed here just now, I

18   had never seen that before, or that messaging, either.

19        Q.    So you had no visibility into the emails or

20   messaging from --

21        A.    I did not personally.  And somebody in our

22   marketing department may have had, but -- but this is the

23   first time I've seen that email.

24        Q.    Okay.  And you don't know whether or not the

25   DarkOwl marketing department was exercising any control over

129

1    the messaging.

2         A.   We didn't have a very large marketing department.

3         Q.   Okay.  That was in the summer of 2021 that DarkOwl

4    hired a new head of sales?

5         A.   Hired?

6         Q.   A new head of sales.

7         A.   Yes, that's correct.

8         Q.   Sorry, I could --

9              MR. FRASIER:  Do you mind getting that?  Pause

10   just for a second while my client gets --

11             THE WITNESS:  Yeah, no problem.

12        Q.   (By Mr. Frasier) All right.  So it was the summer

13   of 2021 that DarkOwl hired --

14        A.   Approximately, yes.

15        Q.   -- hired a new head of sales?

16        A.   Yes.

17        Q.   Okay.  Now, that head of sales eventually changed

18   DarkOwl strategy to focus largely on inbound sales?

19        A.   He tried to, yes.

20        Q.   DarkOwl -- DarkOwl still kept two full-time sales

21   representatives?

22        A.   That's correct.

23        Q.   And those sales representatives were doing

24   outbound sales?

25        A.   Some outbound and then dealing with inbound sales

1   as well.

2        Q.   The shift to primary inbound sales generation in

3   2021 meant DarkOwl focuses its sales efforts on posting

4   content and driving people to DarkOwl's website?

5        A.   It was part of their strategy, yes.

6        Q.   Is that still the strategy today?

7        A.   No.

8        Q.   When did the sales strategy change?

9        A.   We fired them in February of this year and changed

10   the strategy because it wasn't working.

11        Q.   Okay.  Changed to what?

12        A.   We have an outbound strategy that is our primary

13   method of lead generation now.

14        Q.   What is the outbound strategy that you currently

15   have?

16        A.   We identify those companies that we want to target

17   and target the CEO and the C suite for meetings to discuss

18   whether our solution can add value to their product.

19        Q.   And that changed just in the last few months?

20        A.   It changed in January or February of this year.

21        Q.   So in -- for a year in 2020, you're mostly doing

22   outbounds?

23        A.   For a --

24        Q.   From fall of -- from late 2020 to fall of 2021

25   DarkOwl was doing mostly outbound sales generation?

131

1      A.    No.   Inbound.  So from the fall of 2021 through

2   2022, we had -- we added inbound.  And the way you generate

3   inbound leads is by digital marketing, Google or other.

4            So if somebody searches for dark net monitoring

5   on Google, it throws them to our website and we can see them

6   coming in the door through the front door and respond to

7   their needs.

8            What we found was that the level -- the quality of

9   those leads was very, very poor, because our market is

10   extremely small.  It's a very focused market.  And we were

11   not generating leads from large sophisticated cyber security

12   companies; we were generating leads from graduate students.

13      Q.    Okay.  I have a question about another exhibit

14   that is currently marked Attorney's Eyes Only.

15            MR. FRASIER:  Sorry, Rob.  Your Honor, this

16   document is a spreadsheet that I did not print out a digital

17   copy, because you know how they look.  May I just display

18   it?

19            THE COURT:  You may.

20            MR. FRASIER:  Actually, I changed my mind, Your

21   Honor.  I'm starting with what I have a hard copy of.

22            This is Exhibit -- may I approach, Your Honor?

23            THE COURT:  You may.  And this also Attorney's

24   Eyes Only?

25            MR. FRASIER:  Yeah, it is Attorney's Eyes Only.

132

1        Q.    (By Mr. Frasier) Mr. Turnage, you're being shown

2    what's been marked Exhibit 17.  Do you recognize this

3    document?

4        A.    I do.  It's a document that I believe was produced

5    by the VP of sales that we hired.

6        Q.    All right.  Now, this document is currently

7    designated as "Attorney's Eyes Only."  Is this something

8    that ArkOwl could gain a competitive advantage in reviewing?

9        A.    Again, I would love to see the slide before I

10    answer that question, only because I don't remember exactly

11    what's in this deck.

12        Q.    You said this was prepared by the sales director?

13        A.    The (indiscernible) sales director, correct.

14        Q.    Now, it was his job to assign DarkOwl sales reps

15    to particular leads, right?

16        A.    To?

17        Q.    To particular leads.

18        A.    Yes.

19        Q.    Now, this document that we're looking at, Exhibit

20    17, was presented to the DarkOwl sales team?

21        A.    My understanding is -- my recollection is, yes, it

22    was.

23            MR. FRASIER:  I would offer Exhibit 17.

24            THE COURT:  18?

25            MR. FRASIER:  Is it 18?

```
 1              THE COURT:  Yes, it's 18.

 2              MR. FRASIER:  Thank you.

 3              THE COURT:  Any objection to 18?

 4              MR. HOLT:  No objection, Your Honor.

 5              THE COURT:  All right, 18 is received.

 6              (Exhibit 18 admitted.)

 7         Q.   (By Mr. Frasier) I'm going to flip to page 5 of --

 8    it would be 4 of the paper copy where it says, "Key Prospect

 9    High Level."

10              Do you recognize this page?

11         A.   I do.

12         Q.   Now, on the titles on the right hand in the dark

13    blue are titles -- are titles of the DarkOwl's target

14    market; is that right?

15         A.   In the -- in the views of the VP.  He had been

16    with the company about a month and put together, this was

17    his thinking at the time.

18         Q.   Do you agree with these titles being DarkOwl's

19    target market?

20         A.   Broadly, yes.  I mean, VP of engineering is not

21    usually a target for us.  VP of engineering doesn't have

22    binding authority for the type of product that we do.

23         Q.   But, generally speaking, the dark box contains --

24         A.   Generally speaking, yes.

25         Q.   Okay.  I'm flipping down to -- I'm not going to go
```

134

1    to this page.  I think we all hated this graphic.

2         Turning to page 18 of the physical copy, this is,

3    bottom marked DarkOwl 001327.

4         Now, the head of sales created the list appearing

5    on this page to identify potential customers of DarkOwl,

6    right?

7         A.   That's correct.

8         Q.   The list includes actual DarkOwl customers as

9    well?

10        A.   Yeah, which is -- it showed how little familiarity

11   he had with our business.  These are his target lists and it

12   includes people who are already customers of ours.

13        Q.   Now, he also included on this document Email Age?

14        A.   I'm sorry, say that again.

15        Q.   He included on the targets, the addressable

16   markets, a company called Email Age?

17        A.   I don't see it.  If you could point it out to me,

18   that would be great.

19        Q.   It's in the Fraud Detection, Dark Net

20   Quantification Box.

21        A.   Yeah.

22        Q.   Right there:  He included PIPL?

23        A.   I see it to the left of Email Age.

24        Q.   Included Ekata?

25        A.   I don't see it, but I can take your word for it.

135

```
1          Q.   Included GBG Identity Verification Solutions?

2          A.   I assume you're correct that it's on that list

3     somewhere.  Oh, there it is, right in the middle.

4          Q.   Good eye.

5          A.   It's -- yeah, small text.

6          Q.   Now, I will show you the spreadsheet I referenced

7     earlier.

8               MR. FRASIER:  I'm sorry, did I offer that as an

9     exhibit?  I think I did.

10              THE COURT:  You did not offer -- oh, yes, you

11    offered 18.  This has been received.

12              MR. FRASIER:  Yes, thank you.

13         Q.   (By Mr. Frasier) I'm showing you what was marked

14    as a Deposition Exhibit 12.

15              THE COURT:  Are you going to offer this into

16    evidence, Mr. Frasier?  If so, we'll call it Exhibit 19 --

17              MR. FRASIER:  Okay.

18              THE COURT:  -- for purposes of today.

19              MR. FRASIER:  Thank you.

20         Q.   (By Mr. Frasier) Now, the document we're looking

21    at, Exhibit 19, is also a document created by the head of

22    sales, correct?

23         A.   That's my recollection, yes.

24         Q.   And you produced in this case the most updated

25    version of this document?
```

136

1     A.   My guess is that -- was this -- just so I'm clear,

2   was this separate from the deck you were just showing me?

3     Q.   Yes, this is -- yes.

4     A.   Okay.  I haven't seen this document updated since

5   this document was put together by him, so I assume you had

6   the most updated version.

7     Q.   Now, DarkOwl used this document to inform your

8   website redesign in late 2021 or early 2022?

9     A.   To in part, yes.

10     Q.   I'm going to click on the third tab on the bottom

11   called Big Data Targets.  On the top line of tab 3 are names

12   of DarkOwl's sales people, correct?

13     A.   That's correct.

14     Q.   Both rows 3 and 4 are DarkOwl sales reps?

15     A.   That's correct.

16     Q.   Now, the person who created this, it was his job

17   to assign sales reps to leads?

18     A.   This was his first attempt, yes.

19     Q.   And this was the most updated version of this

20   document?

21     A.   It was only used for a while and it was

22   realized -- what he did was he collected names from the

23   Internet of these companies.  And in many cases, the use

24   case was nonsense; it didn't exist.

25     Q.   But tab 3 is a list of companies -- your head of

137

1   sales at the time believed to be DarkOwl potential

2   customers?

3        A.   At the time, yes.  He had just joined the company

4   and he compiled this list of companies from the Internet and

5   assigned the salespeople to go after them.

6        Q.   And it included some of DarkOwl's prospects that

7   you were chasing at the time?

8        A.   I can't actually -- I don't know if that was the

9   case or not.  Probably.  I mean, looking at -- but again,

10  just to put this in context, on this list are clients of

11  ours.  So why would you assign companies to salespeople

12  who -- when they're already clients?

13       Q.   Now, C28 in green, ███████████████████?

14       A.   Yep.

15       Q.   Subsequently became a DarkOwl customer?

16       A.   That's correct.

17       Q.   All right.  Now, in G49, ██████████████ also

18  became a DarkOwl customer?

19       A.   That's correct.

20       Q.   And it's your best guess that the names in the

21  parens after the companies indicated the salesperson has

22  been assigned to go after that company?

23       A.   I think that -- my guess -- my best guess is that

24  they were in conversation and he has acknowledged -- they

25  were already in conversation and he acknowledged that

1    they're already there.

2         Q.   Now, E82 includes PIPL (███████), do you see that?

3         A.   Yep.

4         Q.   Do you know if DarkOwl was engaged in

5    conversations with PIPL when this document was created?

6         A.   I don't know.

7         Q.   But it's included on the --

8         A.   It's included on the list, but I don't know if

9    Jessica was talking to PIPL.

10        Q.   All right.  E98, your head of sales identified

11   Signifyd as a potential DarkOwl customer?

12        A.   Yeah.  He's on -- it's on his list that he pulled

13   from the Internet.

14        Q.   And in F107, Interceptis (ph) by Accertify, right?

15        A.   I see it on the list, yes.

16        Q.   Now, F8 included the Actimize platform?

17        A.   Sorry, your -- your screen is over your -- it's

18   Actimize, yes.  That's on the spreadsheet.

19        Q.   All right.  And in F157 included SEON, S-E-O-N?

20        A.   It's right there on the spreadsheet.

21        Q.   F30, he included Sitcon (ph), right?

22        A.   That's correct.

23        Q.   And he included Email Age?

24        A.   That's correct.

25        Q.   Feeds Eye (ph)?

1        A.    That's correct.

2        Q.    Frogster on F98?

3        A.    Yes.

4        Q.    GBG Identity Verification Services on F100?

5        A.    Yes.

6        Q.    Riskified (ph) on F150?

7        A.    Yes.

8        Q.    Sift Science (ph) on F160?

9        A.    Yes.  And none of them became customers.

10       Q.    Do you know whether DarkOwl reached out to any of

11   the customers?

12       A.    I don't know if it reached out to them and none of

13   those are customers of ours today.

14       Q.    All right.  Now, I just want to make sure that

15   we're -- that you let me finish my question before you start

16   answering your question.

17       A.    Yes.

18       Q.    We're just about done.

19            MR. FRASIER:  I would like to offer Exhibit 19

20   into evidence.

21            THE COURT:  Any objection to 19?

22            MR. HOLT:  No objection, Your Honor.

23            THE COURT:  Thank you.  19 is received.

24            (Exhibit 19 admitted.)

25            MR. FRASIER:  Your Honor, I would like to confer

140

 1    with opposing counsel just for a second on exhibits.

 2             THE COURT:  Sure.

 3             (Counsel confer.)

 4             MR. FRASIER:  Thank you for your patience.  I have

 5    a series of one- or two-page documents that we have agreed

 6    to combine into one exhibit to streamline things, so it will

 7    just take me a second here.

 8             Thank you again for your patience.

 9             Your Honor, may I approach.

10             THE COURT:  You may.

11        Q.   (By Mr. Frasier) All right.  You mentioned

12    Cieence, the outbound sales generation company.

13        A.   I believe you mentioned them.  But, yes, we've

14    spoken about them.

15        Q.   I'm showing you what's been marked as Exhibit 20.

16    We can walk through it.  It's a series of emails.  So I'll

17    start with this one marked as Bates ending in 136.

18             Do you recognize this document?

19        A.   No.

20        Q.   Now, this is an email from Cieence on behalf of

21    DarkOwl; is that right?

22        A.   Apparently so.  I mean, everything looks like it's

23    from Cieence too.

24        Q.   Okay.  And the document marked -- this is not in

25    order -- 144 is also an email from Cieence on behalf of

141

1    DarkOwl?

2         A.   It appears so, yes.

3         Q.   And the document marked 145 is also an email from

4    Cieence on behalf of DarkOwl?

5         A.   It looks so, yes.

6         Q.   And the email 147 is also an email on behalf of

7    DarkOwl from Cieence?

8         A.   Yes, it looks.

9         Q.   And 148 is also an email from Cieence on behalf of

10   DarkOwl?

11        A.   It looks so, yes.

12        Q.   149 is also an email on behalf of DarkOwl from

13   Cieence?

14        A.   Yes.

15        Q.   150 is also an email from DarkOwl on behalf --

16        A.   Yes.

17        Q.   -- or Cieence on behalf of DarkOwl?

18             158 is the same?

19        A.   Yes.

20        Q.   All right, I believe that's all of them.  I'm

21   happy to flip through any of these if you have questions

22   about specifics.  I am not going to ask specifics about any

23   one email.

24             But the series of emails that we're looking at

25   now, the Exhibit 20, are all solicitations on behalf -- on

142

1    behalf of DarkOwl; is that right?

2         A.    Yes, by Cieence on behalf of DarkOwl.

3         Q.    Now, these were all directed to a company called

4    Signifyd; is that right?

5         A.    They appear to be, yes.

6         Q.    Okay.  And Cieence had Taylor Sharp sending

7    emails?

8         A.    Taylor Sharp is I think a made-up name.  They were

9    all Philippino employees of Cieence who were doing this.  I

10   think they made Anglicized names.

11        Q.    And they contacted multiple different people at

12   signified; is that right?

13        A.    I think their strategy was to -- where they could

14   get emails addresses from -- multiple emails addresses from

15   cap, they would target them.

16        Q.    Now, this document was produced in response to a

17   subpoena to Signifyd, correct?

18        A.    I would have to ask my attorneys that question,

19   but I would assume so.

20        Q.    DarkOwl doesn't have the emails that Cieence sent

21   on behalf of DarkOwl?

22        A.    No, we did not.  We never preserve those emails.

23        Q.    Okay.  And all of these emails were Cieence trying

24   to solicit business for DarkOwl?

25        A.    Trying to get a meeting.

143

1       Q.   For business?

2       A.   For business.

3       Q.   Okay.

4            MR. FRASIER:  I have no further questions.

5            THE COURT:  Do you want to offer 20?

6            MR. FRASIER:  Yes, I do.  Thank you, Your Honor.

7            THE COURT:  Is there any objection to 20?

8            MR. HOLT:  No objection, Your Honor.

9            THE COURT:  20 is received.

10           (Exhibit 20 admitted.)

11           THE COURT:  Is there any redirect?

12           MR. HOLT:  No redirect, Your Honor.  And I was

13   hoping that I could have maybe five minutes caucus with

14   opposing counsel.  We're running short on time and we have a

15   number of witnesses that have flown in and we would love to

16   pack everything in.  We're willing to make some concessions

17   if we can come to some agreements.

18           THE COURT:  You may do that.  Let me just tell

19   counsel that to the extent that you need more time for the

20   hearing, just so that everybody isn't freaked out, I do have

21   availability this week, because I had a case of a separate

22   trial on Wednesday that settled this morning.  So there is

23   some availability on my calendar on Wednesday.  I know that

24   may not be convenient for everybody else, but I wanted to

25   throw that out there.

144

1          But if you would like to caucus for five minutes,

2     I'll take a brief recess.

3          MR. HOLT:  That would be great.

4          THE COURT:  Thank you.

5          (Recess taken from 4:53 p.m. to 5:00 p.m.)

6          THE COURT:  All right.  We're back.  Are we

7     finished with the examination of Mr. Turnage?

8          MR. FRASIER:  I am.

9          MR. BUXBAUM:  We are, yes.

10         THE COURT:  All right, thank you.  Mr. Turnage may

11    step down.  He's already stepped down.  All right, where do

12    you want to go next?  Does plaintiff have any additional

13    witnesses?

14         MR. BUXBAUM:  Your Honor, no additional fact

15    witnesses from the parties, but we're looking at one hour.

16    I guess we have a hard stop at 6:00.  We've got three

17    witnesses, and we're trying to come up with a schedule that

18    works.  It's going to be pretty tight, but --

19         THE COURT:  And you actually don't have a full

20    hour.  I have to have you at the doors at 6:00.

21         MR. BUXBAUM:  Okay.

22         THE COURT:  So, you know, you've got to wrap up in

23    the courtroom by, what, five minutes of or something.

24         MR. BUXBAUM:  So I guess with that in mind, if we

25    can be cooperative and just walk through the best --

```
1              MR. FRASIER:  Yeah.  I mean, I'll try to keep my

2    direct of our expert.  So, Your Honor, we have one more fact

3    witness I'm going to call, very short, and then I will do

4    the direct of our expert and they'll do a cross, and then

5    they'll do a direct of their expert and I'll do the cross.

6              THE COURT:  Okay.

7              MR. FRASIER:  I'll try to my limit my directs to

8    ten minutes.

9              THE COURT:  Okay.  And I appreciate your reference

10   to collaborate.  And I'm not trying to be at all dismissive

11   of those efforts, but I'm telling you, we're not going to

12   get done by ten minutes of 6:00, right?  I mean, it's very

13   unlikely we're going to get done by that time.

14             And I also am a little concerned about rushing

15   you --

16             MR. FRASIER:  Sure.

17             THE COURT:  -- and having you feel like you're not

18   getting a full opportunity to present everything you want to

19   present.  So -- and I understand how inconvenient it is for

20   everybody to come back and there is a witness from out of

21   town, et cetera, et cetera, but I think we have to get real

22   about spending some time to reschedule the remainder of this

23   hearing and talk about that for a minute.

24             I just don't see any way you're going to get done

25   with the amount of witnesses you need to call.
```

1          MR. BUXBAUM:  Well, Your Honor, we have two expert

2    witnesses that have flown in.  Our expert is flying to

3    Houston for a trial immediately after this, so it's going to

4    be really difficult.  With that in mind, can I caucus with

5    plaintiff's counsel again and see what we can do.

6          THE COURT:  Yeah, why don't you see if you can

7    reach some agreement.  I mean, if you want to, I can have my

8    courtroom deputy look at my calendar and tell you every

9    available block of time that I have between now and the day

10   that I retire, which is August 4, to finish this hearing.

11   You know, we've got a trial date next month so we want to

12   try to get this done prior to the trial, but, you know, if

13   we don't get this done, there is a chance that the trial

14   would have to be moved as well, and I don't want to put you

15   in that position either.

16          So, you know, if you want to take a minute to look

17   at my schedule and think about my schedule, I think it would

18   be best.  I don't think there is -- I cannot keep you in the

19   building after 6:00.  That's when the security officers

20   leave, and if I could go until 9:00 p.m., I would go until

21   9:00 p.m., but I can't do it.  So we don't have any choice.

22   And I'm telling you, with the amount of back and forth that

23   you've indicated in the number of witnesses, very little

24   chance we're going to get done by 6:00.

25          MR. FRASIER:  Your Honor, before we caucus would

147

1  Your Honor be open to taking -- to taking some testimony by

2  Zoom for the --

3          THE COURT:  Sure.  I mean, you know, specially if

4  counsel agree and there is no objection, we could have

5  witnesses testify by video.  We did that entirely in COVID

6  times, as you well know.  So that's always a possibility as

7  well.

8          I mean, it also may ease a little bit of your

9  worries about getting this done today.  We don't necessarily

10  have to have your experts fly in here from out of town to be

11  in here in person.  I understand you prefer that.  I prefer

12  that too, but honestly to get this done, that may not

13  believe possible.

14          So something to think about.

15          MR. BUXBAUM:  Can you give us two minutes.

16          THE COURT:  Yeah, go ahead.  I'll sit right where

17  I am, try not to listen.

18          MR. BUXBAUM:  Your Honor, in the Zoom situation

19  that we would still have some people in court or would it be

20  all.

21          THE COURT:  Sure.  You can do it however you want.

22  If you've got folks who can be present in the courtroom,

23  that's fine with me.

24          MR. BUXBAUM:  Or, we could do (indiscernible -

25  away from mic).

1          THE COURT:  Yeah, I understand that.

2          MR. BUXBAUM:  We could do it all by Zoom.

3          THE COURT:  You could, you could do it all by

4    Zoom.  I mean, it's not ideal, but we can do it that way if

5    we have to.  And frankly, when it comes to counsel, I'm very

6    reluctant to allow, for example, plaintiff's counsel to be

7    present in the courtroom and not defense counsel.  I mean,

8    if some counsel are not going to be able to be present in

9    person, I'm more likely to say no counsel are present in

10   person.

11         MR. BUXBAUM:  As you may recall, from when we were

12   trying to schedule this, you know, with the experts

13   traveling all around all the time, that's their job, you

14   know, and we've got -- I know my colleague and I have a

15   mediation in Spokane in a couple weeks, and I know you have

16   concerns about getting us all in.  We'll see what Tom and

17   Mike talk, discuss.

18         THE COURT:  Yeah.  I mean, you know, you can

19   always withdraw the motion.

20         MR. BUXBAUM:  We're not going to withdraw the

21   motion.

22         THE COURT:  I said it in jest.

23         (Pause in the proceedings.)

24         MR. HOLT:  Your Honor, I think we have a plan to

25   proceed.

149

1          THE COURT:  All right, what's the plan?

2          MR. HOLT:  We're going to call -- I'm sorry,

3     defendant's counsel is going to call Mr. Cohen, CFO of

4     DarkOwl.  It's about a ten-minute examination.  I doubt

5     we'll have anything for cross, and then we're going to put

6     our rebuttal expert, Hal Poret.  He's got a trial coming up

7     and he's just going to be unavailable in the near term, and

8     we'll try to get to Mr. Kegan.  If we cannot, then we'll do

9     a follow-up Zoom hearing, if that's okay.

10          THE COURT:  All right, let's try it.  Mr. Cohen.

11                        RUSSELL COHEN,

12     having been first duly sworn, was examined and testified as

13     follows:

14          MR. FRASIER:  Thank you, Your Honor.  Appreciate

15     the flexibility from everybody here.

16                      DIRECT EXAMINATION

17     BY MR. FRASIER:  :

18          Q.   Mr. Cohen, you are DarkOwl's president and CFO,

19     right?

20          A.   Correct.

21          THE CLERK:  I'm sorry, Counsel, I need the

22     witness' name.

23          Q.   (By Mr. Frasier) Could you please state your full

24     name.

25          A.   My full name is Russell Cohen.

1          THE CLERK:  Thank you.

2          Q.   (By Mr. Frasier) And you're the president and CFO

3    of DarkOwl

4          A.   Yes, and co-founder.

5          Q.   You're constantly trying to describe who could use

6    DarkOwl's data in different ways, right?

7          A.   Yes.

8          Q.   And over time DarkOwl would emphasize some types

9    of potential customers over other types of potential

10   customers?

11         A.   For marketing purposes, sure.

12         Q.   You would agree that DarkOwl's data could be used

13   in myriad of ways?

14         A.   Yes.

15         Q.   In fact, DarkOwl's enterprise customers use its

16   data in many different -- for many different purposes?

17         A.   Correct.

18         Q.   Sometimes they use DarkOwl's data in ways that are

19   surprising?

20         A.   Yes.

21         Q.   The market for dark net data service is not yet

22   commoditized?

23         A.   Correct.

24         Q.   And you agree that DarkOwl is still learning what

25   your core market is about and what customers want from that

151

1   core market?

2        A.   We're getting better, but, yes.

3        Q.   Now, DarkOwl's potential market is large, isn't

4   it?

5        A.   I believe so.

6        Q.   It's more than a thousand potential customers?

7        A.   How many governments are there?  Sure.

8        Q.   You said there are many thousands of potential

9   customers?

10       A.   Sure.

11       Q.   In fact, DarkOwl tries to sell to everybody who

12   touches on the broader cyber security space?

13       A.   That's overly general, but we try to sell to

14   people who hire sophisticated cyber security experts.

15       Q.   Now, you recall giving your deposition in this

16   case, right?  You recall me asking you questions in your

17   deposition?

18       A.   Yes.

19            MR. FRASIER:  Could we turn on the

20   (indiscernible).

21       Q.   (By Mr. Frasier) I was asking you about an exhibit

22   and where you would put DarkOwl in any of the categories in

23   the exhibit and you said:

24            "I would broadly say that we sell to everybody.

25   We try to sell to everybody with -- who touches the broader

152

1    cyber security space, which is what this is trying to

2    describe."

3              Is that right?

4         A.   What line are we on?  Oh, okay, towards the

5    bottom.

6         Q.   Starting at line 15.

7         A.   Yeah.  What is the exhibit?

8              THE COURT:  The question is:  Did you say that in

9    your deposition?  I can read it.

10        A.   Yes, I said it.

11             MR. FRASIER:  Mr. Cohen, I have no other questions

12   for you.  Thank you.

13             THE COURT:  You're done?

14             MR. FRASIER:  Yes, I'm done.

15             THE COURT:  Oh, I'm sorry, I didn't hear that.

16   All right.  And there is no cross-examination?

17             MR. BUXBAUM:  No questions, Your Honor.

18             THE COURT:  Mr. Cohen, you may step down.  All

19   right.  And does the plaintiff have any additional

20   witnesses?

21             MR. BUXBAUM:  Expert witnesses only.

22             THE COURT:  All right.

23             MR. BUXBAUM:  We would like to call Hal Poret.

24                          HAL PORET,

25   having been first duly sworn, was examined and testified as

1   follows:

2           THE COURT:  Whenever you're ready, Mr. Buxbaum.

3                    DIRECT EXAMINATION

4   BY MR. BUXBAUM:  :

5       Q.   Good afternoon, Mr. Poret.  Would you please state

6   your name for the Court.

7       A.   Hal Poret.

8       Q.   Mr. Poret, are you currently employed?

9       A.   Yes, I am.

10      Q.   What is your job and title?

11      A.   I run my own survey research company.

12      Q.   Mr. Poret, could you briefly give us an overview

13  of your educational and career background?

14      A.   Sure.  I have a bachelor's in math and a master's

15  in math and then I also have a law degree from Harvard Law

16  School.  For the past 20 years I have worked in the field of

17  survey research, designing and conducting well over a

18  thousand surveys, both in the area of regular corporate

19  market research and then also in connection with legal

20  matters, such as this.

21          I work for another market research company for a

22  while, but since 201 I've run my own survey research

23  company.

24      Q.   Thank you.  Mr. Poret, were you retained as an

25  expert witness by DarkOwl in this case?

154

1        A.   Yes.

2        Q.   And what was purpose of your engagement?

3        A.   I was initially asked whether I could do my own

4   survey, but for various reasons after looking into it, felt

5   that I -- I didn't feel that I could reliably reach the

6   proper universe in a case like there and feel confident that

7   I had done a proper survey, so I indicated that I couldn't

8   do that and I was ultimately then retained to review and

9   analyze Mr. Kegan's survey.

10       Q.   And why didn't you believe you could reach a

11  proper universe of respondents to prepare your own

12  likelihood of confusion survey?

13       A.   Because when I looked into and came to understand

14  what DarkOwl is, what DarkOwl does and, you know, what its

15  services are and thought about who are the customers that I

16  would have to try to reach, I realized this -- these are

17  very sophisticated, complex services being marketed to very

18  sophisticated organizations and you -- you know, to be able

19  to reach people who are relatively high level, sophisticated

20  positions in sophisticated organizations and get them to

21  participate in a survey is -- is extremely difficult.

22            And most surveys that we do are done using general

23  consumer panels and I certainly -- it was instantly obvious

24  that it would be impossible to reach this universe through a

25  general consumer panel.  You can't just cast a net out into

1    the street and hope you're going to hit people who are, you

2    know, officers at sophisticated organizations who would

3    contract for services like DarkOwl.  So that certainly

4    wouldn't work.

5            And I considered trying to use a specialty

6    business panel that maybe would be able to reach this

7    particular niche, but when I looked into it, I ultimately

8    didn't feel confident that I would be able to reach people

9    who were truly prospective DarkOwl customers, even using a

10   specialty business panel.

11       Q.   And so you were engaged as a rebuttal witness?

12       A.   Yes.

13       Q.   And did you prepare a rebuttal report?

14       A.   Yes, I did.

15            MR. BUXBAUM:  Your Honor, may I approach.

16            THE COURT:  You may.

17       Q.   (By Mr. Buxbaum) Do you recognize this document,

18   Mr. Poret?

19       A.   Yes, this is my rebuttal report.

20            MR. BUXBAUM:  Okay.  I would like to offer this

21   into evidence as Exhibit 21.

22            THE COURT:  It is.  Any objection to 21?

23            MR. FRASIER:  No, Your Honor.

24            THE COURT:  21 is received.

25            MR. BUXBAUM:  Thank you, Your Honor.

1          (Exhibit 21 admitted.)

2      Q.   (By Mr. Buxbaum) Mr. Poret, what was your ultimate

3   conclusion regarding the liability of Mr. Kegan's survey?

4      A.   It was that it was too severely flawed in a number

5   of critical ways to have any value or reliability on the

6   topic of likelihood of confusion.

7      Q.   If I could direct your attention to page 6 for

8   just a moment, a line or two down from the top, you say,

9   "Critical aspects of the Kegan survey design are based on an

10  inaccurate characterization that the parties offer

11  essentially the same type of service and that such service

12  are directly competing alternatives."  Did I read that

13  correctly?

14     A.   Yes.

15     Q.   And could you please explain what you meant by

16  that and why you said it?

17     A.   Well, sure.  In -- in designing a survey and

18  explaining it, Mr. Kegan essentially indicated that he

19  believes these are parties that are directly -- directly

20  competing and serve the same marketplace and that,

21  therefore, let him to select the -- the wrong universe,

22  assuming that DarkOwl's potential customers are essentially

23  the same as who ArkOwl's potential customers are, and it led

24  him to select methodology that assumes that it would be

25  appropriate to ask the same individuals to review ArkOwl's

1    website and DarkOwl's website in close proximity when that

2    would only be appropriate if they really were directly

3    competitive alternative services or so overlapping that the

4    same consumer would in the real world actually consider

5    those things in close proximity.

6         Q.   Looking at page 2, the bottom paragraph, if I

7    could direct your attention to that.  Does that bottom

8    paragraph reflect a summary of your opinion on the flaws in

9    the survey?

10        A.   Yes.

11        Q.   Can you please just read the 1 and 2 in that

12   paragraph?

13        A.   Sure.  Number 1 is serious flaws in the screening

14   questions, prevented the survey from accurately identifying

15   members of the relevant universe.  And Number 2 is even to

16   the extent the survey included some members of the relevant

17   universe, the survey construct failed to obtain a sample

18   that is representative of the universe.

19        Q.   Could you please explain the role of screening

20   questions in a survey in general?

21        A.   Yes.  The screening questions need to reliably

22   identify the person taking the survey as a prospective

23   customer of the relevant service, which in this instance

24   works be DarkOwl's service.

25        Q.   And for this case, what sort of respondents would

1    comprise an appropriate universe?  I think you just answered

2    DarkOwl customers?

3        A.   That people would be in the relevant universe if

4    they said they are actual or prospective customers of the

5    type of service that DarkOwl offers, which we've heard

6    described today and is a dark -- a dark web of searching and

7    cataloging or indexing the service.

8        Q.   And what was your ultimate opinion regarding the

9    screening questions that Mr. Kegan used in his survey?

10       A.   That they were extremely overbroad and inaccurate

11   and could not have led to identifying the relevant universe.

12   And in fact, there is no way to know whether even a single

13   person who took the survey is in the relevant universe.

14       Q.   Okay.  Let's look at the first substance screening

15   questioning.  If you could turn to page 9 in -- or direct

16   your attention to page 9.  What was the first substantive

17   screening question that Mr. Kegan used in the survey?

18       A.   It asked which, if any, of the following types of

19   services do you personally use as part of your job

20   responsibilities and it offered a number of choices, and the

21   respondent needed to select the choice data services in

22   order to continue with the survey.

23       Q.   So just to be clear, if -- if they selected any of

24   the other answers other than data services they were

25   excluded, but if they said they do use data services, that

159

1    was sufficient to move through to the next stage of the

2    survey?

3         A.   It's if they did select data services, they moved

4    through.  If they did not, they would be terminated.

5         Q.   And do you believe that that screening question

6    was flawed?

7         A.   Yes.  The term "data services" is so overbroad as

8    to encompass so many different things that have nothing to

9    do with what DarkOwl does.  I mean, the most common use of

10   the term data services that I see is to refer to all of the

11   services that actually where company store their data and

12   share their data:  Dropbox, Google Drive, Apple, Microsoft.

13   You know, there is countless things.  I mean, I as a

14   one-person business who does surveys, I use data services, I

15   use Microsoft OneDrive, I use Dropbox, all kinds of things.

16   So none of those have anything to do with DarkOwl.

17        And there is also lots of other things that people

18   would think of as data services, like all of the companies

19   who -- what they do is they take a company's sales data, for

20   instance, and they mine it and they give you insights into

21   it and they say, oh, here are your best customers and things

22   like that.

23        So there are so many different services that would

24   fall under the heading of data services that there is no

25   reason to think that anybody who selected data services is

160

 1    specifically referring to the type of dark web services that

 2    DarkOwl offers.

 3         Q.   So is it fair to summarize that concern as the

 4    data services requirement was quite overinclusive?

 5         A.   It's both overinclusive and underinclusive,

 6    because one problem is somebody who is a consumer of dark

 7    web services might not have picked data services, because

 8    the term "data services" wouldn't convey this type of dark

 9    web catalog service to them.  So they could have been

10    excluded improperly, which would make it underinclusive.

11              But mostly it's really overinclusive because of

12    the fact that probably the vast, vast majority of things

13    people would think data services apply to has nothing to do

14    with what DarkOwl does.

15         Q.   Let's look at the next screening question.  I'll

16    direct your attention to page 13.  What was the next

17    substantive screening question that Mr. Kegan used?

18         A.   So if they selected data services, they were then

19    which of the following type of vendor provided services do

20    you personally use as part of your job responsibilities.

21    And again, there is a number choices, but the ones that

22    would qualify people for the survey were fraud prevention

23    services or user or customer identification or data

24    verification services.

25         Q.   And do you believe that that screening question

1    was flawed?

2         A.   Yes, in that again, these do not come even close

3    to identifying somebody as a prospective DarkOwl customer,

4    because in the case of user or customer identification or

5    data verification services, that certainly is more of an

6    attempt to possibly identify an ArkOwl customer, not a

7    consumer of dark web services.

8              And again, in the case of fraud prevention

9    services, the term "fraud prevention" is so vague and

10   overbroad that it covers countless things that have nothing

11   to do with what DarkOwl does.  Again, such as, you know,

12   banking services, credit card services, antivirus services.

13   They're just -- there are so many things that fall under

14   fraud prevention.

15             So the bottom line is, once somebody has answered,

16   I use data services and I use fraud prevention services or

17   user customer identification services, we still have no idea

18   if what they have in mind has anything to do with what

19   DarkOwl does.

20             And in fact, I was thinking if I took this survey,

21   I would have qualified for it because I -- like I said, I

22   use all kinds of data services and I would have thought,

23   yeah, I use fraud prevention services, I use antivirus

24   software on my computer, I -- my credit cards have fraud

25   protection elements, my banking services have fraud

1   prevention aspects.  So, you know, I would have qualified

2   for this survey as a one-person business who, you know,

3   would never have the slightest even thought for using

4   something like DarkOwl.

5        Q.   Mr. Poret, you made reference earlier to a

6   distinction between general consumer panels and specialty

7   panels.  Just for the edification of us nontrademark survey

8   experts, could you please explain what that difference is.

9        A.   Sure.  So most surveys are done with general

10  consumer panels.  It's basically millions of Americans who

11  have signed up and said, I'm willing to take surveys, send

12  me an invitation.  And that works great for ordinary

13  consumer products.  If you need to study purchasers of cell

14  phones or milk or potato chips, or even automobiles, you can

15  just reach out to a consumer panel and there is going to be

16  plenty of those on it.

17           For something like this, that -- that doesn't

18  work.  That would be searching for a needle in a haystack.

19  You can't contact 100 people and hope that even one of them

20  would be in the market for DarkOwl services.

21           So if you were going to even try to reach

22  consumers of a sophisticated service like this that are

23  people who are high-ranking executives at sophisticated

24  organizations, you would have to at least try to use a

25  business panel, which is something where special efforts

163

1   have been made to recruit people who have certain positions

2   in business and are being paid much, much higher incentives

3   to get them to be willing to do surveys about a specialized

4   area.

5       Q.   And Mr. Kegan did not use a specialty panel; is

6   that correct?

7       A.   No.  Right, that's correct.  Mr. Kegan testified

8   that he used a general consumer panel and he also explained

9   that 15 percent of the people who came in from the general

10  consumer panel met the criteria and qualified for the

11  survey.

12          And that alone proves beyond any doubt that this

13  can't be a credible universe of prospective DarkOwl

14  customers, because there is no way that 15 percent of people

15  under general consumer panel are in the market for this

16  highly specialized, sophisticated, and expensive service.

17  It would be one in 10,000 or one in 100,000.

18          So I mean, the mere fact alone that these

19  screening questions led to 15 percent of a general consumer

20  panel saying, Yep, I checked these boxes, you know, that

21  alone is -- is conclusive proof that the people who met

22  these criteria are not prospective DarkOwl customers.

23  They're people who thought data services and fraud

24  prevention meant some of the much more ordinary typical

25  things that I mentioned before.

164

1       Q.   I believe you made a statement in your survey

2   along the lines that, even if two companies happen to share

3   a customer or a target customer, that wouldn't necessarily

4   make those two companies competitors.

5           Can you just elaborate on that a little bit.

6       A.   Sure.  This same organization, of course, uses all

7   kinds of different services.  The same company uses payroll

8   services, they use legal services, they use waste removal

9   services from their office.  So the mere fact that a

10  particular company might use two different services on its

11  own does not really tell you anything about the competitive

12  relationship between those types of services.

13      Q.   So just to be clear, is it your opinion that

14  Mr. Kegan did not identify the relevant population or

15  universe for his survey?

16      A.   Yes, it's clear that people qualified for this

17  survey on an improper basis and we literally could not

18  identify a single person in the survey as a prospective

19  DarkOwl customer.

20      Q.   Your opinion, does the failure to identify a

21  proper universe of respondents affect the reliability of a

22  likelihood of confusion survey?

23      A.   Yes, very, very much so.

24      Q.   In your opinion, is the survey's failure to

25  identify a proper universe a fatal flaw in the survey,

1    rendering it unreliable?

2         A.    It certainly is in this case.  I mean, flaws in a

3    universe can range from small ones to large ones; but in

4    this case, it's really the largest possible version of a

5    flaw, because we really literally have no idea if the person

6    who took the survey is even remotely in the ballpark here.

7              And it's a serious problem, because if it's, you

8    know, somebody who is not really a prospective DarkOwl

9    customer, first of all, they don't have the interest or

10   attention to pay attention to these websites shown in the

11   survey, they don't have the ability to understand them and

12   see what -- what these services even mean, and they don't

13   have the knowledge and sophistication that a real

14   prospective DarkOwl customer would have to be able to

15   understand what the service is and who the party they're

16   dealing with.

17             So it would, in this case, the wrong universe

18   would render this test, you know, completely artificial and

19   unrealistic.

20        Q.    And just to be clear, is it your opinion that,

21   even if the companies could be shown to have some overlap in

22   potential target customers, that the survey is still fatally

23   flawed in the way it was constructed?

24        A.    Yes, absolutely, because you don't -- you don't

25   know if there is a single person in the survey who is a

166

1    DarkOwl customer, or prospective customer.

2         Q.   You testified earlier that the survey makes a

3    false assumption that the parties are direct competitors.

4    Other than affecting the universe of respondents, did that

5    misrepresentation or false assumption cause the survey to be

6    reliable -- unreliable in other ways?

7         A.   Yes.  The main survey design is also unreliable

8    for that reason, because Mr. Kegan used a format which is

9    common in our area, but it's common for services or products

10   that are either directly competitive or so highly related

11   that the same consumer would consider them in close

12   proximity.

13        Because what the survey is doing is it's

14   essentially saying, imagine you're shopping for this type of

15   service, here is a bunch of options, consider them.  And

16   that's realistic if the services really are ones that have

17   competitive proximity, such that a real consumer might be

18   out there thinking, Gee, should I use DarkOwl or should I

19   use ArkOwl or should I use this other one?

20        Like, if that's not the case, then this entire

21   methodology becomes artificial and just unrealistically

22   suggestive and it just becomes kind of a simple, you know,

23   matching game, Did somebody get a notice that there is some

24   kind of similarity here?  And say, Okay, yeah, that's --

25   these must be related.

167

1        Q.   Other than the failure to identify a proper

2   universe of respondents and artificial construct for the

3   survey, I believe you identified other flaws unrelated to

4   these issues with the survey.  Can you please just briefly

5   describe the other flaws that you identified with the survey

6   that affect its reliability.

7        A.   Sure.  So I mean, one of them is on top of what

8   we're talking about.  The survey introduced DarkOwl's

9   services as, quote, data services, and it also introduced

10  ArkOwl services as, quote, data services.  So it's sort of

11  the exacerbating this process by basically telling the

12  respondents these are the same type of service when they're

13  not.

14            And then also, the survey, it's based on a very

15  limited exposure to a web page, and while I don't blame

16  Mr. Kegan for trying to use web pages, because there is not

17  too much you can do in a survey, the reality, these are

18  sophisticated services that require contracting for, you

19  know, something that's expensive and very involved, and it's

20  extremely difficult to simulate that type of consumer

21  experience in a survey.  It's certainly very, very difficult

22  to do that realistically when all that's happening is a

23  consumer in a survey is, you know, taking 30 seconds to

24  glance at a web page from which it's going to be really hard

25  to tell what these services really are.

168

1           So that -- you know, that was another problem.

2           And then another problem is -- with it is the

3    lineup of the web pages that were being shown besides ArkOwl

4    and DarkOwl.  They're not -- those also are not really the

5    competitors of DarkOwl, and so it's not really

6    realistically -- realistically representing, you know,

7    marketplace of options.

8           And then the final thing is -- is a very critical

9    one.  There is no control group.  You know, do you ever hear

10   about a scientific experiment, it's got a test group, the

11   one that tries the medication and a control group that is

12   given a placebo, which is identical, but lacks the

13   medication, this survey did not have a control group.  It

14   had one single group.  And a really proper likelihood of

15   confusion survey should have a separate control group.

16          So that's one of the other big problems.

17    Q.   And you detail these more in your report, correct?

18    A.   Yes.

19          MR. BUXBAUM:  Thank you, Mr. Poret.  I have no

20   further questions.  It's your witness.

21          THE COURT:  Thank you.  Cross-examination?

22                    CROSS-EXAMINATION

23   BY MR. FRASIER:  :

24    Q.   Thank you, Mr. Perot.

25          Mr. Perot, you're not an expert in the cyber

1    security industry?

2        A.    You are correct.

3        Q.    You're not an expert in DarkOwl services?

4        A.    No.

5        Q.    You're not an expert in the dark net, in general?

6        A.    I am not.

7        Q.    You didn't -- you didn't conduct any survey to

8    determine what people thought of when they heard the phrase

9    "data services," right?

10       A.    Right.

11       Q.    So it's just your lay opinion that people are

12   likely to think of something that is not DarkOwl when they

13   hear "data services"?

14       A.    It's not quite so much that; it's that the phrase

15   "data services" simply is so overbroad that there is no way

16   to even know what people thought it meant, and there are so

17   many possibilities of what it could mean that are different

18   that we don't have any reliable information about what

19   people meant when they said they use data services.

20       Q.    All right.  And that was -- that was just based on

21   your personal belief and experience in hearing the phrase

22   "data services"?

23       A.    I wouldn't say it's just based on personal

24   experience.  It's also based on my professional experience

25   of having done many surveys in all kinds of different

170

1  product and service categories, and you know, knowing what

2  language is used to properly nail down a specific type of

3  service.

4      Q.   You don't contend that DarkOwl does not offer data

5  services, right?

6      A.   I certainly don't contend that their services are

7  unrelated to the -- to data, but I do contend that the term

8  "data services" is potentially very vague, inaccurate, and

9  even misleading as -- as a stand-alone term to apply.

10     Q.   You don't contend that data services primarily

11  refers to services that DarkOwl does not perform?

12     A.   I do think the term "data services" for the vast

13  majority of people would make them think of something other

14  than what DarkOwl offers, particularly considering that most

15  people are not even aware that a thing, such as DarkOwl

16  exists, because ordinary consumers have no reason to know

17  about and use that kind of service.

18     Q.   I'm not sure you answered the question.

19          The question was:  You don't contend that data

20  services primarily refers to services that DarkOwl does not

21  perform?

22     A.   I think the bucket of things that fall within data

23  services do refer to things other than what -- what DarkOwl

24  does.  I think that term encompasses a large category of

25  things, most of which are not what DarkOwl does.

171

1      Q.   All right.  On your deposition -- in your

2  deposition, I asked you if -- let me pull up your deposition

3  transcript.

4          I asked you the question:

5          "Is it your opinion that data services primarily

6  refers to services DarkOwl does not perform?"

7          And you responded:

8          "No, I'm not using the term primarily in my

9  opinion.  I'm just stating, if you are writing proper

10 screening questions, you need to -- to use terminology that

11 do not leave you guessing as to what the person thought it

12 meant and that you can rely on the answer."

13         So at the time you were not saying that data

14 services primarily refers to something DarkOwl does not

15 refer to?

16     A.   I'm not sure I -- I'm not sure I followed that

17 question.

18     Q.   It is not your opinion that the term "data

19 services" primarily refers to services that DarkOwl does not

20 perform?

21     A.   Well, I think what I was trying to say in my

22 deposition is my primary point about the term "data

23 services" is that it's overly vague, so it doesn't primarily

24 refer to anything.

25     Q.   Now, in your report, you did not assume that

172

1    DarkOwl services do not fall within the description of user

2    or customer verification services, right?

3         A.   I have had a little trouble following that

4    question, but I don't think I made any assumption along

5    those lines.

6         Q.   And you're not an expert in user customer

7    verification services?

8         A.   No, I'm not an expert in that area.

9         Q.   You're not an expert in fraud prevention services?

10        A.   No.

11        Q.   I believe you testified in your direct that for

12   this type of survey to be valid, there needs to either be

13   direct competition or, at least, enough competitive overlap

14   such that potential customers would likely encounter both

15   marks; is that -- is that accurate?

16        A.   That's a fair enough summary.

17        Q.   Now, your conclusion that Mr. Kegan did not survey

18   the appropriate universe is based on information given to

19   you by DarkOwl about who their customers are, right?

20        A.   It's based, in part -- well, I mean, it's based

21   primarily on my review of the materials relating to DarkOwl

22   that I had access to in connection with this case, which,

23   yes, some of those came from counsel for DarkOwl.

24             MR. FRASIER:   Spreadsheet -- I apologize, Your

25   Honor.  Did the spreadsheet remain Attorney's Eyes Only?

173

1    It's Exhibit 19.

2         MR. BUXBAUM:  Yeah, it did.

3         Q.   (By Mr. Frasier) Now, on page 8 of your report,

4    the very top, you describe DarkOwl's -- you write:  DarkOwl

5    customers include many other types of entities, including

6    governments, law enforcement agencies, and other corporate

7    entities that seek cyber security/intelligence analysis.

8         Do you see that?

9         A.   Yes.

10        Q.   And then you have a footnote to three documents?

11        A.   Yes.

12        Q.   And those documents were given to you by DarkOwl

13   in response to your request for documents relating to

14   DarkOwl's customers?

15        A.   Yes.

16        Q.   And one of those three documents was what has been

17   marked as Exhibit 19 in this case; is that right?

18        A.   Well, I'm sure you can tell from the number, so I

19   have no reason to doubt that if you're saying this is one of

20   those documents.

21        Q.   Yeah.  And I'm showing you -- I'm showing you what

22   has been marked Exhibit 19.  This is one of the documents

23   that DarkOwl provided you to review in determining who their

24   customers are.

25        A.   Okay.

174

1        Q.   Do you recall reviewing this document?

2        A.   I mean, honestly, it's a little bit hard for me to

3    tell, just from this view, whether this is that document,

4    but it certainly looks consistent with the types of

5    materials that I reviewed.

6        Q.   And do you recall clicking through all three tabs

7    on the bottom of Exhibit 12 -- or Exhibit 19?

8        A.   Yes.

9        Q.   And you didn't rely on anything DarkOwl told you

10   about Exhibit 19 in reaching your conclusion?

11       A.   I'm not even sure what conclusion you're talking

12   about.  But, no, I think it's fair to say I didn't rely on

13   any of that for my analysis.  I relied on the explanations

14   that I gave previously.

15       Q.   And so to be clear, you're not an expert on

16   whether or not the parties are competitors?

17       A.   No, I'm not substantively an expert on that topic.

18       Q.   It's -- among other things, it's your opinion that

19   if they are not competitors, this survey approach is not

20   appropriate?

21       A.   Yes, that's one of the things, but my position --

22   my opinion about the universe is not reliant on what you

23   just mentioned, because the screening questions simply

24   didn't get at the universe, regardless of whether they're

25   competitors.  But you're correct, that I'm not a substantive

1  expert in the nature of these parties' services.  That just

2  is relevant to the -- the valuation of the survey

3  methodology.

4           MR. FRASIER:  Okay, thank you.  I have no further

5  questions.

6           THE COURT:  Thank you.  Is there any redirect?

7           MR. BUXBAUM:  No redirect, Your Honor.

8           THE COURT:  All right, thank you.  You may step

9  down.

10          All right.  It's quarter to 6:00.  Do you want to

11  get started with the final witness, as I understand it, or

12  do you want to defer that to another day for a video

13  presentation?

14          MR. FRASIER:  I would prefer to do it all in one

15  chunk, Your Honor, and have not have his testimony broken

16  up.

17          THE COURT:  I think that makes sense.  Is there

18  any objection to that from plaintiff's counsel?

19          MR. BUXBAUM:  No, there is not.

20          THE COURT:  All right.  So let's talk before we

21  depart about reconvening for purposes of the video testimony

22  of Mr. Kegan; is that right?  And he'll be the final witness

23  on either side of this dispute?

24          MR. BUXBAUM:  That's right.

25          THE COURT:  All right.  So give me a ballpark,

1   maybe how much time you think you might need with Mr. Kegan,

2   both on direct and cross.  I know it's difficult, but --

3           MR. FRASIER:  I will say a half hour, so maybe we

4   should block off an hour just in case, especially with

5   technology being involved.

6           MR. BUXBAUM:  Yeah, I think we can fit it in

7   within an hour.

8           THE COURT:  In an hour as well.  So we're looking

9   at half a day, is what I'm inclined to do, okay.

10          MR. BUXBAUM:  Your Honor, I think an hour will

11  cover both --

12          THE COURT:  Both, direct and cost.

13          MR. BUXBAUM:  Yes.

14          THE COURT:  All right, fair enough.  And why don't

15  we start with the witness.  Do we -- are there limitations

16  that he has in terms of his availability to testify?

17          MR. FRASIER:  So we can compare calendars.

18  Mr. Kegan just actually raised a point that we had prepared

19  his direct based on Your Honor's order about the scope of

20  this hearing.  And Mr. Poret's testimony certainly raised

21  issues that were beyond the scope of that.  And to the

22  extent we need to address those additional issues, we will

23  need a little bit more time than what we had originally

24  outlined.

25          THE COURT:  Well, chances are I'm going to build

1   in some, you know, additional time to whatever we end up

2   landing on.

3          So I understand what you're saying -- and I think

4   I would be foolish to assume it's only going to take an

5   hour.  I think it's likely going to take a little more than

6   that, so I'll build in some extra time whenever we decide.

7          So why don't we start looking at dates, Counsel,

8   and bearing in mind that we have a trial date that is set

9   for some time in June, were you able to locate the trial

10  date?

11          MR. BUXBAUM:  June 26.

12          MR. HOLT:  Yeah, June 26, Your Honor.

13          THE COURT:  All right.

14          MR. BUXBAUM:  Pretrial.

15          THE COURT:  Yeah.

16          MR. BUXBAUM:  Pretrial conference, I think, is

17  25th or something like that.

18          THE COURT:  Yeah, I think it's right around that

19  time.  Okay.  So that means, you know, sooner rather than

20  later, we have to try to wrap this up so the Court can get

21  you an order on this motion prior to the trial.  And the

22  order will have to be in writing and so there will have to

23  be some time taken to draft the order.

24          So is there any chance that anybody is available

25  this week, or should we just not even look at the rest of

178

1    this week?  Is it out of the question?

2           MR. BUXBAUM:  We don't need everyone.  I mean, the

3    good news is think we only need a smaller subsection.

4           THE COURT:  I agree.

5           MR. BUXBAUM:  We just need four of us.

6           MR. HOLT:  Yeah.  Certainly not tomorrow.

7    Thursday or Friday would be preferable.

8           MR. BUXBAUM:  Thursday or Friday on our side.  Any

9    chance over there?

10           UNIDENTIFIED SPEAKER:  If it's Friday, it would

11    need to be the in the middle of the day.  My wife is working

12    so I will have childcare observations.

13           MR. BUXBAUM:  What's your availability at the end

14    of this week, Your Honor?

15           THE COURT:  I could do it between 10 a.m. and 2

16    p.m. on Friday.

17           MR. BUXBAUM:  I'm trying to make it Mountain

18    Central.  So 10 a.m. is --

19           UNIDENTIFIED SPEAKER:  11 Central.

20           THE COURT:  That would be 11 to 3:00.

21           MR. BUXBAUM:  That would be perfect, Your Honor.

22    11 o'clock on Friday.

23           THE COURT:  That work for plaintiff's counsel

24    (indiscernible).

25           UNIDENTIFIED SPEAKER:  Yeah, 10 Mountain, 11

179

1   Central, noon Eastern.

2            (Confer on scheduling.)

3            THE COURT:  I see that that's -- I'm moving it.

4   I'm moving that other matter.

5            All right.  So 10 a.m. on Friday, May 19.  Now,

6   we're going to do this all by video, Counsel, and the

7   witness will be present by video?

8            MR. FRASIER:  That would be preferable.

9            THE COURT:  So you'll need to communicate with

10  Ms. Galera to make sure that you have the instructions that

11  you need to get set up on our VTC, which is our video

12  presentation.  So you don't have to do that tonight, but

13  you'll need to do that between now and then to make sure

14  that it's set up appropriately.

15           Is there anything else I need to remind counsel of

16  with respect to a video hearing at 10 a.m. on Friday?

17           THE CLERK:  I don't think so, Your Honor.

18           THE COURT:  That will take care of it.

19           All right, fair enough.  So I appreciate counsel's

20  efforts to try to get us through as much of this as we could

21  today.  I'll look forward to seeing you again by video at 10

22  a.m. on Friday.  And I hear we're going to have four people

23  present by video:  The witness, Mr. Frasier and two

24  attorneys for plaintiffs, or three?

25           MR. BUXBAUM:  I guess three.

180

1           THE COURT:  All right.  So five people total

2    present by video on Friday for his examination, and

3    cross-examination.  Fair enough.  I will see you then.

4    Thank you.  We're in recess.

5           (Whereupon, the within hearing concluded at 5:50

6    p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

181

```
1                    TRANSCRIBER'S CERTIFICATE

2            I certify that the foregoing is a correct

3    transcript, to the best of my knowledge and belief (pursuant

4    to the quality of the recording) from the record of

5    proceedings in the above-entitled matter.

6

7    /s/Dyann Labo                    May 26, 2023

8    Signature of Transcriber         Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```