IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC

      Plaintiff,

v.

ARKOWL LLC

      Defendant.

_____

### ORDER ON MOTION TO EXCLUDE EVIDENCE AND TESTIMONY
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on **Plaintiff DarkOwl, LLC's Motion to Exclude Evidence and Testimony from Mark Keegan** [#47] (the "Motion").  Plaintiff DarkOwl, LLC ("DarkOwl") seeks to exclude evidence of a survey conducted by Defendant's expert Mark Keegan and his testimony related to that survey pursuant to Fed. R. Evid. 702 and 403.  *See Id.*  Defendant ArkOwl, LLC ("ArkOwl") filed a Memorandum in Opposition [#51] ((the "Response") to the Motion [#47] ,and DarkOwl filed a Reply [#56].  The Court held an evidentiary hearing on the Motion [#47] on May 15 and 19, 2023.  The Court has reviewed the Motion [#47], the Response [#51], the Reply [#56], the Transcripts of the hearing, the entire case file, and the applicable law, and is sufficiently advised in the premises.  For the reasons set forth below, the Motion [#47] is **granted**.

## I.  Background

DarkOwl commenced this declaratory judgment action on August 10, 2021. *Compl.* [#2].  DarkOwl requests declarations (1) that its DARKOWL marks, Nos. 5525738 and 5793807, depicted below, do not violate the Lanham Act or the common law of the State of Colorado; (2) that its DARKOWL marks are valid, and (3) that ArkOwl has not suffered any harm and is not entitled to a finding of infringement, damages, or any other remedy under 15 U.S.C. § 1117.  *Compl.* [#2] at 13-18.



ArkOwl asserts counterclaims against DarkOwl alleging: (1) infringement of its word and design marks, depicted below, in violation of 15 U.S.C. § 1125(A); (2) cybersquatting in violation of 15 U.S.C. § 1125(D); (3) that Plaintiff's trademarks should be cancelled pursuant to 15 U.S.C. § 1119; and (4) that Plaintiff has violated the Colorado Deceptive Trade Practices Act, Colo. Rev. Stat. § 6-1-101 *et. seq.*, through its use of a confusingly similar mark.  *Answer and Counterclaims* [#17] at 14-17.







## II.  Facts

**A.      ArkOwl**

ArkOwl was formed in 2012 in Minnesota as a limited liability company.  *Hr'g Tr.* [#71], *Daline Test*. at 22:8-9; *see also Answer and Counterclaims* [#17] at 8.  Robert D. Daline is the chief executive officer and co-founder of ArkOwl.  *Id*. at 22:2-7.  ArkOwl avers that it has continuously and exclusively offered its services under its service mark and  design marks, displayed in Section I, *supra*, since 2012, and that it obtained a federal registration for the word mark ArkOwl on April 21, 2020 (Reg. No. 6,036,746).  *Answer and Counterclaims* [#17] at 8 .  In 2019, ArkOwl adopted an additional logo, and obtained a federal registration for the design mark.  *Id*.; *see Section I*, *supra.*   ArkOwl mistakenly filed the trademark applications on behalf of ArkOwl Corporation.  *Id*. at 8-9.  ArkOwl alleges that DarkOwl adopted its name, domain, and logo to capitalize off the brand recognition and goodwill that ArkOwl has created, and avers that DarkOwl is infringing its word mark and design marks.  *See Answer and Counterclaims* [#17] at 13.

ArkOwl is fairly characterized as an identity and verification service provider, and its main focus is personal identifiable information ("PII") verification and validation.  *Hr'g Tr.* [#71], *Daline Test*. at 22:10-20.  The types of PII that ArkOwl helps its customers verify include the email address, phone number, IP address, physical address, and a name match.  *Id*. at 22:21-23:2.  ArkOwl provides a platform that allows its users to input various PII into a search, and ArkOwl's data is used by customers to verify whether the individual or entity they are searching is legitimate and whether there is a fraud threat.  *Id*. at 24:23-25, 27:2-13.  The primary use for ArkOwl's data is in retail for paying customers in online transactions, but ArkOwl also has as clients banks, cybersecurity companies, and law

enforcement in Europe.  Cybersecurity companies are, however, the bulk of ArkOwl's business.  *Id.* at 30:6-23; 51:6-24.  Mr. Daline was not aware of any customers using ArkOwl's data for anything other than supporting online purchase transactions.  *Id.* at 33:18-22.  Further, Mr. Daline acknowledged that the companies ArkOwl usually competes directly with are those that provide email address input and outputs, i.e., PII verification services.  *Id.* at 41:21-42:15.

ArkOwl does not search the dark web, and Mr. Daline did not recall any marketing materials of ArkOwl that reference the dark web.  *Hr'g Tr.* [#71], *Daline Test.* at 38:13-18.  ArkOwl does, however, use as part of its services a company, Have I Been Pwnd, whose breach data will say where there is a leak.  This could include a leak in the dark web as well as the surface web.  *Id.* at 37:19-38-7, 38:23-39:8.  Mr. Daline acknowledges, however, that breach data and dark web data are not synonymous.  *Id.* at 37:22:24, 38:9-12.  While customers use ArkOwl to look for threats, ArkOwl does not provide further analytical services, past the raw data, if a threat is discovered.  *Id.* at 40:7-9, 75:2-10.

Mr. Daline testified that when he first learned of DarkOwl in 2019, he did not believe it was a competitor or was in the same industry as ArkOwl.  *Hr'g Tr.* [#71], *Daline Test.* at 64:15-21.  This is because Mr. Daline did not see much on DarkOwl's website about email data, fraud, or data solutions, and he had not heard about DarkOwl from his customers.  *Id.* at 64:16-65:2.  Mr. Daline believed at that time that while DarkOwl was in the cybersecurity umbrella, it conducted penetration testing to make sure that websites cannot get breached.  *Id.* at 74:14-21.  ArkOwl does not offer such services.  *Id.* at 74:24-75:1.  Mr. Daline's opinion on the issue of whether DarkOwl was a competitor changed when he was contacted by one of his customers.  That customer sent Mr. Daline an email

asking if ArkOwl was affiliated with DarkOwl because his company had been receiving emails from DarkOwl.  *Id.* at 65:7-24; *see also Hr'g Ex. 5.*   The email that the customer received from DarkOwl stated in part, "DarkOwl provides a comprehensive data environment to monitor when personal identification info, (PII), is posted on behalf of your clients." *Hr'g Ex. 6.*  Mr. Daline opined at that point, after receiving the email from his customer, that he deemed DarkOwl a competitor because ArkOwl's customer could have used the data services of DarkOwl for the same purpose it was using ArkOwl's services – using an email address input to verify whether the customer or client was legitimate or fraudulent. *Hr'g Tr.* [#71], *Daline Test.* at 69:9-70:3.  Mr. Daline acknowledged, however, that he was not aware of any instance where ArkOwl lost business to DarkOwl or where a customer was trying to decide between DarkOwl and ArkOwl, and he has not run into DarkOwl at any industry events. *Id.* at 43:9-19.

**B.    DarkOwl**

DarkOwl is a limited liability company formed on September 17, 2015, in Colorado that provides dark net or dark web intelligence services. *Compl.* [#2] at 4.[1]  Mark Turnage is the chief executive officer and co-founder of DarkOwl  *Hr'g Tr.* [#71], *Turnage Test.* at 76:20-21  DarkOwl has two registered DARKOWL trademarks, displayed in Section I, *supra,* one of which has been in use since at least as early as August 2017 and the second since September 2018.  *Compl* [#2] at 5-6.  According to Mr. Turnage, he first heard of ArkOwl when DarkOwl received ArkOwl's letter demanding that it stop using the alleged infringing marks. *Hr'g Tr.* [#71], *Turnage Test.* at 99:18-20, 100:21-101:5.  As to

---

[1]  The terms dark net and dark web are synonymous. *Hr'g Tr.* [#71], *Turnage Test.* at 81:8-11.

the email that ArkOwl's customer purportedly received from DarkOwl, Mr. Turnage testified that this came from a third party marketing company that DarkOwl used for a period of time to send email blasts, and that DarkOwl did not approve the list of businesses that the company sent blasts to. *Id.* at 103:14:25,105:20.[2]

DarkOwl monitors the dark web for emerging threats and has built a platform for this. *Hr'g Tr.* [#71], *Turnage Test.* at 77:14-18. While DarkOwl is in the cybersecurity business, this term is very broad and encompasses a wide variety of businesses with an immense diversity of services and technologies. *Id.* at 81:15-82:13. Some cybersecurity businesses compete with each other and some do not. *Id.* DarkOwl's business consists primarily of: (1) threat intelligence services that look for emerging threats to organizations; (2) assessment of third-party risk, which Mr. Turnage explained is the risk assessment of vendors or contractors of large companies; (3) supplying data to the cyber-insured tech companies for risk assessment related to underwriting; (4) digital identity protection and the assessment of whether the digital identity is risk-related; (5) fraud protection for cybersecurity companies that service financial institutions, primarily related to bank account or other financial information that is bought and sold on the dark net; (6) services to intelligence agencies or governments related to threats on the dark net to critical infrastructure (e.g., power plants, water treatment plants); (7) services related to threats to national security in the dark net; and (8) monitoring the use of cryptocurrency in the dark net. *Id.* at 83:12-96:20; *Hr'g Exs.* 8-15. Mr. Turnage testified that these activities have no relation to approving a commercial transaction in real time or PII verification, like

---

[2] Mr. Turnage was also shown at the hearing other solicitation emails (Hearing Exhibit 20) from the third party company on behalf of DarkOwl, including an email to another customer of ArkOwl. *Id.* at 140:15-143:2.

ArkOwl's primary activity. *Hr'g Tr.* [#71], *Turnage Test.* at 85:18-20, 87:5-11, 89:23-90:21, 91:7-10; 92:20-22, 94:21-23, 95:19-21.   In fact, Mr. Turnage testified that DarkOwl's business and platform is not built or set up to provide that data.  *Id.* 91:7-10, 92:23-24, 100:10-17.   Further, Mr. Turnage testified that no customer of DarkOwl has ever suggested or requested that DarkOwl perform PII verification services, and DarkOwl has never encountered ArkOwl in the marketplace.  *Id.* at 100:19-23:

Because of the uses of DarkOwl's data, DarkOwl's customers are typically very sophisticated cybersecurity customers that are dealing with cyber risks, not end-users such as banks, retail companies, and health care.  *Hr'g Tr.* [#71], *Turnage Test.* at 97:1-21.   About 40-45% of DarkOwl's customers are government intelligence agencies or cyber security companies whose customers are governments.  *Id.* at 97:1-20.  The nature of the data is very sensitive, according to Mr. Turnage, and DarkOwl needs to be sure the customer understands the obligations of dealing with that kind of data.  Accordingly, the person purchasing the data from DarkOwl is generally from the C suite – the CEO, CFO, or the chief information security officer.  *Id.* at 97:22-98:9.  There is also an extensive vetting process for DarkOwl's customers with comprehensive legal documents that prevent the misuse of any data provided.  *Id.* at 98:19-99:9.

DarkOwl's business is a small niche under the cybersecurity umbrella, and Mr. Turnage stated he could count on one hand other companies that are doing what DarkOwl does. *Hr'g Tr.* [#71], *Turnage Test.* at 98:12-17.[3]  None of DarkOwl's competitors provide PII services, and none of ArkOwl's competitors are competitors of DarkOwl.  *Id.* at 102:3-

---

[3]  Two of DarkOwl's primary competitors are companies out of Israel that were founded by former Mossad cyber intelligence officers.  Another competitor is a subsidiary of a very large defense contractor, and the final competitor is based out of the United Kingdom.  *Id.* at 101:12-23.

6, 103:4-13.  Mr. Turnage does not consider ArkOwl to be a competitor because not a single DarkOwl customer could get from ArkOwl what it gets from DarkOwl, and not a single ArkOwl customer could get from DarkOwl what it gets from ArkOwl.  *Id.* at 102:7-14.  ArkOwl has access to a wide range of surface web and other datasets that DarkOwl does not have access to and does not provide to its clients.  Similarly, DarkOwl's clients use DarkOwl to get intelligence from a wide variety of sources in the dark net that are not available from ArkOwl, such as hacker chatter and software vulnerabilities that are being sought, bought, and sold on the dark net.  *Id.* at 102:15-103:3.  Thus , Mr. Turnage testified that there is no competitive overlap between DarkOwl and ArkOwl.  *Id.* at 112:6-8.  However, Mr. Turnage acknowledged that DarkOwl is a data company that uses SAS (software as a service), and that it is broadly focused on selling to customers in the cybersecurity industry.  *Id.* at 107:17-23.   DarkOwl's customers can search its database, which includes indexes of email and IP addresses that DarkOwl has accumulated, mainly from the darknet.  *Id.* at 107:24-108:6, 109:2-112:2.  A search would reveal where the email address was found on the dark net, and in some cases whether it was associated with a data breach, and DarkOwl collects data leaks – data that a hacker has extracted from inside a computer network and then reposted or sold.  *Id.* at 113:6-15, 113:19-114:6.

## II.  Standard of Review

"Admission at trial of expert testimony is governed by Fed. R. Evid. 702, which imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"   *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  Rule 702 provides the foundational requirements for

admission of expert opinions:   It states, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The district court's discretion in admitting or excluding expert testimony is broad, "both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003).

In deciding whether an expert opinion is admissible, the district court conducts a two-step analysis: (1) the court must determine whether the expert is qualified to give the proffered opinion, and (2) the Court must examine whether the opinion is reliable.  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).   To establish reliability, there must be a showing that (1) the "testimony is based upon sufficient facts or data," (2) the "testimony is the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d); *see also United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011).   This step of the analysis "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts."  *Dodge*, 328 F.3d at 1221.

"The proponent of expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence." *Zykronix Inc. v. Conexant Systems, Inc.*, No. 16-cv-00163-KLM, 2018 WL 1417701, at *5 n.2 (D. Colo. March 22, 2018).  The proponent must show that the witness has sufficient expertise to choose and apply a methodology, that the methodology was reliable, that sufficient facts and data as required by the methodology were used, and that the methodology was otherwise reliably applied.  *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *see also Daubert*, 509 U.S. at 595.  Ultimately, the rejection of expert testimony is the exception rather than the rule.  *Id.*  "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 922 (D. Colo. 2017) (internal citations omitted).

### III.  Analysis

#### A.    Introduction

The Court first notes that DarkOwl has not contested for purposes of the Motion [#47] that Mr. Keegan is qualified as a survey expert, and thus was qualified to conduct the survey and to opine as to the validity and reliability of the survey.  Similarly, ArkOwl has not contested for purposes of the Motion [#47] that DarkOwl's expert, Hal Poret, is qualified as a survey expert and qualified to give rebuttal opinion regarding the reliability of the survey conducted by Mr. Keegan.  Accordingly, the Court assumes for purposes of the Motion [#47] that the experts are qualified as survey experts.   The issue before the

Court from the Motion [#47] is whether the survey conducted by Mr. Keegan and the methodology he used to construct the survey are reliable.

On that issue, ArkOwl retained Mr. Keegan as an expert witness to examine the likelihood of confusion among relevant consumers between the services sold by both parties under their respective marks and to conduct a survey as to this issue. *See Keegan Report* [#47-1]; *Hr'g Tr.* [#70], *Keegan Test.* at 7:23-25.   Mr. Keegan designed and executed a survey and concluded that there is a likelihood of confusion among consumers between the services sold under both parties' respective marks. *Keegan Report* [#47-1] at 22-23.   DarkOwl argues that Mr. Keegan's survey is fatally flawed and that any probative value of the survey is substantially outweighed by its prejudicial effect. *Motion* [#47] at 18.   Specifically, DarkOwl argues that Mr. Keegan's survey should be excluded because (1) the survey failed to test the appropriate universe and failed to draw a representative sample from that universe; (2) the survey did not reasonably replicate marketplace conditions and employed a leading design; and (3) the survey failed to use a proper control. *Id.* at 2.   Related to the first issue as well as the overall validity of the survey, DarkOwl also argues that the parties are not direct competitors, as they offer different services for different uses than offered by ArkOwl.   *Id.* at 2, 7.   DarkOwl's arguments are supported by its expert, Hal Poret, who analyzed Mr. Keegan's survey (Hearing Transcript [#71], Poret Test. at 153:8:9l 155:11-14), prepared a rebuttal report (Hearing Ex. 21), and opined at the hearing that the survey was too severely flawed in a number of critical ways to have any value or reliability on the issue of likelihood of confusion. *Id.* at 156:2-6.

ArkOwl contends, on the other hand, that Mr. Keegan's survey was created in accordance with accepted methodology and is reliable. *Response* [#51] at 2. ArkOwl presented Mr. Keegan who testified as to that issue. Mr. Keegan testified, even after hearing the testimony of DarkOwl's survey expert, Mr. Poret, that the survey was reliable and used accepted methodology. *See, e.g., Hr'g Test.* [#70], *Keegan Test.* at 33:10-14. ArkOwl also asserts that even if there are flaws in the survey, this does not justify the exclusion of the survey or Mr. Keegan's testimony. *Response* [#51]. at 1-2. Instead, any flaws in the survey should go the weight of the evidence. *Id.* at 2.

Turning to the Court's analysis, parties to trademark infringement actions may use consumer surveys to demonstrate or refute a likelihood of consumer confusion. *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 974 (10th Cir.2002). Surveys can be thus used as evidence of actual confusion, "but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedures." *Universal Money Ctrs., Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1534 (10th Cir. 1994) (internal quotation marks omitted). Although methodological flaws in a confusion survey will typically affect only the survey's weight and not its admissibility, these flaws may justify exclusion under Rule 702 if they are serious and pervasive enough. *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1246 (10th Cir. 2013); *see also Vail Assocs., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 864 (10th Cir. 2008). Thus, "when the deficiencies are so substantial as to render the survey's conclusion untrustworthy, a court should exclude the survey from evidence." *Hodgdon Powder Co., Inc. v. Alliant Techsystems, Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan.2007). To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1)

the survey universe was properly chosen; (2) the sample was representative of that universe; (3) the survey's methodology and execution were in accordance with generally accepted principles; (4) the questions were not leading and suggestive; and (5) the data was accurately gathered and reported. *See J. Thomas McCarthy, 6 McCarthy on Trademarks and Unfair Competition*, § 32:163 (4th ed.2011).

**B.    The Merits of DarkOwl's Motion**

> **1.    Whether the Appropriate Universe Was Surveyed and, Related to This, Whether the Parties are Direct Competitors**

>> **a.    The Survey Universe**

DarkOwl first argues that Mr. Keegan's consumer confusion survey should be excluded because he failed to survey the appropriate universe. "A survey universe is an important factor in assessing the validity of a survey because survey respondents must "'adequately represent the opinions which are relevant to the litigation.'" *Water Pik, Inc. v. Med-Sys., Inc.*, No. 10-CV-01221-PAB-CBS, 2012 WL 2153162, at *4 (D. Colo. June 13, 2012) (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1544 (10th Cir.1996)). "Consequently, a survey's 'appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer[']s goods or services.'" *Id.* (quotation omitted).

Since ArkOwl is the senior user of the marks, ArkOwl's claim implicates forward confusion. Forward confusion occurs when the junior user diverts the senior user's consumers and attempts to capitalize on the senior user's reputation and goodwill. *Altira Group, LLC v. Philip Morris Cos., Inc.*, 207 F.Supp.2d 1193, 1197 (D. Colo. 2002). In cases of forward confusion, "the proper universe to survey is the potential buyers of the *junior user's* goods or services." *Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*,

402 F. Supp. 2d 1312, 1334 (D. Kan. 2005) (quoting McCarthy, § 32:159); *see also OraLabs, Inc. v. Kind Grp. LLC*, No. 13-cv-00170-PAB-KLM, 2015 WL 4538442, at *5 (D. Colo. July 28, 2015). A party introducing a consumer survey bears the burden of establishing that it was conducted in accordance with accepted principles of survey research, including that a proper universe was surveyed and that a representative sample was drawn from that universe. *Nat'l Football League Properties, Inc. v. New Jersey Giants, Inc.*, 637 F. Supp. 507, 513 (D.N.J. 1986). "A court should exclude a survey when the 'sample of respondents clearly does not represent the universe it is intended to reflect.'" *OraLabs, Inc.*, 2015 WL 4538442, at *5 (quotation omitted).

DarkOwl makes several arguments in asserting that the universe surveyed by Mr. Keegan was inappropriate, rendering the survey flawed and subject to exclusion: (1) in constructing the survey, Mr. Keegan failed to identify DarkOwl's prospective customers; (2) the universe surveyed did not represent DarkOwl's prospective customers; and (3) the general consumer panel did not draw a representative sample from the appropriate universe. *See Motion* [#47]. These arguments implicate the first two *McCarthy* factors discussed previously; namely, whether the survey universe was properly chosen and whether the sample was representative of that universe. The Court discusses whether the survey drew a representative sample from the universe in III.B.1.b., *infra.*

ArkOwl responds that the universe surveyed was appropriate and embraces DarkOwl's prospective customers, in part because the two parties are competitors in the same sphere. *Response* [#51] at 2-3. Thus, ArkOwl avers that the universe surveyed by Mr. Keegan encompasses enough of DarkOwl's prospective customers because there is competitive overlap between the parties, i.e., the parties are both involved in

cybersecurity and fraud prevention in connection with customer data verification. *Id.* at 3-5. The issue of competitiveness is thus relevant to the analysis of whether the appropriate universe was surveyed, which the Court now turns to.[4]

Mr. Keegan acknowledged in his report that "the appropriate population from which to sample is likely purchasers of services or services bearing the 'junior' user's mark." *Keegan Report* [#47-1 at 5; *see also Hr'g Tr*. [#70], *Keegan Test*. at 9:1-4, 34:4-8. Nonetheless, he did not use that population. In fact, when he designed the survey, Mr. Keegan testified that he did not have any information about DarkOwl's current customers or the job titles of customers that DarkOwl is targeting, nor did he research the job titles of DarkOwl's targeted customers, other than reviewing DarkOwl's website and seeing the customers listed on the website. *Keegan Dep*. [#47-2] at 183:23, 184:8, 189:8-15; *Hr'g Tr*. [#70], *Keegan Test*. at 48:12-49:1. Further, Mr. Keegan did not understand from his review of DarkOwl's website that its services included national security and law enforcement, and that its customers included intelligence and law enforcement agencies. *Keegan Dep.* [#47-2] at 197:8-199:10; *Hr'g Tr*. [#70], *Keegan Test.* at 46:9-17. Instead, Mr. Keegan's investigation consisted primarily of talking to ArkOwl and reviewing information about job titles of ArkOwl's customers to inform him as to job titles of DarkOwl customers, many of which he said referenced cybersecurity. *See Hr'g Tr* [#70], *Keegan Test*. at 8:11-16, 15:21-16:2; *Keegan Dep.* [#47-2] at 183:11-22. The Court agrees with DarkOwl that as a result, Mr. Keegan did not design a survey that would test the correct universe, i.e., prospective customers of DarkOwl's services. *See Motion* [#47] at 5-7.

---

[4] The Court addresses the issue of whether the parties are direct competitors, an assumption made by Mr. Keegan in designing the survey, in Section III.B.2, *infra*.

Turning more specifically to that issue and the survey design, Mr. Keegan determined from his investigation that the target audience or universe for the study was likely purchasers of cybersecurity software services, *Keegan Report* [#47-1] at 15, and concluded that the parties are competitors because they are both in the cybersecurity industry. *Hr'g Tr.* [#70], *Keegan Test.* at 40:20-23. The target universe of likely purchasers of cybersecurity software services was used even though Mr. Keegan did not understand the types of customers that DarkOwl markets to, and acknowledged that two companies can be in the cybersecurity industry without being direct competitors. *Id.* at 40:24-41. Further, Mr. Turnage presented unrebutted testimony that the term "cybersecurity industry" is incredibly broad, and that there are approximately 10,000 to 14,000 cybersecurity companies around the world that offer an immense diversity of services and technology. *Hr'g Tr.* [#71], *Turnage Test.* at 81:18-82:10. Some compete with each other and some do not. *Id.* at 82:11-13.

After selecting an overbroad target universe, Mr. Keegan used a funnel approach whereby he asked a series of screening questions to respondents to obtain the survey population. *Hr'g Tr.* [#70], *Keegan Test.* at 9:13-19; 10:1-9. After ascertaining that the respondent was employed, *id.* at 10:10-23, the survey then asked which services the respondent used as part of his or her job responsibilities. A number of categories of services were provided, one of which was data services. *Hr'g Tr.* [#70], *Keegan Test.* at 10:22-11:6; *Keegan Report* [#47-1] at 13. If the respondent answered yes to data services being part of his or her job responsibilities, he or she was permitted to proceed in the survey. *Keegan Report* [#47-1] at 13. The next question asked if the respondent used specific types of vendor-provided services as part of his or her job responsibilities.

Seven categories were included, two of which were (1) user or customer identification or data verification services, and (2) fraud verification services. *Id.* at 14; *Hr'g Tr.* [#70], *Keegan Test.* at 11:7-14. If the respondent indicated that he or she used "user or customer identification or data verification services" and/or "fraud prevention services" as part of his or her job responsibilities, s/he was permitted to continue with the survey. *Keegan Report* [#47-1] at 14.

The final question asked the respondent to imagine that his or her company was in need of vendor(s) to supply (1) data for customer verification; (2) data and cybersecurity software and services; (3) darknet intelligence services; and (4) darknet content index services. *Keegan Report* [#47-1] at 14. The respondent was then asked to describe his or her involvement in the process of identifying, vetting, and hiring such vendor(s). *Id.* at 15. If the respondent was part of the decision-making process for hiring a vendor in any of the categories provided, the respondent was qualified for the survey. *Id.*; *Hr'g Tr.* [#70], *Keegan Test.* at 11:7-25, 13:5-12. Mr. Keegan stated that this funnel process "started broad" and "got down to the narrow DarkOwl universe." *Id.* at 12:1.

After the final funnel question, and for informational purposes to ensure that the survey respondents were in the relevant occupational roles of the types that would be likely to purchase the parties' services, the survey then asked for the respondents' job titles. *Hr'g Test.* [#70], *Keegan Test.* at 13:5-12; *Keegan Report* [#47-1] at 15. Mr. Keegan testified that the job titles of the respondents, which included such things as manager, president, officer, chief (a lot of C level individuals), were the exact set of job titles he would expect from customers of DarkOwl, and were indistinguishable from the list of job titles he reviewed from DarkOwl's customers. *Id.* at 13:7-15:7. This gave Mr.

Keegan confidence in the data. *Id.* Mr. Keegan ended up with 207 qualified respondents, which was 15% of those invited to take the survey. *Id.* at 9:21-25; 24:4-6. Mr. Keegan acknowledged that this was a low incidence of qualification, but he testified that was fine and that he often ends up with low incidence populations. *Id.* at 24:7-25:1.

The problem the Court finds with the screening questions is that the respondents were never actually screened on whether they or their employers used the type of services provided by DarkOwl. Thus, as DarkOwl points out, in order to qualify for the survey, respondents had to select one of two qualifying answers from a longer list of types of services that respondents used as part of their job responsibilities: (1) user or customer identification or data verification services; or (2) fraud prevention services. There is no mention of DarkOwl's services, dark web data collection and a dark web searchable database, in the survey until after respondents had answered the final qualifying question and confirmed that they were part of the broader customer universe involving fraud prevention services or user or customer identification or data verification services.

Thus, dark net services were not even mentioned until the final screening question, but that question did not require that the company or organization that the respondent worked for actually use such services. Instead, the respondent was qualified if he or she stated that s/he was part of the decision-making process for a number of services, any of which rendered the respondent qualified. Those individuals and the organizations they worked for thus could have been involved only with data for customer verification or cybersecurity software and services, with no involvement in dark web data services or hiring venders for such services. *See Hr'g Ex. 22*, *Hr'g Tr.* [#70], *Keegan Test.* at 39:8-25, 40:6-14, 50:10-14. Mr. Keegan agreed at the hearing that there was no way to know

from the screening questions whether potential customers of DarkOwl's dark web services actually participated in the survey, or to know the type or size of organization that the respondents worked for relevant to DarkOwl's prospective customer base. *Hr'g Tr.* [#70] at 49:2:14. Further, there was no way to determine if the respondents or their employers actually used dark web data. *Id.* at 50:2-9:

The testimony of DarkOwl's survey expert, Mr. Poret, aptly demonstrates the flaws with Mr. Keegan's methodology, which testimony the Court finds persuasive. Mr. Poret testified that the screening questions needed to identify customers of the relevant service, which in this case was DarkOwl's services involving the dark web. *Hr'g Tr.* [#70], *Poret Test.* at 157:13-158:7. Mr. Poret stated that the screening questions Mr. Keegan used were extremely overbroad and inaccurate and could not have led to identifying the relevant universe. In fact, Mr. Poret testified that there was no way to know whether even a single person who took the survey was in the relevant universe. *Id.* at 158:8-13. Mr. Poret then addressed why the questions were flawed.

The first question asking which types of services the respondent used as part of his or her job responsibilities did not reference any services related to the dark web, and the selection of data services which was required to continue with the survey was flawed, according to Mr. Poret, because the term "data services" is overbroad and encompasses many things that have nothing to do with DarkOwl's services. *Hr'g Tr.* [#71], *Poret Test.* at 158:14-160:2 The term is thus overinclusive, and is also underinclusive because a customer of dark web services might not pick data services. *Id.* at 160:3-14. The second question which asked about vendor services, and qualified the respondent if he or she used (1) fraud prevention services or (2) user or customer identification or data verification

services, was also flawed according to Mr. Poret.  He testified that those two categories do not come even close to identifying a person as a prospective DarkOwl customer, and as to the second category, is more of an attempt to identify an ArkOwl customer, not a consumer of dark web services.  *Id.* at 160:15-24.  Further, Mr. Poret testified that the term "fraud prevention services" (like the term "data services") is vague and overbroad because it covers countless things that have nothing to do with what DarkOwl does.  *Id.* at 160:25-162:4.  Accordingly, Mr. Poret stated that the screening questions simply did not target the appropriate universe of DarkOwl's prospective customers. *Id.* at 174:18-25

Because Mr. Keegan used the wrong universe, the responders qualified for the survey on an improper basis.  Mr. Poret opined that this was a fatal flaw rendering the survey unreliable.  In fact, Mr. Poret testified that this "was the largest possible version of a flaw because we have no idea if the people who took the survey are even in the same ballpark" as the proper universe of DarkOwl's prospective customers.  *Hr'g Test.* [#71], *Poret Test.* at 164:13-165:6, 165:20-166:1.  Even if there was some overlap in the potential target customers, Mr. Poret opined that the survey is flawed because it cannot be known whether there is a single prospective DarkOwl customer in the survey.  *Id.* at 165:20-166:1.  Mr. Poret opined that this was a serious problem because if the respondents are not prospective DarkOwl customers, they would not have an interest in truly paying attention to the websites shown in the survey, and would not have the knowledge and sophistication that a real prospective DarkOwl customer would have to be able to understand what the service is and what type of company they are dealing with.  So the wrong universe, according to Mr. Poret, renders the test artificial and unrealistic.  *Id.* at 165:6-19.

DarkOwl points out that other similar surveys from Mr. Keegan have been excluded by courts for this very flaw.  Thus, in *Kudos Inc. v. Kudoboard LLC*, No. 20-CV-01876-SI, 2021 WL 5415258 (N.D. Cal. Nov. 20, 2021), the court excluded a survey of Mr. Keegan based on a similar format with similar screening questions.  *Id.* at *11-12.  Mr. Keegan "relied exclusively on current users of employee recognition software [Kudos' services] rather than prospective buyers of Kudoboard's good or services[,]" which the court found "puzzling" given Mr. Keegan's acknowledgement that the appropriate population was prospective customers of Kudoboard as the junior user.  *Id.* at *12.  The court excluded the survey on this basis because the "sample selection does not capture a representative sample of the customers 'most likely to purchase' Kudoboard's products."  *Id.*

Similarly, in *vonRosenberg v. Lawrence*, 413 F. Supp. 3d 437 (D.S.C. 2019), the court excluded a survey of Mr. Keegan because it "improperly limited respondents . . . to surveying the wrong universe of respondents[,]" and the universe selected had "the inappropriate effect of improperly weighing members affiliated with the Plaintiffs' organizations stronger than members of the Defendants."  *Id.* at 454-55.  DarkOwl argues, and the Court agrees, that Mr. Keegan's failure to identify the proper universe is a fatal flaw which requires exclusion of the survey.  *Id.; Kudos, Inc.*, 2021 WL 5415258, at *12*; see also Hain Blueprint, Inc. v. Blueprint Coffee*, LLC, No. 4:16-cv-1758-SNLJ, 2018 WL 6246984, *6-7 (E.D. Mo. Nov. 29, 2018) (stating that "'[a] survey can be so badly flawed that it cannot be used to demonstrate the likelihood of consumer confusion' and that "[w]hen surveys do not appropriately target the junior user's goods and services, . . . they have been routinely excluded as unhelpful") (citing cases) (quotation omitted).

In so finding, the Court rejects ArkOwl's argument that there is a "significant likelihood" that the market reflected in Mr. Keegan's survey universe includes DarkOwl's prospective customers.  ArkOwl thus cites cases which it argues supports the fact that the survey does not necessarily need to be designed to survey the prospective consumers of the junior user if the universe necessarily includes such customers.  *Id.* at 7; *see OraLabs, Inc. v. Kind Grp. LLC*, No. 13-cv-00170-PAB-KLM, 2015 WL 4538442, at *5 (D. Colo. July 28, 2015); *Kodiak Cakes, LLC v. JRM Nutrasciences, LLC*, No. 22-cv-00581-DBB-JCB, 2022 WL 17340660, *12-13 (D. Utah Nov. 30, 2022).  Here, however, the Court has found from the flawed nature of the target audience and screening questions that it cannot be determined whether there is even a single prospective customer of DarkOwl who qualified as part of the survey universe.  From this, it certainly cannot be said that that there was a significant likelihood that the survey universe included such customers of DarkOwl.

### b.    Whether the Parties Are Direct Competitors

Related to the Court's finding that Mr. Keegan did not identify the appropriate universe is the fact that the survey was based on Mr. Keegan's assumption that DarkOwl and ArkOwl are direct competitors because they are in the cybersecurity industry.  *See Hr'g Tr.* [#70], *Keegan Test.* at 40:17-23.  Competitors are, according to Mr. Keegan, companies that compete for the same business, and Mr. Keegan acknowledged that two companies can be in the cybersecurity industry but not be direct competitors.  *Id.* at 40:24-41:2, 42:15-17.  Mr. Keegan relied for his assumption that the parties are competitors, at least in part, on his discussions with ArkOwl.  *Id.* at 41:3-11.  Mr. Keegan acknowledged that if the parties are not direct competitors, the applicability of the survey would be

impacted. *Id.* at 41:18-43:5. Mr. Keegan stated that he is not in the business of measuring confusion among customers of parties that are not competitors, because the issue of confusion would not be relevant in those circumstances. *Id.* at 44:24-45:44. Thus, even if marks are confusing, Mr. Keegan acknowledged that this does not matter if the parties are not competitors. *Id.* at 59:20-23. Mr. Keegan also acknowledged that he was not aware of any instances in the marketplace where the parties' products are encountered in a directly competitive setting, although he stated he is not an expert in the industry. *Id.* at 44:15-21.

Here, the Court finds for purposes of the Motion [#47] that ArkOwl has not established that the parties are direct competitors, which impacts both the selection of the appropriate universe and the overall reliability and applicability of the survey. *See Hr'g Tr.* [#71], *Poret Test.* at 174:18-23. As discussed in more detail in Section II, *supra*, DarkOwl offers its customers access to a database of dark web data and offers services such as threat intelligence, assessment of third-party risk, assessment of risk to critical infrastructure, and threats to national security. The services provided have no relation to approving a commercial transaction in real time or PII verification, these services have never been requested by DarkOwl's customers, and DarkOwl's business and platform are not built or set up to provide that data. DarkOwl provides its data to sophisticated cybersecurity professionals, including national intelligence and law enforcement agencies, who go through a stringent vetting process.

ArkOwl, on the other hand, is fairly characterized as an identity and verification service provider, and its main focus is personal identifiable information ("PII") verification

and validation used to support online purchase transactions.[5]   There is no evidence suggesting that ArkOwl's customers are sophisticated in the manner that DarkOwl's clients are, or that ArkOwl's clients have to go through a vetting process such as is required of DarkOwl's clients.   ArkOwl does not search the dark web, and the only information it offers that may come from the dark web is breach data gathered by another company.   The breach data is not, however, further investigated by ArkOwl for risk assessment, as DarkOwl does.   Based on the foregoing, the Court finds that the parties' services and their target customers are quite distinct, and the parties do not compete for the same business.

ArkOwl argues, however, that DarkOwl has in more recent years focused in its marketing materials on cybersecurity companies that aggregate data from multiple sources and create their own product to serve organizations like retail establishments, banks, or law enforcement.   ArkOwl thus asserts that the primary focus of both entities now is to sell data, including PII and breached data, to cybersecurity companies for them to use in things like PII and fraud prevention, i.e., ArkOwl avers that the parties use the data for the same purposes.   *See Hr'g Tr.* [#71], *Opening Argument* at 17:22-18:25, 19:24-20:3; *Closing Argument* at 68:8-72-20.   In support of ArkOwl's argument, it asserts that DarkOwl's own internal documents demonstrate this overlap.   Thus, ArkOwl presented certain DarkOwl marketing documents as exhibits at the hearing, including Exhibits 16-

---

[5]  Consistent with that, the trademark registration for the ArkOwl mark states that the services covered by the registration are software service, SAS services mainly, hosting software for use by others or verifying the credibility of data provided by E-commerce customers in an online order. *Hr'g Ex. 23.*  Mr. Keegan was not aware that ArkOwl's registered trademarks identified ArkOwl's business as verifying the credibility of E-commerce customers in an online order.  *Hr'g Tr.* [#70], *Keegan Test.* at 58:5-17.

19, which ArkOwl contends show that DarkOwl has use cases (which the Court construes as examples of DarkOwl's services) that overlap with ArkOwl's business. The marketing documents also show, according to ArkOwl, that DarkOwl is targeting customers in the cybersecurity industry, including some of ArkOwl's prospective customers, to use its dark net data for the same uses as ArkOwl's business. *See, e.g., Hr'g Tr.* [#71]*, Turnage Test.* at 108:9-139:23.[6]

The Court finds that these documents are not sufficient to counter Mr. Turnage's testimony that DarkOwl does not perform the type of PII verification services that ArkOwl performs, and that its platform is not built or set up to provide that kind of data. Mr. Turnage explained that the marketing documents were prepared by a new VP of Sales who had only been with DarkOwl about a month and had little familiarity with its business. The target market the VP identified was not used very long and was discarded when DarkOwl realized that the list of prospective customers came from the internet, included customers that DarkOwl already had, and "in many cases, the use case was nonsense; it didn't exist." *Hr'g Tr.* [#71], *Turnage Test.* at 133:5-139:14. Further, as discussed in Section II, *supra,* Mr. Turnage explained as to the solicitation emails that they came from a third party marketing company that DarkOwl hired for a period of time to send out email blasts, and that DarkOwl did not approve the lists of companies to whom the blasts were sent. *Id.* at 103:14-24. DarkOwl terminated the company's services because they did not result in any business. *Id.* at 104:13-19. Moreover, as Mr. Poret noted, even if two organizations happen to share a customer or a target customer, that does not necessarily

---

[6] *See also Hr'g Ex. 20,* consisting of solicitation emails on behalf of DarkOwl to customers or prospective customers of ArkOwl.

make the organizations competitors, since a large organization uses all kinds of different services.  Thus, the fact that a particular customer might use two different services does not necessarily mean that there is a competitive relationship between those services.  *Id.* at 164:1-12.

Ultimately, the Court finds that ArkOwl has not shown that DarkOwl's business directly competes with ArkOwl at this time.  To use Mr. Keegan's definition of a competitor, the parties do not compete for the same business.  *See Hr'g Test.* [#70], *Keegan Test.* at :24-41:2; 42:15-17.  While ArkOwl may worry that this will change with time given how DarkOwl's focus has changed over the years, it has not demonstrated for purpose of the Motion [#47] that the parties are currently direct competitors   This impacts both the reliability of the survey and even its applicability, as Mr. Keegan acknowledged.  As to the reliability issue, Mr. Poret testified that the survey is unreliable because its design was based on Mr. Keegan's inaccurate characterization that the parties offer essentially the same type of service in the same marketplace and that such services are directly competing alternatives.  *Hr'g Tr.* [#71], *Poret Test.* at 156:7-13.  Accordingly, Mr. Keegan assumed that the parties have the same potential customers, which led to a selection of the wrong universe.  *Id.* at 156:15-23.  Mr. Poret testified that this led Mr. Keegan to assume that it would be appropriate to ask the participants to review the parties' websites in close proximity, when that would be appropriate only if the parties were direct competitors or their services were so highly related that the consumer in the real world would actually consider those things in close proximity.  *Id.* at 157:17-158:5, 166:2-19. The survey was, from this standpoint, artificial and unrealistically suggestive according to Mr. Poret.  *Id.* at 166:20-25.   The Court finds this testimony persuasive.

Finally on the issue of competitiveness, the Court clarifies that it has found only for purposes of the Motion [#47] that the parties are not direct competitors, since this was the basis of Mr. Keegan's survey format.  The Court does not determine herein whether the parties are competitors in a broader sense, relevant to ArkOwl's argument that there is competitive proximity between the parties.  This larger issue of competitiveness is a factor that the Court must ultimately consider at trial in connection with whether there is a likelihood of confusion between the parties, which requires that the Court address several factors. *See HealthONE of Denver, Inc. v. UnitedHealth Group*, 872 F. Supp. 2d 1154, 1174 (D. Colo. 2012) (citing *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 554 (10th Cir. 1996)).  The Court notes that the issue of whether the parties are competitors is usually addressed under the factor requiring an examination of "the similarities and differences of the parties' goods, services, and marketing strategies (also stated as the relation in use and the manner of marketing between the goods and services marketed by the competing parties.)"  *Id.* at 1181-82.  "Typically, '[t]he greater the similarity between the products and services, the greater the likelihood of confusion.'"  *Id* at 1181 (quotation omitted).  Direct competition is not *sine qua* non for this factor because trademark rights extend to 'non-competing but related goods.'"  *Id.* at 1182 (quotation and internal quotations omitted).  Instead, "under the related goods doctrine, the appropriate inquiry is whether the goods and services of the parties are related in the minds of consumers, not whether the goods and services are directly competitive."  *Id.*  Again, the issue of whether the parties are competitors in this broader sense is reserved for trial.

**2.      Whether a Representative Sample Was Drawn from the Appropriate Universe**

DarkOwl also argues that the general consumer panel that Mr. Keegan used for the survey did not draw a representative sample from the appropriate universe, and that this is another flaw that supports the exclusion of the survey and Mr. Keegan's testimony. *Motion* [#47] at 10.  Mr. Keegan acknowledged that he did not provide any criteria as to the consumers who should comprise the survey panel to the two companies he used to obtain the survey population.  *Hr'g Tr.* [#70], *Keegan Test.* at 50:15-21.  The survey panel used was a general consumer panel.  *Id.* at 50:22-24.  DarkOwl asserts that in order to design the survey to focus on its services and prospective customers, Mr. Keegan should have used a specialty panel instead of a general consumer panel.  *Motion* [#47] at 12. DarkOwl further asserts that Mr. Keegan oversimplified its services and target population in order to manufacture a particular result, and used a general consumer panel instead of a specialty panel in furtherance of that goal.  *Id.* at 13.

Turning to the Court's analysis, Mr. Keegan testified that specialty panels may be appropriate when a survey involves specialized products or the target population at issue is unique and has specific characteristics that should factor into the universe selection. *Hr'g Tr.* [#70], *Keegan Test.* at 51:13-16.  According to Mr. Poret, a specialty business panel recruits people with high ranking positions at sophisticated business who are being paid higher incentives to do the survey.  *Hr'g Tr.* [#71], *Poret Test.* at 162:21-163:3.

Here, Mr. Keegan acknowledged that only a very low incidence of ordinary consumers would use DarkOwl's services.  *Hr'g Tr.* [#70], *Keegan Test.* at 52:2-10. Consistent with that, DarkOwl presented evidence that its target consumers are a highly specialized group, consisting of intelligence agencies, law enforcement agencies and agencies related to national security, and large organizations where the C suite (the

executives) are targeted.   Nonetheless, Mr. Keegan chose to use the same general consumer panel that he has used in the past, for example, to survey confusion among consumers as to bread products.   *Keegan Deposition* [#47-2] at 156:19-22.   DarkOwl argues, and the Court agrees, that Mr. Keegan seemed to have little understanding of the unique characteristics of DarkOwl's customers when he constructed the survey, as previously discussed in Section III.B.1, *supra*, likely due to the fact that Mr. Keegan did not specifically research who DarkOwl's customers were other than seeing a few names of clients on DarkOwl's website.   *See also Keegan Dep.* [#47-2] at 197:12-14, 197:22; 198:5, 198:15-199:10.[7]

The Court finds that the use of a general consumer panel, combined with Mr. Keegan's failure to identify the wrong universe, meant that the survey failed to obtain a sample group that is representative of the target population, i.e., prospective customers of DarkOwl.   Again, the Court finds Mr. Poret's testimony on this issuer persuasive.   Mr. Poret testified, consistent with Mr. Turnage's testimony, that DarkOwl offers "very sophisticated, very complex services" to people in high level positions in sophisticated organizations.   *Hr'g Tr.* [#71], *Poret Test.* at 154:2-21.   Mr. Poret opined that a general consumer panel would not reach this universe.   *Id.* at 154:22-155:10, 162:5-163:4.   The testimony of Mr. Poret also revealed that he was asked to do a survey on likelihood of confusion for DarkOwl but concluded that he could not reliably reach the proper universe, even with a specialty panel.   *Id.* at 154:22-153:10, 62:5-163:4.

Mr. Poret also referenced the fact that only 15 percent of the respondents from the general consumer panel met the criteria and qualified for the survey.   That alone,

---

[7]  The Court notes that while DarkOwl's website listed a few representative clients, it did not state what services those clients actually used.

according to Mr. Poret, shows that a credible universe of prospective DarkOwl customers was not found, because there is no way that 15 percent of people in the general consumer panel are in the market for this highly specialized, sophisticated, and expensive service. That number would be, in Mr. Poret's opinion, more like one in 10,000 or one in 100,000. Instead, Mr. Poret opined that the respondents who qualified likely associated data services and fraud prevention with some of the much more typical things associated with those services, rather than the specialized services of DarkOwl. *Id.* at 163:5-25. For example, Mr. Poret stated that the most common use of the term "data services" in his opinion are services provided by companies that store and share data, such as Dropbox, Google Drive, Apple, and Microsoft. *Id.* at 159:7-12.

The Court finds that this flaw in not drawing a representative sample from the universe contributes to the unreliability of the survey.

### 3. Whether the Survey Created an Artificial Marketplace and Used a Leading Design

DarkOwl next argues that the survey designed by Mr. Keegan created an artificial marketplace and used a leading design. For a survey to provide reliable information, the survey must resemble the manner in which consumers would view the products in the marketplace. *Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir. 1991). The survey must attempt to replicate typical market conditions and simulate how a potential consumer would make a purchasing decision. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983). "[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results." *McCarthy*, § 32:163. In addition, when evaluating the objectivity of a survey, a court must consider the degree of suggestiveness

of the survey questions. *1–800 Contacts, Inc. v. Lens.com, Inc.*, No. 2:07-cv-591 CW, 2010 WL 5186393, at *7 (D. Utah Dec. 15, 2010). A survey is not credible if it relies on leading questions which are "inherently suggestive and invite guessing by those who did not get any clear message at all." *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d Cir. 1994).

DarkOwl argues that Mr. Keegan failed to design a survey that would simulate how consumers might actually encounter the services and marks of both parties under marketplace conditions. *Motion* [#47] at 13. This, DarkOwl argues, is in violation of a "golden rule of sound consumer survey design[,]" and cites cases finding that the failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility. *Id.* DarkOwl alleges four flaws in this respect regarding the design of the survey: (1) it implied that DarkOwl offered data services instead of allowing respondents to make their own conclusions and was thus leading; (2) it provided only partial snapshots of websites for comparison; (2) it allowed but did not require respondents to further inquire about the nature and offerings of the companies in the survey; and (3) it allowed respondents to move forward in the survey after viewing the partial snapshots of each website for 10 seconds. *Motion* [#47] at 13-14. ArkOwl asserts that the survey used appropriate questions to approximate the relevant marketplace. *Response* [#51] at 8.

Turning to the survey, Mr. Keegan began the study as to likelihood of confusion by telling the respondents that on the next page they would " be shown the webpage of a vendor that provides data services[,]" which next page showed ArkOwl's webpage. *Keegan Report* [#47-1] at 15-16. Mr. Keegan then told the respondents that they would be shown additional websites of data vendors, after which they were shown a snapshot

of the websites of four other companies, including DarkOwl. *Id.* at 17-19. Thus, the survey did not show just the webpages of the parties and the three other control companies and allow respondents to draw their own conclusions about their services. Instead, the survey characterized the services provided by the companies for the respondents. The respondents were also told that they could take as long as they wanted to look at the webpages and could look at an expanded view of the website, *id.*, but DarkOwl's assertion that the respondents were permitted to move on from the website snapshots after ten (10) seconds is unrefuted.

Mr. Poret testified on this issue that the survey's introduction to both DarkOwl's and ArkOwl's services as "data services" exacerbated the problem with Mr. Keegan's targeting of the improper universe by telling the respondents the companies are in the same type of service when they are not. *Hr'g Tr.* [#71[, *Poret Test.* at 167:1-13. Further, Mr. Poret noted that the survey gave the respondents the opportunity to limit their exposure to the web pages. This is a problem, according to Mr. Poret, because DarkOwl's services are sophisticated, involved, and expensive, and it is extremely difficult to simulate that type of consumer experience in a survey and have the respondent understand what the services really are when the consumer is taking, for example, 30 seconds to glance at the webpages. *Id.* at 167:14-25. Another problem Mr. Poret identified is that the lineup of the webpages that were being shown besides ArkOwl and DarkOwl's websites are not competitors of DarkOwl, and so the survey did not realistically represent the marketplace of options. *Id.* at 168:2-7.

The Court finds Mr. Poret's testimony persuasive on the flaws with this survey design, and notes that the *Kudos* case, disused earlier, excluded a survey of Mr. Keegan

based on a similar lead-in statement.  *See Kudos Inc.*, 2021 WL 5415258 at \*12.  The survey in that case stated that, "[s]hown below, in random order, are additional pages for companies offering employee recognition and engagement software, and then displayed four webpages, including that of the defendant.  *Id.* at \*11-12.  The court found that this statement constituted an improper lead-in and characterization that departed from simulated market conditions by describing the products that followed.  *Id.*; *see also Universal City Studies, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey based on, among other things, its leading design; explaining that the "inquiry was an obvious leading question in that it suggested its own answer.  The participants were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations.")

Based on the foregoing, the Court agrees with DarkOwl that the survey created an artificial marketplace and used a leading design, and that this is another flaw that impacts the reliability of the survey.

### 4.    Whether the Survey Used an Appropriate Control

Finally, DarkOwl argues that Mr. Keegan's survey did not use an appropriate control.  *See Motion* [#47] at 15.  "A survey designed to estimate likelihood of confusion must include a proper control."  *THOIP v. Walt Disney Co.*, 690 F.Supp.2d 218, 240 (N.Y.S.D. 2010).  "[A] survey control is always necessary to pin down causation: whether survey responses in fact reflect the thing the survey is designed to prove, whether it is secondary meaning or that the accused mark causes confusion or some other issue."  *McCarthy*, § 32:187.  A control isolates "noise" in the survey.  *Id.*  Noise is statistically irrelevant information that can result from situations like a respondent always selecting

yes, or guessing "because they are bored or hurried." *Id.* Noise might result in "false positives arising from something other than the particular confusion that is alleged and that the survey aims to capture." *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1148 (10th Cir. 2013) (citing McCarthy, § 32:187).

DarkOwl makes two specific arguments in connection with the control used by Mr. Keegan: (1) that he failed to use a control group and only used a single set of survey respondents; and (2) that the internal control used in the survey was improper. *Motion* [#47] at 15-18. ArkOwl responds by asserting that Mr. Keegan's use of an internal control was proper, and that an internal control is a recognized and accepted control used in survey construction. *Response* [#51] at 11-12.

The Court first addresses DarkOwl's argument that the lack of a control group in the survey is a critical flaw that justifies the survey's exclusion. *See Motion* [#47] at 15-16. Instead of using a single group which was shown an internal control, DarkOwl contends that Mr. Keegan should have used two groups, where the first group was shown the five comparison companies used in the survey, and the second group was shown the five comparison companies but with DarkOwl's website substituted for a control stimulus. *See id.; McCarthy*, 32:187 ("A properly constructed survey has at least two groups of respondents: one group (the 'test cell') is shown the allegedly infringing mark; the second group (the 'control cell') is shown a mark similar in appearance to the test cell, except for the designation whose influence is being tested.")

The Court finds that this issue goes merely to the weight of the survey. While Mr. Poret opined that a control group should have been used (Hearing Transcript [#71] at 168:8-16), Mr. Keegan testified that it is acceptable in the survey field to use either an

external control (between subject design, consisting of two or more control groups) or an internal control (within subject design, consisting of a single control panel).  *Hr'g Tr.* [#70], *Keegan Test.* at 28:1-21.   There is case authority supporting Mr. Keegan's testimony.  *See, e.g., Maui Jim, Inc. v. SmartBuy Guru Enterprises*, No. 1:16 cv 9788, 2019 WL 5577165, at *3 (N.D. Ill. Oct. 29, 2019) (permitting a survey using an internal control method, and noting that the fact a survey "'used a control that could have been 'stronger' or 'better' may mean it is entitled to less weight, it does not mean that the survey does not provide relevant information'") (quotation omitted); *Rice v. Brand Imports, L.L.C.*, No. 1:09-CV-3254-MHS, 2011 WL 13214072, at *3 (N.D. Ga. Mar. 4, 2011) (finding that survey which used internal controls rather than a separate group did not invalidate the survey); Rappeport, M. (2012) "Design Issues for Controls." in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* Diamond, S.S. and Swann, J.B., eds., American Bar Association, pp. 236-237).*see also Spangler Candy Co. v. Tootsie Roll Indus.*, *LLC*, 372 F. Supp. 3d 588, 597 (N.D. Ohio 2019) (stating in connection with a survey by Mr. Keegan that while the use of a proper control is necessary, a control group is not mandated, and finding that Mr. Keegan's use of multiple "control products" in a sample group was not grounds for exclusion).

Nonetheless, when the fact that Mr. Keegan did not use a control group is considered in connection with DarkOwl's argument that the array of the three purported "controls" was improper (Motion [#47] at 16), the issue of a whether a proper control was used becomes more problematic.  Mr. Keegan testified that the goal of choosing a control is to find one that comes as close to possible to the test stimulus without itself being subject to a claim that it is infringing or misleading.  *Hr'g Test.* [#70], *Keeton Test.* at 53:7-

11. DarkOwl asserts that the three control companies whose websites were used, Ekata, Gemini Advisory, and SpyCloud (Hearing Transcript [#70], Keegan Testimony at 29:21-23), were ArkOwl's known competitors and did not share the attributes of a proper control. Thus, according to DarkOwl, the control companies' marks did not mirror or share any characteristics with its mark, making it highly unlikely that a respondent would select them in the survey. *Motion* [#47] at 16; *see also Hr'g Tr.* [#70], *Keegan Test.* at 53:18-54:5. As a result, DarkOwl argues that the control companies could not isolate potential confusion as intended or fulfill the basic function of estimating the degree of background noise in the survey. *Id.*

The Court notes on this issue Mr. Keegan's testimony that he was not trying to control for DarkOwl's mark, and that the three controls he used did come close to the test stimulus. *Hr'g Test.* [#70], *Keeton Test.* at 54:55:7. Mr. Keegan further opined based on the hearing testimony and evidence he reviewed that one of the controls was a confirmed competitor of DarkOwl and the other two were targets of DarkOwl, and were listed under dark web services *Id.* at 30:22-31:8; *see also* 54:24-55:7. The survey also, according to Mr. Keegan, controlled for marks since the marks of the controls were used in cyber security. *Id.* at 55:8-10. Thus, Mr. Keegan said he did not think one could do better than the controls he selected. *Id.* at 31:7-8.

Mr. Poret, however, pointed out significant problems with the three controls that Mr. Keegan used. In Mr. Poret's report, he opined that the webpages of the three companies differ from the DarkOwl webpage not only in the name of the service, but in all other elements, including the type and description of services offered and the trade dress, style, and formatting of the pages. *Poret Report, Hr'g Ex. 21* at 28-29. The names

of the third-party services are also, according to Mr. Poret, too far afield from the name "DarkOwl" to serve as proper controls, since none of them include a term that refers to "dark" for the dark web, or an owl or other bird term.  *Id.* at 29-30.  Mr. Poret explained that the need for a vigorous control stems from the fact that the Keegan survey is showing both the ArkOwl and DarkOwl websites to the same respondents in very close proximity and under circumstances that are suggestive.  He further stated

> This may lead respondents to find connections/similarities that would not result in actual consumer confusion under realistic marketplace conditions. A control is needed that can measure and weed out the impact of this survey procedure.  The names Ekata, Gemini Advisory, and SpyCloud are not effective enough as controls because they are too different from DarkOwl.

*Id.* at 28.

The Court gives more weight to Mr. Poret's report than the testimony of Mr. Keegan or his report (#47-2] at 6-9) on this issue.  While Mr. Keegan stated in the report that the control marks used in the study properly shared a variety of characteristics with DarkOwl's mark, he did not identify any common characteristics and this is not apparent from the Court's review of the marks.  The Court again finds that this flaw contributes to the overall unreliability of the survey.

## IV.  Conclusion

The Court retains the authority to determine what weight, if any, it should afford a consumer survey.  *Water Pik*, 2012 WL 2153162, at *11.  Here, the Court has found a flaw with Mr. Keegan's survey in that he failed to survey the appropriate universe, i.e., DarkOwl's prospective customers as the junior user.  In fact, the Court found from the screening questions used in the survey that there was no way to know if even one prospective customer of DarkOwl was in the survey universe.  This is a fatal flaw which

requires exclusion of the survey.  Related to this issue, the Court also found that the survey methodology was flawed because the survey was based on Mr. Keegan's assumption that the parties are direct competitors, when in fact they offer different services to different types of customers.  Other flaws found by the Court include (1) that the survey which used a general consumer panel did not and could not have drawn a representative sample from the appropriate universe; (2) the survey created an artificial marketplace and used a leading design; and (3) even if Mr. Keegan did not err in using an internal control rather than an external control with a control group, the three control companies he used did not share the attributes of a proper control and could not isolate potential confusion as intended.  These additional flaws also impact the reliability of the survey and the methodology that Mr. Keegan used in constructing the survey.

The Court finds from the foregoing pursuant to Fed. R. Evid. 403 that the probative value of the survey is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder.  Accordingly,

IT IS HEREBY **ORDERED** that Plaintiff DarkOwl, LLC's Motion to Exclude Evidence and Testimony from Mark Keegan [#47] is **GRANTED**.

Dated: June 6, 2023

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge