UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

| | |
|---|---|
| DARKOWL, LLC, | |
| Plaintiff, | Court File No. 21-cv-02163 KLM |
| v. | |
| ARKOWL LLC and ARKOWL CORPORATION, | **Defendant ArkOwl LLC's Trial Brief** |
| Defendants. | |

## INTRODUCTION

ArkOwl will establish at trial that it has senior rights to its conceptually and commercially strong mark "ArkOwl." DarkOwl's use of a nearly identical mark in overlapping markets is likely to cause confusion over the companies' affiliations. That confusion will manifest before any sale takes place (initial interest confusion), at the time a sale is made, and when consumers are using the services (post-sale confusion). The Lanham Act is designed to prevent these types of consumer confusion, and it should be invoked to require DarkOwl to adopt a different moniker and logo.

ArkOwl will establish the two necessary elements: (I) the geographic scope of its trademark rights, and (II) DarkOwl's use is likely to cause confusion.

**I.    ARKOWL SERVED A NATIONAL (AND INTERNATIONAL) MARKET BY THE TIME DARKOWL ADOPTED AND REGISTERED ITS MARK**

Registration doesn't create trademark rights. Use in commerce does. *Hana Fin., Inc. v. Hana Bank*, 135 S.Ct. 907, 909 (2015). Those common law rights extend to all areas in which the mark was first used. *Okla. Bev. Co. v. Pepper Love Bottling Co.*, 565 F.2d 629, 633 (10th Cir. 1977). ArkOwl was using its mark for years before DarkOwl created (September 2017) and registered (July 2018 and July 2019) its marks. DarkOwl did register first, which presumptively

1

gives it nationwide rights. But those rights have limits. If – as ArkOwl contends – the marks are confusingly similar, that registration only gives DarkOwl the right to use its mark in an "area" where ArkOwl was not already making "continuous prior use" of its mark.

Historically, "area" has been applied to a geographic location – a city, state or region. But this isn't a case about geography. Neither party has presence in one state or even one region of the United States. Both market and provide their services online, serving clients all over the country and even around the world. The internet, for the most part, ignores geography. As one court observed, "[i]t may be possible to view cyberspace as its own distinct market" that could be "evaluated separately from any geographic territory." *Optimal Pets, Inc. v. Nutri-Vet, LLC*, 877 F. Supp. 2d 953, 962 (C.D. Cal. 2012).

What that means for this case is that under 15 U.S.C. § 1115(b)(5), the "area" in which ArkOwl was using its mark in commerce when DarkOwl filed its registration was the entire nation. In 2018, when DarkOwl registered its mark, ArkOwl had clients using its service in all 50 states. In the relatively early days of the internet, the Northern District of Illinois looked at a similar factual scenario – each party using the internet "to not just market its services but to actually render its services" – and concluded that "such active use of a service mark on the Internet could conceivably constitute nation wide use." *Pure Imagination, Inc. v. Pure Imagination Studios, Inc.*, 2004 U.S. Dist. LEXIS 23064, at *42 n.7 (N.D. Ill. Nov. 12, 2004). "Because the parties both rely on the Internet to conduct their business as well as their marketing, they both have a worldwide distribution area." *Id*. at 24. The court there ultimately held the defendant had not introduced evidence demonstrating the nature of its web presence at the relevant times. That will not be the case here: ArkOwl can and will show that by 2017 – when DarkOwl adopted its marks, it was

2

actively engaged with clients across the country through its online services, giving it a nationwide presence. As the first to use its mark in commerce on a nationwide basis, it has the right to continue its use free from the confusion generated by DarkOwl's similar mark.

II. **CONFUSION IS LIKELY BECAUSE DARKOWL'S MARK IS VERY SIMILAR TO ARKOWL'S CONCEPTUALLY STRONG MARK AND THE PARTIES OPERATE IN CLOSELY RELATED MARKETS.**

The question in any trademark infringement case is whether the allegedly infringing mark "is likely to generate consumer confusion in the marketplace." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1114 (10th Cir. 2019). The concern is broader than merely whether a consumer is confused at the point of purchasing a product. Rather, the Lanham Act "was intended to protect the market as a whole from confusion as to the source of a product." *GMC v. Urban Gorilla, Ltd. Liab. Co.*, 500 F.3d 1222, 1227 (10th Cir. 2007). "Consumer confusion can arise prior to the sale (an initial interest), at the point-of-sale, or in post-sale contexts," all of which are actionable under the Lanham Act. *Affliction Holdings, LLC*, 935 F.3d at 1114.

To assess the likelihood of any such confusion, courts in the Tenth Circuit are guided by six non-exclusive factors:

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.

*Affliction Holdings*, 935 F.3d at 1115 (quoting *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002)). None of the factors is dispositive, but "the degree of similarity is the most important factor." *Id*.

3

### A. Similarity of Marks

Marks' similarity is tested according to three metrics: "sight, sound, and meaning." *Altira Grp. Ltd. Liab. Co. v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1198 (D. Colo. 2002). Or, as the Tenth Circuit more fully described the analysis, courts should consider the "degree of similarity" in the marks' "(i) appearance; (ii) pronunciation of the words used; (iii) verbal translation of the pictures or designs involved; (iv) suggestion." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983). Similarities between marks "are to be weighed more heavily than differences." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986).[1] Each metric tilts this factor strongly in favor of ArkOwl – though the metrics should not be "considered in isolation; they must be examined in the contexts of the marks as a whole." *Id*.

#### 1. The ArkOwl and DarkOwl Marks Are Visually Similar

In print, both parties use words that are similar: ArkOwl is a made-up, two-syllable word with a capitalized "O" in the middle; DarkOwl is nearly identical – made-up, two syllables, a capitalized "O" – except that it adds the letter "D" at the beginning. The two words look very similar.

Stylized versions of their names are likewise similar, both incorporating an image of an owl and presenting their names in all-caps:

---

[1] In the *Beer Nuts* case, the Court of Appeals – reversing the lower court – held that the marks "BEER NUTS" and "BREW NUTS" were substantially similar, and that the trial court had focused too much on their differences. "Although there are clearly differences between the marks, the phonetic and semantic similarities outweigh these differences. The words 'brew' and 'beer' are not identical, but they have a similar sound. They are both one syllable words having four letters three of which are the same, and they both begin with the same letter. Moreover, the evidence shows that the word 'brew' is a common synonym for 'beer.'" 805 F.2d at 926.



Confusion is made more likely by the fact that neither of the company names is an actual English word. "[W]ith coined words which are meaningless so far as the English language is concerned, slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between marks." *Altira Grp. Ltd. Liab. Co. v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1198 (D. Colo. 2002) (quoting *Krim-Ko Corp. Krim-Ko Div. v. Coca-Cola Co.*, 390 F.2d 728, 731 (C.C.P.A. 1968)). As the court noted in *Altira* – quoting from *E.I. Dupont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F. Supp. 502 (D.C.N.Y. 1975) – "it is generally thought that use of similar coined words renders confusion more likely." *Id*. In the *Dupont* case, as here, the difference between the words at issue was a single letter: TEFLON vs. EFLON. In *Altira*, the difference was the transposition of two letters: ALTIRA vs. ALTRIA. In both cases, the courts found the words were confusingly similar in appearance.

2. **ArkOwl and DarkOwl Sound Nearly the Same**

The companies' names are perfect rhymes. The only sonic difference between them is the "d" at the beginning of DarkOwl. That is a sound that could easily get lost in conversation. This is particularly true when ArkOwl's name is preceded by a word ending in -d, like "and." There is no phonetic difference between saying "PIPL, Ekata, and ArkOwl" versus "PIPL, Ekata, and DarkOwl."

5

In *Altira*, the words at issue had greater variety in their sound – "Al-TEER-a" vs. "Al-TREE-a" – and the court still found "their sound to be confusing. Neither of the words, alone, has any associated meaning or dictionary definition, making slight variations in appearance or sound difficult to distinguish." *Id*. at 1199. In this case, as in *Altira*, "[o]ne can easily imagine that these names would be uttered in business transactions or discussions conducted over the telephone. Clearly, the similarity of their sound would make them very difficult to distinguish in that context." *Id*.

### 3. Both Words Suggest Similar Meaning – To the Extent They Have Any Meaning At All

Neither "ArkOwl" nor "DarkOwl" has any apparent or intrinsic meaning, and "meaningless words are more easily confused." *Altira*, 207 F.Supp.2d at 1199. To the extent they imply meaning, it is the notion of watchfulness derived from the incorporation of the word "Owl." In that sense, both terms suggest the same meaning – a service that is watching out for their clients. *See Sally Beauty Co. v. Beautyco, Inc*., 304 F.3d 964, 972-73 (10th Cir. 2002) ("GENERIX" had no inherent meaning but conveyed the idea of an inexpensive product similar to the plaintiff's "Generic Value Products" mark).

### B. ArkOwl's Mark is Conceptually and Commercially Strong

"The stronger a trademark, the more likely that encroachment upon it will lead to sponsorship confusion." *Big O Tires, Inc. v. Bigfoot 4x4, Inc*., 167 F. Supp. 2d 1216, 1226 (D. Colo. 2001). Strength of a mark is measured by its conceptual and commercial strength. ArkOwl has a mark with great conceptual strength and substantial commercial strength in the context of the relevant markets.

1. **Conceptual strength**

"Under the conceptual strength prong, the categories, in descending order of strength, are: fanciful; arbitrary; suggestive; descriptive; and generic." *Big O Tires, Inc*., 167 F. Supp. 2d at 1226. "'Fanciful' marks consist of 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." *King of the Mt. Sports, Inc. v. Chrysler Corp*., 185 F.3d 1084, 1093 (10th Cir. 1999).

As has already been discussed, ArkOwl is a "coined" word with no meaning outside its attachment to this company and its business. It is a fanciful mark, affording it the highest level of conceptual strength.

2. **Commercial strength**

Commercial strength assesses "the marketplace recognition value of the mark." *Affliction Holdings, LLC*, 935 F.3d at 1115. Commercial strength measures the degree to which a mark "has come to mean that the article is his product." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013). It can be established through direct evidence – like surveys or consumer testimony – or circumstantial evidence. *Id.* The Tenth Circuit has identified multiple factors courts can use to measure a mark's commercial strength, including "(1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts made to promote a conscious connection, in the public's mind, between the mark and a particular product." *Hornady Mfg. Co. v. Doubletap, Inc*., 746 F.3d 995, 1008 (10th Cir. 2014). "A strong trademark is rarely used by parties other than the owner of the trademark whereas a weak trademark is often used by other parties." *Big Dog Motorcycles, LLC v. Big Dog Holdings, Inc.*, 402 F.Supp.2d 1312, 1337 (D. Kan. 2005).

At trial, ArkOwl will demonstrate its mark is recognized as an indication of source. No other company in the broader cybersecurity industry or ArkOwl's particular niche uses the mark ArkOwl, and only a handful use a mark even remotely similar. ArkOwl has spent little on marketing since 2012 because of the speed at which its name became recognizable through third-party promotion, and ArkOwl will demonstrate that the relevant consumer immediately understands ArkOwl to refer to the company and its product.

Because ArkOwl is very strong conceptually and commercially, it warrants broad protection.

### C. Similarities in the Parties' Markets Make Confusion More Likely

In excluding ArkOwl's survey expert Mark Keegan, the Court concluded ArkOwl and DarkOwl are not direct competitors. ArkOwl, unsurprisingly, disagrees with that conclusion, but – as the Court noted – direct competition is not required for a finding of trademark infringement.

The direct competition requirement faded away by the early 1900s. "[F]ederal courts have long since expanded trademark rights to protect against the use of a mark on non-competing but 'related' goods – that is, 'any [good] related in the minds of consumers.'" *Team Tires Plus v. Tires Plus, Inc.*, 394 F.3d 831, 833-34 (10th Cir. 2005). Under this "related goods" analysis, "the appropriate inquiry is whether the goods and services of the parties are related in the minds of consumers, not whether the goods and services are directly competitive." *Healthone of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F. Supp. 2d 1154, 1182 (D. Colo. 2012). This rule "gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be

8

affiliated with, connected with, or sponsored by, the trademark owner." *Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 804 (N.D. Cal. 1987).

The parties in *Charles Schwab & Co*., for example, were both in the financial services industry, which – like the cybersecurity industry – is broad in scope. They did not compete directly (one offered a software package that provided clients with financial information, the other a home equity line of credit) but, the court noted, "there is often no clearcut line between the services offered by one financial institution and those offered by another." *Id.* at 808. Under those circumstances, the court found confusion was likely because the parties' products "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Id*.

In the *Team Tires Plus* case, the plaintiff offered business consulting services in the automotive service industry and the defendant operated retail tire stores. They did not compete directly. In reversing a judgment of non-infringement, the Tenth Circuit reminded the lower court that "the relevant confusion under trademark law is not limited to confusion of consumers as to the source of the goods, but also includes confusion as to sponsorship or affiliation, such as a consumer's mistaken belief that a retailer is part of a larger franchising operation." *Tires Plus*, 394 F.3d at 835; see also *Planetary Motion, Inc. v. Techsplosion, Inc*., 261 F.3d 1188, 1201 (11th Cir. 2001) (trademark holder has "protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner").

In the words of Judge Learned Hand, "it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is

9

unlawful." *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928). There is no such clear distinction between ArkOwl's services and DarkOwl's. At trial, ArkOwl will demonstrate that the companies operate within the same market, soliciting and targeting the same types of customer (and in many instances, the exact same customer). DarkOwl spent a year actively soliciting ArkOwl's customer base, then hired a VP of sales (who remained in that position for nearly two years) who also identified and targeted ArkOwl's customers and direct competitors.

DarkOwl attempts to dismiss its history of soliciting ArkOwl's customers and potential customers by claiming those doing the soliciting didn't know what they were doing. But it strains credulity that a multi-million-dollar company led by such sophisticated businesspeople would have spent years and as much money as it did on marketing efforts it didn't believe would be fruitful.

Even if – as DarkOwl argues – the DarkOwl product could not be a complete substitute for ArkOwl's, ArkOwl and DarkOwl are targeting and soliciting the same companies, and evidence will show that those companies would reasonably believe that two companies with nearly identical names who provide data to cybersecurity companies to help prevent and detect fraud are somehow related.

### D.    Sophistication

Undoubtedly, the individuals making purchasing decisions regarding DarkOwl's software are sophisticated in their field. Nevertheless, at trial ArkOwl will demonstrate that this factor is neutral for two reasons: First, there is no evidence that DarkOwl's potential customers are sophisticated in recognizing and distinguishing between brands; and second, in cases such as this where initial interest and post-sale confusion are also at issue, the sophistication of the purchaser becomes nearly irrelevant.

1. **Subject Area Expertise**

"It is well settled that expertise in the field of trademarks cannot be inferred from expertise in another area." *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 595 (5th Cir. 1985). In *Kos Pharms., Inc. v. Andrx Corp.*, the trial court determined that medical professionals were too sophisticated to be confused about medications with similar names. 369 F.3d 700, 715 (3rd Cir. 2004.) The Court of Appeals reversed, holding that no reasonable factfinder could weigh the factor heavily for the junior user. *Id.* at 716. It reasoned that "there is no reason to believe that medical expertise as to products will obviate confusion as to source or affiliation or other factors affecting goodwill." *Id.*

Similarly, the Court of Customs and Patent Appeals reversed a TTAB finding of no likelihood of confusion in *Wincharger Corp. v. Rinco, Inc*., 297 F.2d 261, 264 (C.C.P.A. 1962). There, the junior user's products are "precision measuring and testing equipment designed for research and development use in aircraft designing," sold to "the Armed Forces and government agencies, to universities, and to commercial concerns." *Id.* at 852. Although that group of potential customers is very sophisticated, the Court of Appeals held there to be a likelihood of confusion: "Being skilled in their own art does not necessarily preclude their mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field." *Id.* at 853.

Consumers of complex and expensive products and services may be less likely to be confused, but they are not immune from confusion. *GM Co. v. Urban Gorilla, LLC*, 2010 U.S. Dist. LEXIS 136711, (D. Utah 2010) (finding likelihood of confusion in connection with purchasers of $140,000 vehicles); *Kopman A.S. v. Park Structures*, 890 F. Supp. 1167, 1180

(N.D.N.Y. July 14, 1995) (finding likely confusion regarding expensive playground furniture purchased after a bidding process).

### 2. Types of Confusion

The sophistication of the relevant consumer becomes even less important in situations other than source confusion at the time of purchase. As the Ninth Circuit explained, "[t]he care exercised by the typical purchaser, though it might virtually eliminate mistaken purchases, does not guarantee that confusion as to association or sponsorship is unlikely." *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 353 (9th Cir. 1979). Similarly, sophistication has little relevance to initial interest and post-sale confusion. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975).

In a factually similar case, the Fourth Circuit reversed a trial court's finding of no infringement between Comcet and Comsat. *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1252 (4th Cir. 1970). There, the products were very expensive, did not directly compete, and were sold to sophisticated parties. The plaintiff operated a world-wide satellite communications system and sold "only to other communications common carriers and to the federal government" serving "NASA and five communications common carriers." *Id.* at 1248. Comcet manufactured and sold communication computers sold for $200,000 (in 1970's dollars). *Id.* at 1249. The trial court held that there was no likelihood of confusion due in part to the sophistication of the consumers. In reversing and finding confusion likely as a matter of law, the Fourth Circuit reasoned "even buyers of specialized equipment may assume that related corporations are the source of noncompetitive goods . . . Complementary products, or services, are particularly vulnerable to confusion." *Id*.

Similarly, the sophistication of prospective purchasers is nearly irrelevant when it comes to initial interest or post-sale confusion. In *Steinway & Sons*, the court recognized that purchasers of Steinway pianos are likely very sophisticated, yet still found a likelihood of confusion:

> The issue here is not the possibility that a purchaser would buy a Grotrian-Steinweg thinking it was actually a Steinway or that Grotrian had some connection with Steinway and Sons. The harm to Steinway, rather, is the likelihood that a consumer, hearing the "Grotrian-Steinweg" name and thinking it had some connection with "Steinway", would consider it on that basis. The "Grotrian-Steinweg" name therefore would attract potential customers based on the reputation built up by Steinway in this country for many years. The harm to Steinway in short is the likelihood that potential piano purchasers will think that there is some connection between the Grotrian-Steinweg and Steinway pianos. Such initial confusion works an injury to Steinway.

523 F.2d at 1342 (internal quotations omitted). Even among sophisticated consumers, "the probability that potential purchasers would be misled into an initial interest" in another company's product or service "works a sufficient trademark injury." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987).

Given the substantial similarity of the marks at issue here, as well as the fact that the two companies offer services that are at least complementary – if not straight-up competitive – to an overlapping customer base, there is a substantial risk of confusion. There has, in fact, been confusion among at least a few consumers. While those individual incidents of confusion may not be enough to trigger the "actual confusion" factor, they do demonstrate that ArkOwl's fear of confusion is not merely speculative.

## CONCLUSION

Not all of the likelihood of confusion factors weigh in ArkOwl's favor here. That is seldom the case. But the two most important – the strength of ArkOwl's mark and the similarity between

13

the two marks – weigh strongly in favor of a finding of likely confusion when used in connection with similar services. And none of the other factors tilts heavily in DarkOwl's favor. Though the parties' products may not be identical, they are similar and serve similar and overlapping markets, rendering that factor neutral. DarkOwl's customers are sophisticated regarding IT, but not branding, again leaving that factor neutral or – at best – slightly favoring DarkOwl. There is limited evidence of actual confusion, but actual confusion need not be demonstrated. And ArkOwl does not claim DarkOwl intentionally infringed, making that factor a non-issue.

An assessment of the "remaining factors – the absence of specific evidence that [DarkOwl] deliberately adopted its mark with an intent to infringe, of actual customer confusion, or of a level of consumer care – do not overcome" the strength of ArkOwl's marks or DarkOwl's close similarity to those marks. *Affliction Holdings*, 935 F.3d at 1115-16. To protect ArkOwl's rights in its mark, and to prevent the kinds of confusion targeted by the Lanham Act, an injunction should be entered directing DarkOwl to adopt a new name and logo.

Dated: June 16, 2023

By: /s/ Michael Frasier
Michael Frasier, MN Bar #387704
**RUBRIC LEGAL LLC**
111 Third Avenue South, Suite 110
Minneapolis, MN 55401
P: (612) 465.0074
F: (612) 605.1986
Michael@rubriclegal.com

*Attorney for Defendant*