IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC,

       Plaintiff,

v.

ARKOWL, LLC and
ARKOWL CORPORATION,

       Defendants.

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff DarkOwl, LLC ("DarkOwl") submits the following Proposed Findings of Fact and Conclusions of Law in connection with the trial before the Court beginning on June 26, 2023:

### PROPOSED FINDINGS OF FACT

**I.**    *DARKOWL*

    1.     DarkOwl, LLC is a Colorado limited liability company formed in 2015.

    2.     Mark Turnage is the Chief Executive Officer and co-founder of DarkOwl.

    3.     Russell Cohen is the President and Chief Financial Officer and co-founder of DarkOwl.

    A.     *DarkOwl's Trademarks*

    4.     In 2017, DarkOwl adopted the DARKOWL trademark and changed its company name to DarkOwl.

    5.     "Dark" is meant to reference DarkOwl's dark web services and "Owl" is a reference to the animal, which is commonly related to wisdom. The DARKOWL mark is intended to convey to customers an impression of dark web intelligence and knowledge.

6. Since 2017, DarkOwl has been publicly and consistently using the DARKOWL trademark with its dark web service offerings.

7. On March 24, 2017, DarkOwl filed U.S. Trademark Application Serial No. 87384235 with the U.S. Patent and Trademark Office ("USPTO") for the  mark.

8. The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings.

9. No third parties opposed Application Serial No. 87384235 and the application was registered under Reg. No. 5525738 on July 24, 2018 for the following services: "Providing a database featuring information about internet security and computer security from the deep web and the darknet; computer security consultancy regarding data and information collected and obtained from the deep web and the darknet; software as a service (SaaS) services featuring software for retrieving from, adding to, and editing a database featuring information and data obtained from the deep web and the darknet; computer software consulting services in the field of cybersecurity utilizing deepweb and darknet information; electronic monitoring of information and data obtained from the deep web and the darknet for the purpose of internet and computer security by detecting compromised data; computer information security consulting services in the field of maintaining the security and integrity of computer information and data using information and data obtained from the deep web and the darknet; providing computer and internet security analysis of information obtained from the deep web and the darknet; providing cybersecurity threat analysis for protecting data using information obtained from the deep web and the darknet; cybersecurity services, namely, monitoring of computer systems for data security purposes utilizing deep web and darknet information" ("DarkOwl's Registered Services") in Class 42.

10. DarkOwl filed U.S. Trademark Application Serial No. 88216005 with the USPTO on December 4, 2018 for the DARKOWL mark.

11. The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings.

12. No third parties opposed Application Serial No. 88216005 and the application was registered under Reg. No. 5793807 on July 2, 2019 for DarkOwl's Registered Services.

B. *DarkOwl's Services*

13. During its early stages as OWL Cybersecurity, DarkOwl provided dark web database software allowing its customers to search the dark web for content and also provided penetration testing, cybersecurity design and architecture, incident response, and code and application review services.

14. In 2017, DarkOwl focused its offerings, becoming the industry's leading provider of dark web intelligence services.

15. DarkOwl's offerings have been largely the same since 2017 with its focus on dark web data.

16. DarkOwl monitors the dark web for emerging threats and has built a platform for its customers to access this dark web data.

17. DarkOwl offers a large commercially available database of information continuously collected from the dark web.

18. DarkOwl's business consists primarily of: (1) threat intelligence services that look for emerging threats to organizations; (2) assessment of third-party risk, which is the risk assessment of vendors or contractors of large companies; (3) supplying data to the cyber-insured tech companies for risk assessment related to underwriting; (4) digital identity protection and the

3

assessment of whether the digital identity is risk-related; (5) fraud protection for cybersecurity companies that service financial institutions, primarily related to bank account or other financial information that is bought and sold on the dark web; (6) services to intelligence agencies or governments related to threats on the dark web to critical infrastructure (e.g., power plants, water treatment plants); (7) services related to threats to national security in the dark web; and (8) monitoring the use of cryptocurrency in the dark web.

19. The nature of the data DarkOwl provides is highly sensitive and complex.

20. DarkOwl's business has no relation to approving a commercial transaction in real time or providing Personally Identifiable Information ("PII") verification.

21. DarkOwl's customers do not, and have not, requested or suggested that DarkOwl perform PII verification services.

22. DarkOwl's platform and dark web database are not set up to provide PII verification services.

C. *DarkOwl's Customers and Sophistication*

23. DarkOwl's clients are typically very sophisticated cybersecurity professionals who are dealing with cyber risks.

24. About 40-45% of DarkOwl's customers are government intelligence agencies or cyber security companies whose customers are governments.

25. DarkOwl's customers are well-trained in the cybersecurity industry and its nuances.

26. Because of the complexity of DarkOwl's data, its customers must necessarily be equally sophisticated to understand and utilize DarkOwl's offering.

4

27. Given the sensitive nature of DarkOwl's data offerings, DarkOwl conducts an extensive vetting process for its customers, which includes entering into comprehensive legal agreements that prevent the misuse of any data provided.

28. Accordingly, the purchasing decision-maker at DarkOwl's customers is generally from the "C Suite" – the chief executive officer, chief financial officer, chief technology or information security officer – or high-ranking officials at national intelligence agencies.

D.   *DarkOwl's Marketing Strategies*

29. Given the sophisticated nature of DarkOwl's services and customers, DarkOwl primarily engages in direct, outbound marketing to a focused group of target customers.

30. DarkOwl directly contacts the "C Suite" and high-ranking officials at its potential customers to discuss and promote its services.

31. DarkOwl also markets its services through its publicly available website, www.darkowl.com.

32. Since 2017, DarkOwl has prominently identified its dark web data and dark web intelligence services on its website under its DARKOWL trademark.

33. DarkOwl also attends specific trade shows and conferences for its niche area of the cybersecurity industry, including Black Hat, AFCEA's TechNet Cyber, and the RSA Conference.

34. Approximately 30% of the time, DarkOwl turns down requests from potential customers seeking its services due to the complex and sensitive nature of its dark web data.

35. DarkOwl has turned down requests for its services by nation-states that are adversarial to the United States, including China, Russia, Iran, and North Korea, and their covert representatives, whether private persons or companies acting on behalf of adversarial nation-states.

36. DarkOwl used a third-party marketing company for a period of time to send blast emails, but the marketing company did not understand DarkOwl's niche service offerings or its sophisticated customers. The marketing company sent emails to a list of companies DarkOwl did not approve, which included sending emails to existing DarkOwl customers requesting introductory meetings, one of which reported that email to ArkOwl LLC's ("ArkOwl") Chief Executive Officer, Robert Daline. The list did not target DarkOwl's true *potential* customers. The campaign did not generate any business for DarkOwl.

E. *DarkOwl's Knowledge of ArkOwl and Intent*

37. DarkOwl was not aware of ArkOwl when it was creating and adopting its DARKOWL trademark and company name.

38. DarkOwl has never attempted to infringe, pass itself off as, or trade off ArkOwl or the ARKOWL mark.

39. DarkOwl first heard of ArkOwl when DarkOwl received ArkOwl's April 2, 2021 letter demanding that it stop using the DARKOWL marks.

40. Prior to receiving the letter, DarkOwl had never come across ArkOwl or its ARKOWL trademarks.

41. To Mr. Turnage's knowledge, no customer has ever mentioned ArkOwl or its ARKOWL trademarks to DarkOwl.

II. *ARKOWL*

42. ArkOwl is a Minnesota limited liability company formed in 2012.

43. Mr. Daline is the Chief Executive Office and co-founder of ArkOwl.

6

A. *ArkOwl's Trademarks*

44. Mr. Daline named the company ArkOwl to reference his Christian faith and the biblical "Ark of the Covenant."

45. On September 22, 2019, ArkOwl filed Application Serial No. 88626162 for ARKOWL with the USPTO.

46. The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings, including DarkOwl's prior registrations.

47. No third parties opposed Application Serial No. 88626162 and the application was registered under Reg. No. 6036746 on April 21, 2020 covering the following services: "Computer and Software services and Scientific Services being Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order" in Class 42.

48. In 2019, ArkOwl adopted a new logo. On January 29, 2020, ArkOwl filed Application Serial No. 88777943 for ARKOWL.

49. The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings, including DarkOwl's prior registrations.

50. No third parties opposed Application Serial No. 88777943 and the application was registered under Reg. No. 6285973 on March 9, 2021 in connection with the following services: "Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order" in Class 42.

B.     *ArkOwl's Services*

51.    ArkOwl's business developed out of Mr. Daline's experience as a fraud prevention analyst with retail businesses.

52.    ArkOwl is fairly characterized as an identity and verification service provider, and its main focus is PII verification and validation.

53.    ArkOwl helps its customers verify PII, including email address, phone number, IP address, physical address, and a name match.

54.    ArkOwl provides a platform that allows its users to input PII for individuals and entities. ArkOwl's data output is used by customers to verify whether there is a fraud threat connected to those individuals or entities.

55.    ArkOwl has access to real-time surface web and other datasets and provides its customers over 80 data points designed to validate and verify identities, including email age, creation date, social media information, webmail providers, domain name information, and some limited information on "breach data."

56.    ArkOwl works with Have I been Pwnd, a company that provides data breach information.

57.    ArkOwl does not, and has never, accessed the dark web directly and does not directly provide dark web data or services to its customers.

58.    ArkOwl does not search the dark web, and ArkOwl's marketing materials do not reference the dark web.

59.    ArkOwl provides only raw data and does not provide any analytical services if a fraud is discovered.

8

60.     ArkOwl's data is primarily used by retailers attempting to detect fraud or suspicious activity in online transactions.

61.     Mr. Daline is not aware of any customers using ArkOwl's data for anything other than supporting online purchase transactions.

C.     *ArkOwl's Customers*

62.     ArkOwl's U.S. clients include brick-and-mortar retail and online retail companies, banks, and cybersecurity companies.

63.     ArkOwl's customers use ArkOwl's services to support eCommerce and online purchase transactions to verify the legitimacy of purchasers and to reduce fraudulent transactions.

64.     ArkOwl's customers and users are primarily fraud analysts, whose job duties include verifying purchaser identity to reduce fraudulent transactions.

D.     *ArkOwl's Marketing Strategies*

65.     ArkOwl markets its services through its publicly available website, www.arkowl.com, which prominently features the statement "Verify Email addresses and Phone Numbers in Real-Time" at the top of the home page.

66.     ArkOwl also participates in the Merchant Risk Council as a member and attends its trade show conferences. The Merchant Risk Council is a community of merchants, solution providers, and organizations working to improve eCommerce.

E.     *ArkOwl's Knowledge of DarkOwl and Subsequent Action*

67.     ArkOwl first learned of DarkOwl in 2019 and Mr. Daline did not believe DarkOwl was a competitor or in the same industry as ArkOwl.

68.     ArkOwl did not contact DarkOwl regarding its trademarks until April 2021, when it sent a cease and desist letter through counsel.

69. ArkOwl is not aware of any instance where it lost business to DarkOwl.

70. ArkOwl is not aware of any instance where a customer was trying to decide between DarkOwl's and ArkOwl's services.

71. Mr. Daline has never run into DarkOwl at any industry events.

### III. *THERE IS NO LIKELIHOOD OF CONFUSION*

72. The "cybersecurity industry" is very broad and encompasses a wide variety of businesses with an immense diversity of services and technologies. Not all services and technologies under this umbrella are competitive or related.

73. More than a few companies in the cybersecurity industry include "OWL" as part of their trademarks or company names.

74. DarkOwl's business is a small niche in the cybersecurity industry.

75. Only a handful of other companies provide similar services as DarkOwl and compete with DarkOwl.

76. DarkOwl's primary competitors are Cybersixgill, Webbs, Searchlight Cyber, and Bluestone Analytics.

77. None of DarkOwl's competitors provide PII services. DarkOwl's competitors provide similar data intelligence services to similar clients as DarkOwl.

78. ArkOwl competes with other companies that provide PII verification services.

79. ArkOwl's main competitors are Ekata, PIPL, LexisNexis, SEON, and Email Hippo.

80. Neither Mr. Turnage nor Mr. Daline are aware of any cybersecurity company that provides both (1) sophisticated dark web intelligence and data offerings similar to those offered by DarkOwl and (2) PII verification offerings.

81. ArkOwl and DarkOwl do not compete with each other.

82. ArkOwl and DarkOwl do not provide overlapping or related services.

83. DarkOwl and ArkOwl's offerings cannot be substituted for each other.

84. None of DarkOwl's customers could get from ArkOwl the services DarkOwl provides and none of ArkOwl's customers could get from DarkOwl the services that ArkOwl provides.

85. The Parties' marks differ in sight, sound, and meaning.

86. The addition of a "d" in the DARKOWL mark gives the DARKOWL mark an entirely different, look, sound, and meaning than ARKOWL, all of which distinguish the DARKOWL marks from the ARKOWL marks.

87. The word "dark" is unrelated to "ark," other than that they rhyme.

88. The "dark" portion of the DARKOWL mark is suggestive of DarkOwl's dark web data services.

89. ArkOwl's founder testified that the "ark" portion of the ARKOWL mark is a religious reference to the Ark of the Covenant.

90. The parties' owl designs differ as well. DarkOwl's owl design is used in place of the "O" in "DarkOwl," consists of just the outlined head of an owl and features just one large eye - DARK⊘WL. ArkOwl's owl design is situated between the "K" and "O" in "ArkOwl," consists of a whole owl in flight with wings extended, features little or no facial detail, and shows the "O" as a half moon - ARK⁂)WL.

91. When examined in the context of the marks as a whole as they are encountered by the consumers in the marketplace, the parties' respective marks are dissimilar and distinguishable.

92. There are a number of third-party marks containing the term "Owl" (the only term shared by the parties' marks) on the Principal Register of the United States Patent and Trademark

11

Office ("USPTO") for cybersecurity-related and/or fraud detection services, including, but not limited to, for example, OWL CYBER DEFENSE (Reg. No. 5409019), SECUREOWL & Owl Design (Reg. No. 5894589), OWLCHECK (Reg. No. 6442218), and OWLPAY (Reg. No. 6903087).

93. The extensive use of "Owl" in the cybersecurity industry renders ArkOwl's mark conceptually weak.

94. ArkOwl provided no direct evidence proving the commercial strength of its mark.

95. ArkOwl's revenue is modest, its marketing budget is relatively small, and its general customer footprint is limited, which all cut against the commercial strength of its marks.

96. There is no evidence showing DarkOwl intended to derive benefit from ArkOwl's reputation or goodwill, at the time DarkOwl chose its mark or at any time since.

97. DarkOwl was unaware of ArkOwl when it chose its trademarks.

98. There is no evidence of actual confusion between the parties' marks.

99. The parties have coexisted under their current marks and branding for five years without a single credible instance of actual consumer confusion.

100. Mr. Daline's alleged conversation with a United States Postal Service employee at an industry conference is not corroborated by any written document.

101. The parties' services and manners of marketing are both quite distinct.

102. DarkOwl's services have no relation to approving a commercial transaction in real time based on PII verification, these services have never been requested by any DarkOwl customer, and DarkOwl's business and platform are not built or set up to provide that data.

103. ArkOwl classified its own services in its federal trademark registration as "Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order."

104. DarkOwl provides its data to sophisticated cybersecurity professionals, including national intelligence and law enforcement agencies, who go through a stringent vetting and review process.

105. The price of DarkOwl's offerings is quite expensive.

106. Both parties' customers will likely conduct substantial due diligence before making purchasing decisions.

107. There is no likelihood of confusion between the parties' marks.

## PROPOSED CONCLUSIONS OF LAW

108. The Court has personal jurisdiction over the parties.

109. Subject matter jurisdiction lies with this Court pursuant to 28 U.S.C. §§1331, 1332, and 1338(a) & (b) and 15 U.S.C. §§1119 and 1121.

110. Venue is appropriate in this Court under 28 U.S.C. § 1391(a), (b), and (d).

111. To prevail, ArkOwl must prove (1) ownership of a valid and protectable trademark, and (2) that defendants' use of their trademark is likely to cause confusion or mistake. 15 U.S.C. §§ 1114(1)(a); 1125(a).

112. All of the parties' claims, including ArkOwl's cancellation counterclaims, turn on the "likelihood of confusion" analysis. "Likelihood of confusion forms the gravamen for a trademark infringement action." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) (citing 15 U.S.C. §§ 1114(1), 1125(a)). *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 154 (2015) (ruling district courts should apply the same

standards for likelihood of confusion in the contexts of infringement and cancellation and noting "[t]here is no reason to think that the same district judge in the same case should apply two separate standards of likelihood of confusion.").

113. The Tenth Circuit applies the following six non-exhaustive factors that courts balance to determine whether there is a likelihood that consumers will be confused by the use of a trademark: (1) the degree of similarity between the marks; (2) the strength or weakness of the marks; (3) the intent of the alleged infringer in adopting its mark; (4) evidence of actual confusion; (5) similarity of products and manner of marketing; and (6) the degree of care likely to be exercised by purchasers. *King of the Mountain*, 185 F.3d at 1089-90.

114. "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (internal citation omitted).

115. The factors are not to be applied mechanically; courts can and should consider other facts that might be probative of the likelihood of confusion in the context of the dispute. *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1243-44 (10th Cir. 2013). "[T]he weight of any given factor can depend very much on context," and "when certain facts are more probative than others . . . those facts may dominate the analysis." *Id*. at 1243 (citing cases).

116. "What is required for a claim of trademark infringement under the Lanham Act is a *likelihood* of confusion, not merely the possibility of confusion." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1150-51 (10th Cir. 2013). In every case, "the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'" *Heartsprings*, 143 F. 3d at 554 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992)).

117.   It is ArkOwl's burden to show a likelihood of confusion. *See, e.g., Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008) (the court cannot "simply assume a likelihood of initial interest confusion . . . . The proponent of such a theory must prove it. Until then, it remains just a theory."); *Universal Money Ctrs., Inc. v. Am. Tel. 6 Tel. Co.*, 22 F.3d 1527, 1530 (10th Cir. 1994) ("party alleging infringement has the burden of proving likelihood of confusion") *Nutraceutical Corp. v. Affordable Naturals*, LLC, 2017 WL 4564739, *5 (D. Utah October 11, 2017) (same for party seeking trademark cancellation).

118.   The degree of similarity between the marks rests on "sight, sound, and meaning." *King of the Mountain*, 185 F. 3d at 1039.

119.   These factors must be examined "in context of the marks as a whole as they are encountered by the consumers in the marketplace." *Id.* (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986)). "[T]he court is not free to give dispositive weight to any one component of the marks, such as a shared syllable." *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014).

120.   The common use of an identical word does not automatically mean that two marks are similar, as the marks must be considered "in their entireties," including design features, visual appearance to the consumer, meanings of the marks, and how the marks sound. *See* 3 McCarthy on Trademarks and Unfair Competition § 23:43 (5th ed. 2023); *Hornady*, 746 F.3d at 1002 ("consider the effect of marketplace presentation, including lettering styles, logos, and coloring schemes").

121.   In assessing the strength of a trademark, both conceptual and commercial strength should be considered. *King of the Mountain*, 185 F.3d at 1093.

122.   Conceptual strength refers to how distinctive a mark is. *Id*.

123. A mark can be weak where a component term is extensively used by others in the industry. *See Central Bancorp, Inc. v. Central Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1143 (D. Colo. 2019) (finding "Central Bank & Trust" was a conceptually suggestive but weak mark because "Central" was common in the banking industry); *see also Water Pik*, 726 F.3d at 1152 ("[E]xtensive third-party use of a component of a disputed term undermines the strength of the term as a whole.").

124. Third-party registrations are "relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or *suggestive* meaning, leading to the conclusion that that segment is relatively weak." *First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101* F.3d 645, 654 (10th Cir. 1996) (emphasis added) (quoting 1 McCarthy, McCarthy on Trademarks and Unfair Competition § 11.27[2][b] (3d ed. 1995)).

125. Commercial strength refers to the mark's level of recognition in the marketplace. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1151 (10th Cir. 2013).

126. Commercial strength is "the marketplace recognition value of the mark." *King of the Mountain,* 185 F.3d at 1093.

127. The Tenth Circuit has identified "direct evidence, such as consumer surveys or testimony from consumers," as helpful in evaluating commercial strength. *Water Pik*, 726 F.3d at 1154. In the absence of such evidence, courts consider the mark holder's efforts to advertise the mark, including evidence tying such advertisements to an effort to promote the mark in the public's mind. *Id*.

128. In terms of commercial strength, "extensive third-party use of the disputed term indicates that the term itself deserves only weak protection." *First Sav. Bank*, 101 F.3d at 653. The

16

relevant inquiry is not the extent to which *any* other third parties may be using similar marks, but whether they are using similar marks "on similar goods." 2 McCarthy, *supra,* § 11:88, at 11–167. This is because the evidentiary impact of such third-party marks turns upon the probable impact of those marks on the minds of the target group of consumers. *Id*. at 11-168.

129. The proper focus under the intent factor "is whether [DarkOwl] had the intent to derive benefit from the reputation or goodwill of [ArkOwl]." *King of the Mountain*, 185 F.3d at 1091. Proof that the alleged infringer chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion. *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 972 (10th Cir. 2002). "The alleged infringer's intent is measured *at the time it 'chose' or 'adopted' its mark*." *Hornady*, 746 F.3d at 1004 (emphasis added). "In analyzing intent, we look to evidence of 'the process of choosing' a mark, *not evidence of events subsequent to its adoption*." *Id*. (emphasis added) (citing *Water Pik.*, 726 F.3d at 1159).

130. Actual confusion in the marketplace "is often considered the best evidence of a likelihood of confusion." *King of the Mountain*, 185 F.3d at 1092. "We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis." *Water Pik, Inc.*, 726 P.3d at 1150-51. The standard is not "merely the possibility of confusion" but "*likelihood* of confusion." *Id*. (citing 4 McCarthy on Trademarks and Unfair Competition § 23:43 (4th ed. 2013)) (emphasis in original).

131. The standard for actual confusion is not "merely the possibility of confusion" but "*likelihood* of confusion." *Id*. (citing 4 McCarthy on Trademarks and Unfair Competition § 23:43 (4th ed. 2013)) (emphasis in original).

132. "To be relevant … evidence should demonstrate actual confusion *among consumers within the marketplace*." *Heartsprings*, 143 F.3d at 557 (emphasis added).

17

133. Evidence of, for example, some phone calls and letters intended for one party but sent to the other "show inattentiveness on the part of the caller or sender rather than actual confusion." *Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co*., 84 F.3d 1093, 1098 (8th Cir. 1996); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987).

134. Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 398 (2d Cir. 2021).

135. Evidence of actual confusion must link the confusion evidence to a potential or actual effect on consumers' purchasing decisions. *Prime Media, Inc. v. Primedia, Inc.,* 33 F. Supp. 2d 932, 939-40 (D. Kan. 1998).

136. Generally, "the greater the similarity between the products and services, the greater the likelihood of confusion," but when the junior user's offerings are only marginally related to the senior user's, that disconnect greatly reduces the relevance of the similarly of products factor. *King of the Mountain*, 185 F.3d at 1092.

137. Where there is not much overlap in the marketing approaches of the two parties, the likelihood of confusion is lower. *Heartsprings,* 143 F.3d at 556. "The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks." *Id.*

138. If consumers are more likely to exercise a high degree of care in deciding in purchasing a product, the likelihood of confusion is reduced. *Heartsprings*, 143 F.3d at 557. "The level of care often turns on whether consumers choose a product based on impulse or careful study." *Elevate,* 67 F.4th at 1072.

139. A consumer's care generally intensifies with the importance of the product. *See id*. (citing Versa *Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995) ("The more important the use of a product, the more care that must be exercised in its selection."). The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase. *Sally Beauty Co.*, 304 F.3d at 975.

140. If there is no likelihood of confusion between the parties' marks, the Court must grant DarkOwl's request for declaratory judgment and find it did not infringe on ArkOwl's trademark rights and that its federal trademark registrations are valid. Conversely, the Court must deny ArkOwl's trademark infringement and cancellation claims. *See Elevate Fed. Credit Union*, 67 F.4th at 1083 (affirming district court's grant of declaratory judgment of non-infringement based on finding of no likelihood of confusion); *Water Pik*, 726 F. 3d at 1160 (affirming summary judgment for alleged infringer when no genuine factual issue existed regarding likelihood of confusion); *Groupion, LLC v. Groupon, Inc.,* 859 F. Supp. 2d 1067, 1081 (N.D. Cal. 2012) (summary judgment granted against cancellation claim because there was no likelihood of confusion between the parties' marks).

DATED: June 16, 2023

        Respectfully submitted,

        **PERKINS COIE LLP**

        By: *s/ Jeremy L. Buxbaum*
        Thomas L. Holt, IL Bar #6243134
        Jeremy L. Buxbaum, IL Bar #6296010
        110 North Wacker Drive, Suite 3400
        Chicago, IL 60606
        P: (312) 324-8400
        F: (312) 324-9400
        Tholt@perkinscoie.com
        JBuxbaum@perkinscoie.com

        Kourtney Mueller Merrill, CO Bar #36,662
        1900 Sixteenth Street, Suite 1400
        Denver, CO 80202
        P: (303) 291-2300
        F: (303) 291-2400
        KMerrill@perkinscoie.com

        **HOLLAND & HART LLP**

        Sabrina J. Danielson, CO Bar #49,279
        555 17th Street, Suite 3200
        Denver, CO 80202
        P: (303) 295-8565
        F: (303 265-9255
        SJDanielson@hollandhart.com