**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC,

        Plaintiff,

v.

ARKOWL, LLC and
ARKOWL CORPORATION,

        Defendants.

---

## PLAINTIFF DARKOWL, LLC'S TRIAL BRIEF

Pursuant to this Court's Trial Procedures Order (Dkt. 32), Plaintiff DarkOwl, LLC ("DarkOwl") respectfully submits its trial brief.

## <u>INTRODUCTION</u>

The Court should rule in DarkOwl's favor at trial because the evidence will show there is no likelihood of confusion between the parties' trademarks. DarkOwl, a darkweb data services company, serves highly sophisticated clients to aid them in complex criminal investigations, national security, and cybersecurity matters, among other uses. ArkOwl, LLC ("ArkOwl)", on the other hand, provides personal identifiable information ("PII") data services that assist large retailers, among other customers, in verifying consumer purchase transactions in real time at the point of sale. As the Court has found, the companies are not competitors, and they offer distinct services to distinct consumers. Indeed, the parties' marks have coexisted in the United States for more than five years with no known customer confusion. In addition, the parties' marks are different in sight, sound, and meaning, and there is no evidence that DarkOwl, which first heard of ArkOwl when it received a cease-and-desist letter in 2021, intended to infringe the rights of

ArkOwl when it registered and began using its marks. The differing nature of the parties' services, the relatively steep price for DarkOwl's services, the purchasing practices of the parties' respective target customers, and the way the services are marketed and sold make it unlikely that consumers will be confused. The Court should grant DarkOwl's request for declaratory judgment and find that it did not infringe ArkOwl's trademark rights and that its federal trademark registrations are valid.

## **BACKGROUND**

DarkOwl filed this action on August 10, 2021, in which it requests a declaratory judgment of non-infringement (Count 1) and validity of DarkOwl's U.S. Trademark Reg. Nos. 5525738 and 5793807 (28 U.S.C. § 2201 *et seq.*) (Count 2).

Formed in September 2015, DarkOwl is a Colorado-based darkweb data services company. Over the last almost eight years, DarkOwl has developed and now provides the world's largest index of darkweb content. In 2017, DarkOwl began using the DARKOWL trademark throughout the United States to provide its highly specialized cybersecurity services. On March 24, 2017, DarkOwl applied to register its DARKOWL CYBERSECURITY mark with the U.S. Patent and Trademark Office ("USPTO") and was granted federal registration of the mark on July 24, 2018, as amended, under U.S. Registration No. 5525738. On December 4, 2018, DarkOwl applied to register its DARKOWL mark with the USPTO and was granted federal registration of the mark on July 2, 2019 under U.S. Registration No. 5793807. Each mark was reviewed by the USPTO and no likelihood of confusion refusals were issued for either application. The applications were published for opposition, and no third-party oppositions were filed. DarkOwl has invested a substantial amount of time, money, and effort to promote, advertise, and provide its niche darkweb services to its highly sophisticated consumers under the DARKOWL, DARKOWL, and

**DARKOWL**
CYBERSECURITY

trademarks. As a result, DarkOwl has developed a substantial amount of consumer recognition and goodwill in its trademarks, and the trademarks have come to identify DarkOwl as the source of high quality and unique darkweb offerings.

ArkOwl was formed in Minnesota in 2012. The company offers PII verification services. ArkOwl's customers use its services to monitor commercial transactions for their companies in real time. When an item is purchased online, the seller (the ArkOwl customer) inputs the purchaser's email address, phone number, IP address, and/or physical address into ArkOwl's search tool. At the point of sale, ArkOwl returns certain data that may assist its customers in determining whether transactions are likely to be fraudulent. ArkOwl's CEO and co-founder, Robert Daline, is not aware of any customers using ArkOwl's data for anything other than supporting the validation of PII for online commercial transactions.

The evidence will show that ArkOwl knew about DarkOwl since 2019 and chose not to take any action with regard to DarkOwl for over two years. DarkOwl, however, was unaware of ArkOwl, ArkOwl's business, or its alleged ARKOWL trademarks until April 2, 2021, when ArkOwl sent DarkOwl a cease-and-desist letter. This letter accused DarkOwl of using confusingly similar trademarks and demanded that DarkOwl surrender its federal trademark registrations and permanently cease use of its DARKOWL trademarks. DarkOwl disputed ArkOwl's claims and refused to comply with its demands. Under the imminent threat of litigation, DarkOwl filed this declaratory judgment action.

In response, ArkOwl filed counterclaims for trademark infringement and cancellation of DarkOwl's (unspecified)[1] federally registered marks, along with Colorado state law claims that

---

[1] In its counterclaims ArkOwl falsely states that DarkOwl owns a federal registration for the mark DARKOWL. (Dkt. 17 at par. 43). ArkOwl makes further reference to a DarkOwl "design" mark without specifying any specific registration. As noted in DarkOwl's complaint, it owns two federal registrations for different DARKOWL design

have since been dismissed. ArkOwl's requests for monetary damages have also been dismissed. ArkOwl only seeks equitable relief through its remaining claims.

## **ARGUMENT**

All of the parties' claims turn on the "likelihood of confusion" analysis. "Likelihood of confusion forms the gravamen for a trademark infringement action." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) (citing 15 U.S.C. §§ 1114(1), 1125(a)); *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 154 (2015) (finding district courts should apply the same standards for likelihood of confusion in the contexts of infringement and cancellation and noting "[t]here is no reason to think that the same district judge in the same case should apply two separate standards of likelihood of confusion."). The evidence at trial will show there is no likelihood of confusion between the marks at issue. As explained below, the six relevant factors in the likelihood of confusion analysis are either neutral or favor DarkOwl. The marks have clearly distinguishing features (favors DarkOwl). ArkOwl's marks are neither conceptually nor commercially strong (slightly favors DarkOwl). There is no evidence DarkOwl intended to infringe on ArkOwl's rights when it adopted its mark (favors DarkOwl). There is no evidence of actual customer confusion (favors DarkOwl). The parties' services and marketing strategies are not similar (favors DarkOwl). Finally, DarkOwl's customers are sophisticated and both parties' customers are likely to exercise great care when making purchasing decisions (favors DarkOwl). For these reasons, the Court should find at trial that there is no likelihood of confusion,

---

marks. (Dkt. 2 at par. 16). ArkOwl requests that DarkOwl's "registered word mark" and "design mark" should be cancelled. (Dkt. 17 at par. 47). But DarkOwl does not own a registration for the word mark for DARKOWL, so that relief cannot be granted, and the counterclaims do not specify which DarkOwl registration ArkOwl is seeking to cancel. So, apart from the other reasons set forth herein, ArkOwl's cancellation counterclaim should be denied in its entirety as either seeking relief that is nonsensical or, in any event, impermissibly vague.

grant DarkOwl's request for declaratory judgment, and deny ArkOwl's infringement and cancellation claims.

**A.    There is no likelihood of confusion.**

The Tenth Circuit's decision in *King of the Mountain* sets out the six non-exhaustive factors that courts balance to determine whether there is a likelihood that consumers will be confused by the use of a trademark: (1) the degree of similarity between the marks; (2) the strength or weakness of the marks; (3) the intent of the alleged infringer in adopting its mark; (4) evidence of actual confusion; (5) similarity of products and manner of marketing; and (6) the degree of care likely to be exercised by purchasers. 185 F.3d at 1089-90. "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (internal citation omitted). The factors are not to be applied mechanically; courts can and should consider other facts that might be probative of the likelihood of confusion in the context of the dispute. *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1243-44 (10th Cir. 2013). "[T]he weight of any given factor can depend very much on context," and "when certain facts are more probative than others . . . those facts may dominate the analysis." *Id*. at 1243 (citing cases).

"What is required for a claim of trademark infringement under the Lanham Act is a *likelihood* of confusion, not merely the possibility of confusion." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1150-51 (10th Cir. 2013) (emphasis in original) (citing 4 McCarthy, McCarthy on Trademarks and Unfair Competition § 23:3 (4th ed. 2013) (4 McCarthy)). In every case, "the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'" *Heartsprings*, 143 F. 3d at 554 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992)).

It is ArkOwl's burden to show a likelihood of confusion. *Universal Money Ctrs., Inc. v. Am. Tel. 6 Tel. Co.*, 22 F.3d 1527, 1530 (10th Cir. 1994) ("party alleging infringement has the burden of proving likelihood of confusion") *Nutraceutical Corp. v. Affordable Naturals*, LLC, 2017 WL 4564739, *5 (D. Utah October 11, 2017) (same for party seeking trademark cancellation). The evidence will show ArkOwl cannot carry its burden, and therefore, the Court should rule for DarkOwl on all of the parties' claims.

1.  The Parties' Marks Differ In Sight, Sound, and Meaning

The degree of similarity between the marks rests on the "sight, sound, and meaning" of the marks. *King of the Mountain*, 185 F. 3d at 1039. These factors must be examined "in context of the marks as a whole as they are encountered by the consumers in the marketplace." *Id.* (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986)). "[T]he court is not free to give dispositive weight to any one component of the marks, such as a shared syllable." *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014). Moreover, the common use of an identical word does not automatically mean that two marks are similar, as the marks must be considered "in their entireties," including design features, visual appearance to the consumer, meanings of the marks, and how the marks sound. *See* 4 McCarthy on Trademarks and Unfair Competition § 23:43 (5th ed. 2023) (4 McCarthy); *Hornady*, 746 F.3d at 1002 ("consider the effect of marketplace presentation, including lettering styles, logos, and coloring schemes").

The marks at issue are DarkOwl's word mark and its two design marks, on the one hand, and ArkOwl's word and design mark on the other. The parties' respective marks, when viewed in their entireties, have several prominent distinguishing features that set them apart. For example, while ArkOwl will focus on six shared letters in the marks, the addition of a "d," as the first, most conspicuous letter in the DARKOWL marks gives them an entirely different, look, sound, and

meaning, all of which distinguish them from the ARKOWL marks. *See Heartsprings*, 143 F.3d 554 (holding the district court did not err by declining to weight this factor in plaintiff's favor where plaintiff's "Heartsprings" trade name and defendant's "Heartspring" trademark bore no similarity in the parties' use and presentation of their respective trademarks beyond their obvious sameness of spelling). The word "dark" is unrelated to" ark," other than that they rhyme, which is not the test for trademark confusion. The "dark" portion of the DARKOWL mark is suggestive of DarkOwl's darkweb data services, while ArkOwl's founder testified that the "ark" portion of the ARKOWL marks is a religious reference to the Ark of the Covenant. Thus, the differences in the parties' marks outweigh the similarities. *See Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.,* 402 F. Supp. 2d 1312, 1326 (D. Kan. 2005) ("notwithstanding both parties' use of the term 'Big Dog' on their products, those similarities are substantially outweighed by the dissimilarities in the marks as a whole ["Big Dog" v. "Big Dog Motorcycles"] including different logos associated with the marks, different meanings of the marks, and phonetical differences of the marks when considered in their entireties.).

The owl designs in the parties' marks are notably different as well. DarkOwl's owl design is used in place of the "O" in "DarkOwl," consists of just the outlined head of an owl and features just one large eye - DARK🦉WL. However, ArkOwl's owl design is situated between the "K" and "O" in "ArkOwl," consists of an entire owl in flight with wings spread, features little or no facial detail, and replaces the "O" with a half-moon - ARK🦉WL. Taken in their entireties, the marks are not similar and the Court should find this factor favors DarkOwl. *See Universal Money Centers, Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1531 (10th Cir. 1994) (affirming district court's finding that AT&T's "AT&T Universal Card" mark for credit cards was not similar to trademark

holder's bank cards marked with variations of "Universal Money" when significant differences existed in overall design of the marks, including lettering styles, logos, and color schemes).

      2.    <u>ArkOwl's Marks Are Not Strong</u>

In assessing the strength of a trademark, both conceptual and commercial strength should be considered. *King of the Mountain*, 185 F.3d at 1093. Conceptual strength refers to how distinctive a mark is. *Id*. Commercial strength refers to the mark's level of recognition in the marketplace. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1151 (10th Cir. 2013). Here, ArkOwl's marks are neither conceptually nor commercially strong.

First, ArkOwl's marks are not conceptually strong. A mark can be considered weak where, like here, a component term is extensively used by others in the broader industry. *See Central Bancorp, Inc. v. Central Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1143 (D. Colo. 2019) (finding "Central Bank & Trust" was a conceptually suggestive but weak mark because "Central" was common in the banking industry); *see also Water Pik*, 726 F.3d at 1152 ("[E]xtensive third-party use of a component of a disputed term undermines the strength of the term as a whole."). There are a number of third-party marks containing the term "Owl" (the only term shared by the parties' marks) on the Principal Register of the United States Patent and Trademark Office ("USPTO") for cybersecurity-related and/or fraud detection services, including, but not limited to, for example, OWL CYBER DEFENSE (Reg. No. 5409019), SECUREOWL & Owl Design (Reg. No. 5894589), OWLCHECK (Reg. No. 6442218) and OWLPAY (Reg. No. 6903087).

These third-party registrations are "relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or *suggestive* meaning, leading to the conclusion that that segment is relatively weak." *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.,* 101 F.3d 645, 654 (10th Cir. 1996) (emphasis

added) (quoting 1 McCarthy, McCarthy on Trademarks and Unfair Competition § 11.27[2][b] (3d ed. 1995)). The extensive use of "Owl" in the cybersecurity industry renders ArkOwl's marks conceptually weak.

Second, ArkOwl's marks are commercially weak. Commercial strength is "the marketplace recognition value of the mark." *King of the Mountain,* 185 F.3d at 1093. Evidence of a mark's commercial strength can make up for conceptual weakness because a conceptually weak mark may become strong by virtue of acquired consumer awareness. By the same token, a mark with conceptual strength may ultimately be weak if its commercial strength is negligible. *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 395–96 (4th Cir.2009) (assuming that the mark "LCR" was suggestive but ruling that it was ultimately weak because the record lacked adequate evidence that consumers associated it with plaintiff).

The evidence at trial will show ArkOwl's marks are not commercially strong. The Tenth Circuit has identified "direct evidence, such as consumer surveys or testimony from consumers" as helpful in evaluating commercial strength. *Water Pik*, 726 F.3d at 1154. ArkOwl has failed to provide such direct evidence. In the absence of such evidence, courts consider the mark holder's efforts to advertise the mark, including evidence tying such advertisements to an effort to promote the mark in the public's mind. *Id.* The evidence at trial will show ArkOwl's revenue is modest, its marketing budget is relatively small, and its general customer footprint is limited, which all cut against the commercial strength of its marks. *Id.*

Finally, in terms of commercial strength, "extensive third-party use of the disputed term indicates that the term itself deserves only weak protection." *First Sav. Bank*, 101 F.3d at 653. As explained above, the term "Owl" (the only shared component term between the parties' marks) is used extensively in the cybersecurity industry. This type of widespread use weakens the marks in

the minds of relevant consumers. *See, e.g., First Sav. Bank,* 101 F.3d at 653–54 (extensive use of the term "First Bank" made it a weak mark, "at least when applied to the provision of financial services"); *Universal Money Centers,* 22 F.3d at 1533–34 (the term "Universal" was a relatively weak mark where it was used by approximately six other financial institutions on their own ATM cards and by two credit card companies). ArkOwl's marks are thus conceptually *and* commercially weak. This factor slightly favors DarkOwl.

> ### 3.   There is No Evidence that DarkOwl Intended to Copy ArkOwl's Marks

The proper focus under this factor "is whether [DarkOwl] had the intent to derive benefit from the reputation or goodwill of [ArkOwl]." *King of the Mountain*, 185 F.3d at 1091. Proof that the alleged infringer chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion. *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 972 (10th Cir. 2002). "The alleged infringer's intent is measured *at the time it 'chose' or 'adopted' its mark.*" *Hornady*, 746 F.3d at 1004 (emphasis added). "In analyzing intent, we look to evidence of 'the process of choosing' a mark, *not evidence of events subsequent to its adoption.*" *Id.* (emphasis added) (citing *Water Pik.*, 726 F.3d at 1159).

There is no evidence that DarkOwl intended to infringe on ArkOwl's rights when it chose its mark. On the contrary, it is uncontested that DarkOwl's principals had never heard of ArkOwl until they received a letter demanding that DarkOwl stop using the alleged infringing marks, several *years* after DarkOwl had adopted and commenced use of its marks. This factor heavily favors DarkOwl.

> ### 4.   There is No Evidence of Actual Confusion

Actual confusion in the marketplace "is often considered the best evidence of a likelihood of confusion." *King of the Mountain*, 185 F.3d at 1092. "We have consistently recognized,

- 10 -

however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis." *Water Pik, Inc.*, 726 P.3d at 1150-51. The standard is not "merely the possibility of confusion" but "*likelihood* of confusion." *Id.* (citing 4 McCarthy on Trademarks and Unfair Competition § 23:43 (4th ed. 2013)) (emphasis in original). Here, the parties' marks have coexisted in the United States for more than five years with no known actual confusion. Any contrary evidence that ArkOwl claims to possess is, at best, *de minimis* (to the extent it is admissible and even constitutes true actual trademark confusion).

While ArkOwl contends that it is aware of five instances of actual confusion, even a superficial assessment reveals that none of those anecdotes amount to trademark confusion. For example, ArkOwl claims its original logo designer texted ArkOwl's owner, Rob Daline, to note her perception that the parties' logos looked similar. But "[t]o be relevant … evidence should demonstrate actual confusion *among consumers within the marketplace*." *Heartsprings*, 143 F.3d at 557 (emphasis added). The evidence will show that the designer is not and has never been an ArkOwl customer or potential customer. Moreover, there is no evidence that the designer was confused about anything. This is not actual confusion.

ArkOwl also claims that Mr. Daline received an email solicitation from a search engine optimization ("SEO") service that appeared to be intended for DarkOwl. But the evidence will show that this in no way involved a relevant consumer transaction, and, in any event, such a mistake does not constitute actual trademark confusion. *See Heartsprings*, 143 F.3d at 557 (relevant examples of actual confusion must involve consumers within the marketplace); *Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co*., 84 F.3d 1093, 1098 (8th Cir. 1996) (evidence of some phone calls and letters intended for defendant but sent to plaintiff "show inattentiveness on the part of the caller or sender rather than actual confusion.").

ArkOwl also alleges that a representative of Apruvd, an ArkOwl customer, inquired about the relationship between ArkOwl and DarkOwl after receiving sales emails from DarkOwl's third-party marketing company. Mere inquiries do not constitute evidence of actual confusion, however. *See Reply All Corp. v. Gimlet Media, LLC,* 843 F. App'x 392, 398 (2d Cir. 2021) ("Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion.") (internal citations omitted). Indeed, "such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself." *Id.* (emphasis in original); *see also Duluth News-Tribune ,* 84 F.3d at 1098 (a question to an employee asking which of two businesses with similar names he was employed "indicates a distinction in the mind of the questioner, rather than confusion."); *Sterling Jewelers, Inc. v. Artistry Ltd.*, 896 F.3d 752, 758 (6th Cir. 2018) (affirming summary judgment dismissal and noting "questions about potential affiliation confirm that these sophisticated retailers discern a difference between the marks, or at least put themselves in a position to do so."). Courts have found that this type of customer inquiry "standing alone with no other evidence ... is insufficient proof of actual confusion," and "even when combined with other evidence inquiries to the plaintiff about the source of a product are of comparatively little value." *See Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987) (citations omitted) (finding district court properly gave little weight to evidence of phone calls to plaintiff asking if alleged infringer's product was affiliated with plaintiff's). Moreover, the evidence will show that the inquiry clearly noted the two companies were separate, and, in any event, it was not made in the context of a purchase, nor did it affect a purchasing decision. *See Prime Media, Inc. v. Primedia, Inc.,* 33 F. Supp. 2d 932, 939-40 (D. Kan. 1998) (finding actual confusion factor weighed in alleged infringer's favor when "no evidence link[ed]

the confusion evinced by the [inquiries] to any potential or actual effect on consumers' purchasing decisions.") (quoting *Lang v. Retirement Living Publ'g*, Co., 949 F.2d 576, 582 (2d Cir.1991)).

Finally, ArkOwl alleges two instances of actual confusion that purportedly occurred at an industry conference. First, Mr. Daline contends that a United States Postal Service investigations employee approached the ArkOwl booth at the Merchant Risk Council conference in March 2022 and suggested the USPS was a customer of ArkOwl, when it is not. The employee purportedly said, "you are DarkOwl, right?". Second, Mr. Daline contends that an employee of a company called Zoom-Info inquired as to any relationship between ArkOwl and DarkOwl. Again, mere inquiries and/or mistakes do not constitute actual confusion. And again, the evidence will show that these inquiries were not made in the context of a purchase, nor did they affect a purchasing decision. *See Prime Media,* 33 F. Supp. 2d at 939-40; *Heartsprings*, 143 F.3d at 557 (relevant examples must involve consumers within the marketplace). These are therefore not examples of actual confusion.

Additionally, the evidence will show that ArkOwl has no documentation or corroborating testimony to support these out-of-court statements, which are hearsay without exception and should not be considered as evidence. *See* Fed. R. Evid. 801(c); *Warming Trends, LLC v. Stone,* 2023 WL 2713954 (D. Col. 2023) (excluding as inadmissible hearsay testimony from plaintiff that customers allegedly asked about affiliation with alleged infringer's product at trade show); *Alchemy II, Inc. v. Yes! Entertainment Corp.*, 844 F. Supp. 560, 570 n.12 (C.D. Cal. 1994) (evidence of phone calls to plaintiff inquiring where to buy defendant's product is "inadmissible hearsay"); *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 212 (3d Cir. 1995) (error to rely on hearsay evidence of an official of plaintiff who testified that his sales manager told him that at trade shows some people said they were confused).

To the extent the Court considers any of these anecdotes as evidence of actual confusion, they are akin to the isolated incidents that have consistently been disregarded as *de minimus*. *See, e.g., Water Pik,* 726 F.3d at 1150-51 (finding district court properly rejected as *de minimus* four isolated and anecdotal instances of actual confusion); *Universal Money Centers*, 22 F.3d at 1535 (same for three alleged episodes of actual confusion, including affidavits from plaintiff's employees that they had received multiple accounts of similar confusion from consumers); *King of the Mountain*, 185 F.2d at 1092-93 (same for seven alleged episodes of actual confusion). "Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification." *Universal Money Centers*, 22 F.3d at 1535 (quoting 2 McCarthy on Trademarks and Unfair Competition § 23.02[2][b], at 29 (3d ed. 1992)).

The reality is that the parties have coexisted under their current marks for more than *five years* without a single instance of credible consumer confusion.[2] "[A]n absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir. 1993) (finding lack of evidence of actual confusion significant because products had coexisted for roughly six years); *Grubhub Inc. v. Kroger Co.*, No. 1:21-CV-05312, 2022 WL 2774986, at *3 (N.D. Ill. May 25, 2022) (same when the parties' products and services had coexisted for nine years and competing logos for nearly a year). This factor favors DarkOwl.

---

[2] To the extent ArkOwl intended to offer the Keegan Report as evidence of actual confusion, that is no longer available as the Court has excluded Mr. Keegan's report and testimony.

5.     The Parties Offer Different Services Through Different Marketing Channels

Under this factor, courts consider both the similarity of products/services as well as the similarity in the manner they are marketed. *Sally* Beauty, 304 F.3d at 974. Generally, "the greater the similarity between the products and services, the greater the likelihood of confusion," but when the junior user's offerings are only marginally related to the senior user's, that disconnect greatly reduces the relevance of the similarly of products factor. *King of the Mountain*, 185 F.3d at 1092. Courts in the Tenth Circuit have also confirmed this principle – where there is not much overlap in the marketing approaches of the two entities, the lower the likelihood of confusion. *Heartsprings,* 143 F.3d at 556. "The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks." *Id.* Here the parties' services and manner of marketing are both distinct.

First, a relevant consumer would not view the parties' services as related. As the Court already noted, they offer distinctly different services through distinctly different commercial channels. *See* Dkt. 73, June 6, 2023 Order (the "Order") at pp. 23-24. As detailed through evidence presented at the evidentiary hearing and that will be presented at trial, DarkOwl provides access to a massive database of darkweb data to sophisticated cybersecurity professionals, including national intelligence agencies, law enforcement agencies, and select organizations. This data is used by DarkOwl's customers for criminal investigations, enhancing security measures, and national security, among other uses. ArkOwl, on the other hand, offers PII data services for the purposes of verifying online transactions. It returns certain data at the point of sale that may assist its clients in determining in real time whether a commercial transaction is likely to be fraudulent. ArkOwl generally provides its services to fraud analysts that monitor commercial transactions for

their companies (generally large retailers or cybersecurity companies that act as vendors for retailers). As the Court has now found, the parties' services are distinctly different: ArkOwl does not search the darkweb or otherwise have any meaningful connection to it, and DarkOwl's services have no relation to approving a commercial transaction in real time or PII verification. Order at pp. 23-24. They also operate in different commercial channels. Real-time-transaction-verification services have never been requested by DarkOwl's customers, and DarkOwl's business and platform are not built or set up to provide that data. Importantly, as the Court noted, not a single DarkOwl customer could get from ArkOwl what it gets from DarkOwl, and not a single ArkOwl customer could get from DarkOwl what it gets from ArkOwl. The parties "have fundamentally different customers seeking fundamentally different kind of services." *M Welles & Assocs., Inc. v. Edwell, Inc.,* No. 21-CV-03342-NRN, 2022 WL 2901066, at *8 (D. Colo. July 22, 2022), aff'd sub nom. *M Welles & Assocs., Inc. v. Edwell, Inc.,* No. 22-1248, 2023 WL 3731018 (10th Cir. May 31, 2023) (finding services unrelated when one party provided educational services to universities and large corporations and the other provided educational services to K-12 public school employees). A relevant consumer would not perceive the parties' services as similar.[3]

Second, for related reasons, the parties' distinctly different marketing strategies further reduce the likelihood of confusion. "When evaluating the marketing, we consider whether the parties are competitors in the same markets." *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1081 (10th Cir. 2023); *see also Heartspring*s, 143 F.3d 556-57 (finding

---

[3] To the extent ArkOwl attempts to argue at trial that DarkOwl intends to expand into ArkOwl's market, this is untrue and ArkOwl offers no meaningful evidence to support it. *See M Welles & Assocs., Inc. v. Edwell, Inc.,* No. 22-1248, 2023 WL 3731018, at *7 (10th Cir. May 31, 2023) (finding accusing party bore the burden of proving an 'intention of entering the field' if it was to show a likelihood of confusion in this way) (citing *Hormel Foods Corp. v. Jim Henson Prods., Inc*., 73 F.3d 497, 504 (2d Cir. 1996)). Indeed, Mr. Turnage testified at length at the evidentiary hearing as to why DarkOwl would never provide PII verification services.

factor weighed in alleged infringer's favor in part because marketing strategies were unrelated when one party "markets basic skills training to a specialized population, the physically handicapped," and the other "markets publications devoted to nonviolent training for use with the general child population."). As the Court found, the parties are not competitors. DarkOwl occupies a niche market where its few competitors include a subsidiary of a large defense contractor and two companies founded by former Mossad cyber intelligence officials. None of DarkOwl's competitors provide PII services, and none of ArkOwl's competitors are competitors of DarkOwl or provide a large database of darkweb data. Because the companies "operate[] in distinctly different markets" they contact "very different people in their marketing efforts."[4] *Heartsprings*, 143 F. 3d at 557 (finding district court properly weighed factor in favor of accused infringer when parties targeted marketing toward different consumers); *see also* 4 McCarthy, supra, § 24:51, at 24–81 to 24–85 (discussing the diminished likelihood of confusion if the goods are sold in unrelated trade channels).

Reasonable consumers in separate trade channels, especially sophisticated ones like DarkOwl's customers and even those that comprise ArkOwl's distinct but specialized market, who seek one party's services are not likely to be confused by (or even encounter) marketing from the other party. Indeed, DarkOwl's direct, targeted marketing to the individual C-suite level officers at potential customers and the extensive vetting process for all new customers makes it highly improbable that any of its customers would be confused as to source or affiliation. Courts have found no likelihood of confusion in cases in which parties' services, customers, and marketing methods had much greater overlap. *See, e.g., Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d

---

[4] To the extent DarkOwl's third-party marketing agent sent marketing blasts that were received by a handful of purported ArkOwl customers, the evidence shows, and the Court has acknowledged that this was not sufficient to demonstrate that the parties have any overlap in services or target customers. Order at 25.

1122, 1126 (10th Cir. 1991) (no likelihood of confusion where parties' trademarks and trade names were similar, they both manufactured and sold laser products to the U.S. government, and they both marketed in the Laser Focus Buyers' Guide, but parties otherwise marketed in different channels, were not competitors, and their customers were sophisticated). Indeed, the Court has already concluded that a large group of users of customer identification or data verifications services and/or fraud prevention services would not necessarily include a single user of the type of darkweb services that DarkOwl provides, and, that DarkOwl's services "have no relation to approving a commercial transaction in real time or PII verification" -- the services provided by ArkOwl. *See* Order at 22-23. This factor favors DarkOwl.

6.    The Parties Customers Exercise a High Degree of Care in Making Purchasing Decisions

If consumers are more likely to exercise a high degree of care in deciding to purchase a product, the likelihood of confusion is reduced. *Heartsprings*, 143 F.3d at 557. "The level of care often turns on whether consumers choose a product based on impulse or careful study." *Elevate Fed. Credit Union,* 67 F.4th at 1072. A consumer's care generally intensifies with the importance of the product. *See id.* (citing Versa *Prods,* 50 F.3d at 204 ("The more important the use of a product, the more care that must be exercised in its selection."). The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase. *Sally Beauty Co.*, 304 F.3d at 975.

DarkOwl's services are expensive, and its customers are sophisticated. DarkOwl's clients include government intelligence agencies and cybersecurity companies whose customers are governments. The person purchasing the service from DarkOwl is generally the client's CEO, CFO, or chief information security officer, who would all be sophisticated and careful purchasers. *See Coherent*, 935 at 1126 (finding engineers, project managers, and corporate officers are "careful buyers"). There is an extensive vetting process for DarkOwl's clients that includes comprehensive

legal documents that prevent the misuse of any data provided. These customers "will likely conduct substantial due diligence before signing[.]" *M Welles & Assocs., Inc. v. Edwell, Inc.,* No. 22-1248, 2023 WL 3731018, at *7 (10th Cir. May 31, 2023). Evidence will show that ArkOwl's service is reasonably expensive, and its customers and users, while perhaps not as sophisticated as DarkOwl's, are nonetheless specialized professionals who would be scrupulous in the purchasing of the services at issue.

There is no evidence here that would indicate consumers ever mistakenly purchased one party's service when they intended to purchase the other service. In relation to DarkOwl's services, such a scenario would be a near impossibility because of DarkOwl's extensive vetting process before engaging a customer. As to ArkOwl's services, a potential DarkOwl customer would almost immediately realize that ArkOwl is simply not equipped to provide the same darkweb data services as DarkOwl. Indeed, sophisticated customers, such as those of DarkOwl, would come to that conclusion from ArkOwl's website and the absence of darkweb information and promotion. The parties' customers are therefore "unlikely to be confused [because] they are likely to spend a lot of time and energy researching." *Id.* (finding district court properly weighed this factor heavily in alleged infringer's favor when education services at issue were expensive and required due diligence); *see also Heartsprings,* 143 F.3d at 557. This factor heavily favors DarkOwl. Like the Tenth Circuit in *M Welles*, this Court should find the fact that the parties' have sophisticated customers likely to conduct substantial due diligence and are thus highly unlikely to be confused between the parties' marks when purchasing the parties' substantially different services, "particularly probative to the overall likelihood of confusion finding." *M Welles,* 2023 WL 3731018, at *7.

**B.    The Court Must Find There is No Trademark Infringement and No Basis to Cancel DarkOwl's Trademark Registrations.**

Because the evidence supports a finding of no likelihood of confusion between the parties' marks, the Court should grant DarkOwl's request for declaratory judgment and find that it did not infringe on ArkOwl's trademark rights and that its federal trademark registrations are valid. Conversely, the Court must deny ArkOwl's trademark infringement and cancellation claims. *See Elevate Fed. Credit Union*, 67 F.4th at 1083 (affirming district court's grant of declaratory judgment of non-infringement based on finding of no likelihood of confusion); *Water Pik*, 726 F. 3d at 1160 (affirming summary judgment for alleged infringer when no genuine factual issue existed regarding likelihood of confusion); *see also Groupion, LLC v. Groupon, Inc.,* 859 F. Supp. 2d 1067, 1081 (N.D. Cal. 2012) (summary judgment granted against cancellation claim because there was no likelihood of confusion between the parties' marks).

## <u>CONCLUSION</u>

For the reasons stated above, the evidence will show that a reasonable consumer is unlikely to be confused by the parties' trademarks at issue. The Court should rule in DarkOwl's favor at trial and grant its request for a declaratory judgement.

DATED: June 16, 2023

Respectfully submitted,

**PERKINS COIE LLP**

By: *s/ Jeremy L. Buxbaum*
Thomas L. Holt, IL Bar #6243134
Jeremy L. Buxbaum, IL Bar #6296010
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
P: (312) 324-8400
F: (312) 324-9400
Tholt@perkinscoie.com
JBuxbaum@perkinscoie.com

Kourtney Mueller Merrill, CO Bar #36,662
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
P: (303) 291-2300
F: (303) 291-2400
KMerrill@perkinscoie.com

**HOLLAND & HART LLP**

Sabrina J. Danielson, CO Bar #49,279
555 17th Street, Suite 3200
Denver, CO 80202
P: (303) 295-8565
F: (303 265-9255
SJDanielson@hollandhart.com