UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

DARKOWL, LLC,

        Plaintiff,

v.

ARKOWL LLC and ARKOWL CORPORATION,

        Defendants.

Court File No. 21-cv-02163 KLM

[Proposed] Findings of Fact and Conclusions of Law

This matter came before the Court on a three-day bench trial commencing June 26 and concluding on June 28, 2023. Plaintiff DarkOwl, LLC and Defendant ArkOwl, LLC appeared and were represented by counsel. Based on the testimony and evidence offered at trial and arguments of counsel, the Court makes the following:

**FINDINGS OF FACT**

    **A. ArkOwl**

1. ArkOwl, LLC was formed in 2012 as a Minnesota limited liability company. It adopted the ArkOwl word mark in 2012 and has continually used it in connection with its goods and services since 2012.

2. ArkOwl has no descriptive or suggestive qualities in connection with ArkOwl's services. ArkOwl obtained a federal registration for its word mark ArkOwl on April 21, 2020 (Reg. No. 6036746), claiming first use in commerce as early as October 11, 2012.

3. ArkOwl is in the cybersecurity field, operating in the fraud prevention space as a data provider. Since its inception, it has gathered data in connection with email addresses and offered that data to its customers for their use to prevent fraudulent transactions.

4. ArkOwl's offerings have expanded significantly since 2012. It expanded its data offerings regarding emails to include its first seen date, social media correlation data, and data

1

regarding whether and to what extent an email has been exposed via a data breach – likely appearing on the darknet. ArkOwl has also added data in connection with other search inputs, including phone numbers, postal code, and Internet Protocol (IP) data.

5. ArkOwl's customers and users are in various industries, including online retail, law enforcement, finance, cryptocurrency, and cybersecurity. ArkOwl's most significant customers are cybersecurity companies that aggregate ArkOwl's data with other data and use it for or offer it to their customers.

6. ArkOwl does not maintain a physical office presence, and neither do many of its customers. All relevant transactions and nearly all interactions between ArkOwl and its customers are virtual. Due to the nature of the business and industry, ArkOwl's market isn't confined by geography, and can most appropriately be categorized as being a virtual market.

7. Prior to September 2017, ArkOwl made sales to companies throughout the United States. Individuals in each state used ArkOwl's service prior to September 2017.

8. ArkOwl's trade name has become well-known throughout the fraud prevention industry. Third-party publications, such as Tech News, Bloomberg, and Benzinga.com, have written about ArkOwl without being solicited to do so. Individuals list "ArkOwl" as a software tool when identifying their skills on LinkedIn.com. Industry organizations have promoted ArkOwl to their members. Its name is also unique in its field – there are no other companies in the broader cybersecurity field using the mark and only a few using a mark containing "owl".

**B. DarkOwl**

9. DarkOwl, LLC is a Colorado limited liability company. It was formed in 2015 under a different trade name and adopted the DarkOwl mark no earlier than September 20, 2017. DarkOwl obtained trademark registrations for a design mark for its DarkOwl mark on July 2, 2019 (Reg. No. 5793807) and for DarkOwl Cybersecurity on July 24, 2018 (Reg. No. 5525738).

10. DarkOwl operates in the cybersecurity industry by gathering, organizing, and indexing data and offering it to its customers. It primarily gathers data from the darknet, although it also gathers data from non-darknet sources.

11. DarkOwl's products, its marketing strategies, and its target customers have constantly changed. Its earliest products essentially offered its customers a user interface to search the database it accumulated. In response to customer requests and to address evolving demand, it has developed other products.

12. One suite of products DarkOwl developed is access to a subset of data DarkOwl gathered and was able to index. This sub-database contains only structured, indexed data, including email addresses, IP addresses, cryptocurrency addresses, and credit card numbers. It offers various products giving access to this sub-database. Because the sub-database is structured, indexed, and more limited, DarkOwl's customers can search for and obtain relevant data much more quickly.

13. DarkOwl's target market and marketing strategies have also constantly evolved. It is constantly developing new potential use cases as its database evolves and as its customers' needs evolve. Originally, DarkOwl solicited and targeted large commercial organizations. In 2017, it was approached by a cybersecurity company and, as a result, pivoted to primarily target cybersecurity companies.

14. DarkOwl's primary customer base and target market consists of cybersecurity companies. Those companies generally acquire various types of data from multiple sources, including DarkOwl. They then use that data to offer products and services to their customers.

15. DarkOwl has utilized and emphasized different marketing strategies. It originally focused on direct solicitations and referrals. In 2019, DarkOwl pivoted to focus its marketing on

lead generation. It hired a third-party lead generation company in 2020, who sent out thousands of emails a week. DarkOwl retained that company for a year, from which it secured a few clients. That company sent solicitation emails to at least two of ArkOwl's existing customers.

16. From early 2021 through February 2023, DarkOwl focused its marketing more on inbound sales through content generation and more targeted solicitations. It also retained a sales team to contact and solicit potential clients. DarkOwl identified numerous clients, potential clients, and competitors of ArkOwl as potential DarkOwl customers for its sales team to solicit. In March 2023, DarkOwl again changed its marketing strategy to focus on more targeted outbound sales generation.

17. DarkOwl has marketed its ability to discover and monitor personal identification information exposed on the darknet.

18. DarkOwl considers every business that touches the cybersecurity industry a potential client. It has many thousands or tens of thousands of potential customers.

### C. Competitive Proximity

19. DarkOwl and ArkOwl are in close competitive proximity. Both gather data relevant to fraud detection and prevention and provide it to cybersecurity companies. Both companies offer similar types of data – information regarding email addresses, IP addresses, and domains. DarkOwl has identified multiple of ArkOwl's most direct competitors as potential clients, indicating their belief their data can be used for similar purposes. DarkOwl has actively solicited ArkOwl's existing customers, promoting its personal identification information monitoring ability to those customers.

20. DarkOwl's customers are sophisticated in the cybersecurity field. There is no evidence DarkOwl's customers are particularly sophisticated in trademark or branding issues.

The individuals using DarkOwl's and ArkOwl's services are much less sophisticated than those making the purchasing decisions.

## CONCLUSIONS OF LAW

1. A party claiming trademark infringement must establish it owns a mark and that the junior user's use of a similar mark is likely to generate consumer confusion in the marketplace. *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1238 (10th Cir. 2013).

2. ArkOwl owns the rights to the word mark ArkOwl, for which it has a federal trademark registration, Reg. No. 6036746. It acquired those rights at common law by using the mark in commerce beginning in 2012. *Hana Fin., Inc. v. Hana Bank*, 135 S.Ct. 907, 909 (2015). By September 20, 2017 – when DarkOwl adopted its mark – ArkOwl had established a market presence online that effectively reached the entire the United States. Its services are provided entirely virtually, and it had clients using its online products from every state. See *Pure Imagination, Inc. v. Pure Imagination Studios, Inc*., 2004 U.S. Dist. LEXIS 23064, at *24 (N.D. Ill. Nov. 12, 2004) (companies that provided services entirely online had "worldwide distribution area").

3. In determining a likelihood of confusion, courts in the Tenth Circuit consider six non-exhaustive factors: (1) the degree of similarity between the marks, (2) the strength of the marks, (3) evidence of actual confusion, (4) similarity of the parties' products and marketing, (5) the degree of care likely to be exercised by purchasers, and (6) the intent of the alleged infringer in adopting the mark at issue. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). Though no one factor is dispositive, the degree of similarity between the marks is the most important. *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019).

4. DarkOwl's use of its word mark and design mark are likely to cause confusion as to the sponsorship or affiliation between the two companies and are likely to cause initial interest and post-sale confusion.

### A. The Marks Are Similar

5. The degree of similarity factor weighs heavily in favor of a finding of likely confusion. Similarity is evaluated by comparing the marks' appearance, pronunciation, and meaning. *Beer Nuts, Inc. v. Clover Club Foods CO.*, 711 F.2d 934, 940 (10th Cir. 1983).

6. DarkOwl's word mark and design mark are nearly identical in appearance to ArkOwl's. The only difference between the words is the letter "D" at the beginning of DarkOwl; otherwise, they are identical – including the capitalized "O" in the middle of each word. See, e.g., *Altira Grp. Ltd. Liab. Co. v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1198 (D. Colo. 2002) ("Altira" and "Altria" visually similar); *E.I. Dupont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F. Supp. 502 (D.C.N.Y. 1975) ("EFLON" and "TEFLON").

7. The marks also sound nearly the same. The "D" at the beginning of "DarkOwl" could easily be lost in any conversation, eliminating any aural difference between the words. "One can easily imagine that these names would be uttered in business transactions or discussions conducted over the telephone. Clearly, the similarity of their sound would make them very difficult to distinguish in that context." *Altira*, 207 F.Supp.2d at 1199.

8. Finally, both marks are made-up, fanciful words with no particular meaning or suggestion, and "meaningless words are more easily confused." *Altira*, 207 F.Supp.2d at 1199. This lack of meaning also impacts the visual and aural elements of this factor. "[W]ith coined words which are meaningless so far as the English language is concerned, slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between marks." *Id*. at 1198.

9. The similarity of marks factor, therefore, weighs heavily in favor of a finding of likely confusion.

### B. ArkOwl is a Strong Mark

10. Under the strength factor, a stronger mark warrants broader protection. *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F.Supp.2d 1216, 1226 (D. Colo. 2001). This factor weighs heavily in favor of a likelihood of confusion finding.

11. A mark's strength is measured by its conceptual and commercial strength.

12. ArkOwl's mark is strong conceptually. It is fanciful as it has no meaning apart from indicating the source of ArkOwl's services, making it the conceptually strongest type of mark. "Under the conceptual strength prong, the categories, in descending order of strength, are: fanciful; arbitrary; suggestive; descriptive; and generic." *Big O Tires, Inc.*, 167 F. Supp. 2d at 1226. "'Fanciful' marks consist of 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." *King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1093 (10th Cir. 1999).

13. Commercial strength assesses "the marketplace recognition value of the mark." *Affliction Holdings, LLC*, 935 F.3d at 1115. ArkOwl's word mark is commercially strong. No other cybersecurity companies are using ArkOwl as a mark, and very few are using a mark comparatively similar to ArkOwl. Through ArkOwl's continuous and exclusive use, and through its effective marketing, it has become known and recognized in ArkOwl's industry.

### C. The Parties Have Similar Products in Competitive Proximity

14. The competitive proximity factor weighs in favor of a likelihood of confusion finding. The question is not whether the parties compete directly, but whether the parties' services are related in the minds of consumers. *Healthone of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F.Supp.2d 1154, 1182 (D. Colo. 2012). In assessing this factor, "the relevant confusion

under trademark law is not limited to confusion of consumers as to the source of the goods, but also includes confusion as to sponsorship or affiliation, such as a consumer's mistaken belief that a retailer is part of a larger franchising operation." *Team Tires Plus v. Tires Plus, Inc.*, 394 F.3d 831, 835 (10th Cir. 2005).

15. DarkOwl and ArkOwl are moderately competitive, and share significant competitive proximity. Even if they are not directly competitive, the products and services are so closely related that consumers are more likely to believe in an affiliation or connection between the two – especially given the similarity in their marks.

### D. DarkOwl Customers Are Sophisticated in Technical Issues, Not Trademarks

16. The degree of care factor is neutral or weighs very slightly against a finding of likely confusion. The relative sophistication of DarkOwl's customers is insufficient to prevent confusion. There is no indication those consumers are particularly sophisticated in trademark matters. Further, the sophistication factor is much less relevant when, as here, there exists a likelihood of confusion as to sponsorship or affiliation, and a likelihood of initial interest and post-sale confusion. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975).

### E. The Actual Confusion and Intent Elements are Neutral

17. There was no evidence presented as to DarkOwl's intent in adopting its mark. There was only limited evidence presented of instances of actual confusion. Both factors are neutral in this case.

18. Because of the close similarity between the marks at issue, the strength of ArkOwl's mark, and the closely related nature of the parties' services, the Court finds a substantial likelihood of confusion. The "remaining factors – the absence of specific evidence that [DarkOwl] deliberately adopted its mark with an intent to infringe, of actual customer

8

confusion, or of a level of consumer care – do not overcome" the strength of ArkOwl's marks or DarkOwl's close similarity to those marks. *Affliction Holdings*, 935 F.3d at 1115-16.

## ORDER

Based on the above Findings of Fact and Conclusions of Law, the Court Orders as follows:

1. Plaintiff DarkOwl's request for a declaratory judgment of non-infringement is dismissed with prejudice.

2. DarkOwl is permanently enjoined from infringing the ArkOwl's mark. DarkOwl is permanently enjoined from using or contributing to the use of "DarkOwl" in connection with the advertisement, marketing, or sale of software services.

SO ORDERED:

_____

Hon. Kristen L. Mix
United States Magistrate Judge