UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

DARKOWL, LLC,

           Plaintiff,

v.

ARKOWL LLC and ARKOWL
CORPORATION,

           Defendants.

Court File No. 21-cv-02163 KLM

**[Proposed] Findings of Fact and
Conclusions of Law**

This matter came before the Court on a two-day bench trial commencing June 26 and concluding on June 27, 2023. Plaintiff DarkOwl, LLC and Defendant ArkOwl LLC appeared and were represented by counsel. Based on the testimony and evidence offered at trial and arguments of counsel, the Court makes the following:

## FINDINGS OF FACT

### ARKOWL

1.      ArkOwl LLC was formed in 2012 as a Minnesota limited liability company. Tx. p. 31:9-13; Ex. 301. It adopted the ArkOwl word mark at least as early as 2012 and has continually used it in connection with its goods and services since 2012, operating as ArkOwl LLC via the website www.arkowl.com. Tx. p. 31:9-13, 155:2-4.

2.      ArkOwl has no descriptive or suggestive qualities in connection with ArkOwl's services. Tx. p. 28:17-30:7. The founders chose ArkOwl because they wanted a short name – eight characters or less – with a ".com" domain available. Tx. p. 29. It was important to them that the name be "soundable" – "something that somebody could sound when talking about the website and say, go to this website dot-com, and it's just really simple to say that." Tx. p. 30:11-15.

3.      DarkOwl does not contest that ArkOwl's mark is fanciful. Tx. p. 320:5-12.

4.      ArkOwl obtained a federal registration for its word mark ArkOwl on April 21, 2020, claiming first use in commerce as early as October 11, 2012. Ex. 28.

5.      ArkOwl does not maintain a physical office presence, and neither do many of its customers. All relevant transactions and nearly all interactions between ArkOwl and its customers are virtual. Due to the nature of the business and industry, ArkOwl's market isn't confined by geography, and can most appropriately be categorized as being a virtual market. Tx. p. 38-39. It penetrated this virtual market prior to DarkOwl's adoption of its mark in September 2017.

6.      ArkOwl was able to determine the location of its users using Google Analytics, which tracks IP addresses. Through that tool, ArkOwl established that individuals in each state used ArkOwl's service prior to DarkOwl's adoption of its mark in September 2017, and before DarkOwl's trademark registrations in 2018 and 2019. Compare Exs. 327, 423 with Exs. 131, 132. In particular, ArkOwl's CEO Rob Daline testified that one or more of its corporate clients showed IP addresses originating from Colorado – where DarkOwl is headquartered – prior to 2017. Tx. p. 43-44. In Colorado alone, ArkOwl had more than 3,000 unique users interacting with ArkOwl's service more than 41,000 times prior to August 1, 2017. Ex. 423.

## ARKOWL'S SERVICES AND MARKET

7.      ArkOwl is in the cybersecurity field, operating in the fraud prevention space as a data provider. May 15, 2023 Tx. p. 27:2-13. Since its inception, it has gathered data in connection with email addresses and offered that data to its customers for their use to prevent fraudulent transactions. Tx. p. 34:8-35:5.

8.      ArkOwl's offerings have expanded significantly since 2012. It added data in connection with other search inputs, including phone numbers, postal code, and Internet Protocol (IP) data. Tx. p. 143. The data ArkOwl provides in connection with its inputs has also expanded

to include the date that input was first searched by any ArkOwl user, social media correlation data, and data regarding whether and to what extent an email has been exposed via a data breach – likely appearing on the darknet. Tx. p. 138-143.

9.    ArkOwl's users can interact with its services via a user interface (UI), requiring a person to manually enter data. Starting in 2015, ArkOwl also offered its services via API, which allows ArkOwl's users to set up software to run searches. Tx. p. 47-48. An API "is a machine-to-machine interrogation." Tx. p. 194.

10.    ArkOwl began with the idea of providing data for retailers' fraud analysts to use in evaluating online transactions. Tx. p. 8:7-16. But one of its first customers, and its largest source of revenue each year, is a cybersecurity company named CyberSource – a Visa subsidiary. Tx. p. 42:2-43:19.

11.    CyberSource is a cyber security fraud platform. May 15, 2023 Tx. p. 50:15-24. It is a fraud protection company. Tx. p. 95:23-24. It offers its customers a range of fraud prevention service options, from consulting and monitoring to completely outsourced manual review fraud prevention services. Ex. 305, p. 64-70.

12.    In 2013 ArkOwl had at least three customers who were not retail clients, accounting for more than 25% of its revenue. Ex. 382, tab Rev. Those customers included CyberSource and two online payments companies: AliPay and Cleverbridge. Ex. 382, tab. Rev; Tx. p. 44:15-45:12.

13.    By 2015, ArkOwl had acquired additional customers that were not in retail. Specifically, it was hired by a) Signifyd – a fraud solutions provider much like CyberSource (Ex. 383, tab Rev; Tx. p. 46:1-12); b) SELLSecure – a payments platform that became a bank (Tx. p.

46:16-20); and c) TransferWise, an online payments company. Tx. p. 46:23-47:9. That year, more than 35% of ArkOwl's revenue came from non-retail customers. Ex. 383, tab Rev.

14.     By 2022, more than 85% of ArkOwl's revenue came from companies that were not retail companies. Ex. 385, tab Rev.; May 15, 2023 Tx. p. 51. Its largest customers and partners include fraud protection platforms such as Accertify, Apruvd, Signifyd, Getmeelo.com, Socure, and Sentilink. Ex. 385, tab Rev.; Tx. p. 58-60.

15.     ArkOwl's fraud protection customers and partners serve more than just retail companies verifying online transactions. For example, Accertify serves both retailers and banks. May 15, 2023 Tx. p. 59. ArkOwl has partnered with a fraud protection platform called NICE Actimize. Tx. p. 67-69; 72. NICE Actimize serves financial services organizations and markets its platform as a financial crime management ecosystem. Exs. 335, 339. Its customers are banks and fintech businesses. Tx. p. 74.

16.     Socure, another of ArkOwl's fraud prevention cybersecurity clients, uses ArkOwl's data in connection with its platform. Ex. 305, p. 131-134. Socure describes its use cases and customers to include "new account creation, sign in, guest checkout, account changes, etc. The company serves a wide market base where identity verification is particularly valuable, such as financial services, ecommerce, shared marketplaces, telecom, healthcare, insurance, and the federal government." Ex. 305, p. 132.

17.     NICE Actimize partnered with ArkOwl to serve a broader customer base, and for more than just verification of commercial transactions. In its press release announcing its partnership with ArkOwl, NICE Actimize described how ArkOwl's data services could benefit its financial services organization clients. "Technology providers such as ArkOwl, in partnering with NICE Actimize's X-Sight Marketplace ecosystem, are reviewed for their ability to

compliment financial crime and compliance solutions." Ex. 335. NICE Actimize further wrote that ArkOwl's data services will help "financial service organizations improve the accuracy of customer risk scoring when onboarding new customers or enrolling existing customers to new services." Ex. 335.

18.     ArkOwl's customers and end users in the financial services industry use ArkOwl's data to help prevent account takeover fraud, which is distinct from real-time commercial transaction verification. Tx. p. 68-70, 96.

19.     Although ArkOwl cannot monitor exactly how its customers use the data ArkOwl provides, several of its customers likely use its data for purposes other than online transaction verification. Its online payments customers, including Cleverbridge (Tx. p. 44), Alipay (Tx. p. 45), Transferwise (Tx. p. 46-47), Stone (Tx. p. 58), and SELLSecure (Tx. p. 46) likely use ArkOwl's data in the account setup process.

20.     ArkOwl's customers include Kraken.com, a cryptocurrency company (Tx. p. 59), and SelectAccount, a company that sets up Health Savings Accounts (Tx. p. 60). They also likely use ArkOwl's data in the account setup process.

21.     ArkOwl also serves the cybersecurity consulting industry, with customers such as Select.group, David Benford, and Cyber Spyder (Tx. p. 60-61). Those companies provide consulting and training for consumers and law enforcement, and use ArkOwl's data in their consulting work. Again, this use is distinct from verifying online transactions in real-time.

22.     ArkOwl has customers in law enforcement, including westyorkshire.police.uk, Blackstage Forensics Law Enforcement and "Police - Yorkshire Humber." Tx. P. 61; Ex. 385, tab Rev. They use ArkOwl's data in preventing sex trafficking. Tx. P. 61. Although these are not

U.S.-based customers, they demonstrate ArkOwl's data can be and is used for more than real-time, online transaction verification.

23.     ArkOwl acquires most of its data from the surface web. It also acquires and provides data from the website HaveIBeenPwned.com, which identifies whether an email address was included in a data breach. Tx. p. 48-49. Data from HaveIBeenPwned.com identifies the specific data breach the email address was included in, whether it was leaked on the darknet, and whether the data breach included the email address or phone number in question along with usernames, passwords, phone numbers, names, and whatever else was included in the data leak. Tx. p. 49; Ex. 36.

24.     Trial Exhibit 36 shows how ArkOwl's data breach information appears in response to an inquiry of Mr. Daline's personal email address. One of the breaches where Mr. Daline's email address appeared and included in the example is the ParkMobile data breach, which breach included email addresses, names, and phone numbers. Ex. 36.

25.     Other companies use data from the dark web to directly compete with ArkOwl. About-Fraud.com is an organization that compiles companies in the fraud prevention space to help users understand the landscape. Tx. p. 75. It created graphics to break its solution providers – i.e. companies in the fraud prevention space – into subcategories. It identified "Identity and Verification" as one subcategory and included a subcategory under Identity and Verification dedicated to dark web companies. Ex. 347. Those companies include Gemini Advisory and SpyCloud. Ex. 347. SpyCloud previously solicited ArkOwl and offered to sell dark web data to ArkOwl to be used in ArkOwl's PII verification services. Tx. 79.

26.     About-Fraud.com's graphic includes a subsection under Identity and Verification called PII Verification, where ArkOwl can be found. Ex. 347. IPQualityScore appears alongside

ArkOwl in the PII Verification subsection. Ex. 347. IPQualityScore is an ArkOwl direct competitor (Tx. p. 81-82) and advertises that it uses dark web data as part of its PII Verification services. Exs. 344, 345.

27.     ArkOwl's brand and services regularly appear alongside related, but not directly competitive companies. For example, ArkOwl appears in at least two different versions of About-Fraud.com's vendor lists, which comprise approximately 100 other companies in the cybersecurity, fraud prevention industry. Exs. 346, 347. ArkOwl appears in the Paladin Vendor Report alongside 45 other companies in the fraud and payments industry. Tx. p. 35; Ex. 305. SEON, one of ArkOwl's most direct competitors, published a list of ten companies offering the "best fraud detection softwares" and included ArkOwl, some of its competitors, and some of ArkOwl's customers or potential customers including Signifyd. Ex. 349.

28.     Many of the companies identified by About-Fraud.com, the Paladin Report, and SEON's article are ArkOwl's competitors, its potential customers, or potential partners. Tx. p. 77. It is not unusual for companies in the fraud prevention and cybersecurity industry to have complex relationships where they compete in some contexts but are potential customers or partners in other contexts. May 15, 2023 Tx. p. 63.

29.     ArkOwl LLC and DarkOwl LLC are both in the cybersecurity industry, which the parties agree is a very broad industry. DarkOwl testified that it estimated there to be approximately 10,000-14,000 companies in the broader cybersecurity industry, including many in completely unrelated fields. May 15, 2023 Tx. p. 81-82. ArkOwl identified exhibits describing a smaller and more relevant subset of the cybersecurity industry consisting of fraud detection and prevention solution providers, identified and discussed in some detail in the Paladin Report, the About-Fraud.com infographics, the SEON article, and an article published by Aite Group, LLC.

Exs. 305, 346, 347, 348, 349. In the approximately 200 companies discussed in those exhibits, no other mark contained the term "ArkOwl," or any other reasonably similar mark.

30.     As will be discussed below, DarkOwl compiled multiple lists of companies in the cybersecurity industry as well, including an infographic (Ex. 4, p. 7) and lists of DarkOwl's target market (Ex. 4, p. 18; Ex. 5, tab 3). The graphic appearing on Exhibit 4, page 7 was likely compiled by an investment banker to identify and compartmentalize a portion of the cyber industry. Tx. p. 174-175. In the infographic and the lists of companies compiled by DarkOwl, containing hundreds of companies, no other company's mark contained the term "ArkOwl" or any other reasonably similar mark.

31.     DarkOwl concedes that it has never encountered any companies other than ArkOwl and DarkOwl with the term "ArkOwl" as part of the mark. Tx. p. 191. A search on the U.S. trademark database for the word mark "arkowl" only returns four results – ArkOwl's two registrations and DarkOwl's two registrations. Tx. p. 88.

32.     DarkOwl offered evidence of nine other companies using "Owl" in their names, arguing that ArkOwl's mark is relatively common. Exhs. 98-121. The Court is not persuaded. First, the nine marks have very little in common with ArkOwl's mark – only sharing "Owl." Two of the nine begin with "Owl," and four are multiple word marks, making those dissimilar from ArkOwl's mark.  Second, DarkOwl's selection of these "Owl" companies came from the overly broad definition of cybersecurity – which DarkOwl testified comprises up to 14,000 companies. ArkOwl and DarkOwl are both software-as-a-service data providers offering fraud protection and prevention services. Most of the companies DarkOwl chose offer products and services completely unrelated to what ArkOwl and DarkOwl offer:

    a.  Analyticowl provides "temporary use of non-downloadable software;" Ex. 98.

    b.  Owl Cyber Defense provides computer hardware and recorded software for secure data transfer; Ex. 100.

    c.  Owl Scan offers downloadable software for mobile devices to transmit information via a matrix bar code; Ex. 106.

    d.  Secureowl sells downloadable network security software; Ex. 110.

    e.  Spatiowl's services pertain to collecting and analyzing location information for traffic prediction and routing; Ex. 114.

    f.  Street Owl offers software to measure users' driving habits to provide insurance quotes; Ex. 116.

    g.  Watchowl offers "encoded micro particulates, tags and taggants of plastic, metal or silicate for use in the field of passive labeling, tracing or tracking persons, animals, vehicles or goods of any kind." Ex. 120.

33.    Because none of the nine examples is even moderately similar to ArkOwl, and because the companies using those marks are in the overly broad cybersecurity industry and not in the narrower subset of SAAS data providers who offer PII data to help their customers make decisions regarding fraud prevention and protection in which ArkOwl (and DarkOwl) operate, these examples only further demonstrate the unique nature of ArkOwl's mark.

34.    ArkOwl chose its mark in part to be easily understood in conversation. Tx. p. 30. That has been important because ArkOwl's primary marketing method has been word of mouth. Tx. p. 62. ArkOwl acquired its first significant customers after being promoted to an industry group called the Merchant Risk Council, where it subsequently gave a presentation. Tx. p. 32-33.

It has given a handful of other presentations to industry groups, including to Accertify in 2018 (Tx. p. 62; Ex. 331), Airline Info in 2020 (Tx. p. 63; Ex. 353) and Loyalty Security Association in 2020 (Tx. p. 64; Ex. 354).

35.     Its strategy of having "companies use us, talking about how amazing ArkOwl is to other companies" has worked well for ArkOwl. Tx. p. 62. It presented evidence that has been successful in acquiring customers around the world simply through these referrals. See, e.g. Ex. 314 (Frys.com finding ArkOwl via referral); Ex. 316 (RailEurope.com finding ArkOwl through referral from CyberSource); Ex. 317 (Staples.com finding ArkOwl from a MRC meeting); Ex. 322 (Sephora finding ArkOwl through referral). As a result, ArkOwl has not needed to rely on large marketing expenses.

36.     Through its successful word of mouth marketing and its presence in the market since 2012, ArkOwl's trade name has become well-known throughout the fraud prevention industry. Third-party publications, such as Tech News, Bloomberg, and Benzinga.com, have written about ArkOwl without being solicited to do so. Exs. 337, 338, 339, 340, 341, 343, 349. Individuals list "ArkOwl" as a software tool when identifying their skills on LinkedIn.com. Exs. 355-374. Industry organizations have promoted ArkOwl to their members. Ex. 304. ArkOwl's service has become so prevalent it has become an acronym in CyberSource/Visa's manual review desk. Ex. 334.

37.     By August 2017, nearly 90,000 unique users had interacted with ArkOwl's service, being exposed to ArkOwl's mark. Ex. 423, p. 3. And, by 2022, ArkOwl's users engage in more than 20,000 manual review searches each day. Ex. 424, tab "arkowl-useage-stats-all" at line v3.

**DARKOWL**

38.     DarkOwl, LLC is a Colorado limited liability company. It was formed in 2015 under a different trade name and adopted the DarkOwl mark no earlier than September 20, 2017. DarkOwl obtained trademark registrations for a design mark for its DarkOwl mark on July 2, 2019 (Reg. No. 5793807) and for DarkOwl Cybersecurity on July 24, 2018 (Reg. No. 5525738). Exhs. 131, 132.

39.     When it adopted its design and word mark, it chose a mark nearly identical to the design mark in use by ArkOwl at the time:



Exs. 132, 303.

40.     Like ArkOwl, DarkOwl never markets its services using only a portion of its mark, such as "Dark" or "Owl." Its mark is always presented as "DarkOwl." Tx. p. 192.

41.     The two marks are visually similar – nearly indistinguishable, although DarkOwl was unwilling to concede the visual similarity (Tx. p. 303-304).

42.     The marks are also virtually indistinguishable in sound. DarkOwl's mark includes the entirety of the ArkOwl mark and simply adds the "d" sound at the beginning, a difference easily lost in conversation. In fact, DarkOwl's attorney mistakenly said DarkOwl intending to say ArkOwl at least once during trial. May 15, 2023 Tx. p. 71.

43.     Neither mark has any common meaning. DarkOwl attempts to distinguish the marks' meaning by dissecting each mark into components and comparing the first syllable of each word: dark compared with ark. But comparisons of marks must be done as a whole, particularly when both marks are always presented intact and not segregated. Because neither mark has meaning, they are indistinguishable based on the meaning of the marks.

44.     Even if the Court were to accept DarkOwl's suggestion to dissect the marks and compare meanings, the components of the marks overall would have very similar meanings. To the extent the public would ascribe any meaning to either mark, they both would appear to reference an owl with a modifier; a "Dark Owl" (whatever that may be) and an "Ark Owl" would both appear to the public as some descriptive type of owl.

### DARKOWL'S SERVICES AND MARKET

45.     DarkOwl fundamentally is a data company. May 15, 2023 Tx. p. 107. It has a platform that scrapes the dark net and some surface websites on a continuous basis to collect data. Tx. p. 238-239. Each year, its products evolve to include more data sources and more ways for its customers to access that data. Ex. 2.

46.     One of DarkOwl's products allows its customers to access the entire database DarkOwl has accumulated. May 15, 2023 Tx. p. 108. Its products can be accessed by UI or by API. Tx. p. 200-201; Ex. 2, p. 16 (listing UI and API products).

47.     No later than 2021, DarkOwl began indexing certain data it accumulated, including email addresses, IP addresses, cryptocurrency, and credit cards. Ex. 2, p. 14; Tx. p.

193-194. It indexes the data in near-real time. Tx. p. 195-196. The indexed data is made available in a sub-database DarkOwl refers to as "Extracted IOCs" or "Structured Data". Ex. 2, p. 16; May 15, 2023 Tx. p. 109.

48.    DarkOwl created the Structured Data sub-database so that its customers could get relevant responses to their searches more quickly without the noise contained in searches of the broader database. Tx. p. 194-195.

49.    A DarkOwl customer searching the Structured Data database would receive search results in a matter of seconds. Tx. p. 198.

50.    DarkOwl testified it cannot provide email data in real-time. May 15, 2023 Tx. p. 91. But its testimony is contradicted by its admission that it continuously scrapes and indexes email data, which its customers can search and receive results from in seconds. Further, its marketing materials advertise "DarkOwl's continuous collection ensures a relevant, timely risk-based approach for darknet data presence to identify potential risk." Ex. 96.

51.    DarkOwl testified that searches for emails in its database would never include social media information and would rarely include phone numbers, names, or addresses. Tx. p. 268-269. The Court finds this self-serving testimony unpersuasive based on DarkOwl's inconsistent testimony and by evidence presented from ArkOwl regarding what data is included in data breach information. Specifically:

        a.   DarkOwl admitted a DarkOwl customer searching the Structured Data database for an email address would get the following data: when DarkOwl scraped the data, where DarkOwl scraped the data from the darknet, whether the email address was associated with a data breach. Tx. p. 199. When a person's name is associated with an email address,

DarkOwl's search results would provide that information as well. Tx. p. 270. Similarly, if a data breach included a phone number, physical address, or social media handle, DarkOwl's search results would include that information. Tx. p. 268-270.

b. The only example at trial of information found in a data breach appears in Exhibit 36. That exhibit contained two examples – the LinkedIn and ParkMobile data breaches. Those breaches included email addresses, names, phone numbers, social media profiles, geographic locations, and other data. Ex. 36. DarkOwl's database would have provided all such information in response to an inquiry for the relevant email address.

52.     Like ArkOwl, DarkOwl simply provides its customers data. Tx. p. 268. It has no way to monitor what searches its API customers are conducting. Tx. p. 200-201. It only knows what its customers are doing with the data it provides if the customers tell DarkOwl. Tx. p. 202.

53.     DarkOwl believes its data is used to guard against types of fraud that emerge from the darknet. Tx. p. 256. It believes its customers use DarkOwl's data for fraud protection related to bank account information being sold. May 15, 2023 Tx. p. 90. This type of fraud is called account takeover fraud. Ex. 93. DarkOwl's marketing materials specifically advertise account takeover fraud as a use of its data. Ex. 93.

54.     DarkOwl testified extensively about ways in which it believes its data can be used. It claimed that its customers could not use its data to compete with ArkOwl but provided little in the way of explanation. It also admitted that its use cases are constantly evolving. Tx. p. 169; Ex. 11. It admitted that it would strategically determine what use cases to emphasize in its marketing depending on who it was attempting to sell to. Tx. p. 165-166. It admitted that it has

learned of ways its data can be used from its customers, who used the data in new and surprising ways. Tx. p. 166; May 15, 2023 Tx. p. 150. Because of these inconsistencies, the Court gives little weight to DarkOwl's testimony about how its data can and cannot be used.

## DARKOWL'S TARGET MARKET

55.    DarkOwl testified at trial that its current target market primarily consists of government or national intelligence. The Court affords that testimony little weight for two reasons; first, there was no evidence presented regarding whether any of those customers are in the United States; indeed, the evidence indicates that many of DarkOwl's government or national intelligence customers are not U.S.-based. DarkOwl testified that it began targeting cybersecurity companies because a non-US based cybersecurity company approached it. May 15, 2023 Tx. p. 125. DarkOwl's Exhibit 43, appearing to be a list of DarkOwl's customers by invoice, include very few US based government or national intelligence customers. Ex. 43. Nearly all appear to be companies as opposed to government organizations.

56.    Second, DarkOwl's history demonstrates it does not know its target market and that it will sell to nearly any entity willing to buy its services. It also demonstrates that DarkOwl's only consistent target market comprising the majority of its actual customers and marketing efforts consists of companies in the cybersecurity industry providing services for end users.

57.    DarkOwl has never primarily focused on selling to government and intelligence agencies. It first targeted end users, including banks, retail, and healthcare companies. Tx. p. 203. It continued targeting non-governmental entities (Tx. p. 162) while also targeting cybersecurity companies sometime in 2017 or 2018. Tx. p. 203. DarkOwl's marketing materials over the years have included many target customer types, most of which are not government or intelligence agencies. Ex. 3, p. 9 (2018 use cases); Ex. 11 (identifying only 9 of 48 customers as government

as of 2019); Ex. 9, p. 6 (identifying only 15 of 73 customers as in government); Ex. 9, p. 13 (describing strategy as targeting less sophisticated users "which is the **really big market.")**

58.     At trial, DarkOwl admitted its core target market was still the cybersecurity industry as of 2022. Tx. p. 203-204. DarkOwl sells "primarily to either cybersecurity platforms -- which is, I'm a cybersecurity professional, and I need a platform to help me do my job -- or data platforms. We contribute data to platforms, and they're aggregators of all sorts of data." Tx. p. 170. Its potential customers are those cybersecurity companies on speed dial for any company that cannot afford their own cybersecurity department. Tx. p. 177-178. Its most profitable market is large companies, while its broadest market relates to the small and midsize business (SMB) market. Tx. p. 177.

59.     DarkOwl also contradicted itself in testifying about the size of its target market. At one point, in attempting to claim there is no market overlap with ArkOwl, DarkOwl testified its market is extremely small. May 15, 2023 Tx. p. 131. But later, DarkOwl testified that it has many thousands of potential customers. Tx. p. 172-173. And, as will be discussed below, its testimony that it has a large potential market is consistent with the documentary evidence of its marketing strategies for the last three years.

## COMPETITIVE PROXIMITY

60.     The Court finds that DarkOwl's market significantly overlaps with ArkOwl's market. DarkOwl argues that it and ArkOwl do not have overlapping markets because it targets and markets to only a few, select, sophisticated potential customers, but the argument is undermined by DarkOwl's broad definition of its target market (discussed above), its admission that it has many thousands of potential customers, and its historical marketing efforts.

61.     DarkOwl is run by sophisticated individuals with experience in the business world. May 15, 2023 Tx. p. 76-77. DarkOwl's CEO oversaw and was directly responsible for

DarkOwl's marketing and sales department, including overseeing its marketing messaging. Tx. p. 209. He acknowledged that it was important to ensure DarkOwl's messaging was an accurate representation of DarkOwl and its services. Tx. p. 210.

62.     Under the CEO's guidance and leadership, DarkOwl targeted and solicited a broad range of companies in the cybersecurity industry, including ArkOwl's customers, potential customers, and competitors, from at least 2020 through early 2023.

63.     In 2020, DarkOwl's head of marketing decided to hire a vendor to run an outbound marketing effort. Tx. p. 212-213. The vendor hired a company named CIENCE. Tx. p. 213. The CEO approved of this effort. Tx. p. 213. Though DarkOwl testified at trial that CIENCE is a Filipino-based company (Tx. p. 213), public records indicate otherwise. CIENCE's website [https://www.cience.com/about-us] identifies its headquarters to be located in Denver, Colorado; and the U.S. Patent and Trademark database identifies CIENCE as a Delaware corporation. Federal Rule of Evidence 201 permits a court to take judicial notice at any stage in a proceeding and must do so when requested if supplied with necessary information. Fed R. Evid. 201(b), 201(c). "It is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); see also *Elevate Fed.  Credit Union v. Elevations Credit Union,* 2022 U.S. Dist. LEXIS 47346, *48 (D. Utah March 16, 2022) (taking judicial notice of locations of bank branches found on website).

64.     DarkOwl's CEO testified that it set CIENCE up with emails coming from @bd.darkowl.com so that the outside world would believe the solicitations came from DarkOwl. Tx. p. 214. DarkOwl provided CIENCE with general messaging information and had the ability

to control the specific messaging CIENCE used. Tx. p. 215. DarkOwl's CEO did this while understanding the importance of controlling DarkOwl's marketing messaging. Tx. p. 210.

65.     DarkOwl hired CIENCE knowing it would send out thousands of solicitation emails on DarkOwl's behalf. Tx. p. 216. It hired CIENCE not only to send out emails, but also to follow up with any potential customers and secure meetings with DarkOwl's sales team. Tx. p. 214-215. It utilized CIENCE for 12-14 months. Tx. p. 214-215.

66.     This marketing effort through CIENCE was a deliberate decision by DarkOwl and consistent with DarkOwl's testimony about its target market. As discussed above, DarkOwl considers its target market to consist of many thousands of companies, either in the cybersecurity field or relating to the SMB market. DarkOwl's decision to hire CIENCE in 2020 followed DarkOwl's president's recommendation in late 2019 to "Focus on lead gen." Ex. 11, p. 2. DarkOwl's utilization of CIENCE to email thousands of businesses for more than a year is consistent with that approach.

67.     CIENCE may not have been as successful as DarkOwl hoped, but it was successful. DarkOwl initially testified that CIENCE did not generate any business. May 15, 2023 Tx. p. 100. However, DarkOwl later admitted CIENCE secured one or two customers for DarkOwl at a time when DarkOwl only had approximately 50 customers. Tx. p. 215.

68.     DarkOwl did not track or retain information regarding who CIENCE solicited. Tx. p. 215-216; May 15, 2023 Tx. p. 128. ArkOwl discovered that DarkOwl was soliciting its clients when it heard from one of those clients, Apruvd. Tx. p. 90-91. During this litigation, ArkOwl discovered that DarkOwl, via CIENCE, also solicited another of its clients, Signifyd. Exs. 380, 381, 387.

69.     Due to the volume of solicitation emails sent by CIENCE on behalf of DarkOwl and the evidence that DarkOwl via CIENCE targeted the types of cybersecurity companies that are ArkOwl customers, it is highly likely that many other ArkOwl customers received DarkOwl's solicitation emails.

70.     DarkOwl's marketing efforts toward ArkOwl's customers, potential customers, and competitors continued through its internal staff as well. While engaged with CIENCE, DarkOwl hired a person to lead its sales team in March 2021. Tx. p. 211. That individual, Mr. Williamson, was experienced in sales before being hired. Tx. p. 223. DarkOwl testified that it would only take a matter of hours to have a reasonable understanding of its target market (Tx. p. 192) and the head of sales had several months before presenting DarkOwl's leadership with his approach.

71.     Consistent with DarkOwl's testimony regarding its broad target market, Mr. Williamson also believed DarkOwl has a broad universe of potential customers. Tx. p. 220-221. After familiarizing himself with DarkOwl for three or four months, Mr. Williamson created a document to guide his vision of DarkOwl's sales strategies. Tx. p. 223; Ex. 4.

72.     Mr. Williamson's work product included a list of potential customers by use case. Tx. p. 226-227. He included some existing DarkOwl customers on the list, showing the veracity of those use cases. Tx. p. 227. He created a slide called "Vertical Use Case: Targets (Addressable Market)" comprising companies he believed DarkOwl could sell to. Ex. 4, p. 18.

73.     Mr. Williamson used that target list to present to DarkOwl's sales team. May 15, 2023 Tx. p. 132; Ex. 4.

74.     Later – likely several months after presenting the first list -- Mr. Williamson created a spreadsheet designed to craft messaging for DarkOwl's new website. Tx. p. 227-229; Ex. 5. The company used this document into early 2022. Tx. p. 229.

75.     In the spreadsheet, Mr. Williamson expanded on his approach to sell to a broad customer base. He created one tab to list several companies he believed were DarkOwl targets. Tx. p. 230; Ex. 5, tab "Big Data Targets". Mr. Williamson was responsible for assigning leads to salespeople to solicit. May 15, 2023 Tx. p. 137. And Mr. Williamson used the spreadsheet to do just that.

76.     Mr. Williamson organized the list of DarkOwl targets by category. Ex. 5, tab "Big Data Targets". He then assigned two salespeople to each category. Ex. 5, tab "Big Data Targets" at rows 3, 4. He also assigned several of the specific companies to salespeople by including their name next to the company name.

77.     The names appearing by a DarkOwl potential customer indicated that a salesperson was already engaged in conversations with that prospect. May 15, 2023 Tx. p. 137. The list indicated that one of DarkOwl's sales reps was already engaged in conversations with PIPL. Ex. 5, tab "Big Data Targets" E82. PIPL is one of ArkOwl's most direct competitors and markets its services as identity verification "to quickly determine if a buyer is using a real identity." Ex. 305, p. 128.PIPL appears in the "PII Verification" category alongside ArkOwl in About-Fraud's 2021 infographic as well. Ex. 347.

78.     DarkOwl testified that it does not know whether the salespeople on the spreadsheet actually reached out to the leads Mr. Williamson assigned them (May 15, 2023 Tx. p. 139) but admitted that some of the targets subsequently became DarkOwl customers. May 15, 2023 Tx. p. 137.

79.     DarkOwl asks the Court to disregard the sales and marketing efforts made by CIENCE and Mr. Williamson, claiming they were misguided or not effectively overseen. The Court finds that DarkOwl's sales and marketing efforts from 2020 through early 2023 were deliberate and indicative of its target market and marketing strategy for the following reasons:

    a.  DarkOwl claims it knows exactly who its potential customers are and that it currently has a very targeted marketing strategy. At the same time, it asks the Court to disregard three years of its demonstrated marketing activity, claiming that activity was misguided and a mistake, while taking its word at face value on its existing marketing strategy.

    b.  DarkOwl's leadership is sophisticated and experienced. The decisions regarding their sales and marketing efforts appear to have been thought out, discussed, made into presentations to be considered by leadership, and deliberately chosen.

    c.  DarkOwl's leadership exercised care and control over its marketing messaging, overruling recommendations made that leadership believed did not accurately reflect DarkOwl's services. Tx. p. 209-210.

    d.  DarkOwl's decision to hire CIENCE in 2020 followed DarkOwl's president's recommendation in late 2019 to "Focus on lead gen." Ex. 11, p. 2.

    e.  Mr. Williamson had significantly more time than the few hours DarkOwl testified it takes to understand the market and focused his sales team on a broader potential customer base. Tx. p. 220-221. DarkOwl testified that Mr. Williamson's first potential customer list created in July 2021 was

"nonsense" because he hadn't done his homework. Tx. p. 227. Yet, Mr. Williamson created a similar list potentially several months later. Tx. p. 227-228; Ex. 5. DarkOwl continued using the second list into 2022. And DarkOwl did not fire or demote its head of sales for creating what they characterized as nonsense potential customer lists; he remained in charge of DarkOwl's sales from March 2021 through February 2023. Tx. p. 220.

80.     The Court gives substantial weight to the target market lists created by DarkOwl's head of sales for another reason: those lists were the only such lists offered into evidence at trial. DarkOwl presented no competing target list demonstrating a smaller or different set of target customers.

81.     DarkOwl's solicitations from CIENCE and its target lists created by Mr. Williamson further demonstrate the competitive overlap of DarkOwl and ArkOwl. DarkOwl solicited two of ArkOwl's existing customers via CIENCE. Exs. 380, 381, 387. As discussed above, it is very likely DarkOwl solicited other of ArkOwl's clients via CIENCE. It identified other of ArkOwl's customers and potential customers as targets, including Socure (Ex. 5, tab Big Data Targets, line E101), Accertify (Ex. 5, tab Big Data Targets, line F107), Ravelin (Ex. 5, tab Big Data Targets, line E88), Fraugster (Ex. 5, tab Big Data Targets, line F98), and ID Insight (Ex. 5, tab Big Data Targets, line E55).

82.     DarkOwl's identification of ArkOwl's competitors as potential customers further demonstrates its data can be used to provide services similar to ArkOwl's. DarkOwl targeted the following ArkOwl competitors: IPQualityScore (Ex. 5, tab Big Data Targets, line F109), Ekata (Ex. 5, tab Big Data Targets, line F66), PIPL (Ex. 5, tab Big Data Targets, line E82), (Ex. 5, tab Big Data Targets, line E101), emailage (Ex. 5, tab Big Data Targets, line F67), SEON (Ex. 5, tab

Big Data Targets, line F157), Riskified (E89), and Sift (F160). Many of these companies appear alongside ArkOwl in About-Fraud's 2020 and 2021 infographics. Exs. 346, 347. IPQualityScore, PIPL, and Ekata are identified as "PII Verification" companies. Ex. 347. This is also consistent with ArkOwl's competitors, including IPQualityScore, SpyCloud and Gemini Advisory using dark web data to compete with ArkOwl.

83.    DarkOwl's testimony is also consistent with the competitive overlap. DarkOwl sells "primarily to either cybersecurity platforms -- which is, I'm a cybersecurity professional, and I need a platform to help me do my job -- or data platforms. We contribute data to platforms, and they're aggregators of all sorts of data." Tx. p. 170. Its potential customers are those cybersecurity companies on speed dial for any company that cannot afford their own cybersecurity department. Tx. p. 177-178.

84.    DarkOwl's own description of its target market describes ArkOwl's core market – those "middlemen" cybersecurity companies on speed dial for companies without their own cybersecurity department. Apruvd and Signifyd, ArkOwl's customers solicited by DarkOwl, are both such cybersecurity fraud prevention solution providers. Tx. p. 46; 91-92. ArkOwl's other top customers and partners - CyberSource, NICE Actimize, SELLSecure, Accertify, Getmeelo.com, Socure, and Sentilink – are in the same category. DarkOwl could offer no reason why it would refuse to sell to these customers. Tx. p. 217-219; 231-232.

85.    DarkOwl markets a broad range of use cases, some of which do not overlap with any services ArkOwl offers. But it also markets overlapping services. Its solicitations to Signifyd and Apruvd offered near real-time monitoring of the dark net "to monitor when personal identification info (PII) is posted, on behalf of your clients." Exs. 381, 387.

86.     DarkOwl's website boasts of its database containing more than 8 billion email addresses, while telling potential customers they can "Set up monitors that alert when critical PII has been shared on the darknet." Ex. 92. In its "fraud protection" use case on DarkOwl's website, it promotes the ability to "identify, prevent, and mitigate with cutting-edge darknet intelligence." Ex. 93. The same page claims DarkOwl's "APIs and data products enable fraud protection companies to monitor for PII," while stating "Account takeover and fraudulent account creation across a number of financial institutions have increased over time. Ex. 93.

87.     When asked what customers DarkOwl is targeting through the "fraud protection" use case described in Exhibit 93, DarkOwl testified it is targeting "cyber security companies that provide services to financial institutions." May 15, 2023 Tx. p. 92-93. That description includes several of ArkOwl's key customers and partners, including Socure, Accertify, and NICE Actimize.

88.     The evidence also demonstrates that some of DarkOwl's existing customers attend the same trade shows as ArkOwl. ArkOwl described an interaction at the Merchant Risk Council conference with an individual from the U.S. Postal Service. Tx. p. 92-93. The individual claimed to be using ArkOwl's service 3,000-5,000 times each day. Eventually, after some discussion, the individual asked "You guys are DarkOwl, right?" Tx. p. 93.

89.     These marketing materials are targeting ArkOwl's core market, offering to provide data about whether PII, including emails, have been exposed on the darknet, and claiming the data could be used to assist in fraud prevention and mitigation, including account takeover fraud. To the extent DarkOwl's data cannot completely replace ArkOwl's data, it certainly can be used in connection with the same services by the same group of businesses.

90.     DarkOwl argued that consumers were not likely to be confused because of the vetting process it goes through in advance of being hired. It claimed that there were extensive negotiations and legal documents that would mitigate any confusion. But it admitted that these extensive legal documents consist only of its end user license agreement (May 15, 2023 Tx. p. 116) and its standard template subscription agreement. Tx. p. 262-263. DarkOwl offered into evidence its standard template subscription agreement (Ex. 14), but did not offer any sample EULA. Its subscription agreement is extremely short and simple; it is only four pages, excluding its cover and signature block.

## ACTUAL CONFUSION

91.     ArkOwl discovered that DarkOwl was soliciting its customers and marketing comparable services when it heard from Apruvd. Ex. 380. ArkOwl's point of contact with that customer notified ArkOwl of the solicitation and wondered whether DarkOwl was "another project from you guys?" Ex. 380. ArkOwl received a solicitation from a website vendor who suggested a "partnership for one of our clients with your website darkowl.com." Ex. 25.

92.     As discussed above, one of DarkOwl's customers from the U.S. Postal Service encountered ArkOwl at a trade show and mistakenly believed ArkOwl to be DarkOwl. His confusion was only mitigated after he expressly asked whether they were the same company. Tx. p. 92-93.

## CONCLUSIONS OF LAW

1.     A party claiming trademark infringement must establish it owns a mark and that the junior user's use of a similar mark is likely to generate consumer confusion in the marketplace. *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1238 (10th Cir. 2013).

2.     ArkOwl owns the rights to the word mark ArkOwl, for which it has a federal trademark registration, Reg. No. 6036746. It acquired those rights at common law by using the

mark in commerce beginning in 2012. *Hana Fin., Inc. v. Hana Bank*, 135 S.Ct. 907, 909 (2015). By September 20, 2017 – when DarkOwl adopted its mark – ArkOwl had established a market presence online that effectively reached the entire the United States. Its services are provided entirely virtually, and it had clients using its online products from every state. See *Pure Imagination, Inc. v. Pure Imagination Studios, Inc*., 2004 U.S. Dist. LEXIS 23064, at *24 (N.D. Ill. Nov. 12, 2004) (companies that provided services entirely online had "worldwide distribution area").

3.    Relevant confusion under trademark law includes confusion as to the source, sponsorship, or affiliation. *Team Tires Plus v. Tires Plus, Inc.*, 394 F.3d 831, 835 (10th Cir. 2005). Confusion as to sponsorship or affiliation can occur when the parties offer related, but not competing goods and services. *Id.*

4.    The Lanham Act is intended to protect the market as a whole from confusion, including confusion into an initial interest in another company's products and services as well as confusion after a sale has been completed. *General Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d. 1222, 1227 (10th Cir. 2007); *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1114 (10th. Cir. 2009).

5.    Initial interest confusion is actionable even when the parties are not direct competitors. *Affliction Holdings, LLC*, 935 F.3d at 1114 (Apparel company and vape company); *Mobil Oil Corp. v. Pegasus Petroleum Corp*., 818 F.2d 254, 260 (2d Cir. 1987) (affirming a trial court's finding of initial interest confusion even when the marks were not used on competing products.)

6.      Similarly, post-sale confusion is actionable when the parties offer related but not competing goods. *General Motors Corp.*, 500 F.3d at 1227 (Plaintiff sold Humvee vehicles and defendant sold vehicle body kits).

7.      In determining a likelihood of confusion, courts in the Tenth Circuit consider six non-exhaustive factors: (1) the degree of similarity between the marks, (2) the strength of the marks, (3) evidence of actual confusion, (4) similarity of the parties' products and marketing, (5) the degree of care likely to be exercised by purchasers, and (6) the intent of the alleged infringer in adopting the mark at issue. *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).

8.      The same six factors are considered regardless of type of confusion (e.g. source, sponsorship, affiliation) and timing of confusion (e.g. initial-interest, time of purchase, or post-sale). *King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999); *Affliction Holdings, LLC*, 935 F.3d at 1115; *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1239-1240 (10th Cir. 2006) (applying the six factors to an initial interest case).

9.      Though no one factor is dispositive, the degree of similarity between the marks is the most important. *Affliction Holdings,* 935 F.3d at 1115. The second most important factor is the strength of the mark being infringed – encroachment on a strong mark is more likely to lead to confusion. *Id.* "[T]he law today rewards a famous or well known mark with a larger cloak of protection than in the case of a lesser known mark because of the tendency of the consuming public to associate a relatively unknown mark with one to which they have long been exposed if the [relatively unknown] mark bears any resemblance thereto." *R. J. Reynolds Tobacco Co. v. R. Seelig & Hille*, 201 U.S.P.Q. (BNA) 856, 860 (T.M.T.A.B. 1978).

10.     In cases involving source or sponsorship confusion, "the relation in use and the manner of marketing between the goods or services and the degree of care likely to be exercised by purchasers – have little importance." *King of the Mt. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999). Similarly, "[t]he care exercised by the typical purchaser, though it might virtually eliminate mistaken purchases, does not guarantee that confusion as to association or sponsorship is unlikely." *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979). Sophistication has little relevance to initial interest and post-sale confusion. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975).

11.     DarkOwl's use of its word mark and design mark are likely to cause confusion as to the sponsorship or affiliation between the two companies and are likely to cause initial interest and post-sale confusion.

### A.  The Marks Are Similar

12.     The degree of similarity factor weighs heavily in favor of a finding of likely confusion. Similarity is evaluated by comparing the marks' appearance, pronunciation, and meaning. *Beer Nuts, Inc. v. Clover Club Foods CO.*, 711 F.2d 934, 940 (10th Cir. 1983). "Each syllable of each mark generates an 'impact,' but the only impact to be considered is that of the whole." *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 685 (CCPA 1977).

13.     DarkOwl's word mark and design mark are nearly identical in appearance to ArkOwl's. The only difference between the words is the letter "D" at the beginning of DarkOwl; otherwise, they are identical – including the capitalized "O" in the middle of each word. See, e.g., *Altira Grp. Ltd. Liab. Co. v. Philip Morris Cos*., 207 F. Supp. 2d 1193, 1198 (D. Colo. 2002) ("Altira" and "Altria" visually similar); *E.I. Dupont de Nemours & Co. v. Yoshida Intern., Inc*., 393 F. Supp. 502 (D.C.N.Y. 1975) ("EFLON" and "TEFLON").

14.     The marks also sound nearly the same. The "D" at the beginning of "DarkOwl" could easily be lost in any conversation, eliminating any aural difference between the words. "One can easily imagine that these names would be uttered in business transactions or discussions conducted over the telephone. Clearly, the similarity of their sound would make them very difficult to distinguish in that context." *Altira*, 207 F.Supp.2d at 1199.

15.     Finally, both marks are made-up, fanciful words with no particular meaning or suggestion, and "meaningless words are more easily confused." *Altira*, 207 F.Supp.2d at 1199. This lack of meaning also impacts the visual and aural elements of this factor. "[W]ith coined words which are meaningless so far as the English language is concerned, slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between marks." *Id*. at 1198.

16.     The similarity of marks factor, therefore, weighs heavily in favor of a finding of likely confusion.

### B.  ArkOwl is a Strong Mark

17.     Under the strength factor, a stronger mark warrants broader protection. *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F.Supp.2d 1216, 1226 (D. Colo. 2001); *Affliction Holdings*, 935 F.3d at 1115. This factor weighs heavily in favor of a likelihood of confusion finding.

18.     A mark's strength is measured by its conceptual and commercial strength.

19.     "Under the conceptual strength prong, the categories, in descending order of strength, are: fanciful; arbitrary; suggestive; descriptive; and generic.*" Big O Tires, Inc*., 167 F. Supp. 2d at 1226. "'Fanciful' marks consist of 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." *King of the Mt. Sports, Inc.*, 185 F.3d at 1093. ArkOwl's mark is arbitrary or fanciful as it has no meaning apart from indicating

the source of ArkOwl's services, making it the conceptually strongest type of mark. DarkOwl concedes as much. Tx. p. 320.

20.     Commercial strength assesses "the marketplace recognition value of the mark." *Affliction Holdings, LLC*, 935 F.3d at 1115. Commercial strength can be established through direct evidence of the mark's recognition and through circumstantial evidence such as a party's efforts to expose people to its mark. A commercially strong mark is relatively uncommon in its industry. ArkOwl established its mark is commercially strong. It demonstrated that nearly 90,000 people interacted with its website prior to August 2017. It demonstrated that people throughout the country are interacting with its service (and mark) tens of thousands of times each day. It demonstrated that consumers understand ArkOwl to refer to a source of services by offering evidence that many people refer to "ArkOwl" as a skill on LinkedIn.

21.     In addition, ArkOwl's mark is commercially strong because no other companies in the industry are using ArkOwl as a mark, and very few are using a mark comparatively similar to ArkOwl. Through ArkOwl's continuous and exclusive use, and through its effective marketing, it has become known and recognized in ArkOwl's industry.

### C.  The Parties Have Similar Products in Competitive Proximity

22.     The competitive proximity factor weighs strongly in favor of a likelihood of confusion finding. The question is not whether the parties compete directly, but whether the parties' services are related in the minds of consumers. *Healthone of Denver, Inc. v. UnitedHealth Grp. Inc.*, 872 F.Supp.2d 1154, 1182 (D. Colo. 2012). "Moreover, competitive proximity must be measured with reference to the first two" factors. *Mobil Oil Corp.*, 818 F.2d at 258. A stronger trademark is afforded broader protection. *Affliction Holdings, LLC,* 935 F.3d at 1115. And when marks are very similar, the senior mark is afforded protection on less related

goods. *Id;* Cf. *Nautilus Group, Inc. v. Icon Health & Fitness, Inc.*, 372 F.3d 1330, 1345 (Fed. Cir. 2004)(discussing the interrelatedness of the competitive proximity and similarity factors).

23.     In assessing this factor, "the relevant confusion under trademark law is not limited to confusion of consumers as to the source of the goods, but also includes confusion as to sponsorship or affiliation, such as a consumer's mistaken belief that a retailer is part of a larger franchising operation." *Team Tires Plus v. Tires Plus, Inc*., 394 F.3d 831, 835 (10th Cir. 2005).

24.     Source and sponsorship confusion is actionable even where parties are not directly competitive. *Team Tires Plus*, 394 F.3d at 835.

25.     Initial interest and post-sale confusion is actionable even where parties are not directly competitive. *Affliction Holdings, LLC*, 935 F.3d at 1114 (Apparel company and vape company); *Mobil Oil Corp.*, 818 F.2d at 260 (affirming a trial court's finding of initial interest confusion even when the marks were not used on competing products); *General Motors Corp.*, 500 F.3d at 1227 (Plaintiff sold Humvee vehicles and defendant sold vehicle body kits).

26.     DarkOwl and ArkOwl are competitive and share significant competitive proximity. Their products and services are so closely related that consumers are more likely to believe in an affiliation or connection between the two – especially given the similarity in their marks.

27.     As discussed above, both companies primarily sell to cybersecurity service providers and fraud prevention platforms. Both target these "middlemen" companies who aggregate data and provide fraud prevention services to those companies that do not have their own cybersecurity department.

28.     The parties and their customers have overlapped. DarkOwl solicited at least two (and likely many more) of ArkOwl's existing customers. DarkOwl targeted many other ArkOwl

customers and potential customers, assigning sales representatives to solicit them. DarkOwl targeted and solicited ArkOwl's direct competitors. DarkOwl's customer attended a trade show ArkOwl attended.

29.     Contrary to its self-serving testimony, DarkOwl's data can be and is used to directly compete with ArkOwl. At least three of ArkOwl's competitors advertise their use of darknet data for use in PII verification. DarkOwl targeted and solicited other companies who only do PII verification. DarkOwl's Structured Data database is set up to return near instantaneous results that would include data pertaining to email addresses and domains in near-real time, including data associating those inputs with names, phone numbers, and social media accounts. Both companies offer the data to prevent the same types of fraud, including financial crimes fraud and account takeover fraud.

30.     Because of the competitive overlap between ArkOwl and DarkOwl, and in light of the similarity of the marks and the strength of ArkOwl's mark, this factor weighs strongly in favor of a finding of likelihood of confusion.

### D.     The Degree of Care Element is Neutral

31.     The degree of care factor is relatively unimportant in this case and is therefore neutral. The sophistication factor is much less relevant when, as here, there exists a likelihood of confusion as to sponsorship or affiliation, and a likelihood of initial interest and post-sale confusion. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331, 1342 (2d Cir. 1975). DarkOwl has provided inconsistent testimony about its target customers, demonstrating it does not have a clear understanding who its true customer base is. Without reliable, consistent testimony from DarkOwl regarding the sophistication of its customers, the Court cannot credit DarkOwl's argument that its customers are sophisticated. Moreover, the relative sophistication of

DarkOwl's customers in technical matters is insufficient to prevent confusion. There is no indication those consumers are particularly sophisticated in trademark matters.

32.     DarkOwl's testimony that its vetting process would alleviate any confusion is insufficient to make this factor weigh in favor of DarkOwl. It is insufficient because there exists a likelihood of sponsorship or affiliation confusion – as when ArkOwl's customer asked whether DarkOwl is an ArkOwl project. It is insufficient because there also exists a likelihood of initial interest confusion, particularly in light of ArkOwl's primary marketing strategy being word of mouth. It is insufficient because there exists a likelihood of post sale confusion among end users of each party's services who would not be involved in the vetting process. It is also insufficient because the vetting process appears to simply be DarkOwl's customer agreeing to DarkOwl's template subscription agreement and end user license agreement.

33.     As a result, this factor does not weigh in favor of either party.

**E.     The Intent Element is Neutral**

34.     The evidence of the commercial strength of ArkOwl's mark and the similarity between ArkOwl's mark and DarkOwl's mark at the time it was adopted tend to suggest that DarkOwl was or should have been aware of ArkOwl in 2017, when it adopted the mark. As discussed above, DarkOwl's two founders are experienced in business and took care in their business decision. They testified they searched for other conflicting marks, but the details of those searches were not disclosed. They claimed not to have discovered ArkOwl's mark in 2017 when engaging in those searched. But ArkOwl encountered DarkOwl in 2019 when conducting similar searches. Ex. 377.

35.     ArkOwl concedes it has no direct evidence that DarkOwl intended to infringe. Because of the limited evidence regarding DarkOwl's intent, this factor is neutral.

### F.  Actual confusion

36.     ArkOwl presented evidence of a few instances of actual confusion. It received a solicitation intended for DarkOwl. Its customer received a solicitation from DarkOwl and asked whether it was related to ArkOwl. ArkOwl was approached by a DarkOwl customer, believing them to be the same company. While three instances of actual confusion may not be enough to tilt the factor strongly in favor of ArkOwl, it makes the factor at least neutral and it does not weigh in favor of DarkOwl.

### CONCLUSION

37.     The marks ArkOwl and DarkOwl are so similar in sight, sound, and meaning so as to be nearly indistinguishable. ArkOwl's mark is the strongest type of mark conceptually and has become commercially strong. DarkOwl and ArkOwl not only operate in the broader cybersecurity field, they both offer nearly identical services and target the same types of customers in offering those services. The overlap in market is not theoretical – DarkOwl solicited ArkOwl's actual and potential customers and its competitors. These three factors overwhelmingly weigh in favor of a finding of likely confusion.  The "remaining factors – the absence of specific evidence that [DarkOwl] deliberately adopted its mark with an intent to infringe, of actual customer confusion, or of a level of consumer care – do not overcome" the strength of ArkOwl's marks or DarkOwl's close similarity to those marks. *Affliction Holdings*, 935 F.3d at 1115-16.

### ORDER

Based on the above Findings of Fact and Conclusions of Law, the Court Orders as follows:

1.  Plaintiff DarkOwl's request for a declaratory judgment of non-infringement is denied with prejudice.

2.  DarkOwl is permanently enjoined from infringing the ArkOwl's mark. DarkOwl is permanently enjoined from using or contributing to the use of "DarkOwl" in connection with the advertisement, marketing, or sale of software services.


SO ORDERED:


_____

Hon. Kristen L. Mix
United States Magistrate Judge