IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC,

      Plaintiff,

v.

ARKOWL, LLC and
ARKOWL CORPORATION,

      Defendants.

---

## PLAINTIFF'S AMENDED PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Plaintiff DarkOwl, LLC ("DarkOwl") submits the following Amended Proposed Findings of Fact and Conclusions of Law:

## PROPOSED FINDINGS OF FACT

### I. *DARKOWL*

1.    DarkOwl, LLC is a Colorado limited liability company formed in 2015. Stipulated Facts No. 2.

2.    Mark Turnage is the Chief Executive Officer and co-founder of DarkOwl. Stipulated Facts No. 8.

3.    Russell Cohen is the President and Chief Financial Officer and co-founder of DarkOwl. Stipulated Facts No. 9.

#### A. *DarkOwl's Trademarks*

4.    In 2017, DarkOwl adopted the DARKOWL trademark and changed its company name to DarkOwl. Stipulated Facts No. 10.

5.      The DARKOWL mark is intended to convey to customers an insight into what the company does. "Dark" is meant to reference DarkOwl's darknet services, and "Owl" is a reference to the animal, which refers to DarkOwl's ability to "see into the darknet." The word "dark" was DarkOwl's major focus in adopting the DARKOWL mark. Trial Transcript ("Tr. Trans.") 237:9-16.

6.      Since 2017, DarkOwl has publicly and consistently used the DARKOWL trademark with its dark web service offerings. Tr. Trans. 234:2-7.

7.      On March 24, 2017, DarkOwl filed U.S. Trademark Application Serial No. 87384235 with the U.S. Patent and Trademark Office ("USPTO") for the

 mark. Stipulated Facts No. 11.

8.      The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings. Stipulated Facts No. 12.

9.      No third parties opposed Application Serial No. 87384235, and the application registered under Reg. No. 5525738 on July 24, 2018 for the following services: "Providing a database featuring information about internet security and computer security from the deep web and the darknet; computer security consultancy regarding data and information collected and obtained from the deep web and the darknet; software as a service (SaaS) services featuring software for retrieving from, adding to, and editing a database featuring information and data obtained from the deep web and the darknet; computer software consulting services in the field of cybersecurity utilizing deepweb and darknet information; electronic monitoring of information and data obtained from the deep web and the darknet for the purpose of internet and computer security by detecting compromised data; computer information security consulting services in the field of maintaining the security and integrity of computer information and data using information and

data obtained from the deep web and the darknet; providing computer and internet security analysis of information obtained from the deep web and the darknet; providing cybersecurity threat analysis for protecting data using information obtained from the deep web and the darknet; cybersecurity services, namely, monitoring of computer systems for data security purposes utilizing deep web and darknet information" ("DarkOwl's Registered Services") in Class 42. Stipulated Facts No. 13.

10.     DarkOwl filed U.S. Trademark Application Serial No. 88216005 with the USPTO on December 4, 2018 for the **DARKOWL** mark. Stipulated Facts No. 14.

11.     The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings. Stipulated Facts No. 15.

12.     No third parties opposed Application Serial No. 88216005, and the application registered under Reg. No. 5793807 on July 2, 2019 for DarkOwl's Registered Services. Stipulated Facts No. 16.

13.     At the time DarkOwl adopted its DARKOWL mark, it was aware that "owl" was commonly used in trademarks in the cyber industry, including in marks like REDOWL and OWL CYBER DEFENSE. Tr. Trans. 235:2-5.

B.     *DarkOwl's Services*

14.     During its early stages as OWL Cybersecurity, DarkOwl provided darkweb database software allowing its customers to search the darkweb for content and also provided penetration testing, cybersecurity design and architecture, incident response, and code and application review services.  Transcript of May 15, 2023 Evidentiary Hearing ("Hrg. Trans") 77:7-18.

15.     In 2017, DarkOwl focused its business on providing darkweb data to its customers, and it has stayed committed to that focus ever since. Hrg. Trans. 77:7-18; Tr. Trans. 181:21-182:10.

16.     DarkOwl has now become the industry's leading provider of darkweb intelligence services. Tr. Trans. 181:21-182:10.

17.     DarkOwl monitors the darkweb for emerging threats and has built a platform for its customers to access this darkweb data. Hrg. Trans. 77:7-18; Tr. Trans. 239:3-11.

18.     DarkOwl tries to create a mirror image of what is going on in the darknet to provide its customers with that information outside of the darknet.  Tr. Trans. 239:3-11.

19.     DarkOwl offers a large commercially available database of information continuously collected from the darkweb. Hrg. Trans. 77:7-18; Tr. Trans. 239:3-11.

20.     DarkOwl's business consists primarily of: (1) threat intelligence services that look for emerging threats to organizations; (2) assessment of third-party risk, which is the risk assessment of vendors or contractors of large companies; (3) supplying data to cyber-insured tech companies for risk assessment related to underwriting; (4) digital identity protection and the assessment of whether the digital identity is risk-related; (5) fraud protection for cybersecurity companies that service financial institutions, primarily related to bank account or other financial information that is bought and sold on the dark web; (6) services to intelligence agencies or governments related to threats on the dark web to critical infrastructure (e.g., power plants, water treatment plants); (7) services related to threats to national security in the dark web; and (8) monitoring the use of cryptocurrency in the dark web.  Hrg. Trans. 83:12-22; Tr. Trans. 239:12-19; Trial Exhibits 83, 91-97; Order Granting Motion to Exclude ("Order") at p. 6.

21.    The nature of the data DarkOwl provides is highly sensitive and complex. Hrg. Trans. 97:25-98-11; Tr. Trans. 257:17-260:4; Order at p. 7.

22.    DarkOwl's business has no relation to ArkOwl' services, namely, approving a commercial transaction in real time or providing Personally Identifiable Information ("PII") verification. Hrg. Trans. 100:10-18; Tr. Trans. 238:9-11; 245:22-25; Dkt. 73, June 6, 2023 Order at pp. 3-7, 23-24.

23.    DarkOwl's customers do not, and have not requested or suggested that they have or intend to, use DarkOwl's services in connection with PII verification. Hrg. Tr. 100:21-24, 101:6-8; Tr. Trans. 245:22-25; Order at p. 7, 23.

24.    DarkOwl's platform and dark web database are not set up to provide PII verification services. Hrg. Tr. 100:21-24, 101:6-8; Tr. Trans. 246:16-247:16; Order at p. 7, 23.

25.    The term "PII" is a commonly used "umbrella" term in the cybersecurity industry. Tr. Trans. 242:7-15.

26.    PII verification services is not a growth area for DarkOwl. Hrg. Tr. 100:21-24, 101:6-8; Tr. Trans. 246:1-7.

27.    DarkOwl's digital identity protection use case involves monitoring the darknet for the existence of PII. Tr. Trans. 242:20-244:13.

28.    DarkOwl does not provide as data outputs with its services: (i) social media accounts associated with specific email addresses or phone numbers, (ii) WhoIs information associated with specific email addresses or phone numbers, (iii) caller ID information associated with specific phone numbers, (iv) carrier information associated with specific phone numbers, (iv) the date of creation of an email address, or (v) data reflecting customer search queries. Tr. Trans. 244:18-245:21.

29.     When a user inputs an email address into DarkOwl's database, the output almost never includes a person's name associated with that email address. Tr. Trans. 259:10-24.

30.     DarkOwl's largest growth sector is in services provided to government customers, including intelligence agencies.  Tr. Trans. 204:2-10; 246:8-15.

C.     _DarkOwl's Customers and Sophistication_

31.     DarkOwl's customers are typically very sophisticated cybersecurity professionals who are dealing with cyber risks to their companies or organizations. Hrg. Trans. 97:1-21, Hrg. Trans. 98:20-99:17; Tr. Trans. 203:16-204:10; 210:9-18; Order at p. 7, 23.

32.     About 40-45% of DarkOwl's customers are government intelligence agencies or cyber security companies whose customers are governments. Tr. Trans. 203:16-204:10; 210:9-18.

33.     Because of the complexity of DarkOwl's data, its customers must necessarily be equally sophisticated to understand and utilize DarkOwl's offerings. Hrg. Trans. 97:1-21, Hrg. Trans. 98:20-99:17; Tr. Trans. 203:16-204:10; 210:9-18; Order at p. 7, 23.

34.     DarkOwl can monitor how its customers use its data through a user interface. Tr. Trans. 200:14-23.

35.     DarkOwl's customers' use of DarkOwl's services are limited by the DarkOwl end-user licensing agreement that each customer must sign. Tr. Trans. 201:10-18.

36.     Given the sensitive nature of DarkOwl's data offerings, DarkOwl conducts an extensive vetting process for its customers, which includes in-person meetings with high-level executives and decision-makers, multiple conversations with potential customers, and entering into comprehensive legal agreements that prevent the misuse of any data provided. Hrg. Trans. 98:20-99:17; Tr. Trans. 200:14-20, 257:17-260:6; Order at p. 7, 23.

37.     The vetting process takes, on average, 90 to 180 days, and in some cases, can take longer.  Tr. Trans. 259:20-22, 261:1-11.

38.     DarkOwl frequently turns away potential customers because of something that happens during the vetting process.  Hrg. Trans. 99:3-17; Tr. Trans. 260:7-9.

39.     The entry point for DarkOwl's services starts at about $30,000 and goes up to about $500,000 a year.  The average cost of DarkOwl's darkweb data services is about $55,000-$60,000 per year. Tr. Trans. 247:11-12, 260:10-25, 263:7-11.

40.     Accordingly, the purchasing decision-maker at DarkOwl's customers is generally from the "C Suite" – the chief executive officer, chief financial officer, chief technology or information security officer – or high-ranking officials at national intelligence agencies.  Hrg. Trans. 97:22-98:6; Tr. Trans. 257:17-258:10; Order at p. 7.

41.     DarkOwl has a very close relationship with most of its customers. Tr. Trans. 202:19-24.

D.     *DarkOwl's Marketing Strategies*

42.     Given the sophisticated nature of DarkOwl's services and customers, DarkOwl primarily engages in direct, outbound marketing to a focused group of target customers. Hrg. Trans. 130:12-18; Tr. Trans. 247:21-24.

43.     DarkOwl also markets its services through its publicly available website, www.darkowl.com. Stipulated Facts No. 17.

44.     DarkOwl does not market through NICE Actimize. Tr. Trans. 248:10-12.

45.     DarkOwl's primary marketing focus is through industry trade shows. Tr. Tran. 212:16-21; 248:13-22.

46.     DarkOwl attends specific trade shows and conferences for its niche area of the cybersecurity industry, including Black Hat, Milipol Paris, Global Security Exchange, DoDIIS, GISEC, WICYS, RSA, OSMOSIS Con, and ISS World Asia. Tr. Trans. 248:23-253:9; Trial Exhibit 82.

47.     DarkOwl's CEO has been asked to present on the use of cryptocurrency in the darknet at the 2023 G20 conference in New Delhi. Tr. Trans. 252:22-253:9.

48.     DarkOwl spends over a million dollars a year on marketing, with the majority of that going toward industry trade shows. Tr. Trans. 256:23-257:8.

49.     DarkOwl used a third-party marketing company for a period of time to send blast emails, but the marketing company did not understand DarkOwl's niche service offerings or its sophisticated customers.  The marketing company sent emails to a list of companies DarkOwl did not approve, including to existing DarkOwl customers requesting introductory meetings.  One of the emails that was sent as a part of this campaign was reported to ArkOwl's Chief Executive Officer, Robert Daline.  The list did not target DarkOwl's true *potential* customers, and the campaign did not generate any business for DarkOwl. Hrg. Trans. 103:14-105:19; Tr. Trans. 213:24- 216:24; Order at pp. 24-25.

50.     DarkOwl has never encountered ArkOwl at any industry conference. Tr. Trans. 253:25-254:6.

51.     ArkOwl has never encountered DarkOwl at any industry conference. Tr. Trans. 128:13-23.

52.     ArkOwl has never attended the Black Hat, Milipol Paris, Global Security Exchange, DoDIIS, GISEC, WICYS, RSA, OSMOSIS Con, and ISS World Asia conferences that

DarkOwl attends. ArkOwl has attended only one conference, the Merchant Risk Council conference, on four separate occasions over its 11 years in business. Tr. Trans. 127:22-128:23.

53.     ArkOwl is aware of no industry publication that references both ArkOwl and DarkOwl. Tr. Trans. 107:19-21.

   E. *DarkOwl's Knowledge of ArkOwl and Intent*

54.     DarkOwl was not aware of ArkOwl when it was creating and adopting its DARKOWL trademark and company name. Tr. Trans. 146:19-21, 234:20-22, 235:21-236:1 236:21-237:1.

55.     DarkOwl has never attempted to infringe, pass itself off as, or trade off of ArkOwl or the ARKOWL mark. Tr. Trans. 237:4-6

56.     DarkOwl first learned of ArkOwl when DarkOwl received ArkOwl's April 2, 2021 letter demanding that it stop using the DARKOWL marks. Hrg. Trans. 99:18-20; Tr. Trans. 266:14-18.

57.     Prior to receiving the letter, DarkOwl had never come across ArkOwl or its ARKOWL trademarks.  Hrg. Trans. 99:18-20, 100:21-101:8; Tr. Trans. 266:14-18.

58.     To Mr. Turnage's knowledge, no customer has ever mentioned ArkOwl or its ARKOWL trademarks to DarkOwl. Hr. Trans. 100:21-101:8.

**II.** ***ARKOWL***

59.     ArkOwl is a Minnesota limited liability company formed in 2012. Stipulated Facts No. 1.

60.     Mr. Daline is the Chief Executive Office and co-founder of ArkOwl. Hrg. Trans. 28:1-2.

*ArkOwl's Trademarks*

61.     Mr. Daline named the company ArkOwl to reference his Christian faith and the biblical "Ark of the Covenant." Hrg. Trans. 29:24-30:7; Tr. Trans. 124:4-8.

62.     A company called CyberArk prominently features the term "ark" in its trademark and provides identity management services withing the cybersecurity industry. Tr. Trans. 235:16-18.

63.     The "owl" portion of the ARKOWL mark is suggestive of ArkOwl's PII verification for fraud prevention services. Tr. Trans. 108:5-23.

64.     ArkOwl did not seek to register its trademark until roughly seven years after it adopted the mark.  Tr. Trans. 109:5-12.

65.     On September 22, 2019, ArkOwl filed Application Serial No. 88626162 for the ARKOWL word mark with the USPTO. Trial Exhibit 28.

66.     The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings, including DarkOwl's prior registrations. Tr. Trans. 123:18-124:3.

67.     No third parties opposed Application Serial No. 88626162, and the application registered under Reg. No. 6036746 on April 21, 2020 covering the following services: "Computer and Software services and Scientific Services being Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order" in Class 42. Trial Exhibit 28.

68.     In 2019, ArkOwl adopted a new logo. On January 29, 2020, ArkOwl filed Application Serial No. 88777943 for ARK⟩OWL. Trial Exhibit 29.

69.     The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings, including DarkOwl's prior registrations. Tr. Trans. 123:18-124:3.

70.     No third parties opposed Application Serial No. 88777943, and the application registered under Reg. No. 6285973 on March 9, 2021 in connection with the following services: "Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order" in Class 42. Trial Exhibit 29.

A.     *ArkOwl's Services*

71.     ArkOwl's business developed out of Mr. Daline's experience as a fraud prevention analyst with retail businesses. Hrg. Trans. 28:9-16

72.     ArkOwl is fairly characterized as an identity and verification service provider, and its main focus is PII verification and validation. Hrg. Trans. 22:10-15; Order at p. 3, 23-24.

73.     ArkOwl helps its customers verify PII, including email address, phone number, IP address, physical address, and a personal name match. Hrg. Trans. 22:21-23:8; Order at p. 3, 23-24.

74.     ArkOwl provides a platform that allows its users to input PII for individuals. ArkOwl's data output is used by customers to verify whether there is a fraud threat connected to those individuals or entities. Tr. Trans. 99:25-100:1; Order at p. 3, 23-24.

75.     ArkOwl has access to real-time surface web and other datasets and provides its customers over 80 data points designed to validate and verify identities, including email age, creation date, social media information, webmail providers, domain name information, and some limited information on "breach data."  Tr. Trans. 143:4-145:3.

76.     ArkOwl considers itself to be providing services in the "payments" sector.  Tr. Trans. 105:20-25.

77.     ArkOwl does not, and has never, accessed the dark web directly and does not directly provide dark web data or services to its customers. Hrg. Trans. 37:19-38:18; Order at p. 4.

78.     ArkOwl does not search the dark web, and ArkOwl's marketing materials do not reference the dark web. 37:19-38:18; Order at p. 4.

79.     ArkOwl provides only raw data and does not provide any analytical services if a fraud is discovered. Hrg. Trans. 40:7-9, 75:2-10; Order at p. 4.

80.     ArkOwl does not provide passwords as part of its data outputs. Tr. Trans. 146:12:14.

81.     ArkOwl's data is primarily used by retailers attempting to detect fraud or suspicious activity in online transactions. Hr. Trans. 33:18-21; Tr. Trans. 105:22-106:10; Order at p. 4.

82.     Other than ArkOwl's archived database reflecting users' search queries, ArkOwl's data is real time. Tr. Trans.137:23-142:16.

83.     Mr. Daline is not aware of any customers using ArkOwl's data for anything other than supporting online purchase transactions. Hr. Trans. 33:18-21; Tr. Trans. 105:22-106:10; Order at p. 4.

84.     The cost of ArkOwl's services is moderately expensive, such that they would not be the subject of impulse purchases.  Tr. Trans. 131:1-15; 132:9-17; Trial Exhibits 30, 77.

B.     *ArkOwl's Customers*

85.     ArkOwl's U.S. clients include brick-and-mortar retail and online retail companies, banks, and cybersecurity companies. Order at pp. 3-4.

86.     ArkOwl's customers and users are primarily fraud analysts, whose job duties include verifying purchaser identity to reduce fraudulent transactions. Tr. Trans. 133:13-136:4.

87.     ArkOwl's customers tend to have higher education degrees and are discerning. Tr. Trans. 134:12-135:3.

88.     ArkOwl's users are discerning. 135:6-9.

C.      *ArkOwl's Marketing Strategies*

89.     ArkOwl markets its services through its publicly available website, www.arkowl.com, which prominently features the statement "Verify Email addresses and Phone Numbers in Real-Time" at the top of the home page. Trial Exhibit 56.

90.     ArkOwl has participated in the Merchant Risk Council as a member and has attended its trade show conferences. The Merchant Risk Council is a community of merchants, solution providers, and organizations working to improve eCommerce.  Tr. Trans. 127:22-128:15.

91.     ArkOwl relies primarily on word-of-mouth advertising. Tr. Trans. 62:4-10; 82:11-12; 126: 18-21.

92.     Over the last three years, ArkOwl has spent extremely limited amounts annually on marketing, with the majority of that going toward attendance at the Merchant Risk Council trade show. Tr. Trans. 129:5-16.

D.      *ArkOwl's Knowledge of DarkOwl and Subsequent Action*

93.     ArkOwl first learned of DarkOwl in 2019, and Mr. Daline did not believe DarkOwl was a competitor or in the same industry as ArkOwl. Order at p. 4.

94.     ArkOwl did not contact DarkOwl regarding its trademarks until April 2021, when it sent a cease and desist letter through counsel. Hrg. Trans. 64:14-17, 99:18-20.

95.     ArkOwl is not aware of any instance where it lost business to DarkOwl. Order at p. 5.

96.     ArkOwl is not aware of any instance where a customer was trying to decide between DarkOwl's and ArkOwl's services. Order at p. 5.

97.     Mr. Daline has never run into DarkOwl at any industry events. Order at p. 5.

## III.     *THERE IS NO LIKELIHOOD OF CONFUSION*

98.     The "cybersecurity industry" is very broad and encompasses a wide variety of businesses (between 10,000 and 14,000) with an immense diversity of services and technologies. Not all services and technologies under the cybersecurity umbrella are competitive or related.  Hrg. Trans. 81:18-82:13; Tr. Trans. 199:21-25; 254:7-14; Order at p. 6.

99.     "Fraud prevention" and "fraud protection" are also broad terms that can mean very different things depending on the context. Tr. Trans. 255:10-15; 255:16-256:6.

100.     DarkOwl is not included in the compilation of companies provided by About-Fraud.com. Tr. Trans. 106:7-107:18; Trial Exhibits 346 and 347.

101.     More than a few companies in the cybersecurity industry include "OWL" as part of their trademarks or company names.  Tr. Trans. 112:22-123:1; Trial Exhibits 103, 105, 106, 107, 109, 113, 115, 117, 120, 128, 130.

102.     DarkOwl's business is a small niche in the cybersecurity industry. Hrg. Trans. 98:12-18; Tr. Trans. 266:2-11; Order at p. 7.

103.     Only a handful of other companies provide similar darknet data services as DarkOwl and compete with DarkOwl. Hrg. Trans. 98:12-18; Order at p. 7.

104.     DarkOwl's primary competitors are Cybersixgill, Webbs, Searchlight Cyber, and Bluestone Analytics. Hrg. Trans. 101:16-23.

105.     None of DarkOwl's competitors provide PII services. DarkOwl's competitors provide similar darknet data intelligence services to similar clients as DarkOwl. Hr. Trans. 101:16-102:6; Order at p. 7.

106.     DarkOwl does not operate in the "payments" space. Tr. Trans. 256:20-22.

107.     ArkOwl competes with other companies that provide PII verification services. Hr. Trans. 41:21-42:23.

108.     ArkOwl's main competitors are Ekata, PIPL, LexisNexis, SEON, and Email Hippo. Hr. Trans. 41:21-42:23.

109.     A search on Google, for example, will return information about an email address input and may contain more information about an email address than DarkOwl possesses. Tr. Trans. 244:14-17.

110.     ArkOwl and DarkOwl do not compete with each other. Order at p. 23-24.

111.     ArkOwl and DarkOwl do not have any overlapping customers. Order at p. 25.

112.     ArkOwl and DarkOwl do not provide overlapping or related services. Order at pp. 23-24.

113.     DarkOwl and ArkOwl's offerings cannot be substituted for each other.  Order at pp. 23-24; Hrg. Trans. 102:11-103:3

114.     None of DarkOwl's customers could get from ArkOwl the services DarkOwl provides and none of ArkOwl's customers could get from DarkOwl the services that ArkOwl provides. Order at pp. 7-8; Hrg. Trans. 102:11-103:3.

115.     The Parties' marks differ in sight, sound, and meaning. Trial Exhibits 28, 29, 131, and 132.

116.    The addition of a "d" in the DARKOWL mark gives the DARKOWL mark an entirely different, look, sound, and meaning than ARKOWL, all of which distinguish the DARKOWL marks from the ARKOWL marks. Trial Exhibits 28, 29, 131, and 132.

117.    The word "dark" is unrelated to "ark," other than that they rhyme.  Tr. Trans. 237:7-8.

118.    The "dark" portion of the DARKOWL mark is suggestive of DarkOwl's dark web data services.  Tr. Trans. 237:9-16.

119.    The "ark" portion of the ARKOWL mark is a religious reference to the Ark of the Covenant.  Tr. Trans. 124:4-8.

120.    The "owl" portion of the ARKOWL mark is suggestive of ArkOwl's intended use of its services for fraud detection.  Tr. Trans. 108:5-23.

121.    The parties' owl designs differ as well. DarkOwl's owl design is used in place of the "O" in "DarkOwl," consists of just the outlined head of an owl and features just one large eye - DARKOWL.  ArkOwl's owl design is situated between the "K" and "O" in "ArkOwl," consists of a whole owl in flight with wings extended, features little or no facial detail, and shows the "O" as a half moon - ARKOWL. Trial Exhibits 29, 131, and 132.

122.    When examined in the context of the marks as a whole as they are encountered by the consumers in the marketplace, the parties' respective marks are dissimilar and distinguishable. *See* Amended Proposed Findings of Fact 115-121.

123.    There are a number of third-party marks containing the term "Owl" (the only term shared by the parties' marks) on the Principal Register of the United States Patent and Trademark Office ("USPTO") for cybersecurity-related and/or fraud detection services, including, but not limited to, for example, OWL CYBER DEFENSE (Reg. No. 5409019), SECUREOWL & Owl

Design (Reg. No. 5894589), OWLCHECK (Reg. No. 6442218), and OWLPAY (Reg. No. 6903087). Trial Exhibits 103, 105, 110, 111, 113, 127, 128, 130.

124. The extensive use of "Owl" in the cybersecurity industry renders ArkOwl's mark conceptually weak. Tr. Trans. 112:22-123:1; Trial Exhibits 103, 105, 106, 107, 109, 113, 115, 117, 120, 128, 130.

125. ArkOwl provided no direct evidence proving the commercial strength of its mark. Tr. Trans. 130:14-23.

126. ArkOwl's revenue is modest, its marketing budget is relatively small, and its general customer footprint is limited, which all cut against the commercial strength of its marks. Tr. Trans. 129:5-130:13.

127. There is no evidence showing DarkOwl intended to derive benefit from ArkOwl's reputation or goodwill, at the time DarkOwl chose its mark or at any time since.  Tr. Trans. 146:19-21, 234:20-22, 235:21-236:1 236:21-237:1.

128. DarkOwl was unaware of ArkOwl when it chose its trademarks. Tr. Trans. 146:19-21, 234:20-22, 235:21-236:1 236:21-237:1.

129. There is no evidence of actual confusion between the parties' marks. Tr. Trans. 147:9-149:20, 151:7-16, 237:17-238:8.

130. The parties have coexisted under their current marks and branding for five years without a single credible instance of actual consumer confusion. Tr. Trans. 237:17-238:8

131. Mr. Daline's alleged conversation with a United States Postal Inspection Service ("USPIS") employee at an industry conference is not corroborated by any written document. Tr. Trans. 147:9-149:20.

132.    Indeed, Mr. Daline does not know the difference between the United States Postal Service and the USPIS, nor does he know what the USPIS does. Tr. Trans. 147:21-148:1; 148:12-14.

133.    ArkOwl has no evidence that its purported interaction with a USPIS employee had any effect on a purchasing decision by the USPIS.  Tr. Trans. 148:15-17.

134.    ArkOwl has no evidence that an email inquiry by Apruvd reflected at Trial Exhibit 380 had any impact on a purchasing decision by Apruvd or on the business relationship between Apruvd and ArkOwl.  Tr. Trans. 151:7-16.

135.    DarkOwl's services have no relation to, ArkOwl's services, namely, approving a commercial transaction in real time based on PII verification, these services have never been requested by any DarkOwl customer, and DarkOwl's business and platform are not built or set up to provide that data. Hrg. Trans. 92:20-24; Tr. Trans. 246:16-247:16; Order at pp. 22-23.

136.    ArkOwl classified its own services in its federal trademark registration as "Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order." Trial Exhibits 28 and 29; Order at p. 24 n. 5.

137.    DarkOwl provides its data to sophisticated cybersecurity professionals, including national intelligence and law enforcement agencies, who go through a stringent vetting and review process. Hrg. Trans. 97:1-21, 98:20-99:17; Tr. Trans. 200:14-20, 203:16-204:10, 210:9-18, 257:17-260:6; Order at pp. 3-4; 23-24.

138.    The price of DarkOwl's offerings is quite expensive. Tr. Trans. 247:11-12, 260:10-25, 263:7-11.

139.    Both parties' customers will likely conduct substantial due diligence before making purchasing decisions. Hrg. Trans. 97:1-21, 98:20-99:17; Tr. Trans. 134:12-135:3-9; 200:14-20, 203:16-204:10, 210:9-18, 257:17-260:6.

140.    The parties' services are not similar.  Order at pp. 3-4; 23-24.

141.    There is no likelihood of confusion between the parties' marks.

**PROPOSED CONCLUSIONS OF LAW**

**I.   *JURISDICTION AND VENUE***

142.    The Court has personal jurisdiction over the parties.

143.    Subject matter jurisdiction lies with this Court pursuant to 28 U.S.C. §§1331, 1332, and 1338(a) & (b) and 15 U.S.C. §§1119 and 1121.

144.    Venue is appropriate in this Court under 28 U.S.C. § 1391(a), (b), and (d).

**II.   *LIKELIHOOD OF CONFUSION***

145.    To prevail, ArkOwl must prove (1) ownership of a valid and protectable trademark, and (2) that DarkOwl's use of its trademarks is likely to cause confusion or mistake.  15 U.S.C. §§ 1114(1)(a); 1125(a).

146.    All of the parties' claims, including ArkOwl's cancellation counterclaims, turn on the "likelihood of confusion" analysis. "Likelihood of confusion forms the gravamen for a trademark infringement action." *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) (citing 15 U.S.C. §§ 1114(1), 1125(a)). *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 154 (2015) (ruling district courts should apply the same standards for likelihood of confusion in the contexts of infringement and cancellation and noting "[t]here is no reason to think that the same district judge in the same case should apply two separate standards of likelihood of confusion.").

147.    The Tenth Circuit applies the following six non-exhaustive factors that courts balance to determine whether there is a likelihood that consumers will be confused by the use of a trademark: (1) the degree of similarity between the marks; (2) the strength or weakness of the marks; (3) the intent of the alleged infringer in adopting its mark; (4) evidence of actual confusion; (5) similarity of products and manner of marketing; and (6) the degree of care likely to be exercised by purchasers. *King of the Mountain*, 185 F.3d at 1089-90.

148.    "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (internal citation omitted).

149.    The factors are not to be applied mechanically; courts can and should consider other facts that might be probative of the likelihood of confusion in the context of the dispute. *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1243-44 (10th Cir. 2013). "[T]he weight of any given factor can depend very much on context," and "when certain facts are more probative than others . . . those facts may dominate the analysis." *Id*. at 1243 (citing cases).

150.    "What is required for a claim of trademark infringement under the Lanham Act is a *likelihood* of confusion, not merely the possibility of confusion." *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1150-51 (10th Cir. 2013). In every case, "the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'" *Heartsprings*, 143 F. 3d at 554 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992)).

151.    It is ArkOwl's burden to show a likelihood of confusion. *See, e.g., Vail Assocs., Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853, 872 (10th Cir. 2008); *Universal Money Ctrs., Inc. v. Am. Tel. 6 Tel. Co.*, 22 F.3d 1527, 1530 (10th Cir. 1994) ("party alleging infringement has the burden

of proving likelihood of confusion") *Nutraceutical Corp. v. Affordable Naturals*, LLC, 2017 WL 4564739, *5 (D. Utah October 11, 2017) (same for party seeking trademark cancellation).

152.    Initial interest confusion does not apply here because that doctrine applies only where the parties are direct competitors. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1239 (10th Cir. 2013).

153.    Post-sale confusion is also inapplicable, as this doctrine is designed for cases involving knock-off products-that is, replica goods of inferior quality.  *See Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312, 1334-35 (D. Kan. 2005).

*(1) the degree of similarity between the marks*

154.    The degree of similarity between the marks rests on "sight, sound, and meaning." *King of the Mountain*, 185 F. 3d at 1039.

155.    These factors must be examined "in context of the marks as a whole as they are encountered by the consumers in the marketplace." *Id.* (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986)). "[T]he court is not free to give dispositive weight to any one component of the marks, such as a shared syllable." *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014).

156.    The common use of an identical word does not automatically mean that two marks are similar, as the marks must be considered "in their entireties," including design features, visual appearance to the consumer, meanings of the marks, and how the marks sound. *See* 3 McCarthy on Trademarks and Unfair Competition § 23:43 (5th ed. 2023); *Hornady*, 746 F.3d at 1002 ("consider the effect of marketplace presentation, including lettering styles, logos, and coloring schemes").

157.   Even where the marks at issue are found to be similar, that alone cannot support a finding of likelihood of confusion.  *See M. Welles & Assocs., Inc. v. Edwell, Inc.,* No. 22-1248, 2023 U.S. App. LEXIS 13351, *1 (10th Cir. May 31, 2023) (finding no likelihood of confusion between EDWEL used in connection with providing classes, seminars, and certification workshops in the project management professional space, targeting professional across a range of industries and EDWELL used to promote a nonprofit organization dedicated to improving schoolwide mental health and wellbeing); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550 (10th Cir. 1998) (no likelihood of confusion between HEARTSPRINGS used in connection with books, pamphlets, and educational materials to teach children to resolve conflicts nonviolently and HEARTSPRING used in connection with teaching physically-disabled children certain skills like bathing, dressing, and eating).

### *(2) the strength or weakness of the marks*

158.   In assessing the strength of a trademark, both conceptual and commercial strength should be considered. *King of the Mountain*, 185 F.3d at 1093.

159.   Conceptual strength refers to how distinctive a mark is. *Id.*

160.   A mark can be weak where a component term is extensively used by others in the industry. *See Central Bancorp, Inc. v. Central Bancompany, Inc.*, 385 F. Supp. 3d 1122, 1143 (D. Colo. 2019) (finding "Central Bank & Trust" was a conceptually suggestive but weak mark because "Central" was common in the banking industry); *see also Water Pik*, 726 F.3d at 1152 ("[E]xtensive third-party use of a component of a disputed term undermines the strength of the term as a whole.").

161.   Third-party registrations are "relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized

descriptive or *suggestive* meaning, leading to the conclusion that that segment is relatively weak.*"* *First Sav. Bank, F.S.B. v. First Bank Sys., Inc., 101* F.3d 645, 654 (10th Cir. 1996) (emphasis added) (quoting 1 McCarthy, McCarthy on Trademarks and Unfair Competition § 11.27[2][b] (3d ed. 1995)).

162.    Commercial strength refers to the mark's level of recognition in the marketplace. *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1151 (10th Cir. 2013).

163.    Commercial strength is "the marketplace recognition value of the mark." *King of the Mountain,* 185 F.3d at 1093.

164.    The Tenth Circuit has identified "direct evidence, such as consumer surveys or testimony from consumers," as helpful in evaluating commercial strength. *Water Pik*, 726 F.3d at 1154.  In the absence of such evidence, courts consider the mark holder's efforts to advertise the mark, including evidence tying such advertisements to an effort to promote the mark in the public's mind.  *Id*.  Evidence that a plaintiff's products have millions of users and that the products were sold through well-known retailers does not inform a Court whether the sales were stimulated by the mark and are not sufficient evidence to show commercial strength of a mark.  *Id.* at 1154-55.

165.    In terms of commercial strength, "extensive third-party use of the disputed term indicates that the term itself deserves only weak protection." *First Sav. Bank*, 101 F.3d at 653; 2 McCarthy, *supra,* § 11:88, at 11–167.

166.    Google Analytics reports purporting to show thousands of users accessing the ArkOwl website are not sufficient to demonstrate that the ARKOWL marks are commercially strong. *See Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1154-55 (10th Cir. 2013).

*(3) the intent of the alleged infringer in adopting its mark*

167.    The proper focus under the intent factor "is whether [DarkOwl] had the intent to derive benefit from the reputation or goodwill of [ArkOwl]." *King of the Mountain*, 185 F.3d at 1091. Proof that the alleged infringer chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion. *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 972 (10th Cir. 2002). "The alleged infringer's intent is measured *at the time it 'chose' or 'adopted' its mark*." *Hornady*, 746 F.3d at 1004 (emphasis added). "In analyzing intent, we look to evidence of 'the process of choosing' a mark, *not evidence of events subsequent to its adoption*." *Id.* (emphasis added) (citing *Water Pik.*, 726 F.3d at 1159).

*(4) evidence of actual confusion*

168.    Actual confusion in the marketplace "is often considered the best evidence of a likelihood of confusion." *King of the Mountain*, 185 F.3d at 1092. "We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis." *Water Pik, Inc.*, 726 P.3d at 1150-51.

169.    The standard for actual confusion is not "merely the possibility of confusion" but "*likelihood* of confusion." *Id.* (citing 4 McCarthy on Trademarks and Unfair Competition § 23:43 (4th ed. 2013)) (emphasis in original).

170.    "To be relevant … evidence should demonstrate actual confusion *among consumers within the marketplace*." *Heartsprings*, 143 F.3d at 557 (emphasis added).

171.    Evidence of, for example, some phone calls and letters intended for one party but sent to the other "show inattentiveness on the part of the caller or sender rather than actual confusion." *Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*, 84 F.3d 1093,

1098 (8th Cir. 1996); *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487 (10th Cir. 1987).

172.    Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 398 (2d Cir. 2021).

173.    Evidence of actual confusion must link the confusion evidence to a potential or actual effect on consumers' purchasing decisions. *Prime Media, Inc. v. Primedia, Inc.,* 33 F. Supp. 2d 932, 939-40 (D. Kan. 1998).

### *(5) similarity of products and manner of marketing*

174.    Generally, "the greater the similarity between the products and services, the greater the likelihood of confusion," but when the junior user's offerings are only marginally related to the senior user's, that disconnect greatly reduces the relevance of the similarly of products factor. *King of the Mountain*, 185 F.3d at 1092.

175.    Where there is not much overlap in the marketing approaches of the two parties, the likelihood of confusion is lower. *Heartsprings,* 143 F.3d at 556.  "The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks." *Id.*

### *(6) the degree of care likely to be exercised by purchasers*

176.    If consumers are more likely to exercise a high degree of care in deciding to purchase a product, the likelihood of confusion is reduced. *Heartsprings*, 143 F.3d at 557. "The level of care often turns on whether consumers choose a product based on impulse or careful study." *Elevate,* 67 F.4th at 1072.

177.    A consumer's care generally intensifies with the importance of the product. *See id*. (citing Versa *Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995) ("The more important the use of a product, the more care that must be exercised in its selection."). The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase. *Sally Beauty Co.*, 304 F.3d at 975.

### III.    CONCLUSION

178.    If there is no likelihood of confusion between the parties' marks, the Court must grant DarkOwl's request for declaratory judgment and find it did not infringe ArkOwl's trademark rights and that its federal trademark registrations are valid.  The Court must also deny ArkOwl's trademark infringement and cancellation claims.  *See Elevate Fed. Credit Union*, 67 F.4th at 1083 (affirming district court's grant of declaratory judgment of non-infringement based on finding of no likelihood of confusion); *Water Pik*, 726 F. 3d at 1160 (affirming summary judgment for alleged infringer when no genuine factual issue existed regarding likelihood of confusion); *Groupion, LLC v. Groupon, Inc.,* 859 F. Supp. 2d 1067, 1081 (N.D. Cal. 2012) (summary judgment granted against cancellation claim because there was no likelihood of confusion between the parties' marks).

DATED: July 19, 2023

Respectfully submitted,

**PERKINS COIE LLP**

By: *s/ Jeremy L. Buxbaum*
Thomas L. Holt, IL Bar #6243134
Jeremy L. Buxbaum, IL Bar #6296010
110 North Wacker Drive, Suite 3400
Chicago, IL 60606
P: (312) 324-8400
F: (312) 324-9400
Tholt@perkinscoie.com
JBuxbaum@perkinscoie.com

Kourtney Mueller Merrill, CO Bar #36,662
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
P: (303) 291-2300
F: (303) 291-2400
KMerrill@perkinscoie.com

**HOLLAND & HART LLP**

Sabrina J. Danielson, CO Bar #49,279
555 17th Street, Suite 3200
Denver, CO 80202
P: (303) 295-8565
F: (303 265-9255
SJDanielson@hollandhart.com