IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-02163-KLM

DARKOWL, LLC,

     Plaintiff,

v.

ARKOWL LLC,

     Defendant.

_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
_____

     This matter came before the court on a bench trial on June 26, 2017 and June 27, 2023. The Court, having considered and reviewed the evidence presented at trial, including the witnesses and exhibits, the trial transcripts [#92, #93], the parties' Proposed Findings of Fact and Conclusions of Law [#94, #95], the entire file, and the applicable law, and being fully advised in the premises, hereby issues ifs Findings of Fact, Conclusions of Law, and Order.

## I. Findings of Fact

**A. Background**

     1.    DarkOwl commenced this declaratory judgment action on August 10, 2021. *Compl.* [#2]. DarkOwl requests declarations (1) that its DARKOWL marks, Nos. 5525738 and 5793807, depicted below, do not infringe ArkOwl's marks. *See id.*

 

-1-

2.      ArkOwl, LLC ("ArkOwl") asserts a counterclaim that DarkOwl, LLC's brand name and design mark are likely to cause confusion as to the affiliation, sponsorship, or origin of the two companies, thus infringing on ArkOwl's trademark rights.  *See Pretrial Order* [#89] at 5; *Answer and Counterclaims* [#17].  ArkOwl thus asserts that it adopted the ArkOwl word mark and the following design marks.



*Answer and Counterclaims* [#17] ¶ 8.  ArkOwl further asserts that it continuously and exclusively offered its services under the design marks identified above since its formation in 2012.  *Id.* ¶ 9.  ArkOwl seeks a permanent injunction to enforce the ArkOwl word mark and the above design marks pursuant to the Lanham Act (Count I), and cancellation of DarkOwl's two federal trademark registrations (Count III) to remedy the trademark infringement.  *Id.* at 14-15); *Final Pretrial Order* [#78] at 5.[1]

3.      ArkOwl also has a registered mark, shown below

.  This mark was not registered until 2020, after DarkOwl's marks.  ArkOwl does not seek to enforce that design mark.  *See Counterclaims* [#17] at 14-15.

---

[1] Counts II and IV of ArkOwl's Counterclaims [#17] , asserting cybersquatting in violation of 15 U.S.C. §1125(D) and a violation of the Colorado Deceptive Trade Practices Act, were previously dismissed with prejudice by a Stipulated Motion [#48].  *See Minute Order* [#50].

**B.     ArkOwl**

4.     ArkOwl is a Minnesota limited liability company formed in 2012.  *Stipulated Facts* [#96], NO. 1.  ArkOwl first adopted the ArkOwl word mark at least as early as 2012, and the Court finds from the evidence that ArkOwl has continually used the word mark in connection with its goods and services since 2012, operating as ArkOwl, LLC via the website www.arkowl.com.  *See, e.g., Trial Transcript*  ("Tr. Trans.") [#92] at 31:9-23, 155:2-4.

5.     Robert Daline is the Chief Executive Office and co-founder of ArkOwl. *Hearing Transcript* ("Hr'g Trans.") [#71] 22:2-7.

6.     ArkOwl does not maintain a physical office presence.  All relevant transactions and nearly all interactions between ArkOwl and its customers are virtual.  *Tr. Trans*. [#92] 38:2-18.

7.     ArkOwl was able to determine the location of its users using Google Analytics, which tracks IP addresses.  Through that tool, ArkOwl established that individuals in each state used ArkOwl's service prior to DarkOwl's adoption of its mark in September 2017, and before DarkOwl's trademark registrations in 2018 and 2019. *Compare* Trial Exhibits ("Tr. Ex." or "Tr. Exs.") 327, 423 with Tr. Exs. 131, 132.  Mr. Daline further testified that one or more of its corporate clients showed IP addresses originating from Colorado, where DarkOwl is headquartered, prior to 2017.  *Tr. Trans*. [#92] 43:23-25.

### ArkOwl's Name and Trademarks

8.     When Mr. Daline named the company ArkOwl, the "Ark" portion of the name was meant to show that the company put God first and to reference the biblical "Ark of

the Covenant." *Tr. Trans.* [#92] 29:24-30:7, 124:4-8.  The "Owl" portion of the name is in reference to an owl as a predator that can see in the darkness or at night, or "catching something without necessarily seeing it[,"] which Mr. Daline testified worked well with the idea of catching criminals or identifying legitimate customer identities.  *Id.* at 29:18-23, 108:5-12.  Mr. Daline also testified that his co-founder of ArkOwl wanted the name of the company to be eight characters or less to fit into a dot.com, and for it to be a soundable domain, i.e., "something that somebody could sound when talking about the website and say, go to this website dot-com, and it's just really simple to say that."  *Id.* at 29:8-13.

9.     Mr. Daline testified that the "Owl" portion of the ARKOWL mark is suggestive of the type of services that ArkOwl provides in terms of what ArkOwl's data is used for, i.e., to stop and prevent fraud.  *Tr. Trans.* [#92] 108:5-23.

10.     ArkOwl did not seek to register its trademark until roughly seven years after it adopted the mark.  *Tr. Trans. [#92] 109:5-12.*

11.     Thus, on September 22, 2019, ArkOwl filed Application Serial No. 88626162 for the ARKOWL word mark with the USPTO, claiming first use in commerce as early as October 11, 2012.  *See* Tr. Ex. 28.  ArkOwl obtained its federal registration for its word mark on April 21, 2020.  *Id.*

12.     ArkOwl classified its services in its federal trademark registration as "Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order."  *See* Tr. Exs. 28 and 29.

13.      The USPTO reviewed the application and did not reject it based on any prior third-party filings, including DarkOwl's prior registrations.  *Tr. Trans*. [#92] 123:18-124:3.

14.      No third parties opposed ArkOwl's Application Serial No. 88626162. ArkOwl's application was registered under Reg. No. 6036746 on April 21, 2020, and covered the following services: "Computer and Software services and Scientific Services being Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order" in Class 42.  *See* Tr. Ex. 28.

15.      Before 2019, ArkOwl used marks which Mr. Daline referred to as the angry-owl marks:



*Tr. Tran.* [#92] 111:25-112:17.  There is no evidence of registration of these marks; however, ArkOwl presented evidence that these marks were used from the commencement of the company until 2019, when it replaced the angry owl marks with a new mark.  *Id.* 31:6-32:11, 34:8-20, 100:23-101:8, 111:15-17, Tr. Ex. 303.

16.      Mr. Daline referred to the mark adopted by ArkOwl in 2019 as the soaring mark, shown below.  This mark is still being used today.  *Tr. Trans.* [#92] 100:23-108:8, 111:15-17.  On January 29, 2020, ArkOwl filed Application Serial No. 88777943 for the soaring owl design mark:

.  *See* Tr. Ex. 29.

17      The USPTO reviewed the application and did not reject it based on any prior third-party filings, including DarkOwl's prior registrations.  *Tr. Trans*. 123:18-124:3.

18.      No third parties opposed Application Serial No. 88777943.  The application was registered under Reg. No. 6285973 on March 9, 2021, as to the following services: "Software as a service (SAAS) services, namely, hosting software for use by others for use in verifying the credibility of data provided by e-commerce customers in an online order. . . ."  *See* Tr. Ex. 29.

**ArkOwl's Services**

19.      ArkOwl's business developed out of Mr. Daline's experience as a fraud prevention analyst with retail businesses.  *Hr'g. Trans*. [#71] 2879-16.

20.      ArkOwl is fairly characterized as an identity and verification service provider, and its main focus is Personally Identifiable Information ("PII") verification and validation.  *Hr'g. Trans*. [#71] 22:10-15.   ArkOwl helps its customers verify PII, including email addresses, phone numbers, IP addresses, physical addresses, and personal name matches.   *Id*. 22:21-23:8. More generally, ArkOwl is in the cybersecurity industry.  *Tr. Trans.* [#92] 105:23-25.

21.      ArkOwl provides a platform that allows its users to input PII for individuals.  *See, e.g., Tr. Trans*. [#92] 24:23-25, 143:12-24, 145:19-25.  ArkOwl's users can interact with its services via a user interface (UI), requiring a person to manually enter data.   *Id*.  ArkOwl's data output is used by customers to verify whether there is a fraud threat connected to those individuals or entities.  *Tr. Trans*. [#92] 99:25-100:1.

22.     ArkOwl has access to real-time surface web and other datasets and provides its customers over 80 data points designed to validate and verify identities. Those data points include such things as email age, creation date, social media information, webmail providers, domain name information, and "breach data" from a company named "Have I Been Pwnded?"  *Tr. Trans*. [#92] 143:4-145:18. ArkOwl's offerings as to its data have expanded since 2012.  It now offers phone number, IP, and postal data, and added an API, additional social checks, as well as breach data.  *Id.* [#92] 142:23-143.11, 59:20-22; 47:24. [2]

23.     Mr. Daline testified that he considers ArkOwl to be providing services in the "payments" sector.  *Tr. Trans*. [#92] 105:20-25.

24.     ArkOwl does not, and has never, accessed the dark web directly and does not directly provide dark web data or services to its customers.  *Hr'g. Trans*. [#71] 37:19-38:18.  ArkOwl does provide breach data from Have I Been Pwnded?, which will say where the data was found, including the dark web.  *Id.*  Mr. Daline acknowledged, however, that breach data and dark web data are not the same.  *Id.* at 37:19-24.

25.     ArkOwl does not search the dark web, and ArkOwl's marketing materials do not promote any dark web specific services, other than the breach data from I Have Been Pwnded?.  *Hr'g Trans*. [#71] 37:19-21, 40:18-20.

26.     ArkOwl provides only raw data in connection with, for example, stopping the threat of a fraudulent purchase online, and does not provide any analytical services or

---

[2] An API ("Application Programming Interface") allows ArkOwl's data to be accessed by other software (Trial Transcript [#92] 47:25-48:3), and is "machine-to-machine interrogation."  *Tr. Trans*. [#93] 194:6-11.

anything beyond the data if a fraud is discovered. *Hr'g. Trans*. [#71] 75:2-10. ArkOwl also does not provide passwords as part of its data outputs. *Tr. Trans*. [#92[ 46:12:14.

27. Other than ArkOwl's archived database reflecting users' search queries, ArkOwl's data is provided in real time. *Tr. Trans*. [#92]137:23-142:16.

28. Mr. Daline testified that in addition to retailers, ArkOwl has banks, cybersecurity customers, and law enforcement as customers. *Tr. Trans*. [#92] 30:6-15. By 2022, more than 85% of ArkOwl's revenue came from companies that were not retail companies, including fraud prevention platforms. *See* Tr Ex. 385, tab Rev.; *Hr'g Trans*. [#71] 51:12-14, 58:59:19. The fraud prevention platforms serve more than just retail companies verifying online transactions. For example, Mr. Daline testified that Accertify serves both retailers and banks. *Hr'g Trans*. [#71] 59:5-8. NICE Actimize serves banks and tech companies. *Id*. 59:12-15. Nonetheless, Mr. Daline testified that he is not aware of any customers in the United States using ArkOwl's data for anything other than supporting online purchase transactions. *Hr'g Trans*. [#71] 33:18-21; 71:10:21.[3]

29. ArkOwl has a price-per-query pricing model, starting with 2,500 queries for $99.00 a month. 50,000 queries costs $899.00 a month. ArkOwl also has a subscription based pricing model based on month-to-month usage. Most of ArkOwl's revenue comes from the offer of 200,000 queries a month for $3,100. *Tr. Trans*. [#92] 131:1-132:17; *see also* Tr. Exs. 30, 77.

---

[3] The only exception to this are ArkOwl's law enforcement customers outside of the United States, who Mr. Daline testified are using ArkOwl's data to find sex traffickers. This case, however, concerns only alleged infringement in the United States.

**ArkOwl's Customers**

30.     ArkOwl's customers are often fraud solution providers,  and the users of the services are fraud analysts who have experience in fraud detection as to online sales transactions.  *Tr. Trans*. 133:13-134:11.

31.     ArkOwl's customers tend to have higher education degrees and are discerning, and ArkOwl's users are also discerning.  *Tr. Trans*. [#92] 134:12-135:9.

32.     As of August 2017, nearly 90,000 unique users had interacted with ArkOwl's service and were exposed to ArkOwl's mark.  *See* Tr. Ex. 423, p. 3.  By 2022, ArkOwl's users engaged in more than 20,000 manual review searches each day. *See* Tr. Ex. 424, tab "arkowl-useage-stats-all" at line v3.

**ArkOwl's Marketing Strategies**

33.     ArkOwl markets its services through its publicly available website, www.arkowl.com, which prominently features the statement "Verify Email addresses and Phone Numbers in Real-Time" at the top of the home page.  *See* Tr. Ex. 56.

34.     ArkOwl has participated in the Merchant Risk Council as a member and has attended its trade show conferences.  It has not attended other trade shows.  The Merchant Risk Council brings together fraud and payment professionals as well as solution providers.  *Tr. Trans*. [#92] 127:22-128:15, 33:5-11.  ArkOwl has also given a handful of other presentations to industry groups.  *See id.* 62:23-64:4; Tr. Exs. 331, 353, and 354).

35.     ArkOwl relies primarily on word-of-mouth advertising.  *Tr. Trans*. [#92] 62:4-10, 82:11-12, 126:18-21.  Mr. Daline testified that ArkOwl's "goal is to have companies using us, talking about how amazing ArkOwl is to other companies."  *Id.* 72:7-10.  ArkOwl

presented evidence that it has been successful in acquiring customers around the world through these referrals.  *See, e.g.* Tr. Ex. 314 (Frys.com finding ArkOwl via referral); Tr. Ex. 316 (RailEurope.com finding ArkOwl through referral from CyberSource); Tr. Ex. 317 (Staples.com finding ArkOwl from a Merchant Risk Council meeting); Tr. Ex. 322 (Sephora finding ArkOwl through referral).

36.     Third-party publications, such as Tech News, Bloomberg, and Benzinga.com, have written about ArkOwl.  Tr. Exs. 337, 338, 339, 340, 341, 343, 349. Individuals have listed "ArkOwl" as a software tool when identifying their skills on LinkedIn.com.   Tr. Exs. 355-374.   An industry organization promoted ArkOwl to its members.  Tr. Ex. 304.  ArkOwl's service is listed as an acronym in CyberSource/Visa's manual review desk.  Tr. Ex. 334.

37.     Over the last three years, ArkOwl has spent limited amounts annually on advertising ($10,000-$15,000), with the majority of that going toward attendance at the Merchant Risk Council trade show.  *Tr. Trans*. [#92] 129:5-16, 82:8:14.

**ArkOwl's Discovery of DarkOwl**

38.     ArkOwl first learned of DarkOwl in 2019, and Mr. Daline did not believe at that time that DarkOwl was a competitor or in the same industry as ArkOwl.  *Hr'g Tran.* [#71] at 64:14-65:6.

39.     ArkOwl did not contact DarkOwl regarding its trademarks until April 2021, when it sent a cease and desist letter through counsel.  *See Hr'g. Trans.* [#71] 64:14-17, 99:18-20.

40.     ArkOwl is not aware of any instances where ArkOwl has lost business to DarkOwl.  *Hr'g Trans.* [#71] at 43:6-8.  ArkOwl is also not aware of any instance where

customers were using DarkOwl's services for any kind of PII verification, or any customer deciding between ArkOwl and the services of a dark web provider.  *Id.* 43:20-44:11. Further, ArkOwl is not aware of any instance where a customer was trying to decide between DarkOwl's and ArkOwl's services.  *Id.*, 44:8-11.

41.    Mr. Daline has never run into DarkOwl at any industry events ArkOwl attended.  *Tr. Trans.* [#92] 128:13-19.

**C.    DarkOwl**

42.    DarkOwl, LLC is a Colorado limited liability company formed in 2015. *Stipulated Facts* [#96], No. 2.

43.    Mark Turnage is the Chief Executive Officer and co-founder of DarkOwl. *Stipulated Facts* [#96], No. 8.

44.    Russell Cohen is the President and Chief Financial Officer and co-founder of DarkOwl.  *Stipulated Facts* [#96], No. 9.

**DarkOwl's Trademarks**

45.    In 2017, DarkOwl adopted the DARKOWL trademark and changed its company name to DarkOwl.  *Stipulated Facts* [#96], No. 10.

46.    On March 24, 2017, DarkOwl filed U.S. Trademark Application Serial No. 87384235 with the U.S. Patent and Trademark Office ("USPTO") for the



mark*.  Stipulated Facts* [#96] No. 11.

47.    The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings.  *Stipulated Facts* [#96], No. 12.

48.    No third parties opposed Application Serial No. 87384235.   DarkOwl's Application was registered under Reg. No. 5525738 on July 24, 2018 for the following services:

> Providing a database featuring information about internet security and computer security from the deep web and the darknet; computer security consultancy regarding data and information collected and obtained from the deep web and the darknet; software as a service (SaaS) services featuring software for retrieving from, adding to, and editing a database featuring information and data obtained from the deep web and the darknet; computer software consulting services in the field of cybersecurity utilizing deepweb and darknet information; electronic monitoring of information and data obtained from the deep web and the darknet for the purpose of internet and computer security by detecting compromised data; computer information security consulting services in the field of maintaining the security and integrity of computer information and data using information and data obtained from the deep web and the darknet; providing computer and internet security analysis of information obtained from the deep web and the darknet; providing cybersecurity threat analysis for protecting data using information obtained from the deep web and the darknet; cybersecurity services, namely, monitoring of computer systems for data security purposes utilizing deep web and darknet information. . . ."

*Stipulated Facts* [#96], No. 13.

49.    DarkOwl filed U.S. Trademark Application Serial No. 88216005 with the USPTO on December 4, 2018 for the  mark .

*Stipulated Facts* [#96], No. 14.  This is DarkOwl's main design or logo that it uses for the company.  *Tr. Tran*. [#93]  236:7-12; *see also* Tr. Ex. 132.

50.    The USPTO reviewed the application and did not find a likelihood of confusion with any prior third-party filings.  *Stipulated Facts* [#96], No. 15.

51.    No third parties opposed Application Serial No. 88216005, and the application was registered under Reg. No. 5793807 on July 2, 2019 for DarkOwl's Registered Services.  *Stipulated Facts* [#93], No. 16.

52.     According to Mr. Turnage, the DARKOWL mark is intended to convey to customers an insight into what the company does. *Tr. Trans*. 237:9-16. "Dark" is meant to reference DarkOwl's darknet services, and "Owl" refers to DarkOwl's ability to "see into the darknet." *Id.* at 237:11-12. The word "Owl" also harkens back to DarkOwl's founders' purchase in 2016 of a company out of bankruptcy called One World Labs, which went by the monikor "OWL". Both the words/terms "One World Labs" and "OWL" were part of the purchase. *Id.* at 234:8-14, 237:12-14. The figurative Owl that forms the O in the DarkOwl mark was designed by someone at the company that was purchased in 2016, and was part of the bankruptcy estate. *Id.* 234:5:19.

53.   The word "dark" was DarkOwl's major focus in adopting the DARKOWL mark. *Tr. Trans*. [#93] 237:15-16. Mr. Turnage testified that there was no aspect of the DARKOWL mark that was intended to reference the word or concept "Ark." *Id.* at 237:7-9.

54.     At the time DarkOwl adopted its DARKOWL mark, it was aware that "owl" was commonly used in the cyber industry. *Tr. Trans*. [#93] 234:23-235:5. DarkOwl did a trademark search with its attorneys and came across many companies in the cybersecurity industry that were using the "owl" term, including in marks like REDOWL and OWL CYBER DEFENSE. *Tr. Trans*. [#93] 235:2-5.

**DarkOwl's Services**

55.     DarkOwl has been providing dark web data since the company began in 2015.. *Tr. Trans*. [#92] 181:21:24. DarkOwl focused its business at the outset on providing dark web data to its customers, and it has stayed committed to that focus ever since. *Id.* 181:21-182:9.

-13-

56.     DarkOwl's business model is to provide the largest database of dark web data in the world.  *Tr. Trans*. [#92] 181:21-182:10.

57.     DarkOwl monitors the dark web for emerging threats and has built a platform for its customers to access this dark web data.  *Hr'g. Trans*. [#71] 77:14-18**;** *Tr. Trans*. [#93] 239:3-11.

58.     DarkOwl tries to create a mirror image of what is going on in the dark net to provide its customers with that information outside of the dark net.  *Tr. Trans*. [#93] 239:3-11.

59.     DarkOwl offers a large available database of information continuously collected from the dark web, which data can be indexed and made available to its clients.  *Tr. Trans*. [#93] 239:3-11.   The data DarkOwl collects include such things as email addresses, IP addresses, cryptocurrency, and credit cards.  *See* Tr. Ex. 2, p. 14.  This database is a feed available as an API to customers who want that specific type of data, and was created so that its customers could minimize the noise involved in a broader search so they could get the relevant information they are looking for.  *Tr. Trans*. [#93] 193:12-195:2.

60.     Thus, like ArkOwl, DarkOwl is a data company, with software as a service ("SAS*"). Hr'g Trans*. [#71] at 107:23.  DarkOwl's products allow its customers to search the database that DarkOwl has collected.  *Id*. 108:2-6.  Its products can be accessed by user interface ("UI") or by API, as with ArkOwl.  *Tr. Trans*. [#93] 200:21-201:3; Tr. Ex. 2, p. 16.

61.      DarkOwl's business consists primarily of: (1) threat intelligence services that look for emerging threats to organizations; (2) assessment of third-party risk, which

is the risk assessment of vendors or contractors of large companies; (3) supplying data to cyber-insured tech companies for risk assessment related to underwriting; (4) digital identity protection and the assessment of whether the digital identity is risk-related; (5) fraud protection for cybersecurity companies that service financial institutions, primarily related to bank account or other financial information that is bought and sold on the dark web; (6) services to intelligence agencies or governments related to threats on the dark web to critical infrastructure (e.g., power plants, water treatment plants); (7) services related to threats to national security in the dark web; and (8) monitoring the use of cryptocurrency in the dark web. *Hr'g. Trans.* [#71] 83:12-96:20. In other words, DarkOwl has seven use cases for its services, consisting of threat intelligence, third-party risk, cybersecurity underwriting, digital ID protection, fraud protection, critical infrastructure, and national security. *Tr. Trans.* [#93] 239:12-19; *see* Tr. Exs 83, 91-97.

62.   As to fraud protection, DarkOwl guards against types of fraud that emerge on the darknet. *Tr. Trans.* [#93] 256:7-10. DarkOwl does not have any customers in the payment space. *Id.* 256:20-22.

63.   DarkOwl anticipates that its use cases will continue to evolve, as it is trying to describe who could use DarkOwl's data in different ways. DarkOwl's enterprise customers have used DarkOwl's data for many purposes, and in new ways not anticipated by DarkOwl. *Tr. Tran.* [#92] 166:8-17, 168:19-169:7.

64.   The nature of the data DarkOwl provides is highly sensitive and complex. *Hr'g. Trans.* [#71] 97:22-98-11; *Tr. Trans.* [#93] 259:2-6.

65.   Mr. Turnage testified that DarkOwl's business has no relation to ArkOwl's services, namely, approving a commercial transaction in real time or providing PII. *Hr'g.*

*Trans.* [#71] 85:18-20, 87:5-11, 89:23-90:21, 91:7-95:21; *see also Tr. Trans.* [#93] 238:9-11, 245:22-25 (Mr. Turnage testifying that he was not aware of any instance in which somebody expressed interest in purchasing PII (email, phone, or IP) verification services from DarkOwl).  While DarkOwl scrapes and indexes a voluminous amount of websites every day, and some of this is scraped in real-time (Trial Transcript [#93] 195:5-25), Mr. Turnage explained that DarkOwl cannot give data as to use cases such as digital identity protection (which involves PII data and 8 billion email addresses) in real time.  *Hr'g Trans.* [#71] at 89:17-91:10.

67.      DarkOwl's customers do not, and have not, requested or suggested that they intend to use DarkOwl's services in connection with PII verification.  *Hr'g. Trans.* [#71] 100:21-24, 101:6-8; *see also Tr. Trans.* [#93] 245:22-25.

67.      Mr. Turnage further testified that DarkOwl's platform and dark web database are not set up to provide PII verification services.  *Hr'g. Tran.* [#71] 91:7-10, 92:20-224, 100:102-18.  Moreover, Mr. Turnage testified that not a single data point about which Mr. Daline of ArkOwl testified is supplied by DarkOwl; DarkOwl does not have that information and does not supply it.  *Tr. Trans.* [#93] 246:16-247:16. According to Mr. Turnage, a search on Google, for example, would return information about an email address input and would likely contain more information about an email address than DarkOwl possesses. *Id.* 244:14-17.

68.      The term "PII" is a commonly used "umbrella" term in the cybersecurity industry, and the term would be commonly seen on any number of cybersecurity websites.  *Tr. Trans.* [#93] 242:7-15.

69.     PII verification services is not a growth area for DarkOwl.  Mr. Turnage testified that it is a commoditized industry, and that the price point for DarkOwl's platform would make it uncompetitive in that area.  *Tr. Trans*. [#93] 246:1-7.

70.     DarkOwl's digital identity protection use case involves monitoring the darknet for the existence of PII.  *Tr. Trans*. [#93] 242:20-244:13.   While, for example, customers can search an email address on the darknet through DarkOwl, they would not get an indication as to whether the address resides on the darknet.  Mr. Turnage testified that DarkOwl's customers are not interested in the presence or absence of an email on the darknet; instead, they are interested in knowing what is around that email address, e.g., is there a password associated with it, or is it personal information such as that of an FBI agent.  *Id*.

71.     DarkOwl does not provide as part of its services the following data outputs: (i) social media accounts associated with specific email addresses or phone numbers, (ii) "Who is" information associated with specific email addresses or phone numbers, (iii) caller ID information associated with specific phone numbers, (iv) carrier information associated with specific phone numbers, (iv) the date of creation of an email address, or (v) data reflecting customer search queries.  *Tr. Trans*. [#93] 244:18-245:21.

72.     DarkOwl's largest growth sector is in services provided to government customers, including intelligence agencies.  *Tr. Trans*. [#93] 204:2-10, 246:8-15.

**DarkOwl's Customers**

73.     DarkOwl's customers are typically very sophisticated cybersecurity professionals who are dealing with cyber risks to their companies or organizations.  *Hr'g. Trans*. [#71] 97:1-12.

74.     DarkOwl's market strategy prior to 2017 was to sell to banks, retail companies, healthcare companies, tech companies, and other companies that had potential exposure in the dark net.   *Tr. Trans*. [#93] 203:3-6.   In 2017, when a cybersecurity company approached DarkOwl, it pivoted its marketing strategy to focus on the cybersecurity industry as its primary customer base.   *Id.* at 203:16-204:10.   DarkOwl is still selling to cybersecurity companies, *id.,* and more specifically to either cybersecurity platforms or data platforms.   *Tr. Trans.* [#92] 173-16.   However, about 40-45% of DarkOwl's customers are now government intelligence agencies or cybersecurity companies whose customers are governments.   *Tr. Trans.* [#93] 203:16-204:10, 210:9-21.

75.     DarkOwl's most profitable market is large, sophisticated companies with large budgets.   DarkOwl's broadest market, however, is small and medium-sized businesses.   *Tr. Trans.* [#92] 10-20.   While Mr. Turnage testified that DarkOwl's market is small and focused (Hearing Transcript [#71] 131:8-12), Mr. Cohen testified that its market is large (in the thousands) and could be categorized as large companies that are willing to spend $100,000 for darknet information to help protect themselves.   *Tr. Trans.* [#92] 171:24-173:4.

76.     Because of the complexity of DarkOwl's data, its customers must necessarily be sophisticated to understand and utilize DarkOwl's offerings.   *Hr'g. Trans*. [#71] 97:1-21, 98:7-99:17; *see also Tr. Trans*. [#93] 203:16-24, 210:9-18.

77.      DarkOwl can monitor how its customers use its data to a certain extent through a user interface to see whether they are abusing the end-user licensing agreement ("EULA") that each customer must sign.   Tr. Trans. [#93] 200:14-23.

DarkOwl's customers' use of DarkOwl's services are thus restricted by the EULA. *Id.* 201:10-18. Further, while DarkOwl can monitor the volume of searches and which API end point a customer is using the search for, it does not have the capability of monitoring what specific searches are run through the API. *Id.* at 200:24-201:3.

78.     Given the sensitive nature of DarkOwl's data offerings, DarkOwl conducts an extensive vetting process for its customers, which includes in-person meetings with high-level executives and decision-makers, multiple conversations with potential customers, and entering into comprehensive legal agreements that prevent the misuse of any data provided. *Hr'g. Trans*. [#71] 98:19-99:17; *Tr. Trans*. [#93] 200:14-20, 257:17-260:9.

79.     The vetting process takes, on average, 90 to 180 days, and in some cases, can take longer. *Tr. Trans*. [#93] 259:20-22, 261:1-5

80.     DarkOwl frequently turns away potential customers because of something that happens during the vetting process. *Tr. Trans*. [#93] 260:7-9; *see also Hr'g. Trans*. [#71] 99:3-17.

81.     The entry point for DarkOwl's services starts at about $30,000 and goes up to about $500,000 a year. The average cost of DarkOwl's dark web data services is about $55,000-$60,000 per year. *Tr. Trans*. [#93] 247:11-12, 260:10-25, 263:7-11.

82.     Accordingly, the purchasing decision-maker at DarkOwl's customers is generally from the "C Suite" of a company – the chief executive officer, chief financial officer, chief technology or information security officer – or high-ranking officials at national intelligence agencies. *Hr'g. Trans*. [#71] 97:22-98:6; *Tr. Trans*. [#93] 257:17-258:10.

**DarkOwl's Marketing Strategies**

83.    Given the sophisticated nature of DarkOwl's services and customers, DarkOwl primarily engages in direct, outbound marketing to a focused group of target customers.  *Hr'g. Trans*. [#71] 130:12-18; *Tr. Trans*. [#93] 247:21-24.   DarkOwl was, however, engaging in both inbound and outbound marketing, switched primarily to inbound in 2021 (meaning that it focused its sales efforts on posting content and driving people to DarkOwl's website), and then switched to the outbound method in February 2023 when the inbound method wasn't working.  *Hr'g Trans*. [#71] 130:112-

84.    DarkOwl also markets its services through its publicly available website, www.darkowl.com.  *Stipulated Facts* [#96], No. 17.

85.    DarkOwl's primary marketing focus is through industry trade shows. *Tr. Trans*. [#93] 248:13-22; *see also* 212:16-21.

86.    DarkOwl attends specific trade shows and conferences for its niche area of the cybersecurity industry, including Black Hat, Milipol Paris, Global Security Exchange, DoDIIS, GISEC, WICYS, RSA, OSMOSIS Con, and ISS World Asia.  *Tr. Trans*. [#93] 248:23-253:9; *see also* Tr. Ex. 82.  DarkOwl's CEO was also asked to present on the use of cryptocurrency in the darknet at the 2023 G20 conference in New Delhi.  *Id.* 252:22-253:9.

87.    DarkOwl spends over a million dollars a year on marketing, with the majority of that going toward industry trade shows.  *Tr. Trans*. [#93] 256:23-257:8.

88.    DarkOwl, through its head of marketing with approval from Mr. Turnage, hired and used a third-party marketing company, Cience, for about 14 months or so

beginning in around 2020 to send blast emails (the outbound marketing discussed previously). *Hr'g Trans*. [#71] 103:14-20; *Tr. Trans*. [#93] 212:22-214:3, 215:16-19. Cience sent out thousands of emails on DarkOwl's behalf in an attempt to broker meetings between potential customers and DarkOwl's sales team. *Tr. Trans.* [#93] 214:16-215:8. The emails Cience sent were set up as @bd.darkowl.com, so that the outside world would believe the solicitations came from DarkOwl. *Id.* at 214:4-11. DarkOwl gave Cience broad general messaging information, which Cience would sometimes change. *Id.* 215:12-15.

89.     DarkOwl did not monitor where the emails were sent or approve the list of businesses that Cience sent mails to. Mr. Turnage testified, however, that Cience was hired to do targeted outbound marketing to specific sectors within the cybersecurity industry. *Tr. Trans.* [#93] at 216:13. Mr. Turnage further testified that it became obvious over time that Cience was casting a net that was far too broad, beyond the specific information DarkOwl had provided about the types of companies for which DarkOwl had established use cases. *Tr. Trans*. [#93] 216:5-16; *Hr'g Trans.* [#71] at 103:21-24. Instead, the email blasts did not generate business for DarkOwl (at most one or two clients), so DarkOwl terminated Cience's services. *Hr'g. Trans*. 105:17-19, 215:20-22.

90.     ArkOwl learned that one of its prominent clients, Apruvd, received an email blast from DarkOwl (through Cience). Apruvd emailed ArkOwl asking if the email from DarkOwl was in relation to a project from ArkOwl. *Tr. Trans*. [#92] 90:22-91:10; *see* Tr. Ex. 380. Specifically, the email (from Corwin Cole of Apruvd to Mr. Daline of ArkOwl) stated, "Just wanted to give you a heads-up, though you are probably already aware, that DarkOwl exists and seems to be a pretty blatant ripoff of your style and name. We have

received standard sales cycle emails from them, and they seem like a real company, at least.  Any chance it's another project from you guys?"  Tr. Ex. 380. ArkOwl also later discovered that DarkOwl, via CIENCE, solicited another of its clients, Signifyd.  *See* Tr. Ex. 387.

91.     Cience thus sent an email to Apruvd and Signified, which are clients of ArkOwl.  *Tr. Trans*. [#93] 216:25-218:3; *Hr'g Trans*. [#71] 104:14-105:12.  Mr. Turnage testified that he did not know enough about either of these companies to know if they would be targeted customers of DarkOwl, *Hr'g Trans*. [#71] 105:7-12, or if they would have been approved or rejected as customers if they had wanted to meet with DarkOwl. *Tr. Trans*. [#93] 217:8-215

92.     DarkOwl hired an Executive Vice President of Sales, Mr. Williamson, in March or April of 2021.  *Tr. Trans*. [#93] 210:25-211-10.  Mr. Williamson had experience in sales.  *Id*. 223:10-12.  Mr. Williamson wanted to change DarkOwl's strategy from outbound to largely inbound marketing.  *Id*. 220:19-22.  He remained in the position until approximately February of 2023.  *Id*. at 220:2-11.

93.     Mr. Williamson felt that there was a broader universe of potential customers for DarkOwl beyond those that DarkOwl was reaching out to. *Tr. Trans*. [#93] 221:4-6. Mr. Williamson created a marketing document entitled "Strategic Positioning Kickoff" (Trial Exhibit 4) dated July of 2021.  *Tr. Trans*. [#93] 223:4-14.  This included a list of potential customers Mr. Williamson believed DarkOwl should be marketing to by use case.  *Id*. 224:2-17.  According to Mr. Turnage, the list created by Mr. Williamson was a point of contention because he missed DarkOwl's largest market – cybersecurity service providers and law enforcement.  *Id*. 224:6-225:10.  Mr. Williamson's recommendation was

to move primarily to five other use cases (cyber insurtech underwriting, third-party risk management, digital identity protection, fraud detection and darknet qualification, and threat intelligence feeds), which recommendation was ultimately rejected by DarkOwl.  *Id.* 225:6-10; *see* Tr. Ex. 4 at 16.

94.    The marketing document created by Mr. Williamson (Trial Exhibit 4) contained a slide, called "Vertical Use Case: Targets (Addressable Market)[,]", which comprised target companies he believed DarkOwl could sell to.  Mr. Williamson identified as targets some existing DarkOwl customers on the list.  *Tr. Trans*. [#93] 226:20-227:11; Tr. Ex. 4 at 18.  Mr. Turnage testified that this was another major source of contention, because the inclusion of DarkOwl's customers was "nonsense" and Mr. Williamson had not done his homework in assigning these customers as targets.  *Tr. Trans*. [#93] 226:20-227:11.

95.    Mr. Williamson created another document (Trial Exhibit 5), although the time frame of creation of the document is unknown.  Mr. Turnage acknowledged that it could have been created several months after Trial Exhibit 4, although he was not sure about this.  *Tr. Trans*. [#93] 227:15-228:25.  This document was used in part to inform DarkOwl's website rebuild.  *Id.* 229:7-12.

96.    Tab 5 of Trial Exhibit 5, entitled "Big Data Targets[,]" included some of ArkOwl's competitors and customers.  The list indicated that one of DarkOwl's sales reps was engaged in conversations with PIPL, a competitor of ArkOwl.  *See id.* E82.  PIPL is identified as a "PII Verification" company.  *See* Tr. Ex. 347. [4]  Other competitors of ArkOwl on the list included IPQualityScore (Trial Exhibit 5, Tab 5*,* line F109), Ekata (*id.,* line F66),

---

[4]  PIPL appears in the "PII Verification" category alongside ArkOwl in About-Fraud's 2021 infographic.  *Id.*

emailage (*id.,* line F67), SEON (*id.*, line F157), Riskified (*id.* E89) and Sift (*id.* F160). Many of these companies appear alongside ArkOwl in About-Fraud's 2020 and 2021 infographics. *See* Tr. Exs. 346, 347.  Customers or potential customers of ArkOwl on the list included Socure (*id.,* E101), Accertify (*id.* line F107), Ravelin (*id.*, line E88), Fraugster (*id.*, line F98), and ID Insight (*id.*, line E55).

97.    Mr. Turnage testified that he does not know whether DarkOwl's salespeople actually reached out to the companies on Mr. Williamson's list (Hearing Transcript [#71] 139:10:13), but admitted that some of the targets subsequently became DarkOwl customers.  *Id.* 137:13-19.

98.  Mr. Williams' tenure with DarkOwl, and suggested marketing strategy, was, according to Mr. Turnage, an abject failure.  *Tr Trans.* [#93] 222:11-20.

99.    DarkOwl has never encountered ArkOwl at any industry conference.  Tr. Trans. [#93] 253:25-254:6.

100.    ArkOwl has never encountered DarkOwl at any industry conference.  Tr. Trans. [#92] 128:13-23.

101.    ArkOwl has never attended the Black Hat, Milipol Paris, Global Security Exchange, DoDIIS, GISEC, WICYS, RSA, OSMOSIS Con, and ISS World Asia conferences that DarkOwl attends.  ArkOwl has attended only one conference, the Merchant Risk Council conference, on four separate occasions over its 11 years in business.  *Tr. Trans.* [#92] 127:22-128:23.

102.    Mr. Daline acknowledged that he is not aware of any industry publication that references both ArkOwl and DarkOwl.  *Tr. Trans.* [#92] 107:19-21.

**DarkOwl's Knowledge of ArkOwl and Intent**

103.    Mr. Turnage testified that DarkOwl was not aware of ArkOwl when it was creating and adopting its DARKOWL trademark and company name.  *Tr. Trans*. [#93] 234:20-22, 236:21-237:1.  This testimony is unrefuted.  *See Tr. Trans*. [#92] 146:19-21 (Mr. Daline's testimony was that he is not aware of any evidence that DarkOwl had knowledge of ArkOwl at the time it adopted the DarkOwl mark).

104.    When DarkOwl adopted and registered its mark, DarkOwl did not intend to copy ArkOwl's marks in any way.  *Tr. Trans*. [#93] 237:4-6.

105.    DarkOwl first learned of ArkOwl when DarkOwl received ArkOwl's April 2, 2021 letter demanding that it stop using the DARKOWL marks.  *Hr'g Trans*. [#71] 99:18-20; *Tr. Trans*. [#93] 266:14-18.

106.    Prior to receiving the letter, DarkOwl had never come across ArkOwl or its ARKOWL trademarks.  *Hr'g. Trans*. [#71] 99:18-20, 100:21-101:5; *Tr. Trans*. [#93] 266:14-18.

107.    To Mr. Turnage's knowledge, no customer has ever mentioned ArkOwl or its ARKOWL trademarks to DarkOwl.  *Hr'g Trans*. [#71] 100:21-101:2.

**D.    Additional Facts Relevant to Likelihood of Confusion**

108.    The cybersecurity industry is very broad and encompasses a wide variety of businesses (between 10,000 and 14,000) with an immense diversity of services and technologies.  Not all services and technologies under the cybersecurity umbrella are competitive or related.  *Hr'g Trans*. [#71] 81:18-82:13; *Tr. Trans*. [#93] 199:21-25; 254:7-14.

109.  "Fraud prevention" and "fraud protection" are also broad terms that can mean very different things depending on the context.  *Tr. Trans*. [#93] 255:10--256:6.

110.  DarkOwl is not included in the compilation of companies provided by About-Fraud.com, an organization that seeks to consult on fraud prevention matters.  The organization provides a report that compiles vendors or solution providers, and Mr. Daline testified that a number of companies listed on the report could be deemed competitors of ArkOwl or provide similar services.  *Tr. Trans*. [#92] 106:7-107:18; *see* Trial Exs. 346, 347.  ArkOwl is included in the vendor lists in that report.  ArkOwl also appears in the Paladin Vendor Report alongside 45 other companies in the fraud and payments industry.  *Tr. Trans.* [#92] 35:20-37:13; Ex. 305.  Additionally, SEON, a competitor of ArkOwl, published a list of ten companies offering the "best fraud detection softwares" and included ArkOwl.  Ex. 349.  Many of the companies listed in these reports are ArkOwl's competitors, potential customers, or potential partners.  *See Tr. Trans.* [#92] 107:1-13.  Mr. Daline testified that it is not unusual for reports to list companies that are both competitors and potential customers.  *Hr'g Trans*. [#71] 63:3-16.  DarkOwl was not on those lists.  *See* Tr Exs.345, 347, 349.

111.  Other companies in the cybersecurity industry (or potentially in it) include the word "Owl" as part of their trademarks or company names, including Owl Cyber Defense, SECUREOWL, OWLCHECK, REDOWL, STREET OWL, and OWL SCAN.  *Tr. Trans*. [#92] 112:22-123:1; Trial Exs. 103, 105, 106, 107, 109, 113, 115, 117, 120, 128, 130.  ArkOwl does not claim exclusive rights to the word "owl."  *Tr. Trans*. [#92] at 123:9-11.  Third-party marks containing the term "Owl" on the Principal Register of the United States Patent and Trademark Office ("USPTO") for cybersecurity-related and/or fraud

detection services include, for example, OWL CYBER DEFENSE (Reg. No. 5409019), SECUREOWL & Owl Design (Reg. No. 5894589), OWLCHECK (Reg. No. 6442218), and OWLPAY (Reg. No. 6903087). Tr. Exs. 103, 105, 110, 111, 113, 127, 128, 130.

112. ArkOwl did not run a trademark search to see what other owl marks may exist on the register before filing its first trademark registration. *Tr. Trans*. [#92] 112:18-21.

113 DarkOwl's business is a small niche in the cybersecurity industry. *Hr'g. Trans*. [#71] 98:12-19; *Tr. Trans*. [#93] 266:2-11.

114. Only a handful of other companies provide similar darknet data services as DarkOwl and compete with DarkOwl. *Hr'g Trans*. [#71] 98:15-17. DarkOwl's primary competitors are Cybersixgill and Webbs in Israel, Searchlight Cyber based out of the United Kingdom, and Bluestone Analytics in the United States. *Id*. 101:16-23.

115. None of DarkOwl's competitors provide PII services. DarkOwl's competitors provide similar dark net data intelligence services to similar clients as DarkOwl. *Hr'g Trans*. [#71] 101:24-102:6.

116. DarkOwl does not operate in the "payments" space. *Tr. Trans*. [#93] 256:20-22.

117. ArkOwl competes with other companies that provide PII verification services, i.e, those companies that are providing inputs and outputs for email addresses. *Hr'g Trans*. [#71] 41:21-42:5.

118. ArkOwl's main competitors are Ekata, PIPL, LexisNexis, SEON, and Email Hippo, which provide PII verification services. *Hr'g Trans*. [#71] 41:6-42:23.

119.    Mr. Turnage testified that he does not consider ArkOwl to be a direct competitor of DarkOwl.  *Hr'g Trans*. [#71] 102:6-9.[5]  This is because not a single DarkOwl customer could get from ArkOwl what it gets from DarkOwl, and not a single customer of ArkOwl could get from DarkOwl what it gets from ArkOwl.  *Id.* [#71] 102:11-103:3   In other words, DarkOwl and ArkOwl's offerings cannot be substituted for each other.  *Id.*

120.    ArkOwl received a solicitation from a website vendor who suggested a "partnership for one of our clients with your website darkowl.com."  *See* Tr. Ex. 25.

121.    Mr. Daline also described an interaction at the Merchant Risk Council conference with an individual who he said was with the U.S. Postal Service ("USPS").  *Tr. Trans*. [#92] 92:18-21.  The individual claimed to be using ArkOwl's service 3,000-5,000 times each day.  *Id.*  Eventually, after some discussion, the individual asked "You guys are DarkOwl, right?"  *Id.* 93:4-11.  The USPS is not an ArkOwl client, but Mr. Daline testified that he believed it could be a prospective client.  *Id.*  On cross-examination, Mr. Daline testified that the person was actually an employee of the United States Postal Inspection Service ("USPIS"), that he did not know the difference between the USPS and the USPIS, and that the USPIS is not a customer of ArkOwl.  *Id.* 148:18-149:1.  ArkOwl does not have any documentation of this encounter.  *Id.* 149:15-17.

## II.  Conclusions of Law

### A.    Jurisdiction and Venue

1.    The Court has personal jurisdiction over the parties.

2.    Subject matter jurisdiction lies with this Court pursuant to 28 U.S.C. §§1331, 1332, and 1338(a) & (b) and 15 U.S.C. §§1119 and 1121.

---

[5] While the transcript refers to "correct" competitor", the Court construes from the context that the question and related testimony is referring to a "direct" competitor.

3.      Venue is appropriate in this Court under 28 U.S.C. § 1391(a), (b), and (d).

**B.      Trademark Infringement Generally**

4.      To prevail on its claim of trademark infringement, ArkOwl must prove (1) ownership of a valid and protectable trademark, and (2) that DarkOwl's use of its trademarks is likely to cause confusion or mistake.  15 U.S.C. §§ 1114(1)(a); 1125(a).  Thus, a party claiming trademark infringement must establish it owns a mark and that the junior user's use of a similar mark is likely to generate consumer confusion in the marketplace.  *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1238 (10th Cir. 2013).

5.      Here, ArkOwl has a valid and protectible trademark.  It owns the rights to the word mark ArkOwl, for which it has a federal trademark registration, Reg. No. 6036746.  Even though ArkOwl registered its word mark after DarkOwl's registration of its marks, ArkOwl acquired the rights to enforce its mark as well as the ArkOwl angry owl design marks by continuous use of the marks in commerce beginning in 2012.  *Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, 909 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce.  The party who first uses a mark in commerce is said to have priority over other users.").  Those rights extend to all areas in which the mark was first used.  *Okla. Bev. Co. v. Pepper Love Bottling Co.*, 565 F.2d 629, 633 (10th Cir. 1977).

6.      By September 20, 2017, when DarkOwl adopted its mark, ArkOwl had established a market presence online that effectively reached the entire the United States.  Its services are provided entirely virtually, and it had clients using its online products from every state.

7.      The parties acknowledge that all of the parties' claims, including DarkOwl's claims for a declaratory judgment of noninfringement and the validity of DarkOwl's marks and ArkOwl's infringement and cancellation counterclaims, turn on the "likelihood of confusion" analysis.   "Likelihood of confusion forms the gravamen for a trademark infringement action."  *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999) (citing 15 U.S.C. §§ 1114(1), 1125(a)).  The Supreme Court has held that district courts should apply the same standards for likelihood of confusion in the contexts of infringement and cancellation, stating, "[t]here is no reason to think that the same district judge in the same case should apply two separate standards of likelihood of confusion."  *B & B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 154 (2015).

8.      The Tenth Circuit applies the following six non-exhaustive factors that courts balance to determine whether there is a likelihood that consumers will be confused by the use of a trademark: (1) the degree of similarity between the marks; (2) the strength or weakness of the marks; (3) the intent of the alleged infringer in adopting its mark; (4) evidence of actual confusion; (5) similarity of products and manner of marketing; and (6) the degree of care likely to be exercised by purchasers.  *King of the Mountain*, 185 F.3d at 1089-90.

9.      "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors."  *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 554 (10th Cir. 1998) (internal citation omitted).

10.     The factors are not to be applied mechanically; courts can and should consider other facts that might be probative of the likelihood of confusion in the context of the dispute.  *1-800 Contacts, Inc.*, 722 F.3d at 1243-44.  "[T]he weight of any given

factor can depend very much on context," and "when certain facts are more probative than others . . . those facts may dominate the analysis." *Id*. at 1243 (citing cases).

11.    "What is required for a claim of trademark infringement under the Lanham Act is a likelihood of confusion, not merely the possibility of confusion." *Water Pik, Inc. v. Med-Systems, Inc*., 726 F.3d 1136, 1150-51 (10th Cir. 2013).  In every case, "the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'"  *Heartsprings*, 143 F. 3d at 554 (quoting *Two Pesos, Inc. v. Taco Cabana*, Inc., 505 U.S. 763, 780 (1992)).

12.    It is ArkOwl's burden to show a likelihood of confusion. *See, e.g., Vail Assocs., Inc. v. Vend-Tel-Co., Ltd*., 516 F.3d 853, 872 (10th Cir. 2008); *Universal Money Centers, Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1530 (10th Cir. 1994) ("party alleging infringement has the burden of proving likelihood of confusion") *Nutraceutical Corp. v. Affordable Naturals, LLC*, 2017 WL 45647 39, *5 (D. Utah October 11, 2017) (same for party seeking trademark cancellation).

13.    Consumer confusion can arise prior to sale (in initial interest), at the point-of-sale, or in post-sale contexts.  *Affliction Holdings, LLC v. Utah Vape or Smoke, LLC*, 935 F.3d 1112, 1114 (10th. Cir. 2009).

14.    Initial interest confusion "results when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark.  *1-800 Contacts, Inc.*, 722 F.3d 1229, 1239 (10th Cir. 2013) (citing *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1238 (10th Cir. 2006)).  "Courts are most likely to apply the doctrine of initial interest confusion doctrine in circumstances involving directly competing products.  *Epic Sys. Corp. v.*

*YourCareUniverse, Inc.,* 244 F. Supp. 3d 878, 902 (W.D. Wis. 2017) (citing cases); *see also Bd. Of Regents of Univ. of Houston v. Houston College of Law, Inc.*, 214 F. Supp. 3d 573, 601 n. 157 ("[c]ourts have repeatedly found direct competition between the parties to be particularly relevant to claims of initial interest confusion") (citing cases).  Post-sale confusion is generally designed for cases involving knock-off products-that is, replica goods of inferior quality.  *See Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc*., 402 F. Supp. 2d 1312, 1334-35 (D. Kan. 2005).

15.    The same six factors regarding likelihood of confusion apply regardless of the type of confusion.  *Cf. King of the Mountain*, 185 F.3d at 1090; *Australian Gold, Inc;.*, 436 F.3d at 1239-40.

**C.    Likelihood of Confusion Analysis**

### 1.  The Degree of Similarity Between the Marks[6]

16.    The degree of similarity between the marks rests on "sight, sound, and meaning."  *King of the Mountain*, 185 F. 3d at 1039.  As the Tenth Circuit more fully described the analysis, courts should consider the "degree of similarity" in the marks' "(i) appearance; (ii) pronunciation of the words used; (iii) verbal translation of the pictures or designs involved; (iv) suggestion."  *Beer Nuts, Inc. v. Clover Club Foods Co*., 711 F.2d 934, 940 (10th Cir. 1983) ("*Beer Nuts I*").  Similarities between marks "are to be weighed

---

[6]  This factor is relevant to the word marks ArkOwl and Darkowl because the Court found that ArkOwl owns the mark and has been using it since 2012.  As to the design marks at issue, ArkOwl asserts that DarkOwl chose a design mark nearly identical to the angry owl marks used by ArkOwl before 2019 (Proposed Findings of Fact and Conclusions of Law [#94] ¶ 39; *see also Counterclaims* [#17] ¶ 35), as shown below



These are the design marks that ArkOwl is claiming were infringed.

more heavily than differences." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986) (*Beer Nuts II*").

17.     These factors must be examined "in context of the marks as a whole as they are encountered by the consumers in the marketplace." *King of the Mountain,* 185 F.3d at 1039 (citing *Beer Nuts II*, 805 F.2d at 925). "[T]he court is not free to give dispositive weight to any one component of the marks, such as a shared syllable." *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014).

18.     Thus, in determining the degree of similarity, the marks must be considered "in their entireties," including "design features, visual appearance to the consumer, meanings of the marks, and how the marks sound." *See* 3 McCarthy on Trademarks and Unfair Competition § 23:43 (5th ed. 2023); *Hornady*, 746 F.3d at 1002 (stating that the court should "consider the effect of marketplace presentation, including lettering styles, logos, and coloring schemes").

19.     The Court now turns to the similarity between the DarkOwl and ArkOwl word marks. DarkOwl's word mark is nearly identical in appearance to ArkOwl's word mark. Both marks include the word "Owl", which is capitalized, and the term "arkOwl." The only difference between the words is the letter "D" at the beginning of DarkOwl; otherwise, they are identical in terms of the letters used as well as the capitalized "O" in the middle of each word. *See, e.g.,  Altira Grp. Ltd. Liab. Co. v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1198 (D. Colo. 2002) (finding "Altira" and "ALTRIA" are visually similar); *E.I. Dupont de Nemours & Co. v. Yoshida Intern., Inc.*, 393 F. Supp. 502 (D.C.N.Y. 1975) (stating that "there can be no doubt that EFLON, formed by elimination of the first letter of TEFLON, leaves the two words very similar in sound and appearance.")

20.    The word marks differ, however, in that DarkOwl's mark begins with the word "Dark" whereas ArkOwl's mark begins with the word "Ark." The marks thus do not appear as darkowl/arkowl or darkOwl/arkOwl. The word "dark" is also unrelated to "ark," other than that they rhyme. Nonetheless, neither ArkOwl nor DarkOwl markets its services using only a portion of the mark, such as "Dark," "Ark," or "Owl." The Court finds, when viewing the word marks in their entirety, that the similarities outweigh the differences and that the marks are very similar in appearance.

21.    There is also a similarity in sound. While the Court finds that the "duh" sound of the D at the beginning of the mark DarkOwl is distinctive from the "ah" sound at the beginning of the mark ArkOwl, particularly when the words are spoken at a moderate rate of speed and clearly enunciated, the Court also recognizes that when the words are spoken in a faster conversation where enunciation may not be as clear, the "duh" sound at the beginning of "DarkOwl" could be lost in a conversation, eliminating any aural difference between the words. *See Altira*, 207 F. Supp. 2d at 1199 ("One can easily imagine that these names [Altira and ALTRIA] would be uttered in business transactions or discussions conducted over the telephone. Clearly, the similarity of their sound would make them very difficult to distinguish in that context.")

22.    Finally, as to their meaning, Arkowl asserts that when considered in their entirety, both marks are made-up, fanciful words with no particular meaning or suggestion, and "meaningless words are more easily confused." *Altira*, 207 F.Supp.2d at 1199. "[W]ith coined words which are meaningless so far as the English language is concerned, slight variations in spelling or arrangement of letters are often insufficient to direct the buyer's attention to the distinction between marks." *Id*. at 1198.

23.     The Court does not necessarily agree with DarkOwl that the marks are meaningless.  While there is no space between the words Dark/Ark and Owl in the word marks, the Court nonetheless finds that a reasonable person could attribute meaning to the marks.  Both marks have reference to an owl, and the beginning of the word mark could be read to describe a characteristic of the owl.  "DarkOwl" could thus be conceived as a reference to a dark-feathered owl in nature.  While less clear, the ArkOwl mark still obviously has reference to an owl, and when combined with the "ark" portion of the mark, it could mean an owl that affords protection and safety.  *See https://www.merriam-webster.com/dictionary/ark* (defining "ark" to include something that affords safety and protection); *see also https://www.merriam-webster.com/dictionary/arc* (defining an arc as a curved path, e.g., to follow an arc-shaped course, or in the ArkOwl context, an owl that follows a curved path).

24.     Even though the Court disagrees with DarkOwl as to the meaning component, the Court finds based on the sight and sound of the word marks that the first factor, similarity of the word marks, favors ArkOwl.

25.     The parties also ask the Court to analyze the similarity between DarkOwl's design mark  and ArkOwl's angry owl marks used before 2019:

26.     Again, there is a similarity of the marks in that they both can be read to include the term "ARKOWL" in capitalized letters and both have the picture of an eye of

a bird in the mark.  At first glance and without closer inspection, a reasonable person might believe that they are similar and are meant to represent the same company. However, there are differences that mitigate this.  The pictorial reference to an owl in the DarkOwl mark consists of just the outlined head of an owl with one eye, and replaces the O in that mark, unlike in the ArkOwl marks.  ArkOwl's symbol of an owl features more of the face of the owl, and does not focus as much on the eye itself.  Both marks, however, have one eye, although they are different in their appearance.  As to the first ArkOwl design pictured at the left in Paragraph 25, the image of the owl is at the beginning of the mark, whereas the image of the owl eye in the DarkOwl mark is in the middle of the word. As to the ArkOwl mark with the owl image in the middle of the mark, it is very light in color whereas the image of the owl eye in the DarkOwl mark is in bold and a much more prominent feature of the mark.  The design marks of the parties are also in a different font, and the "Owl" portion of the ArkOwl mark is in bold unlike the DarkOwl mark.

27.     Nonetheless, the Court does "not engage in a ''side-by-side' comparison" because consumers typically do not engage in such a comparison. *King of the Mountain*, 185 F.3d at 1090 (quoting *Universal Money Centers, Inc.*, 22 F.3d at 1531); *Heartsprings, Inc.*, 143 F.3d at 554-55.  "Rather, the court must determine whether the alleged infringing mark will be confusing to the public when singly presented.  *King of the Mountain*, 185 F.3d at 1090.  The Court must give the similarities of the marks more weight than the differences.  *Id.*  Given the fact that both parties' design marks reference an owl or bird and both have the term "arkowl" as part of the mark, the Court finds that the design marks would likely stimulate the same mental reaction in a consumer.  *Id.* (citing *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 68, 973 (D. Colo. 1997)).

Accordingly, the Court finds that a reasonable consumer could find that the design marks are similar.

28.     The first factor thus weighs in favor of ArkOwl and a likelihood of confusion. The factors, are, however, interrelated, and the importance of any factor can depend on the impact of another.  *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1079 (10th Cir. 2023).  Accordingly, the Court turns to the remaining factors.

### 2.  The Strength or Weakness of ArkOwl's Mark

29.     Under the strength factor, a stronger mark warrants broader protection. *Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F.Supp.2d 1216, 1226 (D. Colo. 2001); *Affliction Holdings,* 935 F.3d at 1115.  In assessing the strength of a trademark, both conceptual and commercial strength should be considered.  *King of the Mountain*, 185 F.3d at 1093.

30.     Conceptual strength refers to how distinctive a mark is.  *King of the Mountain*, 185 F.3d at 1093.  "Under the conceptual strength prong, the categories, in descending order of strength, are" fanciful; arbitrary; suggestive; descriptive; and generic*." Big O Tires, Inc.*, 167 F. Supp. 2d at 1226.  "'Fanciful' marks consist of 'coined' words that have been invented or selected for the sole purpose of functioning as a trademark." *King of the Mountain Sports, Inc.*, 185 F.3d at 1093.  "Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." *Big O Tires*, 167 F. Supp. at 1226.  "Suggestive marks are those that suggest some quality or ingredient of the goods." *Id.*

31.     ArkOwl asserts that its mark is either fanciful or arbitrary and is thus strong conceptually.  *See Proposed Findings of Fact and Conclusions of Law* [#94] ¶ 29.  The Court agrees that the ArkOwl mark is quite strong conceptually, although the Court finds from the evidence that the mark is arbitrary rather than fanciful. [7]  Both the words "ark" and "owl" are in common linguistic use and the symbol in the angry-owl marks is readily recognizable as an owl.  However, the Court finds that when used with the goods or services at issue, the words in the "ArkOwl" mark do not suggest or describe any ingredient, quality, or characteristic of ArkOwl's services.[8]  Accordingly, the Court finds that the ArkOwl mark is conceptually strong.

32.     The Court now turns to the commercial strength of the ArkOwl mark. Commercial strength refers to the mark's level of recognition in the marketplace.  *Water Pik, Inc. v. Med-Systems, Inc*., 726 F.3d 1136, 1151 (10th Cir. 2013); *King of the Mountain*, 185 F.3d at 1093.  "Evidence of a mark's commercial strength can make up for

---

[7]  While ArkOwl states that DarkOwl's counsel conceded at trial that the ArkOwl mark is fanciful, that is not entirely accurate.  Counsel for DarkOwl was asked by the Court whether DarkOwl agreed with ArkOwl's counsel that the mark was fanciful.  DarkOwl's counsel responded that the mark was made up of two independent terms, one of which was suggestive and the other arbitrary, and that he *was not sure* whether the entire term would be considered fanciful.  *Tr. Trans.* [#93] 320:5-112 (emphasis added).  DarkOwl's counsel also stated, however, that he did not have any authority at that time to dispute that the mark was fanciful.  *Id.*  In any event, ArkOwl now concedes that its mark could be either fanciful or arbitrary, as stated in its Findings of Fact and Conclusions of Law [#94].

[8]  The Court notes that despite this finding, there is evidence to suggest that both the DarkOwl mark and the ArkOwl mark could be deemed suggestive rather than arbitrary, although this does not change the result of this Order.  As discussed in the Findings of Facts, *supra*, Mr. Daline testified that the term "owl" in the ArkOwl mark was suggestive of the type of services that ArkOwl provides in terms of what ArkOwl's data is used for, i.e., to stop and prevent fraud.  Tr. Trans. [#92] 108:5-23.  Similarly, Mr. Turnage testified that the DARKOWL mark is intended to convey to customers an insight into what the company does.  "Dark" is meant to reference DarkOwl's darknet services, and "Owl" refers to DarkOwl's ability to "see into the darknet."  *Tr. Trans.* [#93] at 237:11-12.  In further support of this, there is evidence that the word "owl" is used in a number of cybersecurity companies.  The Tenth Circuit has indicated that the line between arbitrary and suggestive may be difficult to distinguish.  *King of the Mountain*, 185 F.3d at 1093.

conceptual weakness because a conceptually weak mark may become strong by virtue of acquired consumer awareness." *Water Pik, Inc.*, 723 F.3d at 1153. "By the same token, a mark with conceptual strength may ultimately be weak if its commercial strength is negligible." *Id.*

33.    The Tenth Circuit has identified "direct evidence, such as consumer surveys or testimony from consumers," as helpful in evaluating commercial strength. *Water Pik*, 726 F.3d at 1154. The consumer survey that ArkOwl sought to introduce was excluded by the Court. *See* Order on Motion to Exclude Evidence and Testimony [#73]. Accordingly, no direct evidence of commercial strength (or actual confusion) through a survey was presented in this case. In the absence of such evidence as to commercial strength, courts consider the mark holder's efforts to advertise the mark, including evidence tying such advertisements to an effort to promote the mark in the public's mind. *Id.* Evidence that the senior user's products have millions of users and that the products were sold through well-known retailers does not inform a court whether the sales were stimulated by the mark and are thus not generally sufficient evidence to show commercial strength of a mark. *Water Pik, Inc.*, 726 F.3d at 1154-55.

34.    The evidence (through, for example, the Google Analytics reports) showing thousands of users accessing the ArkOwl website prior to August 2017, and that consumers are interacting with ArkOwl's service (and mark) thousands, or even tens of thousands, of times each day, demonstrates some commercial strength of the word mark, but is not sufficient alone to establish that the ArkOwl marks are commercially strong. *Water Pik, Inc.*, 726 F.3d at 1154-55; *see also Bose Corp. v. QSC Audio Products, Inc.*, 293 F.3d 1367, 1375 (Fed. Cir. 2002) ("[r]aw numbers of product sales and advertising

expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading. . . . the sales and advertising numbers for ACOUSTIC WAVE and WAVE have to be seen both in the context of how the products are presented in the advertising and sales material").

35.      Here, the evidence showed that ArkOwl promotes primarily through word of mouth, and spends very little money on advertising (about $10,000 to $15,000 a year). Further, ArkOwl's revenue is modest.  *Tr. Trans*. [#92] 129:17-130:13. These facts mitigate against the commercial strength of the mark, as does the fact that there a number of third-party marks containing the word "owl" in the cybersecurity industry and on the Principal Registry of the USPTO for cybersecurity-related and/or fraud detection services. Third-party registrations are "relevant to prove that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak." *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 654 (10th Cir. 1996) (emphasis added) (quoting 1 McCarthy, McCarthy on Trademarks and Unfair Competition § 11.27[2][b] (3d ed. 1995)).  The Court finds from the foregoing that the commercial strength of the ArkOwl mark is not very strong.

36.      In conclusion, the conceptual strength of ArkOwl's mark is strong, which weighs in favor of ArkOwl and a likelihood of confusion.  This is mitigated by the fact that the commercial strength of ArkOwl's marks is more limited.  Balancing the strong conceptual strength of the ArkOwl word mark with the limited commercial strength, the Court finds that this factor, at most, weighs only slightly in favor of ArkOwl and a likelihood of confusion.

#### d.  The Intent of DarkOwl In Adopting Its Mark

37.     The proper focus under the intent factor "is whether [DarkOwl] had the intent to derive benefit from the reputation or goodwill of [ArkOwl]."  *King of the Mountain*, 185 F.3d at 1091.  Proof that the alleged infringer chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion.  *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).  "The alleged infringer's intent is measured at the time it 'chose' or 'adopted' its mark."  *Hornady*, 746 F.3d at 1004 (emphasis added).  "In analyzing intent, we look to evidence of 'the process of choosing' a mark, not evidence of events subsequent to its adoption."  *Id.*  (emphasis added) (citing *Water Pik, Inc.*, 726 F.3d at 1159).

38.     Here, ArkOwl concedes that it has no direct evidence that DarkOwl intended to infringe.  *Proposed Findings of Fact and Conclusions of Law* [#94]  at 33, ¶ 35.  The Court agrees, finding no evidence that DarkOwl intended to derive benefit from the reputation or goodwill of ArkOwl, or that it chose to copy ArkOwl's marks.  The evidence presented at trial shows that DarkOwl did not know of ArkOwl when it designed its marks, and there is no evidence that it ever saw ArkOwl's marks when it designed its own marks.

39.     ArkOwl argues, however, that evidence of the commercial strength of ArkOwl's mark and the similarity between the parties' marks at the time DarkOwl's marks were adopted suggest that DarkOwl was or should have been aware of ArkOwl when it adopted its marks. *Proposed Findings of Fact and Conclusions of Law* [#94] at 33, ¶ 34. ArkOwl further asserts that DarkOwl's two founders are experienced in business and took care in their business decision.  The founders testified they searched for other conflicting marks, but ArkOwl asserts that the details of those searches were not disclosed.  *Id.*  The

Court rejects ArkOwl's argument, finding that the evidence does not suggest that DarkOwl was or should have been aware of ArkOwl when it designed its marks.  The evidence, in fact, suggests the opposite.

40.     As discussed in the Findings of Fact, *supra*, the word "owl" and the pictorial image of the owl eye in the DarkOwl design mark were part of the bankruptcy estate of a company that DarkOwl's founders purchased in 2016 which went by the acronym "OWL", which Darkowl incorporated into its mark.  DarkOwl thus did not design the figurative owl or owl eye that forms the O in the DarkOwl mark; it was designed by someone at the company that DarkOwl purchased.  *Tr. Trans.* [#93] 234:5:19.

41,     DarkOwl also presented evidence that its mark is intended to convey to customers an insight into what the company does.   "Dark" is meant to reference DarkOwl's darknet services, and "Owl" refers to DarkOwl's ability to "see into the darknet." *Tr. Trans*. [#92] 237:11-12.  The word "dark" was DarkOwl's major focus in adopting its mark.  Mr. Turnage testified that there was no aspect of the DarkOwl mark that was intended to reference the word or concept "Ark."  *Id*. at 237:7-9.  Moreover, given the fact that ArkOwl was not very strong commercially, and the parties are in different markets as discussed in the next section, there is no reason to believe that DarkOwl would have been familiar with ArkOwl or its marks.

42.     As to DarkOwl's search in connection with the mark, DarkOwl testified that it searched the word "dark" and the word "owl."  The Court finds that since the focus was on the word "dark," it was reasonable for DarkOwl to not search for the word "ark" or the term "arkowl."   In contrast, ArkOwl did not even search for the term "ark" before it registered its marks.  Moreover, even if DarkOwl had conducted a search for "ark" or

"arkowl" through the Registry of the USPTO, it would not have located these marks because ArkOwl had not yet registered its mark.  The Court finds from this that DarkOwl came up with its name and mark on its own, and there is no evidence to the contrary.

43.    The Court thus rejects any inference suggested by ArkOwl that DarkOwl was attempting to copy ArkOwl's marks when DarkOwl adopted its name and marks.

44.    Based on the foregoing, the Court finds that this factor favors DarkOwl and weighs against a likelihood of confusion.

### e.  Evidence of Actual Confusion

45.    "Although a plaintiff need not set forth evidence of actual confusion to prevail in a trademark infringement action, . . . '[a]ctual confusion in the marketplace is often considered the best evidence of a likelihood of confusion.'"  *King of the Mountain*, 185 F.3d at 1092 (quotation omitted).  The standard for actual confusion is not "merely the possibility of confusion" but "likelihood of confusion."  *Id*. (citing 4 McCarthy on Trademarks and Unfair Competition § 23:43 (4th ed. 2013) (emphasis in original)).

46.    Here, ArkOwl presented evidence of a few instances of confusion.  ArkOwl's customer Apruvd received a solicitation from Cience on behalf of DarkOwl and asked whether it was related to ArkOwl.  ArkOwl also presented evidence that it was approached by a purported DarkOwl customer, USPIS, at a trade show, believing that ArkOwl was DarkOwl.  Finally, ArkOwl received a solicitation intended for DarkOwl.  The Court finds that these three instances of actual confusion are de minimis.  *See Hornady Mfg. Co, Inc.*, 746 F.3d at 1144 (finding that three instances of evidence cited to show actual confusion were de minimis); *Water Pik, Inc.*, 726 F.3d at 1151 (finding that four instances of consumer confusion were de minimis); *King of the Mountain*, 185 F.3d at

1092 (finding that seven examples of actual confusion, amounting to only a "handful of anecdotal evidence" were de minimis).

47.    Moreover, inquiries about the relationship between an owner of a mark and an alleged infringer is entitled to little weight as to actual confusion.  *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*; 828 F.2d 1482, 1487 (10th Cir. 1987); *see also Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 398 (2d Cir. 2021).  Here, the instances of confusion DarkOwl references, and more particularly the encounter with the USPIS employee and the solicitation to ArkOwl, do not appear to relate to a consumer purchase or inquiry where a consumer is confused between the two companies.  *See Heartsprings*, 143 F.3d at 557 ("[t]o be relevant . . . evidence should demonstrate actual confusion among consumers within the marketplace").

48.    The Court finds from the foregoing that this factor weighs in favor of DarkOwl and against a finding of likelihood of confusion.

### 5.  Similarity of Products and Manner of Marketing

49.    Generally, "'[t]he greater the similarity between the products and services, the greater the likelihood of confusion.'"  *Heartsprings, Inc.*, 143 F.3d at 556-57 (quotation omitted).  Additionally, "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion."  *Id.*

50.    Where there is not much overlap in the marketing approaches of the two parties, the likelihood of confusion is lower.  *Heartsprings*, 143 F.3d at 556. "The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks."  *Id.*

51. The Court adopts its holding from the Order on Motion to Exclude Evidence and Testimony [#73] that ArkOwl has not established that the parties are direct competitors, meaning that they do not compete for the same business. *See Order* [#73] at 22-25 and the evidence cited therein. Direct competition is not, however "'*sine qua non* for this factor* because trademark rights extend to 'non-competing but related' goods.'" *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 872 F. Supp. 2d 1154, 1162 (D. Colo. 2012) (quoting *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831, 833-34 (10th Cir. 2005) (internal quotation marks omitted)). "Under the related goods doctrine, the appropriate inquiry is whether the goods and services of the parties are related in the minds of consumers, not whether the goods and services are directly competitive." *Id.* "This issue 'is not limited as to confusion of consumers as to the source of goods, but also includes confusion as to sponsorship or affiliation.'" *Id.* (quoting *id.* at 835). Thus, confusion can exist if consumers believe that an affiliation or sponsorship exists between the parties. *Id.* (citing *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999*)* ("[T]he focus is on whether the consuming public is likely somehow to associate [the infringer's] products with [the senior user's products].")).

52. As the Federal Circuit stated, similarity of the marks and relatedness of the goods and services are often interdependent. *Nautilus Group, Inc. v. ICON Health and Fitness, Inc.*, 372 F.3d 1330, 1345 (Fed. Cir. 2045). "For example, if a consumer encounters two related goods or services within the same market, less similarity between the marks would be required for confusion of that consumer to be likely." *Id.* "On the

other hand, even if two marks are identical, if they are encountered in different contexts, the consumer can often easily distinguish between the two products." *Id*.

53.     Here, the Court acknowledges that the parties may compete in the broader sense of the word, and that there is some competitive proximity between the parties.  Both DarkOwl and ArkOwl are in the field of cybersecurity and offer SAS data, including PII data, that is indexed and can be searched by its customers.  DarkOwl's structured database, as with ArkOwl's database, is set up to return near instantaneous results that would include data pertaining to email addresses and domain, including data associating those inputs with names, phone numbers, and social media accounts.  Further, both companies primarily sell to cybersecurity service providers and fraud prevention platforms.

54.     ArkOwl also offered evidence, as discussed in the Findings of Fact, *supra*, that DarkOwl (through a third-party, Cience) sent email blasts to two of its customers, and that DarkOwl's marketing documents created by Mr. Williamson included as targets ArkOwl customers and/or competitors who do PII verification.  Further, ArkOwl offered evidence that DarkOwl is constantly searching for new use cases to accommodate market changes.

55.     Despite the evidence offered by ArkOwl, the Court finds that the consuming public would not be likely to associate DarkOwl's products with ArkOwl's products because the services are different and would generally not be encountered within the same marketplace.

56.     Thus, ArkOwl is fairly characterized as an identity and verification service provider, and its main focus is PII verification and validation.  ArkOwl helps its customers

verify PII, including email addresses, phone numbers, IP addresses, physical addresses, and personal name matches.  In fact, ArkOwl's website, www.arkowl.com, prominently features the statement "Verify Email addresses and Phone Numbers in Real-Time" at the top of the home page.  ArkOwl provides services in the purchasing sector, and Mr. Daline of ArkOwl testified that he is not aware of any customers in the United States using ArkOwl's data for anything other than supporting online purchase transactions.  Additionally, ArkOwl does not, and has never, accessed the dark web directly and does not directly provide dark web data or services to its customers.  While it does provide breach data through another company, which will say where the data was found, including the dark web, breach data and dark web data are not the same.  Further, the breach data is not further investigated by ArkOwl for risk assessment, as DarkOwl does.  ArkOwl's marketing materials also do not promote any dark web specific services, other than the breach data discussed previously.  ArkOwl provides only raw data in connection with, for example, stopping the threat of a fraudulent purchase online, and does not provide any analytical services or anything beyond the data if a fraud is discovered.  ArkOwl also does not provide passwords as part of its data outputs.

57.    In contrast, DarkOwl provides dark web data to its customers.  DarkOwl monitors the dark web for emerging threats and has built a platform for its customers to access this dark web data.  DarkOwl's services include threat intelligence, third-party risk, cybersecurity underwriting, digital ID protection, fraud protection, critical infrastructure, and national security, and these services do not include PII verification.  The nature of the data DarkOwl provides is highly sensitive and complex.  DarkOwl's business is a small niche in the cybersecurity industry, and only a handful of other companies provide similar

darknet data services and compete with DarkOwl.  Mr. Turnage testified that DarkOwl's business has no relationship to approving a commercial transaction in real time or providing PII verification, and it does not provide services in the payment sector.  Mr. Turnage also testified that he was not aware of any instance in which somebody expressed interest in purchasing PII verification services from DarkOwl, and Darkowl would not be able to provide this data.

58.     Further, according to Mr. Turnage, DarkOwl's platform and dark web database are not set up to provide PII verification services.  Not a single data point that is supplied by ArkOwl is supplied by DarkOwl – it does not have that information and DarkOwl's clients are not interested in that data.  While, for example, customers can search an email address on the darknet through DarkOwl, Mr. Turnage testified that its customers would not get an indication as to whether the address resides on the darknet and, even if they did, they are not interested in that data.  Instead, DarkOwl's customers are interested in knowing what is around that email address, e.g., is there a password associated with it or does it contain personal information that a customer would not want revealed, such as of an FBI agent.

59.     While ArkOwl asserts that the parties are both in the cybersecurity industry and advertise fraud protection relevant to PII, the Court finds persuasive the testimony from Mr. Turnage that the cybersecurity industry is very broad, and encompasses a wide variety of businesses (between 10,000 and 14,000) with an immense diversity of services and technologies.  Not all services and technologies under the cybersecurity umbrella are competitive or related.  Further, the terms "fraud prevention, "fraud protection, and "PII" are also broad terms that can mean very different things depending on the context.  The

fact that DarkOwl's services include a reference to PII data does not mean that DarkOwl provides the type of PII verification that ArkOwl does; instead, the evidence credibly demonstrates that DarkOwl does not and cannot provide such data.

60.      ArkOwl also suggests that DarkOwl's marketing efforts are always evolving and that it may venture into the PII verification business in connection with the dark web and compete with ArkOwl (if it does not already do that).  The Court finds that the evidence does not support this contention.  Mr. Turnage testified that PII verification services is not a growth area for DarkOwl because it is a commoditized industry and the price point for DarkOwl's platform would make it uncompetitive in that area.   Further, Mr. Turnage testified that DarkOwl's customers have never requested or suggested that they want to use DarkOwl's services for PII verification.  The Court finds this testimony credible and persuasive.

61.       Based on the foregoing, the Court finds that the parties' services and their target customers are quite distinct, and the parties do not compete for the same business.

62.      The parties also have different marketing styles.  ArkOwl relies primarily on word-of-mouth advertising.  ArkOwl has participated in only a single trade show, of the Merchant Risk Council, and has given a handful of presentations to industry groups. ArkOwl has never run into DarkOwl at that trade show or its presentations.  Over the last three years, ArkOwl has spent limited amounts annually on advertising ($10,000-$15,000), with the majority of that going toward attendance at the Merchant Risk Council trade show.

63.      By contrast, DarkOwl's primary method of marketing is through industry trade shows (none of which ArkOwl has participated in).  DarkOwl spends over a million

dollars a year on marketing.   Mr. Cohen testified that DarkOwl's market could be categorized as large companies that are willing to spend $100,000 for darknet information to help protect themselves.  Further, given the sophisticated nature of DarkOwl's services and customers, DarkOwl primarily engages in direct, outbound marketing to a focused group of target customers.

64.     As further evidence that the parties do not compete in the same market, the entry point for DarkOwl's services starts at about $30,000 and goes up to about $500,000 a year.  The average cost of DarkOwl's dark web data services is about $55,000-$60,000 per year.  In contrast, ArkOwl's price-per-query pricing model starts at $99.00 a month, and most of ArkOwl's revenue comes from its offer of 200,000 queries a month for $3,100.

65.   Additionally, Mr. Daline of ArkOwl was not aware of any instances where ArkOwl has lost business to DarkOwl.  Mr. Daline was also not aware of any instance where customers were using DarkOwl's services for any kind of PII verification, or where a customer was deciding between ArkOwl and DarkOwl's services or between ArkOwl and the services of a dark web provider in general.

66.     The Court acknowledges as to marketing that ArkOwl presented evidence that DarkOwl (through Cience) sent emails to two of ArkOwl's customers, and that it listed as targets in its marketing materials customers, potential customers, or competitors of ArkOwl.   Nonetheless, the Court finds persuasive DarkOwl's testimony that the emails sent to Cience did not comply with guidelines that DarkOwl had provided Cience as to the types of customers it was targeting through its use cases.  Further, as to the marketing materials that listed some ArkOwl customers or competitors as targets, DarkOwl testified that the person in charge of those materials, Mr. Williamson, was not at DarkOwl very

long and his list of potential clients was "nonsense" because it included DarkOwl's actual clients. *Tr. Trans.* [#93] 226:20-227:11. Mr. Turnage also testified that Mr. Williamson was ultimately fired because his marketing materials did not target the correct use cases, and the outbound style of marketing implemented by Mr. Williamson was an "abject failure." *Tr. Trans.* [#93] 222:11-20.  Accordingly, Mr. Turnage explained that DarkOwl has now switched back to outbound marketing consistent with its earlier practice which targets specific clients relevant to DarkOwl's use cases.  There is also no evidence that DarkOwl's sales marketing team ever reached out to the customers or competitors of ArkOwl.[9]  The Court thus finds that any emails sent to customers or competitors of ArkOwl by DarkOwl or listing of customers or competitors of ArkOwl as targets in DarkOwl's marketing materials were not based on an intent to solicit ArkOwl's customers or to obtain customers for the services provided by ArkOwl – PII verification.

67.     Based on the foregoing, the Court finds that while there is some competitive proximity between the parties' services, the markets they serve and the services provided are not similar and are, in fact, very different.  Further, the parties engage in different marketing styles.  Accordingly, the Court finds that this factor favors DarkOwl and weighs against a finding of a likelihood of confusion.

### 6.  The Degree of Care Likely to Be Exercised by Purchasers

68.     If consumers are more likely to exercise a high degree of care in deciding to purchase a product, the likelihood of confusion is reduced. *Heartsprings*, 143 F.3d at

---

[9]  Moreover, evidence was presented that even if two organizations happen to share a customer or a target customer, that does not necessarily make the organizations competitors, since a large organization uses all kinds of different services. *See Hr'g Tr.* [#71] 164:1-12.

557.  "The level of care often turns on whether consumers choose a product based on impulse or careful study."  *Elevate Fed. Credit Union*, 67 F.4th at 1072.

69.     A consumer's care generally intensifies with the importance of the product. *See Elevate Fed. Credit Union*, 67 F.4th at 1072 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 204 (3d Cir. 1995) ("The more important the use of a product, the more care that must be exercised in its selection.").  The relevant inquiry focuses on the consumer's degree of care exercised at the time of purchase.  *Sally Beauty Co.,* 304 F.3d at 975.

70.     Here, the evidence is unrefuted that DarkOwl provides its data to sophisticated cybersecurity professionals, including national intelligence and law enforcement agencies, who go through a stringent vetting and review process.  The vetting process takes, on average, 90 to 180 days, and in some cases, can take longer, and DarkOwl frequently turns away potential customers because of something that happens during the vetting process.  There is no evidence that ArkOwl has any such vetting process.

71.     Because of the complexity of DarkOwl's data, its customers must necessarily be sophisticated to understand and utilize DarkOwl's offerings.  Accordingly, the decision-maker as to DarkOwl's services is generally from the company's "C Suite" – the chief executive officer, chief financial officer, chief technology or information security officer – or high-ranking officials at national intelligence agencies.  Further, DarkOwl's largest growth sector is in services provided to government customers, including intelligence agencies.

72.     The Court finds from the foregoing that DarkOwl's customers use great care in selecting its services, particularly when the cost of DarkOwl's services is factored in. "When consumers exercise great care when choosing a product, they're less likely to experience confusion." *Elevate Fed. Credit Union*, 67 F.4th at 1072.

73.     Similarly, as to ArkOwl, Mr. Daline testified that both ArkOwl's customers and users are discerning, and that its customers normally have a higher degree of education.  ArkOwl has not presented any evidence to suggest that its customers or those of DarkOwl "commonly succumb to impulses and [the parties' products] carelessly." *Hornady Mfg. Co.*, *Inc.*, 746 F.3d at 1007.

74.     Based on the foregoing, the Court finds that this factor weighs in favor of DarkOwl and against a likelihood of confusion.

### 7.  The Weighing of the Factors

75.     While the Court has found that the first factor weighs in favor of ArkOwl, similarity of the marks cannot, alone, cannot support a finding of likelihood of confusion. Moreover, while the second factor, strength of the mark, weighs in favor of ArkOwl, the Court found that this factor weighs only slightly in favor of a finding of likelihood of confusion.  All the other factors weigh in favor of DarkOwl, and against a finding of a likelihood of confusion.

76.     The Court finds that the similarities of the marks, even combined with the conceptual strength of the mark, do not weigh very strongly in this case given the strength of the factors that weigh against a likelihood of confusion.  Importantly, the evidence shows that DarkOwl had no knowledge of ArkOwl or its marks when DarkOwl developed its marks.  Instead, DarkOwl created its marks on its own, using the word "owl" and the

pictorial image of the owl eye which were part of the bankruptcy estate of a company which was purchased in 2016.  There is thus no evidence of intent to infringe or intent to derive benefit from the reputation or goodwill of ArkOwl.  The evidence also shows that consumers exercise great care in choosing DarkOwl's services given the sensitive and complicated dark web services DarkOwl provides, and would not even be able to make a purchase without an extensive vetting process.  Similarly, the evidence shows that ArkOwl's clients are discerning and educated, and would likely take care in choosing to select ArkOwl's services.  The parties' services are not similar, the services are not competitors in the same market, and the services are marketed in different manners to customers with different needs.

77.     The Court finds from the foregoing that there is not a likelihood of confusion between the parties' marks.  *See M. Welles & Assocs., Inc. v. Edwell, Inc.*, 69 F.3d 723, 730-36 (10th Cir.2023) (finding no clear error in district court's finding of no likelihood of confusion between EDWEL, used in connection with providing classes, seminars, and certification workshops in the project management professional space, and EDWELL, used to promote a nonprofit organization dedicated to improving schoolwide mental health and wellbeing, when only two of the factors – the "nearly identical" marks between the company demonstrating a similarity and the strength of the mark – weighed in favor of a finding of confusion); *Elevate Fed. Credit Union*, 67 F.4th at 1083 (affirming finding on summary judgment that no reasonable jury could find a likelihood of confusion between the marks of Elevate Federal Credit Union and Elevations Credit Union, even though the marks were similar and the services were the same since both parties were credit unions, "based on the careful attention from the customers, the weakness of

Elevations' marks [in terms of commercial strength], the lack of Elevate's intent to benefit from Elevations' reputation, the marketing differences, and the de minimis examples of actual confusion"); *Heartsprings, Inc.*, 143 F.3d at 558 (affirming grant of summary judgment finding no likelihood of confusion between HEARTSPRINGS, used in connection with books, pamphlets, and educational materials to teach children to resolve conflicts nonviolently, and HEARTSPRING, used in connection with teaching physically-disabled children certain skills like bathing, dressing, and eating; while there was a virtual identity between the parties' trade names and the strength of plaintiff's suggestive name which would indicate a likelihood of confusion, these two factors were found insufficient to indicate a likelihood of confusion when the other relevant factors were considered).

78.  Because there is not a likelihood of confusion between the parties' marks, the Court must grant DarkOwl's request for declaratory judgment and find it did not infringe ArkOwl's trademark rights and that its federal trademark registrations are valid.  The Court must also deny ArkOwl's trademark infringement and cancellation claims.  *See Elevate Fed. Credit Union*, 67 F.4th at 1083 (affirming district court's grant of declaratory judgment of non-infringement based on finding of no likelihood of confusion); *Water Pik*, 726 F. 3d at 1160 (affirming summary judgment for alleged infringer when no genuine factual issue existed regarding likelihood of confusion); *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1081 (N.D. Cal. 2012) (summary judgment granted against cancellation claim because there was no likelihood of confusion between the parties' marks).

### III.  Conclusion and Order

Based on the Court's Findings of Fact and Conclusions of Law, finding that there is not a likelihood of confusion between the parties' marks.,

IT IS HEREBY **ORDERED** that the Court finds in favor of DarkOwl on its declaratory judgment claims that DarkOwl has not infringed ArkOwl's trademark rights, and that its federal trademark registrations are valid.

IT IS FURTHER **ORDERED** that the Court finds against ArkOwl as to its counterclaims of infringement by DarkOwl and for cancellation of DarkOwl's trademarks.

IT IS FURTHER ORDERED that judgment shall enter in favor of DarkOwl on its claims and against ArkOwl.  Judgment shall also enter in favor of DarkOwl on ArkOwl's counterclaims and against ArkOwl.

Dated: August 1, 2023

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge