# EXHIBIT

# A

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2

 3   Civil Action No. 21-cv-02163-KLM

 4   DARKOWL, LLC,

         Plaintiff,
 5

 6   vs.

 7   ARKOWL, LLC AND ARKOWL CORPORATION,

 8       Defendants.
     _____
 9

10                       REPORTER'S TRANSCRIPT
                         TRIAL TO COURT – DAY ONE
11
     _____
12
             Proceedings before the HONORABLE KRISTEN L. MIX,
13
     Magistrate Judge, United States District Court for the District
14
     of Colorado, commencing at 8:58 a.m., on the 26th day of June,
15
     2023, in Courtroom A201, United States Courthouse, Denver,
16
     Colorado.

17

18

19

20

21

22

23             THERESE LINDBLOM, Official Reporter
             901 19th Street, Denver, Colorado 80294
24         Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer
25
```

**A P P E A R A N C E S**

1

2          THOMAS LEE HOLT, JR. and JEREMY LEWIS BUXBAUM,

3    Attorneys at Law, Perkins Coie LLP, 110 North Wacker Drive,

4    34th Floor, Chicago, Illinois, 60606, appearing for the

5    Plaintiff.

6          SABRINA JOHNSON DANIELSON, Attorney at Law, Holland &

7    Hart, LLP, 555 17th Street, Suite 3200, Denver, Colorado,

8    80202, appearing for the Plaintiff.

9          MICHAEL H. FRASIER, Attorney at Law, Rubric Legal LLC,

10   111 Third Avenue South, Suite 110, Minneapolis, Minnesota,

11   55401, appearing for the Defendants.

12                          *   *   *   *   *

13                    **P R O C E E D I N G S**

14          (In open court at 8:59 a.m.)

15          *THE COURT:*  Good morning.  This is 21-cv-02163,

16   DarkOwl, LLC v. ArkOwl, LLC, and ArkOwl Corporation.

17          Let's have counsel enter their appearances, please,

18   starting with counsel for the plaintiff.

19          *MR. HOLT:*  Good morning, Your Honor.  Tom Holt, Jeremy

20   Buxbaum, and Sabrina Danielson on behalf of plaintiff.

21          *THE COURT:*  Good morning.

22          *MR. FRASIER:*  Good morning, Your Honor.  Michael

23   Frasier on behalf of Defendant ArkOwl.

24          *THE COURT:*  Good morning.

25          All right.  We are here for trial, day one of a bench

1    trial.  Is the plaintiff prepared to proceed?

2            *MR. HOLT:*  We are.

3            *THE COURT:*  And is defendant prepared to proceed?

4            *MR. FRASIER:*  Yes, Your Honor.

5            *THE COURT:*  Any preliminary matters from plaintiff?

6            *MR. HOLT:*  One thing, Your Honor.  In the opening

7    statement, there are a few slides that we would like to show

8    the Court.  I didn't know if you wanted to see those ahead of

9    time --

10           *THE COURT:*  I really don't, but I do want them to be

11   admitted in the record.

12           *MR. HOLT:*  Okay.

13           *THE COURT:*  So long as you mark it as an exhibit and

14   move to admit it and, you know, we'll see if there is an

15   objection or not.  But my preference is to have those documents

16   become part of the record.  So even if it's electronic, you can

17   submit it on a flash drive.

18           *MR. HOLT:*  Okay.  And would you like me to do that

19   beforehand or after?

20           *THE COURT:*  Why don't you do it now.

21           *MR. HOLT:*  Okay.

22           *THE COURT:*  Has defense counsel seen it?

23           *MR. HOLT:*  I have talked to him about the slides.  He

24   has not seen them yet.

25           *THE COURT:*  You intend to use these in openings?

1          MR. HOLT:  Yes.

2          THE COURT:  All right.  What I'd like you to do is

3    have you exchange those.  Are you going to do the same thing,

4    Mr. Frasier?

5          MR. FRASIER:  I have no demonstratives.  No.

6          THE COURT:  Okay.  Let me ask you to do that now, to

7    show defense counsel your slides, see if there is any

8    objection.  You can admit it prior to the opening statements so

9    that you can use it, if it's admitted, with impunity.

10          How many slides do you have?

11          MR. HOLT:  Ten slides, five of which are the

12    likelihood of confusion factors.

13          THE COURT:  All right.  Fair enough.

14          Why don't we do this -- Mr. Frasier, sorry to

15    interrupt your preparation.  Why don't we have a moment to have

16    you take a moment to look at the plaintiff's slides.  I'm going

17    to step down and ask my courtroom deputy to call me again when

18    you're ready, and then I'll hear from you whether there is any

19    objection to admitting these.

20          (Recess at 9:01 a.m.)

21          (In open court at 9:06 a.m.)

22          THE COURT:  All right.  Mr. Frasier, have you had an

23    opportunity to review the demonstratives?

24          MR. FRASIER:  Yes, I did, Your Honor.

25          THE COURT:  Is there any objection from the defendant?

1          *MR. FRASIER:*  No, Your Honor.

2          *THE COURT:*  All right.  Thank you.

3          What are you going to mark that as, Mr. Holt, so that

4     I have it for my record?

5          *MR. HOLT:*  Plaintiff's Trial Exhibit 133.

6          *THE COURT:*  133?

7          *MR. HOLT:*  Yes.

8          *THE COURT:*  All right.  Give me a moment.

9          Exhibit 133 is admitted.

10         (Exhibit 133 admitted.)

11         *THE COURT:*  As I understood it from trial preparation

12    conference, counsel has agreed that defendant will proceed

13    first.

14         With that, Mr. Frasier, if you're ready to start your

15    opening argument, I'm ready to listen.

16         *MR. FRASIER:*  Your Honor, there are a few other

17    procedural things we discussed while you were out.  We have a

18    set of stipulated facts that we'd like to offer in paper.

19         And then both parties are prepared to stipulate to

20    offer all of the exhibits for both sides, just so they're

21    already on the record.

22         *THE COURT:*  All right.  Great.  Glad to hear it.

23         In terms of stipulated facts, do you have a copy of a

24    document?  That's fine.  You can bring it right up.

25         Thank you.

1              The Court has received a document entitled "Stipulated

2    Facts," with stipulated facts numbered 1 through 17 and will

3    find that these facts have been stipulated to by counsel and

4    are deemed admitted.

5              All right.  With respect to exhibits, does somebody

6    have a motion on exhibits?

7              *MR. FRASIER:*  Yes, Your Honor.  I move to admit all

8    plaintiff and defendants' exhibits.

9              *THE COURT:*  All right.  And as I take it from the list

10   of proposed exhibits, this is a cumulative of both plaintiff's

11   and defendants'?

12             *MR. FRASIER:*  Your Honor, what we did was, to make

13   sure there is wiggle room, defendants started numbering at 301.

14             *THE COURT:*  Okay.

15             *MR. FRASIER:*  So plaintiff's I believe are 1

16   through -- now it's 133.

17             *THE COURT:*  Yes.  I have an exhibit list for the

18   plaintiff that has Exhibits 1 through 132, typewritten.  I

19   added 133, which was just admitted.  And defendants' list of

20   proposed Exhibits 301 through 424.

21             This, again, being subject to a stipulation; is that

22   right, Mr. Holt?

23             *MR. HOLT:*  That is correct, Your Honor.

24             *THE COURT:*  All right.  I will admit all of those

25   exhibits I just indicated.  Okay.

1          (Exhibits 1-132 admitted.)

2          (Exhibits 301-424 admitted.)

3          *THE COURT:*  Anything else in terms of preliminary

4    matters from the plaintiff?

5          *MR. HOLT:*  Nothing from plaintiff.

6          *THE COURT:*  Anything from defendant?

7          *MR. FRASIER:*  No, Your Honor.

8          *THE COURT:*  All right.  Mr. Frasier, please feel free

9    to begin your opening statement when you're ready.

10                        **OPENING STATEMENT**

11         *MR. FRASIER:*  Over the next few days, everyone in this

12   room is going to have to carefully enunciate "DarkOwl" and

13   "ArkOwl."  And that's because in normal conversation, the two

14   names are virtually indistinguishable.  The evidence presented

15   at trial in the next two days will also show that, visually,

16   these two marks in their entirety are nearly indistinguishable,

17   as well.  Just in terms of the spelling, we'll see only one

18   letter difference, that is easily overlooked.  Oftentimes

19   they're all caps or the first letter and then the "O" in "Owl"

20   are capitalized for both marks.  You will see that the marks

21   are presented not in plain text, but in their logos in a very

22   similar manner.

23         The evidence will also show that neither of those

24   marks as a whole has any inherent meaning and certainly doesn't

25   have any meaning with respect to the services that they

1    provide.  And to the extent that they do have any meaning, the

2    meaning is largely overlapping.  The meaning as a whole and

3    even broken down, these two marks have very similar meanings,

4    give off similar impressions to prospective purchasers,

5    prospective users, prospective referral sources, and

6    prospective clients.

7         Now, the similarity of these two marks is a paramount

8    factor in a likelihood of confusion analysis, but is certainly

9    not the only factor that the Court needs to consider.  First,

10   the evidence at trial will show that the ArkOwl mark is a very

11   strong mark.  Conceptually, it is strong, in that it has no

12   inherent meaning; it does not describe the services that ArkOwl

13   is offering.  ArkOwl, again, doesn't mean anything.  If we

14   break it down into its components, the two components have

15   meaning; but, again, they do not describe ArkOwl's services nor

16   do they even suggest what ArkOwl does.

17        The evidence will also demonstrate that ArkOwl is a

18   commercially strong mark.  The evidence will show that it is

19   recognized in the industry without any additional connotation

20   or description.  ArkOwl is used as a knowing reference to the

21   company and its services.

22        The mark, the website has been used tens of millions

23   of times by tens or hundreds of thousands of different people

24   over the course of the last twelve plus years.  And the

25   evidence will show that over the past twelve years, the -- the

1    marketing efforts, mostly by presentations and word of mouth,

2    have been very effective and that ArkOwl is known widely just

3    by its name without reference to any other mark.

4            It's also unique not just in its very particular niche

5    field with cybersecurity field, but in the broader

6    cybersecurity field, as well.  There are no other marks

7    containing "ArkOwl" except for DarkOwl.  There are no other

8    marks with a similar logo.  There are very view marks even in

9    the broader cybersecurity field that have "owl" in its name.

10   And of those, they're very distinguishable, both by their

11   look -- either they aren't a multi-syllable single word -- or

12   they have just a completely different meaning.  Or the few that

13   the plaintiffs DarkOwl will offer will show that these aren't

14   even closely related fields -- products, instead of services.

15   None -- there are no other marks in the broader field,

16   certainly nothing by a company offering software as a service,

17   as a data provider.

18           Being a unique mark and being well recognized and

19   being so heavily used will show that ArkOwl's mark is both

20   conceptually and commercially strong; and being a conceptually

21   and commercially strong mark, it is entitled to a wide

22   protection.

23           Now, we've already had some evidence on the

24   relatedness of the markets for these two companies.  And while

25   there is dispute over whether or not one of the services can be

1   directly substituted for the other, the evidence at trial will

2   demonstrate that these two companies are in overlapping

3   markets, regularly likely to interact with the same types of

4   companies, the same types of people.

5        Certainly, when we look back through the history of

6   these two companies, they may have both started very focused in

7   a very niche area; but the evidence at trial will show that

8   both of these companies have broadened their services in a way

9   that is making it much more overlapping -- overlapping now, and

10  likely to become much more overlapping in the future.

11       Both companies are software-as-a-service companies,

12  offering the same type of data to the same types of potential

13  customers, used by the same types of people.  The evidence will

14  show that they've already crossed paths a few times,

15  interacting with the same customers.  The evidence will also

16  show that ArkOwl's core market, its most important customers,

17  are the exact type of businesses that DarkOwl targets.

18       Now, even if these services can't be directly

19  substituted, the fact that they are so similar and ArkOwl is

20  such a strong mark, the fact they are likely to be encountered

21  by the same people in the same types of environments leads to

22  the inevitable conclusion that there is a likelihood of

23  confusion, whether it's a likelihood of confusion of

24  affiliation or sponsorship, certainly at the initial interest

25  stage.  So that is what the evidence will show.

1          Now, the remaining factors in the likelihood of

2    confusion.  The plaintiff, DarkOwl, will point out that there

3    is very little evidence of actual confusion and there is no

4    evidence that they -- no direct evidence that they intended to

5    steal my client's mark.  But those factors do not outweigh the

6    strength of my client's mark and how overwhelmingly similar

7    these two marks are when presented, certainly, in the same

8    industries -- in overlapping industries.

9          At the end of the day, Your Honor, my client will ask

10    that this court issue an injunction requiring DarkOwl to change

11    its branding to something that is not confusingly similar.

12          Thank you.

13          *THE COURT:*  Thank you.

14          Mr. Holt.

15                  **OPENING STATEMENT**

16          *MR. HOLT:*  Good morning.  Your Honor.

17          This case involves two companies that have peacefully

18    operated under their respective marks in their separate niche

19    markets for nearly six years now.

20          On the one hand, we have ArkOwl, formed by Mr. Daline

21    in 2012.  ArkOwl provided PII verification services from the

22    outset.  And in the eleven years that have followed, it has not

23    deviated from this market in the slightest.  Real-time PII

24    verification for online transactions is what Mr. Daline knows,

25    having served as a fraud analyst himself for a number of years.

 1   And that is precisely why ArkOwl's customers use the company's

 2   services.

 3        You will recall that Mr. Daline testified that he is

 4   not aware of any customer using ArkOwl's data for anything

 5   other than PII verification for online transactions.  DarkOwl,

 6   on the other hand, has focused on providing highly specialized

 7   dark web data services since the company was formed in 2015.

 8   DarkOwl's data outputs are archived, not real-time.  DarkOwl

 9   has not deviated from its niche market in the seven years it's

10   been in business either.  The company continues to be laser

11   focused on providing dark web data services to some of the most

12   sophisticated professionals and organizations in the world.

13        During the almost six years the parties have operated

14   under their respective marks, there has not been a single

15   instance in which the parties have run into one another.  Not a

16   single customer has ever approached DarkOwl looking for PII

17   verification, nor has a single customer ever approached ArkOwl

18   looking for DarkOwl's dark web data services.  In fact, ArkOwl

19   cannot point to any evidence of actual harm or damage,

20   including lost sales, resulting from the use of DarkOwl's

21   marks.

22        *THE COURT:*  Is it your contention that evidence of

23   actual harm is a necessary predicate to a finding by the Court

24   for the declaratory relief the defendant seeks?

25        *MR. HOLT:*  No.  It's one of the six factors, Your

1   Honor, that the Court should consider.

2         So if the companies operate in completely distinct

3   spheres and there has been no harm to ArkOwl, why are we here

4   litigating trademark infringement issues?  We are here because

5   Mr. Daline has an overly expansive view of not only what ArkOwl

6   does but what DarkOwl does and what it could do in the future,

7   none of which is supported by the evidence.  This has led to an

8   unrealistic view of the overlap or similarity between the

9   parties' services and potential customers.  In fact, ArkOwl has

10  taken positions throughout this litigation that strain

11  credibility, including its continued insistence that the

12  parties serve overlapping markets and the suggestion that they

13  are competitors, even after the Court's most recent order to

14  the contrary.  And we heard the same narrative in Mr. Frasier's

15  opening statement.

16        Based on these misconceptions, ArkOwl is seeking to

17  have DarkOwl give up the brand and the goodwill and the

18  investment that it has spent nearly six years building in its

19  niche market.

20        THE COURT:  Mr. Holt, is the plaintiff contending that

21  the marks themselves, aside from services or customers -- but

22  the marks themselves are not similar or overlapping?

23        MR. HOLT:  The marks themselves, our position is that

24  when you evaluate the similarity of the marks factor, when you

25  consider the differences, that on the whole, the marks are not

1    similar enough to weigh in favor of a likelihood of confusion.

2         THE COURT:  And what do you base that on?  How are

3    they not similar enough, just the marks themselves, based on

4    the similarity in sound when they're spoken and the similarity

5    in appearance?

6         MR. HOLT:  Your Honor, I was going to get into that.

7    I'm happy to jump into it now.

8         THE COURT:  Okay.  Go ahead.  I don't mean to

9    interrupt your opening statement.  I wanted to make sure you

10   were aware of what I was --

11        MR. HOLT:  I understand.

12        So ArkOwl would have DarkOwl restart the branding

13   process from scratch, all of this despite the fact that ArkOwl

14   was aware of DarkOwl for over two years before it decided to

15   take any enforcement action.

16        What seems to be driving this case as much as anything

17   is the parties' use of certain shared terminology, such as data

18   services, fraud prevention, or even cybersecurity.  These terms

19   mean very different things to the companies and their customers

20   in their respective markets.

21        The evidence already presented in this case weighs

22   against a likelihood of confusion finding.  Indeed, the Court

23   already heard ArkOwl's best evidence of competitive proximity

24   of the parties' businesses and customers and determined they

25   are quite distinct and that the parties do not compete for the

1    same business.  As the Court succinctly stated, "The two

2    companies offer different services to different types of

3    customers," which is completely contrary to the narrative we

4    heard in Mr. Frasier's opening statement.  The evidence

5    presented at trial will further demonstrate there is no

6    likelihood of confusion here.

7         Now as a threshold matter, because DarkOwl's

8    trademarks registered before ArkOwl applied to register its

9    marks, ArkOwl has the burden of establishing that its

10   unregistered trademark rights predate the filing of DarkOwl's

11   first trademark application, which was in March of 2017.  If

12   it's able to establish this, only then is it necessary to go to

13   the likelihood of confusion analysis.

14        As we heard from Mr. Frasier, there are a number of

15   factors the courts consider in evaluating likelihood of

16   confusion.  And you can see those six factors here on the

17   screen, Your Honor.

18        ArkOwl acknowledges that four of the six factors do

19   not weigh in its favor.  It concedes that they're either

20   neutral or slightly favor DarkOwl.

21        ArkOwl argues that the first two factors -- similarity

22   between the parties' marks and the strength of ArkOwl's

23   marks -- weigh in its favor and that a likelihood of confusion

24   should be found based on those two factors alone.  The law is

25   clear, however, that no one factor is dispositive; and the

1    final determination of a likelihood of confusion must be based

2    on the consideration of all of the six factors.  ArkOwl has the

3    burden here, and it's important for the Court to note that

4    it's -- that the standard is a likelihood of confusion, not the

5    mere possibility of confusion.

6          Here, all six factors are relevant and should be fully

7    evaluated by the Court.  We believe that all six factors favor

8    DarkOwl and support a finding of no likelihood of confusion.

9          Now, before we dive into these factors, I just want to

10   note for the Court that ArkOwl on the eve of trial referenced

11   for the first time the concepts of initial interest and

12   post-sale confusion.  The Court need not go down these rabbit

13   holes, however.  The Tenth Circuit has made clear that initial

14   interest confusion applies only in direct competitor

15   situations, which, as the Court found, we do not have here.

16   And post-sale confusion is equally inapplicable, as the

17   doctrine applies in cases involving knock-off products -- that

18   is, replica goods of inferior quality.  Again, not applicable.

19         So now let's turn to each of the likelihood of

20   confusion factors.  The evidence will demonstrate that the

21   first factor favors DarkOwl.  The degree of similarity rests on

22   the sight, sound, and meaning of the marks as a whole.  While

23   there are, certainly, some similarities between the marks, they

24   also have important differences.  ArkOwl will focus on the six

25   shared letters in the marks, which we heard; however, the

1    addition of the "D," as the first most conspicuous letter in

2    "DarkOwl," gives the marks an entirely different look, sound,

3    and meaning.  Moreover, the "dark" portion of the mark -- of

4    the DarkOwl mark is suggestive of DarkOwl's dark web data

5    services, while the "ark" portion of the ArkOwl mark was

6    selected by ArkOwl as a religious reference to the Ark of the

7    Covenant.

8         The English language is full of examples where the

9    addition of a single letter -- particularly the first letter --

10   completely changes the site, sound, and meaning of a term.  For

11   instance, consider "Ark" versus "Dark"; "park" versus "spark";

12   "cold" versus "scold"; "tar" versus "star"; and, finally, "ink"

13   versus "pink."

14        The owl designs in the parties' marks are different,

15   as well.  Most notably DarkOwl's design consists of the

16   outlined head of an owl with one large eye; whereas, ArkOwl's

17   design consists of an entire owl in flight, with its wings

18   spread and features little or no facial expression.  And it

19   also replaces the "O" in the ArkOwl mark.  Taken in their

20   entireties, the marks are not just all that similar, Your

21   Honor.

22        The evidence will demonstrate that the second

23   likelihood of confusion factor also favors DarkOwl.  In

24   assessing the strength of a trademark, both conceptual and

25   commercial strength are considered.  Conceptual strength refers

1    to how distinctive a mark is.  A mark can be considered weak

2    where a component term is extensively used by others in the

3    broader industry.  Here, there are a number of third-party

4    marks containing the term "owl," the only term shared by the

5    parties' marks, that are registered with the trademark office

6    for various cybersecurity and/or fraud detection services and

7    products, including Owl Cyber Defense, SecureOwl and Design,

8    OwlCheck, OwlPay, among others.  These third-party

9    registrations render the term "owl" conceptually weak.  And the

10   term "ark" is weak for similar reasons, as well.

11         ArkOwl's marks are also commercially weak.  Commercial

12   strength is the marketplace recognition of a mark.  The Tenth

13   Circuit has identified direct evidence such as consumer surveys

14   or testimony from consumers as helpful in evaluating commercial

15   strength.  ArkOwl has provided no such evidence, however.

16         Courts will also consider the mark holder's efforts to

17   advertise the mark.  The evidence at trial will show that

18   ArkOwl's marketing budget is relatively small and any

19   recognition of its marks is within its niche PII verification

20   market.  Moreover, the court notes that it is the advertising

21   the brand owner itself does that is important, not the mere

22   third-party references to the mark that creates the commercial

23   strength.  And ArkOwl's efforts in this respect are limited.

24         From a commercial strength perspective, the

25   third-party uses of "owl" as well as "ark," to a slightly

1   lesser extent, require that the terms be afforded very narrow

2   protection.

3          ArkOwl's marks are, thus, conceptually and

4   commercially weak; so any exclusionary rights ArkOwl possess

5   are narrow in scope.

6          The evidence will demonstrate that the third factor

7   also favors DarkOwl.  There is simply no evidence here that

8   DarkOwl intended to copy ArkOwl's marks.  It's uncontested that

9   DarkOwl's principals first learned of ArkOwl upon receiving its

10  cease and desist letter in 2019, four years after DarkOwl

11  started using its marks and two years after ArkOwl initially

12  learned of DarkOwl.  And, in fact, ArkOwl no longer claims that

13  DarkOwl intentionally infringed its marks.

14         The evidence will demonstrate that the fourth factor

15  also favors DarkOwl.  Here, the parties have co-existed, as I

16  mentioned, for nearly six years with no actual confusion.

17  While ArkOwl contends there is certain instances of confusion,

18  none amount to the legally recognized trademark confusion that

19  defendants allege.

20         To be relevant, evidence should demonstrate actual

21  confusion among consumers within the marketplace.  The evidence

22  will show that any instances that ArkOwl refers to fall well

23  short of the standard.

24         A typical example of actual confusion is where a

25  consumer buys one party's product thinking that it's the

1    other's.  We simply do not have that here.  And, indeed, ArkOwl

2    finally acknowledged in its trial brief that these incidents,

3    quote, may not be enough to trigger the actual confusion

4    factor, close quote.  ArkOwl also recognizes in its pretrial

5    submissions that the actual confusion factor does not weigh in

6    its favor.  It refers to it as neutral.

7         To the extent the Court considers any of these

8    anecdotes as evidence of actual confusion, they have

9    consistently been disregarded as *de minimis* by the courts.  The

10   reality is, the parties have co-existed for nearly six years

11   without a single instance of credible confusion.

12        The evidence will demonstrate that the fifth factor

13   also favors DarkOwl.  The marketing practices of the parties

14   are particularly relevant in a trademark infringement case

15   because they directly impact the way in which the consumers

16   experience the parties' marks.

17        As to the services themselves, the Court's already

18   noted the parties offer distinctly different services through

19   distinctly different commercial channels.  Real-time

20   transaction verification services have never been requested by

21   DarkOwl's customers, and DarkOwl's business and platform are

22   not built or set up to provide that data.  As the Court's

23   already noted, not a single DarkOwl customer could get from

24   ArkOwl what it gets from DarkOwl.  And not a single ArkOwl

25   customer could get from DarkOwl what it gets from ArkOwl.  The

1    parties have fundamentally different customers seeking

2    fundamentally different kinds of services, as the Court noted.

3    And relatedly, the parties' distinctly different marketing

4    strategies further reduce the likelihood of confusion.

5         As has already been demonstrated, DarkOwl occupies a

6    niche market where it has only a few competitors.  None of

7    DarkOwl's competitors provide PII verification services, and

8    none of ArkOwl's competitors are competitors of DarkOwl or

9    provide dark web data services.  Because the companies operate

10   in distinctly different markets, they contact very different

11   people in their marketing efforts.  Reasonable consumers in the

12   parties' separate trade channels who seek one party's services

13   are not likely to even encounter the marketing from the other

14   party.

15        To the extent DarkOwl's third-party marketing agent

16   sent email blasts that were received by a handful of

17   purported ArkOwl customers, the evidence shows and the Court

18   has acknowledged that this is not sufficient to demonstrate

19   that the parties have any overlap in services or target

20   customers.  And even if DarkOwl did target some of these

21   companies, that would not necessarily establish similarity of

22   services.

23        For example, Waste Management and Microsoft might both

24   target Nike; but this does not mean that Waste Management and

25   Microsoft are similar in any relevant sense.

1          Indeed, the Court has already concluded that a large

2    group of users of the type of verification services ArkOwl

3    provides would not necessarily include a single user of the

4    type of dark web services that DarkOwl provides and that

5    DarkOwl's services have no relation to approving a commercial

6    transaction in real-time, or PII verification.

7          The Court has found that the parties are not

8    competitors, but the Court's underlying findings to support

9    that conclusion are also relevant here to the factor of

10   similarity of services, and they support a finding that the

11   parties' services and the manner in which they advertise are

12   not similar.  The Court stated that DarkOwl services have,

13   quote, no relation, close quote, to ArkOwl's PII verification

14   services.  ArkOwl also acknowledges that the similarity of

15   services and the manner of marketing factor does not weigh in

16   its favor.  Again, it refers to that factor as neutral.

17          The evidence will demonstrate that the sixth and final

18   likelihood of confusion factor also favors DarkOwl.  The

19   evidence has shown and will continue to show that the

20   individuals purchasing DarkOwl's services are generally CEOs,

21   CFOs, CIOs, who are sophisticated and careful purchasers.

22   There is an extensive vetting process for DarkOwl's services

23   that includes a comprehensive set of legal agreements.  So

24   these customers must conduct substantial due diligence before

25   signing on.

1          THE COURT:  Let me stop you there just for a moment,
2     Mr. Holt --
3          MR. HOLT:  Sure.
4          THE COURT:  -- with a question about what you call
5     substantial vetting procedures.
6          MR. HOLT:  Yes.
7          THE COURT:  So is it your contention that a customer
8     cannot be a customer of DarkOwl until all of these vetting
9     procedures have been completed and legal paperwork has been
10    signed?
11         MR. HOLT:  That is my contention, Your Honor.  And we
12    will offer testimony to support that.
13         THE COURT:  All right.  Thank you.
14         MR. HOLT:  So this extensive vetting process includes
15    a comprehensive set of legal agreements, typically months of
16    negotiation, so that these customers must conduct substantial
17    due diligence before signing on with DarkOwl.
18         Evidence will also show that ArkOwl's services are
19    reasonably expensive and its customers and users are
20    specialized professionals who would be scrupulous in purchasing
21    ArkOwl's services.  There is no evidence here, Your Honor, that
22    would indicate consumers ever mistakenly purchased one party's
23    services thinking they were intending to purchase the other
24    party's services.  And this wouldn't even make sense, given the
25    respective offerings.

1          As we just mentioned for DarkOwl's services, this

2     would be a near impossibility because of the vetting process.

3     The fact that the parties have sophisticated, discerning

4     customers likely to conduct substantial due diligence strongly

5     weighs against the likelihood of confusion.

6          THE COURT:  Let me interrupt you again, Mr. Holt.  I'm

7     sorry for the continuing interruptions, but I do want to make

8     sure that you're, you know, sort of aware of the questions that

9     I'm coming up with as I'm listening to your argument.

10         MR. HOLT:  Absolutely.

11         THE COURT:  I recall Mr. Turnage testifying at the

12    hearing with respect to the expert issue that DarkOwl is not

13    set up to provide personal information and identity

14    verification services like ArkOwl.  Is it going to be your

15    contention, and do you have evidence to support that

16    contention, if it is going to be your contention, that

17    customers of DarkOwl who go through the vetting process and

18    sign all of the legal documents could never obtain PII services

19    from DarkOwl?

20         MR. HOLT:  My contention and the evidence will present

21    that DarkOwl's customers are not interested in PII

22    verification.  And the way in which it offers its services,

23    it's not set up to provide PII verification.

24         THE COURT:  Is that the same as saying that DarkOwl

25    simply does not provide PII verification?

1          MR. HOLT:  It does not provide PII verification.

2          THE COURT:  Okay.  Thank you.

3          MR. HOLT:  So in conclusion, because the likelihood of

4    confusion factors strongly tilt in DarkOwl's favor, we ask the

5    Court to find that DarkOwl has not infringed ArkOwl's trademark

6    rights and to grant DarkOwl's request for declaratory judgment

7    of non-infringement and the validity of its trademark

8    registrations.  We likewise ask the Court to deny ArkOwl's

9    trademark infringement and cancellation claims.

10         THE COURT:  Let me ask you one final question.

11         MR. HOLT:  Sure.

12         THE COURT:  I asked you at the beginning about the

13   actual harm component --

14         MR. HOLT:  Yes.

15         THE COURT:  -- and you said it was a factor in the

16   test that the Court must apply.  I don't see it on the screen

17   in the list of six factors; and, of course, I've read the

18   cases, as well.  Is it your contention that actual harm

19   resulting from the use of the alleged infringing trademark is

20   woven into one of these particular factors in the six-factor

21   test?

22         MR. HOLT:  Your Honor, it is the fourth factor,

23   evidence of actual confusion.

24         THE COURT:  So you think actual confusion equals equal

25   harm?  You don't read the actual harm component to include any

1    evidence relating to money damages?

2          MR. HOLT:  So there are a few things to unpack there.

3    So actual confusion is one of the likelihood of confusion

4    factors.  So if it exists, you know, it's considered as part of

5    the analysis as a whole.

6          With respect to recovery of damages or monetary

7    relief, the Courts will look to lost sales, to harm to the

8    brand and evidence that supports that, and also, you know,

9    profits from the defendants' use -- the junior user's use of

10   the mark.  And here we have a situation where after, you know,

11   months and months of discovery and countless depositions and,

12   you know, extensive document production, they were able to

13   point to no harm to support any sort of monetary relief.

14         So that's a slightly separate issue, but with respect

15   to both issues, we feel we're --

16         THE COURT:  And I know, you have noted and so has

17   counsel for the defendant, that there is no pending request for

18   monetary damages here.  I'm just trying to maybe split hairs

19   with respect to what the meaning of the actual harm is in the

20   context of request for declaratory relief.  Does actual harm

21   mean only actual confusion in these circumstances?

22         MR. HOLT:  Under the likelihood of confusion analysis,

23   there is no actual harm requirement.  It's a likelihood of

24   confusion, but actual confusion is considered as a part of the

25   analysis.

Robert Daline – Direct

1          THE COURT:  That is consistent with my understanding,

2    as well.  Thank you.

3          MR. HOLT:  Thank you.

4          THE COURT:  All right.  Let's have defendant call his

5    first witness.  I'm going to be stumbling over that all day,

6    just because of the switch in the manner of presenting here.

7    But go ahead, Mr. Frasier.

8          MR. FRASIER:  Thank you, Your Honor.  The defendant,

9    ArkOwl, calls Rob Daline.

10         THE COURT:  Good morning.  If you could stand in front

11   of the witness stand.

12              (**ROBERT DALINE, DEFENDANTS' WITNESS, SWORN**)

13         THE COURT:  Thank you, please be seated.  Make sure

14   you speak into the microphone.

15         THE WITNESS:  Sounds good.  I'm going to grab a little

16   bit of water here, first.

17         MR. FRASIER:  Will I let you know when I need

18   exhibits --

19         COURTROOM DEPUTY:  I can put it on right now.

20         MR. FRASIER:  That would be great.

21                    **DIRECT EXAMINATION**

22   BY MR. FRASIER:

23   Q.  Good morning, Mr. Daline.

24   A.  Good morning.

25   Q.  Could you please introduce yourself again to the Court.

Robert Daline - Direct

1   A.   I'm Rob Daline -- Robert Daline -- and I am the CEO, one of

2   the co-founders of ArkOwl.

3   Q.   Thank you.  And as you know, we were here about a month

4   ago.  Much of the testimony -- all of the testimony that you

5   provided from that hearing is already a part of this record, so

6   I'll do my best to not ask you duplicative questions.

7          But just briefly, could you explain how you came up

8   with the business idea, ArkOwl.

9   A.   Yeah.  The business idea came as I was a fraud analyst at

10  Target, and I kept having the need as an analyst reviewing, you

11  know, hundreds of orders -- actually, we were -- at Target, I

12  was preparing the team to review, so I was more training.  And

13  as I was thinking through how to train, I had come up with an

14  idea for a data-gathering service, where we could provide data

15  on email addresses, because that seemed to be a huge lacking

16  area in the tools that were there.

17  Q.   Now, how did the name ArkOwl come about?

18  A.   ArkOwl came about, I was having dinner with my father, and

19  I was telling him about my company.  He was getting really

20  excited.  And he was really focused on the name, because, you

21  know, fraud prevention isn't necessarily a field he's in, so he

22  wasn't contributing a whole lot to that.  And he knew -- he

23  knew he wouldn't be able to, so he was focused on the name.

24  And he kept coming up with ideas for animals for the name of a

25  company.  I'm like, I don't want to have a company that's an

Robert Daline – Direct

1    animal name.  That sounds kind of weird and different.  But

2    when -- either he or I came up, you know -- so what about owl?

3    You know, he got really excited.  I actually got excited,

4    which, you know, is different, because I was kind of, you know,

5    maybe more indifferent going in.

6            And then I took it home and thought about it.  And I

7    was actually in the shower.  And, you know, the idea of ArkOwl

8    came, you know.  And I was, like, oh, let's see if the domain

9    name is there.  ███████████████████, founding, co-founder, he

10   had said that he wanted a name that was eight characters and

11   that fit into a dot-com.  The domain had to be a dot-com, and

12   it had to be a soundable domain that was eight characters or

13   less.

14           And ArkOwl, I went and checked, and it was a

15   six-letter domain that was dot-com, and it was available.  And

16   so I called ██████  I said, What do you think?  He's like, Wow,

17   a six-letter domain, that's really great.

18           So that was -- that was how, you know, the name came

19   up.  The "owl" was like, you know, a symbol of like a predator

20   that can see in the darkness or at night.  And as we're, you

21   know, uncovering criminals or legitimate customer identities,

22   you know, we wanted something that -- it seemed to fit really

23   well.

24           And then the "ark," well, that was a way where -- you

25   know, I wanted to have something where we put God first without

Robert Daline - Direct

1   necessarily having it be like we are appealing to a Christian

2   market.  I wanted it to be kind of hidden.  That if somebody

3   were to ask about the name, then I would share and say, this is

4   how we came up with the name.  This is what the "ark" stands

5   for.  It stands for, you know, Samuel sitting in God's

6   presence, hearing from the Lord, and then going with the next

7   step.

8   Q.  Thank you.  You mentioned that your partner wanted the name

9   to be -- I'm not sure what you said, but it had something to do

10  with how it sounded.  Could you explain what you mean on that?

11  A.  He wanted a soundable name for the website.  So something

12  where it wasn't like, you know, FFK08.com.  You know, something

13  that somebody could sound when talking about the website and

14  say, go to this website dot-com, and it's just really simple to

15  say that.  That was -- that was his main concern.  He wanted it

16  to not be too many characters, where it's like a sentence

17  dot-com.  And so that was his thought process.

18          And when we came up with ArkOwl, it was like, you

19  could sound it out.  You could say, go to ArkOwl.com.

20  Q.  Okay.  Thank you.

21          Could we -- could I have the monitor for the exhibits?

22          Can everybody on their monitors see Exhibit 301?

23  A.  Yes.

24          THE COURT:  I can.

25          Give me a second to get organized here.

Robert Daline - Direct

1          MR. FRASIER:  This exhibit might be anticlimactic,

2    Your Honor.

3          THE COURT:  That's okay.  I'll be ready for the

4    climactic ones.

5    BY MR. FRASIER:

6    Q.  Mr. Daline, you testified at the previous hearing that

7    ArkOwl's service was operating in late 2011.  Do you recall

8    when you formed ArkOwl as a company?

9    A.  I believe it was February 6.  But this document shows

10   February 14, so maybe that's when it went through.

11   Q.  So February 14 of 2012.  We're looking at the certificate

12   of organization for ArkOwl, LLC; is that right?

13   A.  Yep.  Yes.

14   Q.  All right.  Showing you what has been marked Exhibit 302.

15   Can you describe to the Court what Exhibit 302 is?

16   A.  Yes.  This is our -- the first version of our service.  So

17   this was when -- when we first put it on ArkOwl.com, this is

18   what ArkOwl.com looked like from December of 2011 until I think

19   it was that spring when we updated it to being all white

20   background.  And I think we also adjusted the letter "A" to be

21   different.

22   Q.  The spring of which year?

23   A.  2012.

24   Q.  Okay.  Tell us about the logo that we're looking at.  I

25   think it's Exhibit 302.

Robert Daline - Direct

1   A.  This logo is the first ArkOwl logo.  It was our V-1 of the

2   logo.  This was created by an artist named ███████.  As

3   far as the concepts go, I gave her the concepts of, I wanted a

4   logo that was black and white, because our service was a data

5   provider.  We wanted to provide black-and-white data, just

6   really solid data to make decisions on.  So I wanted some

7   boldness in there, and I wanted -- I told her to -- I wanted

8   the owl to be angry.  And so she was actually the one that came

9   up with the side angle view of the owl with the eye.  And so

10  that's kind of what you see in the upper left, is that symbol

11  of the owl -- is the angry owl eye.  And she drew that up.

12  Q.  Now, once again, you testified at the prior hearing that

13  you received your first large batch of customers from a former

14  co-worker at Best Buy, who sent an email blast out to the MRC.

15  And we're just looking at that exhibit again.

16          I will make it a little easier to read here.

17          Is this the email that you were referring to?

18  A.  I believe so, yes.  The hello -- no.  That's Brad.

19  Q.  I can scroll down.

20  A.  Yeah.  Maybe it's the one that says "Plats" first.  He's

21  addressing the platinum members of the Merchant Risk Council.

22  Q.  Okay.  "Plats."  So the bottom of page 1, the top of

23  page 2?

24  A.  Yes.

25  Q.  Do you know what "plats" is a reference to?

Robert Daline – Direct

1    A.   Platinum members of the MRC, the Merchant Risk Council.

2    Q.   All right.  And this email was March 12 of 2012; does

3    that sound right?

4    A.   Yes.

5    Q.   What does the Merchant Risk Council do?

6    A.   The Merchant Risk Council brings together fraud

7    professionals, as well as payments professionals.  And I think

8    that's what they advertise.  They bring together any company

9    that is focused on payments and fraud.  And then they also --

10   with that comes the solution providers that are trying to sell

11   to them.

12   Q.   Other than the email blast we just looked at, did you

13   have any other opportunity to promote ArkOwl via the Merchant

14   Risk Council?

15   A.   Yeah.  I think it was a couple of months later we gave a

16   presentation, and it was advertised to the MRC members.

17   Q.   I'm showing you what has been marked as Exhibit 303.  I can

18   flip through this.

19        Do you recognize Exhibit 303?

20   A.   Yes.

21   Q.   What is it?

22   A.   That's the deck from the sales presentation -- the

23   presentation that I gave to the Merchant Risk Council.

24   Q.   And you said this was a few months after that first email

25   blast?

Robert Daline – Direct

1    A.  Yes.

2    Q.  How did that presentation come about?

3    A.  After the email blast, ███████ from the Merchant Risk

4    Council reached out to me and asked if I wanted to give a

5    presentation describing our service.

6    Q.  So you didn't pay for this presentation?

7    A.  No.

8    Q.  I'm going to turn to page 4 of Exhibit 303.  This looks

9    similar to the prior exhibit but with the white background.

10   What is page 4 of Exhibit 303?

11   A.  This is a slide describing how to do a query on ArkOwl, how

12   to input it.  So you've got the email and then the colon,

13   input an email.  And then it's showing the example results that

14   you could get with ArkOwl through the ArkOwl service.

15   Q.  Is the logo in the top left the very first logo that we

16   just looked at, or is it the one that you said was slightly

17   modified?

18   A.  This one was slightly modified.  You can see the "A" as one

19   that Andrea actually made to go along with the owl symbol in

20   the upper left.

21   Q.  Thank you.  Flip to page 5 of Exhibit 303.  What does this

22   page show?

23   A.  This shows a demo of our domain results.  So taking that

24   @fraudbuster.n.  That was a domain that I purchased for the

25   example to show that the domain itself was created one month

Robert Daline – Direct

 1    ago, so you see the results there.  So you would type in the

 2    email, hit "go."  So both of those are screenshots of the same

 3    query.  So I think the last page was what would display on the

 4    left; and then this is displayed -- what would be displayed on

 5    the right for the analyst, who would be looking at it.

 6    Q.  And you said this is a screenshot.  Is this what your --

 7    ArkOwl's website actually looked?

 8    A.  The portions -- so this is a compilation of maybe five,

 9    six, screenshots.  So, yes, this is a compilation of what the

10    screen -- things from that screen.  So it's not exactly what it

11    looked like, because I took screenshots for the slide to fit.

12    Q.  Understood.  On page 7, it's titled "Things to Come."  The

13    top one is, "API."  In 2012 did ArkOwl have an API?

14    A.  No, we did not.

15    Q.  So how did people interact with ArkOwl's service?

16    A.  People would interact -- and it would be people within

17    companies -- would interact by going to ArkOwl.  And much like

18    Google search, they would just type in an email and hit "go."

19    But it wasn't -- an actual person had to go do it.

20    Q.  Understood.  What is the Paladin Vendor Report?

21    A.  The Paladin Vendor Report is a compilation of vendors in

22    the fraud and payments industry, from the Paladin Group.

23    Q.  Now, I'm showing you what has been marked as Exhibit 305.

24         For anybody using paper copies, this is the large one

25    not actually in a binder.

Robert Daline – Direct

1        Is -- do you recognize Exhibit 305?

2   *A.*   I do.

3   *Q.*   What is it?

4   *A.*   It is the Paladin report from 2020.

5   *Q.*   I flipped to the second page, here.  Does the Paladin

6   Vendor Report have any affiliation with the Merchant Risk

7   Council?

8   *A.*   The affiliation is that they struck up a deal where anybody

9   that goes to the MRC conference or who is a part of it gets a

10  vendor report.  So that is the extent of the affiliation I

11  know.  If -- they are completely different organizations.

12  *Q.*   Understood.  Flipping to the third page, which is the table

13  of contents, it appears that there are 46 companies listed on

14  this.

15       First, do you know the difference between the

16  participating vendor and the non-participating vendor reports?

17  *A.*   For the Paladin report, the participating vendor paid to

18  have their -- to have more written about them.

19  *Q.*   Understood.

20  *A.*   The non-participating member didn't pay.

21  *Q.*   How would you describe ArkOwl's relationship with the other

22  45 companies in this report?

23  *A.*   The other 45 companies could be competitors, they could be

24  prospective customers or prospective clients, or clients

25  already for ArkOwl.

Robert Daline - Direct

1   *Q.* Are there any companies on the list we're looking at right

2   now that you as ArkOwl regularly compete directly against?

3   *A.* Yes.

4   *Q.* Which ones?

5   *A.* Ekata, Emailage, Pipl.

6   *Q.* You said there could be some commercial customers on the

7   list. Do you recognize any of the names on this page as actual

8   ArkOwl customers?

9   *A.* Yes.

10  *Q.* Which ones?

11  *A.* CyberSource, ███████████████████. I say

12  potentially because I forget what -- if it's ████ from the data

13  provider that's from Europe. I think that's it.

14  *Q.* Are there any other companies -- any of these 45 companies

15  have "owl" in their name, other than ArkOwl?

16  *A.* No.

17  *Q.* Are there any other companies with a similar name to

18  ArkOwl?

19  *A.* You can look at Arkose Labs; but, then, again, that has

20  "labs" in it. It's got four characters, where it starts out

21  the same. But Arkose Labs -- kind of similar, but not really.

22  *Q.* Are there any other of the 45 on here that you believe are

23  similar to ArkOwl?

24  *A.* In name?

25  *Q.* In name.

Robert Daline - Direct

 1  A.  No.

 2  Q.  One issue in this case that was briefly listed in opening

 3  statement was a question of geography.  In 2012, did ArkOwl

 4  have a physical office where it interacted with potential

 5  customers?

 6  A.  No.

 7  Q.  How did you -- ArkOwl interact with your potential

 8  customers and actual customers?

 9  A.  Interactions were done online, whether they're going to our

10  website -- www.ArkOwl.com -- or they're emailing me, the

11  business is just completely -- where clients would interact

12  with us would be through the website or through email.

13  Q.  Did you ever interact with customers in person?

14  A.  I did.  So I would meet up -- I met up with ███████████

15  from Best Buy or people within the Minnesota area every once in

16  a while, but very rarely.

17  Q.  Where are ArkOwl's products and services used?

18  A.  They're used online, in the cloud.

19  Q.  Does it matter -- does it make any difference to ArkOwl

20  where a customer is located?

21  A.  I mean, if they don't have internet.  Other than that, no.

22  So long as they have internet, they could be a client.

23  Q.  Where --

24  A.  Sorry.  They could be able to use ArkOwl.  Not necessarily

25  could be a client, but --

Robert Daline - Direct

1    Q.  Understood.  Since we have all of these exhibits already in

2    the record, we don't need to spend the time running through the

3    16 exhibits that we have of invoices and contracts; but I'd

4    like to take a look at a few.

5            I'm pulling up Exhibit 308.  Do you recognize

6    Exhibit 308?

7    A.  Yes.

8    Q.  What is it?

9    A.  That's one of our earlier invoices, an invoice to ████

10   ████t.

11   Q.  All right.  And where on your invoice can we find where

12   ████████ -- where it's being sent?

13   A.  It looks like it was sent to █████████████████████

14   █████████████.

15   Q.  Do you always email out invoices physically?

16   A.  I actually don't believe I mailed this out physically.  I

17   think I emailed it to the Home Depot manager.

18   Q.  Do you ever physically mail invoices to your customers?

19   A.  Yes.  There is a company in France that they have, like, a

20   stipulation with banks in France where they have to have a

21   mailed copy of the invoice; so I actually monthly mail an

22   invoice to France.

23   Q.  All right.  And when the Court looks at your other

24   invoices, will the location of the customer, to the extent you

25   know it, be in the same place on the invoice?

Robert Daline – Direct

 1   *A.*  To the extent we know it, yes.  I believe the place of the

 2   address in invoices hasn't changed.

 3   *Q.*  Do you always know the physical address of your customers?

 4   *A.*  I do not.

 5   *Q.*  Showing you an email -- Exhibit 312.  And I'm going to make

 6   it a little bigger.

 7          Do you recognize Exhibit 312?

 8   *A.*  Yes.

 9   *Q.*  And what is Exhibit 312?

10   *A.*  It's an email communication between us and -- "us" being

11   ArkOwl -- and the -- I believe that's the manager of ██████

12   fraud department.

13   *Q.*  All right.  Is this typical of how potential customers

14   would interact with ArkOwl?

15   *A.*  Yes.

16   *Q.*  Did ██████ become an ArkOwl customer?

17   *A.*  No.

18   *Q.*  They did not?

19   *A.*  They did not.  To my recollection, they did not.  I should

20   say that.

21   *Q.*  Let's look at Exhibit 316.

22          Do you recognize Exhibit 316?

23   *A.*  Yes.

24   *Q.*  What is it?

25   *A.*  It's an email between -- it's an email from ██████ from

41

Robert Daline – Direct

1    ███████████████████████.

2    Q.  The second sentence of this email says, "I heard about

3    your tool from a team member at the CyberSource managed risk

4    services division."  Who is CyberSource?

5    A.  CyberSource is a vendor within the industry that provides a

6    fraud platform, as well as fraud prevention services.

7    Q.  What's your relationship with CyberSource?

8    A.  CyberSource is a client of ours.

9    Q.  Showing you what has been marked Exhibit 318.  Do you

10   recognize Exhibit 318?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's an email from ██████████████████████████████,

14   inquiring about our service, I think.

15   Q.  All right.  And did ██████████ eventually become a customer?

16   A.  I believe they did.  This is an older email that we're

17   looking at, but I think so.  I think they -- they at least went

18   through the trial.

19   Q.  All right.  Finally, I'm showing you what has been marked

20   as Exhibit 321.  Do you recognize Exhibit 321?

21   A.  Yes.  This looks like another older -- older invoice.  I

22   think this would be a template.  I'm not sure this was

23   actually -- well, it's got an invoice number on it; so

24   potentially it was sent out.

25   Q.  Who was it sent to?

Robert Daline – Direct

1    *A.*  CyberSource Corporation.

2    *Q.*  All right.  Was CyberSource a customer of yours in 2012 --

3    excuse me -- 2013?

4    *A.*  I believe CyberSource has always been a customer, ever

5    since we started charging, I believe.  They've been there a

6    long time.

7            *MR. FRASIER:*  The next exhibit -- few exhibits we have

8    are financial documents that have been marked Attorneys' Eyes

9    Only.  Ask that your clients leave.

10           *THE COURT:*  Thank you.  The record should reflect that

11   the representatives of the named plaintiff have left the

12   courtroom.

13           *MR. FRASIER:*  Thank you.

14           I'm opening up Exhibit 382.  There is no hard copy of

15   this on file.  This is a spreadsheet.

16   *BY MR. FRASIER:*

17   *Q.*  Mr. Daline, do you recognize 382?

18   *A.*  Yes.

19   *Q.*  What is it?

20   *A.*  This is overall financial -- I put this together every year

21   to just really measure where we're at financially for ArkOwl.

22   It brings together all of our finances.

23   *Q.*  All right.  And it appears this reflects ArkOwl's 2013

24   finances?

25   *A.*  Correct.

Robert Daline - Direct

1   *Q.* For the record, I see there are a number of tabs on the

2   bottom.  We're clicked on the tab labeled R-E-V.

3        I see about ████████████████████████████████████

4   ████████████████████.  You -- what was your relationship -- what

5   was CyberSource doing with your product, service in 2013?

6   *A.* Well, because pre-API, they would actually have analysts --

7   people -- going to the site, putting email addresses in the

8   site, and then getting results.  What they were doing with

9   those results, I would assume they were using that to help

10  determine who was behind the email address, whether for fraud

11  use or not.

12  *Q.* Would it be for CyberSource's own internal purposes?

13  *A.* I believe it was for their team -- the CyberSource team --

14  that would be potentially using the data itself to review

15  transactions for their customers, whoever those are.

16  *Q.* Now, in the spreadsheet, it indicates CyberSource/Visa.

17  What is CyberSource's relationship with Visa?

18  *A.* CyberSource is Visa.  It's a department of Visa.  Visa

19  purchased CyberSource back in maybe 2008, 2009.

20  *Q.* Do you have any way to know where CyberSource's users who

21  are using ArkOwl's tools were physically located?

22  *A.* The best guess we get is the IP address.

23  *Q.* And where -- to the best of your knowledge, where were

24  CyberSource's users located, using ArkOwl's service?

25  *A.* The IP addresses were coming out of Colorado.

Robert Daline - Direct

1    Q.  Anywhere else?

2    A.  I'm -- I'm not sure.  And that's the best to my knowledge.

3    I know that they have teams everywhere.  Like, it's a global --

4    they have teams globally.  They do that today.  I'm not sure

5    about 2013, but I would assume so.

6    Q.  Now, in looking at your revenue list, does it -- first of

7    all, does the tab R-E-V represent ArkOwl's revenue by customer

8    for that year?

9    A.  That column L?

10   Q.  I'm sorry.  Yes, column L.

11   A.  Yes.  That's revenue per customer for the year.

12   Q.  All right.  Now, in 2013 it appears many of these are

13   online retail companies; is that fair?

14   A.  Yes.

15   Q.  Now, line 19, I'm highlighting now, is ▮▮▮▮▮▮▮▮  What

16   is ▮▮▮▮▮▮▮▮

17   A.  I believe they're an online payments company.

18   Q.  So what does that mean?

19   A.  They provide the ability for other companies to input a

20   payment through their system.  So when you use a credit card or

21   sign up for things online, potentially, you're going through

22   other services that the end user is using -- or end user has

23   hired -- hired out.  So, for instance, you know, for ArkOwl, we

24   actually use Stripe for a lot of our online payments.  So a lot

25   of these -- a lot of this money that you see was purchased

Robert Daline - Direct

1   through our online portal, and I actually have that marked down

2   in N9 -- N8.  So it shows how much of the revenue came through

3   Stripe, our online payments processor.

4   Q.  All right.  Now in K6 I see a company called ███████ what

5   is ███████

6   A.  I believe ███████ is similar, online payments.  And they do

7   online payments for China.  And a think a lot of the ███████

8   payments are done with their own internal payments, and I think

9   the ███████ is a piece of their internal payments.  But they

10  also use that to sell to other companies who do business online

11  so that they can process payments through the payments platform

12  that ███████ built.

13  Q.  Now, I'm going to show you what has been marked as

14  Exhibit 383.  And I'm going to click over on the tab saying

15  R-E-V, as well.

16          Do you recognize Exhibit 383?

17  A.  It looks like the same document for 2015.  Yes.

18  Q.  So -- and I'll scroll over the column K.

19          What would column K contain?

20  A.  Column K contains the companies that made purchases in that

21  year.

22  Q.  And then L is the amount they paid?

23  A.  Correct.

24  Q.  On line 31 I see a company called ███████  What is

25  ███████

Robert Daline - Direct

 1  A.  ███████  is a fraud solutions provider.  They provide fraud

 2  platform service.  They also provide fraud teams to be able to

 3  do -- use ArkOwl the way CyberSource would -- or CyberSource

 4  back in 2013 -- to type in email addresses and research

 5  online transactions or whatever they're researching.  But

 6  ███████  also would use ArkOwl via API systematically to go

 7  into their rule systems.  So ████████ provides a way to have

 8  clients take on their whole fraud problem, you know.  So a

 9  client could come to ████████ and say, hey, we're getting

10  fraud, and take on the problem for us.  We'll just pay you, as

11  opposed to setting up our own fraud system, fraud rules, fraud

12  people.

13  Q.  Now, in 2015, did ArkOwl have an API?

14  A.  I believe 2015 is the year we came out with the API and at

15  least started testing it with our current client base.

16  Q.  Now I also see a company on line 39 called ████████████

17  What is ████████████

18  A.  ████████████  I believe, is a French bank; but potentially it

19  could have been a payments platform or fraud solution back

20  then.  But today it is a bank, called ████████ or ████████

21  Q.  And it used to be called ████████████

22  A.  Yes.

23  Q.  Then line 53, I see a company called ████████████  What is

24  ████████████

25  A.  ████████████  is a way to transfer money -- transfer money,

Robert Daline - Direct

1    I believe, to other countries, overseas people -- transfer to

2    people in other countries.

3    Q.   How would ████████████ use ArkOwl's tool?

4    A.   For verification, fraud prevention.  I believe they would

5    be researching the email addresses that were coming in with

6    ████████████ -- I mean, it would be kind of like PayPal saying,

7    send this money to an email address.  ████████████ would have a

8    team or have a system to add more info about that email

9    address that they get from ArkOwl.

10   Q.   So ████████████ do inquiries when an account was set up or

11   when the transfer was initiated, if you know?

12   A.   I don't know.  Either.

13   Q.   We can bring in --

14          (Hearing continued in open court.)

15   BY MR. FRASIER:

16   Q.   You referred to a change in ArkOwl's services, effectively

17   from 1.0 to 2.0.  When did that take place?

18   A.   2.0, I believe it took place -- the software aspect took

19   place in 2015 for current clients; and then we added in for the

20   rest of the clients as well as new clients I believe in 2016.

21   Q.   All right.  And what new offerings did ArkOwl include in

22   its change in 2.0?

23   A.   We included the API, additional social checks, as well as

24   the breach data check.

25   Q.   And you previously testified, API allows computers to talk

Robert Daline – Direct

1   to each other; is that fair?

2   A.   Correct.  It allows ArkOwl's data to be accessed by other

3   softwares.

4   Q.   Okay.  You said you added breach data, where was that

5   coming from?

6   A.   That was coming from the service, "Have I Been Pwned?"

7   Q.   Now, we have Exhibit 329 up on the screen.  Do you

8   recognize it?

9   A.   Yes.

10  Q.   What -- what is Card Not Present?

11  A.   Card Not Present was an organization -- potentially is

12  still an organization -- that provides -- they provided a

13  conference.  But like the Merchant Risk Council, they were an

14  affiliation group for anything where -- any transactions where

15  the credit card was not present.

16  Q.   Did you pay Card Not Present to promote ArkOwl's API launch

17  in this tweet?

18  A.   We did not.

19  Q.   You mentioned breach data from "Have I Been Pwned?"  Do you

20  know where "Have I Been Pwned?" claims to get its data?

21  A.   They claim to get their data from anonymous sources.

22  Q.   All right.  Is there any way to tell where the data has

23  come from?

24  A.   In the descriptions of the breaches -- so when you do a

25  query on ArkOwl, ArkOwl provides the description of where the

49

Robert Daline - Direct

1   breach -- what all the breach entailed.  And every once in a

2   while it actually says where the breach -- where the leaked

3   data was found or how -- how "Have I Been Pwned?" acquired the

4   leaked data.

5   Q.  Okay.  In any of those instances does "Have I Been Pwnd?"

6   claim to have acquired it on the darknet?

7   A.  Yes.  Well, not acquired; but it will say -- like,

8   LinkedIn, it will say, you know, this -- this data file was

9   leaked on the darknet.

10  Q.  Okay.

11  A.  And along with the leak was email addresses, passwords,

12  phone numbers, names.  So it will give a description of the

13  type of information that was found in the data leak.

14  Q.  Understood.

15  A.  And it will also share that -- you know, because it's

16  there, the email address that you're searching for was found

17  in that leak.

18  Q.  Now, a little bit ago we discussed geography and looked at

19  a few invoices.  Does ArkOwl have any way to determine the

20  location of where its software is being used?

21  A.  We can use Google Analytics to gain a guess based on the

22  location of the IP address.  Otherwise, clients can tell us on

23  a phone call if we're on it.  They can say, hey, you know,

24  you're in Minnesota; I'm in, you know, California, enjoying

25  much better weather than you.  Great.  You know, so that --

50

Robert Daline – Direct

1    that was kind of where we would gain it.  Sometimes I would

2    hear accents; and I would be, like, oh, are you calling from

3    another country?  I'm calling from Ireland -- and I can't do an

4    Irish accent but --

5    Q.  I'm disappointed you did not try.

6    A.  Yeah.

7    Q.  Showing you what has been marked Exhibit 327.  What is this

8    exhibit?

9    A.  This is an exhibit -- this is something that I created when

10   I was asked for it in -- what's it called?

11        THE COURT:  Discovery?

12        THE WITNESS:  Discovery.  There we go.  Thank you.

13   Sorry.

14        I was asked for a file that said the exact date when,

15   you know, we first saw usage out of a certain state and where

16   we first saw usage out of every state.  So this is me actually

17   going through Google Analytics -- Google Analytics doesn't have

18   a nice way to do that, so I actually had to go through the

19   calendar, you know, almost one at a time.  It took me probably

20   several hours to go back to each -- you know, the first

21   instance of an IP address or a user using an IP address out of

22   these states.

23   BY MR. FRASIER:

24   Q.  And so then you entered that data into this document?

25   A.  Yes.

Robert Daline – Direct

1  Q.  And just to make sure we understand, could you walk through

2  just column -- row No. 1, Minnesota, could you walk through

3  what each row -- what each column means.

4  A.  Yes.  For Minnesota, December 2, 2011, that was the first

5  time somebody went to ArkOwl.com from Minnesota.  December 9,

6  2011, that was the first time anyone from South Dakota went to

7  ArkOwl.com.

8  Q.  Thank you.  You don't need to walk through any more.

9  A.  Okay.  Thank you.

10  Q.  Now, from 2011 until sometime at least in 2015, ArkOwl did

11  not have an API; is that right?

12  A.  Yes.

13  Q.  All right.  So where would users go to actually use

14  ArkOwl's service?

15  A.  They would go to ArkOwl.com.

16  Q.  Okay.

17  A.  Yep.

18  Q.  When ArkOwl established its API, did it get rid of the user

19  interface on its website?

20  A.  No.  We kept it.

21  Q.  Okay.  Pulling up a document that has been marked as

22  Exhibit 423.  Do you recognize this document from this first

23  page?

24  A.  Potentially.

25  Q.  I can skip down to --

Robert Daline – Direct

1    A.   Yes.  I recognize that.

2    Q.   All right.  Thank you.  What is Exhibit 423?

3    A.   Exhibit 423 is a pull from Google Analytics, and I

4    highlighted -- actually highlighted these in green.

5    Q.   All right.

6    A.   Some of the information is highlighted in green.  That was

7    done by me.

8    Q.   So what -- what information did you pull from Google

9    Analytics to create this document?

10   A.   What I pulled was the new users coming to -- the number of

11   new users coming to ArkOwl.com.  And it's showing the amount of

12   users -- new users from each state, along with the number of

13   sessions from those users.

14   Q.   Now, flipping back to page 1, what date range did you use

15   to pull this data?

16   A.   I used December 1 of 2011 to August 1 of 2017.

17   Q.   So this data reflects the Google Analytics from that period

18   of time?

19   A.   Yes.

20   Q.   Okay.  So, for example, the very first line says "New

21   York," under "new users," ▊▊▊.  What does that mean?

22   A.   That means that Google Analytics says that ▊▊▊ people --

23   or, you know, new hits -- happened on the websites from new

24   machines.

25   Q.   Okay.  Now there is -- the next column is "sessions" of

Robert Daline – Direct

1   ████████.   What would the sessions be?

2   *A.*  The sessions would be the amount of pages or the amount of

3   times each user came to the website.

4   *Q.*  Okay.  So --

5   *A.*  So I'll backtrack.  I said "people."  It could be people

6   or, you know, web crawlers or, you know, a machine coming to

7   the website.

8   *Q.*  Sure.  So this is Google Analytics' report showing the

9   number of unique users and then the number total?

10  *A.*  Correct.  Yes.  The number of users, and then the number of

11  page views.  So that could be repeat, them clicking on other

12  pages --

13  *Q.*  All right.  Now, I see the other column you highlighted was

14  AVG session.  What does that represent?

15  *A.*  I believe that's the average session time.

16  *Q.*  Does this --

17  *A.*  I believe that's in seconds, but I'm not -- you know, I'm

18  not as -- I'm not as sure on that one.  I know I highlighted it

19  at the time.  It might have said minutes in Google, but I'm

20  not -- I don't really recall on that one.

21  *Q.*  Now, the bottom of Exhibit 423 indicates the total new

22  users from the period of time we discussed is ████████████

23  ████████████.  Does that -- does that sound right to

24  you?  Is that something that you can corroborate by looking at

25  other of your internal data?

Robert Daline – Direct

1    A.   Yes.

2    Q.   What would you look at?

3    A.   I would look at -- we track query totals.  So we -- how I

4    would corroborate this would be to look at our internal query

5    totals, because we would have to have an internal process for

6    knowing query totals, because we charge per query.  And from

7    2011 to 2015, we didn't have an API, so they would have to be

8    actual people coming to our site, making those queries to our

9    system.

10   Q.   Okay.

11   A.   And that system -- the system that you would query is

12   behind the log-in, as well.  So you could come to the website,

13   log in, and then start using and querying the service.  And

14   those query numbers match up with the Google Analytics,

15   roundabout.

16   Q.   So I'm pulling up what has been marked as Exhibit 424.

17   This is another electronic only exhibit designated

18   confidential.

19            What is Exhibit 424?

20   A.   These are query volumes on a year-to-year basis and even a

21   day-to-day basis.  We break it down, day to day, month to

22   month, year to year.

23   Q.   For what period of time?

24   A.   Ever since the existence of ArkOwl.

25   Q.   All right.  So --

Robert Daline - Direct

1   A.   All the way back to 2011.

2   Q.   So I'm scrolling this over a little bit.

3             Column I, is that -- are those years in column I?

4   A.   Yes.

5   Q.   From rows 3 to 14?

6   A.   Yes.  So you can see the total for each year in column K

7   for -- down to 14.

8   Q.   So, for example, in 2012, row 13 says you had a total of

9   ████████   queries?

10  A.   Yes.

11  Q.   And for -- it appears this was not a full year for 2022; is

12  that accurate?

13  A.   Yes.

14  Q.   But in 2021 you had more than ████████ queries?

15  A.   Correct.

16  Q.   So we're going to scroll over a little bit to column Q.

17  What is under column Q?

18  A.   Those are the amount of API queries annually.

19  Q.   Okay.  So these would be the queries that were not

20  necessarily done by a human being?

21  A.   Yes, those were done by machines.

22  Q.   What is column U?

23  A.   Those are the ones performed by people coming to our

24  service, typing in a search, just like you do a Google search.

25  Q.   All right.  So this would be users of the user interface?

Robert Daline - Direct

1   A.  Yes.  And this is an annual amount.

2   Q.  All right.  So, for example, in 2021 you had about

3   ██████████  manual review queries?

4   A.  Yes.  And those could be combo queries of phone and

5   email.

6   Q.  All right.  I was going to ask you, column X, what does

7   that indicate?

8   A.  Column X is the amount of email address queries, so the

9   amount of times an email was queried.

10  Q.  Would that include both UI and API queries?

11  A.  Yes.

12  Q.  What is column AA?

13  A.  That is the amount of phone number queries.

14  Q.  And, then, finally, column AE?

15  A.  That is the number of email address queries.

16  Q.  All right.  So in your review of your query data and your

17  review of the Google Analytics data, did you come to any

18  conclusion about the reliability of the location data that you

19  got from Google Analytics?

20  A.  Well, not necessarily the location data, but the magnitude

21  of volume.  So the volume of Google Analytics matched up with

22  the volume that we were seeing.

23  Q.  Understood.  All right.

24       The next document we have is another AEO document, if

25  you don't mind.

Robert Daline - Direct

1          THE COURT:  Mr. Frasier, let me ask you to let me

2    know, please, when you think it might be a good time for a

3    short break.

4          MR. FRASIER:  We could do it now.

5          THE COURT:  Let's do that.

6          It's almost 10:35, so let's take a break until

7    10 minutes to 11:00.  Thank you.

8          (Recess at 10:34 a.m.)

9          (In open court at 10:53 a.m.)

10         THE COURT:  Mr. Daline, you can come back up to the

11   witness stand.  You remain under oath.

12         MR. FRASIER:  Thank you, Your Honor.

13         Thank you, everybody, for your patience.

14         Your Honor, are we on the record?

15         THE COURT:  We are.  Can you simply state the number

16   of the exhibit.

17         MR. FRASIER:  Yes.  We're looking at Exhibit 385.

18   This is also Attorneys' Eyes Only, which is why the plaintiff's

19   representatives are not in the courtroom.

20         THE COURT:  Thank you.

21   BY MR. FRASIER:

22   Q.  Mr. Daline, do you recognize Exhibit 385?

23   A.  Yes.

24   Q.  What are we looking at?

25   A.  I think this is a portion of last year's revenue tab, the

Robert Daline - Direct

1  finance -- the Excel finance sheet.

2  Q.  When you say "a portion," you mean it's not the entire

3  year?

4  A.  Yeah.  I don't think it's the full year.

5  Q.  Okay.  And this would be for 2022?

6  A.  2022.  Correct.

7  Q.  All right.  So column K, what is in column K?

8  A.  Those are any company that made a purchase in that year.

9  Q.  All right.  And then column L is what?

10  A.  The amount that -- the amount of services purchased in that

11  year.

12  Q.  Now, in the 2013 spreadsheets, almost all of the customers

13  that we looked at were in the online retail industry.  What

14  industry is ██████ in?

15  A.  ██████ is a fraud solutions provider, much like ████████

16  that we talked about earlier.

17  Q.  And we've already talked about your number one, number two,

18  number three, and number four highest revenue businesses for

19  2022.  Could you tell us about ██████

20  A.  █████ -- █████ is a short name for ████████████████

21  ████████████   They are a payment solutions provider out of

22  Brazil.  Online payments, I believe; but I don't think they

23  limit themselves.

24  Q.  All right.  Are there any other cybersecurity industry

25  businesses in Exhibit 385 as your customers?

Robert Daline - Direct

1   A.   ███████.com is a fraud prevention platform.  They also

2   advertise themselves as a payments solutions provider.  ███████

3   they advertise themselves as an identity verification solutions

4   provider, and I see them at the Merchant Risk Council for fraud

5   prevention.  ███████ is also a payments fraud prevention

6   provider.  I believe they're out of India.  ███████ is a

7   cryptocurrency exchange.

8   Q.   All right.  So ███████ is not in the cybersecurity

9   industry?

10  A.   That would be fintech, I think.

11  Q.   Fintech?

12  A.   Or cryptocurrency, if it's its own industry now.  I'm not

13  sure.

14  Q.   Okay.  So would ███████ be using ArkOwl to verify

15  individual transactions?

16  A.   I believe in order to sign up for the exchanges, it would

17  be more at account creation.  Because if you're making a

18  transaction -- and I'm not speaking to having used

19  cryptocurrency exchanges -- I mean, I guess I did have an

20  account on Coinbase; and I did not have to input my email

21  address every time I wanted to trade bitcoin for ethereum or

22  whatever.

23  Q.   So you suspect that it would be used just at the account

24  creation.

25  A.   That would be my suspicion, yes -- or assumption.

Robert Daline - Direct

1    *Q.*  On line 19 I see a company called ██████████

2    *A.*  I believe ████████ is like ██████  They're an identity

3    verifications provider in the fraud prevention space.

4    *Q.*  Now, I see down toward the bottom, ██████████ on line

5    36.  What is ████████████?

6    *A.*  ██████████ is healthcare.  They provide some sort of HSA

7    financial accounts online.

8    *Q.*  So what would they use ArkOwl for?

9    *A.*  I believe it would be for account creation verification, to

10   verify if a real person is the one signing up, I believe.

11   *Q.*  Okay.  A few up there on row 30.  ██████████, are you

12   familiar with that company?

13   *A.*  I believe it's a consulting group, potentially, out of

14   Europe.  They provide -- I believe they provide cybersecurity

15   consulting.

16   *Q.*  Now, row 43, ██████████████████████████, what is

17   that.

18   *A.*  The head of that is ██████████, and he has an online

19   course for open source intelligence.  And he has a lot of law

20   enforcement that attend his classes.

21   *Q.*  What is open source intelligence?

22   *A.*  Open source intelligence -- or OSINT -- is a term given for

23   information that you can readily find online.  Almost like

24   public information, like people just being really good at

25   finding stuff online.

Robert Daline - Direct

1    *Q.*  Is the data that ArkOwl gathers and provides OSINT?

2    *A.*  Yes.

3    *Q.*  There is a company called ███████████ in row 47.  What is

4    that company?

5    *A.*  I believe ███████████ is similar to the last two

6    companies, ██████████████████████████████, where

7    they're -- it's -- ███████████; right?

8    *Q.*  Yes.

9    *A.*  It's education.  And I think their mission is for -- yes,

10   their mission is to make the general public more

11   cyber-conscious, cyber-aware.  I think they train in best

12   practices for actual consumers to not, you know, readily give

13   out information that could result in them getting scammed.

14   *Q.*  Row 48 is ██████████████████████.  What is that?

15   *A.*  That's a police department in the U.K.

16   *Q.*  Row 52 at the very bottom is ██████████████████.  What

17   is that?

18   *A.*  I believe that's a different police department in the U.K.

19   *Q.*  Row 50 is ███████████   What is ████████████

20   *A.*  I believe that one is -- I'm forgetting.  I think it's a

21   payment solution provider in the U.K., I think, or in another

22   country.  But I'm not totally sure on that one.  I might need a

23   refresher.

24          *MR. FRASIER:*  All right.  We can close out of that

25   document.

62

Robert Daline – Direct

1        You can bring your clients in, if you'd like.

2        (Hearing continued in open court.)

3   *BY MR. FRASIER:*

4   *Q.*  I'd like to talk about your -- ArkOwl's marketing strategy

5   a little bit more.  What has been your strategy?

6   *A.*  What hasn't it been?

7   *Q.*  What has been?  What is your strategy?

8   *A.*  What has been.  Mainly word of mouth.  Our goal is to have

9   companies using us, talking about how amazing ArkOwl is to

10  other companies.

11  *Q.*  Now, we looked at a presentation you gave to the Merchant

12  Risk Council in 2012.  Have you given any more presentations

13  since then?

14  *A.*  Yes.

15  *Q.*  Yes.  Showing you what has been marked Exhibit 331.  Do you

16  recognize this exhibit?

17  *A.*  Yes.

18  *Q.*  What is it?

19  *A.*  email communication with the team at ███████████

20  *Q.*  All right.  And this is from August of 2018; is that right?

21  *A.*  Correct.

22  *Q.*  All right.  Did you give a presentation to ██████████ in

23  2018?

24  *A.*  Yes.

25  *Q.*  All right.  Who is ██████████

Robert Daline - Direct

1   A.   ██████████   is a fraud prevention platform solution.

2   Q.   What's ArkOwl's -- in 2018, what was ArkOwl's relationship

3   with ██████████

4   A.   We were wanting to be a vendor to ██████████ clients, have

5   our data integrated into their decision-making platform so that

6   their decisions could be made using some ArkOwl data.

7   Q.   So who would have attended the ██████████ presentation?

8   A.   These were ██████████ sales reps, business development reps

9   from all around the world.

10  Q.   You did a pair of related presentations in 2020; is that

11  correct?

12  A.   That's correct.

13  Q.   I'm showing you what is marked as Exhibit 352.  What is

14  Exhibit 352?

15  A.   This is a tweet -- no -- maybe a LinkedIn -- I think this

16  is a LinkedIn -- either way, a social media communication from

17  the Airline Info affiliation group, talking about the

18  presentation that I had given where I won a sales pitch award.

19  Q.   So this is one of the two presentations in 2020?

20  A.   Yes.

21  Q.   What is Airline Info, the organization?

22  A.   So I believe it's an airline and travel payments -- I think

23  that's what the ATPS stands for, potentially.  But it's an

24  affiliation group that brought together payments and fraud

25  professionals for the travel industry.

Robert Daline - Direct

1   Q.  Do you recall the name of the other organization you

2   presented to in 2020?

3   A.  It was LSA, loyalty security association, I think.  Loyalty

4   services association.

5   Q.  And according to 352, you won an award for one of the

6   pitches?

7   A.  Yes.

8   Q.  Showing you what has been marked Exhibit 353.  What -- do

9   you recognize it?

10  A.  Yes.

11  Q.  What is it?

12  A.  These are the lists -- I believe it's the list that was

13  sent out for the presentation itself.

14  Q.  In the top left it says "Attendee Report."  What do you

15  think -- what is contained in this spreadsheet?

16  A.  It contains those who signed in to view the presentation or

17  downloaded it later.

18  Q.  And which presentation would this have been?

19  A.  This was the airlines and travel.

20  Q.  All right.  So the one we just looked at?

21  A.  Correct, yes.

22  Q.  Now in column E, rows 4 and 5, it says number attended,

23  195.  Does that sound accurate to you?

24  A.  That sounds accurate, yes.

25  Q.  One hundred ninety-five people attended?

Robert Daline - Direct

1   *A.*  I believe so.  I was -- you know, in those things, it's

2   like a Zoom, where you're presenting to a camera; you're not

3   actually in front of 200 people.  But I believe so.  We had

4   some solid questions afterwards.

5   *Q.*  Generally speaking, what is ArkOwl's relationship with the

6   195 attendees of the presentation?

7   *A.*  They are potential clients or potentially they're even

8   clients.  But potentially there were clients that tuned in, but

9   I -- I was doing it to -- for potential clients.

10  *Q.*  Sure.  Now, I'm going to scroll over to column J.  Do you

11  see column J?

12  *A.*  Yes.

13  *Q.*  What is in column J?

14  *A.*  The name of the company that the person that put down that

15  they go -- that they come from.

16  *Q.*  All right.  I'm just going to ask you about a few of these.

17  So I see on column J, row 26, there is a company called

18  ████████  Was  ████████  a potential customer of ArkOwl's?

19  *A.*  Yes.  I actually talked to the founders of that company at

20  one of the Merchant Risk Council events.  And they were -- I

21  showed them a demo of ArkOwl.  They were very interested.

22  *Q.*  Now, on column J, row 130 there is a company called

23  ████████  Is  ████████  a potential customer of ArkOwl?

24  *A.*  Yes.  They're similar to  ████████  as well as  ████████

25  *Q.*  On column J, row 154, a company called ████  Is ████ a

Robert Daline - Direct

1   potential customer of ArkOwl's?

2   *A.*   Yes.   They do the same thing as ███████ and they

3   advertise a fraud platform.

4   *Q.*   I'm showing you what has been marked as Exhibit 354.   Do

5   you recognize Exhibit 354?

6   *A.*   Yes.   This is the result of the other one I did at the same

7   time for the loyalty security association.

8   *Q.*   It's the attendees from the -- from the other presentation?

9   *A.*   Correct.

10   *Q.*   All right.   In column E, it says number attended, 76.   Does

11   that sound right to you?

12   *A.*   That sounds right.

13   *Q.*   What's ArkOwl's relationship with the companies that

14   attended this presentation?

15   *A.*   Potential customers.

16   *Q.*   All right.   Column J, it says, "Organization."   Is that the

17   name of the organizations that attended?

18   *A.*   Yes.

19   *Q.*   All right.   So row 13 has ███████   Are you familiar with

20   ██████

21   *A.*   ██████ is like █████████ and ███████

22   *Q.*   Are you familiar --

23   *A.*   I am very familiar with them, yes.

24   *Q.*   Would they be a potential customer of ArkOwl?

25   *A.*   Yes.   If they didn't only go for Israeli -- I think ███████

Robert Daline – Direct

1   only does business within Israel, though; so we don't do that.

2   Q.  So they're not an existing customer?

3   A.  But I know they need what we have, because I know the

4   companies that directly compete, and a lot of them are either

5   interested or are our customers.

6   Q.  All right.  Has ArkOwl received any sort of media coverage?

7   A.  Define "media."  Is that --

8   Q.  How about we look at an exhibit.

9        Exhibit No. 343, do you recognize this document?

10  A.  Yes.

11  Q.  What is it?

12  A.  I believe when I was Google searching ArkOwl, I was able to

13  find this one, that mentions -- mentions us and mentions the

14  partnership that we have with NICE Actimize.

15  Q.  So I'll just jump down to page 3 of Exhibit 343.  Toward

16  the bottom of the page it reads, "NICE Actimize's solution

17  pulls together a variety of identity-proofing tools from

18  different providers through its X-Sight Marketplace, included

19  as digital identity verification from Ekata and ArkOwl."  Is

20  that what you're referring to?

21  A.  Yes.

22  Q.  I want to take a brief look at other parts of this

23  document.  The top of page 2 references synthetic ID fraud.

24  Are you familiar with that phrase?

25  A.  I am.

Robert Daline - Direct

1   *Q.*   What is synthetic ID fraud?

2   *A.*   Synthetic ID is when a fraudster would create a whole

3   new -- basically, if you've seen the movie *Shawshank*

4   *Redemption*, Andy Dufresne creates a synthetic identity.   Over

5   years and years, he's creating this identity.   He creates

6   credit cards that match; he creates license and identification

7   that match this made-up person.   And then, you know, in the

8   ending scene -- I'm sorry if you haven't seen the movie -- he

9   walks into a bank and uses the -- uses the things he's built up

10   for the synthetic ID.

11   *Q.*   Is ArkOwl designed -- used to prevent synthetic ID fraud?

12   *A.*   Yes.

13   *Q.*   The next paragraph under the one we just looked at, the

14   article, talks about, "Other categories of fraud are close

15   behind synthetic ID fraud, the survey suggested.   Third-party

16   fraud, which includes routine account take-over fraud when a

17   criminal steals access to a customer's account, and first-party

18   fraud, where customers deliberately or unknowingly disavow

19   purchases they made, are also top concerns for lenders."

20          Is that -- does ArkOwl assist in preventing those two

21   types of fraud?

22   *A.*   Yes.

23   *Q.*   How?

24   *A.*   Well, oftentimes fraudsters miss -- miss things.   And if

25   they miss the email address, that's where ArkOwl can really

Robert Daline – Direct

1    help out.  When it comes to an email address being in, like, an

2    account takeover, ArkOwl shows the breach data.  And then in

3    the breach data, it could say, this email was in this breach.

4    Along with this breach, were leaked passwords, real names,

5    credit card info.  So ArkOwl could give a hint to whoever is

6    researching the email address that potentially this email

7    address has had its password compromised and is being used by

8    somebody that's not the original owner.

9    Q.  Now, it mentions lenders.  Are lenders potential customers

10   for ArkOwl?

11   A.  Yes.

12   Q.  Now, toward the bottom of this same page, the article

13   reads, "As a starting point, financial institutions, merchants,

14   and government agencies need to overlay data from different

15   channels to verify identifies for new accounts earlier in the

16   onboarding process, Marcos said."

17         Is ArkOwl's data able to be used to verify identities

18   for new accounts?

19   A.  Absolutely.  Any time online you have, you know, the

20   opportunity to join, you know, an account or join a log-in for

21   a website, the first thing they ask you is probably for your

22   phone number or email address.

23   Q.  What -- are you familiar with -- we just mentioned account

24   takeover fraud.  Is that something that ArkOwl is able to

25   prevent?

Robert Daline – Direct

1  *A.*  It's able to help with the data.

2  *Q.*  What's the company SEON?

3  *A.*  SEON advertises itself as a fraud prevention platform.

4  Taking a look at its API, it looks almost identical to the

5  response that we would give customers.  So --

6  *Q.*  It's a competitor?

7  *A.*  Competitor; correct.

8  *Q.*  All right.  Do you recognize Exhibit 349?

9  *A.*  Yes.

10  *Q.*  What is it?

11  *A.*  It's something that SEON had created.

12  *Q.*  I'll zoom in here.  If we're looking at the top -- first

13  page of Exhibit 349, this is an article by one of your

14  competitors?

15  *A.*  Yes.

16  *Q.*  The title is "Ten Best Fraud Detection Software and Tools

17  in 2021"; is that right?

18  *A.*  Yes.

19  *Q.*  To no surprise, I see SEON listed itself among the best

20  fraud detection softwares.

21       *THE COURT:*  So it's a truly objective list, is what

22  you're saying.

23       *MR. FRASIER:*  That's right.  Completely objective

24  list.  Reliable.

25

Robert Daline – Direct

1    *BY MR. FRASIER:*

2    *Q.*  I see ArkOwl is also on that list; is that right?

3    *A.*  Yes.

4    *Q.*  First of all, did you ask SEON to list you in its --

5    *A.*  Absolutely not.

6    *Q.*  Now, are -- the other nine companies ArkOwl is listed next

7    to in this article, are they competitors to ArkOwl?

8    *A.*  They could be, depending on where we grow or where they

9    grow.

10   *Q.*  Now, ███████ is a customer of yours; right?

11   *A.*  Yes.

12   *Q.*  But it's listed beside you as a potential competitor?

13   *A.*  Yes, according to this.

14   *Q.*  Could the -- other than ArkOwl, do the other nine companies

15   in this list only operate in verifying online retail

16   transactions?

17   *A.*  I think that what this list -- right -- as created by SEON,

18   it's representative of SEON's competitors.  And SEON we see as

19   a copycat to our service.  So being that they recognize these

20   as their competitors, you know, potentially there are ways we

21   can compete here.

22   *Q.*  Are there any other companies in this list that contain the

23   word "ArkOwl"?

24   *A.*  No.

25   *Q.*  "Owl"?

72

Robert Daline - Direct

1   *A.*   No.

2   *Q.*   Anything similar to "ArkOwl"?

3   *A.*   No.

4   *Q.*   I think we've mentioned briefly NICE Actimize.  What is

5   NICE Actimize?

6   *A.*   I believe NICE Actimize is a fraud solutions platform

7   provider for -- they target banking and fintech clients and

8   consumers.

9   *Q.*   And what is ArkOwl's relationship with NICE Actimize?

10  *A.*   We are a data partner.  If a client is using NICE Actimize,

11  they can allow data to flow through them -- ArkOwl data to flow

12  through their service to help -- basically update enrichment to

13  help their decision-making.

14  *Q.*   Do you recognize Exhibit 336?

15  *A.*   Yes.

16  *Q.*   What is Exhibit 336?

17  *A.*   I believe this is the NICE Actimize website and the profile

18  that they have for ArkOwl's services.

19  *Q.*   All right.  So in addition to allowing people to use it

20  through NICE Actimize, could customers find you directly from

21  its website?

22  *A.*   Yes.

23  *Q.*   Do you recall when you became a data partner to NICE

24  Actimize?

25  *A.*   I -- I don't recall when; but I know that when it happened,

Robert Daline – Direct

1    there was a bunch of alerts going off on my phone that we were

2    mentioned all over the place.

3    Q.   Do you know why that is?

4    A.   Because they made -- they're a publicly traded company, and

5    they made public announcements of the partnership between us

6    and them.

7    Q.   All right.  So pulling up Exhibit 335.  Do you recognize

8    Exhibit 335?

9    A.   Yes.

10   Q.   What is Exhibit 335?

11   A.   This is NICE Actimize's public announcement of the

12   partnership between us and them.

13   Q.   And I just zoomed into the top.  The headline of the

14   article is, "ArkOwl joins NICE Actimize's X-Sight Marketplace,

15   the industry's first financial crime management ecosystem,"

16   with a subheadline of, "Partnering with the X-Sight

17   Marketplace, ArkOwl offers a search interface that conducts

18   checks against email addresses and phone numbers for

19   verification against potential fraud."

20           So did you say this was a press release that NICE

21   Actimize pushed out?

22   A.   Yes.

23   Q.   All right.  Do you know where else picked up the press

24   release and published it?

25   A.   All sorts of news sites in our industry, in the payments

Robert Daline - Direct

1    industry.  I think, you know, one of the big ones that I'll

2    look at is Papers.net, I think they had one.  Bloomberg had

3    one.  You know, I probably need to look at a list to remember

4    the rest.

5    Q.  Now, NICE Actimize, are their customers retail customers?

6    A.  I believe they're banks and fintech.

7    Q.  Financial crime management ecosystem is what the headline

8    says.

9         Now, you mentioned Papers.com.  Is this the reference

10   here that you're talking about?

11   A.  Yes.

12   Q.  I know it's small on the bottom.  I can scroll down to the

13   bottom of the first page.

14   A.  Yes.

15   Q.  There is a handful of other exhibits with the same press

16   release, and we don't need to go through all of them.  I do

17   want to ask you about one of them, though.

18        Well, first of all, did you pay NICE Actimize to issue

19   this press release?

20   A.  I did not.

21   Q.  All right.  And the press release is dated in September of

22   2019.  Does that sound accurate to you?

23   A.  Yes.

24   Q.  So I have Exhibit 339 up.  And what is Exhibit 339?

25   A.  It looks like the same press release but from a business

Robert Daline – Direct

1    wire -- Bloomberg -- I'm seeing Bloomberg in the upper right,

2    so I think this was on their website as a news article.

3    Q.  And the introductory paragraph says, "Helping financial

4    services organizations keep up with a changing market

5    landscape, NICE Actimize, a NICE business and leader in

6    autonomous financial crime management, today announced that

7    ArkOwl has joined the X-Sight Marketplace, the industry's first

8    financial crime risk management focused ecosystem, designed to

9    assist financial services organizations, evaluate new

10   best-of-breed solutions, and move to stay on top of a

11   challenging regulatory and criminal environment."

12          The question is, becoming a partner of NICE Actimize,

13   was it your opinion that ArkOwl could be used by financial

14   services organizations to do what this article describes?

15   A.  Absolutely.  Yes.

16   Q.  Would NICE Actimize have let you become a data partner if

17   it didn't think you would be useful for those same services?

18   A.  I highly doubt it.

19   Q.  What is the website About-Fraud.com?

20   A.  About-Fraud.com is similar to Paladin report.  It is a site

21   that collects companies that are in the fraud prevention space

22   and compiles profiles on them to help users understand the

23   landscape.

24   Q.  Okay.  And I'm showing you what has been marked as

25   Exhibit 330.  Do you recognize this exhibit?

Robert Daline – Direct

1    A.   Yes.

2    Q.   What is it?

3    A.   This is our profile -- or the -- the intro to our profile

4    for About-Fraud from some years ago.

5    Q.   Do you recall when you had your profile posted on

6    About-Fraud.com?

7    A.   Maybe 2017.

8    Q.   All right.  And just briefly, what is Exhibit 333?

9    A.   This is a blog that About-Fraud -- that I partnered with

10   About-Fraud on.

11   Q.   All right.  Pulling up what has been marked as Exhibit 346.

12   Do you recognize Exhibit 346?

13   A.   Yes.

14   Q.   What is Exhibit 346?

15   A.   346 is kind of the -- the image of all of the company logos

16   that are on About-Fraud at the -- at that time.  Looks like

17   2020.

18   Q.   All right.  And ArkOwl I see is in the Data Consortium and

19   Verification box; is that right?

20   A.   Yes.

21   Q.   Did you have any say in where ArkOwl was put in these

22   boxes?

23   A.   I don't think so.

24   Q.   The four boxes that About-Fraud created, are they

25   canonical?  Are they the type of boxes where -- the market

77

Robert Daline – Direct

1   generally has created?

2   A.  I don't –- maybe reask that question.

3   Q.  Sure.  Are these standard definition boxes of subcategories

4   within the cybersecurity industry?

5   A.  No.  I believe this is where the About-Fraud analysts put

6   these.

7   Q.  Are there any direct competitors of ArkOwl on this graphic?

8   A.  Yes.

9   Q.  Which ones?

10  A.  Emailage, Pipl, I would say also IPQualityScore, Email

11  Hippo, potentially WhoisXML, Ekata, SEON.

12  Q.  Is there any potential customers of ArkOwl on here?

13  A.  Yes.

14  Q.  Which ones?

15  A.  Well, I'm thinking all of them.

16  Q.  Are there any existing ArkOwl customers?

17  A.  Maybe not a lot in the chargeback management area.

18          Sorry.  What was the last question?

19  Q.  No problem.  Are there any existing ArkOwl customers?

20  A.  Yes.  We should have ███████████████, CyberSource —-

21  Q.  That's fine.  In this graphic, there are —- there are quite

22  a few companies listed in here.  Are any of them also called

23  ArkOwl?

24  A.  No.

25  Q.  Do you see any logos that look similar to the ArkOwl logo?

Robert Daline - Direct

1 | A. No.

2 | Q. Do you see any of the companies listed on this graphic that

3 | are a two-word -- two-syllable word ending in "owl"?

4 | A. No.

5 | Q. Do you --

6 | A. Email Hippo has a hippo in it, as far as animal goes.

7 | Q. Do you see any other companies that use "owl" in this

8 | graphic at all?

9 | A. No.

10 | Q. All right. Showing you what has been marked as

11 | Exhibit 347. What is Exhibit 347?

12 | A. This is a newer About-Fraud infographic.

13 | Q. It says it's Q4 2021. So it's about a year later?

14 | A. Yes.

15 | Q. All right. Now, this graphic is broken down differently

16 | than the previous graphic. Do you know -- did anything

17 | fundamentally change about the industry?

18 | A. I -- there might have been newer start-ups come up in the

19 | industry, but -- I'm not sure. I know the infographic changed.

20 | Q. I see ArkOwl on the bottom right, in the Identity and

21 | Verification section, with the subsection PII Verification. Do

22 | you believe that's an accurate way to characterize ArkOwl?

23 | A. Yes.

24 | Q. Do you have any idea why the two graphics changed over the

25 | course of a year?

Robert Daline - Direct

1   *A.*  I think this might be a more granular breakdown, but I

2   don't -- I didn't ask.

3   *Q.*  Now, generally speaking, does Exhibit 347 contain the same

4   type of companies as we were looking at in 346?

5   *A.*  Yes.

6   *Q.*  Now, under the Identity and Verification section, there is

7   now a box called Dark Web.  Are you familiar with either of the

8   companies in the Dark Web Identity and Verification box?

9   *A.*  I talked with SpyCloud.  So, yes.

10  *Q.*  Tell me about your conversation with SpyCloud.

11  *A.*  I was asking them how they compared with "Have I Been

12  Pwned?"  And they were saying how they can provide more

13  in-depth information than "Have I Been Pwned?," they can

14  provide potentially more PII data than "Have I Been Pwnd?," and

15  they were -- I regularly get sales emails from them offering,

16  you know, their data to be a part of our dataset, because they

17  know that we're using "Have I Been Pwned?"  So they were

18  directly trying to compete with "Have I Been Pwnd?" for our

19  business.

20  *Q.*  Do you know -- do you -- About-Fraud placed that company in

21  the Identity and Verification section.  Do you know if SpyCloud

22  provides identity and verification services?

23  *A.*  I believe they do, because that's what they advertised they

24  would do for us.

25  *Q.*  Now, the other company in that box is called Gemini

80

Robert Daline - Direct

1  Advisory -- Gemini Advisory.  Are you familiar with that

2  company?

3  A.  I am not.

4  Q.  In the graphic 347, are there any other ArkOwl companies?

5  A.  No.

6  Q.  Do you see any companies that have a similar logo to ArkOwl

7  in this graphic?

8  A.  ClearSale has a bird.

9  Q.  Would you consider that similar to ArkOwl's logo?

10  A.  Maybe the bird aspect; but, no.  It's definitely not black

11  and white.

12  Q.  Do you see any companies in this graphic that use the word

13  "owl"?

14  A.  No.

15  Q.  Are there any companies with a name that you would consider

16  similar to ArkOwl in this graphic?

17  A.  Like previously mentioned, Arkose Labs starts with Arkose.

18  But other than that, no.

19  Q.  Now, this graphic has Arkose Labs' entire logo in it.

20  Would you consider its logo in its entirety to be similar to

21  ArkOwl's logo?

22  A.  I spotted maybe another clarification.  ARIKI.  Starts with

23  an "A" -- "A-R," and it has a "K" in it, but the "K" is

24  backwards.  Sorry -- sorry to --

25  Q.  No.  No problem.  Would you consider Arkose Labs' entire

Robert Daline - Direct

1  logo to be similar to ArkOwl's?

2  *A.*  No.

3  *Q.*  Do you know whether any other companies are providing

4  identity and verification services using data from the darknet?

5  *A.*  Yes.  IPQualityScore, we've been looking into them.  They

6  also offer darknet data.  And that's how they advertise it, as

7  darknet data, I believe.

8  *Q.*  IPQualityScore is in this graphic in the same sub box as

9  you under Identity and Verification and PII Verification?

10  *A.*  Yes.

11  *Q.*  Do you recognize Exhibit 344?

12  *A.*  Yes.

13  *Q.*  What is Exhibit 344?

14  *A.*  These are the pricing options for IPQualityScore.

15  *Q.*  All right.  How do you know IPQualityScore is using darknet

16  data?

17  *A.*  Because they say so in the options.  If you look at the

18  dark data option, the one that is highlighted there.

19  *Q.*  Okay.  And do you recognize Exhibit 345?

20  *A.*  Yes.  That's a zoom-in of that -- of the info when you

21  click on the dark data from that option.

22  *Q.*  All right.  So on the website IPQualityScore?  So -- I'm

23  sorry.  345 is a zoom-in from the website from IPQualityScore?

24  *A.*  Yes.

25  *Q.*  Okay.  Do you compete directly with IPQualityScore?

Robert Daline - Direct

1   A.  Potentially, sometimes.  They do take emails, and they do

2   advertise email verification, as well as phone number

3   verification, IP verification.  So I would say we do go head to

4   head.

5   Q.  And in the above graphic we looked at, they were listed as

6   PII verification; is that right?

7   A.  Yes.

8   Q.  We didn't look closely at the financial documents, but I

9   know you don't spend a large percentage of your revenue on

10  marketing.  Why is that?

11  A.  Because we really depend on word of mouth, and that's the

12  direction we've chosen, more word of mouth.  We're -- we've

13  made it work for almost eleven years now, just staying really

14  gorilla with our marketing.

15  Q.  You said you made it work.  Do you believe that your

16  word-of-mouth marketing has been effective?

17  A.  Yeah.  We continue to grow in our sales every year; we

18  continue to grow in query volume every year; we continue to get

19  new customers from our word of mouth.

20  Q.  Any other ways that you know that your marketing has been

21  effective?

22  A.  It's been effective in that our name is known throughout

23  the industry.  When people come up to us, say, Oh, you're

24  ArkOwl, you know, I heard about you.  What do you guys do?

25  It -- word of mouth allowed us to have the partnership with

Robert Daline – Direct

1   NICE Actimize.  They had heard about us through ████████ --

2   through reps at Accertify.

3   Q.  Now, we talked about CyberSource a few times.  You said

4   it's a Visa company; right?

5   A.  Right.

6   Q.  Do you have any idea how many fraud analysts CyberSource

7   might employ?

8   A.  Today, I think they employ 800 on their team, about.

9   Q.  Do you recognize Exhibit 334?

10  A.  Yes.

11  Q.  What is it?

12  A.  This is potentially a current CyberSource analyst or

13  ex-CyberSource analyst basically sharing the terms and how they

14  note-take an order.  When I was a fraud analyst, to save on

15  time, we would develop different ways of communicating with

16  other analysts, because we would write notes as to why we made

17  the decision we did.  Management would want to see that.  You

18  know, in case the good person's order got canceled or a bad

19  person's order was let through, the notes really helped show

20  why the analyst made the decision.

21          In this case, it's showing the acronyms that

22  potentially CyberSource analysts would use when communicating

23  with each other through their system about orders.

24  Q.  All right.  The top one is ARK, paren, ArkOwl.  That's a

25  reference to your company; is that correct?

Robert Daline – Direct

1  *A.*  Yes.

2  *Q.*  All right.  So is it fair to say that the manual -- the

3  people attending the manual review desk at CyberSource know

4  they're using ArkOwl as a tool?

5  *A.*  Yes.

6  *Q.*  Have you searched LinkedIn for references to ArkOwl?

7  *A.*  Yes.

8  *Q.*  All right.  Let's take a look at one here.

9        How did you find the LinkedIn posts that have been

10  marked as exhibits?

11  *A.*  I was able to search somehow by -- I typed in "ArkOwl," and

12  I was able to either search in the description or the skills on

13  LinkedIn.  Just a general search.

14  *Q.*  Understood.  And then you -- what did you do when you found

15  those?

16  *A.*  When I found this?  I -- I scanned it.

17  *Q.*  So I -- the exhibits that are in the record that we don't

18  need to go through are the ones that you found?

19  *A.*  Yes.

20  *Q.*  All right.  We've looked at a few different documents

21  identifying many other companies in the cyber industry.  We

22  looked at 46 in the Paladin Vendor Report and nearly 100

23  About-Fraud graphics.  Did we see any other company using

24  ArkOwl as a name?

25  *A.*  No.

Robert Daline - Direct

1   Q.  Did you see any that contained the word "ArkOwl" but with

2   one or two letters different?

3   A.  No.

4   Q.  Did you see any companies that had "owl" in it at all?

5   A.  No.

6   Q.  Now, you've been in the industry for -- since late 2011; is

7   that right?

8   A.  Yes -- well -- ArkOwl industry or myself?

9   Q.  You personally.

10  A.  I've been in it since 2010.

11  Q.  All right.

12  A.  Late 2010.

13  Q.  In that time have you ever encountered other companies

14  using the name ArkOwl?

15  A.  Well, DarkOwl.

16  Q.  Other than DarkOwl?

17  A.  No.

18  Q.  Have you encountered any other companies using a similar

19  logo?

20  A.  No.

21  Q.  Other than DarkOwl, have you encountered any other

22  companies using a similar two-syllable name ending in "owl"?

23  A.  Maybe Cyber Owl, I think.  Either that, or that was from

24  this case.  So -- if it's from this case, then, no.

25  Q.  How many other companies in your experience and in the

Robert Daline – Direct

1   industry that you work in have the word "owl" in it at all?

2   A.   Not very many, if I can even recall.

3   Q.   Now, DarkOwl has offered as exhibits a handful of trademark

4   registrations from other companies that have the word "owl" in

5   it.  I want to ask you about a few of those.

6   A.   Okay.

7   Q.   This is Exhibit 119.  First of all, the word name is Owl

8   Cyber Defense.  Is that similar to ArkOwl?

9   A.   In the fact that it has "owl."  Outside of that, no.

10  Q.   Now, the way "owl" appears with the logo, would you say

11  that is similar to how ArkOwl's logo and name appears side by

12  side?

13  A.   No.

14  Q.   Now, in the Goods and Services section, this registration

15  describes Owl Cyber Defense as having computer hardware and

16  recorded software for secure data transfer.  Would you consider

17  a company offering computer hardware and recorded software for

18  secure data transfer in the same industry as ArkOwl?

19  A.   No.  Hardware, recorded software, no.  Data, that "data"

20  word, maybe.

21        THE COURT:  Mr. Frasier, I'm sorry to interrupt you.

22  But I think you referred to it as Exhibit 119, and it is not

23  Exhibit 119 in my book.

24        MR. FRASIER:  I may have put it in before it was

25  renumbered.  I apologize.

Robert Daline - Direct

1          It's Exhibit 103.

2          *THE COURT:*  Thank you.

3     *BY MR. FRASIER:*

4     *Q.*  Showing you what is marked as Exhibit 106.  OWL SCAN, do

5     you see that?

6     *A.*  Yes.

7     *Q.*  Does OWL SCAN sound like ArkOwl?

8     *A.*  No.

9     *Q.*  Now, zooming in on Goods and Services it was registered

10    for.  It says, "For downloadable mobile software applications

11    for transmission of online-based information accessed via a

12    visual reference, namely, a matrix bar code or other visual

13    codes, for purposes of validating and installing electronic

14    security devices on a network."

15          Are those -- downloading mobile software applications

16    in the same industry as ArkOwl?

17    *A.*  No.

18    *Q.*  Showing you what has been marked as Exhibit 115, SPATIOWL.

19    Under the Goods and Services, SPATIOWL is registered as a

20    computer software for use in collecting, analyzing, providing

21    location information, computer software for use in traffic

22    prediction, routing search, and voice processing.

23          Is that something that is in ArkOwl's industry?

24    *A.*  We're getting closer with computer software and potentially

25    analyzing, but -- potentially that word "data."  But still, no.

Robert Daline - Direct

1    Nothing -- nothing about fraud or PII data.

2    Q.  And Exhibit 120 is WatchOwl.  I'm going to zoom in on the

3    Goods and Services.  We'll just look at the first one, "For

4    encoded microparticulates, tags and taggants of plastic, metal

5    or silicate for use in the field of passive labeling, tracing,

6    or tracking of persons, animals, or vehicles or goods of any

7    kind."

8           Is that goods and services in ArkOwl's industry?

9    A.  No.  We would have to really grow --

10   Q.  Okay.

11   A.  -- into a lot of different areas to get there.

12   Q.  Have you ever gone to the trademark website and conducted a

13   search for the name ArkOwl?

14   A.  Yes.

15   Q.  How recently did you do that?

16   A.  In the past week.

17   Q.  What results came up?

18   A.  Just two -- well, four.

19   Q.  What were they?

20   A.  DarkOwl and ArkOwl.

21   Q.  You said there were four?

22   A.  Two said ArkOwl, and two said DarkOwl.

23   Q.  And no other marks came up when you searched ArkOwl?

24   A.  No.

25   Q.  Now, you testified in the previous hearing that you

Robert Daline - Direct

1    originally discovered DarkOwl in 2019.  What -- how did that

2    come about?  What were you doing?

3    A.  We were just coming out with our phone number verification,

4    and so we wanted to do a slight rebrand to stay the same ArkOwl

5    but also say that we just came out with a groundbreaking new

6    feature.  So we coupled it with probably a -- you know, a

7    slight adjustment of the branding to be able to show that we

8    were the same but we're new.

9    Q.  Okay.  So how did that lead to your discovery of DarkOwl?

10   A.  As I was, you know, searching -- searching owls up and

11   thinking about, you know, how -- how it could look, that's

12   when -- I was actually looking for -- we had developed a logo,

13   and I was looking for a back -- a picture background.  And so I

14   was looking for owl pictures that could go in the background of

15   a main website, and then that's when I came across DarkOwl's

16   website.

17   Q.  Do you recognize Exhibit 377?

18   A.  Yes.

19   Q.  Okay.  I can flip through these pages for you.

20        Tell me what Exhibit 377 is.

21   A.  This is my text history with co-founder Mike Greiling.  And

22   I was showing him all of the owl backgrounds to websites that I

23   had come up with.  And then I threw the DarkOwl website in

24   there.

25   Q.  This was in September 20 of 2019; does that sound right?

Robert Daline - Direct

1   A.   Yes.

2   Q.   Was this the first time you discovered ArkOwl [sic]?

3   A.   DarkOwl, yes.

4   Q.   Okay.  Thank you.  Now, why didn't you send DarkOwl a

5   letter at that point?

6   A.   Because when I read -- when I briefed over their website,

7   it didn't sound like -- that they were in email verification,

8   phone number verification, that they provided any data on

9   emails or phones.  It didn't seem like they were going after

10  fraud prevention.  It seemed like they were more going after,

11  like, pin testing, internal security for companies.  And it

12  didn't seem like they were in the same industry as us; so I

13  kind of just thought, you know, we'll let that be.

14  Q.   Did you take any proactive steps after discovering DarkOwl

15  to protect ArkOwl's brand?

16  A.   Yes.  I went and I -- I made sure it was trademarked to

17  make sure that -- you know, if other companies want to have

18  "ArkOwl" in it, that they're able to find our name via

19  trademark search.

20  Q.   So in September of 2019, at what point did your opinion on

21  DarkOwl change?

22  A.   It changed when I got an email from one of our top

23  customers -- or a prominent client at that time -- sounding

24  confused as to if we were DarkOwl, and if we had just sent them

25  an email to solicit our new effort.  I got an email from ███

Robert Daline - Direct

1    ███████ saying, Is this you guys?  Is this your effort?

2    *Q.*  We're looking at Exhibit 380.  What is Exhibit 380?

3    *A.*  This is the email from ███████ from ███████ ███████ is

4    the ████████████████████

5    *Q.*  He wrote, "Just wanted to give you a heads-up, though you

6    are probably already aware, that DarkOwl exists and seems to be

7    a pretty blatant ripoff of your style and name.  We have

8    received standard sales cycle emails from them, and they seem

9    like a real company, at least.  Any chance it's another project

10   from you guys?"

11        Is this what made you change your mind about DarkOwl?

12   *A.*  That.  And then I went to the DarkOwl.com and saw words

13   like "PII."  "We have 8.4 billion email addresses, fraud

14   protection."  So I started seeing a lot more words that

15   somebody could go to the website and confuse it for, you know,

16   not only our name, but also potentially what we do.

17   *Q.*  Okay.  And we'll talk about that a little bit more in

18   detail.

19        Do you recognize Exhibit 381?

20   *A.*  Yes.

21   *Q.*  And what is Exhibit 381?

22   *A.*  This is the forward from ███████ of an email address to ███

23   at ███████ from a representative of DarkOwl.com.

24   *Q.*  And remind me, what does ███████ do?

25   *A.*  They are a fraud prevention solution provider.

Robert Daline – Direct

1   Q.  Who are their customers?

2   A.  Their customers could be merchants, fintech, anybody that

3   would, you know, have use of a fraud department or need a fraud

4   department.

5   Q.  Now, on the second page, the DarkOwl representative wrote

6   to ██████ "While the data provided by traditional dark web

7   monitoring sites is limited, we can enable Apruvd to access

8   darknet data with more breadth, depth, and volume to better

9   serve your customers.  DarkOwl provides a comprehensive data

10  environment to monitor when personal identification info, PII,

11  is posted on behalf of your clients."

12          Is that something that ██████ could use to verify --

13  to describe its services to its customers?

14  A.  I believe so.  That's what they're advertising.

15  Q.  Other than your interaction with ██████ that we just

16  looked at, have you experienced any other instances where

17  someone thought you and DarkOwl were somehow related?

18  A.  Yes.  So while at the Merchant Risk Council in 2021, I

19  believe, somebody came up to our booth from the U.S. Postal

20  Service.  He came up to our booth saying, I use you, you know,

21  3 to 5,000 times a day.  We love you guys.

22          You know, I'm pretty confused, because I know the U.S.

23  Postal Service doesn't use us.  But anyone who could be at this

24  conference is a potential customer, so I don't want to outright

25  say, What are you talking about?  So, you know, I kind of asked

Robert Daline – Direct

1   a little further.  And he's like, Yeah, we've been talking

2   about Leah.  Leah is one of our favorites.  And I was, like,

3   Okay.  Well, we don't employ anyone named Leah.

4          And, you know, after maybe, like, three minutes of

5   talking, he goes, You guys are DarkOwl, right?  You know, and I

6   said, No, we are ArkOwl.

7   Q.  Is U.S. Postal Service a customer of yours?

8   A.  No.

9   Q.  Is U.S. Postal Service a potential customer of yours?

10  A.  Yes.  I believe so.  I believe U.S. Postal uses -- has the

11  use for email -- email enrichment data.

12  Q.  So you testified a little bit ago that you went to

13  DarkOwl's website a second time after you received your email

14  from ███████.  What type of content did you find in 2021 that

15  concerned you enough to send DarkOwl a letter?

16  A.  You know, the words of "fraud," words of "PII data,"

17  words -- them saying that they had X number of email

18  addresses was probably the major one for me.  It was, okay, you

19  know, now they're using our name and logo; and they're outright

20  advertising, we have X number of email addresses.

21  Q.  Why was that a concern for you?

22  A.  Because email address is like our main input.  It's the

23  main reason why our clients love us.

24  Q.  Were they advertising to -- to the best of your

25  recollection, were they advertising that they could use email

Robert Daline – Direct

1    inputs for anything in particular?

2    A.  I -- I do not recall looking into whether they even had an

3    email input at that time.

4    Q.  But do you recall whether they were -- what they were

5    advertising with regard to email inputs?  Or email?

6    A.  Yeah.  My thought was -- was that they were using it for

7    data enrichment of email addresses.

8    Q.  Do you recall any discussion on DarkOwl's website about

9    PII?

10   A.  I -- I do not recall.  But I know if I go there today,

11   there is a bunch of things that say "PII" all over the website.

12   Q.  And PII was mentioned in the email we just looked at?

13   A.  Correct.

14   Q.  Showing you what has been marked Exhibit 92.  Do you

15   recognize what Exhibit 92 is?

16   A.  Yes.  I believe it's DarkOwl's website.

17   Q.  All right.  And in the middle of the first page --

18   A.  That word of "digital identity" would have scared me too.

19   Q.  So is there anything concerning to you about them --

20   DarkOwl advertising that they have 8.1 billion email addresses

21   in their database?

22   A.  Absolutely.  I mean, ████████████████████████████████

23   ██████████.

24   Q.  Now, in the -- immediately above that, the website says,

25   "Set up monitors that alert when critical PII has been shared

Robert Daline - Direct

1    on the darknet."  Is that anything that you think is

2    potentially concerning to ArkOwl?

3    *A.*  Yeah.  I mean, it's got the word "detection," "coverage,"

4    you know, all words that clients will ask me, What is your

5    coverage?  Detection is, you know, pre the fraud happening.

6    Okay.  You want to detect it.  "Digital identity data," you

7    know, all of those -- all of those words could -- you know, if

8    I'm a customer, all of those words would confuse, because they

9    talk to -- those are words we would use on our website.

10   *Q.*  Showing you what has been marked as Exhibit 93.  Do you

11   recognize Exhibit 93?

12   *A.*  I believe it's DarkOwl's website.

13   *Q.*  Okay.  Now, the use case is described as, "Fraud

14   protection.  Identify, prevent and mitigate with cutting-edge

15   darknet intelligence."  Do you see that?

16   *A.*  Yes.

17   *Q.*  In the first paragraph it says, "Our APIs and data products

18   enable fraud protection companies to monitor for PII, CCN and

19   BIN numbers, cryptocurrency wallets, and much more."

20          Are fraud protection customers potential ArkOwl

21   customers?

22   *A.*  Yes.  They are our customers.

23   *Q.*  Is CyberSource a fraud protection company?

24   *A.*  Yes.

25   *Q.*  Now, is this just talking about preventing fraud through

Robert Daline – Direct

1   use of PII?

2   A.  I believe -- protecting, mitigating, identifying.  Those

3   are the words I'm seeing.

4   Q.  All right.  Now, a little bit below there, on the first

5   page of Exhibit 93, the website says, "Account takeover.

6   Account takeover and fraudulent account creation across a

7   number of financial institutions have increased over time."

8         Is that something that ArkOwl was used to prevent?

9   A.  Yeah.  Account takeover is a type of fraud that ArkOwl

10  helps prevent.

11  Q.  All right.  Do you have customers in the financial

12  institution industry to help prevent account takeover fraud?

13  A.  We have customers in the financial -- the financial

14  industry, and I believe they're using ArkOwl for that.

15  Q.  Have -- do you have any way to know exactly how your

16  customers are using the data you provide them?

17  A.  No.  And they typically don't like sharing that

18  information.  Fraud departments are pretty closed off to giving

19  out information how they do, because then a fraudster can

20  potentially learn how they do it and get around it.

21  Q.  Understood.  Mr. Daline, the big question of the day is,

22  what do you want the Court to ultimately do at the end of this

23  trial and why?  So can you tell us what you think needs to

24  happen.

25  A.  DarkOwl needs to change its name and branding to be

Robert Daline - Examination

1   something completely different than ours.

2   Q.  Why do you think that's necessary?

3   A.  Because our -- we have a client that was confused --

4   potential client that -- you know, with the U.S. Postal

5   Service, you know, maybe -- maybe they were an ArkOwl customer.

6   Maybe they heard about ArkOwl and went to DarkOwl.  I don't

7   know.  Right?  It's because I don't know -- you know, I don't

8   know the future of where this is going.  But I see -- I see us

9   as starting to grow into each other's space.

10          MR. FRASIER:  Thank you.  I have no more questions.

11          THE COURT:  Thank you.

12          Before we take our lunch break, let me just follow up

13   with a couple of questions I had for Mr. Daline.  And then I'll

14   allow defense counsel to follow up on these questions; and, of

15   course, plaintiff's counsel can, as well, on cross-examination.

16                        **EXAMINATION**

17   BY THE COURT:

18   Q.  It would be helpful to me to have a clearer understanding

19   of exactly how customers use ArkOwl's services.  So let's say

20   that I worked for Neiman Marcus in 2013.  Neiman Marcus was on

21   the list of one of your customers at that time.

22          If I were going to use ArkOwl services, how would that

23   happen?  Describe the process to me.

24   A.  It would be different in 2013 than it is today.

25   Q.  I understand.

Robert Daline - Examination

1    *A.*  In 2013, they would go to the website, you would be an

2    analyst of Neiman Marcus, just as I was an analyst at Target.

3    You would go to ArkOwl, you'd sign in, and then you would have

4    access to, like, a Google search.  You would type in an email

5    address, hit "go," and then a bunch of data would come up for

6    the email address.  None of the data would necessarily tell you

7    whether it's fraud or not; but that's what you're looking for

8    as an analyst is, looking at this data, can I determine -- or

9    can I help determine -- an analyst is looking at a bunch of

10   other data.  They're looking at, you know, info on the credit

11   card number, they're looking for info on the address, the

12   billing and shipping addresses, you know, do these make sense?

13   So they're taking in all the data to basically narrow it down

14   to fraud or legitimate.

15        And that's where ArkOwl would help is, you know,

16   potentially the email shows that the email was created ten

17   years ago, and there is -- you know, there seems to be a name

18   that came back on the email address that lines up with a name

19   that they're looking at.  That would be an example of what a

20   potential legitimate customer would look like.

21        Now, you have the, you know, account takeovers,

22   synthetic ID, which if the fraudster is good and thinks through

23   email address when creating their synthetic ID, then ArkOwl --

24   there needs to be more data there.  And that's kind of why

25   we're expanding into phone number, IP address.

Robert Daline - Examination

1    Q.  Okay.  That's helpful.  Thank you.

2            And to fill in my gap in my knowledge about how this

3    works generally, I assume from what you're describing, that

4    this use by the Neiman Marcus customer of ArkOwl that you just

5    described would not necessarily be simultaneous with

6    presentation of the credit card by the Neiman Marcus customer

7    for Neiman Marcus for a transaction?

8    A.  Correct.  There would have to be -- so if you've ever

9    placed an online order, and there is, like, three days before

10   you get the confirmation, the order is going through all of

11   their processes.  And, you know, potentially the rules that

12   were written are, you know, if we see a dollar amount of

13   purchases over $1,000, it going from, you know, New York to LA,

14   X amount of miles apart, make sure an analyst looks at it.  So

15   that's -- that's how it was used in 2013.  We wanted to get

16   beyond -- we wanted to get higher in the funnel.

17   Q.  So let's say now that I worked for the Yorkshire Police

18   Department in 2022.  How would I use ArkOwl?

19   A.  What's fun is that they're actually telling us a little

20   more of how they're using ArkOwl -- or I guess why they're

21   using ArkOwl.  They tell me they're using it ████████████████

22   ███████████████████████.  I don't know how they're using

23   ArkOwl's data to ███████████████████.  But ArkOwl, we just

24   provide the data; and it's their job to use our data to

25   investigate.  We came up with ArkOwl to narrow it down to fraud

Robert Daline - Examination

1   or not.  Maybe they're using the data to say, ██████████

2   ██████.

3   *Q.*  Is it the same process where they go to your website and

4   sign in and ask for data and --

5   *A.*  With the police, I would assume so.  I don't think they've

6   asked for an API key yet.  But 80 percent of our usage today is

7   API usage.

8   *Q.*  So explain that a little bit.  How does that actually -- if

9   I were to try to describe that to a layperson, how would you

10  describe that?

11  *A.*  Yeah.  So we'll take a step back to the Neiman Marcus

12  example.  And instead of your order taking three days to get to

13  you, the Neiman Marcus website tapped into ArkOwl; saw the data

14  that they needed to; and was able to approve the order in, you

15  know, half that time or even a couple of hours.  So ArkOwl

16  could be higher in the funnel with an API, as opposed to lower

17  in the funnel.

18  *Q.*  Okay.  That helps.  Thank you.

19  *A.*  Yeah.

20       *THE COURT:*  Can I ask you, Mr. Frasier, to put up

21  Exhibit 336 quickly.

22  *BY THE COURT:*

23  *Q.*  So this is an exhibit you were asked some questions about.

24  And, of course, the ArkOwl logo on this exhibit is different

25  from the ArkOwl logo at the time -- at the time that the

101

Robert Daline – Examination

1   company was founded.  So when was the logo changed, and why?

2   A.  2019.  So the logo was changed in 2019, kind of like

3   parallel to our phone number verification announcement.  So

4   we're not just doing email verification anymore; we've now

5   added the ability to search a phone number in ArkOwl, as well.

6   And I really wanted it to be a new -- a feeling of newness, but

7   I still wanted the same branding to carry over.  So the logos

8   are similar, but still new.

9   Q.  And did you have help in designing this logo, as well?

10  A.  Mike and I came up with the concept.  We went back and

11  forth for probably several weeks.  We developed the concept of

12  the owl, the wings in the "K," and the moon.  And we had help

13  in making it vectorized and design approved.  So we actually

14  had a designer.  He was pretty disappointed that he didn't get

15  in on the ground floor of designing it, but we allowed him to

16  kind of tune it up for us.

17  Q.  So you and Mike, your co-founder, were you actually drawing

18  this yourself, for lack of a better term --

19  A.  Yeah.

20  Q.  -- before you got help from an outsider?

21  A.  Yeah.

22          THE COURT:  Thank you.  Those are my questions.

23          All right.  I think it is a good time for us to take

24  our lunch break.  It's about 12 minutes past 12:00.  As I said,

25  I'll allow first you, Mr. Frasier, if you have any follow-up on

102
Robert Daline - Examination

1  my questions, to ask those.  Then we'll go to

2  cross-examination.  Then plaintiff's counsel can follow up as

3  well.

4        Why don't we try to reconvene in the courtroom at

5  1:15.  Is that going to give everyone enough time to get some

6  lunch?

7        Thank you.  We'll be in recess, and we'll reconvene at

8  1:15.

9        (Recess at 12:11 p.m.)

10        (In open court at 1:16 p.m.)

11        THE COURT:  We are back on the record.

12        Any preliminary matters we need to take up from

13  plaintiff?

14        MR. HOLT:  No, Your Honor.

15        THE COURT:  Any preliminary matters from the

16  defendant?

17        MR. FRASIER:  No, Your Honor.

18        THE COURT:  Thank you.

19        Mr. Daline, can you please resume the stand.  You're

20  still under oath.

21        And as I indicated, I'll give Mr. Frasier a chance to

22  follow up on any of my questions should he wish to do so.

23        MR. FRASIER:  I have no follow-up, Your Honor.

24        THE COURT:  All right.  We'll have cross-examination

25  when you're ready, Mr. Holt.

Robert Daline – Cross

1          MR. HOLT:  Thank you, Your Honor.

2                    **CROSS−EXAMINATION**

3   BY MR. HOLT:

4   Q.  Good afternoon, Mr. Daline.

5   A.  Good afternoon.

6          THE COURT:  I'm listening, go ahead.

7   BY MR. HOLT:

8   Q.  So earlier you testified regarding Trial Exhibit 385, which

9   I believe you said was a partial 2022 revenue report.  Do you

10  recall that?

11  A.  I recall it.  Yes.

12  Q.  Okay.  And that report listed your various customers in

13  2022; did it not?

14  A.  Yes.  Well, partial.  Because I think it was, like, half or

15  maybe ten months out of the year.

16  Q.  Right.  So it listed the customers that were in place at

17  that point in time?

18  A.  That had paid us.  Yeah.

19  Q.  Okay.  Great.  And you went through and discussed the

20  various business focuses of a number of those customers, didn't

21  you?

22  A.  Yes.

23  Q.  You also testified throughout Mr. Frasier's examination

24  regarding various other companies that are customers or

25  potential customers of ArkOwl; did you not?

Robert Daline - Cross

1    A.   Yes.

2    Q.   That list was pretty expansive, wasn't it?

3    A.   Yes.

4    Q.   And you also mentioned several different industries that

5    could use ArkOwl services; did you not?

6    A.   Yes.

7    Q.   And you also listed a number of companies that could be

8    competitors of ArkOwl, I believe; is that correct?

9    A.   Yes.

10   Q.   And we also saw a number of press releases about ArkOwl and

11   fraud prevention services; didn't we?

12   A.   Yes.

13   Q.   And I think you mentioned at the end of your testimony that

14   ArkOwl services could be used for ████████████████████████; is

15   that correct?

16   A.   I said that in regards to, that's what we were told, yes.

17   Q.   Okay.  And I believe you testified previously that ArkOwl

18   does not provide any services other than PII data verification

19   services; right?

20   A.   We provide personal identifiable information -- data

21   enrichment on those, yes.

22   Q.   Okay.  Notwithstanding the various business focuses of

23   these various companies, industries, and use applications that

24   you've mentioned today, you testified at the Court's

25   evidentiary hearing just a few weeks ago that you were not

Robert Daline - Cross

105

1    aware of any U.S. customer using ArkOwl service for anything

2    other than to support online purchase transactions; correct?

3    A.   In the U.S.?

4    Q.   Correct.

5    A.   That is correct.  I don't -- I don't know.  So payments,

6    fraud solutions, they could be doing that.  They might not be.

7    I don't know.

8    Q.   Sitting here today, you're not aware of any other use cases

9    other than to support online purchase transactions; correct?

10   A.   With fraud prevention.  Correct.

11   Q.   During the evidentiary hearing, you also mentioned that

12   Ekata, Pipl, LexisNexis, and SEON are ArkOwl competitors;

13   right?

14   A.   Yes.

15   Q.   And you said, yep, those are our competitors.  Didn't you?

16   A.   That sounds like me.  Yeah.

17   Q.   And these competitor companies, they all provide PII

18   verification data services, as well; do they not?

19   A.   That and more.

20   Q.   Mr. Daline, at times you've characterized ArkOwl as being

21   in the cybersecurity industry; is that true?

22   A.   Yes.

23   Q.   Wouldn't it be equally fair to describe ArkOwl as being in

24   the payments space?

25   A.   Yes.

Robert Daline - Cross

1    Q.  Let's take a look at Trial Exhibit 346, which you discussed

2    during your direct examination.

3    A.  I wouldn't limit us to payments, though, if that was the

4    question.

5    Q.  No.  Just, you're in that space?

6    A.  Correct.  Yes.

7    Q.  Okay.  This Trial Exhibit 346, this is a report that you

8    reviewed this morning; correct?

9    A.  Yes.

10   Q.  And this is a report that was put out by About-Fraud?

11   A.  Yes.

12   Q.  What is About-Fraud?

13   A.  About-Fraud is an organization that seeks to consult on

14   fraud prevention matters.

15   Q.  And what is the purpose of this report?

16   A.  This report is to compile the vendor -- this is a vendor

17   report -- a solution provider report.  A compilation of the

18   solution providers About-Fraud.com sees being in the space.

19   Q.  It shows a pretty vast assortment of companies; does it

20   not?

21   A.  Yes.

22   Q.  Let's turn to Exhibit 347, if we could.

23        And this report was put out by About-Fraud, as well;

24   correct?

25   A.  Yes.

Robert Daline - Cross

1    *Q.*  And I believe you said earlier that this is the more

2    granular of the two reports from About-Fraud that we looked at?

3    *A.*  Comparing 2020 to 2021, yes.

4    *Q.*  And does this report have the same purpose as Trial

5    Exhibit 346 that we just reviewed?

6    *A.*  The 2020 one, yes.

7    *Q.*  I believe you testified that a number of companies listed

8    in this report are or could be competitors of ArkOwl; is that

9    right?

10   *A.*  That's correct.

11   *Q.*  And that they could provide similar services to ArkOwl; did

12   you say that?

13   *A.*  Correct.  Potentially.

14   *Q.*  Do you see DarkOwl listed anywhere in this report?

15   *A.*  I do not.

16   *Q.*  Let's go back to Trial Exhibit 346.  And do you see DarkOwl

17   listed anywhere in this report?

18   *A.*  I do not.

19   *Q.*  Have you ever seen in any industry publication or report a

20   reference to both ArkOwl and DarkOwl?

21   *A.*  I have not.

22   *Q.*  So based on your prior testimony, I understand that you

23   selected the ArkOwl mark back in the 2012 time frame; is that

24   right?

25   *A.*  Yes.  That's right.

Robert Daline - Cross

1   *Q.*  And you testified earlier why you selected the ArkOwl mark,

2   but I just want to make sure I have it correct.  Could you just

3   recap for me kind of the basis for choosing the owl portion of

4   the ArkOwl mark?

5   *A.*  Yeah.  The owl portion was something that my dad and I came

6   up with over dinner -- specifically pizza, to get more detailed

7   this time around.  I've got to keep the story interesting.  And

8   he was excited about animals, and that's why we picked an owl

9   for -- well, I started thinking more about "owl" from there.

10  It seemed like something similar to, you know, catching

11  something without necessarily seeing it.  You know, catching

12  something in the dark.

13  *Q.*  And there are some parallels there between that description

14  and the services that ArkOwl provides; isn't that right?

15  *A.*  Similar.

16  *Q.*  Yes.

17  *A.*  The concept; right.

18  *Q.*  In a way, "owl" suggests the type of services that ArkOwl

19  provides; right?

20  *A.*  Not in, like, email data enrichment; but in what it's

21  used for to stop and prevent fraud, to determine fraud or not.

22  *Q.*  It's suggestive in that way?

23  *A.*  It is.

24  *Q.*  Yeah.  At the time you selected the ArkOwl mark, were you

25  aware of any other owl marks in the marketplace?

Robert Daline – Cross

1    A.  I was not.

2    Q.  Did you search for any other owl marks before adopting

3    ArkOwl?

4    A.  I believe I did, but I do not recall.

5    Q.  Okay.  And I believe you testified earlier that you did not

6    immediately seek to register the ArkOwl mark at the time it was

7    adopted; correct?

8    A.  That's correct.

9    Q.  It wasn't until roughly seven years later, give or take,

10   after ArkOwl first adopted the mark that it finally sought to

11   register it?

12   A.  That's correct.

13   Q.  I would now like to refer to Trial Exhibit 28.  There are a

14   number of pages to this exhibit, but I would like you to focus

15   just on the first page.

16           Does this exhibit reflect the details of the

17   registration that resulted from the initial trademark

18   application filing?

19   A.  Yes.

20   Q.  Do you see this shows that the ArkOwl application was filed

21   in September of 2019?

22   A.  Yes.

23   Q.  And the registration issued in April of 2020?

24   A.  Yes.

25   Q.  Does this registration cover the services that you

Robert Daline – Cross

1   identified in the application?

2   *A.*   Broadly, yes.

3   *Q.*   And these are SaaS services; right?

4   *A.*   Software as a service, yes.

5   *Q.*   And these SaaS services are identified as being used in,

6   quote, verifying the credibility of data provided by e-commerce

7   customers in an online order.  Do you see that?

8   *A.*   Yes.

9   *Q.*   And then seven months later, in January of 2020, you filed

10   another trademark application to register ArkOwl's logomark;

11   right?

12   *A.*   Yes.

13   *Q.*   I would like to refer to Trial Exhibit 29.  Again, there

14   are a number of pages to this exhibit, but I'm focused on

15   page 1.

16         Does this reflect the details of the registration of

17   the ArkOwl logomark?

18   *A.*   Yes.

19   *Q.*   And you refer to this logo as the soaring owl logo; do you

20   not?

21   *A.*   Yes.  Soaring owl?

22   *Q.*   Soaring.

23   *A.*   Soaring.

24   *Q.*   S-O-A-R-I-N-G.

25   *A.*   Where is that on the --

Robert Daline - Cross

1    Q.  Just in practice.

2    A.  Like, internal?

3    Q.  Yeah.

4    A.  I've never referred to it.  It's just the newer mark.

5    Q.  Okay.  But I thought I saw reference to that in the

6    deposition transcript, but I'll take your word for it.

7    A.  Okay.

8    Q.  And this covers the same basic SaaS services that we saw in

9    the earlier ArkOwl registration; right?

10   A.  Yes.

11   Q.  Services that are used in, quote, verifying the credibility

12   of data provided by e-commerce customers in an online order;

13   right?

14   A.  Yes.

15   Q.  And the logo reflected in this registration is the logo

16   that ArkOwl uses today; correct?

17   A.  That's correct.

18   Q.  I now want to show you Plaintiff's Trial Exhibit 17.

19          Do you recognize this document?

20   A.  I believe so.  A lot of these legal documents tend to look

21   the same to me so --

22          THE COURT:  Me too.  Just thought I'd lighten it up.

23          MR. HOLT:  They do, indeed.

24   BY MR. HOLT:

25   Q.  I'll submit to you that this is ArkOwl's Answer and

Robert Daline - Cross

1    Counterclaims that were filed in connection with this case.

2              I'd like to turn to page 9, paragraph 8.

3              Are the two logos here that you referred to as

4    ArkOwl's angry-eye logo that we heard about this morning?

5    A.  Yes.  That's -- I mean, they both have angry eyes in them.

6    But if somebody were to say, your angry-eye logo, I would

7    probably think this one.

8    Q.  Understood.  So is it fair to say that ArkOwl replaced the

9    angry-eye logo with the new or current logo in 2019?

10   A.  Did our best to and replaced it in all of our material,

11   yes.

12   Q.  And ArkOwl is not using this logo today; correct?

13   A.  We are not.

14   Q.  Any plans to recommence use of this logo going forward?

15   A.  Not currently, but I'm not saying we won't.  Maybe there

16   is, like, a nostalgia day or something.  I don't know.  But

17   it's not -- yeah, it's not in our plans.

18   Q.  Before filing the first trademark application for the

19   ArkOwl wordmark in September of 2019, did you run a trademark

20   search to see what other owl marks may exist on the register?

21   A.  I did not.

22   Q.  Let's take a look at some of the owl marks that were on the

23   trademark register at the time you filed your first trademark

24   application.

25             Can we turn to Trial Exhibit 105, please.

Robert Daline - Cross

 1            I believe you reviewed this registration this morning,

 2    but I'd like to go through it again.

 3            Do you recognize this document?

 4    *A.*  Yes.  I saw it earlier today.

 5    *Q.*  And are you familiar with the Owl Cyber Defense mark

 6    referenced in this printout?

 7    *A.*  I mean, as I am familiar with it, you know, from earlier.

 8    Yes.

 9    *Q.*  Prior to this morning were you familiar with it?

10    *A.*  Maybe prior to this -- this week, no.

11    *Q.*  And do you see that the goods and services for this mark

12    are computer hardware and software for secure data transfer?

13    *A.*  Yes.

14    *Q.*  Based on that description, would you characterize these

15    services -- I'm sorry -- these products, rather, as being in

16    the cybersecurity industry?

17    *A.*  I wouldn't say it's -- no.  I don't see "cybersecurity" in

18    this.

19    *Q.*  So data security in your view is not a part of the

20    cybersecurity industry?

21    *A.*  Secure data transfer.  I mean, I see that.  I don't see the

22    word "cybersecurity."

23    *Q.*  I'm not asking if you see the word.  I don't see it either.

24    *A.*  Could it broadly touch cybersecurity?  Absolutely.

25    *Q.*  Do you see that the filing date for this mark was May 11,

Robert Daline - Cross

1    2017?

2    *A.*   Yes.

3    *Q.*   And do you see that the registration date was February 20,

4    2018?

5    *A.*   Yes.

6    *Q.*   So this mark was registered at the time ArkOwl filed its

7    first trademark application; correct?

8    *A.*   No.  I believe ArkOwl filed its first trademark in 2019.

9    *Q.*   Yeah.  What I'm asking is, at the time ArkOwl filed --

10   *A.*   Yes, it was already filed.  Sorry.  I'm keeping up.

11   *Q.*   No problem.

12          Has ArkOwl ever attempted to enforce its trademark

13   rights against Owl Cyber Defense?

14   *A.*   No.

15   *Q.*   Has the owner of this mark ever attempted to enforce the

16   Owl Cyber Defense mark against ArkOwl?

17   *A.*   No.

18   *Q.*   Has ArkOwl ever run into Owl Cyber Defense in the

19   marketplace?

20   *A.*   I do not believe so.

21   *Q.*   Let's turn to Trial Exhibit 113.

22          Do you recognize this document?

23   *A.*   I don't believe we went through this one earlier.  So, no.

24   *Q.*   Are you familiar with the SECUREOWL mark and owl design

25   referenced in this printout?

Robert Daline – Cross

1    *A.*  No.

2    *Q.*  Do you see that the goods and services for this mark cover

3    computer security software, network security appliance, in the

4    nature of computer hardware used to aid in securing computer

5    networks, computer hardware and software used to aid in

6    securing computer networks?

7    *A.*  Yes, I see that.

8    *Q.*  And based on this description, would you view those goods

9    as being within the cybersecurity industry?

10   *A.*  Potentially, they could be.

11   *Q.*  Do you see that this mark was filed on October 9, 2018?

12   *A.*  I do now, yes.

13   *Q.*  So this mark was pending at the time you filed your first

14   ArkOwl trademark application; correct?

15   *A.*  Yes.

16   *Q.*  Has ArkOwl ever attempted to enforce its trademark rights

17   against the SECUREOWL mark?

18   *A.*  No.

19   *Q.*  Has the owner of this mark ever attempted to enforce the

20   SECUREOWL mark against ArkOwl?

21   *A.*  No.

22   *Q.*  Has ArkOwl ever run into SECUREOWL in the marketplace?

23   *A.*  I do not believe so.

24   *Q.*  I'd like to turn to Trial Exhibit No. 128.

25          Do you recognize this document?

Robert Daline - Cross

1   *A.*  I think it was one we went over earlier.  No, I don't

2   believe so.

3   *Q.*  Are you familiar with the OwlCheck mark referenced in this

4   printout?

5   *A.*  No.  I'm not familiar with OwlCheck.

6   *Q.*  I'd like to draw your attention in the first paragraph to

7   the description that reads, "Computer software, namely,

8   downloadable," to about halfway through the paragraph.

9   *A.*  Okay.

10  *Q.*  There we go.  "Computer software, namely, downloadable or

11  recorded software for verifying the authenticity of goods in a

12  transaction using blockchain technology."  Do you see that?

13  *A.*  Yes.

14  *Q.*  And then in the second paragraph of the description,

15  "Blockchain technology, namely, providing temporary use of

16  online non-downloadable software and applications to verify the

17  authenticity of goods in a transaction using blockchain

18  technology."  Do you see that?

19  *A.*  I see that.

20  *Q.*  And based on this description, would you consider these

21  goods and services to be within the cybersecurity industry?

22  *A.*  It looks like it.

23  *Q.*  Are you familiar with the OwlCheck mark referenced in this

24  printout?

25  *A.*  I am not.

Robert Daline - Cross

1   Q.  Do you -- I'm sorry -- has ArkOwl ever attempted to enforce

2   its rights against the OwlCheck mark?

3   A.  No.

4   Q.  And has the owner of this mark ever tried to enforce the

5   OwlCheck mark against ArkOwl?

6   A.  No.

7   Q.  Have you ever run into OwlCheck in the marketplace?

8   A.  I have not.

9   Q.  I'd like to turn to Trial Exhibit 130.

10          I would draw your attention to the second paragraph of

11  services, about a third of the way down.  "The monitoring of

12  computer systems for detection" -- "for detecting

13  unauthorized" -- there we go -- "unauthorized access to data

14  breach."  Do you see that?

15  A.  Yes.

16  Q.  And then if we scroll down a bit further, "Software as a

17  service -- SaaS -- namely, providing non-downloadable software

18  and applications to verify the authenticity of goods in a

19  transaction using blockchain technology."  Do you see that?

20  A.  I see that.

21  Q.  And then if we scroll down a few more lines, there is

22  description, "electronic monitoring of personally

23  identifiable" -- there we go -- "electronic monitoring of

24  personally identifying information to detect identity theft via

25  the internet."  Do you see that?

Robert Daline – Cross

1    *A.*  Yes.

2    *Q.*  And based on these descriptions, would you view the

3    services listed in this registration as falling within the

4    cybersecurity industry?

5    *A.*  Yes.

6    *Q.*  Has ArkOwl ever attempted to enforce its rights against the

7    OwlPay mark?

8    *A.*  No.

9    *Q.*  Has the owner of this mark ever attempted to enforce the

10   OwlPay mark against ArkOwl?

11   *A.*  No.

12   *Q.*  Has ArkOwl ever run into OwlPay in the marketplace?

13   *A.*  No.

14   *Q.*  I'd like to turn to Trial Exhibit 109.

15          I would draw your attention to the first five or six

16   lines of goods and services description, ending in "forensics."

17          Are you familiar with the REDOWL mark referenced in

18   this printout?

19   *A.*  I am not.

20   *Q.*  Do you see that the goods and services cover "Software as a

21   service -- SaaS -- services featuring software for data

22   collection and data analysis, data reporting, data monitoring,

23   data search, relational event analysis, security analytics, and

24   behavioral analytics; software-as-a-service services featuring

25   tour software for identifying and predicting insider risks and

119

Robert Daline - Cross

1  threats, reporting and delivering risk and threat intelligence,

2  and facilitating post-incident forensics."

3          Do you see that?

4  A.  I see that.

5  Q.  Based on this description, would you consider these

6  services to be within the cybersecurity industry?

7  A.  Yes.

8  Q.  And do you see that the filing date for this mark was

9  December 29, 2015?

10  A.  Yes.

11  Q.  And that the registration date was August 16, 2016?

12  A.  Yes.

13  Q.  So this mark was active at the time you filed your ArkOwl

14  trademark applications; correct?

15  A.  Yes.

16  Q.  Has ArkOwl ever attempted to enforce its trademark rights

17  against the REDOWL mark?

18  A.  No.

19  Q.  Has the owner of the mark ever attempted to enforce the

20  REDOWL mark against ArkOwl?

21  A.  No.

22  Q.  Has ArkOwl ever run into REDOWL in the marketplace?

23  A.  No.

24  Q.  I'd like to turn to Trial Exhibit No. 117.

25          Do you recognize this document?

120

Robert Daline – Cross

1    *A.*  No.

2    *Q.*  Are you familiar with the STREET OWL mark referenced in

3    this exhibit?

4    *A.*  No.

5    *Q.*  Do you see that the goods and services for this mark

6    include -- two or three lines down -- "computer software for

7    providing an online database in the field of transaction

8    processing, to upload transactional data, provide statistical

9    analysis, and provide notifications and reports"?

10   *A.*  I see that.

11   *Q.*  And would you view the products listed in this application

12   as falling within the cybersecurity industry?

13   *A.*  Potentially.  Not necessarily.  But transaction processing.

14   *Q.*  So potentially?

15   *A.*  Potentially.

16   *Q.*  Do you see that the filing date for this mark was March 26,

17   2014?

18   *A.*  Yes.

19   *Q.*  And the registration date for this mark was October 20,

20   2015?

21   *A.*  Yes.

22   *Q.*  So the mark was pending at the time you filed your ArkOwl

23   trademark application; correct?

24   *A.*  I don't believe -- was it pending, or was it registered?

25   *Q.*  An active mark on the trademark register.

Robert Daline - Cross

1  A.  Yeah, it looks like it was registered.

2  Q.  Has ArkOwl ever attempted to enforce its trademark rights

3  against the STREET OWL mark?

4  A.  We have not.

5  Q.  Has the owner of the mark ever attempted to enforce the

6  STREET OWL mark against ArkOwl?

7  A.  No.

8  Q.  Has ArkOwl ever run into STREET OWL in the marketplace?

9  A.  No.

10  Q.  Let's turn to Trial Exhibit 107.

11       Do you recognize this document?

12  A.  I believe so.  Yes.

13  Q.  Are you familiar with the OWL SCAN mark referenced in this

14  printout?

15  A.  Yes.

16  Q.  Do you see that the goods and services for this mark

17  cover -- the goods, rather -- "downloadable mobile software

18  applications for transmission of online-based information

19  accessed via a visual reference, namely, a matrix bar code or

20  other visual codes, for purposes of validating and installing

21  electronic security devices on a network"?

22  A.  I don't know what that means, but I probably wouldn't be

23  worried about it.  If that's --

24  Q.  Based on your understanding, would you view those products

25  as falling within the cybersecurity industry?

Robert Daline - Cross

1    *A.* I don't think so.  Maybe.  I --

2    *Q.* It's possible?

3    *A.* I guess.  I don't really know.  That's -- we don't

4    provide -- well, I'm not seeing anything that's, like --

5    screams cybersecurity here.  Maybe a matrix bar code.

6    *Q.* Validating and installing electronic security services on a

7    network?

8    *A.* Devices -- devices are like hardware, though; right?  Would

9    that fall under cybersecurity?  I mean, possibly.

10   *Q.* Do you see that the application filing date for this mark

11   was December 5, 2013?

12   *A.* Yes.

13   *Q.* And do you see that the registration date was December 29,

14   2015?

15   *A.* Yes.

16   *Q.* So this mark was active on the register at the time you

17   filed your ArkOwl trademark applications; correct?

18   *A.* Yes.

19   *Q.* Has ArkOwl ever attempted to enforce its trademark rights

20   against the OWL SCAN mark?

21   *A.* No.

22   *Q.* Has the owner of this mark ever attempted to enforce OWL

23   SCAN against ArkOwl?

24   *A.* No.

25   *Q.* Has ArkOwl ever run into OWL SCAN in the marketplace?

Robert Daline - Cross

1   A.   No.

2   Q.   So we just went through seven third-party owl marks.   Other

3   than DarkOwl, are you aware of any others?

4   A.   Not off the top of my head.

5   Q.   All of these marks we just went through were registered

6   with the trademark office at the same time the ArkOwl marks

7   were on the register; correct?

8   A.   Before that, yes.

9   Q.   So is it fair to say that ArkOwl does not claim exclusive

10  rights to the term "owl"?

11  A.   Yes.   We do not proclaim we own "owl" as a word.

12  Q.   You're claiming that you do or do not?

13  A.   Do not.

14  Q.   Okay.   So the two applications that you filed, one for the

15  wordmark, one for the logomark, those marks eventually

16  registered; correct?

17  A.   Correct.

18  Q.   And during the examination of these applications, the

19  trademark office did not issue a rejection based on any of

20  these existing "owl" registrations that we just reviewed, did

21  it?

22  A.   We were not rejected for our mark.

23  Q.   And that includes the DarkOwl mark, as well; correct?   The

24  DarkOwl mark did not provide a basis for rejection of the

25  ArkOwl marks?

Robert Daline - Cross

1   A.  I am just saying that our mark was not rejected.  I'm not

2   making any inferences to what the attorney or analyst did when

3   he approved it.

4   Q.  Let's now focus on the "ark" portion of the ArkOwl mark.  I

5   believe you testified earlier that the use of the reference to

6   "ark" in these marks is a biblical reference to the Ark of the

7   Covenant; is that right?

8   A.  Yes.

9   Q.  Are you aware of other companies in the cybersecurity

10  industry using the term "ark" as a part of their brand?

11  A.  Arkose Labs has the three letters.

12  Q.  We heard about Arkose Labs a bit earlier.  Do you

13  understand that it provides fraud prevention and cybersecurity

14  services?

15  A.  Arkose Labs?

16  Q.  Correct.

17  A.  Yes.

18  Q.  Are you familiar with a company called CyberArk?

19  A.  I might have seen it.

20  Q.  Do you understand that it provides identity security

21  protection services?

22  A.  I don't know what they do.

23  Q.  Are you familiar with a company called TrustArc?

24  A.  Yes.  I believe they spell "ark" with a "C."

25  Q.  That is correct.  And do you understand that they provide

Robert Daline - Cross

1    data privacy, data security solutions?

2    A.   I don't.  I'm not an expert on what they do.

3    Q.   So the spelling of "ark" with a "C," that doesn't cause you

4    concern?

5    A.   The word "TrustArc" definitely doesn't.

6    Q.   What about "arc" alone?

7    A.   If somebody had ArkOwl and -- with a "C" instead of a "K,"

8    that would concern me.

9    Q.   Whether it's -- okay.  Strike that.

10           In viewing the two terms, A-R-C versus A-R-K in

11   isolation, does that cause you concern?

12   A.   They sound the same.  "Arc" and "ark," can you notice the

13   difference between the "C" and the "K" in which one they use?

14   Probably not.  I don't even know, and I just said it.

15   Q.   Are you familiar with other companies in the cybersecurity

16   industry other than those that we just reviewed, that use the

17   term "ark"?

18   A.   Outside of cybersecurity or inside?

19   Q.   Within.

20   A.   Within.  Not off the top of my head, no.

21   Q.   How about fraud prevention, generally?

22   A.   Not off the top of my head.

23   Q.   How about data services, generally?

24   A.   Not off the top of my head.

25   Q.   Has ArkOwl had any trademark infringement issues with any

126

Robert Daline - Cross

 1    of these other "ark" marks that we just discussed?

 2    A.   No.

 3    Q.   So ArkOwl is not claiming exclusive rights to the term

 4    "ark" for the cybersecurity and fraud prevention industry;

 5    right?

 6    A.   True.

 7    Q.   During Mr. Frasier's examination, you testified about

 8    various third-party promotional materials that reference

 9    ArkOwl.  Do you recall that?

10    A.   Yes.

11    Q.   So these were not promotional activities that ArkOwl itself

12    initiated; correct?

13    A.   Like, initiated, as in paid for or -- what do you mean?

14    Sorry.

15    Q.   Was ArkOwl active in pursuing the various references that

16    we saw in third-party publications?

17    A.   Some of them, yes; some of them, no.

18    Q.   I'd like to focus on the advertising that ArkOwl itself

19    initiated.  So you said earlier ArkOwl relies primarily on

20    word-of-mouth advertising; right?

21    A.   Yes.

22    Q.   This word-of-mouth advertising, it's done by third parties;

23    correct?

24    A.   Yes, or people -- yeah -- talking, yes.

25    Q.   Individuals, companies?

Robert Daline - Cross

1   A.  Not me.  Right?  Word of mouth is outside --

2   Q.  Those outside of ArkOwl.

3   A.  External.  Yes.

4   Q.  Okay.  Most of these would be from your customers; is that

5   correct?

6   A.  Yeah, that's the hope.

7   Q.  And would you say that word of mouth drives the vast

8   majority of ArkOwl's sales?

9   A.  I would say so.  Yes.

10  Q.  I think you said earlier, customers talk about how amazing

11  our company is to other companies.  That was kind of the upshot

12  of the word-of-mouth advertising?

13  A.  Yes.

14  Q.  So is it fair to say that ArkOwl's marketing strategy is to

15  wait for a potential customer to learn about the company

16  through someone else, decide whether or not to -- decide

17  whether or not they're potentially interested in ArkOwl's

18  services, and then contact ArkOwl?

19  A.  Yes.  And we don't -- we don't say no to speaking

20  engagements if we're invited, but we're not actively paying for

21  them.

22  Q.  Okay.  You had mentioned earlier the MRC conference; do you

23  recall that?

24  A.  I do.

25  Q.  And that's the Merchant Risk Council?

Robert Daline - Cross

1    A.   Yes.

2    Q.   How many times have you attended that conference?

3    A.   Four times, I think.

4    Q.   And when did you attend the MRC conference?

5    A.   It was potentially I attended it five times.  Four or five.

6    Q.   If it helps, during your testimony last year, August -- I

7    believe August of 2022, you said you had attended three times.

8    A.   I've attended it once since then, so that makes four.

9    Q.   Four.  Have you set up a booth at any of these conferences?

10   A.   Yes.  The last two, we had a booth.

11   Q.   So would that be 2022 and 2023?

12   A.   Yes.

13   Q.   And have you ever encountered DarkOwl at the MRC

14   conference?

15   A.   I have not.

16   Q.   Any other conferences or trade shows that ArkOwl attends

17   other than MRC?

18   A.   No.  We tried to attend one, but COVID -- COVID knocked it

19   out.  So MRC is the only one.

20   Q.   So in the eleven years that ArkOwl has been in business,

21   roughly, it's attended a total of four trade shows; is that

22   right?

23   A.   Yes.

24        MR. HOLT:  I now have some questions that are going to

25   get into AEO information.  It won't take too long.

Robert Daline – Cross

1           *THE COURT:*  The record should reflect that the

2    representatives of the plaintiff have left the courtroom.

3           Go ahead.

4    *BY MR. HOLT:*

5    *Q.*  On average, how much has ArkOwl spent on advertising

6    annually over the last three years?

7    *A.*  Advertising specifically?  ███████████████████████

8    ███████████████████████████  a year.  I think we've been

9    a part of it for two or three years.

10   *Q.*  And is that the bulk of your advertising budget?

11   *A.*  I think we've had a couple of other efforts here or there,

12   but that's our main one.

13   *Q.*  So is it fair to say that your advertising spend on an

14   annual basis over the last three years has been roughly ████

15   ██████?

16   *A.*  Yeah, that's fair.

17   *Q.*  And what was ArkOwl's total revenue in 2021, which I

18   believe is the last set of financial data that we have?

19   *A.*  Off the top of my head, ████████████████.

20   *Q.*  In revenue?

21   *A.*  I think so.  I'm not looking at it right now, but I think

22   ballpark -- you're asking 2021; right?

23   *Q.*  Correct.

24   *A.*  Yeah.

25   *Q.*  What were the profits for that year?

Robert Daline - Cross

1   A.   ███████.   I'm -- I would need to look at it.   I'm --

2   Q.   Ballpark?

3   A.   Yeah.

4   Q.   I can put up the reports if you'd like, but I'm just

5   looking for some general ballpark numbers here.

6   A.   If you want my best guess, that's it.

7   Q.   And for 2022, last year, how did things end up from a

8   revenue perspective?

9   A.   ████████████████████.   For 2022, you're saying?   Yep.

10  Q.   In revenue, yes.

11  A.   ██████████████.

12  Q.   And how about profits?

13  A.   I think ████████████   last year.

14  Q.   Has ArkOwl ever conducted a survey to determine the

15  strength of the ArkOwl brand?

16  A.   Does the survey we talked about in March -- May count?

17  Q.   Explain to me what was done in March or May.

18  A.   The --

19  Q.   Oh, the survey here?

20  A.   -- one we decided --

21  Q.   That was excluded by the Court?

22  A.   Yes.   If that counts, then, yes.   If that doesn't count,

23  then, no.

24  Q.   Just trying to see if there is a way I can cover

25  information while the representatives are out.

Robert Daline - Cross

1          Let's take a look at Trial Exhibit 30, which is

2    attorneys' eyes only.

3          Do you recognize this document?

4    *A.*   Yes.  That looks like our pricing on our website.

5    *Q.*   So is this ArkOwl's price-per-query pricing model?

6    *A.*   For everyone, no; but for website purchases, yes.

7    *Q.*   Okay.  Do I understand correctly that this shows that 2,500

8    queries through ArkOwl's system would cost a customer $99?

9    *A.*   Yes.

10   *Q.*   So this is the first package that is offered.  And then the

11   prices go up from there; correct?

12   *A.*   Yes.

13   *Q.*   And then it looks like price per query for 50,000 queries

14   is 1.8 cents, for a total of $899; is that right?

15   *A.*   That's correct.

16   *Q.*   ArkOwl also provides a subscription-based pricing model;

17   does it not?

18   *A.*   Yes.

19   *Q.*   I'd like to refer to Trial Exhibit No. 77.

20          Do you recognize this document?

21   *A.*   Yes.  Yes.

22   *Q.*   What is this?

23   *A.*   This is the higher volume pricing.  So this is for the

24   month to month.  If you want to do a contract with our service,

25   we provide --

Robert Daline - Cross

1   Q.   You have subscription-based program?

2   A.   Yes.

3   Q.   And where do you find that most of your customers fall

4   within this pricing range for a subscription?

5   A.   By revenue or by number?

6   Q.   By the minimum monthly commitment.

7   A.   By number of customers or dollar amount of revenue?

8   Q.   Either way.  Whatever is easier for you.

9   A.   Okay.  Well, most of our revenue comes from the ▓▓▓▓ price

10  per query.  So the ▓▓▓▓▓ query monthly minimum, most of our

11  revenue comes from that.  And then -- sorry.

12  Q.   So the charge for that level of subscription is ▓▓▓▓ per

13  month?

14  A.   Correct.

15  Q.   And do you have a number of clients that have committed to

16  greater monthly query minimums?

17  A.   Not yet.  We have hope, though.

18  Q.   And am I correct in understanding that ArkOwl also provides

19  a blending price model-- a blended pricing model?

20  A.   What does that mean?  Like --

21  Q.   Does it offer some customers the ability to have both a

22  subscription and a price per query?

23  A.   No.  This is actually all price per query.  It's only if

24  you do a contract, there is a minimum monthly spend in the case

25  that they don't meet the minimum monthly amount of 200,000

Robert Daline - Cross

1   queries purchased.

2   Q.  I see.  So if a customer was under agreement for ████████

3   monthly minimum query and they did 3████   any given month, how

4   would that be priced out?  Would they automatically --

5   A.  That would be priced at ██████ per query for the ████████

6   queries purchased.

7   Q.  Understood.

8         MR. HOLT:  I'm done with the AEO, so I'm going to

9   bring the representatives back in.

10         THE COURT:  Thank you.

11         (Hearing continued in open court.)

12  BY MR. HOLT:

13  Q.  ArkOwl's customers are often fraud analysts, are they not?

14  A.  No.  Fraud solution providers.  They're -- ArkOwl's clients

15  are companies.  We're business to business.

16  Q.  So fraud analysts would be the users of the services?

17  A.  For their manual review queries made.

18  Q.  So for ArkOwl's customers, they typically have experience

19  in online sales transaction, fraud detection; do they not?

20  A.  Which part?  I mean, the end user using the service is an

21  analyst; but those purchasing are probably a purchasing

22  department, a manager, or somebody higher level than the

23  analyst.

24  Q.  Let's focus on the users.

25  A.  Okay.  The user is typically the analyst, I believe.

Robert Daline – Cross

1    Q.  And they have experience in online sales transaction, fraud

2    detection?

3    A.  If that's what they're using it for, yes.  But, you know,

4    when it comes to, like, U.K. police, I can't say they have a

5    lot of experience with online transactions.

6    Q.  Okay.  But this case is limited to the U.S., so let's just

7    focus on the U.S.

8    A.  Right.  So I can say I don't know.

9    Q.  ArkOwl's paying customers are generally knowledgeable about

10   the field of fraudulent transaction protection; correct?

11   A.  I would believe so.

12   Q.  And these customers tend to have higher education degrees;

13   do they not.

14   A.  When I was at Target, I wasn't required to have higher

15   education.  But I think so, given the job market.

16   Q.  Those within these roles tend to have higher education?

17   A.  Yeah.  Tend to have.

18   Q.  Is it fair to say that ArkOwl's paying customers are

19   discerning?

20   A.  We're talking about the ones paying for it, not the user,

21   now; right?  Not the analyst.

22   Q.  Let's start with the paying customer.

23   A.  I would say the procurement department is a little further

24   away from the analyst, so they're basically just doing what

25   they think the analyst is telling them.  I would believe they

135

Robert Daline - Cross

1   went to college.

2   Q.   I asked whether the customers are discerning.

3   A.   I would believe they are discerning.

4   Q.   They are?  Or are not?  I'm sorry.

5   A.   I don't know.  I would hope they are.

6   Q.   And what about the users, would you say that they're

7   discerning?

8   A.   I would say they're discerning on the orders that they're

9   going through.  Yes.

10  Q.   So when you hear the term "ArkOwl customer," are you --

11  when you hear the -- when you use the term "ArkOwl customer,"

12  are you referring to the online purchasing departments, or are

13  you referring to the analysts that use the service?

14  A.   I'm referring to the business.  If the analysts or the

15  purchasing manager, if they leave the company, I still have a

16  contract with the business.  And whoever takes over their role

17  still has the contract and still uses ArkOwl -- or has us in

18  their contract.

19  Q.   So if we use your definition, would you agree that ArkOwl's

20  customers are discerning?

21  A.   I -- I would say I don't know.  I don't know whether the

22  one picking ArkOwl is discerning or not.  I would hope so.  I

23  would hope they did their due diligence and their research.

24  Q.   So sitting here today, would you agree with the testimony

25  you provided in your deposition, when asked, "Can you identify

Robert Daline - Cross

1   any ArkOwl customer that you don't believe are discerning?"

2          And you responded, "I cannot think of any."

3   *A.*  That's true.  Just like I cannot think of any the other

4   way.

5   *Q.*  Let's turn to Trial Exhibit 56.

6          Do you recognize this document?

7   *A.*  Yes.  It looks like the home page of our website.

8   *Q.*  And do you see the timestamp in the lower left-hand corner?

9   *A.*  May 15, 2023.  Is that what that says?

10  *Q.*  Yeah.  Thank you.

11         Let's turn to page 2.

12         Under "real-time data," do you see where it says, "Our

13  data is 100 percent live, real-time data.  No pulling from

14  stale, potentially outdated databases."  Do you see that?

15  *A.*  Yes.

16  *Q.*  Why does ArkOwl promote the use of real-time data?

17  *A.*  Because real-time data -- you don't want data that -- if

18  you're researching for fraud prevention purposes -- you know,

19  let's say somebody steals my password, you'd want to make sure

20  that, you know, you -- you're up to date on the data to stop

21  the fraud.

22  *Q.*  Is it fair to say that time is of the essence when you're

23  combating fraud in a marketplace?

24  *A.*  I would say so.

25  *Q.*  If you weren't providing real-time data, do you think it

Robert Daline - Cross

1   would hurt your business?

2   A.  We've actually taken some steps to diversify our dataset to

3   have -- ████████████████████████, I would say.  I have

4   actually -- you know, over the past couple of years, it's been

5   a project to really get back our -- to push through more of our

6   tech stack.  And I -- I actually haven't been able to update

7   the marketing aspect of our website for a little bit.

8   Q.  So the statement that we just reviewed that is highlighted

9   on the screen, that is not correct?

10  A.  The ██████████████ is not current.  We need to update

11  that.

12  Q.  Did you not think it was important to update it?

13  A.  I haven't had the resource to be able to do it.  So last

14  year, ██████████    ██████████████████████, which

15  brought a lot of higher priority projects for the service

16  itself to be able to stay online.  And this is the next

17  up-and-coming project, is making sure we're consistent in our

18  marketing.

19  Q.  So you did not have time to change the two sentences that

20  we're reviewing right now?

21  A.  The resource.  Not necessarily time.  If I could get in

22  there and do it myself, I would.

23  Q.  So what percentage of the data that you provide currently

24  is real-time?

25  A.  ██████  ██████████████.

Robert Daline - Cross

1  *Q.*  And what about the remaining ███████████████? 

2  *A.*  That's our internal database that's been growing, our

3  

15  *Q.*  Okay.  So let's focus first on real-time.  What data that

16  you provide is real-time?

17  *A.*

21  *Q.*  Anything else?

22  *A.*  That -- yeah, I'm just looking at the screenshot.

Robert Daline - Cross

1   A.   ████████████████   This is an older screenshot.  We need to

2   update it to reflect our new -- our newer screenshot.

3   Q.   Anything else that is provided in real-time other than what

4   you just mentioned?

5   A.   Not -- not off the top of my head.

6   Q.   Okay.  Now, let's turn to the archived data.

7   A.   Okay.

8   Q.   What types of data would be included there?

9   A.   ████████████████████████████████████████

10  ████████████████████████   ████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████   ████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████

18  ██   ████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████

21  ██   ████████

22  Q.   Is there anything else that would fall within the archived

23  data?

24  A.   ████████████████████████████████████████████

25  ████████████████████████

Robert Daline - Cross

1    Q.  Can you explain.

2    A.  

3

4

5

6

7

8

9

10

11   Q.  So we went through email.

12

13

14

15

16

17

18

19

20   A.  I don't feel as comfortable sharing this with DarkOwl in

21   the room.

22   Q.  Would you feel more comfortable if I had the

23   representatives for DarkOwl leave the room?

24   A.  Yeah.

25   Q.  Certainly.

Robert Daline - Cross

1    A.   We're talking about in-depth product stuff, so --

2    Q.   Okay.  Fine.

3    A.   If that's cool.

4    Q.   Absolutely.

5         THE COURT:  Again, the record will reflect that the

6    representatives have stepped out.

7         THE WITNESS:  Thank you.  Thank you for accommodating.

8    BY MR. HOLT:

9    Q.   That's all right.

10   A.   Okay.  Let's continue.

11   Q.   So I wanted to make sure I understand the archived data

12   that you retain.  It's my understanding that the archived data

13   that ArkOwl maintains is limited to ███████████████████

14   ████████████████████████████████████████████████████

15   ███████████████████████████████████████████

16   ███  ████████   ██████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ███████████████████████████████████████████

19   ████████████████████   ████████████████████████████████

20   ███████████████████████████████████  ██

21   ██████████████████████████████████████████████

22   █████████████████████████   ██████████████████████

23          ████████████████████████████████████████████

24   ██████████████████████████████████████████████

25   ████████████████████████████████████████

Robert Daline – Cross

1    ████████████████████████    ██████████████████████████

2    ██████████████████████████

3    *Q.*  So is it fair to kind of categorize the archived data

4    versus the real-time data, the real-time data is being provided

5    by third-party sources --

6    *A.*  Yes.

7    *Q.*  -- and the archived data is being provided by ArkOwl

8    itself?

9    *A.*  Correct.

10   *Q.*  And what outputs are generated from the archived data?

11   *A.*  ██████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ███████   █████████████████████████████████   ████████

15   ████████████████████████████████████████████

16   ███████████████████████████████

17          *MR. HOLT:*  I believe I'm done with the questions that

18   hit sensitive topics.

19          *THE WITNESS:*  Okay.

20          *MR. HOLT:*  Can I have our representatives come in?

21          *THE WITNESS:*  Yep.  Any, like, product-type stuff I'll

22   get sensitive about.

23          *MR. HOLT:*  Is the data points -- the data points that

24   you promote on the website?

25          *THE WITNESS:*  No.  If I promote them on the website,

Robert Daline - Cross

1    they're fine.

2              (Hearing continued in open court.)

3    *BY MR. HOLT:*

4    *Q.*  Let's turn to page 1 of this exhibit.

5              ArkOwl promotes that it provides 81-plus data points

6    to its customers.  Do you see that?

7    *A.*  I see that.

8    *Q.*  And is that current?

9    *A.*  We provide a lot more now.

10   *Q.*  How many do you provide currently?

11   *A.*  I think maybe 120 plus.

12   *Q.*  And I would like to understand a bit more about the

13   120-plus data points that you provide.  Can you give me a brief

14   overview.

15   *A.*  Yeah.  These are all data points like the social network

16   check.  So that's, you know, if we're checking -- if we're

17   checking ███████ you know, or if we're checking ███████ that's

18   one -- that's two data points there that I just said.  So if

19   it's a yes-no check on either of those -- right?  A yes is a

20   data point; a yes for a different one is a data point; creation

21   data by ██████ is a data point.

22   *Q.*  So an email address is input into your system, searches are

23   conducted -- the example you just gave was that you may check

24   ███████  So what is it checking ██████ for?

25   *A.*  Registration, yes or no, is there a ██████ account

Robert Daline - Cross

1    associated with this email address?  Is there a ███ account

2    associated with this phone number?  Basically, just yes-no

3    checks.

4    Q.  Okay.  So social network you had mentioned.  What would be

5    the next category of checks?

6    A.  ███ information, the @gmail side of the email to -- and

7    the ███ would share stuff about Google.

8    Q.  What do you mean, "stuff about Google"?

9    A.  Well, the creation date of Google.com or Gmail.com has a

10   website, has a web host.  They would share who registered it.

11   It would say, Google Corporation registered this.  It's a lot

12   more useful for the @ArkOwl.com, where you're like, you know,

13   who is behind this?  When did this start?

14   Q.  Okay.  So social networks, ███ check, ███ check, what

15   else?

16   A.  I got -- our internal database check that we talked about.

17   Q.  Uh-huh.

18   A.  We have caller ID check.  So that's basically just what it

19   sounds like.  When your caller ID comes up on your phone, you

20   know, that checks a database.

21   Q.  Any other categories?

22   A.  Yeah.  That would be for phone.  For IP address, you know,

23   we check the carrier of the phone, check the carrier of the IP

24   address I mean, there is -- there is probably like 90 more of

25   these or --

Robert Daline - Cross

1    *Q.* So for each category that you have mentioned, there are

2    multiple checks going out to a variety of resources?

3    *A.* Correct.

4    *Q.* Are there any other categories that you didn't mention?

5    *A.* Not that are coming to mind.

6    *Q.* Okay. So we talked about the checks that occur, so now

7    let's talk about the data output that --

8    *A.* Oh, wait. Our breach data, we do that. Okay.

9    *Q.* That's the data that comes from "Have I Been Pwned?"

10   *A.* Yes.

11   *Q.* Any other categories you can think of?

12   *A.* Not off the top of my head. It's a lot easier when I'm

13   looking at the service, but -- I'm going off memory.

14   *Q.* And just to recap your earlier testimony. Of all of the

15   categories we just mentioned -- all of the categories of

16   checks -- all are real-time except the archived ArkOwl

17   database?

18   *A.* Yes.

19   *Q.* Data outputs, let's talk about that. Can you explain to me

20   what data output ArkOwl provides to its customer?

21   *A.* We provide the -- I mean, this is all data output. I mean,

22   the input is the email address, the phone number, the IP --

23   potential zip code. We've been talking about the outputs this

24   whole time. Whether there was social account, it's going to be

25   a yes-or-a-no output.

146

Robert Daline - Cross

1   Q.   Are most of the outputs yes-no?

2   A.   There are others that aren't yes-no.

3   Q.   And what would those be?

4   A.   We can provide name; metadata; caller ID, there is a name.

5   Q.   Personal name, is that what you're referring to?

6   A.   Yes, personal name.  With the Whois, there is, you know,

7   creation and registration dates.  So there is dates that could

8   come back.  Typically, it's yes-no.  Sometimes it's a string.

9   Q.   Okay.

10  A.   You know, could get birth dates or locations sometimes

11  coming back from different sources.

12  Q.   Are passwords themselves ever provided as a part of

13  ArkOwl's data output?

14  A.   No.  I sure hope not.

15  Q.   What about log-in credentials, generally?

16  A.   No.  I say "I hope not" because sometimes we pass through

17  bios.  So if somebody puts a password in their bio, that's

18  where I say, "I hope not."

19  Q.   Are you aware of any evidence that DarkOwl had knowledge of

20  ArkOwl at the time that it adopted the DarkOwl mark?

21  A.   I do not have any evidence.

22       MR. HOLT:  Your Honor, would it be okay to take a

23  short break?  I can look at my notes and see what additional

24  questions I have.

25       THE COURT:  That's fine.  It's about 2:25.  Let's take

Robert Daline - Cross

1   a break until about 2:40 p.m.

2           (Recess at 2:25 p.m.)

3           (In open court at 2:43 p.m.)

4           *THE COURT:*  All right.  We're back on the record.

5           Mr. Holt, any further cross-examination?

6           *MR. HOLT:*  A few further questions, Your Honor.  Thank

7   you.

8   *BY MR. HOLT:*

9   *Q.*  During your examination by Mr. Frasier, you discussed a

10  purported interaction with an employee of the United States

11  Postal Service at the MRC conference.  Do you recall that?

12  *A.*  Yes.

13  *Q.*  You testified that the USPS was a potential customer of

14  ArkOwl because you believe they do online purchase

15  transactions; right?

16  *A.*  I believe they might have the need for additional data on

17  email addresses that would come in.

18  *Q.*  The encounter you claim to have had at MRC was with an

19  employee of the United States Postal Inspection Service; right?

20  *A.*  Yes.

21  *Q.*  Do you have an understanding of the difference between the

22  USPS, United States Postal Service, and the USPIS, United

23  States Postal Inspection Service?

24  *A.*  Neither of which are our customers, so I do not.

25  *Q.*  Any idea what the USPIS does?

148

Robert Daline - Cross

1   A.   I do not.

2   Q.   You contend that this USPIS employee queried as to a

3   relationship between ArkOwl and DarkOwl; right?

4   A.   No.   They inquired of us, thinking that they used us as a

5   service.

6   Q.   And is USPIS a customer of DarkOwl?

7   A.   I would assume so, based on that interaction.

8   Q.   USPIS is not a customer of ArkOwl; correct?

9   A.   Not a customer of ArkOwl.

10   Q.   Nor was it at the time of this interaction?

11   A.   Correct.

12   Q.   Do you know what services intelligence analysts at the

13   USPIS use?

14   A.   I do not.

15   Q.   You don't have any evidence that this purported inquiry by

16   USPIS had any impact on a purchasing decision by USPIS;

17   correct?

18   A.   I do not believe so.

19   Q.   Was anybody else present during this interaction?

20   A.   I mean, it's a conference; there are people around.   But I

21   think -- ██████ was there with me.   He was in and out.   So it was

22   a conversation the representative was having with me.

23   Q.   Anyone else privy to that conversation?

24   A.   Well, ██████ was.   I told him about it after.   I told my

25   attorney --

Robert Daline - Cross

1  Q.  I'm sorry.  The question was, was there anyone privy to the

2  conversation while it was occurring?

3  A.  Privy, like invited into it?

4  Q.  Or was a part of the discussion or could hear the

5  discussion?

6  A.  ████ might have been able to hear pieces of it.

7  Q.  But you told --

8  A.  But --

9  Q.  I'm sorry?

10  A.  But no one else.

11  Q.  But you said you told ████ afterwards; correct?

12  A.  Yeah.  I think he was in and out.  So I think he asked

13  about it after the fact, like, what were you guys talking

14  about?

15  Q.  You had no documentation regarding this interaction,

16  though?

17  A.  No.

18  Q.  And you have not talked to the USPIS employee since that

19  time; correct?

20  A.  Correct.

21  Q.  During your examination by Mr. Frasier, you reviewed Trial

22  Exhibit 380, the ████████ email.  Do you recall that?

23  A.  Yes.

24  Q.  I'd like to show that exhibit again.

25          Now, you contend that ████████ inquired into a

Robert Daline - Cross

1   potential relationship between ArkOwl or DarkOwl; correct?

2   A.  "Any chance it's another project from you guys."  It

3   doesn't seem like █████████ is, you know, thinking that there is

4   a relationship there.

5   Q.  He's inquiring whether there is a relationship?

6   A.  He's inquiring whether it's us or whether we knew about

7   DarkOwl.  That's my interpretation of the words written down

8   here.

9   Q.  It's an inquiry; is that fair?

10  A.  Yeah.

11  Q.  And this inquiry was prompted by Apruvd's receipt of an

12  email blast from DarkOwl's third-party agent; right?

13  A.  Yes.

14  Q.  And this third-party agent who sent the email was Taylor

15  Sharp; is that right?

16  A.  Well, ██████ had sent to it to █████████  So Taylor sent it to

17  █████████ ██████ sent it to █████████

18  Q.  To your knowledge, Apruvd is not a DarkOwl customer;

19  correct?

20  A.  To my knowledge, Apruvd is not a DarkOwl customer.

21  Q.  You did not have any follow-up discussions with █████████

22  regarding this inquiry; correct?

23  A.  I don't believe so.

24  Q.  And at any time after █████████ email, did he or anybody

25  else from Apruvd ask you anything about DarkOwl?

Robert Daline - Cross

1    *A.*  I think they might have asked, you know, what happened or

2    whatnot.  And I would say -- I did tell them that we were

3    engaged in a lawsuit after -- after that started.  But outside

4    of that, I have told them pretty strictly that anything we talk

5    about will probably be brought up in court, and we don't want

6    to do that.  And they agreed.

7    *Q.*  And you don't have any evidence that the inquiry by Apruvd

8    had any impact on the purchasing decision made by Apruvd;

9    correct?

10   *A.*  To purchase our service?  Our ArkOwl service?

11   *Q.*  Correct.

12   *A.*  Correct.  I do not believe this affected any purchasing

13   decisions.

14   *Q.*  Or had any impact on the business relationship?

15   *A.*  Or impact on the business relationship with -- from us and

16   Apruvd.  Correct.

17   *Q.*  Earlier you mentioned the archived database that ArkOwl

18   maintains; correct?

19   *A.*  Correct.

20   *Q.*  ██████████████████████████████████████████████████████

21   ██████████████

22   ██ ████████████████████████████████████████████████

23   ██████████   ████████████

24   ██ █████████████████████████████

25   ██ ██████████████████████████████████████

Robert Daline - Cross

1   ████████████████████   ████████████████████   ████████████

2   ██████████████████████████████████████

3   ██   ████████████████████

4   ██   ████████████████

5   *Q.* The data inputs that ArkOwl's service is set up to receive

6   include what information?

7   *A.* The input includes the ability to take in an email address,

8   and then there is one titled "phone" that could take in a phone

9   number.

10  *Q.* Okay.

11  *A.* There is an IP address input that can take in an IP

12  address.  And there is zip code input that can take in a zip

13  code, and you have to specify which country.

14  *Q.* So four different fields of input?

15  *A.* Yes.  Correct.

16  *Q.* All right.  And do you consider each of those fields to

17  fall within the PII verification classification?

18  *A.* I believe email address, phone number, and IP address.  I

19  do not believe zip code.

20  *Q.* Why do you believe zip code is not included?

21  *A.* Because zip code can't go to a particular person.  It would

22  go to a geographical range.

23          *MR. HOLT:* I have no further questions at this time,

24  Your Honor.

25          *THE COURT:* Thank you.

Robert Daline - Redirect

1          Any redirect, Mr. Frasier?

2              *MR. FRASIER:*  Yes, please.

3              *THE COURT:*  All right.

4                      **REDIRECT EXAMINATION**

*BY MR. FRASIER:*

5

6   *Q.*  Mr. Daline, I wanted to ask you about your knowledge

7   regarding how your customers and end users use your data.

8          Earlier you testified on your cross-examination that

9   you were confident that users were using ArkOwl's services to

10  verify online transactions; is that fair?

11  *A.*  That's fair.

12  *Q.*  How are you confident that that is what one of the uses is?

13  *A.*  Because I was a fraud analyst when I started, and that's

14  what I was doing to come up with the idea for ArkOwl.  Our

15  early-on clients reported that's how they used it.

16  *Q.*  Is there any way for you to independently verify how your

17  clients are actually using the data that you provide them?

18  *A.*  There is not.  I actually even tried at Best Buy to get

19  back into the fraud department for nostalgic purposes and

20  review a fraud order; and they wouldn't let me, even though

21  they were using our service.

22  *Q.*  Now, in -- that's funny.  And in looking through your

23  customer list, can you have a decent guess as to what a Louis

24  Vuitton, for example, would be using ArkOwl's data for?

25  *A.*  I would guess that Louis Vuitton would use it the same way

Robert Daline - Redirect

1   that I used it at Target -- as a tool that I would go to as an

2   analyst and do a manual review check.  Many of our I would say

3   retail customers, our clients, use us on a manual review check

4   basis.

5   Q.  Now, you also made some speculation, I guess we could say,

6   as to other uses.  Did you -- did you -- were you told by your

7   customers that they were using ArkOwl's data, for example, in

8   account setups?

9   A.  I haven't been told that.  But by prospective clients, they

10  have told me that's how they could see them -- see us fitting

11  into their tech suite -- their tech stack.

12  Q.  All right.  And I understand that you've had a few

13  customers that we looked at who don't actually engage in online

14  transactions.

15  A.  Correct.

16  Q.  Is ArkOwl's mark ever displayed just as "ark"?

17  A.  No.

18  Q.  Does any potential customer ever just say "owl," to

19  reference ArkOwl?

20  A.  No.

21  Q.  Is it -- it's -- is it ever segregated between "ark" and

22  "owl"?

23  A.  Not in our material.  Every once in a while I'll have a

24  customer say, how is the Ark doing, or how is the Owl doing?

25  It's a nickname that a customer could give us.  It's not

Robert Daline - Redirect

1    something we ever put out saying, we're "ark" or we're "owl."

2    Q.  All right.  So how is your name -- your logo, your brand

3    seen?

4    A.  It's always seen as ArkOwl.

5    Q.  We looked at some About-Fraud infographics, and I don't

6    need to pull them up right now.  I understand that your

7    testimony was that the About-Fraud graphics captures your

8    portion of the cybersecurity industry.  First of all, is that

9    accurate?

10   A.  I don't think it covers the full industry.  This is just

11   how the About-Fraud curators see what they see in the industry.

12   Q.  Is it an exhaustive list of companies in the industry?

13   A.  I would say no.  I mean, I think they came about and had

14   their vendor list before we were on it.  And that's the same

15   with the Paladin report.  I think you can find a report where

16   ArkOwl isn't on it.

17   Q.  That doesn't mean that you're not in that industry?

18   A.  Correct.

19   Q.  Now, in 2019, when you first discovered the existence of

20   DarkOwl, did you think they were not in the cybersecurity

21   industry?

22   A.  No.  I thought they were in the cybersecurity industry.

23   Q.  And you still didn't think it was a problem for them to

24   have the name?

25   A.  I mean, I thought the name aspect was a problem; but it

Robert Daline - Redirect

 1   wasn't a problem enough for us to pursue it.  I felt like, you

 2   know, economically, you know, it didn't make -- it didn't make

 3   sense for what I saw that they were doing.  I didn't see that,

 4   you know, our other customers getting confused or anyone

 5   getting confused.  You know, it didn't seem like the verbiage

 6   on the site could be confused for our verbiage with how we

 7   communicated with clients and the things that our clients are

 8   asking for.

 9   *Q.*  So it's not simply that DarkOwl is in the cybersecurity

10   industry in general that is your concern?

11   *A.*  Yeah.  That's not the concern.

12   *Q.*  All right.  You were shown I believe it was nine trademark

13   registrations for other companies, and you were asked if they

14   were in the cybersecurity industry.  Is your concern

15   regarding -- or lack of concern regarding the marks that you

16   looked at simply whether or not they fall within the

17   cybersecurity industry?

18   *A.*  Yeah.  "Cybersecurity" is not the concerning term for me.

19   *Q.*  Have you ever had a customer reach out to you and say that

20   they had been solicited by one of those nine customers?

21   *A.*  No.

22   *Q.*  Now, my computer isn't syncing with it, but I think we can

23   work with it anyway.

24           Can you just turn to Exhibit 117 in your notebook,

25   please.  This would be in the DarkOwl exhibit notebook.

Robert Daline - Redirect

1   *A.*  Which volume?

2   *Q.*  Not sure.

3          *THE COURT:*  It's in the second one.

4          *THE WITNESS:*  Second one?

5          *THE COURT:*  I think so.

6          *THE WITNESS:*  Thank you.

7          Okay.  Which one, 1 -- 113?

8   *BY MR. FRASIER:*

9   *Q.*  No, 117.  117.

10         *MR. FRASIER:*  If you don't mind, that would be great.

11  I appreciate that.

12         There it is.  Is this from you or me?

13  *BY MR. FRASIER:*

14  *Q.*  STREET OWL is one of the -- it's on the monitor now,

15  Exhibit 117 was one of the marks that you were asked about; do

16  you recall that?

17  *A.*  Hold on here.  I'm having some complications.  I'm having

18  non-tech complications here.

19         *THE COURT:*  Can we put it up on the witness's screen,

20  as well?

21         *THE WITNESS:*  It's on my screen.  I had to maneuver

22  the paper.  Okay.

23  *BY MR. FRASIER:*

24  *Q.*  All right.  And counsel read a sentence for you asking

25  about whether it was in the cybersecurity industry.  I believe

158

Robert Daline - Redirect

1    they read the sentence -- computer -- starting in the second

2    line, "Computer software for providing an online database in

3    the field of transaction processing, to upload transactional

4    data, provide statistical analysis, and produce notifications

5    and reports."

6         The following sentence is, "Computer software for

7    measuring users' driving habits."  Does measuring users'

8    driving habits have anything to do with ArkOwl?

9    A.   No.

10   Q.   Do you think a company that has software that measures

11   users' driving habits is in a field that is related to ArkOwl?

12   A.   I do not.

13        MR. FRASIER:   Thank you.

14        Could we just pull up Exhibit 130, as well.  Could you

15   flip down to the second page.  Thank you.

16   BY MR. FRASIER:

17   Q.   Mr. Daline, I want to draw your attention to on the second

18   page, the filing date of October 20, 2021.

19   A.   Okay.

20   Q.   I'm not sure your testimony was clear on this.  Was -- had

21   you registered -- had you applied for your trademark

22   registration as of October 20, 2021?

23   A.   Yes.  Ours was already applied and registered by that time.

24   Q.   All right.  So this registration wouldn't have been on the

25   register when you applied for your mark?

Robert Daline - Redirect

1    *A.*  Correct.

2          *MR. FRASIER:*  Thank you.  You can shut those exhibits

3    down.  I appreciate that.

4    *BY MR. FRASIER:*

5    *Q.*  You were asked a few questions about what data you have in

6    real-time.  Is that something that is common throughout your

7    competition, that that same data is provided in real-time?

8    *A.*  No.  It's not common.

9    *Q.*  Do you have any -- any companies that you find most

10   directly competitive with that do not provide real-time data?

11   *A.*  Ekata and Emailage, probably the companies that we get

12   mentioned alongside the most, do not do a lot with real-time

13   data.

14   *Q.*  Is real-time data something that is necessary to provide

15   personal identification information verification?

16   *A.*  I believe so, but a lot of -- a lot of I would say

17   purchasers and fraud professionals out there don't think so.

18   *Q.*  Is it a critical element to be able to sell that service?

19   *A.*  No.

20   *Q.*  So you have competitors selling the service of personal

21   identification information verification without having

22   real-time data?

23   *A.*  Correct.

24         *MR. FRASIER:*  Thank you.  I have no further questions.

25         *THE COURT:*  I have one follow-up question.  Of course,

Robert Daline - Redirect

1   I'll allow counsel to follow up.

2          I think you testified previously, Mr. Daline, that

3   ArkOwl was not currently using the flying owl logo; is that

4   right?

5          THE WITNESS:  We are using -- so what I learned --

6   it's been a while since my deposition.  But in my deposition, I

7   said "soaring owl."  And we were -- I believe what we were

8   talking about was the terms I used for each logo.  I used the

9   term -- in my mind, this is our new logo; that's the old logo.

10  So -- maybe they asked a question of, would you say this is the

11  soaring owl, to which I would say, yeah, there is an owl

12  soaring in it.  We could refer to this as the soaring owl logo.

13         So I think in my deposition, I had agreed to saying

14  it's soaring, because it looks like it's flying, in our new

15  logo.

16         THE COURT:  And you are currently still using that

17  logo?

18         THE WITNESS:  Yes.  That's our logo.

19         THE COURT:  Thank you.  I was confused on that point.

20         Any further follow-up?

21         MR. FRASIER:  No, Your Honor.

22         THE COURT:  I'm not going to allow recross.  So

23  Mr. Daline, you may step down.

24         THE WITNESS:  Thank you.

25         THE COURT:  All right.  Does the defendant have any

Russ Cohen – Direct

1  additional witnesses?

2          MR. FRASIER:  Yes, Your Honor.  May I confer about

3  order of witnesses for a second?

4          THE COURT:  Yes.

5          MR. FRASIER:  Hopefully, I can get this monitor

6  working.

7          THE COURT:  You may.

8          MR. FRASIER:  Thank you, Your Honor.

9          ArkOwl would call Mr. Russ Cohen.

10         THE COURT:  Mr. Cohen, come forward.

11              (**RUSS COHEN, DEFENDANTS' WITNESS, SWORN**)

12         THE COURT:  Please be seated.  And speak into the

13  microphone.

14         MR. FRASIER:  Thank you for your patience while I work

15  this out.

16                      **DIRECT EXAMINATION**

17  *BY MR. FRASIER:*

18  *Q.*  Mr. Cohen, could you please introduce yourself.

19  *A.*  Sure.  I'm Russ Cohen.  I am the president and chief

20  financial officer of DarkOwl.

21  *Q.*  You've always been the president and chief financial

22  officer of DarkOwl; right?

23  *A.*  Correct.

24  *Q.*  Before joining DarkOwl, you were a chief risk officer?

25  *A.*  I was.

Russ Cohen – Direct                                        162

1   *Q.* And a chief risk officer, otherwise known as a CRO, is a

2   officer for private companies?

3   *A.* I'm sorry?

4   *Q.* They're officers for private companies?

5   *A.* Generally, for public companies.

6   *Q.* Excuse me.  Non-governmental companies.

7   *A.* Correct.

8   *Q.* In 2017, you gave a presentation to an organization of CROs

9   on behalf of DarkOwl; is that right?

10  *A.* That is correct.

11  *Q.* And at the time you gave that presentation, it was because

12  you believed that CROs were a potential customer of DarkOwl?

13  *A.* Yes.

14  *Q.* Rather, that there were officers of those companies who

15  would be potential customers of DarkOwl; is that right?

16  *A.* That is correct.

17       *MR. FRASIER:* All right.  Could you -- this isn't

18  working --

19       *COURTROOM DEPUTY:* If you want to plug it into the

20  table, that might --

21       *MR. FRASIER:* Sure.  We can do that.

22       Your Honor, may I do the cross from --

23       *THE COURT:* You may.  Just make sure you're as close

24  to the microphone as you can possibly get.

25       *MR. FRASIER:* Okay.

Russ Cohen – Direct

1          THE COURT:  Is it on plaintiff's counsel's monitor?

2          MR. BUXBAUM:  Yes, Your Honor.

3          THE COURT:  Is it on your monitor --

4          MR. FRASIER:  It's not on this monitor -- it's on this

5   one.

6          THE COURT:  Is it going to work for you, Mr. Frasier?

7   Do you need us to call the technology people?

8          MR. FRASIER:  We can make this work, Your Honor.

9   Thank you.

10         THE COURT:  Thank you.

11  BY MR. FRASIER:

12  Q.  Thank you for your patience, Mr. Cohen.

13         You were involved in creating Exhibit 3 that we're

14  looking at; is that true?

15  A.  Yes.

16  Q.  And this was as of 2018?

17  A.  Yes.

18  Q.  All right.  Now, I'm going to flip through it quick.  This

19  document was a document --

20         MR. HOLT:  Your Honor, I believe this document is

21  marked AEO.

22         MR. FRASIER:  Yes.

23         THE COURT:  It is.

24         MR. FRASIER:  I apologize.

25         THE COURT:  Mr. Daline, if you would step out.

Russ Cohen – Direct

1          MR. FRASIER:  Exhibit 3.  I can pull up a different

2     copy of it that actually has the stamp on it.

3          This is Exhibit --

4          THE COURT:  Is everybody on the same page?  I just

5     want to make sure we don't have any confusion about this.

6          Plaintiff's counsel is able to access this?

7          MR. BUXBAUM:  I think he was using a different version

8     that didn't have the exhibit stamp on it.

9          MR. FRASIER:  My apologies.

10         THE COURT:  Thank you.  All right.

11    BY MR. FRASIER:

12    Q.  We're looking at Trial Exhibit No. 3.  Do you believe this

13    document was created to present primarily to investors; is that

14    right?

15         MR. HOLT:  Your Honor, I'm sorry.  Mr. Daline's wife

16    is present in the courtroom.  Could we ask her to leave?

17         THE COURT:  Yes.

18         Thank you.  So the record will reflect that Mr. Daline

19    and his wife have both exited the courtroom.  All right.

20         THE WITNESS:  Yeah.  This does not look like a

21    presentation I would have given to the chief risk officers.

22    BY MR. FRASIER:

23    Q.  Right.  This is a year after the one you gave to the chief

24    risk officers?

25    A.  Okay.

Russ Cohen – Direct

1    Q.  And this -- you believe this would have been given to

2    investors?

3    A.  Probably.

4    Q.  We're looking at page 9 of Exhibit 3.  The graphic on

5    page 9 describes some of the data that was available on the

6    darknet as of 2018 on the left side; is that right?

7    A.  Yes.

8    Q.  And then as of 2018, the right side indicates some of the

9    ways that data could be used?

10   A.  Correct.

11   Q.  And the right side of the graphic either represents

12   DarkOwl's then-existing customer uses or its target customers;

13   is that right?

14   A.  Yes.

15   Q.  Now, if this graphic were recreated in 2023, it would have

16   different names and different use cases, wouldn't it?

17   A.  I don't believe there is any use cases listed that -- ours

18   are the ones that are implying the use cases to be used by the

19   end users, which are the companies on the right.

20   Q.  But DarkOwl would emphasize other types of potential

21   customers over time?

22   A.  The list gets longer, sure.

23   Q.  And part of the reason that you would put different names

24   on there is a strategic decision on what you want to emphasize?

25   A.  Because you can't put an unlimited number of used by --

Russ Cohen – Direct

1    it's a large number, as we saw by lots of the graphics.  So,

2    yeah, I could easily see us changing -- you know, for example,

3    MSSPs out with a different -- you know, with a different

4    segment.

5    Q.  But part of the reason you would provide different

6    descriptions is a strategic marketing decision?

7    A.  That's fair.

8    Q.  And part of the reason is that you're constantly trying to

9    describe who could use DarkOwl's data in different ways?

10   A.  Sure.

11   Q.  And DarkOwl's enterprise customers have used DarkOwl's data

12   for many different purposes?

13   A.  Correct.

14   Q.  And sometimes DarkOwl's enterprise customers have used it

15   in a way that was a new use case?

16   A.  New to us, sure.

17   Q.  Yes.

18        THE COURT:  Mr. Frasier, let me ask you about the

19   attorneys' eyes issue.  I see the next exhibit you pulled up

20   also is marked attorneys' eyes.  Are you going to be able to

21   group the attorneys' eyes only during your examination so we

22   can let Mr. Daline come back in when you're done with all of

23   the attorneys' eyes only or not?

24        If not, it's fine.  I just want to be prepared to --

25        MR. FRASIER:  I believe so.  I don't think they'll be

Russ Cohen - Direct

1    coming in and out.

2         THE COURT:  All right.  Thank you.

3    BY MR. FRASIER:

4    Q.  Now, Mr. Cohen, having reviewed the previous exhibit we

5    were just looking at, do you believe that ArkOwl could gain a

6    strategic competitive advantage by looking through that 2018

7    deck?

8    A.  I don't understand ArkOwl's business well enough to make a

9    judgment.

10   Q.  Now, Exhibit 11 that we're looking at right now, do you

11   believe that ArkOwl would gain a competitive advantage by

12   reviewing these notes?

13   A.  I don't know.  Again, I didn't classify these documents as

14   attorneys' eyes only.

15   Q.  Is this something that your --

16        THE COURT:  Wait a minute.

17        MR. FRASIER:  We can just keep moving with it as

18   attorneys' eyes only.

19        THE COURT:  Well, I mean, I absolutely agree that the

20   witness is not perfectly situated to answer any questions

21   relating to the classification of the document by the

22   attorneys.  If you continue to have issues about that and you

23   want to confer with plaintiff's counsel about that during a

24   short break, I'm happy to allow you to do that.  But I don't

25   want to waste time having the witness say he wasn't the one who

Russ Cohen – Direct

1  classified this as attorneys' eyes only.

2           *MR. FRASIER:*  Absolutely, Your Honor.

3           *THE COURT:*  Does that make sense?

4           *MR. FRASIER:*  Yes.  We'll just -- we'll not worry

5  about the designations during the --

6           *THE COURT:*  All right.  Thank you.

7  *BY MR. FRASIER:*

8  *Q.*  Now, Exhibit 11 was created in 2019; is that right?

9  *A.*  I believe so.  Yes.

10          *MR. FRASIER:*  Okay.  I'm going to put a second copy

11 down here for myself.

12 *BY MR. FRASIER:*

13 *Q.*  So as of 2019, DarkOwl had 48 clients?

14 *A.*  As of either the beginning or the end of Q2, I would say

15 that's right.

16 *Q.*  Now, on page 1, the first general key take-away was, "We

17 are still learning the market and will continue to do so as we

18 win/lose more and more deals, both strategic and otherwise."

19          Do you believe that DarkOwl is still learning the

20 market?

21 *A.*  I believe the market is changing; so, absolutely, we have

22 to keep learning how the market is changing.

23 *Q.*  Right.  And so two years prior to this market, you were

24 making a pitch to chief risk officers.  But as of 2019, you

25 wouldn't target chief risk officers anymore; right?

Russ Cohen - Direct

1   *A.*  Probably not.

2   *Q.*  You were still learning potential use cases as of Q2 of

3   2019?

4   *A.*  Yes.

5   *Q.*  And you anticipate use cases for DarkOwl's data to continue

6   evolving?

7   *A.*  Yes.

8   *Q.*  You were still learning what your core market is about and

9   what customers want from that core market?

10  *A.*  In general, I think the customers know what they want.  The

11  specifics of what they want change.

12  *Q.*  DarkOwl sells primarily to either cybersecurity platforms

13  or data platforms?

14  *A.*  Or to governments.

15  *Q.*  Primarily to either cybersecurity platforms or data

16  platforms?

17  *A.*  Currently, or in 2019?

18  *Q.*  In 2022, last year.

19  *A.*  In 2022, I would have to look; but it was much more even

20  than it was in 2019.

21  *Q.*  Now, in your deposition I asked who you sold to; do you

22  recall that?

23  *A.*  Okay.  I don't specifically recall that, but it was a long

24  deposition.

25  *Q.*  I will show it to you before I ask you questions about it.

Russ Cohen – Direct

1          Can you see the deposition transcript?

2     *A.*  Yes.

3     *Q.*  Now, I asked you on line 9, question, "Now, the second to

4     last bullet in this section you wrote, 'major opportunities

5     exist in platforms,' and then it goes on.  But my question is,

6     what do you mean, 'platform?'"

7          And you responded, "So platforms in general are places

8     that users go to to do whatever function they want to do.  In

9     general, we sell primarily to either cybersecurity platforms --

10    which is, I'm a cybersecurity professional, and I need a

11    platform to help me do my job -- or data platforms.  We

12    contribute data to platforms, and they're aggregators of all

13    sorts of data."

14    *A.*  Yes.

15    *Q.*  Is that still true today?

16    *A.*  Yes.

17         *MR. FRASIER:*  I need to pull that exhibit back up.

18    All right.

19    *BY MR. FRASIER:*

20    *Q.*  So as of the second quarter of 2019, you had 48 clients.

21    And 26 were in the U.S.; is that right?

22    *A.*  I'm trying to see where that is stated.  On this page, or

23    is it the next page?

24    *Q.*  Must be on the next page.  I'm -- yes.  "Customers by

25    geography."  I'm sorry.  Thank you for working through this.

Russ Cohen - Direct

1    A.   Yes.

2    Q.   All right.  Back on the first page, of your 48 clients, 20

3    were in the cyber industry; is that right?

4    A.   Correct.

5    Q.   And they counted for about -- they accounted for about

6    60 percent of the revenue?

7    A.   That is correct.

8    Q.   There were nine --

9    A.   50 percent I think is what I'm -- okay.

10   Q.   There were -- nine of your customers were the government?

11   A.   Correct.

12   Q.   And then another 13, a few of which may serve government

13   entities?

14   A.   Yes.

15   Q.   All right.  And then at that time, as of quarter 2, 2019,

16   you were making about $5,000 a month for the cyber customer?

17   A.   I think that is --

18   Q.   I -- I did the math for that.  I'm sorry.

19   A.   20 divided by 100.

20   Q.   $60,000 a month in revenue, is that right?

21   A.   The math is about right.

22   Q.   Okay.

23   A.   $60,000 per client, on an annual basis.

24   Q.   Thank you.  DarkOwl's potential market is large; would you

25   agree?

Russ Cohen – Direct

1   A.   Yes.

2   Q.   Thousands of companies?

3   A.   I don't know how to quite answer that.  I don't want to say

4   it's hundreds of thousands of companies.  You know, certainly

5   single digits or something in thereabouts.

6   Q.   All right.  You would consider -- you would consider a

7   company a potential customer if they were willing to spend

8   $100,000 to avoid any sort of bad cyber event?

9   A.   We would be a piece of that $100,000.  So I would

10  categorize it as any company that is willing to spend $100,000

11  for darknet information to help them protect themselves.  That

12  would mean that they would have a larger budget than that.  So

13  these are pretty large companies.

14  Q.   I asked you the same question in your deposition, as well;

15  right?

16  A.   Uh-huh.

17  Q.   I asked you, "Do you have a number of approximately how

18  many potential clients exist for DarkOwl?"

19          And you said, "I don't have a specific number.  I -- I

20  could spend a lot of money on consulting firms that could give

21  me a specific number.  I don't think it would be money well

22  spent.  What I would -- what I would say is, broadly, how many

23  companies would spend $100,000 to avoid -- and you can fill in

24  the cybersecurity blank -- ransomware or a breach or a bad

25  event.  And I think there are many thousands of companies that

173

Russ Cohen – Direct

1   could afford $100,000 to avoid that bad outcome."

2   A.  Yes.

3   Q.  Do you still agree with that today?

4   A.  Yes.

5   Q.  Showing you what has been marked Exhibit 9.  This is a

6   document you also created; is that right?

7   A.  I believe so.  I'd have to see a couple of pages.  Yes.

8   Q.  And this is, essentially, an updated version of the Exhibit

9   11 we were looking at, Q2 2019 Russ's notes?

10  A.  Correct.

11  Q.  But this document is about two years updated from the one

12  we just looked at?

13  A.  And in a different form; but, yes.

14  Q.  Right.  I'm on page 13 of Exhibit 9, the second to the last

15  page.  The title of this slide is, "Where do we go from here,

16  strategy.  Become the ubiquitous source of darknet data."  In

17  the second bullet you wrote, "As our product offerings expand,

18  we can target ever less sophisticated users, which is the

19  really big market."  Right?

20  A.  Correct.

21  Q.  All right.  Now, we're going to go up to page 6 of this

22  document.

23          Page 6 reflects the customers that DarkOwl was selling

24  to as of June 30 of 2021; is that right?

25  A.  Yes.

174

Russ Cohen – Direct

1   *Q.*  And there were -- 28 of your customers were commercial

2   cybersecurity?

3   *A.*  I'm sorry.  Commercial platforms were ten.  Commercial

4   cybersecurity was 28?

5   *Q.*  Yes.

6   *A.*  Yes.

7   *Q.*  Now, only 15 were national or regional governments; right?

8   *A.*  Yes.

9   *Q.*  And there were somewhere in the ballpark of 80 -- 80

10  existing customers that you had?

11  *A.*  Sounds about right.  I can't do the math quite quickly

12  enough.

13  *Q.*  I'm showing you what has been marked as Exhibit 4.  This is

14  not a document you created; right?

15  *A.*  Correct.

16  *Q.*  This was created shortly after the one we just looked at,

17  roughly July of 2021?

18  *A.*  Yes.  The other one was June of 2021?

19  *Q.*  Yes.  Around the same time, at least.

20          Flipping to page 7 -- and I'm going to zoom in on this

21  graphic -- you -- you recognize the nature of this graphic;

22  right?

23  *A.*  Yes.

24  *Q.*  This is someone's attempt to compartmentalize a portion of

25  the cyber industry?

Russ Cohen – Direct

1    A.   Yes.

2    Q.   I believe your guess was that this was put together by an

3    investment banker?

4    A.   That was my guess.  Still is.

5    Q.   Sure.  And you agree that this is not a comprehensive list

6    of companies in the cybersecurity industry?

7    A.   Correct.

8    Q.   But the graphic is trying to describe companies that touch

9    the broader cybersecurity space?

10   A.   As either providers or companies that needed their services

11   and might acquire those providers.

12   Q.   Okay.  And DarkOwl tries to sell to everybody who touches

13   the broader cybersecurity space?

14   A.   DarkOwl tries to sell to people who have a use case for our

15   data.  They can be across the entire schema that you put in

16   front of me.  Any one customer or any one prospect on that list

17   may or may not be a good candidate, depending on the use case.

18   Q.   Now, you would sell to any of the large companies in the

19   acquirers section?

20   A.   Actually, not; but that's a different issue.  There are

21   certain companies in the acquirers that we don't trust, that,

22   you know, we don't think is a good use case; others that we

23   would.

24   Q.   I'm not sure how well this is appearing on your screen.  Is

25   the printout -- the printed version easier to read the logos on

Russ Cohen – Direct

1   this?

2        My question is whether you see any other companies on

3   this graphic that include the term "ArkOwl" in it.

4   *A.* I don't see ArkOwl on there, but it's a little bit like,

5   find Waldo.

6   *Q.* Do you see any logos that look like an angry owl in the

7   graphic?

8   *A.* The graphics are hard.  I would look at Darktrace and the

9   logo next to it as being some sort of a predator bird.  It's

10  just too hard for me to tell with the resolution here if there

11  are birds or not.  These are very small logos.

12  *Q.* Fair enough.  Now, in your deposition, I did ask you about

13  this graphic; do you recall that?

14  *A.* Not specifically, but I don't doubt it.

15  *Q.* Okay.  Do you recall having a difficult time reading the

16  graphic at that point, as well?

17  *A.* Probably.  The resolution hasn't improved.

18  *Q.* In asking you about the graphic, I asked, "Would you put

19  DarkOwl in any other categories, as well?"

20        And I want to skip through the first paragraph of your

21  answer.  Your second paragraph, you said, "I would broadly say

22  that we sell to everybody.  We try to sell to everybody with --

23  who touches the broader cybersecurity space, which is what this

24  is trying to describe.  So whether any given logo is likely to

25  be a customer, it goes back to, how well are they put into that

Russ Cohen – Direct

1    criteria or not."

2           Is that right?

3    A.  Yes.  I think it's a permutation of what I said about the

4    use case.

5           MR. FRASIER:  I'd like to bring my client back in.

6           THE COURT:  You may.

7           MR. FRASIER:  Thank you.

8           (Hearing continued in open court.)

9    BY MR. FRASIER:

10   Q.  DarkOwl's most profitable market is large sophisticated

11   companies who have very large budgets and are looking for best

12   in-breed solutions for whatever they're engaging in; is that

13   right?

14   A.  Sounds correct.  Yes.

15   Q.  And DarkOwl's broadest market relates to the small- and

16   medium-sized business, the SMB market?

17   A.  Can you say that again?

18   Q.  You believe DarkOwl's broadest market relates to the small-

19   and medium-sized business, the SMB market?

20   A.  Yes.

21   Q.  And then for those businesses who don't have a budget for

22   cybersecurity and outsource it, your customers are -- your

23   potential customers are those that are on speed dial for the

24   smaller businesses?

25   A.  And the larger ones, too.

Russ Cohen – Direct

1    Q.   Your company records are not geographically focused; is

2    that right?

3    A.   Focused?

4    Q.   I can clarify.  You don't divide up your sales team by

5    geography?

6    A.   That is correct.

7    Q.   You don't track information related to sales by geography?

8    A.   I know geography when we make a sale.  I try to -- I do use

9    geography as a meaningful input; we happen to not organize the

10   sales force accordingly.  We do have certain salespeople who

11   speak different languages; and they would naturally get areas

12   that speak those languages, which relates to geography.  But

13   we're not traditionally set up with Northeast America, that

14   kind of sales focus -- sales organization, I should say.

15   Q.   DarkOwl doesn't do targeted advertising based on geography?

16   A.   Correct.

17   Q.   And DarkOwl doesn't have any way to track the physical

18   location of its end users?

19   A.   DarkOwl has the same ability to trace the end user that

20   Mr. Daline went through, which is Google Analytics and the

21   like.  We just -- most -- we just believe that enough of our

22   end users use VPNs, which obfuscate it -- obfuscate where they

23   really are coming from and try to spoof it as a matter of trade

24   craft.  So as a rule, we find it to be less reliable than more

25   generic product offering, that uses those same analytical

Russ Cohen – Direct

1    tools.

2    Q.  And it was a deliberate strategic decision not to rely on

3    geography in how you approach sales?

4    A.  Yes.

5    Q.  It was much more important to focus on use cases and

6    customers, as opposed to geography?

7    A.  Yes.

8    Q.  And your use cases aren't at all reliant on geographic

9    locations?

10   A.  There is correlations between the various use cases and

11   different geographics.  But you're correct, we don't preclude

12   somebody from one geography or another because of the use case.

13   Q.  And it's -- especially within the United States, geography

14   isn't all that important to DarkOwl?

15   A.  That's a very broad statement.  I can't agree with that,

16   which is -- we think where a company is headquartered matters;

17   we think where a company has its workers matters; but we don't

18   choose to say that if you're in Washington, D.C., you only use

19   this one use case, for example, or New York City, or Chicago,

20   for that matter.  We haven't found that correlation to be as

21   strong.  But if you're in Washington, D.C., you probably are

22   more likely to care about a government end user.  That kind of

23   aspect is not lost on us, and we track it.

24   Q.  Sure.  Geography inside the United States isn't all that

25   important for how you, for example, assign sales leads.  You

Russ Cohen - Direct

1   don't assign sales leads based on geography?

2   *A.*  We don't assign sales leads strictly on geography.  We do

3   have somebody who focuses, for example, on government sales.

4   And if a lead comes in from Washington, she won't get all of

5   those leads, because some are not legitimately for that use

6   case; but if we do view it to be that use case, she has a lot

7   of clients in Washington, D.C., for example.

8   *Q.*  Sure.  So it boils down mostly to the use cases, is what --

9   *A.*  Correct.

10   *Q.*  Understood.

11        Mr. Cohen, I don't have any more questions for you.

12        *THE COURT:*  Thank you, sir.

13        Cross-examination.

14        *MR. HOLT:*  Your Honor, would you be open to a short

15   recess?

16        *THE COURT:*  Sure.  Let's make it short, though,

17   because I'd like to at least move on to our third and final

18   witness today if we can.  So why don't we take until ten

19   minutes until 4:00.  Would that be enough time?

20        *MR. HOLT:*  Yes.

21        *THE COURT:*  We'll be in recess.

22        Mr. Cohen, you may step down.

23        (Recess at 3:43 p.m.)

24        (In open court at 3:54 p.m.)

25        *THE COURT:*  Thank you.  Please be seated.

Russ Cohen - Cross

1        All right.  Mr. Holt, anything further on direct exam

2   for Mr. Cohen -- or Mr. Buxbaum?

3        *MR. BUXBAUM:*  I believe direct was --

4        *THE COURT:*  Well, yeah --

5        *MR. BUXBAUM:*  Cross and direct.

6        *THE COURT:*  You know, I'm floating fast and loose with

7   the terms because defense counsel called him.

8        *MR. BUXBAUM:*  Exactly.  We do have a few

9   questions --just a few questions.

10        *THE COURT:*  Go ahead and take the witness stand again,

11  Mr. Cohen.

12        *MR. HOLT:*  Your Honor, we do have a housekeeping

13  matter.  We can do it after we're done with Mr. Cohen if you

14  want.

15        *THE COURT:*  That's fine.

16        *MR. HOLT:*  Afterwards?

17        *THE COURT:*  Yeah.

18        All right.

19                    **CROSS-EXAMINATION**

20  *BY MR. BUXBAUM:*

21  *Q.*  Mr. Cohen, just a few questions for you.  DarkOwl has been

22  providing dark web data since the company began in 2015;

23  correct?

24  *A.*  Yes.

25  *Q.*  And that's still the business model of DarkOwl's focus

Russ Cohen - Cross

1  today; correct?

2  A.  Yes.

3  Q.  It sounds like the use cases for the dark web data that

4  DarkOwl is able to supply continues to evolve, as one would

5  expect; but DarkOwl's business model remains the same as it has

6  been for day one, which is to provide the largest database of

7  dark web data in the world; correct?

8  A.  Correct.

9  Q.  Any plans to move away from that core business model?

10  A.  Not to my knowledge.

11  Q.  And DarkOwl's customers are primarily either cybersecurity

12  companies or governments; is that correct?

13  A.  Yes.

14  Q.  And do you know what the percentage breakdown, roughly, is

15  as of today?

16  A.  Ultimately, we don't know that that group that was the gray

17  area -- we don't know, you can only guess, but that's where the

18  wiggle room comes in.  But I would say broadly, we're, you

19  know, 50/50 right now.

20  Q.  We heard a little bit of testimony a few minutes ago about

21  potential customers of DarkOwl's in the cybersecurity industry.

22  I just wanted to seek a little bit of clarification.

23        Mr. Cohen, it is not the case that every company in

24  the cybersecurity industry is a potential customer of DarkOwl

25  for the simple reason, among others, that many companies have

Russ Cohen - Cross

 1   no need for dark web data services; is that correct?

 2   A.  Correct.

 3   Q.  You testified earlier about a document that suggested a

 4   strategy of potentially going after less sophisticated users;

 5   do you recall that?

 6   A.  I do.

 7   Q.  Now, the less sophisticated users that DarkOwl was

 8   considering targeting at that time were nonetheless still

 9   sophisticated.  It was a relative judgment; is that not

10   correct?

11   A.  Yes.

12   Q.  And DarkOwl ultimately decided not to pursue even those

13   slightly less sophisticated customers; isn't that correct?

14   A.  We do go after customers who are not as sophisticated as

15   they think they are.  That's the way I would describe it.

16   Q.  Why -- why, though, at -- did -- did and does DarkOwl not

17   focus on unsophisticated customers?

18   A.  It costs us way too much money to get them up to speed, is

19   what it amounts to.  It's just bad business prospect.

20            MR. BUXBAUM:  I have no further questions.

21            THE COURT:  All right.  Thank you.

22            Any redirect?

23            MR. FRASIER:  No, Your Honor.

24            THE COURT:  Thank you.

25            Thank you, Mr. Cohen.  You may step down.

1          Does the defendant have any additional witnesses?

2          MR. FRASIER:  Yes, Your Honor.  That was part of the

3     housekeeping issue.

4          THE COURT:  All right.  Let's talk about the

5     housekeeping.

6          MR. HOLT:  Well, we spoke during the recess, Your

7     Honor.  And Mr. Frasier inquired whether we would be waiting to

8     call Mr. Turnage until tomorrow morning, with the understanding

9     that both sides would be done with his testimony by midday,

10    probably shortly after lunch.  We wanted to see if you would be

11    open to that.

12         THE COURT:  He's the final witness for both sides?

13         MR. HOLT:  He is, indeed.  Yes.

14         THE COURT:  All right.  Well, I mean, if you really --

15    if you think it would be helpful in terms of making the

16    testimony more concise, I'm happy to give you the extra time

17    tonight to get ready to have Mr. Turnage take the witness stand

18    tomorrow morning.

19         Is there any problem with counsel resuming at

20    9:00 a.m. tomorrow?

21         MR. HOLT:  None here.

22         MR. FRASIER:  No, Your Honor.

23         THE COURT:  All right.  Thank you.

24         Then we will adjourn for the evening, it being

25    4 o'clock.  And we'll adjourn again -- we'll reconvene -- I'm

1    sorry -- at 9:00 a.m. tomorrow for the purpose of Mr. Turnage's

2    testimony.  And make sure that if you have any preliminary

3    matters that you'd like the Court to address before 9:00 a.m.

4    tomorrow, you make sure you alert Ms. Galera.  Otherwise, I'll

5    see you at 9:00 a.m. tomorrow.

6         *MR. HOLT:*  Quick question.  We had talked before about

7    doing closing arguments on Wednesday morning.  I just wanted to

8    ensure that that's still the case.

9         *THE COURT:*  I mean, honestly, counsel, I'd really like

10   to wrap it up tomorrow, especially given the fact that you

11   think you'll be done with Mr.  Turnage's testimony by the lunch

12   hour.  Is there any reason why you can't do closings tomorrow

13   afternoon?  I can even extend the lunch hour to give you more

14   time if you wanted to prepare for closings over lunch.  I don't

15   guess that you'll have much longer than an hour each for

16   closings; right?

17        *MR. HOLT:*  I understand your concerns, Your Honor.  We

18   would really prefer Wednesday morning, if we could; but,

19   obviously, we defer to Your Honor.

20        *THE COURT:*  How do you feel about that, Mr. Frasier?

21        *MR. FRASIER:*  Your Honor, I would also prefer to wait

22   until Wednesday morning to have an opportunity to review that

23   testimony that actually comes in tomorrow, to --

24        *THE COURT:*  All right.  Well, let's tentatively

25   prepare for closing arguments on Wednesday morning.  But, you

 1   know, if you're done with Mr. Turnage at, you know, 10:30

 2   tomorrow, it's going to be difficult for me to want to wait

 3   until Wednesday morning for closing arguments.  So --

 4        MR. HOLT:  Understood.

 5        THE COURT:  It's not an incentive to drag out

 6   Mr. Turnage's testimony, either.

 7        MR. HOLT:  Suddenly he's going until 4 o'clock now.

 8        THE COURT:  But I understand where you're coming from.

 9   I'd like to try to accommodate you within reason.

10        MR. HOLT:  Appreciate it.

11        THE COURT:  So tentatively, we'll plan for Mr. Turnage

12   at 9:00 and then closing arguments on Wednesday morning.

13        MR. HOLT:  Thank you, Your Honor.

14        MR. FRASIER:  Thank you.

15        (Recess at 4:01 p.m.)

16                        **I N D E X**

17   **Item**                                                   **Page**

18

Opening Statement By Mr. Frasier                             8
19   Opening Statement By Mr. Holt                               12

20       ROBERT DALINE
             Direct Examination By Mr. Frasier                 28
21           Examination By The Court                          98
             Cross-examination By Mr. Holt                    104
22           Redirect Examination By Mr. Frasier              154
         RUSS COHEN
23           Direct Examination By Mr. Frasier                162
             Cross-examination By Mr. Buxbaum                 182

24

25

187

1                          PLAINTIFF'S EXHIBITS

2    Exhibit       Offered  Received  Refused  Reserved  Withdrawn

3    1-132                      8
     133                        6
4                          DEFENDANT'S EXHIBITS

5    Exhibit       Offered  Received  Refused  Reserved  Withdrawn

6    301-424                    8

7

8                          REPORTER'S CERTIFICATE

9           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

10
            Dated at Denver, Colorado, this 1st day of July, 2023.

11

12                              _Therese Lindblom_

13                              _____
                                Therese Lindblom,CSR,RMR,CRR

14

15

16

17

18

19

20

21

22

23

24

25

1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2

3   Civil Action No. 21-cv-02163-KLM

    DARKOWL, LLC,
4

        Plaintiff,
5

6   vs.

7   ARKOWL, LLC AND ARKOWL CORPORATION,

8       Defendants.
    _____

9

                    **REPORTER'S TRANSCRIPT**
10                 TRIAL TO COURT - DAY TWO

11  _____

12          Proceedings before the HONORABLE KRISTEN L. MIX,

13  Magistrate Judge, United States District Court for the District

14  of Colorado, continuing at 9:12 a.m., on the 27th day of June,

15  2023, in Courtroom A201, United States Courthouse, Denver,

16  Colorado.

17

18

19

20

21

22

23              THERESE LINDBLOM, Official Reporter
               901 19th Street, Denver, Colorado 80294
24         Proceedings Reported by Mechanical Stenography
               Transcription Produced via Computer
25

1                          **A P P E A R A N C E S**

2         THOMAS LEE HOLT, JR. and JEREMY LEWIS BUXBAUM,

3 Attorneys at Law, Perkins Coie LLP, 110 North Wacker Drive,

4 34th Floor, Chicago, Illinois, 60606, appearing for the

5 Plaintiff.

6         SABRINA JOHNSON DANIELSON, Attorney at Law, Holland &

7 Hart, LLP, 555 17th Street, Suite 3200, Denver, Colorado,

8 80202, appearing for the Plaintiff.

9         MICHAEL H. FRASIER, Attorney at Law, Rubric Legal LLC,

10 111 Third Avenue South, Suite 110, Minneapolis, Minnesota,

11 55401, appearing for the Defendants.

12                                \*   \*   \*   \*   \*

13                        **P R O C E E D I N G S**

14         (In open court at 9:12 a.m.)

15         *THE COURT:*  Good morning.  We're back on the record in

16 21-cv-02163.

17         I apologize for the tardy start to the extent that was

18 due to me and not anyone else.  They always decide to do

19 construction on every conceivable route to the courthouse on

20 days of trial, so that was where I was.

21         Is the plaintiff ready to proceed this morning?

22         *MR. HOLT:*  We are, Your Honor.  Although I believe

23 it's defendants' counsel who will be going forward.

24         *THE COURT:*  Is defendant also ready to proceed?

25         *MR. FRASIER:*  Yes, Your Honor.

1          *THE COURT:*  Any preliminary matters we need to address

2     before we call the next witness from the plaintiff?

3          *MR. FRASIER:*  Yes, Your Honor.  I have my notes up

4     here.

5          There are five documents that have been designated as

6     attorneys' eyes only that the parties have agreed for today's

7     purposes my client can stay in the room and hear testimony

8     regarding those documents.

9          *THE COURT:*  All right.  They are?

10         *MR. FRASIER:*  Exhibits 2, 3, 6, 7, and 8.

11         *THE COURT:*  Thank you.

12         And anything else from defense counsel?

13         *MR. FRASIER:*  No, Your Honor.

14         *THE COURT:*  All right.  Thank you.

15         Then let's have you call your next witness, please.

16         *MR. FRASIER:*  Thank you.  Defense calls Mark Turnage.

17         *THE COURT:*  Mr. Turnage, if you would come forward.

18              (**MARK TURNAGE, DEFENDANTS' WITNESS, SWORN**)

19         *THE COURT:*  So before we get started, let me just

20    remind counsel and Mr. Turnage that I'm familiar with the pace

21    and style of testimony from the previous hearing that we had;

22    and I noted that there was quite a bit of overlap between

23    counsel speaking and Mr. Turnage speaking.  And I think,

24    Mr. Turnage, that's probably because you anticipate some of the

25    questions and begin answering before the question is fully out.

Mark Turnage – Direct

1    With a court reporter here, it's incredibly important that we

2    not speak over each other.  So I'm going to stop you if you

3    start doing that and ask you not to do that, just to forewarn

4    you.

5            And with that, whenever you're ready, Mr. Frasier.

6            *MR. FRASIER:*  Thank you, Your Honor.  And I will do my

7    best to make sure that we're not talking over each other, as

8    well.

9                         **DIRECT EXAMINATION**

10   *BY MR. FRASIER:*

11   *Q.*  Good morning, Mr. Turnage.

12   *A.*  Good morning.

13   *Q.*  Could you please state your full name and position with

14   DarkOwl.

15   *A.*  Mark Turnage.  I'm the CEO and co-founder.

16   *Q.*  You've always been in that position with DarkOwl?

17   *A.*  Yes.

18   *Q.*  Have you ever encountered any other companies other than

19   ArkOwl and DarkOwl with the name "ArkOwl" as part of the mark?

20   *A.*  Excuse me.  "ArkOwl," as part of the mark?

21   *Q.*  A-R-K-O-W-L.

22   *A.*  No.  I've encountered plenty of other companies with "owl,"

23   and plenty of other companies with "ark," but not "ArkOwl"

24   together.

25   *Q.*  Nothing like spark owl or shark owl?

Mark Turnage - Direct

1   A.   Nothing that I've seen.

2   Q.   Okay.  DarkOwl never presents its brand simply using the

3   word "dark"; is that right?

4   A.   That's correct.

5   Q.   Or simply using the word "owl"?

6   A.   Occasionally people will refer to us as "owl" -- as "owl,"

7   but not often.

8   Q.   And DarkOwl itself doesn't present its mark as "owl."  It

9   presents it as DarkOwl?

10   A.   Correct.

11   Q.   Between the hearing in May and today, you'll have had a

12   handful of hours to convey a lot of information about your

13   company.  Do you think the amount of time you have is

14   sufficient to give us lay people an understanding of who

15   DarkOwl's target market is?

16   A.   Depends on the questions you ask, but it should be.

17   Q.   Okay.  Do you think the -- a handful of hours would be

18   enough to at least convey the basic information of who DarkOwl

19   targets for its customers?

20   A.   I believe so.

21   Q.   As DarkOwl's CEO, you personally oversee the sales

22   department; is that right?

23   A.   I oversee the entire company.  I'm ultimately responsible

24   for everything in the company.

25   Q.   And the head of sales reports directly to you?

Mark Turnage – Direct

1    A.   Yes.

2    Q.   The marketing department also directly reports to you?

3    A.   Yes.

4    Q.   Has DarkOwl always had a head of sales?

5    A.   No.  At various points in the life of the company, I've

6    occupied that role myself, personally.

7    Q.   Understood.  Has DarkOwl had a head of marketing?

8    A.   Pretty much since the beginning, yes, it has had a head of

9    marketing.

10   Q.   I want to talk about DarkOwl's products and services for a

11   little bit.  Not as much detail as we did in May, but --

12          DarkOwl indexes the data it gets from the darknet to

13   make it searchable; right?

14   A.   That's correct.

15   Q.   Whatever data is able to be indexed, at least.

16   A.   That's correct.

17   Q.   It indexes email addresses?

18   A.   Yes.

19   Q.   And domains, as well?

20   A.   Yes.

21   Q.   And DarkOwl offers a separate database for -- just to the

22   data that it was able to index?

23   A.   Well, it's not a separate database.  It's a feed -- it's an

24   API to customers who only want that specific type of data.

25   Q.   And the reason DarkOwl created that separate feed is to

194

Mark Turnage – Direct

1    minimize the amount of noise that your customers get when

2    engaging in a search; right?

3    A.  That's correct.

4    Q.  So when they engage in a search, they're more likely to get

5    just the relevant information they're searching for?

6    A.  Just one correction.  The curated data that you're speaking

7    of is available via an API, which is machine-to-machine

8    interrogation.  So there is no search involved as there would

9    be for an analyst on a keyboard.  So a machine can interrogate

10   and get that information back, but a human is not involved in

11   that search.

12   Q.  Okay.  So one of your customers via their -- their computer

13   algorithm would do a query via API?

14   A.  That's correct.

15   Q.  And the reason that you have this more structured subset is

16   that that query would then return much more relevant -- rather,

17   only relevant responses and not -- and much less noise?

18   A.  That's correct.

19   Q.  It allows those customers to get the relevant data they're

20   looking for much more quickly?

21   A.  That's -- yes.  I don't think speed is of the essence.  I

22   think the elimination of noise -- noisy data -- meaning

23   non-relevant data -- is of the essence to those customers.

24   Q.  So that those customers don't have to spend time sifting

25   through the noise?

Mark Turnage – Direct

1   A.   That's correct.

2   Q.   DarkOwl markets that it is continually collecting and

3   indexing data; right?

4   A.   That's correct.

5   Q.   It markets that it scrapes something like 10 to 15 million

6   websites per day?

7   A.   I couldn't give you -- I don't think it's that high per

8   day.  But, yes, we collect data from many, many, many websites

9   every day.

10  Q.   I'm showing you what has been marked as Exhibit 3,

11  designated as attorneys' eyes only, but with the understanding

12  that my client can stay in the room for this.

13        I'm going to turn to page 5 of Exhibit 3.

14        On the right side it says, "What is in DarkOwl's

15  database?"  Do you see that?

16  A.   Yes.

17  Q.   The second bullet point says "10 to 15 million pages

18  scraped daily."  Do you see that?

19  A.   Yes.  I believe your prior question was how many websites

20  we scrape daily.  We do actually collect this order of volume

21  on a daily basis; but these are pages, not websites.

22  Q.   Okay.  Thank you for that clarification.

23        Now, DarkOwl markets that it processes the data it

24  scrapes in near real-time?

25  A.   Not all the data, no.

Mark Turnage - Direct

1   Q.   Showing you what's been marked as Exhibit 86.  This is a

2   screenshot from DarkOwl's website; is that right?

3   A.   Yes.

4   Q.   And the timestamp on the bottom says March 23, 2022?

5   A.   That's correct.

6   Q.   Turning to the second page, the website says, "Where do we

7   get our data?"

8   A.   Yes.

9   Q.   On the right there is "collect," and then the second red

10  text says "process."  Do you see that?

11  A.   Correct.

12  Q.   And DarkOwl's website says "Continuous processes from

13  DarkOwl engines consume unstructured data in near real-time.

14  Dataset is cleared and stored in a secure environment."  Did I

15  read that right?

16  A.   That's correct.  And what that is referring to here is

17  data -- so when we collect data in our platform, if we're

18  automatically collecting that data -- meaning, we're going to,

19  say, a darknet forum or a darknet site -- and that data is

20  automatically adjusted, that is done in real-time.  The latency

21  is ten minutes, or it can be as long as twenty-four hours,

22  depending on how often the website changes.  There is a

23  category of data that is not done in near real-time, and that

24  is the category of breaches are not done in real-time.  Those

25  would have to be manually processed.

Mark Turnage - Direct

1   Q.  Okay.  Understood.  Showing you what has been marked as

2   Exhibit 96.  Do you recognize this exhibit?

3   A.  I do.

4   Q.  This is another screenshot from DarkOwl's website?

5   A.  That's correct.

6   Q.  Dated in March of 2022?

7   A.  That's correct.

8   Q.  Now, this is under the "use cases" section in DarkOwl's

9   website; right?

10  A.  I believe so.  Yes.

11  Q.  Now, the second paragraph on the first page of this exhibit

12  reads, "Risk management is not a single-point-in-time exercise,

13  and DarkOwl's continuous collection ensures a relevant, timely,

14  risk-based approach for darknet data presence to identify

15  potential risk."

16          Did I read that correctly?

17  A.  You did.

18  Q.  Is that still true today?

19  A.  That is.

20  Q.  Now, in the paragraph above that --

21  A.  I'm sorry --

22  Q.  I'm looking at the paragraph immediately above that now.

23  The second sentence in the middle of the third line, starting

24  with the word "with."  The website says, "With DarkOwl's

25  unparalleled darknet data breadth and depth, customers can

Mark Turnage - Direct

1    automate scoping third parties through the identification and

2    management of darknet risk as a key indicator for new or

3    potential customers or vendors, including tiering of risk

4    profiles."

5           Did I read that right?

6    A.  That's correct.

7    Q.  Is that still a use case of DarkOwl today?

8    A.  That's correct.

9    Q.  When one of your customers via the API does a search of the

10   database or the subset that has been indexed, that computer

11   will receive the results from that search in a matter of

12   seconds?

13   A.  Generally, yes.

14   Q.  And so one of those DarkOwl customers could have a computer

15   API program searching and pinging email addresses found in that

16   database?

17   A.  That's entirely possible.  Yes.

18   Q.  Now, when that -- that user runs a search for an email

19   address, and if that email address is present, that search

20   result would also produce not only the presence of the email

21   address but additional metadata; correct?

22   A.  Well, no -- it does not just give the presence of the email

23   address or absence.  It gives -- our customers are interested

24   in passwords -- is there a password associated with that

25   email?  So it would give the email address, and it would give

Mark Turnage - Direct

1    the password and the metadata associated with that.

2    Q.  So it would also provide when the email address was

3    scraped by DarkOwl?

4    A.  Yes, it would.

5    Q.  It would identify where that email address was found on the

6    darknet?

7    A.  If -- yes, it would identify the site on the darknet where

8    that was found.  That's oftentimes more difficult in the case

9    of breaches.  So sometimes you can't identify -- a breach will

10   be publicly available not in the darknet but in the surface

11   web; and in that case, we would not identify it as having come

12   from a darknet site.

13   Q.  DarkOwl would also identify as part of these search results

14   whether or not that email address was part of a known breach?

15   A.  Yes.

16   Q.  If it were?

17   A.  If it were.

18   Q.  And it would identify the specific breach that it was a

19   part of?

20   A.  If we had that information.

21   Q.  Now, the hearing in May, I believe you testified there was

22   something like 10,000 to 14,000 cybersecurity companies around

23   the world.

24   A.  I think that's the universe of potential -- potential

25   cybersecurity companies.

Mark Turnage - Direct

1   *Q.* But the -- according to you, that was a very broad

2   interpretation of the word "cybersecurity"?

3   *A.* Yes.

4   *Q.* It would include companies selling network security, for

5   example.

6   *A.* Network security is at the core of cybersecurity.  Yes.

7   *Q.* Including companies selling computer hardware?

8   *A.* Yes.

9   *Q.* Or mobile applications?

10  *A.* If those mobile applications involve securing, for example,

11  a mobile phone.

12  *Q.* DarkOwl's only method of control over how its customers use

13  the data is its end user license agreement; is that right?

14  *A.* Well, no.  I mean, that's a primary method of the control

15  over how our customers use the data.  But we do a very

16  extensive vetting process ahead of it, and then we monitor our

17  customers' use of the data afterwards so that we can see

18  whether they're abusing the EULA in the context of the use

19  interface.  So I would say there are probably multiple points

20  of control.

21  *Q.* You mentioned monitoring what your customers are doing, at

22  least via the user interface.

23  *A.* That's correct.

24  *Q.* DarkOwl does not have the capability of monitoring what

25  searches are run via the API?

Mark Turnage - Direct

1   *A.* We do not, but we know the volume of searches and we know

2   which API end point they're using it for -- which one they're

3   accessing.

4   *Q.* And then the -- your -- DarkOwl's ability to track the

5   searches done via the user interface are only for a small

6   period of time?

7   *A.* A very limited period of time.

8   *Q.* And you don't have any -- you don't actually control what

9   searches your users are running?

10   *A.* No. But if we see -- I believe I gave this example in

11   prior testimony. You know, if J.P. Morgan becomes a customer

12   of ours, under the terms of the EULA, they are -- the primary

13   use -- they are restricted under the EULA to looking for only

14   their information. So if we see them suddenly looking for

15   Citibank information, that's a violation of the EULA. So we

16   will monitor their searches in that context, and it's a primary

17   method for us to make sure that the very sensitive data we

18   provide our customers is not being abused.

19   *Q.* Now, in that example, if Citibank were an API customer,

20   DarkOwl would have no way of knowing what searches it was

21   running?

22   *A.* No. So in the example I gave, J.P. Morgan was a customer.

23   But should Citibank be a customer, the conversation we would

24   have with Citibank ahead of selling them the platform would be,

25   what's your use case? Why are you accessing this end point

Mark Turnage – Direct

1   versus that end point?

2          So let's say that Citibank wanted to access our crypto

3   end point, and we saw that they were doing 400 searches a day

4   or 4,000 searches a day on the crypto end point.  We have a

5   high likelihood -- we have a high degree of confidence to

6   believe that they're appropriately using the platform, because

7   they're using crypto.  If suddenly they start hitting a

8   different end point, we would ask the question:  Why are you

9   doing that?  Because that's not the use case we discussed for

10  you.

11  Q.  So you would be able to tell what input they were

12  searching --

13  A.  Right.

14  Q.  -- what category of information they were searching, but

15  not the specific --

16  A.  Correct.

17  Q.  In fact, you have very limited insight into your customers

18  once they take data from your platform?

19  A.  It -- it varies significantly.  But most of our customers,

20  we have a very close relationship with.  And more often, it is

21  the case that they come to us and say, we have found the

22  following dataset on your platform.  Can you help us understand

23  this.  So we have those types of conversations on a daily basis

24  across our customer base.

25  Q.  In 2017 -- prior to 2017, DarkOwl didn't initially target

Mark Turnage - Direct

1   cybersecurity companies as potential customers?

2   A.   Sorry.  I missed the last part of that question.

3   Q.   Prior to 2017, DarkOwl did not target cybersecurity

4   companies as customers?

5   A.   We did not target cybersecurity companies.  Broadly, that's

6   correct.

7   Q.   You did not initially target intelligence agencies either?

8   A.   Well, we did not target them; they found us.

9   Q.   And prior to 2017, your go-to market strategy was to sell

10  to banks, retail companies, and healthcare companies?

11  A.   And tech companies and other companies that had potential

12  exposure in the darknet.

13  Q.   Now, in 2017, that changed when a cybersecurity company

14  approached DarkOwl?

15  A.   That's correct.

16  Q.   And it was at that point that DarkOwl pivoted to focus on

17  the cybersecurity industry as its primary customer base?

18  A.   At that point, yes.

19  Q.   Ever since then, DarkOwl has been focused on selling to

20  companies in the cybersecurity industry?

21  A.   Well, yes.  And the strategy has evolved even since then.

22  We continue to market and sell to other cybersecurity

23  companies.  But governments have become a much, much larger and

24  fastest part of our business.

25  Q.   At least as of the time of your deposition, the

Mark Turnage - Direct

1    cybersecurity industry was the core target market for DarkOwl?

2    A.  Yeah.  I would say it's probably a slim majority of our

3    customers to this day.  I forgot when the deposition was, six

4    months ago?  Since that time, governments have become a far

5    larger percentage of our customers.

6    Q.  Just in the last six months?

7    A.  Yeah.  I mean, since I was in this courtroom a month ago,

8    we've signed three intelligence agencies as customers -- three

9    more intelligence agencies as customers.  So it is by far and

10   away the fastest growing part of our business.

11   Q.  Showing you what has been marked as Exhibit 8.  Again, this

12   is designated as attorneys' eyes only, with the understanding

13   that the defendant can stay in the room.

14          Do you recognize Exhibit 8?

15   A.  Yes.

16   Q.  This is an -- an internal product training document for

17   DarkOwl?

18   A.  Correct.

19   Q.  This would have been created in -- in 2022?

20   A.  You know, I don't have a date on it.  And the template is

21   old -- this blue bar is old, so I actually -- unless it has a

22   timestamp on it somewhere, I couldn't testify that it was

23   definitely 2022.

24   Q.  I can show you page 6, which is an infographic of DarkOwl's

25   vision ecosystem.  Does this --

205

Mark Turnage - Direct

1   A.   That's correct.

2   Q.   -- refresh your memory --

3   A.   It does.  Because the vision on the left, ransomware, we

4   launched that product in March of 2022.  So that would -- it

5   would be 2022.

6   Q.   Thank you.  Mr. Turnage, I will be careful -- let's make

7   sure that we're not speaking over each other.  You may know

8   where I'm going with a question, but let's give the court

9   reporter a chance to write it all out.

10         Page 9 of Exhibit 8 describes some sample user

11  interface clients for DarkOwl; is that right?

12  A.   It does.

13  Q.   It describes the type of company that would be the client?

14  A.   Yes.

15  Q.   All right.  And cybersecurity services and cyber monitoring

16  are two of the examples on page 9?

17  A.   Yes.

18  Q.   Page 10 is an example of some of the DarkOwl search API

19  clients; right?

20  A.   That's correct.

21  Q.   Page 10 describes the type of company; is that right?

22  A.   Yes.

23  Q.   And the third column is who their clients are?

24  A.   No.  Just so I'm clear --

25  Q.   The third row.  The first column, blue; the third row says

Mark Turnage – Direct

1   who their clients are.

2   A.   Correct.

3   Q.   Immediately across from that describes who the clients of

4   DarkOwl's customers are.

5   A.   That's correct.

6   Q.   So, for example, data aggregators would be DarkOwl's

7   client; is that right?

8   A.   Generally, yes, that's absolutely accurate.

9   Q.   And then data aggregators would provide services to both

10   law enforcement, government, and large corporations?

11   A.   Correct.

12   Q.   Page 11 is a description of DarkOwl's Entity API clients?

13   A.   That's correct.

14   Q.   All right.  With the same general layout as the page we

15   just looked at?

16   A.   That's correct.

17   Q.   So, for example, DarkOwl's client would be cybersecurity

18   teams, and their clients would be Fortune 500 companies?

19   A.   Correct.

20   Q.   Page 12 describes DarkOwl's Score API clients; is that

21   right?

22   A.   That's correct.

23   Q.   With the same general layout as what we just looked at?

24   A.   That's right.

25   Q.   Under vendor risk assessment would be a description of a

Mark Turnage – Direct

1    DarkOwl customer?

2    A.   That's correct.

3    Q.   And their client would be SMBs?

4    A.   Yes.   Although that's not really accurate, because the

5    largest consumers of vendor risk management services are

6    actually the largest companies.

7    Q.   SBMs mean small- to medium-sized businesses?

8    A.   Correct.

9    Q.   You say the vendor risk assessment would more likely be

10   serving larger companies?

11   A.   That's correct.

12   Q.   And then page 13 identifies DarkOwl's data feed clients; is

13   that right?

14   A.   Correct.

15   Q.   Again, with the same general layout as what we looked at in

16   the last few pages?

17   A.   Correct.

18   Q.   DarkOwl has specific branding guidelines; is that right?

19   A.   Yes.

20   Q.   Has it always had specific branding guidelines?

21   A.   Not necessarily.   I mean, as a small start-up, it's not

22   something you spend your time on.   You basically have a brand,

23   and you spend some time on it.   But written guidelines I think

24   come later in the maturity of any small company.

25   Q.   You had written branding guidelines in 2020?

Mark Turnage - Direct

1    A.  I don't know.  I mean, we had a look and a feel.  If I

2    looked at a PowerPoint presentation that one of our salespeople

3    prepared, I could tell you immediately if it fit the general

4    look and feel we were trying to achieve with the company.  I

5    don't actually remember if the marketing department in 2020 had

6    put together written guidelines.

7    Q.  Sure.  In 2021, DarkOwl changed its branding guidelines?

8    A.  It was -- I believe it was late 2021 and early 2022.

9    Q.  And established -- or replaced its prior written branding

10   guidelines?

11   A.  We primarily adopted the color red and shades of red as a

12   new look for the business.  We didn't change the fundamental

13   logo or name of the company.

14   Q.  Right.  But -- so the guidelines, for example had specific

15   colors DarkOwl wanted to use in its marketing?

16   A.  That was the first time that I remember seeing specific

17   written guidelines for a look and feel.

18   Q.  And DarkOwl has put those guidelines into formal written

19   policies?

20   A.  I believe so.

21   Q.  That's important because DarkOwl wants to control how the

22   rest of the world sees DarkOwl; do you agree?

23   A.  Well, I think any company wants to control how they're seen

24   in the marketplace.  If, for example, one time we show up with

25   a red background and another time we show up with a pink

Mark Turnage - Direct

1   background, another time we show up with a lime green

2   background, you're not sending a consistent branding message.

3   Q.  The rebranding that we're talking about in late 2021, was

4   that the same time that DarkOwl was redoing its website;

5   correct?

6   A.  Correct.

7   Q.  And as part of the process of redoing its website -- well,

8   first of all, you were personally involved in the vision of

9   crafting DarkOwl's new website in late 2021?

10  A.  I wasn't personally involved on a day-to-day basis.  I saw

11  the progress as it unfolded.

12  Q.  As part of the rebranding process, the executive vice

13  president of sales put together some documents to create a

14  conversation about messaging?

15  A.  Yeah.  It was his hypothesis about how we should be

16  messaging the business.

17  Q.  And you recall having some say in that messaging?

18  A.  Yeah.  It was -- I was really at various points not pleased

19  with his work product.

20  Q.  For example, you didn't want to use the phrase, quote, risk

21  quantification, unquote, because it's not something that

22  DarkOwl does except for in cyber and insurtech?

23  A.  At that time we didn't have a product that truly quantified

24  risk, and so I was uncomfortable using that.  He was unfamiliar

25  with some of the terms of art in our particular sector of the

Mark Turnage - Direct

 1   cybersecurity industry, so some of the things that he suggested

 2   were just wholly inappropriate.

 3   Q.  It is important to you to make sure that the messaging was

 4   an accurate representation of what DarkOwl does?

 5   A.  Broadly, yes.

 6   Q.  Now, you testified last month that you estimated about

 7   20 percent of DarkOwl's clients to be direct -- direct clients

 8   to be part of the government; does that sound right?

 9   A.  Yeah, I think broadly -- so we have government clients who

10   access our system, and we have contracts with directly.  And

11   then we have a larger group of governments who access our data

12   through third-party platforms, primarily data aggregators.  I

13   think as Mr. Cohen testified yesterday, it's difficult to

14   assess -- we know broadly how many of their customers are

15   government customers, so we can make an assessment.  But I

16   would say probably of the number of users on a daily basis who

17   access our platform directly or indirectly through a third

18   party, probably 40 to 45 percent are governments.

19   Q.  Many of those cyber companies, the data aggregators, are

20   also serving non-government entities; is that right?

21   A.  They are.

22   Q.  Some of them are serving both government and non-government

23   entities?

24   A.  That's correct.

25   Q.  We briefly referenced your executive vice president of

Mark Turnage - Direct

1   sales.  You hired -- this is Mr. Williamson; right -- or was

2   Mr. Williamson?

3   *A.*  That's right.

4   *Q.*  He was hired in April of 2021?

5   *A.*  Roughly, yes.

6   *Q.*  Do you have a -- can you be more specific on exactly when

7   you believe DarkOwl hired him?

8   *A.*  I don't.  I actually don't -- it was spring of 2021.  I can

9   confirm that.  I -- whether it was late March, early April, I

10  couldn't tell you.

11  *Q.*  Prior to having Mr. Williamson, did DarkOwl have a

12  different executive vice president of sales?

13  *A.*  There was a -- there was a chief revenue officer who hired

14  Mr. Williamson as head of sales, and so she had previously

15  occupied the role herself.

16  *Q.*  Mr. Williamson reported directly to you?

17  *A.*  No.  He reported to her until she went out on maternity

18  leave.  Then he reported directly to me.

19  *Q.*  Who was the name of the person that he reported to?

20  *A.*  Allison Holland.

21  *Q.*  For how long did he report to Allison Holland?

22  *A.*  She went out on maternity leave I believe around November

23  of that year.  So that would have been, what, about six months.

24  *Q.*  November of 2021?

25  *A.*  Yes.

Mark Turnage - Direct

1    *Q.* And she reported to you?

2    *A.* She did.  She did, and she does.

3    *Q.* In 2020, did DarkOwl have a marketing director?

4    *A.* We had a director of marketing.  We did.

5    *Q.* Did DarkOwl have a -- you said -- was it the same person

6    that you just mentioned that was also the head of sales at that

7    time -- in 2020?

8    *A.* No.  Her name was Kim Ketchall.  She was the marketing

9    director.

10   *Q.* Who was the head of sales in 2020?

11   *A.* Allison -- as I said, Allison Holland was both the chief

12   revenue officer, with the marketing department reporting to

13   her, and she also held the job of head of sales.

14   *Q.* Prior to 2020, what was DarkOwl's marketing approach?  Was

15   it more -- was it inbound sale or outbound sales?

16   *A.* It was a combination of the two.  But our primary marketing

17   approach, particularly prior to COVID, was extensive

18   participation in trade shows and conferences and reaching out

19   to -- directly to clients that had a use case that we could

20   establish for our data.  But our primary marketing focus prior

21   to COVID was conferences.

22   *Q.* We talked about this somewhat at the hearing in May.  In

23   late 2020, DarkOwl hired a third-party vendor that did outbound

24   sales generation?

25   *A.* Yes.  Our director of marketing hired a woman to set up an

Mark Turnage – Direct

1  outbound marketing effort, and so we used her as a contractor.

2  And she in turn hired a Filipino-based outbound sales company

3  to help with outbound sales.

4  Q.  A company called CIENCE?

5  A.  CIENCE spelled with a "C," instead of "S-C."

6  Q.  C-I-E-N-C-E?

7  A.  Correct.

8  Q.  This company isn't based in Denver, here?

9  A.  Not to my knowledge.

10  Q.  Who made the decision to hire the consultant?

11  A.  The -- sorry.  Which consultant?  The consultant who did

12  the outbound marketing?

13  Q.  The individual who oversaw CIENCE.

14  A.  The head of marketing made that decision and made a

15  recommendation to me, and I approved it.

16  Q.  And who did that individual consultant report to?

17  A.  The head of marketing.

18  Q.  And, ultimately, it was your job at that time to oversee

19  the sales and marketing department?

20  A.  Well, it's my job to oversee the entire company.  Yes.

21  Q.  So the third-party consultant, the individual that was

22  hired, helped structure the outbound lead generation program?

23  A.  Structured it from scratch.

24  Q.  And CIENCE, with a "C," that company's job was to

25  communicate with the outside world, to third parties on behalf

Mark Turnage - Direct

1  of DarkOwl?

2  A.  Well, yes, they -- not to communicate with the outside

3  world, but to reach out to prospective customers.

4  Q.  Right.  And when DarkOwl retained CIENCE, DarkOwl set up

5  an email domain, bd.DarkOwl.com?

6  A.  That's correct.

7  Q.  And DarkOwl did that so that it would appear to the people

8  receiving the emails that the emails were coming from

9  DarkOwl?

10 A.  That's correct.  And it's pretty common practice in

11 outbound marketing.

12 Q.  DarkOwl wanted to make sure that the people being solicited

13 knew the solicitation was coming from DarkOwl and not from

14 CIENCE?

15 A.  Correct.

16 Q.  You testified that the company sent out thousands of

17 emails per week on DarkOwl's behalf?

18 A.  That's my understanding.

19 Q.  They were -- they were also supposed to engage in any

20 potential customer beyond sending out those emails; right?

21 A.  Yes.  So what -- they were compensated based on the number

22 of meetings they were able to set up for our sales team with a

23 prospective customer.  And so the general gist of the

24 conversation -- the general way they worked was, they would

25 send out an email.  And then should the person -- receiving

Mark Turnage - Direct

 1   person respond, they would have a phone conversation and set up

 2   a meeting with our -- one of our actual account executives, our

 3   sales team.  And at that point, they were compensated for

 4   having set that meeting up.

 5   Q.  So CIENCE was supposed to send out emails looking like it

 6   was coming from DarkOwl and then also have follow-up phone

 7   conversations with potential clients?

 8   A.  That's correct.

 9   Q.  And you obviously knew that that was what CIENCE was hired

10   to do?

11   A.  That's correct.

12   Q.  And you had the ability to control the messaging that

13   CIENCE was using?

14   A.  We gave broad general messaging, which they would

15   oftentimes use.  And sometimes they would change it, you know.

16   Q.  Now, DarkOwl contracted with CIENCE for a year or longer?

17   A.  Sorry.  Missed the last words.

18   Q.  A year or longer.

19   A.  I think it was about a year.  Maybe 14 months or so.

20   Q.  And DarkOwl may have generated one or two clients as a

21   result of CIENCE?

22   A.  If that.

23   Q.  Now, in 2021 how many clients did DarkOwl have?

24   A.  In 2021 roughly 50 clients.

25   Q.  When CIENCE was sending out these emails, did DarkOwl

Mark Turnage - Direct

1    monitor where those emails went?

2    *A.*   No.

3    *Q.*   You understood that CIENCE was -- was casting a wide net,

4    though?

5    *A.*   Well, it became obvious over time that they were casting a

6    net that was far too broad.  So, for example, we had given them

7    specific information around the types of companies where we had

8    established use cases; and they were going far broader with

9    that.  In fact, they actually were contacting current customers

10   of DarkOwl as part of their outreach.

11   *Q.*   But you understood when CIENCE was contracted that they

12   would be -- would be casting a wide net?

13   *A.*   No.  They were not contracted to cast a wide net.  They

14   were contracted to actually do targeted outbound marketing to

15   specific sectors within the cybersecurity industry that we had

16   identified a use case.

17   *Q.*   DarkOwl didn't provide CIENCE a customer list -- a

18   potential customer list to contact?

19   *A.*   No.

20   *Q.*   DarkOwl understood that it would be sending out thousands

21   of emails?

22   *A.*   We did.

23   *Q.*   CIENCE would not have been soliciting government entities?

24   *A.*   Not that I'm familiar with.

25   *Q.*   Now, we know that CIENCE solicited a company, ████████.

Mark Turnage - Direct

217

1   That's ███████.  We looked at that email before; right?

2   A.  I think it was on the screen yesterday.

3   Q.  DarkOwl would have had a meeting with ██████, had ██████

4   responded and requested one?

5   A.  Presumably, if they -- if the criteria for setting up a

6   meeting had been established by CIENCE, we would have had a

7   meeting.

8   Q.  And if ██████ asked to have access to DarkOwl's database,

9   DarkOwl would have sold data to ██████

10  A.  Well, there is a fairly lengthy process to establish and

11  vet the customers.  They wouldn't have just been able to show

12  up and ask for access or buy access.

13  Q.  Do you have any reason to believe that DarkOwl would have

14  rejected ██████ as a customer?

15  A.  I don't know anything about ██████

16  Q.  Okay.  And we know that CIENCE solicited a company called

17  ████████ -- ███████████ -- is that correct?

18  A.  I don't know, actually.  I -- I think I saw the ██████

19  email, but I don't know if they did.

20  Q.  I'm pulling up Exhibit 387.

21  A.  Okay.

22  Q.  This is --

23  A.  It looks like the same email that ██████ received.  Yes.

24  Q.  And this -- this would be from the company CIENCE?

25  A.  Correct.  And you can tell that because of the email

Mark Turnage - Direct

1  address of the person who is Taylor Sharp.

2  *Q.* All right.  And it's sent to ▆▆▆▆▆▆

3  *A.* Yes, it appears so.

4  *Q.* DarkOwl would have met with ▆▆▆▆▆▆ had they responded to

5  these email requests?

6  *A.* Again, that would have gone through a vetting process.  And

7  if they would have passed the vetting process, we would have

8  had the meeting, and we would have had a conversation about

9  whether they had a use case that was appropriate.

10 *Q.* Do you have any reason to believe that DarkOwl would have

11 refused to sell data to ▆▆▆▆▆▆ had they made the request?

12 *A.* I don't know anything about ▆▆▆▆▆▆  I mean, I don't know

13 how big they are, if their credit would be good, if they're

14 credible people, if they're a cover or front company for

15 somebody else.  I don't know.

16 *Q.* DarkOwl would sell to CyberSource, the Visa company,

17 wouldn't it?

18 *A.* Say that again.

19 *Q.* DarkOwl would sell to CyberSource, the Visa company?

20 *A.* I missed the last word.  The Visa company?

21 *Q.* It's a subsidiary of Visa.

22 *A.* I don't know anything about that company.

23 *Q.* Do you have any reason to believe that DarkOwl would refuse

24 to sell data to CyberSource?

25 *A.* Again I don't know anything about the company; so it's hard

Mark Turnage – Direct

1   for me to say.

2   *Q.*  Do you have any reason to believe that DarkOwl would refuse

3   to sell data to ███████ which is a fintech payment solution

4   company?

5   *A.*  I've never heard of them before.

6   *Q.*  One of DarkOwl's customers on its website is Coinbase.  Is

7   Coinbase still a customer?

8   *A.*  I believe so, yes.

9   *Q.*  And Coinbase is a cryptocurrency --

10  *A.*  That's correct.

11  *Q.*  DarkOwl would also sell data to ███████ another cyber --

12  cryptocurrency exchange?

13  *A.*  What's the name?

14  *Q.*  ████████████████

15  *A.*  I've never heard of them.

16  *Q.*  Do you have any reason to believe why you would -- why

17  DarkOwl would not sell data to another cryptocurrency exchange?

18  *A.*  Oh, plenty of reason.  In the crypto space, it's complete

19  land mines everywhere.  It's an unregulated space with a lot of

20  criminal activity.  And many of these companies -- I don't know

21  anything about ██████ -- but many of these companies congregate

22  in areas where there is no regulation -- Panama, Dubai,

23  Singapore.  And oftentimes they're very thinly capitalized, and

24  oftentimes they are a front for criminals.  So we have to be

25  extraordinarily careful about who we sell to in the crypto

Mark Turnage - Direct

1    space.

2    Q.  Understood.  I want to talk a little bit more about

3    Mr. Williamson.  You testified that you hired him in the spring

4    of 2021.

5    A.  Yes.

6    Q.  March or April?

7    A.  Yes.

8    Q.  And he remained in that position until March of 2023?

9    A.  Until I think January of 2023.

10   Q.  So he --

11   A.  Maybe February of 2023.

12   Q.  So he was hired at the time the company CIENCE was sending

13   out the thousands of emails?

14   A.  Yes.  Although he didn't oversee that effort.

15   Q.  Sure.  Mr. Williamson, did he -- when he -- at what point

16   did he report directly to you?

17   A.  When Allison Holland went out on maternity leave, he

18   reported directly to me.  So late 2021 or early 2022.

19   Q.  Mr. Williamson wanted to change DarkOwl's sales strategy to

20   be largely inbound, as opposed to outbound?

21   A.  That was his major focus.  Yes.

22   Q.  He still retained two full-time salespeople to do

23   outbound -- outbound campaigns?

24   A.  No.  He had three salespeople reporting to him, and he had

25   two sales development representatives reporting to him.  There

Mark Turnage - Direct

1    was -- he put an emphasis, as you said, on inbound sales --

2    meaning driving demand to make people reach out to us, as

3    opposed to reaching out to companies that we knew had a use

4    case.  So that was his focus.  He felt that there was a broader

5    universe of potential customers for DarkOwl beyond those that

6    we were reaching out to.

7    Q.  Understood.  And the two sales development reps that you

8    mentioned, their job was to continue to do outbound, though?

9    A.  Primarily, their job was to actually manage the inbound

10   requests that came in the door.  They had a very small -- they

11   did almost no outbound marketing until probably late 2022.

12   Q.  Did you have anybody doing outbound in late 2021?

13   A.  Not a lot.

14   Q.  Now, part of Mr. Williamson's job was to oversee those

15   sales reps who were doing outbound?

16   A.  Yes.  To the extent they were doing outbound, yes.

17   Q.  And part of Mr. Williamson's job was to assign leads to

18   those people doing outbound?

19   A.  No, the sales -- when a lead came in the door -- and the

20   way -- when I say they came in the door, generally, there is a

21   spot on our website where a lead -- a third party can say, I'd

22   like to talk to you, and they fill out their information.  When

23   those leads came in, there was a process for establishing who

24   to send those leads to; and that was done by the SDRs, not by

25   Mr. Williamson personally.

222

Mark Turnage - Direct

1  *Q.*  Now, do you currently still have two sales reps doing

2  outbound lead generation?

3  *A.*  We have two sales development reps who do outbound lead

4  today.  Correct.

5  *Q.*  Now, the shift to inbound sales in late 2021 meant that

6  DarkOwl put more effort in hosting content to drive customers

7  to DarkOwl's website?

8  *A.*  Broadly, yes.

9  *Q.*  And that changed again recently.  That's not DarkOwl's

10  primary marketing strategy?

11  *A.*  No.  I think the -- the concept -- since the founding of

12  the company up until John Williamson was hired, we had

13  primarily relied on reaching out via conferences, emails,

14  meetings, emails, face-to-face meetings, so forth, with

15  companies who had a use case that we established and we knew

16  that we could serve.  When he came in, he felt that by

17  generating large amounts of content that was relevant to

18  specific market sectors, that he could cause those companies to

19  then come in and -- at a higher volume than we could reach out.

20  It was an abject failure.

21  *Q.*  But DarkOwl continued that attempt for approximately two

22  years?

23  *A.*  No.  About a year.

24     *MR. FRASIER:*  All right.  We have a document that is

25  marked AE.  I'm going to ask my client to step out.

Mark Turnage - Direct

 1         *THE COURT:*  The record should reflect that Mr. Daline

 2    and his wife have left the courtroom.

 3    *BY MR. FRASIER:*

 4    *Q.*  Showing you what has been marked as Exhibit No. 4, and it's

 5    attorneys' eyes only.  Do you recognize this document?

 6    *A.*  I do.

 7    *Q.*  This is a document created by Mr. Williamson?

 8    *A.*  I believe so.

 9    *Q.*  No earlier than July of 2021?

10    *A.*  Sorry.  When you --

11    *Q.*  He created it no earlier than July of 2021?

12    *A.*  I mean, he may have worked on it prior to July.  I don't

13    have any insight into that.

14    *Q.*  But it's dated July of 2021.

15    *A.*  That's correct.

16    *Q.*  It says V2?

17    *A.*  That's correct.

18    *Q.*  So this was at least three or four months into

19    Mr. Williamson's tenure at DarkOwl?

20    *A.*  That's correct.

21    *Q.*  And Mr. Williamson had a history in sales prior to working

22    at DarkOwl; right?

23    *A.*  Yes, he did.

24    *Q.*  And he had spent at least three or four months getting to

25    know DarkOwl before creating this document?

Mark Turnage – Direct

1  A.  That's correct.

2  Q.  I'm looking at page 16 of Exhibit 4.  "Big darknet data

3  primary use cases.  Definitions."  This is -- this is a

4  description by Mr. Williamson of who he believed -- what use

5  cases he believed existed at that time for DarkOwl?

6  A.  It was his -- it was his estimation of where we should be

7  marketing.  It wasn't an estimation of where we were currently

8  selling.  And that was actually quite a point of contention in

9  this presentation that he made.  So he missed off -- in this

10  slide, he missed off our largest market.

11  Q.  But this was his attempt to at least identify some other

12  use cases that he believed existed?

13  A.  That's correct.  Well, it wasn't an attempt by him to

14  identify other use cases.  It was his attempt to say, this is

15  where we should be focused, to the exclusion of the other

16  sectors, including our largest sales sector at the time,

17  including our largest actual group of customers.

18  Q.  Now, I just skipped above to page 15, "note on next few

19  slides."

20  A.  Yeah.

21  Q.  Mr. Williamson wrote, "You will note the absence of two --

22  not to be ignored in broader execution -- use cases."

23  A.  That's correct.

24  Q.  Cybersecurity service providers, law enforcement agencies

25  and intelligence?

Mark Turnage – Direct

1    A.   That's correct.

2    Q.   Those are the two that you're talking about?

3    A.   That's correct.

4    Q.   So the next slide is a description of other use cases that

5    he believed existed.

6    A.   No.  The slide is titled, "Big darknet data primary use

7    case.  Definitions."  And his ultimate recommendation was that

8    we move away from cybersecurity providers and move away from

9    law enforcement and intelligence agencies and focus on these

10   five sectors, which was ultimately rejected.

11   Q.   Under the vertical use case, fraud detection and darknet

12   quantification, Mr. Williamson wrote, "Fraud detection is a set

13   of processes and analyses that allow businesses to identify and

14   prevent unauthorized financial activity.  This can include

15   fraudulent credit card transactions, identity theft, cyber

16   hacking, insurance scams, and more."

17   A.   That's correct.

18   Q.   Now, page 17 of Exhibit 4 is titled "Message Framework.

19   Use-Case-Specific Benefits."  This would be Mr. Williamson's

20   attempt to craft messaging around the use cases he proposed?

21   A.   That's correct.

22   Q.   Now, under the digital identity protection use case,

23   Mr. Williamson wrote, "DarkOwl's unparalleled telemetry to

24   darknet sources enables our clients to instantly search and

25   locate critical consumer and corporate data on the darknet,

226

Mark Turnage – Direct

1    improving digital identity reporting and safeguarding, plus

2    enhances operational accuracy and efficiency, leading to better

3    customer experience."

4    A.  Yeah.  The digital identity market that he's talking about

5    there is called identity access management.  And it's those

6    companies that actively handle, for example, a person's access

7    to a company's network.  So sign in, log-in information for a

8    company's network, how the two-factor authentication interacts.

9    And so it's a very specific identity access management targeted

10   market.  That's correct.

11   Q.  Immediately below that, the message framework

12   Mr. Williamson wrote for fraud detection and darknet

13   quantification, it says, "DarkOwl enables the quick and easy

14   assessment of financial risk, including credit card, Social

15   Security number, BIN, and/or cryptocurrency fraud and

16   cryptowallet misuses as indicated by darknet data and provide

17   risk input that correlates darknet exposure to the

18   quantification of digital and risk."  Is that right?

19   A.  That's correct.

20   Q.  Now, page 18 is an identification of who Mr. Williamson

21   believed would be the addressable market by the use cases he

22   proposed?

23   A.  That's -- yeah.  He had gone and done some research

24   apparently and put these list companies out onto the -- out

25   onto this slide.

Mark Turnage - Direct

1    Q.  And as you sit here today -- I understand that you disagree

2    with the -- at least some of the companies that are on this --

3    A.  No.  At the time we thought it was nonsense.  The very

4    first company listed on this slide is a customer of ours.  Why

5    would he identify a target list of a customer of ours --

6    Cowbell, under cyber insurance underwriting -- it's one of our

7    largest customers.  He identified them as a prospective target.

8    Threat intelligence platform, on that first line of companies,

9    half of those companies were customers of ours.  So he had not

10   done his homework; and it was a major source of contention in

11   the meeting, that he had not actually done his homework.

12   Q.  Had you reviewed prior versions of the document before the

13   version two that I'm looking at today?

14   A.  I had not.

15   Q.  We're looking at Exhibit 5, which is also designated as

16   attorneys' eyes only.  This is also a document that

17   Mr. Williamson created.  And I'm on zooming out so we can see

18   it better.

19            This is another document Mr. Williamson created?

20   A.  Yes.

21   Q.  This was created -- he created this several months after he

22   created Exhibit 4?

23   A.  I don't actually -- I can't place the timing unless there

24   is a timestamp on the document.

25   Q.  This document was used to inform DarkOwl's redesign of its

Mark Turnage - Direct

1    website?

2    A.   I'm sorry.  I didn't hear that.

3    Q.   DarkOwl used this document to inform the redesign of its

4    website.

5    A.   Yes, in part.

6    Q.   This document would have been created at least at the same

7    time or after Exhibit 4?

8    A.   You know, I would assume so; but I can't say definitively.

9    Q.   When I asked you about this document in your deposition,

10   the bottom of page 124, I asked, "Do you believe that this --

11   that he created this at the same time, before he was familiar

12   with DarkOwl?"

13        And your answer was, "I don't know whether he created

14   this at the same time as he created the other deck or, you

15   know, several months later, I think."

16        Is that the best of your recollection as you sit here

17   today?

18   A.   I think that's what I just said.  Yes.

19   Q.   Okay.  So it could have been created several months after

20   the first document we just looked at?

21   A.   It could have.

22   Q.   So that means that it could have been created in the

23   ballpark of six or seven months after Mr. Williamson was

24   employed by DarkOwl?

25   A.   It could have been, yes.

Mark Turnage - Direct

1  *Q.*  Now, this is the only document that was produced in

2  discovery.  To the best of your recollection, this is the most

3  recent version of this document?

4  *A.*  Well, it may -- it may in fact have been the only version

5  of this document.  I'm not aware of any other different

6  versions.

7  *Q.*  And this document was used in part to inform DarkOwl's

8  website redesign, which went into early 2022?

9  *A.*  In part, it did.  I think the -- the then-head of marketing

10  used parts of it, but also did -- created messaging of his own

11  at the time.  So I think this was used in part to inform our

12  website rebuild.

13  *Q.*  Now, on tab 3 called "Big Data Targets" --

14  *A.*  Sorry.  Say that again.

15  *Q.*  I'm clicking to tab 3, called "Big Data Targets."

16  *A.*  Yes.

17  *Q.*  The names in the row "assigned" -- I'm looking at row 3,

18  called "Assigned."  The names in that row were DarkOwl sales

19  reps in 2021?

20  *A.*  Is -- yeah.  Sorry.  The ones that are in parentheses, like

21  Jamie, Magnus, and so on --

22  *Q.*  I'm asking about row 3, at the very top.

23  *A.*  I'm sorry.

24  *Q.*  Assigned, Chris Brown, Jamie Baumgartner, etc., those were

25  DarkOwl reps?

230

Mark Turnage – Direct

1    A.   Yes.

2    Q.   As of 2021?

3    A.   Yes.

4    Q.   And then row 4, immediately below that, those are also

5    DarkOwl sales reps?

6    A.   Correct.

7    Q.   As of 2021?

8    A.   Correct.

9    Q.   Mr. Williamson's job in part was to oversee those sales

10   reps; is that right?

11   A.   To oversee, yes, it was.

12   Q.   Now, this is -- tab 3 of Exhibit 5 is a list of companies

13   that Mr. Williamson believed to be DarkOwl's big data targets?

14   A.   Correct.

15   Q.   Potential customers of DarkOwl?

16   A.   Correct.

17   Q.   And DarkOwl was actively pursuing some of the companies

18   that are on this list?

19   A.   Well, not only were we pursuing them, many of the companies

20   on this slide were customers.  Again, it was a fundamental

21   oversight of Mr. Williamson's.

22   Q.   So, for example, in green down here, ██████████,

23   Jessica -- this is C28.  At the time ███████████ was a

24   prospect being pursued by Jessica?

25   A.   No.  I think at the time they were a customer.

Mark Turnage – Direct

1    *Q.*  You don't believe they became a customer after 2021?

2    *A.*  No.  I'm pretty sure they were a customer prior to this.

3    Jessica was the sales rep who was assigned to manage that

4    account.

5         I don't understand the color coding on this, because

6    in the next row, row D is Aravo.  Aravo has not been a

7    customer, so I couldn't tell you why the color coding is what

8    it is.

9         *MR. FRASIER:*  I'll close out of this document.  Ask my

10   clients to come back in.

11        *THE COURT:*  Please.

12        (Hearing continued in open court.)

13   *BY MR. FRASIER:*

14   *Q.*  Are you familiar with the company NICE Actimize?

15   *A.*  Say again.

16   *Q.*  Are you familiar with the company, NICE Actimize?

17   *A.*  I've never heard of it.  No.

18   *Q.*  Do you have any reason to believe that DarkOwl would refuse

19   to sell data to NICE Actimize?

20   *A.*  I have no idea if they would hit our criteria.

21   *Q.*  Are you familiar with the company ███████

22   *A.*  ███████?

23   *Q.*  ███████████████████████

24   *A.*  I believe I've heard of them, but I don't know anything

25   about them.

Mark Turnage - Direct                                    232

1    *Q.* Do you have any reason to believe that DarkOwl would not

2    sell data to them?

3    *A.* Again, I don't know if they would meet -- match our

4    qualification criteria.

5    *Q.* Have you done a search for ArkOwl on the trademark

6    database?

7    *A.* A search for -- I've never been on the trademark database.

8    *Q.* Have you searched any of the documents that we looked at

9    today for companies named ArkOwl?

10   *A.* Have I searched any of the documents that you -- that were

11   in discovery?

12   *Q.* The documents we just -- the spreadsheet that we just

13   looked at, have you ever searched that document to see if a

14   company named ArkOwl appears in it?

15   *A.* No.

16          *MR. FRASIER:* I have no more questions.  Thank you.

17          *THE COURT:* Thank you.

18          Is there cross-examination -- so-called

19   cross-examination?

20          *MR. BUXBAUM:* Yes, there is, Your Honor.  I think it's

21   direct and cross.

22          *THE COURT:* Yeah, it is a combination of direct and

23   cross.

24          *MR. BUXBAUM:* I only say that just because of what

25   might come after.

Mark Turnage – Cross

1          THE COURT:  I understand.

2          MR. BUXBAUM:  I do want to ask Mr. Turnage, do you

3    need a break?

4          THE WITNESS:  I wouldn't mind five minutes.

5          MR. BUXBAUM:  Can we ask for a short break?

6          THE COURT:  Give me an idea of how much you might have

7    on your direct and cross?

8          MR. BUXBAUM:  I think it would probably be about the

9    same amount of time Mr. Frasier just used.

10         THE COURT:  A little more than an hour?

11         MR. BUXBAUM:  That seems about right.

12         THE COURT:  The reason I ask is I have a 12:15 meeting

13   that I must attend.  I want to make sure you're aware of that,

14   because we will have to take a break at that time for about an

15   hour.  Why don't we take a break now until 10:30, and we'll

16   make all the progress we can make until 12:15 or 12:10, at

17   which time I'm going to have to break again.

18             (Recess at 10:19 a.m.)

19             (In open court at 10:38 a.m.)

20         THE COURT:  Mr. Turnage, you can please resume the

21   witness stand.

22             And, counsel, whenever you're ready.

23                        **CROSS-EXAMINATION**

24   BY MR. BUXBAUM:

25   Q.  Good morning, Mr. Turnage.

234

Mark Turnage - Cross

1   A.   Good morning.

2   Q.   Mr. Turnage, when did DarkOwl first decide to adopt the

3   DarkOwl trademark?

4   A.   In 2017.

5   Q.   Did you adopt the DarkOwl wordmark and design marks, the

6   logo, around the same time?

7   A.   Yes, with the -- yes.

8   Q.   And what are the origins of the owl design in the logomark?

9   A.   In 2016, we purchased out of bankruptcy the assets of a

10  company that had been based here in Denver -- a cybersecurity

11  company based here in Denver called One World Labs.  They also

12  went by the moniker OWL.  And we acquired the word "One World

13  Labs" and "OWL" and the figurative owl that we use in our logo

14  today.  It's part of the bankruptcy estate.

15  Q.   So no one at DarkOwl actually designed that -- that owl

16  figure?

17  A.   My understanding was the owl figure was designed by

18  somebody at the company from which we bought the assets in the

19  bankruptcy estate.

20  Q.   Okay.  And did you know about ArkOwl or the ArkOwl marks at

21  the time you adopted the DarkOwl word and design marks?

22  A.   No.

23  Q.   At the time you adopted the DarkOwl marks, were you aware

24  of any other marks that were being used in the cybersecurity

25  industry, broadly speaking, that made use of the word "owl"

Mark Turnage - Cross

1    and/or an owl design?

2    *A.*  Yes.  We did a trademark search with our attorneys, and

3    came across many of the companies that were mentioned

4    yesterday -- REDOWL, Owl Cyber Defense, and so on.  So we were

5    aware that "owl" was commonly used in the cyber industry.

6    *Q.*  And at the time that you adopted the DarkOwl marks, were

7    you aware of any other marks being used in the cybersecurity

8    industry broadly that made use of the word "ark"?

9    *A.*  We did not look for "ark" or a -- we didn't look -- we

10   didn't disaggregate the word "dark."  We looked for other

11   companies that use the word "dark."  There are a host of other

12   companies in the cybersecurity industry that use the word

13   "dark," but we did not look for "ark."

14   *Q.*  Sitting here today, are you aware of companies in the

15   cybersecurity industry that use the word "ark"?

16   *A.*  Yes.  A very well known company called CyberArk is a

17   company in the cybersecurity industry, and they do identity

18   management.

19   *Q.*  Did you ultimately register the DarkOwl design marks?

20   *A.*  We did.

21        *MR. BUXBAUM:*  Can we show Exhibit 131, please.

22   *BY MR. BUXBAUM:*

23   *Q.*  Mr. Turnage, do you recognize this document?

24   *A.*  I do.

25   *Q.*  Does this reflect the USPTO registration information

Mark Turnage – Cross

 1    regarding the DarkOwl Cybersecurity design mark?

 2    *A.  It does.*

 3    *Q.  Do you recall whether the application for this trademark*

 4    was refused by the USPTO in light of other registered or

 5    applied-for marks?

 6    *A.  It was not denied, no.  It was allowed.*

 7            MR. BUXBAUM:  I'd like to look at Exhibit 132, please.

 8    *BY MR. BUXBAUM:*

 9    *Q.  Mr. Turnage, do you recognize this document?*

10    *A.  I do.*

11    *Q.  Does this reflect the USPTO registration information*

12    regarding the DarkOwl design mark?

13    *A.  It does.*

14    *Q.  Do you recall whether the application for this trademark*

15    was refused by the USPTO in light of other registered or

16    applied-for marks?

17    *A.  It was not refused.  It was allowed.*

18    *Q.  Is the trademark shown in Exhibit 132 DarkOwl's main design*

19    mark or logo?

20    *A.  It is.*

21    *Q.  Now, I asked you a moment ago about what you were aware of*

22    at the time you adopted the DarkOwl marks.  I want to ask you a

23    slightly different question.  At the time that DarkOwl applied

24    to register the trademarks we have just looked at, were you

25    aware of ArkOwl or the ArkOwl marks?

Mark Turnage – Cross

1    *A.*  Was I aware of ArkOwl or ArkOwl marks?  No.

2          *MR. BUXBAUM:*  You can take that down.

3    *BY MR. BUXBAUM:*

4    *Q.*  At the time you adopted and registered the DarkOwl marks,

5    did you intend to copy ArkOwl's marks in any way?

6    *A.*  No.

7    *Q.*  Is there any aspect of the DarkOwl mark that is intended to

8    reference the word or concept "ark"?

9    *A.*  No.  The reason we branded the company as DarkOwl is we

10   wanted to give our customers a good insight into what the

11   company did.  And, obviously, "dark" refers to the darknet.

12   "Owl" refers to our ability to see into the darknet, as well as

13   it harkens back to the origins of the company, in the -- which

14   was the assets we acquired out of the bankruptcy estate.  So

15   there is no reference to "ark."  The word "dark" was our major

16   focus.

17   *Q.*  Outside of this litigation, are you aware of any instances

18   in which any person has expressed the belief that the DarkOwl

19   marks are similar to the ArkOwl marks?

20   *A.*  No.  I've never heard of ArkOwl, been approached about

21   ArkOwl, had any conversation with anyone about ArkOwl, seen

22   them at any conference, seen them at any trade show, been asked

23   by a prospect, been asked by a conference, never had a

24   conversation about ArkOwl outside the context of this

25   litigation.

Mark Turnage - Cross

1   *Q.* Are you aware of any instances in which any person has

2   expressed the belief that they believe DarkOwl's products or

3   services are associated with ArkOwl in any way?

4   *A.* No.

5   *Q.* Are you aware of any instances in which any person has

6   expressed a belief that ArkOwl's products are associated with

7   DarkOwl?

8   *A.* No.

9   *Q.* Are you aware of any instance in which somebody expressed

10  interest in purchasing PII verification services from DarkOwl?

11  *A.* No.

12  *Q.* Are you aware of any instances where anybody expressed an

13  interest in purchasing dark web data services from DarkOwl?

14  *A.* No.

15  *Q.* Mr. Turnage, can you please remind the Court of what dark

16  web data is and what DarkOwl does with regard to dark web data.

17  *A.* Yes.  Briefly, darknet data comes from the darknet or the

18  dark web -- those terms are used interchangeably.  The broad

19  definition of the dark web or the darknet is that area of the

20  internet that requires specific browsers to get access to.  You

21  can't get there from your Google browser.  And user identity is

22  largely obfuscated, and the traffic is obfuscated.  So it's

23  very difficult to search or to broadly cover or understand what

24  is going on in the darknet, because unlike Google -- which

25  indexes all internet traffic, and that's how they create their

Mark Turnage - Cross

1    search engine -- it's very difficult to do something like that

2    in the darknet.

3         We have built a platform that goes into the darknet on

4    a continuous basis and collects data.  And we actually extract

5    the data out of the darknet and put it in a separate database

6    that we control.  We can then index that data and make it

7    available to our clients.

8         The way I would describe it is, we try and create a

9    mirror image as best as we can of what is going on in the

10   darknet, outside the darknet, so we can give that to our

11   clients.

12   Q.  Mr. Turnage, do you recall testifying at the hearing a few

13   weeks ago about seven use cases for DarkOwl's services?

14   A.  I do.

15   Q.  And just for the record, those use cases are titled threat

16   intelligence, third-party risk, cybersecurity underwriting,

17   digital ID protection, fraud protection, critical

18   infrastructure, and national security; is that correct?

19   A.  That's correct.

20   Q.  How do your customers use your data?

21   A.  Well, there are a broad variety of uses, depending on which

22   use case, for example you're referencing.  National security

23   application use case, for example, is looking for threat actors

24   who might be associated with adversarial nation states in the

25   darknet.  All the way to threat intelligence, which is trying

Mark Turnage - Cross

1    to understand the emerging threats to an organization and see

2    what hackers are chatting about.

3           Oftentimes you can see in the darknet, for example,

4    two hackers talking to each other on a forum that we collect

5    data from.  And they'll say, I have back-door access to X, Y, Z

6    company, and I'll sell it to you.  And if you're that company

7    and you're monitoring our platform -- using our platform to

8    monitor the darknet, you'll see right away that you're going to

9    be subject to an attack.  And oftentimes the hackers will

10   actually identify the tools that they're going to use to break

11   into the company.  And that's enormously useful, for example,

12   in that case.  But it varies by use case.

13          *MR. BUXBAUM:*  I'd like to look at Exhibit 92, please.

14   *BY MR. BUXBAUM:*

15   *Q.*  Do you recognize this document, Mr. Turnage?

16   *A.*  I do.

17   *Q.*  What is it?

18   *A.*  It's a page from our website.

19   *Q.*  Do you see the word "coverage" on this page, Mr. Turnage?

20   *A.*  Yes.  "Expand your detection coverage to the hardest to

21   reach corners of the internet."

22   *Q.*  Are you aware of any other websites in the cybersecurity

23   industry that use the word "coverage" on them?

24   *A.*  Yes.  I mean, "coverage" is a very generic term used to

25   denote how much of a specific area or context your product

Mark Turnage – Cross

1   covers.  "Coverage" is widely used in the cybersecurity

2   industry.  For example, an end point security company that

3   protects a computer network protects every single device that

4   accesses that network.  They would say they have 100 percent

5   coverage of devices that are accessing the network.  So

6   "coverage" is just a generic term used very, very broadly in

7   the cybersecurity industry to indicate the extent to which you

8   can actually see and protect.

9   Q.  So is it fair to say that if you saw two companies'

10  websites that both had the word "coverage" on them, you

11  wouldn't necessarily believe that those companies provided

12  related or similar services?

13  A.  Well, no.  It's such a generic term that I would be

14  surprised if there were any websites for any cybersecurity

15  company that didn't use the word "coverage."

16  Q.  Do you see the phrase or word "PII" on this web page?

17  A.  Yes.

18  Q.  What does "PII" mean?

19  A.  PII means personally identifiable information.  And it's an

20  extremely broad term.  It can encompass things like Mr. Daline

21  testified yesterday, an email address is personally

22  identifiable information, if it's traceable to an individual,

23  like a password would be.  It can also encompass healthcare

24  records; it can encompass bank account information; it can

25  encompass employment details; it can encompass any variety -- I

Mark Turnage - Cross

 1   mean, the City and County of Denver has records on the home I

 2   own here in Denver.  That's PII.  And I know that in the

 3   context of this trial, we've tended to refer to PII as emails;

 4   but PII is a very, very broad umbrella term used in the

 5   industry to -- for any digital information that can be tracked

 6   back to an individual.

 7   Q.  So email -- an email address, for example, is one form of

 8   PII --

 9   A.  Yes.

10   Q.  But there are many others?

11   A.  Yes.

12   Q.  Would you expect to see the word or phrase "PII" on any

13   number of cybersecurity websites?

14   A.  Yes.  It's a commonly used term -- umbrella term in the

15   industry.

16   Q.  And I'm assuming, merely seeing the phrase or word "PII" on

17   two companies' websites wouldn't indicate that they necessarily

18   provided similar services; is that correct?

19   A.  That's correct.

20   Q.  Now, this web page depicts one of the seven use cases that

21   we've talked about a few times here in this case; correct?

22   Digital identity protection?

23   A.  Correct.

24   Q.  And can you explain to the Court what it is that DarkOwl is

25   doing with regard to digital identity protection?

Mark Turnage - Cross

1   A.   Yes.  So digital identity protection refers to monitoring

2   the darknet for any data that falls in that umbrella of PII.  I

3   mean, I'll give you an example.

4          Several years ago we detected the fact that a

5   malicious darknet actor had leaked into the darknet the -- a

6   list of all the FBI employees -- all the FBI agents including

7   undercover agents.  Their name, their home address, personal

8   details on each of those individuals, their telephone number,

9   in many cases their emails.  And so our system picked up the

10  fact that that data was now available in the darknet.  And,

11  obviously, the FBI then had to mitigate the damage that was

12  done by that.  So that's an example of what we do in the

13  darknet.

14  Q.   So the reference underneath the words "Unprecedented

15  coverage to 8 billion email addresses" --

16  A.   Yes.

17  Q.   -- can you remind us what that is a reference to, please?

18  A.   That's a reference to email addresses that are found in the

19  darknet that we've collected on our system.

20  Q.   So, for example, a user can search an email address and get

21  back a reflection of information regarding -- that resides on

22  the darknet pertaining to that email address; correct?

23  A.   Well, no.  They would get the data that is -- the data

24  itself.  They wouldn't get an indication of whether it resides

25  on the darknet or not.  And that's an important distinction

Mark Turnage – Cross

1    here because our customers are not at all interested in the

2    presence or absence of an email address on the darknet.  In

3    fact, you can see it's 8.1 billion email addresses.  There are

4    not 8.1 billion people on the planet.  And even counting those

5    people who have multiple email addresses, you still don't get

6    anywhere near the billions of email address that we've

7    collected.  That's just noise.  What our customers are

8    interested in knowing is, what is around that email address?

9    Is there a password associated with it?  Is it an FBI agent's

10   actual personal information, which is how they found that.

11         So you don't just get a red light or a green light,

12   which is, yes, it's found on the darknet or, no, it's not.  Our

13   system isn't built to do that.

14   Q.  Could a user search on Google for information pertaining to

15   an email address?

16   A.  Yes.  And they would probably get a lot more information

17   than we have on Google about that email address.

18   Q.  In terms of -- in terms of outputs, does DarkOwl provide to

19   its customers whether an email address or phone number is

20   associated with a social media account?

21   A.  No.

22   Q.  You heard Mr. Daline testify yesterday about the 81 or over

23   100 now data points that he provides to customers through

24   ArkOwl; correct?

25   A.  I did hear his testimony.

Mark Turnage - Cross

1   Q.  Does DarkOwl provide to its customers Whois information as

2   an output?

3   A.  No, we don't have access to that information.

4   Q.  Does DarkOwl provide to its customers caller ID information

5   as an output?

6   A.  No.

7   Q.  Does DarkOwl provide to its customers the carrier

8   associated with a phone number?

9   A.  The what?

10  Q.  The carrier associated with a phone number?

11  A.  No.

12  Q.  Does DarkOwl provide the customers the date of creation of

13  an email address?

14  A.  We don't have that information.

15  Q.  Does DarkOwl store data reflecting its own customers'

16  search queries?

17  A.  We store it for an extremely limited amount of time for

18  compliance reasons, which I testified to earlier.  Retaining it

19  longer than a very short period of time is a violation of GDPR,

20  as well as California and Colorado privacy laws.  So we do not

21  retain that data, and we don't archive that data.

22  Q.  Are you aware of any customers that have expressed an

23  interest in or are using DarkOwl services for email, phone,

24  or IP address verification?

25  A.  No.

Mark Turnage - Cross

1  *Q.* Do you see email, phone, or IP address verification in

2  the payment space as a growth area, in general?

3  *A.* As a broad -- broadly, not at all. It's a commoditized

4  industry, and the price point for our platform would make us

5  uncompetitive in that area. It's not at all a growth area.

6  *Q.* So is it safe to say it's not a growth area for DarkOwl?

7  *A.* For DarkOwl.

8  *Q.* What are the biggest growth areas for DarkOwl?

9  *A.* The biggest growth area right now for us is governments.

10  Even this last year, it switched fairly dramatically to growth

11  in the government space. I think I testified earlier that the

12  ███ capital venture wing has now invested in us. We continue

13  to sell to select intelligence agencies around the world, as

14  well as law enforcement. That's the fastest growth area for us

15  right now.

16  *Q.* Just to go back to my question a moment ago about the use

17  of DarkOwl for email, phone, or IP verification. You've

18  testified a few times, I believe, that it would be impossible

19  or at least impractical to use DarkOwl for that. Why would it

20  be impractical to use DarkOwl for that service?

21  *A.* Well, as I understand from listening to Mr. Daline's

22  testimony, verification -- email verification, to use that

23  example -- encompasses an analyst looking at a wide variety of

24  data points that we don't supply. In fact, there is not a

25  single data point that Mr. Daline testified yesterday that we

Mark Turnage – Cross

1    can supply to his clients.  There is not one that I could --

2    that I was able to discern that we could give to his client.

3           So for verification purposes as it's used in the area

4    of the industry that Mr. Daline and ArkOwl compete in, we don't

5    have that information, so we don't supply it.  So it -- if one

6    of Mr. Daline's clients came to us, in no way, shape, or form

7    could I solve their needs.

8    Q.  Isn't it also the case that the price point for inquiries

9    that DarkOwl charges would make it impractical to use your data

10   service for what Mr. Daline does?

11   A.  Yes.  I mean our average customer size I think is roughly

12   $55,000 in revenue a year.  And much of the data -- well, I

13   think that Mr. Daline testified that a lot of the data that he

14   provides his clients is freely available.  He just aggregates

15   it and gives it to them.  I can't compete with free, and my

16   investors would be quite upset with me if I tried to.

17   Q.  Mr. Turnage, does DarkOwl market its services?

18   A.  Yes.

19   Q.  Does DarkOwl send out blast email campaigns as part of

20   that marketing effort?

21   A.  We do targeted marketing.  And the marketing that we do

22   today is very directed -- highly directed to specific sectors

23   of the cybersecurity industry and governments that -- where we

24   know established use case.

25   Q.  Does DarkOwl place ads in industry publications?

Mark Turnage - Cross

1    *A.*  We don't buy paper printed ads, but we spend about a

2    quarter of a million dollars a year on LinkedIn advertising

3    that is highly targeted to individual companies.  So on

4    LinkedIn, if we're targeting a company, we can actually ensure

5    that people who are from that company who are on LinkedIn will

6    see our ad.  That's how finely tuned the marketing has become

7    for these online platforms.

8         We do Google Adword buys.  If somebody searches the

9    term "darknet threat intelligence," they see DarkOwl's website.

10   *Q.*  Do you advertise or market through a company called NICE

11   Actimize?

12   *A.*  I've never heard of them.

13   *Q.*  Mr. Turnage, does DarkOwl attend industry trade shows or

14   conferences?

15   *A.*  Yes, we attend -- it's the major focus of our marketing

16   effort is to attend trade shows and conferences and present and

17   meet with prospects and clients at trade shows and conferences.

18   And we probably spend north of a million dollars a year overall

19   on our marketing budget, and the bulk of that is trade shows.

20   *Q.*  So is it safe to say, then, that attending industry

21   conferences is an important marketing channel for DarkOwl?

22   *A.*  The most important.

23        *MR. BUXBAUM:*  Can we see Exhibit 82, please.

24   *BY MR. BUXBAUM:*

25   *Q.*  Do you recognize this document, Mr. Turnage?

249

Mark Turnage - Cross

1    *A.*  This looks to be a page from our website.

2    *Q.*  And is it safe to say that this reflects some conferences

     or industry trade shows that DarkOwl has attended?

3

4    *A.*  It was -- the timestamp is March, so this would have

5    been -- yes.  Sorry.  This would have been those conferences

6    that we attend -- were attending at that point -- we're going

7    to attend at the point where this data -- this website -- this

8    page was captured.

9    *Q.*  Okay.  Since most of us in here probably haven't heard of

10   the conferences, I just want to have you talk a little bit

11   about each one of these.

12          The top one says Black Hat.  What is that industry

13   conference?

14   *A.*  Black Hat is one of the world's top cybersecurity

15   conferences.  It takes place, inconveniently for us, in

16   Las Vegas in August.  The attendees of Black Hat are chief

17   technology officers, chief information security officers, COOs

18   of the major cybersecurity companies and their clients,

19   worldwide.  So it's probably one of the top two or three

20   cybersecurity conferences in the world.

21   *Q.*  And the next one on the list is Milipol?

22   *A.*  Milipol.

23   *Q.*  What's the Milipol Paris conference?

24   *A.*  Milipol is the sort of premier European conference for law

25   enforcement and security and intelligence conferences.  It's a

Mark Turnage – Cross

 1    very large conference.  It encompasses everything from

 2    cybersecurity to personal security to anti-aircraft missiles.

 3    Broadly, they're selling to governments.

 4         *MR. BUXBAUM:*  Could we see the broader list for a

 5    second, please.

 6    *BY MR. BUXBAUM:*

 7    *Q.*  The next is the GSX, Global Security Exchange.

 8    *A.*  Yes.

 9    *Q.*  What is that?

10    *A.*  The GSX is the American version of Milipol.  They're not

11    related by the way.  It's a very large conference for security

12    companies.  Primary attendees are governments, and they sell

13    everything from cybersecurity to armored cars to bulletproof

14    vests to shooting alerts, all kind of technologies primarily

15    for law enforcement and governments.

16    *Q.*  And the next on the list is DoDIIS?

17    *A.*  DoDIIS.

18    *Q.*  What is that?

19    *A.*  Department of Defense Information Conference.  So these are

20    suppliers of cybersecurity and information security products to

21    the DOD.  It's hosted by the DOD once a year, and it's a way

22    for -- it's a way for the DOD to get sight of new technologies

23    in the market, as well to meet with their vendors.

24    *Q.*  Next one is GISEC?

25    *A.*  GISEC.  GISEC is the Gulf Information Security Conference,

Mark Turnage - Cross

1  held every year in the Arabian Gulf, or the Persian Gulf.  It's

2  usually in Dubai.  We attend that because we have a range of

3  customers in the region.  Once again, it's cybersecurity

4  companies that sell to governments in the Gulf.

5  *Q.*  Next on the list is WiCyS?

6  *A.*  Women in Cyber.  We attend the Women in Cyber event because

7  of a very large portion of our employees are women, and most of

8  my management team are women.  And we attend Women in Cyber as

9  a recruiting tool.  We like to recruit from that group -- from

10  that conference.  It's less of a conference for customers of

11  ours.

12  *Q.*  Understood.  Next on the list is RSA.

13  *A.*  RSA is arguably the world's premier cybersecurity

14  conference.  I think something like 20 or 30,000 attendees a

15  year.  It's held in San Francisco.  It's our major trade show.

16  We spend a significant amount of money, both having a booth and

17  setting up an offsite meeting facility that we can meet with

18  both prospects and clients.

19  *Q.*  The next on the list is OSMOSIS Con.

20  *A.*  Yes.  OSMOSIS Con is a conference that is held for open

21  source intelligence analysts.  And we're a primary sponsor of

22  that.  Because under the broad umbrella of open source

23  intelligence, darknet intelligence is one of those -- is

24  considered open source.

25  *Q.*  Finally, I believe this website shows ISS World Asia.

Mark Turnage – Cross

1   *A.*  Yes, ISS -- ISS is a group of conferences held in Asia, the

2   Middle East, Europe, and North America and Latin America every

3   year.  We attend all of them.  This one refers to the one that

4   is held in Singapore.  It's an invite-only conference for

5   suppliers selling to intelligence agencies, and the attendees

6   are all intelligence agencies.

7   *Q.*  Are there any other industry trade shows that DarkOwl

8   typically attends?

9   *A.*  Yes.  I mean, this is a main list.  We have actually

10  expanded our list of conferences that we attend since -- this

11  was, I believe, 2022.  We attend conferences, for example,

12  OnRamp, Insurtech, these are conferences that we go to because

13  we have a growing market in the insurance underwriting

14  intelligence area.

15         We went to a conference last month called AFCEA.

16  AFCEA is Armed Forces -- it's hosted, again, by the DOD.  So we

17  try and stay abreast of new conferences like that.  We were

18  last week in London at a conference called InfoSec Europe.  And

19  those are information security companies serving the

20  cybersecurity industry, and it was based in London.  So there

21  are a host of other -- this isn't an exhaustive list.

22  *Q.*  And perhaps not an industry trade show, *per se*, but have

23  you been recently invited to attend the G20 conference in New

24  Delhi?

25  *A.*  Yeah.  I was asked by the Indian government to come out to

Mark Turnage – Cross

1  New Delhi the week after next to give a talk.  So the Indian

2  government is hosting the G20 Group of Nations this year, and

3  they hold a series of conferences in connection with that.  One

4  of them is around cybersecurity.  They've asked me to come out

5  and talk about the use of cryptocurrency in the darknet for

6  criminal enterprises, so I'll go out there.  That is a common

7  marketing thing we do.  My CTO was giving a presentation and a

8  speech to CTOs of defense contractors the week before last.

9  It's very common for us to do those kinds of talks.

10  Q.  And the use of cryptocurrency in the darknet is something

11  that DarkOwl has experience with?

12  A.  Yeah.  It's a primary use case for our customers.  Because

13  I talked earlier about how the darknet obfuscates user

14  identity.  So if two actors -- malicious actors in the darknet

15  are buying stolen information from each other or buying drugs

16  from each other, we can see that transaction occur.  We cannot

17  assess who the identity of the buyers are unless we have other

18  intelligence that correlates to that.  But the way they make

19  that transaction occur is through cryptocurrency.  If there is

20  a credit card involved, suddenly they become visible to law

21  enforcement.  If there was some other payment mechanism used

22  that was trackable back to the surface, it's used.  But crypto

23  is the primary method by which criminals conduct business on

24  the darknet.

25  Q.  And you've never encountered ArkOwl at any of these

254
Mark Turnage – Cross

1   conferences; is that correct?

2   *A.*   No.

3   *Q.*   Have you ever countered ArkOwl at any industry conference

4   that DarkOwl has attended?

5   *A.*   No.   I've never encountered them outside the context of

6   this litigation.

7   *Q.*   Mr. Turnage, would you agree that the cybersecurity

8   industry is large with many, many companies offering many, many

9   different types of services?

10  *A.*   Yes.

11  *Q.*   Would you also agree that many of the companies and

12  services offered in the cybersecurity industry are completely

13  unrelated to one another?

14  *A.*   Yes.

15  *Q.*   Can you give an example that might come to mind of two

16  companies in the cybersecurity industry that provide vastly

17  different products or services?

18  *A.*   Certainly.   I mean, Palo Alto Networks is a well-known

19  company that does end-point security.   By end-point security, I

20  mean, how do you protect this courtroom's -- this courthouse's

21  network from being hacked?   So they have a series of hardware

22  and software components by which they can see every device that

23  is -- that is connecting to the network and they can control

24  what devices connect to the network.   At the other end of the

25  cybersecurity world are companies that provide both hardware

Mark Turnage – Cross

1 and software solutions for your cell phone.  So, you know, to

2 keep your cell phone from being hacked.  And then there are

3 threat intelligence providers who monitor, for example, social

4 media for threats -- emerging threats to companies.  Those are

5 widely different solutions.

6 Q.  Do some companies in the cybersecurity industry offer what

7 can broadly be referred to as fraud prevention or fraud

8 protection services?

9 A.  Sorry.  Could you say that again?

10 Q.  Sure.  Do some companies within the cybersecurity industry

11 offer what can broadly be referred to as fraud prevention or

12 fraud protection services?

13 A.  Yes.  Although fraud is just an enormously broad term.  I

14 mean, it can mean very, very different things, depending on the

15 context in which it's employed.

16 Q.  So what would be an example of companies that offer

17 fraud-related services in the cybersecurity industry?

18 A.  Oh, I mean, there are -- there are companies that track

19 cash management in banks, and they have software solutions to

20 tell whether tellers are robbing -- stealing cash, stealing

21 money on a regular basis from their tellers.  That's at one end

22 of the spectrum.  At the other end of the spectrum I assume are

23 companies like Mr. Daline's, which are involved in the stream

24 of commerce, meaning, involved in a purchase transaction.  All

25 the way to companies that monitor credit card data and say --

Mark Turnage – Cross

1    and are able to detect that Mr. Turnage is suddenly spending

2    far more on his credit card than he ever has before, and there

3    is something gone wrong -- there is something wrong with that.

4    So fraud is just this very broad term.  I'd be surprised if you

5    found any cybersecurity company that didn't at some level use

6    the word "fraud."

7    Q.  And how do DarkOwl's services relate to fraud detection and

8    protection?

9    A.  Well, we guard against the fraud -- any fraudulent -- any

10   types of fraud that emerge from the darknet.  So one of the

11   primary uses of fraud which I testified about is use of

12   cryptocurrency in a fraudulent context.  Another example would

13   be, for example, on the darknet, techniques are bought and sold

14   by hacker groups for breaking into and stealing enterprise --

15   stealing from companies or defrauding the companies in some

16   fashion.  One of the things that is traded on the darknet are

17   these tools and techniques.  So there is just a broad variety

18   of different fraud use cases that our customers use to monitor

19   for the darknet -- anything that emerges from the darknet.

20   Q.  Does DarkOwl operate in the payments space at all?

21   A.  No, we don't have any customers in the payment space, *per

22   se*, or using us in a payment context.

23   Q.  Mr. Turnage, I believe you testified earlier that DarkOwl

24   spends a million or more dollars on marketing each year.  How

25   is that money used?

Mark Turnage - Cross

1   A.  Well, as I said, I think the biggest expenditure we have is

2   conferences and trade shows.  I think we spend roughly a

3   quarter million dollars a year on online advertising -- online

4   targeted advertising.  We have a staff.  We generate a lot of

5   content.  If you go to our website you'll be able to see on the

6   blog the type -- we publish content to establish thought

7   leadership in our industry.  We -- that's -- I mean, those are

8   the broad areas of expenditure.

9   Q.  I believe there has been some testimony on this before, but

10  I just want to make sure we have a clear record for it.  What

11  industry sectors are DarkOwl's customers typically from?

12  A.  Well, cybersecurity industry broadly, but specifically

13  inside that -- I think we've seen that on some of the exhibits

14  here -- threat intelligence, cybersecurity providers, services

15  providers, insurtech, fintech -- although -- fintech, as well

16  as governments, law enforcement, national intelligence.

17  Q.  And the individuals that you deal with as customers,

18  potential customers, those are -- tend to be individuals in the

19  C-suite; is that correct?

20  A.  That's correct.

21  Q.  And why is that?

22  A.  Well, for two reasons.  One is the -- the amount of money

23  it takes to buy a platform usually will go up to the C-suite.

24  Secondly, the -- the process -- the vetting process that we put

25  our customers through, if the purchasing decision is made below

258

Mark Turnage - Cross

1    the C-suite, the vetting process extends to the C-suite.  So we

2    have to make sure that we're selling to clients who are going

3    to treat the data in an appropriate fashion, not misuse the

4    data, and are not associated with either criminal gain or with

5    an adversarial nation state to the United States.  So even if

6    the purchasing decision is made below the C-suite, we often end

7    up talking to the general counsel, the chief technology

8    officer, the chief information security officer, and many

9    times, depending on the size of the company, the CEO

10   themselves.

11   Q.  We've heard a little bit about DarkOwl's vetting process,

12   but I'd like to ask you to explain in more detail the exact

13   nature of that vetting process for DarkOwl customers.

14   A.  Yeah.  It's one of the most difficult parts, to be honest,

15   and most expensive parts of selling our services.

16        So when a company comes in the door, we have to

17   establish whether they're a credible company, what -- who the

18   management team is, are they -- do they have credible financial

19   backers, and in some cases, can they pay the bills?  And so we

20   go through a vetting process where we do that research

21   ourselves.  We ask them questions ourselves.  And it becomes

22   far more complex outside the United States, because the type of

23   data that we have access to in the U.S. in the vetting process

24   is not widely available outside the U.S.  So almost always, if

25   we're outside the United States, we will visit the client

259

Mark Turnage - Cross

1   themselves.

2          And the reason for that is, the data we're sitting on

3   is so sensitive, that if it were in the hands of criminals or

4   if it were in the hands of somebody who misused the data, it

5   would reflect badly, obviously, on us.  It could be

6   catastrophic for us.

7          Then we get to the legal vetting.  This is the most

8   painful part of our process.  So I think earlier today we

9   mentioned an end user license agreement.  That end user license

10  agreement is highly unusual in the software business.  In fact,

11  I've never seen another one like it.  It effectively transfers

12  responsibility for the misuse of that data onto the client

13  themselves.  And that is a document that is negotiated to death

14  by our lawyers and by our prospective client's lawyers.  There

15  is a subscription agreement.  If the client adheres -- which

16  most companies do today to GDPR -- there is an entire document

17  covering the GDPR regulations and how we conform and where we

18  don't conform with GDPR regulations.  And then oftentimes there

19  will be confidentiality agreements, as well as other side

20  contracts, depending on the use case.  It can take -- our

21  normal sales process takes between 90 and 180 days; and in some

22  cases, it can be quite a bit longer.

23          I mean, we recently concluded a negotiation with a

24  German client where we, on our side, had three separate law

25  firms dealing with the client, with the documentation.  One in

Mark Turnage - Cross                                    260

 1   Germany, one in London, one in the U.S., dealing with various

 2   elements of the legal agreements.  And we successfully

 3   concluded them, but it was an extremely -- it's extremely

 4   painful, and it's the most difficult part of our sales process.

 5   Q.  I hope that that U.S. firm was Perkins Coie.  We'll come to

 6   that later.

 7        And you've had to turn away customers before because

 8   of something that comes up in the vetting process; correct?

 9   A.  It happens all the time.

10   Q.  Mr. Turnage, can you explain the pricing model for

11   DarkOwl's services?

12   A.  Yeah.  We are what is called a software-as-a-service

13   business.  And software-as-a-service business encompasses a

14   very, very broad range of different ways.  But what it means is

15   that you're paying a fee to subscribe to a software package.

16   And probably most of the people in this courtroom knowingly or

17   unknowingly subscribe to some sort of a software-as-a-service

18   package.

19        If you are, for example, on LinkedIn and you subscribe

20   to one of LinkedIn's premium packages, you're a

21   software-as-a-service buyer.  But we sell our process -- we

22   sell our product and our platform as a subscription.  So you

23   subscribe for a year or longer, in the case may be.  And our

24   entry point starts at about $30,000 and goes up to about half a

25   million dollars a year.

Mark Turnage – Cross

261

1   *Q.*  I believe you testified a moment ago that the contracting

2   process can take, like, three to six months.  I'm assuming you

3   have more than one conversation with the customer throughout

4   that process?

5   *A.*  Oh, yes.

6   *Q.*  So these are not light purchasing decisions being made

7   by -- these are not light purchasing decisions being made by

8   the customer?

9   *A.*  Did you say light?

10  *Q.*  Light, L-I-G-H-T.

11  *A.*  Not at all.

12  *Q.*  I need to briefly show an exhibit that is attorneys' eyes

13  only, if I could ask Mr. Daline and his wife to briefly leave

14  the room.

15         *THE COURT:*  All right.  And the record should reflect

16  that Mr. Daline and his wife have left the courtroom.

17         *MR. BUXBAUM:*  Could you please show the witness

18  Exhibit 14.

19  *BY MR. BUXBAUM:*

20  *Q.*  Mr. Turnage, do you recognize this document?

21  *A.*  Yes.  This is our subscription agreement for a client

22  called ██████.

23         *MR. BUXBAUM:*  Can you -- can you just scroll down,

24  Hunter.

25

Mark Turnage – Cross

1   *BY MR. BUXBAUM:*

2   *Q.* Let me know, Mr. Turnage, if you want to see a different

3   page of this. I don't think it's particularly long. But do

4   you recall -- or you can look at the document -- what services

5   were being provided under this agreement?

6   *A.* Yes. ████████ primarily accessed our data -- they're a

7   threat intelligence platform. So they primarily accessed our

8   data through a vision API, which gave them access to our

9   database through -- on a machine-to-machine basis. In other

10  words, their computers talked to our computers. We did

11  actually I believe also give them one or two UI licenses --

12  meaning analyst licenses -- so they could use it to help

13  program their API access to our system.

14  *Q.* And I believe this showed that the contract was for

15  $180,000 for 13 months of services.

16  *A.* I can't see the pricing on the screen, but I'm sure it's in

17  there somewhere. There it is.

18  *Q.* Is that correct?

19  *A.* That's right. So they had 250,000 monthly API calls to our

20  database, and then two seat licenses for their development

21  team. They didn't have an analyst team. It was $180,000. I

22  believe this contract increased to over $200,000 during the

23  life of this 13-month contract.

24  *Q.* And this is one example of a subscription agreement. Is it

25  fair to say that this is a representative sample of a DarkOwl

Mark Turnage - Cross

1    subscription agreement with a customer?

2    *A.*  Yes.  It's a standard template that is used for all of our

3    customers.

4    *Q.*  And what about this particular contract -- this one was

5    $180,000 over 13 months.  How does that fit into the range of,

6    you know, more revenue or less revenue?

7    *A.*  Yeah.  I think our average size of our customer, as I said

8    earlier, I think is about 55 or $60,000.  The entry point for

9    getting access to our platform is about $30,000.  The biggest

10   customer we have is probably half a million dollars a year in

11   revenue -- in pricing.

12        *MR. BUXBAUM:*  You can take this down.  And we can have

13   Mr. Daline come back in.

14        (Hearing continued in open court.)

15   *BY MR. BUXBAUM:*

16   *Q.*  Mr. Turnage, yesterday the judge asked Mr. Daline to walk

17   her through just sort of on a practical basis what it looked

18   like for a user to use the ArkOwl service.  Could you do

19   something similar here and give us an example of what it would

20   look like for a DarkOwl user to utilize DarkOwl data and search

21   inquiries and what that might look like?

22   *A.*  Sure.  So depending on how -- depending on, obviously, the

23   use case of the client and depending on how they're accessing

24   the platform, that can be quite different.  But I'll give you

25   an example of an analyst using our user interface.

Mark Turnage – Cross

1      We had a client -- we actually had a prospect at the

2   outset of the Ukraine-Russia war who came to us and said that

3   one of their clients was concerned about possible exposure of

4   that client in Ukraine.  And so they asked if we could do -- if

5   they could search on our platform to see what exposure that

6   company may have in the Ukraine.  And as it turned out, we

7   discovered that that company had recently signed a

8   multi-hundred million dollar software development company --

9   contract with a Ukrainian entity.  It didn't take -- the point

10  of entry, by the way, for the search of our database was the

11  domain of that company.  And using the domain, we got to a set

12  of information in the darknet that indicated that, in fact, the

13  software company with whom they had signed the contract had

14  been penetrated and compromised by the FSB, the Russian

15  intelligence service, and that information was only piecing

16  together pieces of information that were available on our

17  platform.

18      They took that information to the FBI, and they

19  canceled the contract.  So that's a case where an intelligence

20  analyst, using a domain as an entry point into the platform --

21  I want to know what is in the darknet about this company --

22  found that that company had been very badly exposed to a

23  company that was penetrated by Russian intelligence.

24      At the other end of the spectrum, you know, we have an

25  entity end point -- an API end point on IP addresses.  The vast

Mark Turnage – Cross

1    majority of IP addresses that show up in the darknet are

2    targeting data.  Meaning, two hackers saying, here is an IP

3    range or an IP addresses; I have access to this IP; I have

4    access to this company.  And so subscribers to that service

5    will continually hit that API with their own IP addresses or

6    the range of IP addresses that they use.  And if something

7    comes up -- if they get a hit -- meaning our IP address has

8    been mentioned in the darknet -- they will then go and look at

9    the context and see if in fact they're actively being targeted

10   by -- actively being targeted by malicious actors in the

11   darknet.

12           We have another API end point, which is scores.  And a

13   company can get access to their scores and see how exposed they

14   are as an entity, as an organization, on the darknet, as a way

15   of assessing whether their company is at risk from malicious

16   actors.

17           So the answer to your question is, it depends on the

18   use case.  But the use cases are many and they're varied.

19   Q.  Mr. Turnage, as you know, DarkOwl filed this case seeking a

20   declaration from the Court of non-infringement.  And as you

21   heard Mr. Daline testify, they are requesting that DarkOwl be

22   required to rebrand, move away from the DarkOwl mark.  Why have

23   you been resistant to move away from the DarkOwl mark?

24   A.  Well, we've spent now six years and millions and millions

25   of dollars building DarkOwl into one of the premier brands in

Mark Turnage - Cross

1    the darknet threat intelligence space -- darknet data and

2    intelligence space.  And we have a brand that is very widely

3    recognized in the area of darknet, in that narrow niche of the

4    cyber industry.  So I'd be loath -- and, frankly, a good

5    percentage of the millions of dollars that we have put into

6    that are mine -- it's my money and my partner's money, Russ

7    Cohen.  We took the assets of this company -- the beginnings of

8    that company out of bankruptcy, bought them from another

9    company, and have spent time building that.  There is a lot of

10   brand loyalty, and there is a lot of brand awareness around the

11   DarkOwl brand in our niche, in our industry.

12   Q.  And do you have any indication that there is going to be a

13   problem regarding confusion with ArkOwl or its services?

14   A.  I've never heard of ArkOwl outside the context of this

15   litigation.  We've never had a conversation with anybody about

16   ArkOwl.  They've never been approached -- we've never been

17   approached about ArkOwl.  And I wouldn't know they exist except

18   for having received a cease and desist letter from them.

19            MR. BUXBAUM:  I have no further questions for you,

20   Mr. Turnage.  Thank you.

21            THE COURT:  Thank you.  Is there any redirect,

22   recross?

23            MR. FRASIER:  Your Honor, I have maybe five minutes of

24   questions.  Could we have a short recess to confer before we do

25   that?  Understanding your time limits.

Mark Turnage – Redirect

1          THE COURT:  Certainly.  Why don't we take a recess,

2     then, until a quarter to noon; and we'll resume at that time.

3     Thank you.

4              (Recess at 11:32 a.m.)

5              (In open court at 11:46 a.m.)

6          THE COURT:  Mr. Turnage -- if you can -- do we have

7     any further redirect or recross?

8          MR. FRASIER:  Yes, Your Honor.  Just a few.

9          THE COURT:  All right.  Thank you.

10         Mr. Turnage, could you take the witness stand again.

11         And, Mr. Frasier, whenever you're ready.

12                       **REDIRECT EXAMINATION**

13    BY MR. FRASIER:

14    Q.  Mr. Turnage, a little bit ago you testified about what

15    DarkOwl is doing with digital identity protection.

16    A.  Yes.

17    Q.  I want to be clear, though, DarkOwl is not actually doing

18    anything with data; right?  It's only providing data.

19    A.  That's correct.  Sometimes we will tokenize or sort the

20    data or curate the data for our clients, but we don't do

21    anything with the data.

22    Q.  So --

23    A.  The exception to that is, some of our scoring products

24    physically take the data, process it through an algorithm, and

25    generate a numerical score.  In that case, we're providing the

Mark Turnage – Redirect

1    customers with a numerical score as an indication of risk.  And

2    then they're able to access our system on daily or weekly or

3    however often basis they care to and see whether their score

4    has gone up or down.  In that case we're actively using the

5    data.

6    Q.  Understood.  Other than using the score product, DarkOwl

7    simply provides the data being requested.  And your testimony

8    is more about what your customers may be using the data for?

9    A.  Broadly, yes.

10   Q.  You testified a little bit about what results may be

11   returned from a DarkOwl user entering searches, whether it's an

12   actual human being user or a computer via API.  When someone

13   searches DarkOwl's database for an email, you testified that it

14   would return some of the metadata.  I want to narrow it down a

15   little bit.  It could include the person's name associated with

16   that email address?

17   A.  No.

18   Q.  It never includes the name associated?

19   A.  Almost never.  I may have seen it a handful of times, but

20   very, very rarely is there an attribution of an email address

21   to an actual name.

22   Q.  The person associated with that email does not appear in

23   the darknet?

24   A.  It can.  Hypothetically, it can.  It almost never does.

25   Q.  It can include a phone number associated with that email

Mark Turnage - Redirect

1   address?

2   *A.*  If -- the context in which a phone number may or may not

3   appear -- may appear with an email address is if somebody's

4   entire identity as been doxed.  Doxing means, somebody has

5   stolen private information in bulk about an individual.

6           So, for example, this happens with CEOs of major

7   corporations.  Malicious actors who target the corporation will

8   gather up, you know, the name, address, health records, phone

9   number, email address, kids' information, wife's information,

10  and dump it into the darknet.  And they do that as a targeting

11  exercise, because what will happen is other malicious actors

12  will then jump on that data and use it to harass the CEO of the

13  company.  So in that case, you might find a phone number

14  associated with an email address.  But in almost no -- in

15  almost no other cases can I think of a case where a phone

16  number is associated with an email address.

17  *Q.*  Data breaches posted on the darknet don't typically contain

18  the names of the email?

19  *A.*  The vast majority of data breaches that appear on the

20  darknet are simply emails and passwords, not phone numbers --

21  I mean, there are some data breaches that would have --

22          I'll give you an example.  We mentioned the FBI -- I

23  mentioned the FBI breach.  That one had FBI agents' phone

24  numbers -- their phone numbers associated -- you know, in the

25  same line with their email addresses, with their home address

Mark Turnage – Redirect

1   and so on.  That's an example where it might happen.

2   Q.  Now, if a data breach included a name associated with an

3   email, DarkOwl's search results would provide that data;

4   correct?

5   A.  Yes.

6   Q.  Okay.  It --

7   A.  It's not a common use case because there so rarely are

8   names associated with emails in the darknet.

9   Q.  What about social media handles?

10  A.  We don't cover social media.

11  Q.  And to be clear, I'm talking about when somebody searches

12  for an email address, would social media handles associated

13  with that email address appear as search results?

14  A.  I've never seen that actually in the darknet.

15  Q.  Social media handles don't appear in data breaches?

16  A.  I've never seen a social media handle appear in a darknet

17  data breach.

18  Q.  What about physical addresses?

19  A.  Sometimes, yes.

20  Q.  All right.  So that would sometimes be returned -- would be

21  a result when a person searches an email address?

22  A.  Sometimes, yes.

23          MR. FRASIER:  I don't have any more questions.

24          Thank you, Your Honor.

25          THE COURT:  Thank you.

1        Thank you, Mr. Turnage.  You may step down.

2            THE WITNESS:  Thank you.

3            THE COURT:  And I think I know the answer to this

4    question, but are there any more witnesses for the defendant?

5            MR. FRASIER:  No, Your Honor.

6            THE COURT:  Are there any more witnesses for the

7    plaintiff?

8            MR. HOLT:  There are not, Your Honor.

9            THE COURT:  All right.  That concludes the

10   presentation of the testimony.  Now let's talk about further

11   proceedings.

12           Are there any motions that any party wishes to make at

13   this time?  I hope the answer to that is no, because, frankly,

14   this is not a typical halftime situation.  We've presented all

15   the evidence now.  The Court wants to rule on -- in writing,

16   and I think that's a more appropriate way for me to rule.  And

17   I want you to also submit revised proposed findings of fact and

18   conclusions of law which tie to the testimony that was

19   presented.

20           I appreciate the effort that you made to submit

21   proposed findings of fact and conclusions of law in advance of

22   the trial, but now I want something that is more specific that

23   relates to the evidence that the Court has heard.  So you're

24   going to have to order a transcript.  I don't really care which

25   side of the equation does that.  I think it would be most fair

 1    if you simply split the cost of the transcript.  But you'll

 2    have to order the transcript, get the transcript, and then

 3    submit your proposed findings of fact and conclusions of law.

 4          We'll talk about closing arguments.  I haven't

 5    forgotten closing arguments.  But let's get this out of the way

 6    first.  What's a reasonable time frame in light of the volume

 7    of testimony presented -- let's say it's going to be a week for

 8    a transcript, what's a reasonable time period for you all to

 9    submit revised proposed findings of fact and conclusions of

10    law?

11          Mr. Holt, want to take a shot at that, bearing in mind

12    that on August 4, I will no longer be employed in this

13    position, and I have to get this order out prior to that,

14    because it's been my trial, and I've presided, I'm not going to

15    dump it in the lap of a new judge who did not preside.

16          MR. BUXBAUM:  Working backwards, not that we want to

17    go to the end, but how much time will you need from the time

18    you get our revised findings of fact, you're going to look at

19    the transcript yourself?

20          THE COURT:  I'd like to have a couple of weeks.  So,

21    you know, today is June 27.  So I have exactly five weeks and

22    three days left on the bench.  So if we presume you can get a

23    transcript -- there is a holiday next week, of course, as well.

24    But if we presume you can get a transcript by -- let's say the

25    5th, then.  She's going to shoot for Monday, we'll say

1    worst-case scenario would be the 5th, Wednesday.  If you got me

2    your amended proposed findings of fact and conclusions of law

3    by no later than July 19 -- which is two weeks after July 5 --

4    I'd feel comfortable that I can get an order out -- it may be

5    on August 4, but by August 4.

6         MR. HOLT:  That's certainly reasonable from our

7    perspective.

8         THE COURT:  Will that work for the plaintiff?

9         MR. HOLT:  Yes.

10        THE COURT:  Defendant, as well?

11        MR. FRASIER:  Yes, Your Honor.

12        THE COURT:  All right.  Great.  We've got that taken

13   care of.  I'll leave it to you to do what you need to do to

14   order transcripts.  But the parties will submit amended

15   findings of fact and conclusions of law with citations to the

16   evidence as presented by the parties on or about July 19.

17   Then --

18        MR. HOLT:  Your Honor --

19        MR. BUXBAUM:  Your Honor, I'm sorry.  Is it -- is it

20   just findings of fact; or is it the legal piece, as well?

21        THE COURT:  Well, I'll leave it to you as to whether

22   you think you need to amend the conclusions of law or not.  I

23   think that's fair.  If you think your conclusions of law

24   already adequately cover what you need to cover, then you may

25   stick with them.  It would be extremely helpful to the Court if

274

1    you could give citations to the record that support the

2    conclusions of law -- or the pieces of the record that you

3    think that support the conclusions of law.  That's really the

4    amendment that I was referring to more than anything else.  But

5    I'll leave it to you.  You do what you think is best under the

6    circumstances.

7            All right.  So that takes care of the issue of the

8    amended proposed findings of fact and conclusions of law and a

9    written order.

10           Now, closing statements.  So I take it you still want

11   to do closing arguments tomorrow morning.  Am I wrong in that

12   assumption?

13           MR. FRASIER:  You're right, Your Honor.

14           THE COURT:  Okay.  Well, I mean, let me ask you about

15   that.  It's very unusual to delay the closing argument in a

16   hearing or trial that's had so few witnesses.  You had three

17   witnesses; and all three testified previously, as well.  So

18   convince me that I should give you the entire afternoon to put

19   your closing arguments together for tomorrow morning.

20           You know, I just -- it seems like a stretch to me.  If

21   there is something else you need to do this afternoon, just

22   come clean and tell me that there is something else you need to

23   do this afternoon.  But if you really think you need the time

24   for the closing arguments, you're going to have to explain why

25   you think you need all of that time to get a cogent closing

1    argument together.

2            Let's start with you, Mr. Holt.

3            MR. HOLT:  Your Honor, we would prefer to do it

4    tomorrow morning; but we have no compelling reason for that

5    other than we would like to have the additional time.  If Your

6    Honor would prefer to have it this afternoon, we'll be ready to

7    go.

8            THE COURT:  All right.  Fair enough.

9            Mr. Frasier.

10           MR. FRASIER:  I agree with that.  The -- the most

11   compelling argument I have, Your Honor, is that we submitted

12   all of the exhibits without testimony regarding a lot of the

13   exhibits.  So part of the closing arguments are going to, I

14   imagine on both sides, tying in exhibits and the contents of

15   those exhibits that weren't testified to.  So it may appear --

16   it may be more work than it appears to tie everything together

17   in a closing.  But we can be ready this afternoon.

18           THE COURT:  All right.  Let's ask this question:  How

19   much time do you think you're going to need for a closing?  How

20   much time would you like to have?

21           Mr. Holt?

22           MR. HOLT:  I'm thinking roughly the amount of time I

23   spent on the opening, which is about 25 minutes, Your Honor.

24           THE COURT:  Okay.  How much time do you think,

25   Mr. Frasier?

1          MR. FRASIER:  I would expect no more than half an

2     hour, 20, 25 minutes.

3          THE COURT:  How about if we do closing arguments this

4     afternoon beginning at 3:30?  That gives you three and a half

5     hours between now and then to get your closing arguments

6     together.  And by that -- by starting at 3:30, I can be assured

7     that we'll be done by around 5:00, which is when I would like

8     to be done.  I don't want to push you too hard; but given the

9     unique circumstances here involving what else I have to do on

10    my race to the finish, I would greatly appreciate having

11    tomorrow morning available for other matters.  So if you think

12    that this would not be detrimental to you, to do it that way,

13    I'd appreciate your cooperation.

14          Mr. Holt, what do you think?

15          MR. HOLT:  We're agreeable, Your Honor.

16          THE COURT:  Mr. Frasier.

17          MR. FRASIER:  That's fine with me too, Your Honor.

18          THE COURT:  All right.  So in keeping with the way we

19    have handled things so far, I would assume Mr. Frasier would go

20    first with his closing argument.  Is that what you're

21    anticipating?

22          MR. FRASIER:  That works for me, Your Honor.

23          MR. HOLT:  Yes.

24          THE COURT:  Is that fine with Mr. Holt, as well?

25          MR. HOLT:  Yes.

277

1          *THE COURT:*  Thank you.  I appreciate it counsel.  I do

2     think you'll be able to have shining closing arguments with the

3     amount of time that I've giving you.

4          So let's reconvene at 3:30, and we'll plan to start at

5     that time with the defendants' closing argument.  And I'll see

6     you then.  Thank you.

7          (Recess at 11:59 a.m.)

8          (In open court at 3:36 p.m.)

9          *THE COURT:*  Good afternoon.  We're back on the record

10    in 21-cv-2136.  Is the plaintiff ready to proceed with respect

11    to closing argument?

12         *MR. HOLT:*  We are, Your Honor.

13         *THE COURT:*  Is the defendant ready to proceed?

14         *MR. FRASIER:*  Yes, Your Honor.

15         *THE COURT:*  Mr. Frasier, I'll hear from you first.

16                       **CLOSING ARGUMENT**

17         *MR. FRASIER:*  DarkOwl made the deliberate decision to

18    market to companies and solicit companies that happened to be

19    customers or potential customers of ArkOwl, including some of

20    ArkOwl's most important and prominent customers.  In those

21    solicitations and in its marketing, DarkOwl offered services

22    that sound very similar to or related to what ArkOwl offers

23    those same customers.  DarkOwl's use of its mark in connection

24    with those services in its marketing material is likely to

25    cause confusion -- very likely to cause confusion in the

1  marketplace, in general.

2       Now, DarkOwl would have this court believe there

3  should be a bright line drawn -- the only actionable confusion

4  is confusion as to origin at the time a purchasing decision is

5  made.  The Lanham Act is designed to prevent multiple types of

6  confusion, including affiliation confusion, association

7  relationship between the two companies and their services.

8  It's also meant to prevent confusion at the time of multiple

9  different steps, and that's because the Lanham Act recognizes

10 that marketplace confusion itself is harm to a company's brand

11 and reputation.

12       At the end of trial, the evidence overwhelmingly

13 demonstrates that DarkOwl's use of its mark is likely to cause

14 confusion in the relevant marketplace.

15       Now, any trademark infringement case begins with the

16 question of ownership and priority.  ArkOwl is a mark

17 immediately protectable.  And there is dispute it has been

18 continuously and exclusively using that mark.  The question was

19 a priority, or whether ArkOwl had effectively penetrated the

20 relevant market before DarkOwl had registered its marks in

21 2017.  ArkOwl established that at trial in two different ways.

22 First, these two companies are software-as-a-service companies

23 who interact with their customers and provide their services

24 online.  DarkOwl testified that it made a strategic decision

25 that geography isn't particularly relevant to how it markets

1    itself or interacts with its customers.  And there is no

2    dispute that ArkOwl had penetrated the internet marketplace

3    well before DarkOwl existed.  But even looking at it in a

4    breakdown of state by state within the United States, ArkOwl

5    established that it had effectively penetrated all 50 states

6    well before DarkOwl registered its marks.

7         It did so not only through testimony and offering

8    examples of invoices, demonstrating the location of many of its

9    customers, dating from 2012 through 2015, it also offered

10   Exhibit 327, which was a document that demonstrates where and

11   when ArkOwl appeared by state -- it was the first time ArkOwl

12   appeared in each state.  And it demonstrates that ArkOwl was

13   there from 2012, as I believe the latest one was 2013 or 2014,

14   well before DarkOwl registered its marks.

15        It also established its market penetration through

16   Exhibit 423, which demonstrated the number of new users, the

17   number of sessions of ArkOwl users by state from the period of

18   ArkOwl's inception through the relevant date in 2017.  And

19   Exhibit 423 shows there were many thousands of people in each

20   state using ArkOwl's website -- using ArkOwl's services

21   hundreds of thousands of times well before DarkOwl ever

22   registered its mark.  Whether the relevant market is geography

23   or just the internet, ArkOwl established it has ownership and

24   priority of the ArkOwl mark.

25        The second question in any trademark infringement

1    case, whether there is a likelihood of confusion, is once again

2    a continuum and not a bright line, although there are six

3    factors that the Tenth Circuit considers.  Courts have said

4    that the single most important factor is how similar the marks

5    are, similar -- similarity in how they appear, how they sound,

6    and in their meaning.  And similarities are to be measured not

7    only as a whole instead of breaking it down as in component

8    parts, but the similarities are supposed to be weighed more

9    heavily than any differences.  And in all meaningful senses,

10   the two companies' marks here are nearly indistinguishable in

11   sight, sound, and meaning.

12          First of all, both companies testified that neither

13   mark ever appears just as a component.  DarkOwl never

14   advertises just as "Dark" or just as "Owl," and ArkOwl doesn't

15   either.  Both marks are always presented in their entirety, or

16   ArkOwl, LLC, or www.ArkOwl.com, and the same with DarkOwl.  So

17   comparing these two marks shouldn't be done on a granular

18   basis.  Regardless, the sight, sound, and meaning of both of

19   these words, there is only one difference, that is really the

20   first letter of DarkOwl's name.

21          THE COURT:  How could you say the meanings are

22   similar?

23          MR. FRASIER:  For two reasons, Your Honor.  First,

24   neither of these marks has a meaning.  DarkOwl doesn't mean

25   anything, and ArkOwl doesn't mean anything.  To the extent the

1    Court would break down the component parts and ask what the

2    meanings of the components of these marks are, they have very

3    similar meanings.  It's a modifier ending in "owl," ArkOwl or

4    DarkOwl.  Those meanings -- to the extent the layperson would

5    look at the mark ArkOwl and try to attribute meaning to it --

6    hinges on -- it's something to do with an ArkOwl.  ArkOwl

7    conveys a meaning, to the extent it conveys any meaning at all,

8    something about an owl.  That's the same with DarkOwl.  So they

9    have very similar meanings, to the extent they have any meaning

10    at all.  But as a whole, neither mark has any meaning.  ArkOwl

11    and DarkOwl aren't used at all except for in reference to these

12    two companies.

13           They sound nearly identical, especially in common

14    speech.  In casual conversation, it's -- it's almost inevitable

15    that somebody is going to say and -- and DarkOwl and ArkOwl,

16    and it's impossible to tell which company is being referenced.

17           And the similarities in how they appear are also

18    nearly identical, again, with just the difference being the

19    first letter in "dark."  They are present either in all caps or

20    with the first letter and the "O" in "owl" capitalized.

21           Now, because these two marks are so similar, nearly

22    identical in all relevant ways, that factor weighs strongly in

23    favor of likelihood of confusion.  No one dispositive factor is

24    dispositive because they're so closely similar.

25           The other factors -- other five factors weigh less

1    heavily.  Certainly, there would need to be factors weighing

2    strongly against a likelihood of confusion to overcome the

3    similarity factor.

4         The strength of ArkOwl's mark is also an important

5    factor.  Strong marks are afforded greater protection.  The

6    strength of a mark is broken down into conceptual and

7    commercial strength.  The evidence at trial showed that ArkOwl

8    is both conceptually and commercially strong.  Conceptual

9    strength is on a continuum.  It ranges from generic -- not

10   protectable -- to descriptive, suggestive, arbitrary, and

11   fanciful, which is the strongest mark.

12        As the evidence showed and I just argued a minute ago,

13   ArkOwl itself has no meaning.  It is a fanciful mark.  It

14   doesn't -- it doesn't convey any meaning other than as a

15   reference to a source of a service.

16        THE COURT:  Does the failure to immediately register

17   the mark have any bearing to the analysis of the strength of

18   the mark?

19        MR. FRASIER:  Yes, Your Honor.  To the extent the

20   trademark office required proof of secondary meaning that would

21   indicate it was descriptive, that is not the case here.  It was

22   immediately registered.  So the mark is not descriptive.  And

23   to the extent it's suggestive at all, it is very -- it's a

24   major stretch to get from ArkOwl to a software-as-a-service

25   data company in the cybersecurity industry.

283

1        Certainly, a connection came to mind thinking of

2   "owl," but it's a large stretch to go from "owl" to providing

3   fraud prevention services as a software as a service.  ArkOwl's

4   mark is conceptually very strong and afforded broad protection.

5        Commercial strength is ultimately a question of

6   consumer recognition.  Courts consider all different sorts of

7   evidence on commercial strength.  Sometimes it's surveys;

8   sometimes it's circumstantial evidence, like the amount of

9   money spent on marketing.  But in those cases, the question

10  isn't how much money was spent on marketing, it was the effect

11  of that marketing.  Here, the evidence at trial demonstrated

12  that the effect of ArkOwl's marketing, regardless of the amount

13  of money it spent -- ArkOwl is recognized in its industry by

14  its name.

15       The evidence that established that, first of all, was

16  the breadth of its use.  Exhibit 423 demonstrated that it had

17  approximately 90,000 unique users from 2011 through 2017,

18  90,000 different people were interacting with ArkOwl on its

19  website and its services over tens of millions of times in that

20  period of time.

21       Exhibit 424 demonstrated that there were tens of

22  millions of queries, including millions of queries annually by

23  manual review.  Manual isn't when the computers are talking to

24  each other; this is when an individual goes to ArkOwl's

25  database and runs a search.  The evidence shows that ArkOwl's

284

1   name has been in front of many, many people millions of times.

2           The evidence also demonstrated that consumers

3   recognize ArkOwl as a reference to the company.  There were a

4   few dozen exhibits submitted that were LinkedIn profiles.

5   These were individuals trying to market themselves; and in

6   doing so, they said, I know ArkOwl.  They did so understanding

7   that the market would recognize ArkOwl as a particular service.

8   That just demonstrates that both they and who -- they were

9   targeting for their jobs understood that ArkOwl is a recognized

10  name.

11          Another question on commercial strength is how common

12  the name is.  A name that is relatively common in the industry

13  is less commercially strong.  Now, this is one of the times in

14  the case where DarkOwl tried to take differing definitions --

15  you know, a broad definition versus a narrow definition.  In

16  this case, it was cybersecurity.  And DarkOwl attempted to

17  present evidence that "owl" is a relatively common name in the

18  cybersecurity industry.  But in doing so, it presented, I

19  believe, nine registrations that were in what they would have

20  defined as a broader cybersecurity industry of 14,000

21  companies.  We know that by looking at those registrations,

22  each of those registrations -- most of those registrations had

23  nothing to do with either of these companies.  They were

24  hardware, tracking, driving habits, things of that nature that

25  were -- while they might be defined in the broader

1    cybersecurity industry, weren't related to ArkOwl or to DarkOwl

2    in any meaningful way.

3         Moreover, for most of them, all they had in common

4    with ArkOwl's mark is it had an owl in it with many

5    distinguishing characteristics.  None of them said "ArkOwl."

6    Many of them had multiple syllables or many words.  Many of

7    them began with the word "owl," so it was in a way that would

8    be immediately distinguishable.

9         If we're looking at nine examples in 14,000 cases,

10   "owl" is relatively rare in the broader cybersecurity industry.

11   But we also looked at documents that were in the more relevant

12   industries -- quite a few documents, in fact -- and "ArkOwl"

13   was never present.  And there may have only been one or two

14   instances where anyone had a name including the world "owl."

15   Specifically, Exhibit 4, page 7 was a document that DarkOwl

16   testified -- page 7 included a graphic that was designed to

17   describe a relatively broad subsection of the cyber industry.

18   And in that graphic, there weren't "ArkOwl," and there weren't

19   the "owl" registrations that we have looked at.

20        Page 18 of that same exhibit included many names of

21   companies in the cyber industry.  I believe there was

22   Cowbell.com, but beyond that there were no other companies with

23   "owl" in its name.  Certainly no "ArkOwl" companies.

24        The same goes for the spreadsheet, Exhibit 5.  Tab 3

25   had many names of many different companies in the more niche

1    cybersecurity industry, none of which contained "ArkOwl," and

2    maybe one had "owl" in it.

3         We looked at the Paladin report, which contained 46

4    companies.  None of them had "owl" in their name, other than

5    ArkOwl.

6         We looked at two About-Fraud graphics, each of which

7    had about 100 different companies in it.  And, again, there

8    were no other companies with "owl" in its name.  There are also

9    two publications discussing ArkOwl's industry, Exhibit 348 and

10   349, one published by an industry organization, one published

11   by a competitor.  Although both of those publications listed

12   between ten and twenty other companies in this industry, there

13   were no "owl" companies, and certainly no "ArkOwl" companies.

14        So the only examples of other companies that use the

15   "owl" name are in far afield industries that only -- that have

16   no relationship to ArkOwl or DarkOwl.

17        So whether we're looking at the broad industry or a

18   narrower subset of that industry, ArkOwl is unique.  And the

19   "owl" portion of it is also, if not unique, very, very rare; so

20   that makes this mark commercially strong, as well.

21        Now, because ArkOwl's mark is commercially strong, it

22   is afforded broader protection against marks that aren't as

23   closely related.  But the evidence at trial showed that the

24   other -- another likelihood of confusion factor, the

25   competitive proximity or the similarity of products and the

1   manners of marketing, also weigh in favor of a finding of

2   likelihood of confusion.

3          Again, DarkOwl's evidence was presented in a manner

4   that suggested a bright line should be drawn -- either they're

5   direct competitors or they don't compete at all.  In this

6   context, there is a continuum, explicit doctrine in the Tenth

7   Circuit called the Related Goods Doctrine that protects marks

8   from other similar marks when those services are in similar

9   fields, in fields where people might think they are related

10   even if they don't think that they are directly competitive.

11          So there was a lot of contradictory evidence presented

12   at trial about DarkOwl's marketing and its manner of marketing

13   and its target market.

14          What do we know?  First, the evidence established that

15   DarkOwl's marketing and target market is always changing.  And

16   that's not a bad thing.  DarkOwl has demonstrated that it will

17   pivot to different business opportunities and different methods

18   of marketing as the opportunities arise and to take advantage

19   of business opportunities.  For example, DarkOwl's Exhibit

20   No. 2 shows DarkOwl's product history and shows how each year

21   it has evolved to offer new, distinct, different products to

22   satisfy different customers' needs.

23          We know that DarkOwl started by trying to sell to

24   banks, to retail, and to healthcare.  That was the testimony.

25   In 2017 we also know that DarkOwl pivoted to focus primarily on

1    cybersecurity companies because cybersecurity reached out to

2    DarkOwl and said, Hey we think we can use your services.  It

3    was at that point in 2017 that DarkOwl decided, we should try

4    to sell to cybersecurity services.  We also know the next year,

5    in 2018, while it was selling to cybersecurity services, it was

6    trying to sell to non-governmental organizations when it made a

7    pitch to the chief risk officers in 2018.

8         Now, in a company deck from 2018, which was Exhibit 3,

9    we also know that in 2018, DarkOwl targeted credit monitoring

10   bureaus, identity theft companies, cybersecurity companies,

11   insurance companies, and MSSPs.

12        Exhibit 11, which was created by the company's CFO and

13   president, was created in 2019.  And he explained that DarkOwl

14   as of 2019 was still learning the market.  We know that at that

15   time, that document identified the customers of DarkOwl by

16   industry, and at that time it only had a handful of

17   governmental clients.  In that document, the president and CFO

18   presented to the sales team that DarkOwl should focus on lead

19   generation and that DarkOwl needed way more clients to be

20   successful and that it thought it had thousands of potential

21   clients.

22        The next year we know that DarkOwl followed that

23   advice and did pivot in part at least to lead generation.  It

24   hired a lead-generation company; it kept that company for a

25   year.  It had the ability and responsibility to control that

1    company's messaging, and it ensured that that company's

2    messaging appeared as though it was coming from DarkOwl.

3    DarkOwl knew that that company would be casting a larger net

4    and let it operate for at least a year.  We also know that

5    DarkOwl secured a few clients through that lead-generation

6    company at a time when it only had 50 clients.  So a few

7    clients isn't insignificant.

8          We know that that lead-generation company also

9    solicited at least two of ArkOwl's clients.

10         We know the next year, in 2021, DarkOwl hired an

11   executive vice president of sales who had a different vision

12   for DarkOwl.  That year, the -- first of all, before hiring

13   that person -- well, I guess it was shortly after hiring the

14   executive vice president, the president presented to the sales

15   company -- this is Exhibit 9 -- offering a sales strategy on

16   page 13, suggesting that they should target less sophisticated

17   people.  And the breakdown of customers that DarkOwl had, which

18   was on page 6, shows that DarkOwl still had the vast majority

19   of its customers that were not in the government.

20         Now, while it was working on its lead -- with its

21   lead-generation company, it hired a head of sales in March, who

22   worked at DarkOwl for several months before making his pitch.

23   His first pitch was in Exhibit 4, which was presented to the

24   sales team.  Now, that head of sales wanted to pivot not to

25   lead generation, but to inbound -- rather, to creating content

1    to drive customers to DarkOwl's website and make sales that

2    way.  That's what DarkOwl did for a time.  But the head of

3    sales also wanted to focus on big-data customers, and this was

4    a point of contention that we heard testimony about.  After

5    having worked at DarkOwl for multiple months, he made the

6    pitch.  He identified big-data customers as potential clients,

7    and he identified all the different use cases that those

8    big-data customers could use DarkOwl's data for.

9         That Exhibit 4 included paragraphs talking about how

10   they should present their sales and on both pages 9 and

11   page 20, as part of its messaging, recognized that sometimes

12   these sales pitches will be made to companies who don't use

13   darknet data regularly or don't even know that they need

14   darknet data.  Part of the messaging sales pitch was convincing

15   these companies that they need darknet data.

16        On pages 16 and 17, which we looked at during trial,

17   the head of sales discussed several use cases for these

18   big-data companies that they would benefit from, including many

19   of the use cases that are similar to ArkOwl, which we'll take a

20   look at shortly.  And, again, this head of sales created a

21   target list for the sales team, which was on page 18 of that

22   document.

23        That same head of sales created another document after

24   the Exhibit 4, which the company used until at least early 2022

25   to inform its website redesign.  This Exhibit 5 spreadsheet

1    that the head of sales created helped guide the company's

2    website or design, once again focused the company on trying to

3    target big data.  This is as opposed to government agencies.

4    And this was after having worked at DarkOwl for many months and

5    having worked closely on messaging with some of DarkOwl's

6    officers.

7              And looking at the tab 3, big-data targets from

8    Exhibit 5, we'll see that those targets weren't government, but

9    they were cyber companies.

10             DarkOwl is constantly reevaluating what its data can

11   be used for and how best to sell it.  Again --

12        THE COURT:  So what, though?  So what?  I mean, what

13   difference does that make to the trademark analysis?

14        MR. FRASIER:  Your Honor, DarkOwl attempted to present

15   its marketing and its target as, we're trying to sell to

16   government.  We don't compete with ArkOwl because we sell to

17   government; and ArkOwl sells to either cyber or it sells to

18   retail.  That's simply not the case.  They go wherever

19   opportunity arises.  For the vast majority of their history,

20   they have targeted similar companies --

21        THE COURT:  There is no evidence that they targeted

22   retail companies; right?

23        MR. FRASIER:  Yep.

24        THE COURT:  Is your argument that because there is a

25   potential that this company who pivoted in the past may pivot

1    in the future, your client's trademark should be protected?

2           MR. FRASIER:  No, Your Honor.  I will certainly get to

3    this.  My argument is that ArkOwl doesn't only -- and doesn't

4    primarily market to -- and sell to retail companies verifying

5    online transactions.  Its top ten customers are all

6    cybersecurity industries, cybersecurity companies providing a

7    variety of services.  ArkOwl's services are broader than

8    DarkOwl would have the Court believe.  They are more

9    overlapping, certainly much more likely to be encountered by

10   the same companies in similar context in the market.

11          THE COURT:  Tell me what evidence there is with

12   respect to the so-called cybersecurity company customers of

13   your client being different from the retail customers who want

14   personally identifiable information verified.

15          MR. FRASIER:  Absolutely.  For example, one of

16   ArkOwl's Partners is a platform called NICE Actimize.  The

17   press release, for example, that NICE released when ArkOwl

18   became a partner explained that NICE's customers are -- excuse

19   me -- financial service organizations, and that ArkOwl -- it

20   told its customers that ArkOwl could improve the accuracy of

21   customer risk scoring when onboarding new customers.  ArkOwl in

22   its client list has a company called ████████ which is a

23   cryptocurrency exchange.  It had a few companies that are in

24   law enforcement.  ArkOwl has a customer called ███████████,

25   which is in the HSA sales environment; and it would be using

1    ArkOwl when opening new accounts.  And, similarly, it has a

2    client named ██████████ that would be used for account

3    creation.

4         Now, ArkOwl's other customers, including -- including

5    CyberSource, its most profitable customer, is in the broader

6    cybersecurity industry and could -- offers services other than

7    just to retail companies.

8         THE COURT:  I'm sorry.  Offers --

9         MR. FRASIER:  Other than to just retail companies.

10        Now, we know that these two companies have overlapped

11   on numerous occasions.  The evidence at trial demonstrated

12   ArkOwl's customers and potential customers appeared on multiple

13   lists and solicitations that DarkOwl made.  For example, ███████

14   is an ArkOwl customer; and DarkOwl sent multiple solicitations

15   via CIENCE to ██████   ████████ is an ArkOwl customer, and

16   DarkOwl solicited them.  ███████████ -- and DarkOwl identified

17   ████████ as a target in Exhibits 4 and 5.  NICE Actimize is an

18   ArkOwl partner, appeared once again on the target lists.

19   ArkOwl testified that █████ and ██████████ are potential

20   clients --

21        THE COURT:  But isn't it possible that these

22   overlapping customers might use both ArkOwl and DarkOwl for

23   different purposes?

24        MR. FRASIER:  It's certainly possible, Your Honor.

25   But the question, again, isn't simply whether one could be

294

1    substituted for another.  The question is competitive

2    proximity, whether these two marks are used competitively in a

3    way that a customer might think there is some sort of

4    affiliation between the two -- DarkOwl is ArkOwl's darknet

5    branch, for example.  And the fact that such similar marks are

6    being marketed to the exact same companies is an important

7    factor showing that they are closely competitive.

8            Now, we could look at those specific solicitation

9    emails as well and see that DarkOwl isn't offering something

10   that is totally unique.  It's offering services that a

11   reasonable person would say are similar to ArkOwl's services,

12   whether or not they might be substituted for them --

13           THE COURT:  But it's offering something that your

14   client does not offer, because what it offers is information

15   obtained from the darknet.  And your client does not offer that

16   information; correct?

17           MR. FRASIER:  The only information that ArkOwl offers

18   that could come from the darknet are the breached data that

19   come from the "Have I Been Pwnd?" website.  The question on

20   proximity, first, isn't whether one could be substituted for

21   the other, whether a person might think that they're

22   affiliated -- and this is in the trial brief that was

23   submitted, as well -- it's how related might they be.

24           But we also look at the DarkOwl solicitations, which

25   are Exhibits 381 and 387, where DarkOwl is saying that we can

1   help you find your customers' exposed PII on the darknet.

2   While that's not exactly what ArkOwl provides, DarkOwl is also

3   saying to the same people, we can help you verify your

4   customers' PII.  And so whether or not █████ thought DarkOwl

5   could replace ArkOwl, it's likely DarkOwl would say -- █████

6   would say, these two sound like similar services, and the name

7   is almost identical, so are they affiliated?  Are they

8   associated in some way?  And that's less likely for a customer

9   that has been a long-term customer of ArkOwl, like █████ or

10  █████ but for all the other customers and potential

11  customers that may have heard of ArkOwl but don't have quite as

12  close a relationship, it's more likely they would be confused

13  when seeing similar language offering the software as a service

14  from nearly identical names.

15          Now, DarkOwl -- as I alluded to, ArkOwl has expanded

16  its service from where it started, working for Best Buy,

17  verifying consumer transactions.  I gave you a few examples a

18  few minutes ago.  DarkOwl has also expanded.  It's no longer an

19  unstructured database of darknet data that it scraped.  The

20  evidence at trial demonstrated that it has created a platform

21  that only has data from a few different things it could index,

22  including email addresses, and that DarkOwl scrapes and indexes

23  in near real-time so that its API customers can get responsive,

24  relevant results from those searches in seconds.

25          The evidence at trial demonstrated that DarkOwl

1    customers who searched those -- that product for an email would

2    get relevant -- to the extent it appeared on the darknet would

3    get relevant information, including when it appeared on the

4    darknet, where it was found on the darknet, whether -- what

5    breach it was associated with, which is some of the data that

6    ArkOwl provides.  It would also get information if that email

7    were associated in a breach and also included names, phone

8    numbers, addresses.  DarkOwl would provide that information as

9    well.  That's all the same type of information that ArkOwl

10   provides its customers.

11         Exhibit 8, pages 9 through 13 were an effort by

12   DarkOwl to describe some of the various use cases it is still

13   selling to, including ID monitoring, vendor risk assessment,

14   which is compared to helping people -- companies set up new

15   vendor accounts.

16         Now, ███████ ███████ and CyberSource are not much

17   different than many of the customers that DarkOwl has.  There

18   are a handful of cyber companies that DarkOwl has that do

19   similar types of things, including Arceo, which is Exhibit 399,

20   press release about that company; Ares, Exhibit 400; BlueVoyant

21   at 404; Cowbell Cyber, 405; CTM360; FinClusive, at 410; Hitachi

22   at 413; HWG at 414; Ontic at 416; Pathfynder at 417; Tactical

23   Analysis at 420; TBG Security --

24         *THE COURT:*  There is no evidence that ███████ and

25   ███████ which are clients of your client, are customers of

1   DarkOwl.  In fact, there is no evidence of any overlapping

2   customers whatsoever between the two companies, is there?

3        MR. FRASIER:  Correct, Your Honor.  There is no

4   evidence of overlapping customers, just overlapping

5   solicitation.

6        THE COURT:  And DarkOwl contends it was, essentially,

7   a mistake.

8        MR. FRASIER:  DarkOwl would have this court believe it

9   was a mistake.  It was a mistake, first of all, done for a year

10  by a company that it -- DarkOwl testified that it was important

11  to control its messaging, had the power to control what this

12  company said, had the ability to monitor what it sent out to

13  its potential customers, and either didn't monitor it or did.

14  But either way, it allowed that company to send out thousands

15  of emails a week for a year and actually got clients through

16  it.

17       Some of those emails we know went to ArkOwl's

18  existing customers, and we don't have any idea where the other

19  tens of thousand of those emails went to.

20       THE COURT:  But you know they didn't result in any

21  overlapping customers.

22       MR. FRASIER:  Not overlapping customers, certainly.

23  We also -- DarkOwl would also have you believe that the

24  documents put together by its executive vice president of sales

25  were a mistake; but they were put together after months of this

1    person being involved in the company.  And DarkOwl testified it

2    doesn't take that long to understand who their target market

3    is.  Yet after four, five, six months, this head of sales said,

4    I think we can sell to these people, we can sell to potential

5    customers and customers of ArkOwl.  And those sales may not

6    have actually taken place -- DarkOwl doesn't have that many

7    customers yet.  They're trying to grow to many thousands of

8    customers, but they don't have that many customers yet.

9    They're soliciting and have for years the same companies and

10   customers that ArkOwl works for or at the very least solicits.

11            *THE COURT:*  Is there such a thing in your view,

12   Mr. Frasier, in trademark law of the existence of two companies

13   who do at some point compete in an overlapping fashion but

14   eventually diverge?  And even though the marks are in use by

15   the competing companies when they compete in some sort of

16   fashion, eventually, as time goes by, they diverge in their

17   services to a certain extent that the marks really no longer

18   become competitive marks, they don't compete with each other

19   anymore because one company has gone off in another track, its

20   direction is not directly competitive with the other company

21   anymore?

22            What does the trademark law say about those

23   circumstances and the validity of the two trademarks at issue

24   when that happens?  True, this is not -- I assume from

25   DarkOwl's presentation that that's part of its contention here,

299

1    that to the extent there might have been some overlapping

2    services offered by these two companies at the same time, when

3    each was using its own respective mark, whether registered or

4    not registered, that now the divergence in services is so

5    substantial that there can't be any reasonable likelihood of

6    confusion with respect to the marks.  What does the law say

7    about that?

8         MR. FRASIER:  In the hypothetical that the two

9    services currently are so divergent that no reasonable person

10   would think that they are related, the question -- the only way

11   a court would find likelihood of confusion is if there were any

12   sort of likelihood or plan to go back into the same market.

13   But that's certainly not the fact pattern here, Your Honor.

14   The fact --

15        THE COURT:  You don't buy it that DarkOwl has diverged

16   to the extent that DarkOwl wants to convince the Court it has;

17   is that what I'm hearing from you?

18        MR. FRASIER:  Yes, Your Honor.  That's certainly part

19   of it.  It's also that they have a history of changing exactly

20   who they target and how they target every year.  They've

21   demonstrated they will try to sell to pretty much anybody that

22   they can, with limited exceptions of representatives of hostile

23   nations and things like that.  But, generally, if they find a

24   way to sell to a company, they will sell to that company.

25             And right now, they're -- they're testifying that at

1    least part of their direction has turned more toward

2    emphasizing law enforcement, but nothing in their history

3    should give this court confidence that it's going to continue

4    in that direction to the exclusion of the rest of the market.

5    And even where they are today, the testimony was that somewhere

6    between 40 and 45 percent of their market either directly or

7    indirectly were law enforcement, which leaves substantial room

8    for overlap.

9         And I just want to emphasize one more time, whether or

10   not they're directly competitive isn't the question.

11        THE COURT:  I understand.

12        MR. FRASIER:  It's whether or not somebody might

13   believe -- is likely to believe they're related.

14        THE COURT:  I do understand that.

15        Mr. Frasier, if you leave here with any thought today,

16   leave here thinking that I do understand the point that you

17   have made repeatedly -- that you made both in the previous

18   hearing and that you've made today.  I understand the legal

19   point.  I'm pressing the envelope.

20        MR. FRASIER:  Understood.  And I certainly appreciate

21   any questions, I'm happy to answer.

22        So, Your Honor, the three factors of the six-factor

23   likelihood of confusion analysis that we discussed, similarity

24   of the marks -- which is the most important -- the strength of

25   ArkOwl's mark, which weighs heavily in favor of broad

301

1    protection, and how much these markets overlap weigh in favor

2    of a finding of likelihood of confusion.  And the lack of

3    evidence on the intent or the actual evidence of actual

4    confusion doesn't weigh against it.  The absence of evidence on

5    those are neutral.

6          The only other factor is the sophistication of the

7    potential customers.  And certainly DarkOwl's customers are

8    sophisticated in what they do; we're not going to try to

9    challenge that.  There is a question of how sophisticated those

10   people are as to trademark matters, and certainly there is a

11   question of the sophistication of the ultimate end users of

12   DarkOwl's services.  So even if that factor weighs in favor of

13   no likelihood of confusion, it's outweighed significantly by

14   the other three factors.

15         *THE COURT:*  Let me touch on the intent for a moment,

16   because I want to make sure I understand your argument clearly.

17   You are not contending that there is any evidence that DarkOwl

18   intended to somehow usurp ArkOwl's mark, are you?

19         *MR. FRASIER:*  Correct.

20         *THE COURT:*  Okay.  Thank you.

21         *MR. FRASIER:*  Thank you, Your Honor.  That's all I

22   have.  Do you have any more questions?

23         *THE COURT:*  No, I don't.  Thank you very much.

24   Appreciate it.

25         All right.  Mr. Holt, are you on deck?

1        MR. HOLT:  Good afternoon.

2        THE COURT:  Good afternoon.

3                        **CLOSING ARGUMENT**

4        MR. HOLT:  Your Honor, the evidentiary hearing and the

5   last two days of trial have presented the Court with extensive

6   evidence on the parties, their respective marks, their

7   businesses, their customers, their competitors, and use cases.

8   The Court must now determine whether ArkOwl has met its burden

9   of showing that relevant consumers are likely to confuse the

10  parties' marks as they are being used in their respective niche

11  markets.

12       As you've heard, there are six non-exhaustive factors

13  that you must consider in evaluating the likelihood of

14  confusion.  The Court need not make difficult factual findings

15  on at least four of the six factors.  As ArkOwl has

16  acknowledged, these factor do not weigh in its favor.  It

17  concedes that there are -- these factors are either neutral or

18  slightly favor DarkOwl.

19       Those factors are, DarkOwl's intent in adopting its

20  mark, evidence of actual confusion, similarity of products and

21  manner of marketing, and, finally, the degree of care likely to

22  be exercised by purchasers.

23       With that, there are only two factors the Court could

24  realistically determine weigh in ArkOwl's favor.

25       THE COURT:  There are cases, though, that hold those

303

1    first two factors are the two most important factors.  If they

2    weigh heavily in favor of the one side, nevertheless, the side

3    who is favored by the first two factors can prevail; right?

4         MR. HOLT:  I've never seen any authority, Your Honor,

5    indicating that the first two factors are the strongest or most

6    important.  Six factors.  There are plenty of cases that say

7    the degree or similarity of the marks is an important factor.

8    It's usually the similarity of the marks along with the

9    similarity of the goods and services that are the most heavily

10   weighed.

11        THE COURT:  Okay.

12        MR. HOLT:  To be clear, while the Court has heard

13   argument from ArkOwl regarding the parties' alleged competitive

14   nature and the relatedness of the parties' services, ArkOwl has

15   expressly stated that this factor is neutral, notwithstanding

16   Mr. Frasier's comments during the opening that this factor

17   weighs in ArkOwl's favor.

18        While there are certainly some similarities in the

19   parties' marks, there are also important differences that

20   should be taken into account.  But even if the Court finds that

21   the marks are similar, this alone cannot support the likelihood

22   of confusion finding.

23        THE COURT:  I mean, the marks are similar; right?

24   Visually, they're similar.  Is there really an argument about

25   that?

304

1          MR. HOLT:  I would not argue they share some

2    similarities.

3          THE COURT:  That would be the winged versus the eye --

4          MR. HOLT:  There are a number of cases, Your Honor,

5    that involve identical marks.  That is not what we have here.

6    We have notable differences that we believe should be

7    considered along with the other relevant factors.

8          THE COURT:  Just out of curiosity, a couple of the

9    exhibits that you showed with respect to trademark

10   registrations indicated that originally DarkOwl's trademark was

11   DarkOwl with "Cybersecurity" underneath it.  Later it was

12   amended to be just DarkOwl.

13         MR. HOLT:  They have two registrations.  One includes

14   the "cybersecurity" term; the other does not.

15         THE COURT:  All right.  And there wasn't any evidence

16   about the prevalence of the two -- the use of the two marks.

17   Why is that?  Does that not matter?

18         I mean, the DarkOwl Cybersecurity mark is visually

19   quite different from the ArkOwl mark.

20         MR. HOLT:  Yeah.

21         THE COURT:  Why aren't you telling me more about how

22   prevalent it is as to which mark DarkOwl uses.

23         MR. HOLT:  I would, Your Honor, if that was the case.

24   Their core mark is without the "cybersecurity" language on it.

25         THE COURT:  Fair enough.

1          *MR. HOLT:*  That's the mark we're primarily arguing

2     over.

3          Speaking of similar marks, Your Honor, the *M. Welles*

4     case out of the Tenth Circuit -- this decision was issued just

5     a few weeks ago -- the marks at issue were "Edwell," one with a

6     single "L" and the other with two "L"s.  They were -- let's

7     see.  Edwel, providing classes, seminars, and certification

8     workshops in the project management space, targeting

9     professionals across a range of industries.  And that was

10    compared to Edwell -- with two "L"s -- used to promote a

11    nonprofit organization dedicated to improving school-wide

12    mental health and well-being.

13         The Tenth Circuit held that although the marks are

14    nearly identical -- that's a quote -- there was no likelihood

15    of confusion between the parties because they operate in

16    different markets.  Consumers are unlike -- likely to exercise

17    a high degree of care, and there was little evidence of any

18    actual confusion.

19         Similarly --

20         *THE COURT:*  Don't you think the *Edwell* case turned on

21    the difference of the markets for these two companies were

22    marketing to?  "Edwell" with two "L"s was a school company;

23    right?  It was essentially marketing to school administers and

24    teachers.  And the other company was marketing to corporations,

25    mostly private corporations.  Don't you think that was a

1 significant factor in the first decision?

2    *MR. HOLT:*  I think it was a factor.  I believe there

3 are parallels here to that case.

4    *THE COURT:*  What are the parallels?

5    *MR. HOLT:*  Well, the parties, we believe, are

6 operating in distinct markets.

7    *THE COURT:*  This is your evidence relating to all of

8 the trade shows your client goes to?

9    *MR. HOLT:*  That's part of it, Your Honor.  The fact

10 that we target C-level executives, governmental agencies, there

11 is very little evidence of any sort of competitive overlap.

12    *THE COURT:*  Does there have to be evidence in terms of

13 who is marketed -- relating to who actually receives the

14 marketing attempts?  I mean, you say that DarkOwl markets to

15 CEOs and C-suite executives, et cetera, though there is no

16 evidence that those are the folks who are actually hiring

17 DarkOwl or employing DarkOwl.  Does there have to be evidence

18 in terms of establishing that the markets are different, that

19 you're reaching the intended market of C-suite executives,

20 they're the ones making the hiring decisions?

21    *MR. HOLT:*  Yeah.  Your Honor, I believe that evidence

22 is in the record.  Mr. Turnage testified at length about the

23 meetings, conferences he attends, who he meets, and various

24 negotiations that occur throughout the vetting process,

25 oftentimes C-suite executives, along with legal teams to

307

1    negotiate the term of the relationship.

2            THE COURT:  Okay.

3            MR. HOLT:  So another example from the Tenth Circuit

4    is the *Heartsprings* case.  Here, the marks were Heartsprings --

5    "S" -- books, pamphlets to teach children to resolve conflict

6    nonviolently.  Opposing mark, Heartspring, for a school

7    teaching physically disabled children certain skills.  The

8    Tenth Circuit held that although the two marks consisted of

9    similar words, there was no likelihood of confusion because,

10   among other things, the parties' presentations of their trade

11   name were otherwise visually different, the two parties

12   marketed their products and services differently, and consumers

13   exercise a high degree of care in selecting the services.

14           As we just saw, similarity of two marks alone does not

15   create marketplace confusion.  Here, we have a number of

16   examples where identical marks are being used in the

17   marketplace peacefully:  Delta Airlines, Dental Dental, Delta

18   Faucet, each as a strong brand, each operating in their own

19   respective market.  Dove Chocolate and Dove Soap; Apple Records

20   and Apple Computer; Domino Sugar, Domino's Pizza.

21           THE COURT:  The sugar and the pizza should be

22   combined.

23           MR. HOLT:  That would be tasty.

24           THE COURT:  They're both bad for you; right?

25           MR. HOLT:  So even if you couple a finding of

1    similarity of the marks with a determination that mark --

2    ArkOwl's marks have some strength, that should not change the

3    result.  Where each of the reference marks have at least some

4    strength -- I'm sorry -- sorry.

5          Even if the Court were to determine that the marks

6    have some strength, that combined with the similarity of the

7    marks finding would not result -- should not result in a

8    likelihood of confusion finding.  These two factors, in view of

9    the other four factors, and especially two of the factors,

10   factors five and six -- similarity of products, manner of

11   marketing -- along with the degree of care, render a likelihood

12   of confusion extremely unlikely.

13         So let's now look at those two key factors, five and

14   six, similarity of services and manner of marketing.  Your

15   Honor has heard extensive testimony on the specific types of

16   data services the companies provide and how they're used.  The

17   evidence is clear that the parties' respective customers are

18   seeking the parties' data services for very different reasons

19   and applications.  ArkOwl's customers are looking to verify

20   online consumer transactions through the use of ArkOwl's PII

21   data outputs, and DarkOwl's customers are looking to obtain

22   highly specialized dark web data for assessing cybersecurity

23   risk, enhancing data protection systems, protecting national

24   security, among other sophisticated --

25              THE COURT:  Not all of those customers want to do

1  that, and not all of ArkOwl's customers want to verify

2  personally identifiable information; right?  What do I do with

3  that?  I mean, is it a percentages game, that I have to accept

4  on its face your client's contention that 40 percent of the

5  business is government, and government isn't looking to

6  identify anybody's personally identifiable information, not

7  even darknet information.  Is that really the key to winning a

8  trademark case, that you can, you know, have a self-serving

9  statement with respect to the percentage of customers who are

10  of a certain type in each business dictate the outcome?

11       *MR. HOLT:*  Yeah, Your Honor.  We don't believe Your

12  Honor needs to go there.  We think it's clear that if you look

13  at DarkOwl's business, it is not catering to companies that

14  process or evaluate or verify online purchase transactions.

15  That's not what its clients do.  That's not why they go to

16  DarkOwl.

17       On the flip side, if you look at ArkOwl's customers,

18  notwithstanding some of Mr. Daline's testimony, at the end of

19  the day he said he's not aware of a single customer within the

20  U.S. that is using his data for anything other than online

21  purchase transactions.  So we think this is a bright line.

22       *THE COURT:*  Fair enough.

23       *MR. HOLT:*  Despite ArkOwl's strained efforts to find

24  similarity between actual or potential customers, actual or

25  potential competitors, and highly speculative use cases, the

1    evidence is squarely within their respective lane.  Mr. Daline

2    speculates on all of the ways his service could be used, but

3    they're unsupported by the evidence.  Again, he knows not of a

4    single customer using his service for anything other than

5    online transactions.  And ArkOwl's attempts to paint DarkOwl's

6    data services as an actual or potential PII data verification

7    platform is not only unsupported by the evidence, but fails for

8    practical reasons.

9            As Mr. Turnage explained at length, DarkOwl's business

10   and platform are not designed to provide PII information for

11   validation purposes; and any attempt by any end user to use

12   DarkOwl's data for that purpose would be extremely impractical,

13   if not impossible.  ArkOwl simply has no concrete evidence to

14   support its position that DarkOwl's data services could be used

15   in that way.

16           ArkOwl has tried to paint itself as providing dark web

17   data as part of its PII verification service, but the evidence

18   clearly shows that ArkOwl includes limited information on

19   breached data as one of its over 120 data points.

20       THE COURT:  Refresh my recollection about the

21   testimony.  Is it your contention that Mr. Daline testified

22   that the breached data that ArkOwl makes available is breached

23   data on the open internet; it's not from the darknet?

24       MR. HOLT:  Mr. Daline's testimony, as I understand it,

25   is that his service -- one of the sources that it pings for

1    information is "Have I Been Pwned?"  And "Have I Been Pwned?"

2    provides information on breached data.  Breached data can be on

3    the surface web; it can be on the darknet.

4          THE COURT:  Okay.

5          MR. HOLT:  And they have tried to use that fact to

6    demonstrate that they are providing dark web data, which simply

7    isn't the case.

8          THE COURT:  You don't dispute that "Have I Been

9    Pwned?" mines data?

10          MR. HOLT:  I have no evidence to dispute that, yeah.

11          THE COURT:  Thank you.

12          MR. HOLT:  So to this point, ArkOwl inappropriately

13   conflates its PII verification service, its true bread and

14   butter, with "Have I Been Pwned?" to create the similarity

15   between DarkOwl's data, where none actually exists.

16   Inappropriately conflates breached data with darknet data.  It

17   would have the Court believe that those terms are synonymous,

18   and they are not.

19          And, again, the use of certain shared terminology by

20   the parties does not change this fact.  Particularly within the

21   vast and complex industries like cybersecurity and fraud

22   prevention, the analysis must go beyond the use of common

23   terminology to the substance.

24          PII or emails or fraud within DarkOwl's use cases

25   does not establish similarity between the parties' services.

1    PII is nothing more than information that allows someone to

2    identify an individual -- emails, phone numbers, information

3    along those --

4         THE COURT:  When it comes right down to it, does

5    DarkOwl know what percentage, if any, of its customers are

6    using the data for so-called fraud prevention?  Does it have

7    any way of knowing that?

8         MR. HOLT:  I don't know the answer to that, Your

9    Honor.  I know that fraud prevention is one of its use cases,

10   but I don't know the specifics on the breakdown of that case.

11        THE COURT:  I assume that testimony at least would

12   lend itself to the construction that to the extent that a

13   DarkOwl customer is using DarkOwl services for fraud

14   prevention, that would have to be mentioned in some agreements

15   between the customers and DarkOwl, probably; right?

16        MR. HOLT:  I would certainly think so.  I can tell

17   you, none of DarkOwl's customers are using the information in

18   connection with verifying online purchase transactions.

19        THE COURT:  I understand.

20        MR. HOLT:  The nature of DarkOwl's data, the most --

21   the cost of queries to DarkOwl's platform and the form in which

22   the data is provided make it impractical and virtually

23   impossible that the data could or would be used to support

24   verification of a purchase transaction.  And Mr. Turnage's

25   testimony that the fraud prevention industry is such a broad

313

1   and amorphous term that it can apply to a vast array of

2   companies and markets speaks very little on its own what

3   underlying services are actually being provided.

4           Tellingly, not once have the parties run into one

5   another in the marketplace, notwithstanding the fact that

6   they've been in business for over six years.

7           THE COURT:  Not until your company -- your client's

8   filthy marketers sent emails to ArkOwl's customers.

9           MR. HOLT:  Even that, they didn't run into one another

10  in the marketplace.

11          THE COURT:  Close enough; right?

12          MR. HOLT:  Yeah.

13          THE COURT:  I mean, it's a marketing attempt sent by,

14  you know, your agents to ArkOwl's customers; right?  You can't

15  deny that, can you?

16          MR. HOLT:  It was a marketing attempt.  I can tell you

17  based on Mr. Turnage's testimony that it was not based on any

18  strategic business decision made.  It was kind of crude and --

19          THE COURT:  It was a cover-the-waterfront move by an

20  independent agent, essentially.

21          MR. HOLT:  It was a very basic and crude attempt to

22  identify the marketplace without any real forethought or

23  strategic thinking behind it.

24          As you heard Mr. Turnage say today, not a single

25  customer has ever approached DarkOwl looking for personally

314

1    identifiable information verification.  Indeed, no reasonable

2    customer looking for comprehensive dark web data services would

3    reach out to ArkOwl looking for those services, for the simple

4    reason that ArkOwl does not provide this type of data, nor does

5    it market itself as providing dark web data.

6         THE COURT:  What are comprehensive dark web data

7    services?  I mean, it would include fraud protection; right?

8         MR. HOLT:  The data that DarkOwl provides is

9    marketed -- our client believes is the most comprehensive dark

10   web database in the industry.

11        THE COURT:  By that you mean, it has the most data

12   mined from the dark web?

13        MR. HOLT:  That is my understanding, based on the

14   evidence and the testimony.  Yes.

15        THE COURT:  So, I mean, does DarkOwl purport to know

16   all of the uses to which its information -- legal uses to which

17   its information can be put?

18        MR. HOLT:  Well, I believe, Your Honor, that is the

19   reason why there is such an extensive vetting process and the

20   agreements are put in place to put guardrails in the way that

21   information will be used.  I believe it can -- I believe

22   Mr. Turnage testified that they can evaluate -- they can see

23   how customers are using that data, or at least searching the

24   data.

25        THE COURT:  But, theoretically, they could be learning

315

1  from customers as they enter into these agreements with

2  customers, right?  They could -- new customers could be out

3  there finding their data in ways they are unaware of, which

4  ways they vet them, and they could have a relationship with

5  that customer?

6      *MR. HOLT:*  That is a possibility, Your Honor.  But I

7  can tell you just from a practical perspective that the

8  evolution of that -- the evolution of those business cases will

9  not ever evolve into PII verification.

10     *THE COURT:*  Why not?

11     *MR. HOLT:*  Because it is not set up to do that.

12     *THE COURT:*  Because it's too expensive?

13     *MR. HOLT:*  It's entirely too expensive.  It's cost

14  prohibitive.  The system is just not set up to provide the

15  types of data feed and the searches that you would need to do

16  that.

17     *THE COURT:*  I mean, who is to say if some customer

18  approached DarkOwl and said, here is what I want to use the

19  data for.  We take our verification of -- whatever it is

20  called -- personally identifiable information very seriously,

21  and we're not interested in only what is available on the

22  surface web.  We want to know what is on the darknet.  That's

23  what we're going to use the information for.  I mean, there is

24  no reason to believe that DarkOwl would turn its back on that

25  customer, is there?

1      MR. HOLT:  Just from a practical perspective, that

2  type of use case would never develop, because the information

3  that the client would be interested in would be available from

4  other sources at a much better cost.

5      THE COURT:  Cheaper?

6      MR. HOLT:  Yeah.  DarkOwl's customers are looking for

7  very specific data, and it's not PII.

8      THE COURT:  What is it?

9      MR. HOLT:  It's threats to national security, threats

10  to computer systems, evaluating risk based on those threats.

11      So marketing, the parties' distinctly different

12  marketing strategies further reduce the likelihood of

13  confusion.  DarkOwl occupies a niche market where it has only a

14  few competitors.  None of DarkOwl's competitors provide PII,

15  and none of ArkOwl's competitors are competitors of DarkOwl,

16  because the companies operate in distinctly different markets

17  and they contact very different people.

18      As we talked about earlier, Mr. Daline testified

19  ArkOwl has attended a single trade conference, Merchant Risk

20  Council, four times in the eleven years he's been in business,

21  DarkOwl, on the other hand, you heard from Mr. Turnage today

22  attends countless industry trade shows annually, each of which

23  specialize in cybersecurity and the dark web.  And these are

24  attended by some of the most sophisticated cybersecurity,

25  military, and national security organizations.

1          Reasonable consumers in the parties' separate trade

2     channels who seek other the party's services are not likely to

3     even encounter the other party.

4          Yes, as we talked about, the third-party marketing

5     agent did send emails received by a number of purported

6     ArkOwl customers, but that is not new evidence.  That came out

7     at the hearing.  You know, it was fully vetted; and, you know,

8     Your Honor found that that did not create the kind of

9     competitive proximity that would assist in, you know, creating

10    a link between the two companies and their offerings.

11         *THE COURT:*  I found they were not direct competitors;

12    but I was, I think, quite clear that I wasn't making -- drawing

13    a conclusion they were not essentially competitors of some sort

14    in a broader sense.

15         *MR. HOLT:*  I understand that.  But some of the factual

16    findings leading up to that could support the position that

17    we're putting forth here.

18         *THE COURT:*  Some of the factual findings?

19         *MR. HOLT:*  Some of the factual findings in your order

20    would support the conclusions that we're offering here.  And

21    that is that the parties' services and the way in which they

22    market are not similar.

23         *THE COURT:*  Okay.  I understand the argument.

24         *MR. HOLT:*  So let's go to factor six, the

25    sophistication of the purchasers.  The evidence shows that the

 1    individuals purchasing DarkOwl's services are C-suite

 2    executives, who are sophisticated and careful.  There is an

 3    extensive vetting process.  As you've heard, DarkOwl's

 4    clients -- that include a -- DarkOwl's clients require the

 5    execution of a number of legal agreements.  And as you heard

 6    Mr. Turnage today, the average negotiation period for a

 7    relationship with DarkOwl is three to six months, including,

 8    you know, direct and in-person meetings with DarkOwl

 9    representatives and legal teams.  The customers here, they

10    conduct substantial due diligence before signing up with

11    DarkOwl.

12          Evidence also shows that ArkOwl's services are

13    reasonably expensive.

14          I think we can proceed.

15          THE COURT:  Okay.

16          MR. HOLT:  These customers -- the evidence also shows

17    that ArkOwl is reasonably expensive and its customers and users

18    are -- they're scrupulous in their purchasing decisions as it

19    relates to ArkOwl's services.  No evidence has been offered

20    that shows consumers have ever mistakenly purchased one party's

21    services thinking they were the other's.

22          For DarkOwl services, this is a near impossibility

23    because of the complex nature of the services and that

24    extensive vetting process.  The fact that the parties have

25    sophisticated and discerning consumers likely to conduct

1    substantial due diligence strongly weighs against a likelihood

2    of confusion.  And in its brief, ArkOwl conceded this factor is

3    neutral or favoring DarkOwl.

4          So we just covered factors five and six, let's go back

5    to factor three quickly, intent.  It is undisputed that DarkOwl

6    had no intention to infringe the ArkOwl marks.  DarkOwl was

7    unaware of them until well after DarkOwl's marks were adopted,

8    and ArkOwl has conceded this point.

9          Actual confusion, factor four.  Although actual

10   confusion is not required to establish a likelihood of

11   confusion, the absence of it, where the parties have peacefully

12   co-existed in the marketplace for a significant period of time,

13   is telling.  Here, the parties have co-existed for nearly six

14   years without a single instance of credible consumer confusion.

15   And ArkOwl concedes this factor, as well.

16         So now let's go back to the first two factors, the two

17   factors that ArkOwl claims weigh in its favor.  Again, while

18   there are certainly some similarities between the marks, we

19   believe there are meaningful differences; and we ask that the

20   Court consider those in its analysis.

21         Strength and weakness -- strength or weakness of the

22   marks.  Again, we're focused on ArkOwl's marks here.  Yesterday

23   Mr. Daline testified that ArkOwl's use of the term "owl" in its

24   marks suggest the nature of its services, which touches on some

25   of the questions that Your Honor had during Mr. Frasier's

1   opening.  ArkOwl is not an arbitrary term in the

2   cybersecurity --

3          THE COURT:  Let me interrupt you for a second to get

4   this question out of my head.

5          Do you agree with Mr. Frasier that ArkOwl's mark is a

6   fanciful mark, as that is described in the law?

7          MR. HOLT:  You know, Your Honor, I believe it -- I

8   believe it's a mark that is made up of two independent terms,

9   one of which is suggestive, the other of which is arbitrary,

10  and the combined term -- I guess I'm not entirely clear whether

11  that would be considered fanciful, but I have no authority at

12  the moment to dispute that.

13         THE COURT:  Okay.  Thank you.

14         MR. HOLT:  So "owl" is not an arbitrary term in the

15  cybersecurity industry, which explains why the term is widely

16  used throughout the industry, generally.  As a general matter,

17  the ArkOwl component should not be afforded a particularly

18  strong level of protection.  The evidence also demonstrates

19  that the term "ark" is used to a lesser extent by third parties

20  in the cybersecurity space.  The suggestive quality of the term

21  "owl" and the third party uses of both "owl" and "ark" weaken

22  the overall significance of rights afforded to the ArkOwl

23  marks.

24         THE COURT:  When you say that "owl" is used throughout

25  the industry generally, you're referring to the cybersecurity

321

1    industry and the evidence that was presented with respect to

2    STREET OWL, et cetera, et cetera?

3             *MR. HOLT:*  That is correct, Your Honor.

4             *THE COURT:*  Okay.  Thank you.

5             Sorry to interrupt.  Go ahead.

6             *MR. HOLT:*  Owners' efforts to advertise its services

7    under its marks may assist in developing commercial strength.

8    Here, however, we heard that ArkOwl's primary means of

9    promotion is word of mouth, which is not a legally relevant

10   form of advertising in the strength-of-mark analysis.  Rather,

11   ArkOwl admits that its own marketing activities have been

12   extremely limited.  In short, ArkOwl has not engaged in any

13   meaningful activity that supports a finding that the marks

14   should be afforded a high level of commercial strength.

15           So, Your Honor, at their core, trademark laws are

16   designed to protect the consumer from confusion.  The courts

17   have developed a test to help the fact finder assess whether

18   two marks are likely to be confused; and here, that is the

19   six-factor test that we've been reviewing, articulated by *King

20   of the Mountain*.  Regardless of which factors favor which

21   parties in any given case, a proper determination must answer

22   the ultimate question, and that is, are there relevant

23   consumers likely to be confused?  And the answer here is no.

24           When the Court takes into account all of the context

25   of the situation, we have -- there is simply no way any DarkOwl

1  customer or potential customer would believe the company is

2  associated with ArkOwl.

3          First, DarkOwl's actual and target consumers are so

4  highly specialized and sophisticated that they're not prone to

5  confusion.  They're discerning; they're exacting.  Moreover, as

6  we heard from Mr. Turnage, the vetting process for engaging in

7  DarkOwl's services is rigorous.  It's a mere impossibility for

8  any customer to be confused.  There is no conceivable world --

9  there is no conceivable world in which DarkOwl is unfairly

10 taking advantage of the goodwill of ArkOwl.

11         *THE COURT:*  So is it your contention that the law pays

12 no mind to the potential -- let me put it differently.  Is it

13 your contention that the law pays no mind to the fact that a

14 customer looking for certain services may be confused about

15 what kinds of services are offered by companies that have

16 similar marks, but upon further investigation and contact with

17 the companies learns what the differences are?  That that

18 initial confusion about whether DarkOwl might offer, you know,

19 verification of PII, for example, doesn't matter, because

20 before they can become a customer of DarkOwl, this vetting

21 process must occur and they must be educated especially about

22 what DarkOwl services actually are?

23         *MR. HOLT:*  That's an excellent question, Your Honor.

24 What you've described is a concept called initial interest

25 confusion, and it is applicable only in direct competitor

1    situations.

2          THE COURT:  Okay.  I'm --

3          MR. HOLT:  Are you good?

4          THE COURT:  I'm good.  I'm understanding the --

5    yeah -- the point now.  Thank you.

6          MR. HOLT:  So there is no conceivable world in which

7    DarkOwl is unfairly taking advantage of the goodwill that

8    ArkOwl has built up in its brand because consumers simply do

9    not associate the brands.

10          Over the past six years, DarkOwl and its founders have

11    invested millions of their own dollars in building the brand

12    and earning its reputation in its niche industry.  Requiring

13    DarkOwl to change its brand at this stage in its business would

14    not only significantly and unnecessarily damage DarkOwl, but it

15    would ultimately have no meaningful impact on the consuming

16    public, because confusion is at the bedrock of the trademark

17    laws.

18          Moreover, it's unclear if an order excluding DarkOwl

19    from using its mark would even benefit Mr. Daline and, you

20    know, protect his trademark.

21          THE COURT:  Is that part of the test, though?  Where

22    in the test is the Court asked to weigh whether requiring one

23    party to change its mark would have an impact on the other

24    party?

25          MR. HOLT:  Well, Your Honor, the reason, you know, I

1   explained the investment that DarkOwl has made is because it's

2   been in the marketplace for six years; it's devoted significant

3   investment; it's developed goodwill in the marketplace; and

4   notwithstanding all of that use, there has been no confusion.

5   So to issue an order that after six years of use, investment,

6   and brand building requires them to start the rebranding

7   process from scratch, it's unconscionable.

8          THE COURT:  Okay.  I understand.  It's sort of an

9   equitable argument.

10         MR. HOLT:  It is.

11         THE COURT:  Okay.  Fair enough.

12         MR. HOLT:  Okay.  So in closing, Your Honor, we ask

13  that you find no likelihood of confusion here.

14         THE COURT:  All right.  Thank you.

15         The case stands submitted.  As I indicated, I'm

16  looking forward to your amended proposed findings of fact and

17  conclusions of law.  The more specific you are with respect to

18  the evidence that you believe supports your contentions in

19  those amended proposed findings of fact and conclusions of law,

20  I can I think honestly say the quicker you're going to get an

21  order from the Court.  We will cross-reference your references

22  to the evidence very carefully, and they will be helpful to us

23  in getting our order done.

24         So I thank counsel for your patience with the Court

25  and with the questions.  And the matter will stand submitted,

1    and we'll be in recess.  Thank you.

2            (Recess at 4:55 p.m.)

3                        **I N D E X**

4    **Witness**                                              **Page**

5       MARK TURNAGE
            Direct Examination By Mr. Frasier          192
6            Cross-examination By Mr. Buxbaum           234
            Redirect Examination By Mr. Frasier        268
7
     Closing Argument By Mr. Frasier                   278
8    Closing Argument By Mr. Holt                      303

9

10                   REPORTER'S CERTIFICATE

11          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
12
            Dated at Denver, Colorado, this 3rd day of July, 2023.
13

14                        _Therese Lindblom_

15                    _____
                     Therese Lindblom,CSR,RMR,CRR
16

17

18

19

20

21

22

23

24

25